Case No. _____                    19-415-JPG

"Cristina Nichole Iglesias"        § U.S. District Court

(nee Cristian Noel Iglesias),       § Southern District

Vs.                                § Illinois —

B. True, Warden,      et al.,      § Benton Division

---

## Original Complaint

---

To the Honorable District Court:

Comes Miss Cristina Nichole Iglesias, in defense of herself, and for the sake of all that is good and decent, holding her high with Dignity as she Respectfully appears, in a last Resort Effort to address the continued suppressing of her basic and inalienable Rights as a human being and female prisoner of the Federal Bureau of Prisons.

Relying entirely upon a dear friend to assist her, in the composition and introduction of her claims, as well the Prosecution thereof, Miss Iglesias (hereafter "Plaintiff"), Presents the following Civil Rights Action.

Iglesias v. True, et al.
Original Complaint
Pg. Two

## Jurisdiction and Venue

1. This Court has Jurisdiction over this Action Pursuant To To 28 U.S.C. §§ 1331 (3) and (4). The issues in controversy arise under 42 USC §§ 1985 and 4042 as well as The Americans With Disabilities Act (ADA) 42 USC § 12101, et. seq.

2. Venue properly lies in this District Pursuant To 28 USC § 1391 (b)(2), because the events giving Rise To this Cause of action occurred Most Recently at USP Marion, in Marion, Illinois, in the Southern District of Illinois.

## Parties

3. Plaintiff Cristina Nichole Iglesias (nee Cristian Noel Iglesias) is and was, at all times Relevant hereto, a Prisoner in the Custody of the Federal Bureau of Prisons (hereafter "BOP").

Iglesias v. True, et al.
Original Complaint
Pg. three

### Parties

4. Defendant B. True is, and was at all times relevant hereto, the Warden of USP Marion, in Marion, Ill.;

### Fictitious Name or Doe Clause

5. The True Names or capacities, whether individual, official, or otherwise, and defendantship of defendants Does #1 through #10, inclusive, are unknown at the time of the filing of this Complaint to Plaintiff, who therefore sues said defendants by such fictitious names and asks leave of the Court to amend this Complaint to show their true names and/or capacities, as well as defendantship, when the same have been ascertained.

Plaintiff is informed and believes, and based upon such information and belief, alleges that each defendant designated herein as a DOE was responsible for the events causing injury to Plaintiff as hereinafter alleged.

Iglesias V. True, et al.
Original Complaint
Pg. Four (4)

## Parties

6. Defendant Ian Connors, is and was, at all times Relevant hereto, the National Inmate Appeals Administrator of the BOP;

7. Doe #1, Regional Director Responsible for the Review of the Warden's Administrative Remedy Response and issuing Findings based thereon;

8. Doe #2, Staff Psychologist, Marion USP, Responsible for Treatment of Plaintiff's underlying medical condition and making Recommendations related thereto;

9. Doe #3, Chief Psychologist, at all times Relevant to the Claims herein, of USP Marion;

10. Doe #4, Clinical Director over USP Marion, at all times Relevant to the Claims set forth herein;

11. Doe #5, Chief Psychiatrist of Marion USP, at all times Relevant hereto;

12. Doe #6, BOP Medical Director at all times Relevant;

Iglesias v. True, et al.
Original Complaint
Pg. Five (5)

## Parties

13. Doe #7, BOP Health Services Director at all times
    Relevant to the claims set forth herein;

14. Does #8 through       , members of the BOP Endocrin-
    ology Transgender Clinical Care Team responsible
    for the acts and omissions described herein;

15. Doe #9, Director of the BOP;

16. Deborah Schult, Asst. Director Health Services;

17. Dr. Alix McLearen, Women and Special Populations
    Branch Administrator; and

18. Donald Trump, President and Chief Executive
    of the United States of America.

19. Doe #10, United States Attorney General.

Iglesias v. True, et al
Original Complaint
Pg.

## Parties

- Due to the Complex Nature of this action, and the diversity of the claims involved, as well as Plaintiff's status as a Pro Se Litigator, the Defendants are sued in both their individual AND official Capacities, where Applicable.

- Plaintiff RESERVES the Right To add defendants as this case develops and NAMES become available, Through discovery or otherwise.

## Jury Trial

- Plaintiff demands a jury Trial, if Necessary, To determine Matters of Fact which may be in dispute, and the issues of damages.

Iglesias N. True, et al.
Original Complaint
Pg:

## Previous Lawsuits

. Plaintiff has filed No other lawsuits dealing with the
same facts alleged in the instant action. Plaintiff's
history of Previous lawsuits is attached hereto, and
thereby incorporated. (Exhibit No. ___.)

∘ ## Exhaustion

. Plaintiff has exhausted available alternative remedies.

## Relevant Facts

. Despite being born anatomically male, on 06/10/1974,
Plaintiff is a female.

At age Twelve (12) Plaintiff told her Mother of her
desire for sexual Reassignment surgery.

. Plaintiff has been in BOP custody since 1994.

. Plaintiff has been Recognized as a trans sexual
by the BOP, Receiving hormone therapy since 2015
at F.C.I Terre Haute, In

Iglesias v. True, et al
Original Complaint
Pg.

## Relevant Facts

. Plaintiff has a lengthy history of being the victim of sexual abuse while incarcerated

. Plaintiff also has a lengthy history of Protective Custody

. Plaintiff is currently diagnosed with Gender Dysphoria (See attached BOP "Sensitive but Unclassified" Psychology services Diagnostic formulation.)

. Plaintiff also has a lengthy history of suicidal ideation, as early as 13 yrs old. (See attached)

. Plaintiff cut herself in a self-castration attempt in 2009.

. Plaintiff's risk for suicide required staff action on at least thirty-three (33) occasions in the BOP.

. Plaintiff is a female, suffering cruel hardships as a result of being held in a men's prison.

. Plaintiff is being required to live, work, & sleep

Iglesias V. True, et al.
Original Complaint
Pg.

## Relevant Facts

. and eat among males, living outwardly as a male.

. Plaintiff is being denied the standard of care established by the World Professional Association for Transgender Health including sexual Re assignment surgery and social transitioning; as well as epilation (hair Removal).

. Plaintiff has Requested that the BOP Refer to her in all documentation as Female. The BOP refuses, responding that there is no "obligation" to do this until the Transgender Executive Council deems placement in a Female Facility appropriate. (See Relevant Grievance Response)

. Plaintiff has Repeatedly Requested transfer to a Female institution and has been Repeatedly denied. (See Relevant Grievance Responses attached hereto.)

. Plaintiff's continued Placement in an all male Prison exacerbates her distress and condition unnecessarily, while subjecting her to non-stop Pressure, danger, unwanted attention, testosterone, and discrimination.

Iglesias v. True, et al
Original Complaint
Pg.

## Relevant Facts

- Plaintiff has suffered endless abuse in men's prisons, due to being a transgender woman.

- Plaintiff's testosterone levels are no longer in the male range for testosterone levels, and she is in the female range for estrogen levels.

- Plaintiff cannot obtain an erection and is therefore chemically castrate and possibly permanently infertile.

- Plaintiff is and always has been sexually attracted to men.

- Plaintiff endures continuous harassment and abuse by prison staff and inmates.

- Plaintiff has reported numerous incidents of abuse, but faces long periods of isolation in lockup for investigation(s). Therefore, most incidents go unreported.

- Isolation takes an enormous psychological toll on Plaintiff.

- Plaintiff lives in a constant state of distress.

Iglesias v. True, et al
Original Complaint
Pg.

## Relevant Facts

. Plaintiff has Requested Sex Reassignment Surgery. The BOP has NOT taken action on this Request, acknowledging only Receipt of the Request almost a year & a half ago. (See attached Relevant Grievance Response.)

. It is the passage of so much time which would indicate deliberate INDIFFERENCE To a serious medical NEED. No action, NO update, NO HOPE.

. Plaintiff Requested laser hair REMOVAL, after advising officials that the presence of Facial hair was causing her "Great Distress". Relief was denied. (See attached Relevant Grievance Response.)

. Plaintiff has been Receiving hormone therapy, but avers that medication alone is NOT Enough To TREAT her SEVERE gender dysphoria, impairing her ability to Function.

. Plaintiff is without access to comparable conditions as the BOP's other FEMALE PRISONERS. (Commissary items, sisterhood,

Iglesias v. Tane, et al
Original Complaint
Pg.

## Relevant Facts

. (Cont'd) empathy, etc.)

. Plaintiff is unable to express herself in a way that reflects her gender identity, as other female prisoners are able to do. (eg., earrings, perfume, lip gloss, etc.) The prison for males at Marion does not allow these items.

. The failure to provide the relief requested amounts to cruel and unusual punishment, and will result in significant injury or unnecessary pain. Given the history of Plaintiff's attempts at suicide, it's clear Plaintiff's medical needs are urgent.

. Additionally, the BOP's Transgender Offender Manual was revised last year to remove gender identity as a consideration for housing facility recommendation(s). The Transgender Executive Counsel (or "Council") "will use biological sex as the initial determination" for Transgender inmates facility assignments. This act subjects Plaintiff to gender discrimination unnecessarily.

Iglesias v. Tene, et al.
Original Complaint
Pg.

## Relevant Facts

. Plaintiff seeks Transfer To a Women's Prison on grounds she'll be less vulnerable To sexual assault, taunting, ridicule, and beatings she's subjected To in male prisons as well as alienation, ostracization, scrutiny, etc.

. In a male prison, Plaintiff's normal behavior (normal for a woman) has nothing but negative effects for her, daily, amounting To a miserable existence for her.

. Removal of facial and body hair is a necessary treatment for the health of transsexual people. (Principles of Transgender Medicine and Surgery, Haworth Press Binghamton, NY 2007)

. More than a year has passed since Plaintiff's request for hair removal and denial of such. (See Grievance Response # 923754-A1 4/06/18)

. The Defendants have failed To make an informed judgment as To whether surgery is appropriate for Plaintiff.

Iglesias v. Tave, et al
Original Complaint
Pg.

## Relevant Facts

• Plaintiff asserts that gender dysphoria intensifies with age and middle-aged gender dysphoric adults experience an exacerbation of symptoms. (See WPATH Standards of Care, attached as Exhibit _3_ .)

• The development of any treatment Plan and subsequent Treatment must be administered by clinicians qualified in treating gender dysphoria. Plaintiff alleges that the medical and mental health clinicians at USP Marion are Not qualified to treat gender dysphoria.

• Said clinicians treating Plaintiff do Not have an established Competence in the assessment and treatment of gender dysphoria, nor are they working under the supervision of such a Professional; as Required by the Standards of WPATH.

