UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CRISTINA NICHOLE IGLESIAS | ) | |
| (a.k.a. CRISTIAN NOEL IGLESIAS), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19-cv-00415-JPG |
| v. | ) | |
| | ) | |
| IAN CONNORS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOTION TO DISMISS INDIVIDUAL-CAPACITY CLAIM AGAINST
NATIONAL INMATE APPEALS ADMINSTRATOR IAN CONNORS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................. 1

I.   Treatment of Gender Dysphoric Federal Inmates ................................................ 2

    A.  Clinical Interventions ................................................................................... 3

    B.  Institution Transfers for Gender Dysphoric Prisoners ................................ 4

II.  Alleged Shortcomings in Iglesias's Treatment .................................................... 5

    A.  Laser Hair Removal ..................................................................................... 5

    B.  Transfer to a Female Facility ...................................................................... 6

    C.  Gender-Affirming Surgery .......................................................................... 7

ARGUMENT .................................................................................................................... 7

I.   This Court Lacks Personal Jurisdiction. ............................................................... 8

II.  The PLRA Bars Any Claim for Compensatory Damages. .................................... 8

III. This Court Should Decline to Imply a Novel *Bivens* Remedy. ............................ 9

    A.  The Special-Factors Framework ................................................................ 10

    B.  This Case Presents a New *Bivens* Context ............................................... 10

    C.  Special Factors Counsel Against a *Bivens* Remedy .................................. 12

IV. Qualified Immunity Protects Connors. ............................................................... 16

    A.  Iglesias Fails to Establish That Connors Personally Violated Any Right. ....... 16

    B.  Iglesias Alleges No Violation of Any Clearly Established Right. ................ 19

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arar v. Ashcroft*,
    585 F.3d 559 (2d Cir. 2009) ................................................................... 11

*Ariel Investments v. Ariel Capital Advisors*,
    881 F.3d 520 (7th Cir. 2018) .................................................................... 8

*Arnett v. Webster*,
    658 F.3d 742 (7th Cir. 2011) ............................................................. 17, 18

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ................................................................... 16, 19, 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 16

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ................................................................................ 19

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ........................................................................ 1, 9, 10

*Brown v. Fed. Bureau of Prisons*,
    602 F. Supp. 2d 173 (D.D.C. 2009) ....................................................... 14

*Brown v. Holder*,
    770 F. Supp. 2d 363 (D.D.C. 2011) ....................................................... 14

*Brown v. Wilson*,
    No. 3:13CV599, 2015 WL 3885984 (E.D. Va. June 23, 2015) ............... 18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) .................................................................................. 8

*Bush v. Lucas*,
    462 U.S. 367 (1983) ................................................................................ 10

*Campbell v. Kallas*,
    936 F.3d 536 (7th Cir. 2019) ......................................................... passim

*Carlson v. Green*,
    446 U.S. 14 (1980) ............................................................................. 9, 11

*Catlin v. City of Wheaton*,
    574 F.3d 361 (7th Cir. 2009) .................................................................. 20

iii

*Cohen v. United States*,
   151 F.3d 1338– (11th Cir. 1998) ............................................................... 14

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) ..................................................................................... 12

*Davis v. Passman*,
   442 U.S. 228 (1979) ...................................................................................... 9

*Dugan v. Jarvis*,
   725 F. App'x 813 (11th Cir. 2018) .............................................................. 8

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ............................................... 2, 12, 16, 19

*Effex Capital, LLC v. Nat'l Futures Ass'n*,
   933 F.3d 882 (7th Cir. 2019) ...................................................................... 9

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ....................................................... 2

*George v. Smith*,
   507 F.3d 605 (7th Cir. 2007) .................................................................... 17

*Gevas v. Mitchell*,
   492 F. App'x 654 (7th Cir. 2012) .............................................................. 17

*Gibson v. Collier*,
   920 F.3d 212 (5th Cir. 2019) .............................................................. 16, 19

*Giles v. Godinez*,
   914 F.3d 1040 (7th Cir. 2019) .................................................................. 20

*Goree v. Serio*,
   735 F. App'x 894 (7th Cir. 2018) ........................................................ 12, 13

*Grady v. Kinder*,
   No. 18-cv-2159-JPG, 2019 WL 718534 (S.D. Ill. Feb. 20, 2019)............ 13

*Guzman-Martinez v. Corr. Corp. of Am.*,
   No. CV 11-02390-PHX-NVW, 2012 WL 2873835 (D. Ariz. July 13, 2012) .......... 15

*Hardaway v. Meyerhoff*,
   734 F.3d 740 (7th Cir. 2013) .................................................................... 16

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) .............................................................................. 16, 20

*Hernandez v. Mesa*,
   137 S. Ct. 2003 (2017) .............................................................................. 10

iv

*Hoban v. Godinez,*
 502 F. App'x 574 (7th Cir. 2012) .......................................................... 17

*Hodgson v. Mississippi Dep't of Corr.,*
 963 F. Supp. 776 (E.D. Wis. 1997) ........................................................ 8

*Hohol v. Jess,*
 394 F. App'x 318 (7th Cir. 2010) .......................................................... 17

*Hope v. Pelzer,*
 536 U.S. 730 (2002) .............................................................................. 20

*Hopper v. Barr,*
 No. 5:18-cv-01147-MGL-KDW, 2019 WL 3938076 (D.S.C. July 31, 2019) ..................... 8, 17

*Keller v. Walton,*
 No. 3:16-cv-00565-JPG-GCS, 2019 WL 1513498 (S.D. Ill. Apr. 8, 2019) ........................ 9, 10

*Keller v. Walton,*
 No. 16-0565-JPG-GCS, 2019 WL 2494169 (S.D. Ill. Jan. 28, 2019) ..................................... 10

*King v. Cross,*
 No. 12-1280-CJP, 2014 WL 185015 (S.D. Ill. Jan. 16, 2014) ............................................ 13, 14

*Kosilek v. Spencer,*
 774 F.3d 63 (1st Cir. 2014) ............................................................. 6, 7, 19

*Lamb v. Maschner,*
 633 F. Supp. 351 (D. Kan. 1986) ......................................................... 15

