## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS
(a.k.a. CRISTIAN NOEL IGLESIAS),

              Plaintiff,

    v.

IAN CONNORS, *et al.*,

              Defendants.

Case No. 19-cv-00415-RJN

Judge Nancy J. Rosenstengel

## PLAINTIFF'S MOTION AND MEMORANDUM
## IN SUPPORT OF A PRELIMINARY INJUNCTION

Plaintiff Cristina Nichole Iglesias is a transgender woman in the custody of the Federal Bureau of Prisons ("BOP") at Federal Correctional Institution-Fort Dix ("Fort Dix"), a men's prison. Her life is at risk. She moves for a preliminary injunction to address Defendants' failures to provide adequate care for gender dysphoria—a serious medical condition—and to protect her from mental anguish, sexual assault, and physical violence. Defendants continue to deny Plaintiff medically necessary treatment, including gender confirmation surgery ("GCS"), permanent hair removal, and transfer to a female facility. She has also been repeatedly raped and assaulted at Fort Dix, as at previous facilities, and is under continuous and serious threats to her life and safety. Because of the violence she experiences as a woman in a men's facility, she is now isolated in protective custody as her only means of survival. In past weeks, Ms. Iglesias has again considered life-threatening self-harm. In the absence of preliminary relief, she will suffer irreparable harm.

## STATEMENT OF FACTS

### I.    Procedural Status

Ms. Iglesias filed a pro se complaint in April 2019 seeking injunctive relief and damages. (ECF No. 1). On July 14, 2019, the Court's Initial Screening Order permitted Plaintiff to proceed

on claims against certain Defendants. (ECF No. 40). On February 20, 2020, Plaintiff was appointed counsel. *Id*. On September 8, 2020, Plaintiff filed her First Amended Complaint ("FAC") (ECF No. 52), limiting her claim to injunctive relief. On October 29, 2020, this Court entered a screening order allowing the FAC to move forward but dismissing the BOP without prejudice. (ECF No. 70). On November 9, 2020, Plaintiff moved for reconsideration to restore the BOP as a defendant. (ECF No. 74). On February 24, 2021, Plaintiff sought leave to file a seconded amended complaint with the BOP as a defendant. (ECF No. 85).[1] All parties currently agree that the BOP should be a party. (ECF Nos. 76 & 89).

## II.    Plaintiff's History of Gender Dysphoria

Ms. Iglesias is a transgender woman—an individual whose female gender identity differs from the male sex assigned to her at birth. Declaration of Dr. Randi Ettner ("Ettner Decl.") at ¶ 77; Declaration of Cristina Nichole Iglesias ("Iglesias Decl.") at ¶ 3. She was aware of her female identity from a very young age and understood that her body and sex assigned at birth did not match her true identity. Iglesias Decl. at ¶¶ 2−3. At age twelve, Ms. Iglesias expressed to her mother a desire for GCS so she could live as a girl. *Id.* at ¶ 3. After withdrawing from school in tenth grade, Ms. Iglesias began to socially transition by wearing stereotypically feminine hairstyles and clothing and by taking hormonal birth control to develop breasts. *Id.* at ¶ 4.

Ms. Iglesias entered BOP custody in 1994. *Id.* at ¶ 6. In or around 1994, Ms. Iglesias was diagnosed with gender identity disorder by BOP psychologist Dr. Brian Gray. *Id.* at ¶ 7. In 2015,

---

[1] Plaintiff has supported this motion with the evidence available to her. She and her counsel have attempted to get copies of her medical records from BOP since Plaintiff was appointed representation, to no avail. Plaintiff's counsel requested assistance in obtaining those records from counsel for Defendants as early as November 2020 and served discovery on Defendants in December 2020, but Defendants have refused to respond at this time. Counsel also filed a Freedom of Information Act request on January 4, 2021 but has received no response. Ms. Iglesias also requested her BOP Central Office medical records but has not received a response or the records.

BOP updated Ms. Iglesias's diagnosis to gender dysphoria to reflect changes in the Diagnostic and Statistical Manual Version 5 ("DSM-5"), published in 2013. *Id.*

### III.     Standards of Care for the Treatment of Gender Dysphoria

Gender dysphoria is a serious condition that is characterized by a marked incongruence between the sex assigned at birth and a person's gender identity, strong cross-gender identification, and clinically significant distress or impairment of functioning. Ettner Decl. at ¶ 21. The condition is recognized by the American Psychiatric Association and listed in the DSM-5 and the World Health Organization's International Classification of Diseases-10. *Id*. at ¶¶ 19−20. Like many medical conditions, gender dysphoria can be ameliorated or cured through treatment. *Id.* at ¶ 26.