• Treatment Plans generated by Providers lacking the Requisite experience can Result in inappropriate care, and Place Patients at significant medical Risk.

Iglesias v. True, et al
Original Complaint
Pg.

## Relevant Facts

○ While Psychotherapy and Counseling can be effective Treatment for gender dysphoria, they cannot substitute for medical intervention where medical intervention is needed. (Surgical intervention.)

○ Additionally, changes to gender expression and Role, to Feminize one's appearance (Referred to as the "Real life experience"), are an important part of Treatment for the condition. (However, it goes without saying, 'Feminizing one's appearance' in a men's prison is not conducive to one's good health.)

○ Some individuals with gender dysphoria experience relief from hormone therapy alone. Individuals with severe gender dysphoria, however, cannot achieve relief without surgical intervention. (Genital Reconstruction.)

○ For many People, it is the only effective treatment.

○ Plaintiff avers she is one of those People.

○ As a Result of her long-term hormonal usage, she

Iglesias v. True, et al
Original Complaint
Pg.

## Relevant Facts

- (Cont'd) is Now hormonally Reassigned. (Has secondary sex characteristics and sex steroid levels which correspond To that of an adult Female.)

- Plaintiff has applied To have her Name legally changed; and has Relentlessly Requested Medical and Surgical care, yet No decision is Made, other than To say it's being Considered.

- Without Surgery, Plaintiff will succumb To Feelings of hopelessness and despair and will be at great Risk For emotional destabilization and Self-harm or suicide. This Risk is Particularly Severe given her history of Prior attempts at Suicide and autocastration.

- Plaintiff suffers significant anxiety and depression as a direct result of her Severe gender dysphoria, and gender affirming surgery is Necessary To Reduce her mental-health Conditions, and risk of suicide.

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

. Count One : Breach of Duty of Care

The defendants named herein exercised deliberate indifference to the safekeeping and care of Plaintiff by failing to provide for the protection and health of Plaintiff as mandated by 18 USCS § 4042.

Specifically, Plaintiff is vulnerable to, and has endured, sexual assault, taunting, and beatings (and continues to be subjected to same) in male prisons. The defendants named herein acknowledge Plaintiff is "overtly feminine" (see attached Psychology Services Diagnostic and Care Level Formulation, pg. 2) and has a lengthy history of sexual abuse while incarcerated, yet they continue to hold Plaintiff in male prisons despite Plaintiff's repeated requests to be transferred to a female institution.

Plaintiff is continuously referred to as "it" and

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

. (Cont'd) "he-she", in the male prisons she's been held in, as well as being groped and threatened with Rape, violence, and death. Unable to safely or comfortably Represent herself as Female in a men's prison Plaintiff suffers devastating Psychological effects.

The acts and omissions of the defendants named herein Fail to comply with 18 USCS §4042 (a)(2) & (3). Plaintiff brings this claim against every defendant named herein, in their official capacities, seeking Relief in the Form of a declaration, as to the relevant duties and Rights encompassed by §4042, as well as Prospective Relief in the Form of an injunction, enjoining said Defendants to comply with §4042, as Relates to the Factual allegations set Forth above, and Provide the safekeeping, Protection, care, and suitable quarters, as Requested, in a Female Prison.

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

. COUNT TWO : Equal Protection "Class of One"

Plaintiff brings this claim under the Fifth Amendment,
alleging she is being treated differently than similarly
situated individuals and that there is No rational basis
for the difference in Treatment.

. As early as November 21, 2016, Plaintiff formally requested
to be transferred to a Female Facility. (See attached Exhibit
Numbered 4 ; letter to Plaintiff from S. Ma'at, Warden.)

. Plaintiff received a Cookie-cutter response, or what
amounted to a Form letter, stating that her request is
"under review". Two and a half years later, Plaintiff's
request is still being denied, with Cookie-cutter
responses that lack substance or genuine reasons. The
Responses are empty, claiming staff is continuing to review
Plaintiff's "specific Needs". (See attached Exhibits 4, 5, & 6.)

. The Defendants have Not demonstrated than any such

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

. COUNT TWO : Equal Protection "Class of ONE"

. (CONT'd) review has taken place or is "ongoing".

. Meanwhile, BOP inmate Peter Langdon, #64023-061, enjoys living as a Female, at FMC (Female Medical Center) in Texas (Carswell). FMC-Carswell is a Facility for Female Prisoners.

. Plaintiff contends that she and Langdon are similarly situated, in that they both born anatomically male and were both assigned to a Male Facility (USP Marion, Marion, Illinois) when transfer to a Female Prison was Requested. Both are male-to-female transgender inmates. There are No Notable differences between them.

∘ Plaintiff contends that there is No Rational basis for the difference in treatment, and any reasonable officer understands that in Factually similar situations inmates are not to intentionally be treated differently.

Iglesias v. True, et al
Original Complaint
Pg.

## Claims

o **Count Three :** Eighth Amendment-Conditions

Plaintiff brings this claim asserting that continued

detention in a Male Prison violates her Right To be

Protected From assault and unnecessarily oppressive

Prison Conditions.

. Incorporating by Reference the relevant Foregoing

Facts and arguments, Plaintiff claims her long history

abuse and sexual assault in male Prisons results From

the deliberate indifference of the Defendants cited

herein.

. Plaintiff has identified as Female all her life, and

is as Feminine as a Flower. She is so effeminate that

it is unconscionable to hold her in a cage with men.

Moreover, the Defendants house her with men who

are sex offenders. (USP Marion is Primarily Sex Offenders.)

. Plaintiff has been on hormone therapy For years, and

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

. Count Three : Eighth Amendment — Conditions

. (Cont'd) is very unmanly. Holding her in a men's prison

is tantamount to dangling a lambchop in a lion's den.

. In a men's prison Plaintiff can't safely behave like

a woman, which is to deny her very Nature. Plaintiff

is incapable of behaving like a man; she can't even pee

standing up. To expect Plaintiff not to be womanly is

like expecting water not to be wet.

. Continuing to hold Plaintiff in a men's prison places her

at a much higher risk of violence and sexual assault.

As the years pass by the Defendants turn a blind eye

toward the obvious risks, demonstrating deliberate in-

difference, pretending Plaintiff is actually being considered

for transfer to a female facility.

. These conditions are not only unnecessarily risky for

Plaintiff, they are very psychologically damaging and

extend immeasurably beyond her court-ordered sentence.

Iglesias v. True, et al.
Original Complaint
Pg:

## Claims

. Count Four : Eighth Amendment-Medical Care

. The Defendants Named herein Violated & Continue
To Violate Plaintiff's Right To be Free From Cruel
and unusual Punishment by being deliberately in-
different To her serious Medical needs.

. Specifically, the BOP has refused To Provide her
Requested Laser hair Removal.

. Under the Eighth Amendment, inmates are entitled
To adequate Medical Care. Estelle v. Gamble, 429
U.S. 97 (1976).

. To establish liability, inmates must show:
   (1) a medical Need is objectively serious; and
   (2) defendants acted with deliberate indifference
      To that serious medical Need.

      Farmer v. Brennan, 511 U.S. 825, 834 (1994)

Iglesias V. True, et al.
Original Complaint
Pg.

## Claims

. Count Four : Eighth Amendment – Medical Care

. Plaintiff incorporates by reference the foregoing facts
and adds that transsexualism as a condition requires
hair removal. (Recognized Standard of Care, attached.)

. Plaintiff complained to BOP officials that facial hair
causes her "GREAT DISTRESS", as well as depression,
sadness, anxiety, and poor self-image.

. The Defendants demonstrated deliberate indifference
when they told her to just shave. (See attached
Grievance Response, No. 923754-A1.)

, The Defendants have failed to make an informed
judgment as to whether laser hair removal is
appropriate for Plaintiff, and to direct her to "just
shave" her face like a man impermissibly denies her
adequate medical care afforded by the Constitution,
as it fails to provide for her mental well-being.

Iglesias v. True, et al
Original Complaint
Pg.

<u>Claims</u>

• <u>Count Five</u> : <u>Eighth Amendment</u> — <u>Medical Care</u>

◦ Plaintiff incorporates by reference the relevant Foregoing Facts, as well as the legal argument (s) presented in Count Four as relates to Medical Care.

• Plaintiff Further alleges that the Defendants named herein have acted, and continue to act, with deliberate indifference towards her need For sex reassignment surgery in violation of the Eighth Amendment.

• Plaintiff alleges she needs sex reassignment surgery because she has severe gender dysphoria and as a result of not undergoing said surgery she has on at least thirty-three (33) occasions during the course of her incarceration been assessed For risk of suicide, with numerous attempts being committed, and Twelve (12) Placements on suicide watch. Additionally, she attempted autocastration in 2009. (See attached Exhibits No. 2

Iglesias v. True et al
Original Complaint
Pg.

## Claims

- Count Five : Eighth Amendment - Medical Care

- Plaintiff Further asserts that the requested surgery is essential and medically necessary to alleviate her severe gender dysphoria.

- Relief from gender dysphoria for Plaintiff cannot be achieved without modification of her primary and/or secondary sex characteristics, in order to establish congruence with her gender identity.

- Denial or hindering of said surgery constitutes deliberate indifference to a serious medical need, because the Constitution requires not just emergent care but also care for conditions that can result in self-harm or psychological suffering.

- Plaintiff made it abundantly clear that having a penis is causing her tremendous suffering. (See attached grievance, No. 920251-A1, dated 1-6-18.)

- More than a year has passed since her request

Iglesias v. True, et al.
Original Complaint
Pg.

<u>Claims</u>

o <u>Count Five</u> : <u>Eighth Amendment – Medical Care</u>

• (cont'd) and the Defendants are no closer to
making an informed decision concerning the surgery.

• (<u>Clarification</u> : More than a year has passed since
exhaustion of Administrative Remedies. (See attached
Response No. 920951-A1) Plaintiff's Request for surgery
was made several years ago. (See attached email to
Butner Health Services Administrator, from Plaintiff,
designated "Exhibit <u>No. 10</u>.)

o The Defendants are simply sitting on their hands,
parroting feel-good policy statements, offering empty
assurances that Plaintiff's needs are being taken
seriously, while nothing happens as the years pass by.
It is more likely, and seems eerily obvious (what
with history staring back at us in the rear-view mirror),
that the Defendants are sadistically biding their time,
waiting for Plaintiff to attempt the surgery herself. (Again.)

Iglesias v. True, et al
Original Complaint
Pg.

## Claims

- **Counts Six-Ten** : <u>Americans With Disabilities Act of 1990</u>

- Title 2 of the ADA creates a Private Cause of Action For damages (42 USC §§ 12101, et seq.,) Resulting From injuries that Constitute substantial limitation(s) on Major Life activity.