*Lopez v. City of New York,*
 No. 05 Civ. 10321(NRB), 2009 WL 229956 (S.D.N.Y. Jan. 30, 2009) ............................ 18, 19

*Marchesani v. McCune,*
 531 F.2d 459 (10th Cir. 1976) ............................................................. 13

*Matter of Gee,*
 815 F.2d 41 (7th Cir. 1987) ................................................................. 14

*McGee v. Adams,*
 721 F.3d 474 (7th Cir. 2013) ............................................................... 17

*Meachum v. Fano,*
 427 U.S. 215 (1976) ............................................................................. 15

*Moody v. Daggett,*
 429 U.S. 78 (1976) ............................................................................... 18

*Moran v. Sondalle,*
 218 F.3d 647 (7th Cir. 2000) ............................................................... 12

*Norsworthy v. Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) ........................................................ 2

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...................................................................................... 16

*Purdue Research Found. v. Sanofi-Synthelabo*,
   338 F.3d 773 (7th Cir. 2003) ......................................................................... 8

*Rasho v. Elyea*,
   856 F.3d 469 (7th Cir. 2017) ......................................................................... 9

*Reeb v. Thomas*,
   636 F.3d 1224 (9th Cir. 2011) ..................................................................... 14

*Richardson v. D.C.*,
   322 F. Supp. 3d 175 (D.D.C. 2018) ............................................................ 19

*Rodriguez v. Copenhaver*,
   823 F.3d 1238 (9th Cir. 2016) ..................................................................... 12

*Roe v. Elyea*,
   631 F.3d 843 (7th Cir. 2011) ....................................................................... 16

*Rosen v. Ciba-Geigy Corp.*,
   78 F.3d 316 (7th Cir. 1996) ......................................................................... 16

*Sain v. Wood*,
   512 F.3d 886 (7th Cir. 2008) ....................................................................... 18

*Simmat v. U.S. Bureau of Prisons*,
   413 F.3d 1225 (10th Cir. 2005) ................................................................... 12

*Tamburo v. Dworkin*,
   601 F.3d 693 (7th Cir. 2010) ......................................................................... 8

*Thornburgh v. Abbott*,
   490 U.S. 401 ........................................................................................... 16, 19

*Turner v. Safley*,
   482 U.S. 78 (1987) ....................................................................................... 15

*United States v. Stanley*,
   483 U.S. 669 (1987) ..................................................................................... 12

*Walden v. Fiore*,
   571 U.S. 277 (2014) ....................................................................................... 8

*White v. Sloop*,
   772 F. App'x 334 (7th Cir. 2019) .................................................................. 9

*Whitford v. Boglino*,
   63 F.3d 527 (7th Cir. 1995) ................................................................... 19

*Wilkie v. Robbins*,
   551 U.S. 537 (2007)................................................................... 10, 15

*Wilson v. David*,
   No. 9:08-cv-618, 2010 WL 610714 n.5 (N.D.N.Y. Feb. 17, 2010).......................... 19

*Wojtaszek v. Litherland*,
   No. 3:08-cv-317-JPG, 2010 WL 1325248 (S.D. Ill. Mar. 26, 2010)....................... 20

*Wright v. Miller*,
   561 F. App'x 551 (7th Cir. 2014) ........................................................ 9

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)................................................................ passim

## Statutes

18 U.S.C. § 3621(b) .......................................................................... 14

18 U.S.C. § 3625 ............................................................................. 14

18 U.S.C. § 3626(g)(2) ....................................................................... 12

18 U.S.C. § 4001 ............................................................................. 13

18 U.S.C. § 4001(b)(1) ....................................................................... 14

18 U.S.C. § 4042(a)(2) ....................................................................... 14

18 U.S.C. §§ 3621–3624 ....................................................................... 14

34 U.S.C. §§ 30301–30309 ..................................................................... 13

42 U.S.C. § 1983 ........................................................................... 9, 13

42 U.S.C. § 1997e(e) .......................................................................... 9

U.S.C. § 4001 ................................................................................ 13

U.S.C. §§ 3621–3624 .......................................................................... 14

## Regulations

28 C.F.R. § 115.401 ........................................................................... 5

## Other Authorities

1984 U.S.C.C.A.N. 3182 ....................................................................... 14

James, *Reforming Prison Litigation Reform: Reclaiming Equal Access to Justice for Incarcerated Persons in America*, 12 Loy. J. Pub. Int. L. 465 (2011)...................................... 13

## INTRODUCTION

Count I was the only individual-capacity cause of action to survive preliminary screening. *See* Dkt. No. 14, Memorandum & Order pp.3–5 (Mem.). It seeks to hold National Inmate Appeals Administrator Ian Connors personally financially responsible for the Bureau of Prisons's alleged "deliberate indifference" in denying additional "accommodations and treatments" to a transgender USP Marion inmate already receiving, among other things, hormone therapy. Mem. pp.4–5; *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971). But the prisoner's allegations cannot establish jurisdiction over Connors, justify implication of a novel *Bivens* remedy against him, or overcome his presumptive entitlement to qualified immunity. Dismissal is now appropriate.

## FACTS

USP Marion inmate Cristian N. Iglesias, who identifies as female, is serving a 240-month sentence for threatened use of a weapon of mass destruction. Dkt. No. 1, Complaint (Compl.) pp.7, 43; Dkt. No. 19, Motion for Preliminary Injunction (Mtn. Prelim. Inj.); Dkt. No. 19-2, Mtn. Prelim. Inj. Ex. O p.39. She has been diagnosed with gender dysphoria[1] and borderline personality disorder. Compl. Ex. 2 pp.47–48; *see also* Fed. Bureau of Prisons, *Medical Management of Transgender Inmates* p.5 (Dec. 2016) (Med. Mgmt. Guidance); Fed. Bureau of Prisons, *Transgender Offender Manual* p.5 (May 11, 2018) (Trans. Policy). Iglesias "is being medically treated as female, consistent with the BOP policy on Medical Management of Transgender Inmates." Mtn. Prelim. Inj. Ex. B p.7. This includes long-term hormone therapy, Compl. pp.7, 11, as well as "liv[ing] as a woman" within the bounds of prison life, Mtn. Prelim. Inj. p.9. She

---

[1] This diagnosis refers to distress "stemming from strong feelings of incongruity between one's anatomy and one's gender identity." *Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019); Amer. Psych. Assoc., *Gender Dysphoria* (2013).