The World Professional Association for Transgender Health ("WPATH"), the leading authority on transgender healthcare, publishes internationally accepted Standards of Care ("SOC") for treating gender dysphoria. *Id.* The current SOC, published in 2011, are the prevailing standard of care for medical professionals treating gender dysphoria. *Id.*; *see De'lonta v. Johnson*, 708 F. 3d 520, 522−23 (4th Cir. 2013); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *3 (E.D. Mo. May 22, 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1186 (N.D. Cal. 2015); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231 (D. Mass. 2012).

The WPATH SOC set forth individualized and patient-centric medical treatment options for gender dysphoria. Ettner Decl. at ¶¶ 27, 31−34. In addition to living in accordance with the person's gender identity, treatment may include hormone therapy, surgery to change primary and/or secondary characteristics, and psychotherapy. *Id.* at ¶ 27. The SOC "explain that some individuals are unable to obtain relief from gender dysphoria without surgical intervention, and describe sex-reassignment surgery . . . as 'essential and medically necessary' for this group of

patients." *Norsworthy*, 87 F. Supp. 3d at 1186 (quoting WPATH SOC at 36); Ettner Decl. at ¶ 44. The WPATH SOC apply to both incarcerated and non-incarcerated people. Ettner Decl. at ¶ 28.

## IV.    Defendants' Inadequate Treatment of Plaintiff's Gender Dysphoria and Refusal to Transfer Her to a Female Facility

Ms. Iglesias requested hormone therapy from BOP medical staff in 2011 but was denied that treatment until 2015. Iglesias Decl. at ¶ 8. Since 2016, Ms. Iglesias has made requests for GCS to treat her gender dysphoria to BOP staff, Dr. Randall Pass, the United States Penitentiary at Marion ("USP-Marion") clinical team, and L.J.W. Hollingsworth, the former USP-Marion warden. *Id.* at ¶ 14. Dr. Pass, USP-Marion's clinical director, confirmed that Ms. Iglesias met the WPATH criteria for, and should receive, GCS. *Id.* at ¶ 15.

In November 2019, Ms. Iglesias was transferred from USP-Marion to Federal Medical Center-Lexington ("FMC-Lexington"). *Id.* at ¶ 18. Ms. Iglesias was told that she was being transferred there to receive GCS. *Id.* However, she was told after she arrived that no surgeons in Kentucky performed the GCS she required. *Id.* At a December 18, 2019 consultation with nurse practitioner Tammy Thomas at the University of Kentucky HealthCare's Endocrinology Department, Ms. Thomas evaluated Ms. Iglesias and concluded that she met the WPATH standards for GCS and should receive GCS. *Id.* at ¶ 20.

Ms. Iglesias formally appealed several denials she received for GCS. *Id.* at ¶¶ 16, 19. In January 2018, she appealed Warden Hollingsworth's and the Regional Director's denials of her request for GCS to the Central Office Administrative Remedies Division ("COARD"). *Id.* at ¶ 16. On March 2, 2018, Defendant Connors—National Inmate Appeals Administrator, Office of the General Counsel for BOP—acknowledged receipt by BOP's Transgender Clinical Care Team ("TCCT") of her request for GCS and indicated that he would defer to TCCT to make a decision, which Ms. Iglesias never received. *Id.* In December 2019, Ms. Iglesias again appealed her GCS

denial to the COARD. *Id.* at ¶ 19. Defendant Connors issued BOP's response to this appeal, which stated that Ms. Iglesias could not have GCS because she did not meet the requirements to be transferred to a female facility and her hormone levels "have not been maximized or stabilized." *Id.* at ¶ 21.

Ms. Iglesias also requires permanent hair removal as part of treatment for gender dysphoria. *Id.* at ¶ 22. This request was denied by Warden Hollingsworth and BOP's regional director. *Id.* at ¶ 23. Ms. Iglesias appealed the denial in March 2018. *Id*. Her appeal was denied on the grounds that she had not reported major emotional or environmental problems during her last visit with psychological services and that no provider recommended hair removal. *Id.*