- Plaintiff incorporates by reference the relevant foregoing Facts and arguments.

- Plaintiff alleges that the acts and omissions described herein Violate the Plaintiff's Rights and entitlements created by the ADA, such as :

- **Count Six** : <u>Prolonged Detention in Male Prisons</u>
  - Plaintiff alleges that the Defendants have held her in Men's Prisons unnecessarily, and in contravention of the ADA.
  - Said Prolonged detention has deprived Plaintiff of Major Life activities that are typically enjoyed by

Iglesias v. True, et al
Original Complaint
Pg.

## Claims

○ <u>Count Six</u> : <u>Prolonged Detention in Male Prisons</u>

• (Cont'd) other Female inmates. Such activities include, but are not limited to, access to Female-oriented Programming & activities such as games, movies, television, peer interaction and Fellowship, etc.

• Plaintiff cannot function as a Male, due to her severe gender dysphoria and she is essentially a 'Fish-out-of-Water' in a man's Prison.

• The Defendant's failure to allow Plaintiff access to a Female Prison before now, due to her disability (that being having been born with a penis), constitutes the basis for Count Six.

○ <u>Count Seven</u>: <u>Access to Safe Environment</u>

• Plaintiff incorporates the foregoing facts, theorys, & arguments, as relates to the unsafe and dangerous

Iglesias v. True, et al.
Original Complaint
Pg.
<u>Claims</u>

- <u>COUNT SEVEN</u>: <u>ACCESS TO SAFE ENVIRONMENT</u>

- (CONT'd) ENVIRONMENT she's been Forced To abide in, as she's been denied access To a Female Facility due To her Physical disability.

- The NAMED DEFENDANT(s), To Whom the ADA's liability applies, must be held accountable To Plaintiff, For depriving her ACCESS To a safe Prison ENVIRONMENT For Female Prisoners simply because she has a PENIS.

- <u>COUNT EIGHT</u>: <u>LASER HAIR REMOVAL</u>

- Plaintiff incorporates by REFERENCE the Preceding Facts, theorys, and ARGUMENTS, as Relate To access To medical TREATMENT. (i.e., laser hair REMOVAL)

- Plaintiff argues Further that the DEFENDANT(s) are denying her medically Necessary TREATMENT due to her disabilities, which are: 1) her status as a PRISONER; (2) her medical Condition; And (3) inability To Pay.

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

• **Count Nine** : <u>Gender Affirming Surgery</u>

• Plaintiff incorporates by Reference the foregoing facts, arguments, and theorys, as they relate to the failure to grant access to gender affirming surgery.

◦ By denying access to gender affirming surgery the Defendant(s) deprives Plaintiff of major life Activities, because her gender dysphoria is so severe that it impairs her ability to function.

• **Count Ten** : <u>Suppression of Gender Identity</u>

◦ Plaintiff hereby incorporates the foregoing facts as they relate to her condition as a transgender female.

• Plaintiff Requested that the Defendant(s) cause her prison records to reflect "Female", Rather than "Male". (See attached Response No. 985163-A3, Exhibit No. 12)

• The Defendant(s) Refused, placing a major limitation of, or on her life activity of being seen as a woman.

Iglesias v. True et al
Original Complaint
Pg:

## Claims

○ Counts Six — Ten :   ADA Declaratory & Injunctive

. Plaintiff Repeats and Realleges the Preceding Paragraphs as if Fully set Forth in these Counts.

. As described in the Preceding Paragraphs, Plaintiff qualifies as a Person with a disability under the ADA (Gender Dysphoria and Borderline Personality Disorder. (See attached Exhibit No. 2.)

○ As a Result, the Defendants are obligated to Provide Plaintiff accommodations For her disabilities.

○ Plaintiff seeks injunctive and declaratory Relief against the Defendants, in their official Capacities, to Prevent the continued violation of her Rights under the ADA.

○ Specifically, Plaintiff Seeks to apply the Requested Relief to the Claims Presented in the Preceding Paragraphs listed as Counts Six — Ten.

Iglesias v. True, et al
Original Complaint
Pg.

<u>Claims</u>

• <u>Count Eleven</u> :   <u>Freedom of Expression</u>

• Plaintiff incorporates by reference the relevant
  Facts set Forth in Count Ten.

• Plaintiff asserts that the Named Defendants are
  liable to her under the First Amendment For Not
  recognizing her as Female in her Prison Records.
  (See Response No. 945168-A3, Exhibit No. <u>12</u> .)


• <u>Count Twelve</u> :   <u>Gender Discrimination</u>

• Plaintiff incorporates by reference the relevant
  Foregoing Facts.

• Current BOP Policy relating to the Placement of
  Transgender people instructs officials to consider
  "biological sex as the initial determination".
  (<u>Program Statement</u> 5200.04, CN-1 <u>Transgender Offender</u>
  <u>Manual</u> .)

• This amounts to gender discrimination, and offends

Iglesias V. True, et al
Original Complaint
Pg.

## Claims

- Count Twelve :          Gender Discrimination
- (cont'd) Plaintiff's Rights guaranteed by the Constitution
  and several Acts of Congress, to which the Defendants
  are bound.
- Count Twelve will assert a Failure to Protect
  theory under the Eighth Amendment, based upon the
  May 11, 2018, revision implementing the use of biological
  sex as a determination Factor For housing Placement.

- The Eigth Amendment dictates that Prison Officials
  "take Reasonable Measures to guarantee the safety
  of inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994).
- The New Policy Falls well short of a guarantee.
- And as was shown above, 18 USC § 4042 mandates
  that the BOP SHALL Provide For the safekeeping
  of All Persons held in the BOP. Said statute
  does Not discriminate, taking "biological sex" into account.

Iglesias v. True, et al.
Original Complaint
Pg.

## Claims

○ Count Twelve :                    Gender Discrimination

○ The Due Process Clause of the 5th Amendment also proscribes sex-based discrimination, as does Title VII, of the Civil Rights Act of 1964.

○ Defendants Donald Trump, the U.S. Attorney General, and the Director of the BOP, are not only responsible for the May 11, 2018, Revision, but are also capable of changing it back.

○ Further, said Revision directs Prison officials to place transgender Prisoners in male or Female Facilities based on "biological sex" as the initial determination criteria. (See attached Exhibit No. 14.)

○ Under "Sec. 2. Definitions," "biological sex" is not defined. Therefore, the Assessment Factors being vague, the decision-making Process for Facility assignment is arbitrary.

Iglesias v. True, etal
Original Complaint
Pg.

## Claims

. Count Twelve :        Gender Discrimination

. Moreover, there is No Fixed definition of "biological sex" in law or medicine. Until the Revision in question, the term appeared Nowhere in Federal or state law.

. Prison Policies that Force Transgender individuals into Facilities based on assigned sex at birth increase violence and Negative health outcomes for an already vulnerable Population.

. Such Policies reflect deliberate indifference To the safety and well-being of Plaintiff, in Violation of the Eighth Amendment; and also violate long-established Prohibition (s) against discrimination based upon assigned sex at birth.

Iglesias v. True, et ol.
Original Complaint
Pg.

## Relief Sought

○ <u>Count One</u> : As to Count One, Plaintiff set forth her

Requested Relief in the last Paragraph of said claim.

. <u>Count Two</u>: As To Count Two, <u>Plaintiff seeks a declaration</u>

as To the Rights and Responsibilities of the Parties, as

Relates To this claim.

<u>Plaintiff Further seeks</u> Prospective Relief, in the form

of <u>an injunction</u>, directing the Defendants To Afford her

Equal Protection of the law, Treating her No differently

than similarly-situated inmates and Transfer her To a

Female Facility without Further delay.

. <u>Plaintiff seeks damages</u> :

(a) <u>Compensatory</u> : Plaintiff seeks <u>Ten (10) dollars a</u>

<u>day</u>, jointly and severally, From each Defendant <u>For</u>

<u>every day</u> she was held in Male Prisons after she

<u>Requested she be housed with other</u> girls, For

Mental Anguish & suffering associated with the

physical injuries she incurred (autocastration,

*Iglesias v. True, et al.*
Original Complaint
Pg.

## Relief Sought

- Plaintiff Seeks Damages :

    (a) COMPENSATORY : (cont'd) beatings, and sexual assaults she endured during her incarceration), the physical injuries themselves (as supported by medical records and BOP reports attached hereto), and to provide for future mental health treatment she will require as a result;

    (b) Nominal Damages : Nominal damages, in the amount of ONE dollar, for the violation of her Constitutional Right to Equal Protection; and

    (c) Punitive Damages : in the amount of ONE-thousand dollars each, jointly and severally, from each defendant.

- Count Three : As to Count Three, Plaintiff seeks the same Relief listed in Count Two, separately and cumulatively.

Iglesias v. True, et al.
Original Complaint
Pg.

<u>Relief Sought</u>

○ <u>Count Four</u> : As To <u>Count Four</u>, Plaintiff seeks :

(a) <u>Declaratory Relief</u> — stating that Plaintiff's condition required removal of facial hair and that expecting her to "just shave" was wrong ;

(b) <u>Compensatory Damages</u> : Although no amount of money could adequately compensate the injuries, both physically and psychologically, a lady incurs from having to drag a cheap razor across her face every morning, Plaintiff seeks a modest <u>Five Dollars a day</u>, jointly and severally, from each Defendant, for every day she had to scrape whiskers from her face after she requested epilation (and was denied) ;

(c) <u>Nominal Damages</u> : Nominal Damages of <u>one Dollar</u> ;

(d) <u>Punitive Damages</u> : Punitive Damages, in the amount of <u>Five-Hundred Dollars</u>, from each Defendant (to help with the cost of repair, upon

Iglesias v. True, et al.
Original Complaint
Pg.

## Relief Sought

• **Count Four** :  (d) *Punitive damages* : (cont'd) release;

and  (e) *Prospective Relief* : Plaintiff seeks an

injunction, ordering removal of the hair.


○ **Count Five** :  As to *Count Five*, Plaintiff seeks :

(1) *Declaratory Relief* : as described above ;

(2) *Compensatory Damages* : Plaintiff seeks an award

of *Twenty (20) Million dollars*, to cover the costs

of obtaining the surgery herself upon release, and

associated costs, as well as to compensate her

for the injuries suffered as a result of being

held in a men's prison because she has a Penis;

(3) *Prospective Relief* : Plaintiff seeks an injunction

directing the Defendants to provide said surgery

( which would render the compensatory damages

Amendable )

Iglesias v. True, et al
Original Complaint
Pg.