1

wears, with BOP's permission, "long hair," women's undergarments, and "make-up (eyeshadow, blush, foundation, lip gloss"). *Id.* Iglesias has also received a "pat search exception," ensuring that she undergoes "pat search[es] by female staff only." Mtn. Prelim. Inj. Ex. J p.15. And she has "periodically engaged in counseling and taken psychotropic medication." Compl. Ex.2 p.47. She now asserts an Eighth Amendment entitlement to three additional accommodations: (1) laser hair removal, (2) transfer to a female facility, and (3) gender-affirming surgery. Mem. pp.4–5. And while Iglesias alleges no particular acts by National Inmate Appeals Administrator Ian Connors, she seeks to recover from his personal assets for the agency's purported "deliberate indifference" to these needs.

## I.  Treatment of Gender Dysphoric Federal Inmates

In determining a treatment plan for a gender dysphoric patient, most consult the Standards of Care promulgated by the World Professional Association of Transgender Health. *See Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (7th ed. 2012) (WPATH)[2]; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (collecting cases); *Campbell v. Kallas*, 936 F.3d 536, 538–39 (7th Cir. 2019). The relevant Bureau of Prisons Program Statement cites these Standards, though they do not independently bind the agency. *See* Trans. Policy p.17; Med. Mgmt. Guidance p.10. WPATH eschews a one-size-fits-all approach. *See, e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951 (W.D. Wis. 2018) ("[N]ot all people suffering from gender dysphoria are interested in surgery; and only a

---

[2] Exhibit 3 purports to be "WPATH Standards of Care" and a "Study on Epilation," but is two pages from WPATH, followed by a portion of *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015), and what appears to be an excerpt from an article in favor of hair removal that relies on the outdated edition of *Principles of Transgender Medicine and Surgery*. *See infra* p.6 & n.5.

subset of those people will meet the WPATH Standards of Care making the surgery medically necessary."). Rather, "a range of treatment options" may fit the bill. *Campbell*, 936 F.3d at 538; *see* WPATH pp.9–10 (Options include "[c]hanges in gender expression," such as "living part time or full time in another gender role"; "[h]ormone therapy"; "[s]urgery"; and various forms of "[p]sychotherapy."). In short, "while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither." WPATH p.8. BOP takes a similarly individualized approach.

### A.  Clinical Interventions

BOP's Transgender Clinical Care Team (TCCT), a subsidiary of the Health Services Division, oversees and guides "the medical treatment of . . . inmates with [gender dysphoria]." Trans. Policy p.6. The agency treats gender dysphoria in three steps: First, a mental health assessment, which includes "provid[ing] individualized counseling support and other interventions as appropriate"; second, a medical assessment that (along with consultation with the TCCT) serves as a prerequisite for "hormone therapy"; third, a plan for "individualized treatment." Med. Mgmt. Guidance p.6.[3] "Each treatment plan or denial of treatment must be reviewed by the Medical Director or BOP Chief Psychiatrist." Pt. Care p.41.

BOP's guidance on surgery echoes WPATH's: "[G]ender-affirming surgery may be appropriate for some and is considered on a case-by-case basis." Med. Mgmt. Guidance p.19; WPATH, p.54 ("While many . . . individuals find comfort with their gender identity, role, and

---

[3] *See also* Fed. Bureau of Prisons, *Patient Care* p.41 (June 3, 2014) (Pt. Care) (Medical staff develop an individualized "proposed treatment plan . . . which promotes the physical and mental stability of the patient."); Med. Mgmt. Guidance p.6 (individualized plans seek to "allow for successful transition through education, counseling, real-life experience, medical evaluation, hormone treatment, and in some cases, sex reassignment surgery").

expression without surgery, for many others surgery is essential and medically necessary[.]"). Requests for surgery go through the TCCT "for initial review and recommendation to the Medical Director, who is the approving authority." Med. Mgmt. Guidance p.19. Eligibility criteria include "12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicted, full-time real life experience in [the inmate's] preferred gender, and consolidation of gender identity." *Id.*; WPATH p.60 (requiring "12 continuous months of living in a gender role that is congruent with their gender identity"). "Medical and/or mental health conditions, if present" must also be "reasonably well-controlled." Med. Mgmt. Guidance, p.11; WPATH p.60 ("[S]ignificant medical or mental health concerns . . . must be well controlled."). Decision-makers rely on "comprehensive medical and mental health summaries" and "a comprehensive psychosocial assessment." Med. Mgmt. Guidance p.19.

### B.  Institution Transfers for Gender Dysphoric Prisoners

BOP's Transgender Executive Council (TEC), "determin[es] appropriate housing of transgender inmates." Trans. Policy p.1. Members include representatives from "the Health Services Division, the Women and Special Populations Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC),[4] and the Office of General Counsel." Trans. Policy p.4. The TEC makes "assessments on a case-by-case basis," with reference to "biological sex," "the health and safety of the transgender inmate," "factors specific to the transgender inmate," and "whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution." *Id.* p.6.

---

[4] DSCC, located in Grand Prairie, Texas, matches most federal inmates to institutions, based on a complicated calculus that factors in a multitude of considerations. *See* Fed. Bureau of Prisons, *Inmate Security Designation and Custody Classification* (Sept. 4, 2009).

The same principles govern requests for transfers. *Id.* pp.2–3. "[D]esignation to a facility of the inmate's identified gender would be appropriate only in rare cases . . . where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments." *Id.* p.3.

Following a housing designation, institution "staff will twice-yearly review the inmate['s] current housing unit status and programming available for transgender inmates," which involves making sure "that the inmate placement does not jeopardize the inmate's health and safety." *Id.* pp.6–7. Institutions regularly undergo audits for compliance with the Prison Rape Elimination Act. *See* 28 C.F.R. § 115.401; *see* Fed. Bureau of Prisons, *Prison Rape Elimination Act Audit Report* (PREA Audit) (June 5, 2019). These "[a]ssess[] . . . practices for ensuring the sexual safety of all inmates," with particular attention to "the most vulnerable populations in custody." U.S. Dep't of Justice, *PREA Auditor Handbook* p.44 (Aug. 2017).