Lastly, Ms. Iglesias has repeatedly requested transfer to a female facility for her safety and as part of treatment for gender dysphoria. *Id.* at ¶ 24. In November 2016, Ms. Iglesias requested a transfer by writing then-Attorney General Loretta Lynch. *Id.* at ¶ 25. Her request was forwarded to the warden at Federal Correctional Complex-Butner. *Id.* In December 2016, she received notification that her transfer request was "under review as part of an ongoing process." *Id.* at ¶ 26. On May 31, 2017, Ms. Iglesias appealed the BOP Regional Director's denial of her request for transfer to a women's facility. *Id.* at ¶ 27. She explained that she required transfer for her safety and health. *Id.* In July 2017, Defendant Connors notified her that her appeal was denied, in part because it was repetitive of earlier appeals. *Id.* at ¶ 28. In March 2020, Defendant Connors again denied Ms. Iglesias's transfer request, stating that "surgery is created after real world experience in your preferred gender." *Id.* Later that month, Ms. Iglesias applied for transfer to the women's facility at FMC-Lexington by sending a request to the warden of that facility. *Id.* at ¶ 30. Moreover, since May 2018, placements of transgender prisoners have been based at least initially on a

person's sex assigned at birth, such that any contrary placement based on gender identity "would be appropriate only in rare cases." *See* BOP Change Notice No. 5200.04 CN-1.[2]

Inadequate treatment exacerbates the symptoms related to gender dysphoria and puts the patient at a greater risk of self-harm. Ettner Decl. at ¶¶ 70, 72−73. Some individuals who do who not receive adequate medical care for their gender dysphoria become so desperate for treatment that they attempt life-threatening self-surgery. *Id.* at ¶ 70. Ms. Iglesias has engaged in self-treatment by attempting to remove her testicles and penis. Iglesias Decl. at ¶ 11. Ms. Iglesias was diagnosed with gender identity disorder in 1994 while in BOP custody; gender dysphoria is a condition that intensifies with age, causing her increasingly greater distress. *Id.*; Ettner Decl. at ¶ 71. Overall, Ms. Iglesias's gender dysphoria treatment "appears to fall far outside of what is recommended by the SOC." Ettner Decl. at ¶ 80.

## V.    Defendant's Failure to Protect Plaintiff from Physical and Sexual Violence

Since entering BOP custody in 1994, Ms. Iglesias has been housed in male prisons. Iglesias Decl. at ¶ 6. Throughout her time in BOP custody, Ms. Iglesias has been subjected to extensive sexual abuse, physical abuse, and harassment by BOP staff and other prisoners. *Id.* at ¶¶ 31−44. Prisoners frequently expose themselves to her, grope her, and demean her in other ways, including demanding to see her breasts. *Id.* at ¶ 36. Ms. Iglesias has reported numerous instances of abuse and harassment in 2001, 2013, 2015, 2016, 2017, 2019, and 2020. (*See* Ex. 8, June 16, 2017 BOP Psych. Services Report at 1; Ex. 9, Nov.22, 2019 BOP Health Services Report at 3-4; Ex.10, Feb. 25, 2020 Client Medical Record at 9); Iglesias Decl. at ¶ 34.

In January 2020, Ms. Iglesias was held hostage by her male FMC-Lexington cellmate because he did not want to be housed with a transgender woman, until prison staff used force to

---

[2] https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf.

remove him. Iglesias Decl. at ¶ 39. When Ms. Iglesias refused to allow a different male prisoner at FMC-Lexington to prostitute her, he placed a "hit" on her, offering $500 to another inmate for the chance to be alone with her and hurt her. *Id.* at ¶ 41. BOP staff entered a separation order between the prisoner and Ms. Iglesias, but her safety remained at serious risk as a transgender woman in a facility where this prisoner and other men are housed. *Id.*

Because of the threats she faced at FMC-Lexington, Ms. Iglesias was transferred to Fort Dix on December 14, 2021. *Id.* at ¶ 44. She was first housed in Unit 5703 as part of the COVID-19 quarantine process but was moved in or around mid-February 2021 to Unit 5702, which is a general-population unit with capacity for three hundred prisoners. *Id.* at ¶¶ 45, 46. The unit has multiple floors with stairways connecting each floor, and each floor has an open floorplan with two-person bunk beds spaced throughout the floor. *Id.* at ¶ 46.

After entering Unit 5702, a male inmate, Osvaldo Rosa, approached Ms. Iglesias because she is a transgender woman and began to threaten her with harm if she did not engage in sex and pay him money. *Id.* at ¶¶ 47−55, 64−66. Mr. Rosa was a leader of an active gang at Fort Dix called the Ñetas. *Id.* at ¶ 47. He and another Ñetas leader, "Mejía," both demanded sex and money from Ms. Iglesias. *Id.* at ¶¶ 47, 51−53. In general, Ms. Iglesias is extremely vulnerable while housed with male prisoners because she is a woman with feminine characteristics, such as breasts, which make her a target for rape and forced prostitution. *Id.* at ¶¶ 31, 40, 46; Ettner Decl. at ¶¶ 66, 82.