## Relief Sought

- **Counts Six - Ten** : As to Counts Six thru Ten, Plaintiff understands that individuals cannot be held PERSONALLY liable for violations of ADA, nor can individuals be sued in their official capacities under ADA.

  Therefore, Plaintiff will seek damages from Defendant Bureau of Prisons (BOP).

- **Count Six** : ONE HUNDRED dollars a day, for EVERY day — for every day Plaintiff was held in a MAN's PRISON after she requested TRANSFER AND TRANSFER would have been available.

- **Count SEVEN** : ONE hundred dollars a day, for every day Plaintiff was deprived access to a safe ENVIRONMENT.

- **Count Eighth** : ONE hundred dollars a day, for every day Plaintiff had to scrape her face with a razor (which was EVERY MORNING) after she requested removal.

- **Count Nine** : TWENTY Million dollars, for the same basis set forth in Count Five (2).

Iglesias v. True, et al
Original Complaint
Pg.

## Relief Sought

. Count Ten : ONE hundred dollars a day, For every day

the Defendant (s) have persisted in recognizing Plaintiff

as MALE, in her Prison Records, after she insisted

she be shown as Female.

. Count Eleven : As To Count Eleven, First Amendment :

    1.) Compensatory : ONE Hundred dollars a day, For

      the reasons described in Count Ten;

    2.) Nominal Damages : ONE Dollar  ; and

    3.) Prospective Relief : Order, directing Defendant's

      To Recognize Plaintiff as Female, in SENTRY :

    4.) Punitive Damages : ONE-Thousand dollars, Punitive.

. Count Twelve : As To Count Twelve :

    1.) Declaratory Relief : Judgment, as to the Rights

      and Responsibilities of the Parties, as to the issue;

    2.) Prospective Relief : An injunction, directing the

      Defendants to cease use of "biological sex" as a

      Factor For making housing assignments.

Iglesias v. True, et al.
Original Complaint
Pg.

## Declaration in Support

I, Cristian N. Iglesias, 'a.k.a' Cristina Nichole Iglesias,
do hereby declare under Penalty of Perjury that the Facts
asserted in the Foregoing are true & correct, To the best
of my knowledge & Recall.

Respectfully Submitted;

Dated  4-2-19

Cristian Noel Iglesias

Executed in Williamson County, Il.

Iglesias v. True, etal
Original Complaint
Exhibit No. 1

Attached  Exhibits, in
Support  of  Original Complaint

Exhibit No. 1

PREVIOUS Lawsuits

# II. Previous Lawsuits

1. **Parties to previous lawsuits:**
   **Plaintiff(s):** Cristian Noel Iglesias

   **Defendant(s):** Hellen Gilmore et al.

2. United States District Court (District of Hawaii)
3. CV-07-00518JMS/KSC
4. Judge Seabright

5. Civil Rights Action / Habeas Corpus.
6. Dismissed

7. May 2007

8. June 2007

9. Voluntarily dismissed by Plaintiff, DID NOT receive a strike.

1. **Parties to previous lawsuits:**
   **Plaintiff(s):** Cristian Noel Iglesias

   **Defendant(s):** Oden et al. VS True et al.
2. United States District Court (Southern District of Illinois)
3. 3:18-cv-00600-MJR

4. _____
5. Civil Rights Action

6. Case still pending. (Plaintiff is no longer a party to this action).

7. June 2018

8. Still Pending (Plaintiff is no longer a party to this action).

9. Plaintiff voluntarily withdrew from action. (Did not receive a strike).

Iglesias v. True, et al
ORIGINAL Complaint
Exhibit No. 2

Exhibit No. 2

Psych SNCS Diagnostic and
Care Level Formulation

# Bureau of Prisons
## Psychology Services
## Diagnostic and Care Level Formulation

**SENSITIVE BUT UNCLASSIFIED**

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | IGLESIAS, CRISTIAN NOEL | | | Reg #: | 17248-018 |
| Date of Birth: | 06/10/1974 | Sex: | M    Facility: MAR | Unit Team: | UM NORTH |
| Date: | 06/16/2017 10:43 | Provider: | Hampton, Sarah PhD | | |

## Relevant Historical Information

Inmate IGLESIAS is a 43-year-old WHITE anatomical male who identifies as female, serving a 98-month sentence for Mailing Threatening Communications. Her projected release date is 04/26/2023. Inmate Iglesias described a childhood in which her father was physically and emotionally abusive due to his difficulty accepting her femininity and sexual orientation. Following the divorce of her parents, she was raised primarily by her mother, who died during inmate Iglesias's incarceration. Inmate Iglesias has previously reported a history of head injury in a car accident at age 12 with loss of consciousness and subsequent seizures, for which she received anti-seizure medication until 2002. Sentry assignment is GED HAS. Inmate Iglesias reported that she withdrew from formal school in tenth grade due to running away. She denied a history of behavioral problems, learning disorder diagnosis, or special education placement. She said she obtained her GED in state prison. She denied a legitimate employment history, stating she was in state prison beginning at age 17 or 18, was in the community for two months, and has been in BOP custody since. Inmate Iglesias said she is single and has not fathered any children. Of note, she has been in BOP custody since 1994. She denied chronic medical concerns.

Inmate Iglesias has a lengthy history of reporting being the victim of sexual abuse while incarcerated, including but not limited to: 1993 (FL state prison), 2001 (BOP; Otisville, NY), 1993 (threat of an assault), 2001(reported being assaulted), 2013 (reported sexual harassment), 2015 (reported sexual harassment by staff), 2015 (reported sexual harassment by inmates), 2016 (reported sexual harassment by staff), 2016 (reported sexual harassment by staff), 2016 (reported sexual harassment by another inmate), 2016 (reported being sexually propositioned by other inmates), 2016 (reported being fondled by another inmate), and 2017 (reported being sexually propositioned by other inmates and received brief supportive services through a crisis response center). She has previously acknowledged engaging in consensual sexual behavior while incarcerated. Inmate Iglesias also has a lengthy history of requesting protective custody due to gang involvement and has previously been housed at the ADX. She said she used to "run with the Nietas for protection" but has been "Xed out." She does not have a noted history of violence but has incurred multiple incident reports, including 205 Engaging in Sexual Acts, 219 Stealing, and Threatening Bodily Harm. Inmate Iglesias said she communicates regularly with her aunt and uncle, sister, and other relatives.

MENTAL HEALTH HISTORY:
Inmate Iglesias described a history of emotional difficulties since childhood. She has previously been diagnosed with Adjustment Disorder With Depressed Mood and Major Depressive Disorder. In 2009, following a psychiatry consultation, she was diagnosed with Bulimia Nervosa due to reporting purging activity as well as a history of same behavior periodically over the past several years. Records indicate that inmate Iglesias's affective instability is better accounted for by diagnosis of Borderline Personality Disorder. Inmate Iglesias has a history of reporting symptoms of depression and/or anxiety, specifically when she perceives interpersonal stressors or perceives herself to have limited control over her environment. She has demonstrated a history of poor judgment, as she appears to repeat patterns of maladaptive behavior (e.g., unhealthy interpersonal relationships, accruing debt, etc.) despite her ability to acknowledge these patterns as being maladaptive and being provided with treatment (e.g., programming and therapy) to develop more adaptive coping skills and behaviors. She is also currently diagnosed with Gender Dysphoria.

Inmate Iglesias has reported a history of multiple inpatient hospitalizations while in the community due to suicidal ideation. From ages 13 to 16, she underwent outpatient counseling. She has also periodically engaged in counseling and taken psychotropic medication (e.g., Lithium, Fluoxetine, Mirtazapine, Buspirone, Oxcarbazepine, Citalopram) while incarcerated, vacillating between CARE2-MH and CARE3-MH status. She was coded as incomplete from the Challenge program in 2013, expelled from the RHU program in 2015, and incomplete from the Stages program in 2015.

SELF-HARM HISTORY:
Inmate Iglesias has denied a history of suicide attempts with intent to die but reported suicidal behavior including hanging at age 13, overdose on Lithium at age 18, and hanging in 2010 following the death of her mother. In 1991 and again in 1992, she made suicidal threats while in county jail and state custody. She has also reported that she

| Inmate Name: | IGLESIAS, CRISTIAN NOEL | | | Reg #: | 17248-018 |
|---|---|---|---|---|---|
| Date of Birth: | 06/10/1974 | Sex: | M    Facility:  MAR | Unit Team: | UM NORTH |
| Date: | 06/16/2017 10:43 | Provider: | Hampton, Sarah PhD | | |

rehearsed strangulation in 2006 and again in 2015. She reported that she cut her penis in 2009. Overall, inmate Iglesias's risk for suicide has been assessed on approximately 33 occasions during her course of incarceration with the BOP (most often due to an overreaction to stressors, inadequate coping skills, conflict with other inmates, or frustration with circumstances) with 12 placements on suicide watch.

SUBSTANCE USE HISTORY:
Inmate Iglesias reported alcohol and marijuana use when she was younger. She said she experimented with Valium one time. Inmate Iglesias completed BOP drug education in 2012 and NRDAP in 2016.

## Presenting Problem/Symptom

Inmate Iglesias stated, "I struggle every day waking up in this body," adding that she reportedly cut her penis in 2009. She identified mild anxiety surrounding her adjustment to USP Marion and what commissary items would be available for transgender inmates. Speech was normal in rate, volume, and tempo. Mannerisms were overtly feminine. She was alert and oriented to person, place, date, and situation. Grooming and hygiene were appropriate. The inmate denied delusional or psychotic symptoms. She denied recent or current thoughts of self-harm, and there was no overt evidence to suggest suicidal ideation. Inmate IGLESIAS was asked if she was currently suicidal, and she stated, "No." She is not currently prescribed psychotropic medication.

## Diagnostic Reconciliation

As previously noted, features of affective instability appear primarily related to Borderline Personality Disorder diagnosis rather than Major Depressive Disorder.

## Diagnostic Formulation

Inmate Iglesias meets the following criteria, warranting diagnosis of Gender Dysphoria in Adolescents and Adults (portions of the following were copied from a previous Diagnostic and Care Level Formulation note and have been updated accordingly):

1. Marked incongruence between experienced/expressed gender and primary and/or secondary sex characteristics
2. Strong desire to be rid of one's primary and/or secondary sex characteristics because of the incongruence
3. Strong desire for the primary and/or secondary sex characteristics of the other gender
4. Strong desire to be of the other gender
5. Strong desire to be treated as the other gender
6. Strong conviction that one has the typical feelings and reactions of the other gender
B. Her transgender condition is associated with clinically significant distress or impairment in social, occupation, or other important areas of functioning.