## II.  Alleged Shortcomings in Iglesias's Treatment

Iglesias challenges BOP's alleged denial of: (1) laser hair removal, (2) transfer to a female facility, and (3) on-demand gender-affirming surgery. *See* Mem. p.5; Compl. p.9.

### A.  Laser Hair Removal

Iglesias prefers laser hair removal to shaving. *See* Compl. p.24. BOP denied it because of the absence of any clinical records "indicat[ing] the need for laser hair removal as part of [her] treatment plan." *See id.* p.11; *id.* Ex.7 p.65. She still has not proffered any documentation of personal medical necessity beyond her own opinion. Compl. Ex.7 p.64. Instead, she asserts that as a general rule "[r]emoval of facial and body hair is a necessary treatment for the health of transsex-

ual people." Compl. p.13 (citing 2007 edition of *Principles of Transgender Medicine and Surgery*).[5]

### B.  Transfer to a Female Facility

BOP also denied Iglesias a transfer from Marion, which she describes as "a men's prison,"[6] to a female facility. Compl. p.8. This was because the TEC had "reviewed and approved of [her] close supervision transfer to USP Marion," which "was determined to be commensurate with [her] current programming and security needs." Compl. Ex.5 p.60. Iglesias argues that a transfer is necessary because she needs "real time [*sic*] experience" as a woman to qualify for gender-affirming surgery. Compl. Ex.5 p.59; *but see* Mtn. Prelim. Inj. p.9 (reporting that at present, "[s]he lives as a wom[a]n").[7] She also maintains that living at Marion exposes her to "cruel hardships," because her inability to access commissary items like "earrings, perfume, lip gloss, etc." prevents her from "express[ing] herself in a way that reflects her gender identity." Compl. pp.8–9, 12.[8] The Complaint does not assert that she has ever requested (or been denied)

---

[5] The current version contains no such bright-line rule and adopts WPATH's flexible approach. *See* Ettner et al., *Principles of Transgender Medicine and Surgery* pp.36–40 (2d ed. 2016) (endorsing the WPATH standards of care); *id.* at p.121 ("The history of trans health and the [WPATH] *Standards of Care* have evolved in parallel from a sex change model to one of overall health and individualized care[.]"); *id.* p.253 ("Removal of facial hair . . . *can* be an additional manner to facilitate the experience of living in the new gender role.") (emphasis added).

[6] Iglesias does not claim to be the only gender non-conforming inmate at Marion. *See* PREA Audit p.5 (describing interviews with six [inmates] who self-identified as transgender").

[7] WPATH has not set out the essential elements of a meaningful "real life experience" in a prison setting. *See* WPATH pp.67–68; *Campbell*, 936 F.3d at 540 (describing the difficulty inmates can have in meeting the requirement); *Kosilek v. Spencer*, 774 F.3d 63, 88 (1st Cir. 2014) (en banc) ("Prudent medical professionals . . . reasonably differ in their opinions regarding the requirements of a real-life experience" in an institutional setting).

[8] She also refers to "non-stop pressure, danger, unwanted attention, testosterone, and discrimination" at Marion, but without detailing any specific incidents of abuse or particular viola-

these items as an accommodation for her gender dysphoria. Indeed, she now concedes that "[t]he B.O.P[.] allows certain items for her to purchase make-up (eyeshadow, [b]lush, foundation, lip gloss.[)]" Mtn. Prelim. Inj. p.10.

### C. Gender-Affirming Surgery

After "[m]ore than a year," BOP has not yet issued a decision on Iglesias's request for "gender affirming surgery," which she opines "is [n]ecessary [t]o [r]educe her mental-health conditions, and risk of suicide." Compl. pp.16, 26, 69; *see also* Compl. Ex.9 p.69; Med. Mgmt. Guidance p.19. However, Iglesias does not claim to meet the eligibility criteria for surgery.[9] Rather, she seems to take the position that gender dysphoria automatically requires surgery. *See* Compl. p.9 (describing "the standard of care" as requiring "sexual [r]eassignment surgery"); *id.* p.25 ("[S]he [n]eeds sex [r]eassignment surgery because she has severe gender dysphoria[.]").

### ARGUMENT

Iglesias's effort to target Connors's personal assets must fail. Her allegations cannot support personal jurisdiction, offer no compelling basis to imply a *Bivens* remedy in this new context, and fail to plausibly establish that he violated any clearly established constitutional right.

---

tions of Prison Rape Elimination Act standards. Compl. p.9; *see* PREA Audit p.40 ("The [Marion] staff do an excellent job addressing all the needs of the transgender inmates."); Mtn. Prelim. Inj. Ex. N p.33 (reporting in 2018 that Iglesias feels "[n]either safe [n]or unsafe"). This Court dismissed allegations that BOP officials failed to prevent broadly pleaded abuse. Mem. p.7.

[9] Elsewhere, she seems to concede otherwise, based on lack of "real time experience" as a woman. *See* Compl. Ex.5 p.59. She also has not claimed to have her borderline personality disorder under control. *See* Med. Mgmt. Guidance pp.11, 19 ("[M]ental health conditions, if present" must also be "reasonably well-controlled."); Duišin et al., *Personality Disorders in Persons With Gender Identity Disorder*, Scientific World Journal p.6 (May 2014) (A personality disorder is a potential "contributing factor[]" affecting the success of any surgical treatment.).