Threats to Ms. Iglesias's life and safety intensified in February and March 2021. Iglesias Decl. at ¶¶ 47−48. Mr. Rosa threatened her with homemade knives to demonstrate the seriousness of his threats. *Id.* at ¶¶ 49, 51. He demanded that she pay him through a cell-phone application and call her friends and family to collect money to send to him. *Id.* at ¶¶ 49−51. To date, Mr. Rosa has extorted Ms. Iglesias for approximately $8,000. *Id.* at ¶ 50.

Mr. Rosa and Mejía repeatedly raped Ms. Iglesias and forced her to show her breasts to other prisoners. *Id.* at ¶¶ 51−53. Mr. Rosa forced her to perform oral sex on him on four occasions. *Id.* at ¶ 51. On the last occasion, Mr. Rosa held her at knife point. *Id.* Mejía raped Ms. Iglesias by forcing her to engage in anal sex. *Id.* at ¶ 52. Ms. Iglesias was also forced to show her breasts to other prisoners. *Id.* at ¶ 53. Ms. Iglesias was scared to file an internal grievance about the extortion and physical and sexual violence because Fort Dix is an open facility, making it impossible for her to avoid contact with male prisoners, including Mr. Rosa, Mejía, and other Ñetas members. *Id.* at ¶ 54. Ms. Iglesias also feared retaliation from staff. *Id.*

On or about March 4, 2021, Mr. Rosa told Ms. Iglesias that she would be killed if she did not pay him $2,000. *Id.* at ¶ 55.  She then filed an online complaint with the United States Department of Justice Sexual Abuse Reporting System, requested protective custody ("PC"), and filed PREA complaints against Mr. Rosa and Mejía, detailing the extortion and physical and sexual violence. *Id.* ¶ at 57. She spoke to Lieutenant Morales, a Unit 5702 supervisor, about the PREA complaints, and medical staff gave her HIV-prophylaxis medication. *Id.*

On or about March 5, 2021, Ms. Iglesias was moved to Unit 5751, a three-story unit in which each prisoner is in a cell accessible to all others through the stairwells. *Id.* at ¶ 59. She feared for her life in this unit because there were Ñetas members in the unit who could communicate by cell phone with Mr. Rosa. *Id.* On March 5, 2021, Ms. Iglesias was moved to PC, where she remains. *Id.* at ¶ 63. Soon thereafter, Mr. Rosa was also placed in PC, where he continued to harass Ms. Iglesias. *Id.* at ¶ 64. He repeatedly shouted threats to her, told other prisoners that she was a snitch, and disclosed contact information for her friends and family members. *Id.* Though Mr. Rosa was released from prison on March 17, 2021, Ms. Iglesias continues to live in constant fear for her life because she remains in a male prison with prisoners who have threatened and assaulted her, such

as Mejía. *Id.* at ¶¶ 66−68. Due to the trauma she experiences from being denied necessary medical care and kept in BOP male facilities, Ms. Iglesias suffers from anxiety, panic attacks, sleeplessness, and loss of appetite. *Id.* at ¶ 68. She must talk herself out of committing self-harm or ending her life every day. *Id.*

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that (1) her claim has "some likelihood" of succeeding on the merits; (2) traditional legal remedies are inadequate; and (3) she will suffer "irreparable harm" without such relief. *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017). If the plaintiff meets this burden, the court then weighs "the harm the plaintiff will suffer without an injunction against the harm defendant will suffer with one" and considers whether an injunction is in the "public interest." *Id.*; *see also Ty, Inc. v. Jones Grp. Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

Under the Prison Litigation Reform Act ("PLRA"), a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm[,] . . . and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Plaintiff seeks that Defendants cease their policies and practices that expose her to ongoing violence and abuse in men's facilities and that they provide her with medically necessary care to treat her gender dysphoria. Insofar as it may require affirmative acts by Defendants, the preliminary injunction is mandatory. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

## ARGUMENT

Plaintiff's current situation satisfies the necessary elements for preliminary injunctive relief. First, Plaintiff has a strong likelihood of success on the merits of her constitutional claims challenging Defendants' continued violation of her Eighth and Fifth Amendment rights. Second,

there is no adequate remedy at law; an injunction from this Court is necessary to prevent ongoing harm. Third, unless this Court provides injunctive relief, Plaintiff will continue to suffer irreparable physical and psychological harm. Finally, the balance of harms and public interest both compel an injunction. At this stage, only this Court can ensure that Plaintiff is provided safe and appropriate treatment, including transfer to a women's facility.

## I.      Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Claims.

To establish the first element, Plaintiff need only establish "any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Here, Plaintiff easily satisfies this "low threshold" with respect to each of her three constitutional claims. *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017).