Inmate Iglesias also meets criteria for diagnosis of Borderline Personality Disorder. She has exhibited efforts to avoid abandonment (e.g., behavior following news that primary psychologist would be transferring to a different institution), periods of extreme and transient mood changes (marked affective instability apparent throughout review of PDS record), recurrent suicidal behavior and gestures (approximately 33 SRAs while in BOP custody with 12 suicide watch placements), a pattern of unstable and intense interpersonal relationships (e.g., associating with gangs, engaging in sexual behavior while incarcerated), identity disturbance, and marked impulsivity (e.g., suicidal behavior, incurring debts, associating with gangs, description of criminal behavior).

## Care Level Formulation

Justification for CARE2-MH assignment:

History of suicidal behavior in the last five years (most recent suicide risk assessment May 2017).
Lengthy history of disruptive behavior and adjustment concerns.
The inmate requires monthly clinical intervention to maintain outpatient status.

## Diagnosis:

Gender Dysphoria In Adolescents And Adults, F64.1 - Current - *Validated Transgender Male to Female, seeking Gender Affirmation Surgery*

Borderline Personality Disorder, F60.3 - Current - *Generally stable*

| Inmate Name: | IGLESIAS, CRISTIAN NOEL | | | | Reg #: | 17248-018 |
|---|---|---|---|---|---|---|
| Date of Birth: | 06/10/1974 | Sex: | M | Facility: MAR | Unit Team: | UM NORTH |
| Date: | 06/16/2017 10:43 | Provider: | Hampton, Sarah PhD | | | |

Completed by Hampton, Sarah PhD on 06/27/2017 12:17

Iglesias v. True, et al
Original Complaint
Exhibit No. 3

# Exhibit No. 3

WPATH Standards of Care, and,

Study on Epilation, attached.



# Standards of Care

## for the Health of Transsexual, Transgender, and Gender-Nonconforming People

Eli Coleman, Walter Bockting, Marsha Botzer, Peggy Cohen-Kettenis, Griet DeCuypere, Jamie Feldman, Lin Fraser, Jamison Green, Gail Knudson, Walter J. Meyer, Stan Monstrey, Richard K. Adler, George R. Brown, Aaron H. Devor, Randall Ehrbar, Randi Ettner, Evan Eyler, Rob Garofalo, Dan H. Karasic, Arlene Istar Lev, Gal Mayer, Heino Meyer-Bahlburg, Blaine Paxton Hall, Friedmann Pfäfflin, Katherine Rachlin, Bean Robinson, Loren S. Schechter, Vin Tangpricha, Mick van Trotsenburg, Anne Vitale, Sam Winter, Stephen Whittle, Kevan R. Wylie & Ken Zucker

© 2012 World Professional Association for Transgender Health (WPATH). All rights reserved.

7th Version[1] | www.wpath.org

ISBN: X-XXX-XXXXX-XX

1   This is the seventh version of the *Standards of Care* since the original 1979 document. Previous revisions were in 1980, 1981, 1990, 1993, and 2001. Version seven was published in the International Journal of Transgenderism, 13(4), 165–232. doi:10.1080/15532739. 2011.700873

The Standards of Care
VERSION 7

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the *SOC*, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. An example of a reasonable accommodation is the use of injectable hormones, if not medically contraindicated, in an environment where diversion of oral preparations is highly likely (Brown, 2009). Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the *SOC* (Brown, 2010).

Housing and shower/bathroom facilities for transsexual, transgender, and gender-nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization (Brown, 2009).

Institutions where transsexual, transgender, and gender-nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.



# XV

# Applicability of the *Standards of Care* to People With Disorders of Sex Development

## Terminology

The term *disorder of sex development* (DSD) refers to a somatic condition of atypical development of the reproductive tract (Hughes, Houk, Ahmed, Lee, & LWPES/ESPE Consensus Group, 2006). DSDs include the condition that used to be called *intersexuality*. Although the terminology was changed to DSD during an international consensus conference in 2005 (Hughes et al., 2006), disagreement about language use remains. Some people object strongly to the "disorder" label, preferring instead to view these congenital conditions as a matter of diversity (Diamond, 2009) and to continue using the terms *intersex* or *intersexuality*. In the *SOC*, WPATH uses the term DSD in an objective and value-free manner, with the goal of ensuring that health professionals recognize this medical term and use it to access relevant literature as the field progresses. WPATH remains

## B. WPATH Standards of Care

The World Professional Association for **Transgender** Health ("WPATH") has developed Standards of Care for the Health of Transsexual, **Transgender**, and Gender-Nonconforming People ("Standards of Care"), which are recognized as authoritative standards of care by the American Medical Association, the American Psychiatric Association, and the American Psychological Association. Ettner Decl. ¶ 21; see also Deposition of Lori Kohler, M.D. ("Kohler Dep."), ECF No. 67 at 21, at 91-92. The Standards of Care explain that treatment for gender dysphoria is individualized: "What helps one person alleviate gender dysphoria might be very different from what helps another person." Standards of Care, Version 7, ECF No. 10-1 at 5. They address a variety of therapeutic options, including changes in gender expression and role, hormone therapy, surgery, and psychotherapy. Id. at 8.

One treatment for gender dysphoria is sex reassignment surgery ("SRS"). "Vaginoplasty is the definitive male-to-female sex reassignment surgery." Declaration of Dr. Marci L. Bowers ("Bowers Decl."), ECF No. 65 ¶ 15. It involves the removal of the patient's male genitals and creation of female genitals, and has two therapeutic purposes. Id. ¶ 19; Ettner Decl. ¶ 39. SRS for transsexual female patients both removes the principal source of testosterone in the body and creates congruence between the patient's gender identity and her primary sex characteristics. Ettner Decl. ¶¶ 38-39. The Standards of Care explain:

> While many transsexual, **transgender**, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria. For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity.Standards of Care at 36; see also Ettner Decl. ¶ 38 ("For many individuals with severe gender dysphoria, however, hormone therapy alone is insufficient. Relief from their dysphoria cannot be achieved without surgical intervention to modify primary sex characteristics, i.e. genital reconstruction."); Bowers Decl. ¶ 31 ("Although some **transgender** people are able to effectively treat their gender dysphoria through other treatments, sex reassignment surgery for many people is a medically necessary treatment needed to treat gender dysphoria and establish congruence with one's gender identity."). Studies have shown that SRS is a safe and effective treatment for individuals with gender dysphoria. See Standards of Care at 36 ("Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes."); Ettner Decl. ¶ 40 ("Decades of careful and methodologically sound scientific research have demonstrated that sex reassignment surgery is a safe and effective treatment for severe gender dysphoria and, indeed, for many people, it is the only effective treatment."); Bowers Decl. ¶ 28 ("The vast majority of studies have shown that sex reassignment surgery is clinically effective. In my professional experience, the success rate of vaginoplasty is extremely high."); Defendants' Expert Report ("Levine Report"), ECF No. 72-4, at 6-7 (acknowledging that "SRS is not thought to be experimental now that it has been repeatedly positively evaluated for over twenty years").

The Standards of Care set forth six eligibility criteria for vaginoplasty in male-to-female patients:

> (1) Persistent, well-documented gender dysphoria;(2) Capacity to make a fully informed decision and to consent for treatment;(3) Age of majority in a given country;(4) If significant medical or mental health concerns are present, they must be well controlled;(5) 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual);(6) 12 continuous months of living in a gender role that is congruent with the patient's identity.Standards of Care at 39. They also require two referrals from qualified

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

mental health professionals who have independently evaluated the patient. Id. at 19-20. "If the first referral is from the patient's psychotherapist, the second referral should be from a person who has only had an evaluative role with the patient." Id. at 20.

The standards "in their entirety apply to all transsexual, **transgender**, and gender-nonconforming people, irrespective of their housing situation." Id. at 43. They expressly provide that "[p]eople should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons." Id. The Standards allow for "[r]easonable accommodations to the institutional environment," such as the use of injectable hormones where diversion of oral prescriptions is highly likely, but they make clear that "[d]enial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the [Standards of Care]." Id. at 44.

## C. Norsworthy's Treatment

Norsworthy indicated to prison staff that she sought hormone treatment and even

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

17248018

Removal of facial and body hair through electrolysis or laser instruments provides a necessary treatment that allows perceptions of gender based on secondary sex characteristics, and particularly facial cues, to correctly identify transgender women as women.[1] One study noted a mean of 90% hair clearance using an Intense Pulsed Light Source (laser) and that clearance rates did not differ based on whether the individual had undergone any hormone therapy.[2]

Schroeter, C. A., Groenewegen, J. S., Reineke, T., & Neumann, H. A. M. (2003). Ninety percent permanent hair reduction in transsexual patients. *Annals of Plastic Surgery* 51(3): 243-248.

> Transsexualism as a condition requires hair removal. Twenty-five male-to-female transsexual patients were included in this study on epilation using the Intense Pulsed Light Source (IPLS). Patients received a varying number of treatments, depending on their response. A mean hair clearance rate of 90% was achieved in the studied patients. The average number of treatments per patient was nine. A negative correlation was found between hair removal and the age of the patient. Hair removal was also found to be more effective when the patients had not used any needle epilation. No difference in hair removal was found between transsexual patients, who were hormonal, and those who were not. Follow-up lasted an average of 44 months. This study proved that the IPLS has the potential to be effective, permanent, and painless especially in younger patients who have not used any mechanical methods for epilation before photoepilation.

---

[1] Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism*. 2012;13(4):165–232; Ettner R, Monstrey S, Eyler AE. *Principles of Transgender Medicine and Surgery*. Haworth Press Binghamton, NY; 2007; Kreukels BP, Steensma TD, De Vries AL. *Gender Dysphoria and Disorders of Sex Development*. Springer; 2014.

[2] Schroeter, C. A., Groenewegen, J. S., Reineke, T., & Neumann, H. A. M. (2003). Ninety percent permanent hair reduction in transsexual patients. *Annals of Plastic Surgery* 51(3): 243-248.

Iglesias v. True et al
Original Complaint
Exhibit No. 4

Exhibit No. 4

Letter From S. Ma'at, Warden



**U.S. Department of Justice**
Federal Bureau of Prisons
*Federal Correctional Complex*
*Federal Correctional Institution*

*Post Office Box 1000*
*Butner, North Carolina 27509*

December 21, 2016

Iglesias, Cristian Noel
Register No.:   17248-018
Wake Forest Unit

Dear Ms. Iglesias:

I am in receipt of your correspondence to Loretta Lynch, Attorney General, dated November 21, 2016.   This correspondence has been forwarded to my office for response.   In your correspondence, you request to be transferred to a female facility.