## I.   This Court Lacks Personal Jurisdiction.

Iglesias cannot carry her burden of "establish[ing] a prima facie case of personal jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo*, 338 F.3d 773, 782 (7th Cir. 2003). Connors works "in Washington, D.C." *Hopper v. Barr*, No. 5:18-cv-01147-MGL-KDW, 2019 WL 3938076, at *21 (D.S.C. July 31, 2019). Iglesias accuses him of no conduct in Illinois, let alone acts "purposely establish[ing] minimum contacts with" the state sufficient to justify "hal[ing] [him] into court" across the country. *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (internal quotation marks omitted) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985)); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State."). At *best*, Iglesias demonstrates that Connors played some role in making decisions whose effects were felt in this district, which is not enough. *See Walden*, 571 U.S. at 286 ("random, fortuitous, or attenuated contacts [a defendant] makes by interacting with other persons affiliated with the State" cannot establish jurisdiction) (internal quotation marks omitted). Standing alone, this absence of "minimum contacts" defeats Count I.[10]

## II.   The PLRA Bars Any Claim for Compensatory Damages.

The Prison Litigation Reform Act says that "[n]o Federal civil action may be brought by a prisoner" for compensatory damages "for mental or emotional injury suffered while in custody

---

[10] *See Ariel Investments v. Ariel Capital Advisors*, 881 F.3d 520, 522 (7th Cir. 2018) ("[K]nowledge and intent concerning a resident of [a] State . . . do not justify compelling [a defendant] to defend himself there."); *Hodgson v. Mississippi Dep't of Corr.*, 963 F. Supp. 776, 796 (E.D. Wis. 1997) (Processing "[prison transfer] requests  cannot be characterized as acts by which the Defendants purposefully availed themselves of the privilege of conducting activities within Wisconsin."); *Dugan v. Jarvis*, 725 F. App'x 813, 816 (11th Cir. 2018) ("[R]eceiv[ing]—in Washington, D.C.—two administrative grievances" is "insufficient.").

without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18)." 42 U.S.C. § 1997e(e); *accord Wright v. Miller*, 561 F. App'x 551, 555 (7th Cir. 2014) ("[A]bsent an accompanying physical injury, a court may not award compensatory damages for nonphysical harm, such as fear of attack."). Iglesias fails to allege with any particularity any physical injury or "sexual act" that might plausibly be construed as a consequence of the denial of her administrative remedies. *See* Compl. p.8, Ex.2 pp.47–48; *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017), *reh'g denied* (May 5, 2017) (an "undisputed incident of self-mutilation" could count as a "physical injury" allegedly resulting from inmate's transfer out of mental health unit). So she cannot recover compensatory damages from Connors.

### III. This Court Should Decline to Imply a Novel *Bivens* Remedy.

Iglesias has no automatic right to sue Connors for money damages. *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 891 (7th Cir. 2019) (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). The Supreme Court has recognized *Bivens* remedies only three times. *Keller v. Walton*, No. 3:16-cv-00565-JPG-GCS, 2019 WL 1513498, at *2 (S.D. Ill. Apr. 8, 2019). These were: (1) a "Fourth Amendment unreasonable search[] and seizure[]" claim (*Bivens*, 403 U.S. 388); (2) a "Fifth Amendment gender discrimination" claim (*Davis v. Passman*, 442 U.S. 228 (1979)); and (3) an "Eight Amendment deliberate indifference to medical needs" claim over an inmate's fatal asthma attack (*Carlson v. Green*, 446 U.S. 14 (1980)). *Keller*, 2019 WL 1513498, at *2–3 (citing *Abbasi*,  137 S. Ct. 1855–56). "[T]he expansion of the *Bivens* remedy" beyond these scenarios is now "a 'disfavored judicial activity.'" *Effex Capital*, 993 F.3d at 891 (quoting *Abbasi*, 137 S. Ct. at 1857); *White v. Sloop*, 772 F. App'x 334, 335 (7th Cir. 2019) (*Abbasi* "strongly cautioned against creating new *Bivens* claims."). "The idea is that since *Bivens* is an implied remedy for damages under Constitutional principles rather than a legislatively-created

remedy like 42 U.S.C. § 1983, courts should not expand that remedy unless there are special cir-
cumstances at hand." *Keller v. Walton*, No. 3:16-cv-00565-JPG-GCS, 2019 WL 1513498, at *1
(S.D. Ill. Apr. 8, 2019) (citing *Abbasi*, 137 S. Ct. at 1854–55).

### A.  The Special-Factors Framework

A case that "differs 'in a meaningful way'" from *Bivens*, *Davis*, and *Carlson* "presents a
'new [*Bivens*] context,'" *Keller v. Walton*, No. 16-0565-JPG-GCS, 2019 WL 2494169, at *2
(S.D. Ill. Jan. 28, 2019), *report and recommendation adopted sub nom. Keller*, 2019 WL
1513498 (citing *Abbasi*, 137 S. Ct. at 1859–60), and may not move forward unless the court first
considers: (1) whether "alternative, existing process[es]" exist to address the allegedly unconsti-
tutional conduct; and (2) whether any other "special factors counsel[] hesitation" in implying a
damages remedy, *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (quoting *Bivens*, 403 U.S. at 396);
*Abbasi*, 137 S. Ct. at 1857. This two-prong inquiry "concentrate[s] on whether the Judiciary is
well suited, absent congressional action or instruction, to consider and weigh the costs and bene-
fits of allowing a damages action to proceed." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017)
(quoting *Abbasi*, 137 S. Ct. at 1858). At bottom, "[t]he question is 'who should decide' whether
to provide for a damages remedy, Congress or the courts?" *Abbasi*, 137 S. Ct. at 1857 (quoting
*Bush v. Lucas,* 462 U.S. 367, 380 (1983)). "The answer most often will be Congress." *Abbasi*,
137 S. Ct. at 1857.

### B.  This Case Presents a New *Bivens* Context.

The Supreme Court has neither recognized a *Bivens* remedy for denying inmate griev-
ances, nor addressed what specific accommodations the Constitution guarantees prisoners with
gender dysphoria. *Carlson* alone has any similarities to this case, but not enough to avoid a spe-
cial-factors inquiry. *See Abbasi*, 137 S. Ct. at 1865 (Even where "[t]he differences between [a]

10

claim and the one in *Carlson* are perhaps small," "the new-context inquiry is easily satisfied."). *Carlson* arose out of a fatal, pre-PLRA medical emergency. So the inmate could not have turned to the administrative remedy process or a suit for equitable relief. *See Abbasi*, 137 S. Ct. at 1865. And Mr. Carlson died because those on the scene made obvious errors in responding to a physical condition with clear-cut treatment protocols. *See Carlson*, 446 U.S. at 16 n.1 (describing prison staff "fail[ing] to give him competent medical attention [for an asthma attack] for some eight hours," "administer[ing] contra-indicated drugs," and "attempt[ing] to use a respirator known to be inoperative").