### A.  Defendants Are Deliberately Indifferent in Denying Plaintiff Medically Necessary Care for Gender Dysphoria, Including Social Transition.

Plaintiff has a strong likelihood of success on the merits of her claim that Defendants deny her medically necessary care in violation of the Eighth Amendment. Deliberate indifference to a prisoner's "serious medical needs" is unconstitutional because "it constitutes the unnecessary and wanton infliction of pain." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Federal courts have consistently held that a prison's failure to provide adequate treatment for gender dysphoria is deliberate indifference sufficient to justify preliminary injunctive relief. *See Monroe v. Baldwin*, 424 F. Supp. 3d 526, 547  (S.D. Ill. 2019) (granting a preliminary injunction ordering a prison system to, among other things, "develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations"); *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1129 (D. Idaho 2018) (granting a preliminary injunction ordering that a transgender prisoner be provided

"adequate medical care, including gender confirmation surgery"); *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *15 (E.D. Mo. Feb. 9, 2018) (granting a preliminary injunction ordering that a transgender prisoner be provided "care that her doctors deem to be medically necessary treatment for her gender dysphoria, including . . . access to permanent body hair removal"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015) (granting a preliminary injunction ordering that a transgender prisoner be provided "adequate medical care, including sex reassignment surgery . . . as promptly as possible"); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 792−94 (9th Cir. 2019) (upholding an injunction based on a deliberate-indifference claim challenging the denial of GCS); *De'lonta v. Johnson*, 708 F.3d 520, 525−26 (4th Cir. 2013) (reversing a district court's dismissal of a transgender prisoner's deliberate-indifference claim challenging the denial of GCS).

To succeed on a deliberate-indifference claim, a plaintiff must establish both objective and subjective elements. *See Greeno v. Daley*, 414 F.3d 645, 652−53 (7th Cir. 2005). To satisfy the objective element, a plaintiff must demonstrate that her medical condition is "objectively, sufficiently serious." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Defendants diagnosed Plaintiff with gender identity disorder in or around 1994 and later updated the diagnosis to gender dysphoria in 2015. Iglesias Decl. at ¶ 7. Since 1987, the Seventh Circuit has recognized that gender dysphoria is a "serious medical need" in deliberate indifference inquiries. *See, e.g.*, *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987); *see also Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011).

To satisfy the subjective element, a plaintiff must show that prison officials acted with a "sufficiently culpable state of mind," meaning they "knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834).

Defendants have long been aware of Plaintiff's gender dysphoria diagnosis, but routinely and deliberately disregard the substantial risk of harm to Plaintiff's health caused by their denial of Plaintiff's medically necessary care for gender dysphoria, including permanent hair removal and GCS. Iglesias Decl. at ¶¶ 12−23; *see Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture.").

Currently, Plaintiff's treatment is further compromised by her placement in PC segregation, where Defendants knowingly deny her even the ability to shave more than once per week; this leaves her with facial hair that is "deeply disturbing" for her. Iglesias Decl. at ¶¶ 24−43, 63.  Social transition, which involves "grooming and otherwise outwardly presenting oneself through social signifiers of gender consistent with one's gender identity," is medically necessary for gender dysphoria treatment. Ettner Decl. at ¶ 36. Defendants' refusal to allow Plaintiff to shave and provide other medically necessary treatment for gender dysphoria "ignore[s] a request for medical assistance" and thus supports an inference of deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016).

Left inadequately treated, Plaintiff's gender dysphoria will worsen, with harmful and potentially fatal consequences. Ettner Decl. at ¶ 72−75, 86. Because "[t]he Eighth Amendment protects [prisoners] not only from deliberate indifference to [their] *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health," this pattern of inadequate care underscores Defendants' ongoing constitutional harms. *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005); *see Monroe*, 424 F. Supp. 3d at 545.

**B. Defendants Unlawfully Discriminate on the Basis of Sex by Failing to House Plaintiff in a Women's Facility.**

Plaintiff also has a strong likelihood of success on the merits of her equal-protection claim under the Fifth Amendment. Defendants' insistence on housing Plaintiff in a men's facility because she was assigned male at birth unlawfully discriminates against her based on her transgender status and sex. This sex-based classification triggers intermediate scrutiny. *See Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1737 (2020) (finding that acts taken due to transgender status are based on sex); *Hampton v. Baldwin*, No. 3:18-CV-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018) (applying intermediate scrutiny to a sex-based classification when "inmates are, by default, placed in a facility based on their genitalia"). Federal courts also recognize transgender people as a protected class under equal-protection analysis and thus subject policies based on transgender status, such as Defendants' prison-placement policy, to heightened scrutiny. *See, e.g.*, *Ray v. McCloud*, No. 2:18-CV-272, 2020 WL 8172750, at *8−9 (S.D. Ohio Dec. 16, 2020).