Your requests for transfer to a female facility are being seriously considered by the Bureau of Prisons.   The decision to transfer a transgender inmate to a female facility is not one that is taken lightly by the Agency.   It is a decision that involves many factors, one of which is the safety and security of the inmate who would be transferred.   That being said, your request is under review as part of an ongoing process.   I encourage you to continue to work closely with your treatment team, including medical providers and psychologists, to address any issues that may arise in your transition.

Your concerns regarding your safety at the Federal Correctional Institution, Butner, North Carolina, have been forwarded to the appropriate individuals for investigation and review.   I encourage you to talk with not only your Unit Team, but also SIS and Psychology staff, particularly with regard to specific threats to your safety.   Our primary concern is the safety and security of all inmates.   All staff receive frequent training in gender related issues and strive to treat inmates according to the inmate's reported gender.

If you have further concerns regarding this matter, please refer them to your Unit Team. I trust this addresses your concerns.

Sincerely,

S. Ma'at
Acting Warden

Iglesias v. True, et al
Original Complaint
Exhibit No. 5

## Exhibit No. 5

Administrative Remedy

No. 914685-A1

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: Iglesias, Cristian N.        17248-018        C-1        FCI Cumberland
 LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

Part A—REASON FOR APPEAL I am appealing the Regional Directors response to my Request to be transferred to a female Prison. I am a transgender female on hormone therapy and I have breast and am very effeminate in my mannerisms and I identify as a female and am recognized and validated transgender female with a current CmA-as, tm m2F.(*In the response it appears that I just was recognized on 2-2-17, as a transgender female, the CmA SENTRY assignment was due to new Program Statement-of: RSD/FoB-#5200.04-Dated:1-18-17. I have been recognized by the BoP since 2015, I am transitioning to a female with the end result of having gender affirming surgary part of my treatment is to live "real time experience" as a female and gender consolidation meaning female. I request this transfer to a female Prison so that I can continue my treatment, the next Phase as well be safer for me. No PREA. Please grant my request.

5-16-17        * Exhibit Enclosed *        C.      I 7248-018        13585
DATE        SIGNATURE OF REQUESTER

Part B—RESPONSE



RECEIVED

MAY 3 1 2017

Administrative Remedy Section
Federal Bureau of Prison

_____        _____
DATE        GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE        CASE NUMBER: 897368-A1

Part C—RECEIPT

        CASE NUMBER: _____

Return to: _____
 LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____                _____        BP-231(13)
DATE                SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL        APRIL 1982

Administrative Remedy No. 914685-A1
Part B - Response


This is in response to your Central Office Administrative Remedy Appeal, wherein you state that you meet the requirements to be considered as a female due to your diagnoses of gender dysphoria. For relief, you request to be transferred to a female institution.

We have reviewed documentation relevant to your appeal and, based on the information gathered, concur with the manner in which the Warden and Regional Director addressed your concerns at the time of your Request for Administrative Remedy and subsequent appeal.  In accordance with Program Statements 5324.12, Sexually Abusive Behavior Prevention and Intervention, and 5200.04, Transgender Offender Manual, decisions regarding transgender inmate designations are carefully scrutinized and made with safety and security as vital considerations.  The record reflects that the Central Office Transgender Executive Counsel reviewed and approved of your close supervision transfer to USP Marion.  This placement was determined to be commensurate with your current programming and security needs.  You are advised to participate in recommended programming as well as communicate your needs/concerns with your Unit Team, Psychology Services, and Health Services.

Staff will continue to review your specific needs on a regular basis to determine your appropriateness to remain at your current facility.

Accordingly, this response is for informational reasons only.


_____                    _____
Date                                         Ian Connors, Administrator
                                             National Inmate Appeals

Iglesias v. True, et al
Original Complaint
Exhibit No. 6

# Exhibit No. 6

Administrative Remedy
Response No. 897368-A1

Administrative Remedy Number 897368-A1
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal wherein you request a transfer to a female facility.

Following our review, we find your complaint is repetitive to
Central Office Administrative Remedy Appeal number 865332-A1,
for which we have previously provided a response.  That is, we
do not find the appeal is materially or substantively different
and, as such, we refer you to that response, rather than
elaborating further with like conclusions.

Accordingly, we find your appeal repetitive and have closed it
as such.

_____                    _____
Date                                       Ian Connors, Administrator
                                           National Inmate Appeals

Iglesias v. True, et al
Original Complaint
Exhibit Seven

Exhibit No. 7

Administrative Remedy,

Response No. 923754-A1

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: **Iglesias, Cristian N.**            **17248-018**          **X**          **USP Marion**
      LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A - REASON FOR APPEAL**

I am appealing the response to my request for laser hair removal (facial), that
I feel is totally inadequate.  I am requesting to have laser hair removal (facial).
This is part of my treatment in transitioning to a woman.  Having facial hair
causes me GREAT DISTRESS, as well as sadness, depression, anxiety, and poor
self-image.  The FBOP has an obligation to give me this medically necassary
procedure.  This is NOT cosmetic.  The FBOP has allowed this in other transgender
female inmates settlement agrements, in court.  I have been to sick call (per
response), and the typical response to my request is to just shave.  This
causes me even further distress, depression, and worsens my self-image.

    03-07-18                                   17248-018
      DATE                                   SIGNATURE OF REQUESTER

**Part B - RESPONSE**

**RECEIVED**

MAR 1 4 2018

Administrative Remedy Section
Federal Bureau of Prisons

_____                              GENERAL COUNSEL
      DATE
                                    CASE NUMBER: *923754·A*
ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**

                                            CASE NUMBER: _____

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____                              _____
      DATE                              SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

UPN LVN                    PRINTED ON RECYCLED PAPER

**Administrative Remedy No. 923754-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy
Appeal wherein you allege you have been denied laser hair
removal.  You contend you are requesting laser hair removal as
part of your transition to a woman.  You assert having facial
hair causes you mental distress.  For relief, you request laser
hair removal.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  Our succeeding review reveals at present, your clinical
provider has not indicated the need for laser hair removal as
part of your treatment plan.  You were last evaluated by
Psychology Services on March 9, 2018.  During the encounter, you
reported no major emotional or environmental problems since you
last contact with Psychology Services.  If you are having
issues, you need to request sick call or Psychology Services for
your concerns.  Your primary care team will continue to make
recommendations as needed.  As recommendations are made, a
course of treatment will be determined.  Given this, we shall
defer diagnostic testing and treatment interventions to the
Health Services staff at the local level.  Based on this
information, there is no evidence to substantiate your claim of
being denied appropriate medical care.

The record reflects you have received medical care and treatment
in accordance with evidence based standard of care and within
the scope of services of the Federal Bureau of Prisons.  You are
encouraged to comply with proposed medical treatment so Health
Services can continue to provide essential care and to contact
medical personnel through routine sick call procedures should
your condition change.

Considering the foregoing, your appeal is denied.


_____
Date

Ian Connors, Administrator
National Inmate Appeals

Iglesias v. True, et al
ORIGINAL Complaint
Exhibit No. 8

Exhibit No. 8

Administrative Remedy

No. 920251 - A1

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: **Iglesias, Cristian   N.**          **17248-018**          **X**          **USP Marion**
_____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A - REASON FOR APPEAL**

I am appealing to the Bureau of Prisons regarding my request for sexual reassignment surgery at the earliest opportunity. delaying this process leads to emotional and psychological distress, depression, anxiety, stress, and thoughts of self mutilation (because of my gender dysphoria). The only appropriate treatment option at this tinme is sexual reassignment surgery. My gender dysphoria, making me a transgender female, causes me GREAT pain and psychological torture, due to having body parts that make me a biological male. TThe FBOP refusing or hindering in any way to give me sexual reassignment surgery is a violation of my Constitutional rights  (under the 8trh amendment- Cruel & Unusual Punishment). Please approve me for sexual reassignment surgery as I clearly qualify for this procedure, and as you say: "I am continue adhering to institution rules as well as treatment and programing recommendations", witch i have been doing. The FBOP has an obligation to provide such treatment.

_____1-6-18_____                          _Cristian_ _____17248-018_
DATE                                        SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

JAN 1 8 2018

Administrative Remedy Section
Federal Bureau of Prisons

_____          _____
DATE                             GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE       CASE NUMBER: _92251 A1_

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

_____          _____
DATE                             SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)
JUNE 2002

Iglesias v. True, et al
Original Complaint
Exhibit No. 9

Exhibit No 9

Administrative Remedy

Response No. 920251-A1

Administrative Remedy No. 920251-A1
Part B - Response

This is in response to your Central Office Administrative Remedy
Appeal wherein you request sexual reassignment surgery without
delay.  You allege the Bureau of Prisons is violating your
Constitutional rights by refusing or hindering this surgery.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  Further, Program Statement 6031.04, Patient Care,
provides that inmates in the custody of the Bureau of Prisons
with a possible diagnosis of Gender Identity Dysphoria (GID)
will receive a current, individualized assessment and
evaluation.  Treatment options will not be precluded solely due
to level of services received, or lack of services, prior to
incarceration.  If a diagnosis of GID is reached, a proposed
treatment plan will be developed which promotes the physical and
mental stability of the patient.  Treatment plans will be
reviewed regularly and updated as necessary.

The Transgender Clinical Care Team (TCCT) has acknowledged they
have received your parent institution's request for you to
receive gender reassignment surgery.  Health Services will notify
you when a decision has been made.  Given the foregoing, we
shall defer all surgical approvals until the TCCT reaches a
decision.

The record reflects you have received medical care and treatment
in accordance with evidence based standard of care and within
the scope of services of the Federal Bureau of Prisons.  You are
encouraged to comply with proposed medical treatment so Health
Services can continue to provide essential care and to contact
medical personnel through routine sick call procedures should
your condition change.

Considering the foregoing, this response is provided for
informational purposes only.


3|2|18
_____                    _____
Date                               Ian Connors, Administrator
                                   National Inmate Appeals

Iglesias V. True, et al
Original Complaint
Exhibit No. Ten (10)

Exhibit No. 10

email to Ms. Daniels,
dated 08/02/16

TRULINCS  17248018 - IGLESIAS, CRISTIAN NOEL - Unit: BUT-W-A

---

FROM: 17248018
TO: BUT/Health Systems Administrator
SUBJECT: ***Request to Staff*** IGLESIAS, CRISTIAN, Reg# 17248018, BUT-W-A
DATE: 08/02/2016 03:52:26 PM

To: Ms.Daniels
Inmate Work Assignment: WK-ICP

I am writing this to get some clarification from you, i received my Administrative Remedy from the Mid-Atlantic [BP-10]today
8/2/16 in regards to  my Request for the sexual reassignment surgery, in the response ,it stated that Central Office had made
recommendations in order for them to consider me for the surgery and that i should get with my local health care team to get
these reccomendations?I am asking you to please let me know what were the reccomendations and what steps are needed to
continue the process? Please let me know. Thank you very much.