Iglesias, by contrast, does not claim that her serious medical needs have gone unaddressed or that prison staff affirmatively worsened her condition in the face of an emergency. *See, e.g.*, Mtn. Prelim. Inj. Ex. N p.34 (in 2018 survey, reporting that Iglesias was "somewhat" satisfied with "treatment related to [her] transgender status"). She seeks to impose liability based on the *administrative* denial of an alternative course of treatment for a psychological condition with rapidly evolving protocols. *See Abbasi*, 137 S. Ct. at 1860 ("meaningful" differences include factors such as "the rank of the officers involved," "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted," and "potential special factors that previous *Bivens* cases did not consider"); *Arar v. Ashcroft*, 585 F.3d 559, 580 (2d Cir. 2009) ("In the small number of contexts in which courts have implied a *Bivens* remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued."). This makes a special-factors inquiry mandatory.

### C. Special Factors Counsel Against a *Bivens* Remedy.

#### 1. Alternatives Exist.

##### a. Injunctive Relief May Be Available.

Inmates may challenge conditions of confinement in a suit for injunctive relief. *See Ab-basi*, 137 S. Ct. at 1862 ("[D]etainees may seek injunctive relief" to "challenge large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners."); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("Inmates . . . have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief.").[11] An official practice giving rise to an ongoing constitutional violation can be "enjoined *if* and when discovered," as Iglesias seeks here. *United States v. Stanley*, 483 U.S. 669, 690 (1987); *Edmo*, 935 F.3d 757 (ordering Idaho to provide gender-affirming surgery); Mtn. Prelim. Inj.

##### b. Administrative, State, and Other Processes Are Available.

An inmate unhappy with her housing assignment or medical treatment can avail herself of a number of additional alternatives. Chief among these are the multi-tiered administrative remedies created by the PLRA. *See Abbasi*, 137 S. Ct. at 1865; 18 U.S.C. § 3626(g)(2); *Goree v. Serio*, 735 F. App'x 894, 895 (7th Cir. 2018) ("Where Congress has established an alternative remedial structure to protect a constitutional right, the Supreme Court has strongly cautioned that

---

[11] The Supreme Court has "left open" whether inmates can "challenge their confinement conditions via a petition for a writ of habeas corpus." *Abbasi*, 137 S. Ct. at 1862–63. The Seventh Circuit says no. *See Moran v. Sondalle*, 218 F.3d 647, 650-51 (7th Cir. 2000). But standalone official-capacity claims for equitable relief remain available. *See Rodriguez v. Copenhaver*, 823 F.3d 1238, 1242 (9th Cir. 2016) (district courts can "decide whether [BOP] acted contrary to established federal law, violated the Constitution, or exceeded its statutory authority when it acted pursuant to 18 U.S.C. § 3621"); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005) ("[T]here is no reason to rely on a court-created remedy, like *Bivens,* when Congress has created an adequate means for obtaining legal redress" for an inmate alleging deliberate indifference to his serious medical needs.).

the courts should not create a second remedy."). Iglesias "had available to h[er], and indeed pursued, administrative remedies through the Federal Bureau of Prisons to seek relief based on the same conduct underlying this suit." *Goree*, 735 F. App'x at 895. This makes a *Bivens* remedy inappropriate. *Id.* at 895; *see, e.g.*, *Grady v. Kinder*, No. 18-cv-2159-JPG, 2019 WL 718534, at *2 (S.D. Ill. Feb. 20, 2019), *appeal filed*, No. 19-1442 (7th Cir. Mar. 12, 2019) (declining to recognize a *Bivens* due process claim where "Plaintiff has access to alternative remedies through the BOP's administrative remedies program").

### 2.   Additional Special Factors Not Present in *Carlson*

#### a.   Congressional Action Counseling Against a Remedy

Congress never enacted a federal counterpart to 42 U.S.C. § 1983. *Abbasi*, 137 S. Ct. at 1857. In the PLRA, it provided no "standalone damages remedy against federal jailers," giving rise to the inference that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865. The Prison Rape Elimination Act also conferred no new right of action on inmates. *See* 34 U.S.C. §§ 30301–30309. And in 2007 and 2009, Congress rejected the Prison Abuse Remedies Act, neither iteration of which would have gone so far as to create the sort of remedy Iglesias seeks to pursue here. *See* James, *Reforming Prison Litigation Reform: Reclaiming Equal Access to Justice for Incarcerated Persons in America*, 12 Loy. J. Pub. Int. L. 465, 490 (2011).

#### b.   Suits Over Housing Designations Implicate Separation-of-Powers Concerns.

Prison housing decisions have long "rest[ed] within the sound discretion of the Attorney General by virtue of the authority vested in him under 18 U.S.C. § 4001." *Marchesani v. McCune*, 531 F.2d 459, 461 (10th Cir. 1976); *accord King v. Cross*, No. 12-1280-CJP, 2014 WL

13

185015, *5–6 (S.D. Ill. Jan. 16, 2014).[12] This includes "provid[ing] suitable quarters" for all federal detainees. 18 U.S.C. § 4042(a)(2). Rather than dictate the minutiae of such decisions, Congress laid out five general, enumerated factors for consideration. 18 U.S.C. § 3621(b). In the PREA, Congress also deferred to the Attorney General's "independent judgment." U.S. Dep't of Justice, *PREA Regulatory Impact Analysis* p.15 (May 17, 2012). Similarly, Congress barred certain types of claims under the Administrative Procedure Act, in order to ensure "that [BOP] is able to make decisions concerning the appropriate facility . . . for a particular prisoner without constant second-guessing" on the part of the judiciary. S. Rep. No. 98-225, at 149 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3332; *see Brown v. Holder*, 770 F. Supp. 2d 363, 365 (D.D.C. 2011).[13] So there can be no question of congressional "intent to allow the BOP to rely on its own judgment in . . . placing [prisoners] in institutions." *Cohen v. United States*, 151 F.3d 1338, 1343– (11th Cir. 1998). Putting "the judicial branch in charge of designating the place of confinement for a federal prisoner" would "collide[] with" Congress' preference to the contrary. *See Matter of Gee*, 815 F.2d 41, 42 (7th Cir. 1987). As a result, individual-capacity litigation over inmate housing designations poses exactly the "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" described in *Abbasi*. 137 S. Ct. at 1860.