Under intermediate scrutiny, Defendants must proffer an "exceedingly persuasive" justification for their sex-based housing policies for transgender prisoners like Plaintiff. *Whitaker ex rel. Whitaker,* 858 F.3d at 1050 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). However, "generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on [Defendants] to justify sex-based classifications." *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (quoting *Virginia*, 518 U.S. at 531). Federal courts have therefore consistently declined to recognize that placing transgender women in men's prisons substantially furthers an important government interest. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 682 (S.D. Ill. 2020) (noting that assigning a transgender woman to a *women's* prison serves government interests in protecting her from sexual assault and

13

harassment and in promoting her safety); *Hampton*, 2018 WL 5830730, at *12; *Doe*, 2018 WL 2994403, at *9.

Separately, the rampant sexual harassment that Plaintiff experiences from prisoners and staff in male prisons also violates the Fifth Amendment's equal-protection guarantee. Plaintiff is verbally harassed, threatened, and physically and sexually assaulted. Iglesias Decl. at ¶¶ 32−38, 42, 51−53. She is also frequently misgendered by other prisoners and prison staff. *Id*. at ¶ 43. This conduct satisfies both elements of an equal-protection sexual-harassment claim. *See Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). First, the frequent harassment Plaintiff endures based on her gender identity is intentional and based on sex. *Id*. Second, such harassment is "sufficiently severe and pervasive" as to be unconstitutional. *Id.* (internal quotation marks omitted); *see Tay*, 457 F. Supp. 3d at 682−84 (finding that a transgender woman's equal-protection claim based on verbal and physical harassment in a male prison was likely to succeed); *Hampton*, 2018 WL 5830730, at *12 (finding that a transgender woman's equal-protection claim based on verbal harassment in a male prison was likely to succeed).

### C. Defendants Subject Plaintiff to Cruel and Unusual Punishment by Failing to Protect Her, Placing Her at Serious Ongoing Risk of Bodily Harm.

Plaintiff has a strong likelihood of success on the merits of her claim that Defendants are failing to protect her from the constant risk of bodily harm, in violation of the Eighth Amendment. "Prison officials have a duty under the Eighth Amendment 'to protect prisoners from violence at the hands of other prisoners,' and, by extension, correctional officers." *Tay*, 457 F. Supp. 3d at 684 (quoting *Farmer*, 511 U.S. at 833); *see Hampton*, 2018 WL 5830730, at *13. To succeed on a failure-to-protect claim, a plaintiff must establish both objective and subjective elements.

First, Plaintiff must show that she is objectively "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The conditions in which Defendants

continue to hold Plaintiff plainly constitute "serious deprivations of basic human needs" and deny her "the minimal civilized measure of life's necessities," thus creating an egregious risk to her health and safety. *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). While housed with male prisoners in male facilities, Plaintiff continuously endures a range of targeted violence. She has been subjected to multiple instances of rape and sexual assault by other prisoners. Iglesias Decl. at ¶¶ 34, 38, 51−52; *see Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) (noting that physical assault by a fellow detainee "clearly constitutes serious harm"). She has been forced to display her breasts to other prisoners, is sexually harassed by prisoners and guards, and lives in constant fear for her life. Iglesias Decl. at ¶¶ 32, 35, 53, 68. A plaintiff can also "establish exposure to a significantly serious risk of harm by showing that [s]he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Farmer*, 511 U.S. at 843 (internal quotation marks omitted). Transgender women in men's facilities are such a group, as Plaintiff's own experience of violent attacks substantiates. *See Perkins v. Martin*, No. 3:14-cv-00191-SMY-PMF, 2016 WL 3670564, at *3 (S.D. Ill. Jul. 11, 2016) (noting that "transgender prisoner[s] with feminine characteristics in male prison[s]" are "more likely to be victimized").

Second, Plaintiff must show that Defendants acted with "deliberate indifference to that risk, which requires a subjective inquiry into [their] state of mind." *Tay*, 457 F. Supp. 3d at 684. "[O]fficial[s] must both be aware of facts from which the inference could be drawn that a substantial risk or serious harm exists, and [they] must also draw the inference." *Farmer*, 511 U.S. at 837. Such awareness may be demonstrated "by showing that [a prisoner] complained to prison officials about a specific threat to h[er] safety," *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991), which Plaintiff has repeatedly done. *See* Iglesias Decl. at ¶¶ 24−43, 54−59. Defendants

"disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *see Tay*, 457 F. Supp. 3d at 684−86 (finding that the subjective component of a failure-to-protect claim was met in part by proof that defendants "kn[e]w that Plaintiff is a transgender woman and is therefore particularly vulnerable in a men's facility"); *Hampton*, 2018 WL 5830730, at *13 (finding that the subjective component of a failure-to-protect claim was met by defendants' knowledge of a transgender woman's lawsuits, grievances, and PREA filings documenting her sexual and physical abuse in men's prisons).