CC-File/Printed 08/02/16
Cristian Iglesias #17248-018

Iglesias v. True, et al
Original Complaint
Exhibit No. Eleven (11)


Exhibit No. 11

email To AW-Maat,
dated 08/15/2016

TRULINCS 17248018 - IGLESIAS, CRISTIAN NOEL - Unit: BUT-W-A

---------------------------------------------------------------------------------

FROM: 17248018
TO: BUT/AWO
SUBJECT: ***Request to Staff*** IGLESIAS, CRISTIAN, Reg# 17248018, BUT-W-A
DATE: 08/15/2016 11:48:36 AM

To: AW-Maat
Inmate Work Assignment: WK-ICP

I have been trying to get these recommendations from Medical. To no avail, can you please ensure that Medical responds to my request to find out what i need to do to get my Sexual reassignment surgery from Central Office. Thank you.
-----IGLESIAS, CRISTIAN NOEL on 8/2/2016 3:52 PM wrote:

>     .

I am writing this to get some clarification from you, i received my Administrative Remedy from the Mid-Atlantic [BP-10]today 8/2/16 in regards to  my Request for the sexual reassignment surgery, in the response ,it stated that Central Office had made recommendations in order for them to consider me for the surgery and that i should get with my local health care team to get these reccomendations?I am asking you to please let me know what were the reccomendations and what steps are needed to continue the process? Please let me know. Thank you very much.

CC-File/Printed 08/02/16
Cristian Iglesias #17248-018

Iglesias v. True, et al
Original Complaint
Exhibit No. Twelve (12)

Exhibit No. 12

Administrative Remedy &

Response No. 945168-A3

CRISTIAN NOEL IGLESIAS, 17248-018
MARION USP    UNT: UM NORTH    QTR: X02-229U
P.O. BOX 2000
MARION,  IL 62959

U.S. Department of Justice

**Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __Iglesias, Cristian N.__ __17248-018__ __X__ __USP-Marion__
LAST NAME, FIRST, MIDDLE INITIAL REG. NO. UNIT INSTITUTION

**Part A - REASON FOR APPEAL** I am Appealing the Regional Director response.
I am Requesting that Bureau of Prisons change my gender on all documents including Sentry, from Male to Female. As a transsexual/transgender femal diagnosed with gender dysphoria, it is torturous to be labeled as a male on documents. I have met all the requirements to have my Gender Changed. I have taken all steps that are available to me (including requesting gender affirming surgery).* Please see attached medical document written by Randall Fess MD/CD. A denial of this request would be a clear violation of the 8th amendment to my constitutional Rights. "Cruel & Unusal Punishment." My gender Identity is female, my hormone levels are female and all documents including Sentr should Reflect female.

__9-21-18__    __Cristian Iglesias__
DATE                         SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED
OCT 0 2

RECEIVED
NOV 0 2018

Administ...
Federal B...

_____                    _____
DATE                                     GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE          CASE NUMBER: __965168-A, A2__

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**Part C - RECEIPT**
                                     CASE NUMBER: _____

Return to: _____
          LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION
SUBJECT: _____

_____          ☸          _____
DATE                            SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

                                                            BP-231(13)

**Administrative Remedy No. 945168-A3**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal wherein you request your gender be modified to reflect female in SENTRY and on all documentation.

We have reviewed the documentation related to your appeal and, based on this review, we concur with the manner in which the Warden and Regional Director addressed your concerns.  Until the Transgender Executive Council deems you appropriate for placement in a female facility, there is no obligation to modify your SENTRY or documentation to reflect female.  Staff determinations in this matter are consistent with the requirements of Pursuant to Program Statement 5200.04, <u>Transgender Offender Manual</u>.

Accordingly, your appeal is denied.