---

[12] *See also* 18 U.S.C. § 4001(b)(1) (vesting "control and management of Federal penal and correctional institutions . . . in the Attorney General, who shall promulgate rules for the government thereof"); *id.* at § 4001(b)(2) ("The Attorney General may . . . classify the inmates; and provide for their proper government, discipline, treatment, care, rehabilitation, and reformation."); *id.* at § 4042(a)(3) (directing BOP to "provide for the protection . . . and discipline of all persons charged with or convicted of offenses against the United States").

[13] Under 18 U.S.C. § 3625, "the judicial review provisions of the APA . . . do not apply to 'any determination, decision, or order' made pursuant to 18 U.S.C. §§ 3621–3624." *Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2011). This covers decisions on "place of imprisonment" and "transfers to other federal facilities." *See* 18 U.S.C. § 3621(b); *Brown v. Fed. Bureau of Prisons*, 602 F. Supp. 2d 173, 176 (D.D.C. 2009).

### c.   Implying a Remedy Would Invite an Onslaught of Unworkable Litigation.

Recognizing Iglesias's Eighth Amendment claim could bring a wide swath of prison actions "within the *Bivens* regime," *Wilkie*, 551 U.S. at 561, even those that concern "issues and discretionary decisions that are not the business of federal judges." *See Meachum v. Fano*, 427 U.S. 215, 228–29 (1976) (rejecting the argument that state inmate transfers fall "within reach of the procedural protections of the Due Process Clause"). And expanding the universe of potential *Bivens* defendants to include those who sign denials of grievances would guarantee that the ensuing litigation takes the broadest, most burdensome form. *See Abbasi*, 137 S. Ct. at 1858 ("It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation[.]").

It would also create significant line-drawing challenges. *See Wilkie*, 551 U.S. at 554 (describing "the difficulty of defining limits to legitimate zeal on the public's behalf"). The kind of ad hoc, multifactorial determinations at the heart of this case do not lend themselves to a clear standard. "Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would . . . best serve institutional security or the safety and welfare of the inmate." *Meachum*, 427 U.S. at 225. On top of this "[t]here is no consensus regarding the classification, housing, training, and supervision policies and practices that best protect transgender women detainees." *Guzman-Martinez v. Corr. Corp. of Am.*, No. CV 11-02390-PHX-NVW, 2012 WL 2873835, at *8 (D. Ariz. July 13, 2012). That is precisely why "prison administrators . . . , and not the courts" must "make the difficult judgments concerning institutional operations." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Lamb v. Maschner*, 633 F. Supp. 351, 353 (D. Kan. 1986) ("Even though a transfer [to a female prison] may relieve plaintiff's anxieties," it risks "a violation of the women's rights.").

15

Similarly, all "inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011); *see also Edmo*, 935 F.3d at 769 ("[N]ot every gender dysphoric person has the same medical needs."). "[M]edical debate" continues to surround gender dysphoria. *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *Campbell*, 936 F.3d at 547 n.3 (noting "debate" over surgery). These factors complicate the "close examination of professional standards and the specific choices made by care providers" necessary to rule on a "deliberate indifference" claim. *Campbell*, 936 F.3d at 548. They also highlight the propriety of deferring to officials with specialized knowledge. *See Thornburgh v. Abbott*, 490 U.S. 401, 407–08; *cf. Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("Law lags science; it does not lead it.").

## IV. Qualified Immunity Protects Connors.

Qualified immunity shields Connors unless Iglesias plausibly alleges that he (1) personally "violated a constitutional right," that was (2) "clearly established at the time the conduct occurred." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[14] She cannot, for the simple reason that "no case clearly establishes that denying treatment beyond hormone therapy"—much less administratively affirming such a decision—"is unconstitutional." *Campbell*, 936 F.3d at 549.

### A. Iglesias Fails to Establish That Connors Personally Violated Any Right.

#### 1. Administrative Grievance Denials Are Not Personal Involvement.

"[E]ach Government official . . . is only liable for his or her own misconduct." *Ashcroft v.*

---

[14] Courts can "decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

*Iqbal*, 556 U.S. 662, 677 (2009). Iglesias neglects to accuse Connors of any. *See Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) ("[T]here must be individual participation and involvement by the defendant."); Compl. ¶ 6 (asserting only that Connors is "the National Inmate Appeals Administrator of the BOP"). Connors remains in the lawsuit only because his signature appears on "letters responding to Plaintiff's administrative remedy appeals." Mem. p.5. The Seventh Circuit has repeatedly emphasized that this is not enough. *See George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation.").[15] This absence of alleged personal participation entitles Connors to qualified immunity. *See Hopper*, 2019 WL 3938076, at *11 (refusing to "infer personal involvement" when "Defendant Connors . . . is not mentioned in the Complaint except where Plaintiff lists his role as Administrator of National Inmate Appeal and as the person who had the final decision on inmate appeals").

### 2. The Constitution Does Not Entitle Iglesias to Unilaterally Demand the Additional Accommodations She Seeks.

Iglesias asserts a constitutional right to, in addition to hormone therapy and other accommodations: (1) "laser hair removal," (2) "facility reassignment," and (3) gender-affirming surgery. Mem. pp.4–5. But even if personally attributable to Connors, "no case clearly establishes that denying treatment beyond hormone therapy is unconstitutional." *Campbell*, 936 F.3d at 549.

---

[15] *See also id.* at 609–10 (denying "an administrative complaint about a completed act of misconduct does not" "violate[] the Constitution"); *McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013) (claims against "individuals who ruled against [inmate] on the institutional grievances . . . fail"); *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012) (complaint that "alleges no personal involvement . . . outside of the grievance process . . . was properly dismissed"); *Hoban v. Godinez*, 502 F. App'x 574, 578 (7th Cir. 2012) ("[T]hose who review administrative decisions of others . . . are not liable[.]"); *Hohol v. Jess*, 394 F. App'x 318, 320 (7th Cir. 2010) ("[S]imply evaluating or rejecting an inmate's institutional complaint does not make a prison official complicit in the alleged deprivation.").