Federal courts consistently recognize that the subjective prong of a failure-to-protect claim may be satisfied when prison officials know that a transgender woman is in a men's prison. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) ("[A] jury could infer that [prison officials] knew Doe faced a substantial risk of rape . . . as a transgender woman."); *Stover v. Corr. Corp. of Am.*, No. 1:12-cv-00393-EJL, 2015 WL 874288, at *9 (D. Idaho Feb. 27, 2015); *Lojan v. Crumbsie*, No. 12-CV-0320 (LAP), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *see also Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016) (noting that the "vulnerability of transgender prisoners to sexual abuse is no secret"). Given Plaintiff's history of rape, sexual assault, and sexual harassment while housed in men's facilities, "keeping her there may be tantamount to confining her in a cell with a cobra," thus putting her at risk of serious harm. *Tay*, 457 F. Supp. 3d at 685; *see Brown*, 398 F.3d at 911.

## II.    Plaintiff Has No Adequate Remedy at Law.

Plaintiff has no adequate remedy at law. As this Court has recognized in another case involving a transgender woman held in men's prisons, "money will not make [the woman] whole or protect her from physical and emotional abuse." *Tay*, 457 F. Supp. 3d at 687−88; *see Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (noting that "quantification of injury is

difficult and damages are . . . not an adequate remedy" in cases "involv[ing] prison conditions"). The harms Plaintiff faces as a woman housed in a men's facility who is denied the necessary medical care she needs cannot be addressed by monetary damages. There is no adequate remedy for "preventable life-long diminished well-being and life-functioning" when a transgender person is denied the ability to socially transition, and "any award would be seriously deficient as compared to the harm suffered." *Whitaker ex rel. Whitaker*, 858 F.3d at 1046 (internal quotes omitted). Indeed, Plaintiff's complaint does not even seek money damages, only declaratory and injunctive relief.

## III.   Plaintiff Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.

Plaintiff's suffering shows that she "will likely suffer irreparable harm" absent injunctive relief. *Id.* at 1044. The ongoing deprivation of Plaintiff's constitutional rights is an irreparable harm. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) (noting in a prison case that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm"); *Tay*, 457 F. Supp. 3d at 687 ("The ongoing deprivation of Plaintiff's Eighth and Fourteenth Amendment [equal-protection] rights . . . is an irreparable harm sufficient to warrant a preliminary injunction.").

Without relief from this Court, Plaintiff will "suffer irreparable harm in the interim," *Hampton*, 2018 WL 5830730, at *9, that "cannot be prevented or fully rectified" by a final judgment. *Whitaker ex rel. Whitaker*, 858 F.3d at 1045 (internal quotation marks omitted). Plaintiff's physical and mental health remain at risk given her inadequate medical care and her exposure to violence from which BOP staff do not protect her. *See Tay*, 457 F. Supp. 3d at 687 (finding irreparable harm where a transgender woman in a men's facility was "assaulted, harassed, and threatened"); *Monroe*, 424 F. Supp. 3d at 545 (finding irreparable harm caused by "lack of

proper treatment for gender dysphoria"); *Hampton*, 2018 WL 5830730, at *15 (finding irreparable harm where a transgender woman in a men's facility was assaulted and staff did not protect her).

## IV.     The Balance of Harms and the Public Interest Require Injunctive Relief for Plaintiff.

If Plaintiff makes the tripartite threshold showing, the Court next considers "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted" and "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). In this analysis, the Court "weighs the balance of potential harms on a 'sliding scale,'" such that "the more likely [the movant] is to win, the less the balance of harms must weigh in h[er] favor" to warrant injunctive relief. *Id.*

Here, the balance of party harms weighs strongly in favor of injunctive relief for Plaintiff. Because Defendants continue to deny her adequate medical care, unlawfully house her in a men's facility, and fail to protect her from the constant risk of violence, Plaintiff remains at a significant ongoing risk of harm. If this Court denies her relief, Plaintiff will continue to endure the mental and physical harms of mistreated gender dysphoria, sexual harassment, physical assault, and sexual assault in addition to the harms of continuing constitutional violations.