_2 | 5 | 19_
Date

Ian Connors, Administrator
National Inmate Appeals

```
   MARFM          *ADMINISTRATIVE REMEDY GENERALIZED RETRIEVAL *      02-19-2019
 PAGE 191 OF 191 *                FULL SCREEN FORMAT          *      09:32:29


 REGNO: 17248-018  NAME: IGLESIAS, CRISTIAN
 RSP OF...: MAR UNT/LOC/DST: UM NORTH            QTR.: X02-229U    RCV OFC: BOP
  REMEDY ID: 945168-A3       SUB1: 26TM SUB2: 32ZM DATE RCV:    11-20-2018
 UNT  RCV..: UM NORTH    QTR RCV.: X02-229U      FACL RCV: MAR
 UNT  ORG..: UM NORTH    QTR ORG.: X02-219U      FACL ORG: MAR
 EVT FACL.: MAR    ACC LEV: MAR  1 NCR  1 BOP  3   RESP DUE: SAT 01-19-2019
 ABSTRACT.: REQ MALE TO FEMALE REFLECT ON ALL DOCUMENTS
 STATUS DT: 02-05-2019  STATUS CODE: CLD STATUS REASON: DNY
 INCRPTNO.:          RCT: P EXT: P DATE ENTD: 11-30-2018
 REMARKS..:




          190 REMEDY SUBMISSION(S) SELECTED
 G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

Iglesias v. True, et al
Original Complaint
Exhibit No. Thirteen (13)

Exhibit No. 13

Administrative Remedy

and Response No. 944828-A1

U.S. Department of Justice

**Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: IGLESIAS,CRISTIAN N.            17248-018            X            USP_MARION
      LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.            UNIT            INSTITUTION

**Part A - REASON FOR APPEAL** I AM APPEALING THE BUREAU OF PRISONS REVISION TO THE TRANSGENDER - OFFENDER MANUEL - P-5200.04 CN-1,WHICH STATES OFFICIALS HAD TO CONSIDER TRANSGENDER INMATES "GENDER IDENTITY" WHEN MAKING DECSIONS ABOUT PRISON PLACEMENT,NOW OFFICALS MUST USE BIOLOGICAL SEX AS THE INITIAL DETERMINATION FOR PLACEMENT DECSIONS.BIOLOGICAL  SEX IS AN ARBITARY STNDARD . AND IT IS UNCLEAR HOW THE BUREAU OF PRISONS OR INDIVIDUAL OFFICALS WILL INTERPRET IT AND CAUSE HARM TO THE TRANSGENDER INMATE,TRANSGEDERS WITH GENDER DSYPHORIA ARE AT EXTREMLLY HIGH RISK ,AND RELY ON STAFF KEEP THEM SAFE.AND USING BIOLOGICAL  SEX WHEN MAKING IMPORTANT DECSIONS FOR TRANSGENDER INMATES SHOULD NOT BE PUT INTO SITUATIONS WHERE THEY ARE HURT MENTALLY,DUE THE FEDERAL BUREAU OF PRISONS NOT TAKING INTO ACCOUNT THE INMATES GENDER IDENITIY.
I THEREFORE,REQUEST THE FEDERAL BUREAU OF PRISONS REVISE POLICY - P-5200.04 CN-1,TO ONCE AGAIN STATE THE BUREAU OF PRISONS STAFF " MUST USE GENDER IDENITITY" WHEN MAKING DECSIONS ABOUT PRISON PLACEMENT FOR TRNASGENDER INMATES.
STOP BUREAU OF PRISONS OFFICALS FROM BEING "DELIBERATE INDEFFERANCE"WHICH IS A VIOLATION OF THE UNITED STATES CONSTITUTION,8th AMENDMENT FOR TRANSGENDER INMATES.

September 21, ,2018                    Cristian Iglesias
      DATE                          SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

OCT 0 2 2018

Administrative Remedy Section
Federal Bureau of Prisons

                                    GENERAL COUNSEL
      DATE                          CASE NUMBER: 944828-A1
ORIGINAL: RETURN TO INMATE

**Part C - RECEIPT**
                                    CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION
SUBJECT: _____

      DATE                          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

Administrative Remedy Number 944828-A1
Part B - Response


This is in response to your Central Office Administrative Remedy
Appeal wherein you request a revision to Program Statement
5200.04, CN-1, <u>Transgender Offender Manual</u>.

We have reviewed documentation relevant to your appeal and,
based on our findings, concur with the manner in which the
Warden and Regional Director responded to your concerns at the
time of your Request for Administrative Remedy and subsequent
appeal.  Pursuant to Program Statement 1221.66, <u>Directives</u>
<u>Management Manual</u>, "Changes to existing PSs are accomplished by
issuing Change Notices (CNs), which also are approved by the
Director (or acting Director)." A revision of Program Statement
5200.04, CN-1 will not be implemented at this time.

Accordingly, your appeal is denied.



_____                    _____
     10/4/18                             Ian Connors, Administrator
Date                                     National Inmate Appeals

Iglesias v. True, et al
Original Complaint
Exhibit No. 14

Exhibit No. 14

Transgender Offender Manual

Revised May 11, 2018



**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE

| | |
|---|---|
| OPI: | RSD/WSP |
| NUMBER: | 5200.04 CN-1 |
| DATE: | May 11, 2018 |

# Transgender Offender Manual

*Approved*: Mark S. Inch
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5200.04, **Transgender Offender Manual**, dated January 18, 2017. The purpose of the Change Notice is to ensure that the Transgender Executive Council (TEC) considers issues related to prison management and security in determining appropriate housing of transgender inmates, including risks posed to staff, other inmates, and members of the public. The clarifications to policy will establish appropriate expectations for the inmate population concerning designations.

The changes are marked with a ==highlight== and inserted into the policy. Deleted text is struck through. In addition, the branch name has been changed from Female Offender Branch to Women and Special Populations Branch.

## 1. PURPOSE AND SCOPE

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population, ==consistent with maintaining security and good order in Federal prisons.==

## 4. STAFF TRAINING

The ==Women and Special Populations Branch== will be responsible for developing training materials and current information on the management of transgender inmates. ==Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public.== This information will be made available to staff on the ==Women and Special Populations Branch== Sallyport page.

## 5. INITIAL DESIGNATIONS

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 7. HOUSING AND PROGRAMMING ASSIGNMENTS

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility ~~location, including a facility housing individuals of the inmate's identified gender~~, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

*Gender identity* – a person's sense of their own gender, which is communicated to others by their gender expression.

*Gender expression* – includes mannerisms, clothing, hair style, and choice of activities.

*Gender nonconforming* – a person whose appearance or manner does not conform to traditional societal gender expectations.

*Transgender* – the state of one's gender identity not matching one's biological sex. For the purposes of this policy, a transgender inmate is one who has met with a Bureau of Prisons psychologist and signed the form indicating consent to be identified within the agency as transgender. This step allows for accommodations to be considered.

*Cisgender* – the state of one's gender identity matching one's biological sex.

*Sexual orientation* – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related.

*Gender Dysphoria* (GD) – a mental health diagnosis currently defined by DSM-5 as, "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." Not all transgender inmates will have a diagnosis of GD, and a diagnosis of GD is not required for an individual to be provided services.

*Intersex* – a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical biological definitions of male or female. Not all intersex people identify as transgender; unless otherwise specified, this policy does not apply to intersex people who do not identify as transgender.

*Transition* – measures that change one's gender expression or body to better reflect a person's gender identity.

## 3. STAFF RESPONSIBILITIES

The following Bureau components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for transgender offenders.

a. **Central Office**

(1) The <mark>Women and Special Populations Branch</mark> is the agency's primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in Bureau custody.  The Branch is responsible for the following functions as they relate to transgender inmates:

- Engaging stakeholders, including serving as the primary point of contact on issues affecting transgender inmates with judges, political figures, and advocacy groups.
- Ensuring the Bureau offers appropriate services to transgender inmates.
- Preparing budgetary requests to deliver national and pilot programs or services affecting transgender inmates.
- Providing guidance and direction to Regional staff and institution leadership on transgender issues.
- Developing and implementing staff training on transgender issues.
- Building a research-based foundation for the Bureau's work with transgender inmates.
- Presenting at internal and external conferences/events regarding the agency's transgender inmates' practices.
- Developing and monitoring monthly reports on the transgender population and institutional programs.
- Issuing an annual report on the state of transgender offenders in the Bureau that will be made available to all staff and stakeholders.
- Advising agency leadership on transgender inmate needs.
- Conducting an annual survey of transgender inmates in the Bureau and sharing results with internal and external stakeholders.
- Providing national oversight of pilot programs and initiatives serving transgender offenders.

(2) The **Health Services Division** oversees all medical and psychiatric activity as it applies to transgender inmates.  Guidance on the most current research-driven clinical medical and psychiatric care of transgender inmates will be provided by the Medical Director.

The Health Services Division also has oversight of a Transgender Clinical Care Team (TCCT). This team will be comprised of Physicians, Pharmacists, and Psychiatrists.  Social Workers, Psychologists, and other clinical providers can also be included when appropriate.  The TCCT will offer advice and guidance to health services staff on the medical treatment of transgender inmates and/or inmates with GD.  Medical staff can raise issues to the TCCT through the Health Services Division.

(3) The **Psychology Services Branch** oversees all psychological mental health programs and services as they apply to transgender inmates, to include providing advice and guidance on

identification and evaluation of transgender inmates, and making recommendations for treatment needs of transgender inmates and/or inmates with GD.

(4) **Central Office Branches/Divisions** of Correctional Services, Psychology Services, Education, Correctional Programs, Reentry Affairs, Residential Reentry Management, Health Services, Health Programs, Social Work, Office of General Counsel, and Trust Fund meet annually with the Women and Special Populations Branch to discuss transgender population needs and evaluate current gender-responsive services. The National Union and the Central Office LGBT Special Emphasis Program Manager will be invited to attend these meetings.

(5) The **Transgender Executive Council (TEC)** will consist of staff members from the Health Services Division, the Women and Special Populations Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel. The TEC will meet a minimum of quarterly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including designation issues. Institution staff and DSCC staff may raise issues on specific inmates to the TEC through the Women and Special Populations Branch. The National PREA Coordinator is consulted as needed.

b. **Regional Offices**

■ Provide oversight to institutions regarding services and other relevant trends managing transgender inmates.
■ Assign transgender responsibilities to the Regional Female Offender/Transgender Coordinator Collateral Duty Assignment. This individual meets quarterly with the Women and Special Populations Branch to discuss staffing and programming needs.

c. **Institutions**

The institution CEO will establish a multi-disciplinary approach to the management of transgender inmates; specifically:
■ Ensure transgender inmates have access to services.
■ Enter tracking information for self-identified transgender inmates by updating SENTRY and other databases (e.g., PDS), as appropriate.
■ Provide appropriate reentry resources that may be specific to the population.
■ Advise the Local Union of transgender inmate management issues, as appropriate.

## 4. STAFF TRAINING

Staff will be provided specialized training in working with unique issues when managing transgender inmates, with refresher training at annual training.  Institutions housing known transgender inmates should provide additional training, if needed.

The Women and Special Populations Branch will be responsible for developing training materials and current information on the management of transgender inmates.  Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public.  This information will be made available to staff on the Women and Special Populations Branch Sallyport page.

In addition, the Prison Rape Elimination Act (PREA) regulations incorporated into the BOP Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** have training requirements concerning pat searches and communication skills for transgender inmates. See 28 C.F.R. § 115.15(f) and 115.31 (a) (9).  Please refer to this Program Statement regarding implementation of those training requirements.

Staff will be provided adequate time to complete these trainings during duty hours.

## 5. INITIAL DESIGNATIONS

The PREA regulations, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**, state in section 28 C.F.R. § 115.42 (c):

> **"In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates…the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."**

Upon receipt of information from a Pre-Sentence Report, court order, U.S. Attorney's Office, defense counsel, the offender, or other source that an individual entering BOP custody is transgender, designations staff will refer the matter to the TEC for advice and guidance on designation.

Institution staff managing pretrial or holdover offenders may also refer cases to the TEC for review.  Any TEC recommendations concerning pretrial inmates will be coordinated with the appropriate United States Marshal's Office.

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 6. INTAKE SCREENING

The PREA regulations in 28 C.F.R. part 115, Subpart A, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** and the Program Statement **Intake Screening,** address intake screening.  Screening of transgender inmates will be conducted in accordance with these policies and all other applicable policies and procedures.

## 7. HOUSING AND PROGRAMMING ASSIGNMENTS

During Initial classification and Program Reviews, Unit Management staff will twice-yearly review the inmate(s) current housing unit status and programming available for transgender inmates; this review will be documented by Unit Management.

The reviews will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's health and safety and does not present management or security concerns.

In making housing unit and programming assignments, a transgender or intersex inmate's own views with respect to his/her own safety must be given serious consideration.

Transgender inmates shall be given the opportunity to shower separate from other inmates.

The agency shall not place transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree , legal settlement, or legal judgment for the purpose of protecting such inmates.

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility ~~location, including a facility housing individuals of the inmate's identified gender~~, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

In considering such recommendations, the TEC will apply all criteria of Section 5, above, and make the following assessments concerning the recommendation:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;
- The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress

==towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments.==

==It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.==

## 8. DOCUMENTATION AND SENTRY ASSIGNMENTS

a. **Medical and Mental Health Information**. Medical and mental health information for transgender inmates will be maintained in the current electronic recordkeeping system in accordance with the Program Statement **Health Information Management**. Medical and mental health information is considered confidential, and may only be released in accordance with appropriate laws, rules, and regulations.

b. **Initial Screening**. For initial designations, designations staff will assign Case Management Activity (CMA) SENTRY assignments if information in the PSR or other documentation indicates a likely transgender identity. The screening codes will be:

> SCRN M2F – inmate should be screened for male to female.
> SCRN F2M – inmate should be screened for female to male.

Any inmate arriving at the designated institution with a screening code is to be referred to the Chief Psychologist or designee for review within 14 days. If the code was assigned in error, the screening code will be removed by the psychologist. If the inmate identifies as transgender, the psychologist will replace the screening code with an identifying code, as indicated below. Holdover facilities will be exempt from this initial screening requirement, as limited available records and brevity of stay do not allow for a comprehensive screening.

Any inmate who arrives without a screening code but identifies as transgender during intake, or at any time during the incarceration period, is referred to the Chief Psychologist or designee and interviewed within 14 days of the inmate notification. Inmates in pretrial status at Bureau facilities may also receive a SENTRY code.

c. **Notification to Staff and Tracking**. After consultation with Psychology Services, and if the inmate affirms his/her transgender identity, the screening code will be updated to a permanent assignment by a psychologist:

> TRN M2F – inmate is male to female transgender (transgender female).
> TRN F2M – inmate is a female to male transgender (transgender male).

The inmate must request to Psychology Services staff that the CMA assignment be entered, and the inmate consents that all staff will therefore be notified that the individual is transgender. The inmate's request will be documented on BP-A1110, Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (included as Attachment A to this policy). Psychology Services will maintain the form in the electronic mental health record and forward a copy of the form to the Unit Team. The Unit Team will maintain the form in the FOI Exempt section of the Central File.

Staff should consult the CMA assignment when interacting with the inmate; e.g., use of pronouns, searches, commissary items, etc., as indicated below.

If there are questions about the need to continue a CMA assignment, the Warden should contact the Women and Special Populations Branch. Should the CMA assignment change, staff members will not be disciplined for the continued provision of accommodations or use of pronouns.

## 9.  HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other necessary medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.

In the event this treatment changes the inmate's appearance to the extent a new identification card is needed, the inmate will not be charged for the identification card.

## 10.  INSTITUTION PSYCHOLOGY SERVICES

Bureau psychologists are available to provide assessment and treatment services for transgender inmates, if appropriate. Guidance on assessment procedures will be provided by the Psychology Services Branch.

If an inmate identifies as transgender, the psychologist will provide the inmate with information regarding the range of treatment options available in the Bureau and their implications. In addition, based upon the psychologist's preliminary assessment and the inmate's expressed interest, a referral to the Clinical Director and/or Chief Psychiatrist may be generated. While the initial interview must be scheduled within 14 days, an assessment may take longer in some instances.

Warden

United States Penitentiary APR 1 2019
Marion, IL. 62959

Date: _____

The enclosed letter was processed through
special mailing procedures for forwarding to you.
The letter has not been opened nor inspected.
If the writer raises a question or problem over
which this facility has jurisdiction, you may
wish to return the material for
further information or clarification.
If the writer encloses correspondence for
forwarding to another addressee, please return
the enclosure to the above address.

RECEIVED

APR 1 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON OFFICE

Cristian Iglesias, #17248-018
United States Penitentiary
P O Box 1000
Marion IL 62959

**$0.00**
R2304N116685-12

MAIL CLEARED
US MARSHALS





PRIORITY MAIL
★ ★ ★
TRACKED
INSURED
★

UNITED STATES POSTAL SERVICE ®

For Domestic Use Only          Label 107R, July 2013

⇔17248-018⇔
Us District Court
** Legal Mail **
301 MAIN ST
Benton, IL 62812
United States

Legal Mail

EXPECTED DELIVERY DAY:  04/13/19


USPS TRACKING NUMBER



9505 5116 0903 9101 2092 19