17

"[P]risons aren't obligated to provide every requested treatment once medical care begins." *Id.* at 548. Their medical decisions are only "deliberately indifferent" if "no minimally competent professional would have" made them. *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)); *see also Arnett*, 658 F.3d 742 at 758 (no constitutional violation where "treatment wasn't so far afield of accepted professional standards as to raise the inference that it was not actually based on medical judgment."). Nothing Iglesias alleges comes close.

This is because there is no authority establishing the particular rights she asserts. Her insistence on non-prescribed laser hair removal carries no weight in the Seventh Circuit, where the "cases offer no indication that denying arguably nonmedical cosmetic accommodations" of this nature "violates the Eighth Amendment." *Campbell*, 936 F.3d at 542, 549 (granting qualified immunity over denial of transgender inmate's "requests for electrolysis and makeup").[16] Likewise, and regardless of gender identity, inmates have no right to any particular housing classification. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (prison housing assignments are matters dele-

---

[16] *See also Lopez v. City of New York*, No. 05 Civ. 10321(NRB), 2009 WL 229956, at *13 (S.D.N.Y. Jan. 30, 2009) ("In the absence of any case law upholding a claim that a transgender prisoner has the right to choose what clothing she will wear," qualified immunity applies.); *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, at *6 (E.D. Va. June 23, 2015) (no deliberate indifference where prison offered "Nair, instead of electrolysis").

gated to the "full discretion" of federal prison officials and thus implicate "no legitimate statu-
tory or constitutional entitlement sufficient to invoke due process").[17] No case requires the cate-
gorical assignment of transgender inmates to all-female facilities,[18] an inherently problematic
rule from the standpoint of prison administration.[19] And, until after this case was filed,[20] every
federal court of appeals to consider the question had found that denying "surgery to a
transgender inmate" does not violate the Eighth Amendment. *Gibson*, 920 F.3d at 215–16 (citing
*Kosilek*, 774 F.3d at 76–78, 87–88, 96). This includes the Seventh Circuit. *Campbell*, 936 F.3d at
549.

## B. Iglesias Alleges No Violation of Any Clearly Established Right.

Qualified immunity "gives officials 'breathing room to make reasonable but mistaken
judgments about open legal questions,'" *Abbasi*, 137 S. Ct. at 1866 (quoting *al-Kidd,* 563 U.S. at

---

[17] *See also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should
be accorded wide-ranging deference in the adoption and execution of policies and practices that
in their judgment are needed to preserve internal order and discipline and to maintain institu-
tional security."); *Thornburgh*, 490 U.S. at 407–08 ("[T]his Court has afforded considerable def-
erence to the determinations of prison administrators[.]"); *Whitford v. Boglino*, 63 F.3d 527, 532
(7th Cir. 1995) ( "A prisoner has no due process right to be housed in any particular facility.").

[18] *See, e.g.*, *Richardson v. D.C.*, 322 F. Supp. 3d 175, 184 (D.D.C. 2018) ("*Farmer* does
not hold that transgender female inmates . . . may *never* be celled with male inmates. In fact,
*Farmer* says nothing whatsoever about general procedures for housing transgender inmates.");
*Wilson v. David*, No. 9:08-cv-618, 2010 WL 610714, at *5 n.5 (N.D.N.Y. Feb. 17, 2010) (reject-
ing argument that supervisors were responsible for sexual assault due to policy of assigning
transgender inmates to prisons with those of similar biological sex).

[19] *Lopez*, 2009 WL 229956, at *13 (S.D.N.Y. Jan. 30, 2009) ("We note that a number of
problems could arise by altering this practice and housing biologically male inmates who iden-
tify as transgender with the female population, not the least of which would be concerns for the
safety of female inmates[.]").

[20] The Ninth Circuit has since ordered Idaho to provide surgery to an inmate with medi-
cally documented need. *Edmo*, 935 F.3d at 803.

743), by barring individual-capacity lawsuits unless they involve the violation of a right that "was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (quoting *Harlow,* 457 U.S. at 818); *see also Hope v. Pelzer,* 536 U.S. 730, 731 (2002) ("[B]efore they are subjected to suit, officers [must be] on notice that their conduct is unlawful."). The housing and medical decisions that Iglesias challenges were not "deliberate indifference" at all, much less clearly established Eighth Amendment violations. *See Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009) ("If there is a legitimate question as to the existence of the right at issue, then qualified immunity attaches."). Nor could Connors have been on notice that signing denials of administrative grievances could expose him to personal liability. *See supra* pp.16–17; *cf. Abbasi*, 137 S. Ct. at 1868 ("[T]he fact that the [circuit] courts are divided as to whether or not a [42 U.S.C.] § 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on the point is not well established."). This holds especially true where the grievances involve medical decisions. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019), *docketing petition for cert.*, No. 18-1504 (U.S. June 3, 2019) ("[N]on-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."); *Wojtaszek v. Litherland*, No. 3:08-cv-317-JPG, 2010 WL 1325248, *3 (S.D. Ill. Mar. 26, 2010) ("The Seventh Circuit has consistently declined to hold responsible non-medical prison officials who investigate and respond to grievances for deliberate indifference."). So Iglesias falls short of overcoming qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendant Connors respectfully requests dismissal.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

Civil Division

C. SALVATORE D'ALESSIO, JR.
Acting Director
Torts Branch, Civil Division

ANDREA W. McCARTHY
Senior Trial Counsel, Torts Branch

*/s/ Laura Katherine Smith*
LAURA KATHERINE SMITH
Trial Attorney, Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-0419
Laura.Smith2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing(s) to the following:

    Laura J. Jones
    Assistant U.S. Attorney - Fairview Heights
    9 Executive Drive
    Fairview Heights, IL 62208
    618-628-3700
    Laura.Jones@usdoj.gov,

and I hereby certify that on October 4, 2019, I sent by Federal Express, the document(s) to the

following non-registered participants:

    Cristian Noel Iglesias
    17248-018
    MARION
    U.S. PENITENTIARY
    P.O. BOX 1000
    MARION, IL 62959