In contrast, granting injunctive relief would visit only minimal costs on Defendant. Prisoners in BOP custody are routinely transferred between facilities; Plaintiff herself has been transferred within the past four months. Iglesias Decl. at ¶ 44. Moreover, if providing Plaintiff adequate treatment for her gender dysphoria and protecting her from threats of violence constitute costs to Defendants, Defendants *already* owe such duties of treatment and protection. *See Farmer*, 511 U.S. at 833−34 (noting that prison officials "have a duty . . . to protect prisoners from violence

at the hands of other prisoners" and that "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay" (internal quotation marks omitted)).

The public interest is also served by granting Plaintiff injunctive relief. Indeed, "the public has the 'highest' interest in preventing the violation of a party's constitutional rights." *Monroe*, 424 F. Supp. 3d at 546 (quoting *United States v. Raines*, 362 U.S. 17, 27 (1960)). In the prison context, remedying a "continuing constitutional violation . . . certainly would serve the public interest." *Preston*, 589 F.2d at 303 n.3; *see Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009). Specifically, "it is in the public interest to ensure that Plaintiff's constitutional rights are not violated by correctional officers." *Tay*, 457 F. Supp. 3d at 689; *see Hoskins v. Dilday*, No. 16-CR-334-MJR-SCW, 2017 WL 951410, at *7 (S.D. Ill. Mar. 10, 2017) ("[T]he public interest is best served by ensuring that corrections officers obey the law.").

Federal courts generally do not interfere with prison administrative matters except when, as here, constitutional concerns require such intervention. *See Williams v. Lane*, 851 F.2d 867, 871 (7th Cir. 1988) (noting that federal courts will intervene in prison administration "to remedy unjustified violations of those rights retained by prisoners"). Here, the public interest weighs heavily in favor of an injunction to protect Plaintiff's constitutional rights. *See Tay*, 457 F. Supp. 3d at 679 (noting that "courts usually hesitate to interfere" with inter-prison transfers unless "an inmate's constitutional rights are at issue"); *Hampton*, 2018 WL 5830730, at *16 (same).

## V.   Plaintiff's Requested Relief Complies with the PLRA.

Pursuant to the PLRA, Plaintiff has exhausted all available administrative remedies to challenge Defendants' unconstitutional conduct, including filing complaints with BOP's Northeast Regional Office and the Department of Justice, filing PREA complaints, and complaining to prison officials. Iglesias Decl. at ¶¶ 13−21, 23−35, 54−59; 42 U.S.C. § 1997e(a). These remedies have

been unsuccessful. *See Dole v. Chandler*, 438 F.3d 804, 813 (7th Cir. 2006) (finding exhaustion when a prisoner "took all steps necessary to exhaust one line of administrative review, and did not receive instructions on how to proceed once his attempts at review were foiled"); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (holding that administrative remedies are exhausted "when prison officials fail to respond to inmate grievances"); *Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2000) (finding exhaustion when a prisoner "submit[ted] a grievance but received no ruling").

Here, Plaintiff has waited and received no meaningful response to her emergency grievances that sufficiently "asserted [Defendants'] shortcomings in the form of denying her adequate and appropriate . . . health treatment and placing her in a men's prison despite being a female." *Hampton*, 2018 WL 5830730, at *9. This lack of response—in addition to Defendants' ongoing lack of response to years of complaints about the mistreatment of Plaintiff and her gender dysphoria—is sufficient to demonstrate exhaustion under the PLRA. *See Godfrey v. Harrington*, 13-cv-0280-NJR-DGW, 2015 WL 1228829, at *7 (S.D. Ill. Mar. 16, 2015) (noting that, in emergency situations, waiting sixteen days with no response to a grievance "may be sufficient to exhaust, particularly when the inmate is in imminent danger of harm").

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants to (i) provide Plaintiff with the medically necessary healthcare she needs, including permanent hair removal and gender confirmation surgery; (ii) house Plaintiff at an institution consistent with her gender identity; and (iii) protect Plaintiff from the known and serious risks of harm she continues to face while housed in a men's prison.

Dated: April 6, 2021

Respectfully submitted,

/s/ John A. Knight_____

**Angela M. Povolish**
FEIRICH MAGER GREEN RYAN
2001 West Main Street
P.O. Box 1570
Carbondale, IL 62903
(618) 529-3000
apovolish@fmgr.com

**John A. Knight**
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740 x335
jknight@aclu-il.org

**Taylor Brown**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7887
tbrown@aclu.org

*Attorneys for Plaintiff*
*Cristina Nichole Iglesias*

**Kevin Warner**
**Frank Battaglia**
**Katherine D. Hundt**
**Courtney Block**
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600
kwarner@winston.com
fbattaglia@winston.com
khundt@winston.com
cblock@winston.com