UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS              )
(a.k.a. Cristian Noel Iglesias),       )
                                       )
                        Plaintiff,     )
                                       )        Case No. 19-cv-00415-RJN
              v.                       )
                                       )
IAN CONNORS, *et al.*,                 )
                                       )
                        Defendants.    )

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Defendants recognize that Plaintiff's gender dysphoria is a serious medical condition that requires attention. Defendants further agree that Plaintiff—like all inmates—deserves respect and reasonable efforts to protect her from harassment or harm. As discussed below, Defendants consistently have attended to Plaintiff's gender dysphoria. And, at all times, Defendants have taken prompt steps to ensure Plaintiff's safety.

Plaintiff has filed a preliminary injunction motion requiring Defendants to transfer her to a female facility, provide her with permanent hair removal and gender-affirming surgery, and protect her from harassment from other inmates. At this time, however, Plaintiff cannot satisfy any of the four preliminary injunction factors.

Plaintiff cannot show a likelihood of success on her claims. As an initial matter, Plaintiff has not alleged an adequate basis for venue in this District, and the Court should transfer this case to a District where venue would be proper. Plaintiff's request for an injunction requiring her to be housed in a female facility is also now moot in light of a recent conclusion that a transfer is appropriate. Before Plaintiff filed her Motion, Defendants had already begun an investigation into

Plaintiff's allegations of threats and harms at Fort Dix. That investigation took place in parallel with an individualized assessment of Plaintiff's housing conditions by medical and penological experts. In light of that assessment, Defendants have concluded that it is now appropriate to transfer Plaintiff to a female institution. Accordingly, Plaintiff's claim concerning a transfer to a female facility and her failure-to-protect and sexual harassment claims are moot.

Plaintiff's claim for gender-affirming surgery and permanent hair removal is also unlikely to succeed. Following several evaluations of Plaintiff's medical needs, Defendants reasonably concluded that gender-affirming surgery is not yet appropriate for Plaintiff because her hormone levels had not stabilized and because she has not lived in her preferred gender in real-world conditions for twelve months. And it is undisputed that Plaintiff provided no medical justification for her request for permanent hair removal. Plaintiff may disagree with these considered judgments, but such disagreements do not amount to a constitutional violation. Indeed, far from exhibiting deliberate indifference to Plaintiff's medical and safety needs, Defendants consistently have carefully evaluated Plaintiff's requests and timely provided appropriate medical care, and will continue to do so in the future.

Finally, Plaintiff has failed to show irreparable harm, and the balance of the equities tip against the issuance of an injunction under these circumstances. Plaintiff's motion for a preliminary injunction therefore should be denied.

## BACKGROUND

### I.    STATUTORY AND REGULATORY BACKGROUND

#### A.  BOP's Inmate Designation Authority and Process

Decisions regarding classification and designation of inmates to a particular prison facility are vested in Federal Bureau of Prisons ("BOP"). *See* 18 U.S.C. § 3621(b). In making inmate designation decisions, BOP "may designate any available penal or correctional facility that meets

minimum standards of health and habitability established by the Bureau . . . that the Bureau determines to be appropriate and suitable." *Id.* Among other things, BOP's determination must take into account "the history and characteristics of the prisoner" and "the resources of the facility contemplated." *Id.* Pursuant to this authority, BOP created the Designation and Sentence Computation Center ("DSCC") to centralize all determinations regarding inmate institution placements, referred to as "designations." Declaration of Alison Leukefeld ("Leukefeld Decl.") ¶ 5.

BOP issued Program Statement 5100.08, <u>Inmate Security and Custody Classification</u> (the "Program Statement") to provide guidance to staff on how to apply § 3621(b). *Id.* The Program Statement directs DSCC staff to consider three primary factors when making a designation decision: (1) the level of security and supervision the inmate requires; (2) the level of security and staff supervision the institution is able to provide; and (3) the inmate's program needs. *Id.*[1]

BOP takes into account two additional authorities with respect to transgender inmates. First, "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates," 28 C.F.R. § 115.42(c) requires BOP to "consider on a case-by-case basis whether placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." Second, the Transgender Offender Manual (the "Manual") found in Program Statement 5200.04 provides guidance on many aspects of managing transgender inmates, including staff training, initial designations, intake screening, housing and programming

---

[1] Other factors to be considered by the DSCC include: the inmate's release residence; the level of overcrowding at an institution; any security, location or program recommendation made by the sentencing court; any Central Inmate Monitoring issues; any additional security measures to ensure the protection of victims/witnesses and the public in general; and, any other factor(s) which may involve the inmate's confinement, the protection of society, and/or the safe and orderly management of a BOP facility. *Id.*

assignments, documentation and SENTRY[2] assignments, medical treatment, institution psychology services, searches, clothing and commissary, and reentry needs. *See* Leukefeld Decl. Attach. 2 (Manual) at 1.

To help implement these policies and procedures, BOP created the Transgender Executive Council ("TEC")—a multidisciplinary team comprised of medical and mental health experts and custody and classification professionals—to conduct the case-by-case assessments for designation of transgender inmates. Leukefeld Decl. Attach. 2 at 4-6. This case-by-case assessment considers a number of factors about the inmate in question as well as facility-specific factors. *Id.* at 5-6. Based on these considerations, the TEC will recommend housing by gender identity when, in its view, such housing is "appropriate." *Id.* at 6. Once the TEC makes a recommendation, it is forwarded to the DSCC for designation. *See* Leukefeld Decl. ¶ 5.

Such designations are subject to regular reevaluation. The inmate's housing assignment and programming are reviewed twice yearly by Unit Management staff, to ensure "on a case-by-case basis that the inmate placement does not jeopardize the inmate's health and safety and does not present management or security concerns." Leukefeld Decl., Attach. 2 at 6. Additionally, institution staff may refer cases to the TEC for review of any issues, concerns, or questions regarding the housing and management of a transgender inmate. *Id.* at 4-6. If the TEC receives a request to transfer a transgender inmate, it will meet and conduct a case-by-case assessment to consider if a transfer is appropriate, and, if so, to which institution. *Id.* If the TEC recommends redesignation, DSCC staff will then typically redesignate the inmate. *See* Leukefeld Decl. ¶ 5.

---

[2] Some of the BOP's computerized records are maintained in a database named SENTRY. SENTRY is a real-time information system consisting of various applications for processing inmate information. Data collected and stored in the SENTRY system includes information related to the classification, discipline, and programs of federal inmates. Leukefeld Decl. ¶ 14 n.1.

### B. Factual and Procedural Background Regarding Plaintiff

#### 1. Plaintiff's Relevant History in BOP Facilities

Plaintiff Christina Nichole Iglesias is a transgender woman currently serving a 240-month sentence for her most recent conviction, threatened use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(b). Leukefeld Declaration ¶ 7. In 2015, BOP medical staff diagnosed Plaintiff with gender dysphoria in addition to her diagnoses for borderline personality disorder and anxiety. *Id.* ¶ 8.

To address Plaintiffs' psychological needs, Defendants have provided her with regular individual and group therapy sessions and an intensive residential treatment program for individuals with borderline personality disorder. *Id.* Defendants also have provided numerous accommodations to address her gender dysphoria, *id.*, including a prescription for female hormones, Declaration of Dr. Berhan Yeh ("Yeh Declaration") ¶¶ 7-12. Defendants' accommodations additionally include ensuring that all pat down searches are conducted by female staff, giving Plaintiff female undergarments, and providing her access to a female commissary list, including female razors. Leukefeld Decl. ¶ 8. Moreover, Defendants transferred Plaintiff to Federal Medical Center Lexington ("FMC Lexington"), a lower security male facility, specifically as an intermediate step toward possible future placement in a female facility. *Id.* ¶ 15.

Plaintiff has sought additional accommodations for her gender dysphoria, such as gender-affirming surgery, permanent hair removal, and reassignment to a female facility. *Id.* ¶ 9. At her most recent review preceding the filing of this Motion, which occurred in March 2020, the TEC determined that Plaintiff was not at that time an appropriate candidate for gender-affirming surgery. *Id.* ¶ 10. The TEC reached this determination because Plaintiff's hormone levels were unstable and, as a result, transfer to a female institution was not yet appropriate. *Id.* The TEC further determined that Plaintiff did not meet the criteria for gender-affirming surgery because, having lived solely in

5

male facilities, she had not lived in a gender-conforming role for twelve months. *Id.* ¶¶ 10-11. Defendants also declined Plaintiff's request for permanent hair removal because there was no indication that such a procedure was medically necessary. Exhibit A (Denial of Administrative Remedy No. 923754-A1).

While incarcerated at the FMC Lexington, Plaintiff had safety and disciplinary issues that led staff to recommend her transfer. Shivers Decl. ¶ 4. Plaintiff was then transferred to the Federal Correctional Institution at Fort Dix ("Fort Dix"). *Id.* Through routine monitoring of one of Plaintiff's phone calls, BOP staff at Fort Dix learned that other inmates might be threatening her. *Id.* ¶ 7. During a follow-up interview with Plaintiff that evening, Plaintiff informed staff that her life was in danger from another inmate. *Id.* To ensure Plaintiff's safety, she was transferred to the Special Housing Unit ("SHU"), in accordance with BOP Program Statement 5270.11. *Id.* ¶ 8. The inmate threatening Plaintiff was placed in a separate cell in the SHU and then transferred out of Fort Dix entirely. *Id.* ¶ 9. Subsequent investigation determined that Plaintiff's claims were unsubstantiated, and Plaintiff was going to be released from the SHU. *Id.* ¶ 10.

Before Plaintiff's release, however, Plaintiff disclosed alleged physical and sexual assault by another inmate in her prior housing unit. *Id.* ¶ 11. Plaintiff therefore has continued to be housed in the SHU pending investigation of her new allegations. *Id.* For safety and security reasons, inmates in the SHU as a matter of general policy are not permitted to have razors in their cells. *Id.* ¶ 13. Instead, they are given the opportunity to shower three times a week and may shave while they do so. *Id.* Plaintiff frequently chooses to decline these opportunities. *Id.*

As part of BOP's ongoing consideration of Plaintiff's proper placement and care, the TEC reconvened on April 19, 2021, to reevaluate Plaintiff's requests for accommodations and treatment concerning her gender dysphoria, including transfer to a female facility. Leukefeld Decl. ¶ 16. The TEC reviewed Plaintiff's most recent lab results and recommended her placement in a female facility

based on her stabilized hormone levels, which the TEC expects that the DSCC will accept *Id.*

2. Procedural History of this Case

Plaintiff, then an inmate at United States Penitentiary, Marion ("USP Marion"), filed a *pro se* complaint in this case on April 12, 2019. ECF 1. While that complaint was pending, the Court assigned counsel to Plaintiff and dismissed the *pro se* complaint without prejudice on mootness grounds. ECF No. 40. Plaintiff was housed at FMC Lexington when she filed her First Amended Complaint ("Amended Complaint"), ECF No. 52, on September 8, 2020. *Id.* ¶ 5. The Amended Complaint asserted three counts—an Eighth Amendment claim for failure to provide adequate medical care for Plaintiff's gender dysphoria, *id.* ¶¶ 94-100, a Fifth Amendment equal protection claim based on her placement in a male prison facility, *id.* ¶¶ 101-109, and an Eighth Amendment claim alleging a failure to protect her from serious harm, *id.* ¶¶ 110-114. Pursuant to 28 U.S.C. § 1915A(b), the Court screened the Amended Complaint for merit, allowing claims against only certain individual defendants to proceed. ECF No. 74.

Although Plaintiff sought reconsideration of the Court's screening order, ECF No. 74, she did not wait for the Court to resolve that motion before moving for leave to file a second amended complaint, ECF Nos. 85, 85-1. The proposed pleading ("Second Amended Complaint") alleged the same claims as the Amended Complaint, with some modifications to the parties against whom the claims were asserted. *Compare* Am. Compl. *with* 2d Am. Compl. Defendants opposed the amendment in part as futile, ECF No. 89, and the Court has not yet ruled.

Since the filing of the motion to amend, Plaintiff has been transferred to Fort Dix, another BOP men's facility. Decl. of Cristina Nichole Iglesias in Supp. Pl.'s Mot. for Prelim. Inj. ("Iglesias Declaration"), ECF No. 93-2, ¶ 1. While incarcerated at Fort Dix, Plaintiff moved for a preliminary injunction based on a subset of the same claims asserted in the Amended Complaint, as well as an unpled claim for sexual harassment. *See* Pl.'s Mot. & Mem. in Supp. of Prelim. Inj. ("Motion"), ECF

No. 93, at 10-16. Defendants hereby oppose the Motion.

## ARGUMENT

### I.     STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). It is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 927 (1997) (citation omitted).

To obtain a preliminary injunction, "a plaintiff must establish that [she] has some likelihood of success on the merits; that [she] has no adequate remedy at law; [and] that without relief [she] will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation and quotation marks omitted). Only after a plaintiff passes this threshold must a court "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* at 364 (citation and quotation mark omitted). These two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *GEFT Outdoors*, 922 F.3d at 364 (citation and quotation marks omitted). A plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely*," not merely possible, "in the absence of an injunction." *Winter*, 555 U.S. at 22.

In addition, because Plaintiff is seeking an injunction that would require Defendants to take affirmative actions, she is seeking a mandatory injunction. Such injunctions should be "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation omitted)

(reversing mandatory injunction against prison concerning conditions of confinement); *W.A. Mack, Inc. v. Gen. Motors Corp.,* 260 F.2d 886, 890 (7th Cir. 1958) (holding that "mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds."). Moreover, in the context of prisoner litigation, "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

## II.   THE COURT SHOULD FIRST RESOLVE THE SCREENING OF PLAINTIFF'S SECOND AMENDED COMPLAINT BEFORE ADDRESSING HER PRELIMINARY INJUNCTION MOTION

Plaintiff's partially opposed motion to file a second amended complaint is still pending with the Court. Dkt. No. 85. Under these circumstances, the Court should review the proposed second amended complaint under 28 U.S.C. § 1915A before addressing Plaintiff's preliminary injunction motion. *See Chavez v. Cunningham*, No. 19-cv-00377-NJR, 2019 WL 1517592 (S.D. Ill. Apr. 8, 2019) (Rosenstengel, J.). The position of former defendants BOP and the federal officials sued in their official capacity concerning the screening of the proposed Second Amended Complaint is reflected in ECF No. 86, and individual-capacity defendant Connor's positon is reflected in ECF No. 87. Without addressing and resolving those issues, it is unclear whether any claims upon which Plaintiff seeks preliminary injunctive relief are even properly before the Court.

## III.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.

Plaintiff's Motion raises four claims: (A) alleged sex discrimination in housing her in a male facility, (B) alleged deliberate indifference in failure to provide her adequate treatment for her gender dysphoria, (C) alleged sexual harassment, and (D) alleged failure to protect her from serious harm while incarcerated. Plaintiff cannot establish that she is likely to succeed on any of these claims, and

in light of the determination that it is now appropriate to transfer her to a female institution all of her claims, other than her claim that she has been denied adequate treatment, are moot.

**A.  Plaintiff Cannot Establish a Likelihood of Success as to Any of Her Claims Because This Court Is an Improper Venue for Her Complaint.**

Federal Rule of Civil Procedure 12(b)(3) provides that courts should dismiss complaints filed in an improper venue. Failure to establish venue is thus fatal to a showing of success on the merits. *See Crenshaw v. Antokol*, 238 F. Supp. 2d 107, 113–14 (D.D.C. 2002); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1049 n.8 (S.D. Fla. 1990); *see also BMO Harris Bank N.A. v. Stafford Transp. of La.*, No. 1:20-CV-01731-LMM, 2020 WL 4548726, at *1 n.3 (N.D. Ga. June 4, 2020).

Plaintiff cannot meet her "burden of establishing that venue is proper" in this Court. *Graves v. Pikulski*, 115 F. Supp. 2d 931, 934 (S.D. Ill. 2000). Plaintiff alleges that venue is proper here "because the majority of events giving rise to this action occurred in this [d]istrict."[3] Am. Compl. ¶ 4; 2d Am. Compl. ¶ 4. In actuality, <u>none</u> of the operative facts occurred in this judicial district, much less the "substantial part" required for venue. 28 U.S.C. §1391(e)(1) (claims against United States); *id.* § 1391(b)(2) (claims against individuals). Plaintiff is challenging the conditions of her confinement. When Plaintiff filed the Amended Complaint—which is still the operative pleading in this case—she was housed at FMC Lexington, in Kentucky. Am. Compl. ¶ 5. When she moved for leave to file the Second Amended Complaint, Plaintiff was housed at Fort Dix in New Jersey and continues to be incarcerated there. 2d Am. Compl. ¶ 5. Plaintiff's only allegation concerning events occurring in this judicial district is that she made one of her multiple requests for gender-affirming surgery while incarcerated at USP Marion. Am. Compl. ¶ 39; 2d Am. Compl. ¶ 40. However, by the time that claim

---

[3] In the same paragraph, Plaintiff states that "Defendants are subject to personal jurisdiction in this district." Am. Compl. ¶ 4; 2d Am. Compl. ¶ 4. Not only does Plaintiff fail to offer any allegations in support of this assertion, *see Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (non-conclusory, non-speculative allegations required to plead personal jurisdiction), but it is not an independent basis for venue, *see* 28 U.S.C. §§ 1391(b)(2), (e)(1).

was administratively exhausted (and therefore ripe for judicial review), Plaintiff was incarcerated at FMC Lexington. *See* Shivers Decl., Attach. 4 at 14 (administrative complaint 991304-A1). Thus, venue is not and has never been appropriate in this judicial district.

The Court should therefore deny Plaintiff's Motion without prejudice, resolve the motion to amend to determine the operative complaint, and transfer this case to the appropriate judicial district where Plaintiff may renew her requests for relief if necessary. *See* 28 U.S.C. § 1404(a) (permitting transfer of venue, *inter alia*, "in the interest of justice").

### B. Plaintiff Has Not Established a Likelihood of Success on Her Claim for Housing in a Female Facility.

Plaintiff alleges that Defendants' denial of her request for transfer to a female facility violates her right to equal protection under the Fifth Amendment.[4] Br. 13. In *Tay v. Dennison*, 457 F. Supp. 3d 657 (S.D. Ill. 2020), this Court held that a prison could satisfy constitutional scrutiny by conducting "individualized determination[s]" of a transgender inmate's placement, based on medical and penological interests. *Id.* at 681. Defendants repeatedly have undertaken just such an individualized analysis through the TEC, an administrative body with expertise in the medical and penological issues implicated by transgender prisoners. The TEC has considered the appropriateness of recommending Plaintiff's redesignation to a female facility and concluded that placement in a female facility is now appropriate. Leukefeld Decl. ¶ 16. Although the TEC's recommendation is subject to approval by the DSCC, the TEC's recommendations typically are accepted by the DSCC, and it is expected that it will accept the TEC's recommendation concerning Plaintiff's transfer. Leukefeld Decl. ¶ 16.

---

[4] Although the Amended Complaint and proposed Second Amended Complaint include Eighth Amendment claims based on Plaintiff's placement in a male facility, she does not assert such a claim as a basis for issuing a preliminary injunction. *Compare* Am. Compl. ¶¶ 99-100; 2d Am. Compl. ¶¶ 100-01 *with* Mot. at 10-12 (arguing a likelihood of success on Eighth Amendment claims relying only on the allegedly wrongful denial of gender affirming surgery and hair removal for purposes of social transitioning).

Accordingly, Plaintiff's failure-to-transfer claim is moot and she cannot establish a likelihood of success on the merits of that claim. *See Santiago v. Walls*, 196 Fed. Appx. 416, 417 (7th Cir. 2006) (holding that inmate's motion for a preliminary injunction seeking a change in housing was rendered moot by his transfer to another facility); *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief . . . become[s] moot."); *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988) (holding that preliminary injunction seeking transfer by inmate was moot when prison officials voluntarily decided to transfer him).

### C. Plaintiff Has Not Established a Likelihood of Success on Her Claim for Deliberate Indifference to Plaintiff's Gender Dysphoria.

To succeed on her claims that the refusal to provide gender-affirming surgery and permanent hair removal violates the Eighth Amendment, Plaintiff must show two things. First, she must show that she is suffering from "a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measures of life's necessities.'" *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). That "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused"; it requires a showing that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Second, plaintiff must show that "prison officials are deliberately indifferent to this state of affairs." *Gray*, 826 F.3d at 1005 (quoting *Farmer*, 511 U.S. at 834). Plaintiff cannot satisfy either requirement.

Deliberate indifference imposes a "high hurdle," requiring a showing "approaching a total unconcern for the prisoner's welfare." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). More generally, prison officials' conduct is judged based on "the constraints facing the official," and

managing a prison requires officials to balance competing interests. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Establishing that Defendants were deliberately indifferent to Plaintiff's serious medical needs requires more than showing a mere difference of opinion regarding the appropriate medical care she has received or mere speculation about the medical care she might yet receive. *Estelle v. Gamble*, 429 U.S. 97, 104-05, 107 (1976). "Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference." *Brown v. Wilson*, No. 3:13CV599, 2015 WL 3885984, *5 (E.D. Va. Jun. 23, 2015) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). Allegations that are akin to run-of-the-mill medical malpractice claims are insufficient to maintain a viable Eighth Amendment claim. *Estelle*, 429 U.S. at 104; *Farmer*, 511 U.S. at 835. Courts are reluctant to second-guess medical judgments where prisoners, like Plaintiff, have received medical attention and subsequently dispute the adequacy of that medical care. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Instead, to establish an Eighth Amendment claim, Plaintiff must establish that she was subject to a cruel and unusual punishment because Defendants were so deliberately indifferent to her serious medical needs as to unnecessarily and wantonly inflict pain. *Estelle*, 429 U.S. at 104.

The Supreme Court repeatedly has affirmed that the Eighth Amendment does not authorize courts to superintend prison officials' decisions about how to balance competing interests within the constraints of the prison setting. *See, e.g.*, *Helling*, 509 U.S. at 37 (explaining that the Eighth Amendment must take account of "the realities of prison administration"). Prison officials act with deliberate indifference in violation of the Eighth Amendment only if they "know[] of and disregard[] an excessive risk to inmate health or safety," a standard that "incorporates due regard for [officials'] unenviable task of keeping dangerous [individuals] in safe custody under humane conditions." *Farmer*, 511 U.S. at 837, 845 (quotation marks omitted). As the Seventh Circuit recently

emphasized, "[c]orrectional administrators must have 'substantial discretion to devise reasonable solutions to the problems they face,'" and courts must give "considerable deference . . . to the judgment of prison administrators" about how to balance competing objectives. *Mays*, 974 F.3d at 820-21 (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)); *see also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (noting that the Eighth Amendment "leav[es] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources."). "A prison medical professional faces liability only if his course of treatment is 'such a substantial departure from accepted professional judgment, practice, or standard[] as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (citations omitted) (holding that there was no clearly established Eighth Amendment violation from denial of gender affirming surgery). Courts therefore must use "caution" in issuing injunctions in the prison context and may not "enmesh[]" themselves "in the minutiae of prison operations." *Farmer*, 511 U.S. at 846-47.

1. BOP's Decision Not to Approve Plaintiff's Request for Gender-Affirming Surgery at this Juncture Does Not Violate the Eighth Amendment.

It is undisputed that Plaintiff has received medical care from BOP for the treatment of her gender dysphoria, including hormone therapy, the provision of female garments, and female grooming products and makeup. Leukefeld Decl. ¶ 8. It is further undisputed that the TEC, which includes multiple medical professionals, conducted an individualized assessment of Plaintiff and concluded that she was not an appropriate candidate for gender affirming surgery at this juncture because her hormone levels had not yet stabilized, and she had not lived a real-life experience as a female for twelve months in a female prison. *Id.* ¶¶ 10-11; Yeh Decl. ¶¶ 7-12; Mot. at 4-5. Accordingly, the issue presented here is a narrow one: whether Defendants violated the Eighth Amendment where they have provided Plaintiff medical care for her gender dysphoria, and where she disagrees with Defendants' judgment that gender-

14

affirming surgery is not yet appropriate for her. As the Seventh Circuit has explained, the Eighth Amendment is not violated under these circumstances.

In *Campbell*, 936 F.3d at 548, the Seventh Circuit held that "prisons aren't obligated to provide every requested treatment once medical care begins." *Id.* at 548. Rather, "[d]eciding whether to provide additional medical interventions—especially when the inmate's preferred course of treatment poses considerable challenges to prison administration—is not the same as deciding to provide no treatment at all." *Id.* at 549. The Seventh Circuit emphasized that "[s]urgery is 'the last and the most considered step in the treatment process,' and not all gender-dysphoric patients are surgical candidates." *Id.* at 539 (citing WPATH standards). Accordingly, the federal courts of appeal have held that the denial of gender-affirming surgery does not violate the Eighth Amendment when an inmate receives other forms of treatment, such as hormone therapy, and an individualized determination is made that additional medical care is unwarranted. *See Lamb v. Norwood*, 899 F.3d 1159, 1163 (10th Cir. 2018) (prison officials not deliberately indifferent when they provided inmate counseling and hormone treatment for gender dysphoria and prison doctor stated that gender-affirming surgery was unnecessary)..[5]

Plaintiff's reliance upon the Court's decision in *Monroe v. Baldwin*, 424 F. Supp. 3d 526 (S.D. Ill. 2019) (Rosenstengel, J.), is misplaced. *See* Mot. at 10. In *Monroe*, the Court held that a putative class of transgender inmates had a likelihood of success on the merits of their Eighth Amendment claims where the evidence indicated that the Illinois Department of Corrections ("IDOC") altogether "denies

---

[5] Other federal courts of appeals are in accord. *See Kosilek v. Spencer*, 774 F.3d 63, 90-91 (1st Cir. 2014) (*en banc*) (holding that a prison's decision not to provide gender affirming surgery did not violate the Eighth Amendment where the prison provided other treatment options and the inmate simply disagreed with the prison's medical decisions); *see Wittkowski v. Levine*, 382 F. Supp. 3d 107, 115 (D. Mass. 2019) (applying *Kosilek* and rejecting claim for gender affirming surgery); *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1274 (11th Cir. 2020) (holding that denial of gender affirming surgery at most constituted negligence and explaining that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [cannot] support a claim of cruel and unusual punishment.").

and delays the diagnosis and treatment of gender dysphoria without a medical basis or penological purpose." *Monroe*, 424 F. Supp. 3d at 544. In particular, the evidence reflected lengthy delays in diagnosis and treatment. *Id.* The Court also found that IDOC had not evaluated a single transgender inmate for surgery, and that the failing to provide care "for a non-medical reason or inexplicably delaying treatment with no penological purpose can amount to deliberate indifference. *Id.* (citation omitted).[6]

Here, it is undisputed that Plaintiff has received significant treatment for her gender dysphoria, including the provision of hormone therapy, mental health counseling, female undergarments, and makeup. Leukfeld Decl. ¶ 8. And, unlike in *Monroe*, Defendants have both medical and penological reasons for concluding that Plaintiff is not currently suitable for gender-affirming surgery. Defendants made the reasoned medical judgment that gender-affirming surgery was not appropriate for Plaintiff at this juncture for two reasons. First, Plaintiff had not lived in a gender-conforming role for twelve months since being incarcerated under the custody of BOP. *Id.* ¶¶ 11-12. Defendants appropriately concluded that successful placement in a female facility for twelve months is a critical step for gender-

---

[6] Plaintiff's reliance upon *De'Lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013), and *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019), also are misplaced. In *De'Lonta*, the court held that the plaintiff alleged a plausible Eighth Amendment claim where she claimed that she had never been evaluated concerning her suitability for gender-affirming surgery despite the lack of efficacy of other treatments. *De'Lonta*, 708 F.3d at 525; *see Campbell*, 936 F.3d at 547 n.2 (distinguishing *De'Lonta* on the ground that the prison officials in that case "never allowed [the plaintiff] to be evaluated by a [gender-dysphoria] specialist in the first place") (citation omitted). In this case, BOP has evaluated plaintiff's suitability for gender affirming surgery and reached the professional medical and penological judgment that she is not currently suitable. Leukfeld Decl. ¶¶ 9-13.

In *Edmo*, the Ninth Circuit affirmed the district court's "extensive factual findings" that credited the plaintiff's experts' opinion that gender-affirming surgery was medically necessary and discredited the prison's treating physicians, who lacked expertise in treating individuals with gender dysphoria. *Edmo*, 935 F.3d at 787. BOP's medical professionals who evaluated plaintiff possess expertise in treating individuals with gender dysphoria; and, as discussed below, plaintiff's expert Dr. Ettner admits that she has not considered sufficient facts and data to offer a reliable opinion concerning the medical necessity for gender-affirming surgery for Plaintiff.

affirming surgery in order to permit Plaintiff to fully live in her preferred gender in prison conditions. *Id.* Because prisons are segregated by sex, it is not possible for transgender female individuals to fully experience their gender in reference to same-gender peers without living in a female facility. *Id.* In addition, based on Defendants experience handling transgender inmates, they have recognized that not all transgender women adapt successfully to female prisons and some end up returning back to a male prison. *Id.* ¶ 12. Accordingly, Defendants view female transgender inmates' successful placement in a female facility as a critical step to being eligible for irreversible gender-affirming surgery because returning a post-operative transgender female inmate to a male prison due to adjustment issues would raise significant safety concerns. *Id.*[7]

Second, Defendants concluded that Plaintiff's placement in a female facility was not warranted until now because her hormone levels had fallen below their goal and had not been maximized. *Id.* ¶ 10. Achieving target hormone levels is a first step for transgender women moving to a female facility, because transgender women become more feminine in appearance when target hormone levels are maintained. *Id.* For example, maintenance of target hormone levels result in the loss of muscle mass, a decrease in libido, and the inability to maintain erections. *Id.* These feminizing effects are important for the ability of a transgender woman to safely and successfully live in a female institution. *Id.* Accordingly, Defendants reasonably concluded that Plaintiff's hormone levels needed to be observed and stabilized before consideration was given to transferring her to a female facility. *Id.*

Plaintiff's expert, Dr. Randi Ettner, disagrees with Defendants' judgment. But that disagreement fails to establish an Eighth Amendment violation for at least three reasons. First, Dr. Ettner acknowledges that she lacks sufficient facts and data to offer any reliable conclusions about whether gender-affirming surgery is medically appropriate for Plaintiff. Dr. Ettner acknowledges that her

---

[7] Notably, Plaintiff's expert agrees that transgender female inmates who present female characteristics would be at an increased risk of harm in a male facility. Dkt. No. 93-1 at ¶ 66.

conclusions are at best "tentative" based on the "small amount of information [she] h[as] been able to receive about Plaintiff's treatment," ECF No. 93-1, ¶ 76, and that "[i]n order to properly analyze the treatment that Plaintiff is receiving, [Dr. Ettner] would need to be able to see a more complete set of [Plaintiff's] medical and mental health records and an opportunity to conduct a longer interview of her. It would also be helpful if [Dr. Ettner] could conduct psychological testing of [Plaintiff]." *Id.* Dr. Ettner's opinion offers no basis for injunctive relief, as she admits that it is "impossible for [her] to reach any definitive conclusions based on the small amount of information she ha[s] received[.]" *Id.* ¶ 83. This acknowledged lack of sufficient facts and data are particularly problematic here, because the WPATH Standards of Care ("SOC") upon which she so heavily relies "are intended to provide *flexible direction for the treatment* of [gender dysphoria] and state that individual professionals and organized programs may modify the Standards requirements in response to a patient's unique situation or an experienced professional's evolving treatment methodology." *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (cleaned up); *Arnold v. Wilson*, No. 1:13cv900, 2014 WL 7345755, *6 (E.D. Va. Dec. 23, 2014) (recognizing that the WPATH SOC recommendations "are flexible clinical guidelines," and can be adjusted based on "a patient's unique anatomic, social or psychological situation.") (citing WPATH standards)). Accordingly, in the admitted absence of sufficient data to determine whether the WPATH's flexible standards have been met under these circumstances, Dr. Ettner admits that she lacks any reliable basis to offer her opinions.[8] *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (affirming

---

[8] Plaintiff states that the Defendants have refused to respond to discovery requests. Mot. at 2, n.1. Plaintiff served discovery after the Court dismissed all of the official capacity claims in this case in its screening order. Although Plaintiff moved for reconsideration, in part, of that screening order, the Court has not yet ruled on that motion. In addition, Plaintiff did not seek reconsideration of the dismissal of the official capacity claims against the individual federal defendants. ECF No. 76. Accordingly, there presently are no official capacity claims in this case, and any discovery concerning the dismissed claims is inappropriate and, regardless, would be premature. In any event, Plaintiff has the ability to access her medical records by submitting a request to staff members at her institution. *See* 28 C.F.R. § 513.42

exclusion of expert that lacked sufficient facts and data to support opinion); *see Second Amendment Arms v. City of Chicago*, No. 10-cv-4257, 2020 WL 1157347, *11-12 (N.D. Ill. Mar. 10, 2020) (excluding expert that admitted he lacked sufficient data in offering opinion).

Second, Dr. Ettner's opinions are internally inconsistent. On the one hand, Dr. Ettner contends that placement in a female facility should not be a prerequisite for gender-affirming surgery. *Id.* ¶ 88 (taking issue with Defendant Connor's statement that "gender-affirming surgery is considered after real life experience in your preferred gender" and concluding that the SOC do not focus on the location where the patient lived). Yet Dr. Ettner acknowledges that "transgender women with feminine characteristics are at elevated risk for harm when housed in male prisons." *Id.* ¶ 66. In short, Dr. Ettner's own opinions support Defendants' judgment that gender-affirming surgery is not currently appropriate for Plaintiff while she is incarcerated in a male facility.

Third, Defendants' judgment that living in one's preferred gender for twelve months includes placement in a facility that corresponds with the inmate's gender identity is entirely consistent with the non-binding WPATH standards upon which Dr. Ettner relies. For example, WPATH explains that the rationale for requiring a "12 continuous months of living in a gender role that is congruent with their gender identity" is that "this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role" before surgery. *Campbell*, 936 F.3d at 539 (citing WPATH standards). This one-year preparatory period "helps patients adjust to the 'profound personal and social consequences' of adjusting one's gender expression." *Id.* Dr. Ettner fails to explain, beyond her own *ipse dixit*, how Plaintiff properly could socially adjust to gender-affirming surgery in the absence of being housed in a female institution. But even if Dr. Ettner were correct and Defendants misconstrued the WPATH guidelines, that would not rise to the level of an Eighth Amendment violation. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008); *see Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996) (holding that "a mere disagreement with the course

of [the inmate's] medical treatment [does not constitute] an Eighth Amendment claim of deliberative indifference.") (cleaned up); *Lamb v. Norwood*, 262 F. Supp. 3d 1151, 1158 (D. Kan. 2017) (recognizing "the reality that the treatment of gender dysphoria is a highly controversial issue for which there are differing opinions"). For all these reasons, Plaintiff cannot establish a likelihood of success on her Eighth Amendment claim for gender affirming surgery.

### 2. Plaintiff Cannot Establish an Eighth Amendment Violation Based on Defendant's Refusal to Provide Hair Removal.

Plaintiff's claim for hair removal is unlikely to succeed because the Eighth Amendment does not mandate that prisoners receive cosmetic hair removal. As the Seventh Circuit has explained in reviewing claims for electrolysis, "our cases offer no indication that denying arguably nonmedical cosmetic accommodations violates the Eighth Amendment." *Campbell*, 936 F.3d at 549. Courts have rejected Eighth Amendment claims for hair removal in the absence of evidence that the procedure was medically necessary. *Murillo v. Godfrey*, No. 2:18-cv-02342, 2020 WL 1139811, *14 (C.D. Cal. Mar. 9, 2020) (denying Eighth Amendment claim by transgender inmate for hair removal where inmate alleged that her "facial hair was torture" but failed to provide any evidence that removal was medically necessary); *Renee v. Neal*, 483 F. Supp. 3d 606, 615 (N.D. Ind. 2020) (holding that denial of permanent hair removal "is not a clearly established federal constitutional right").

Here, Plaintiff informed Defendants that she wanted laser hair removal because it caused her mental distress. Ex. A. But, as BOP officials observed, her clinical provider had not indicated the medical necessity for laser hair removal as part of her therapy. *Id.* Defendants further noted that during Plaintiff's evaluation by BOP's Psychology Services, she reported "no major emotional or environmental problems since [she] last contact[ed] Psychology Services." *Id.* Accordingly, Defendants informed Plaintiff that if she was having issues, she should request a sick call or Psychology Services to address her concerns, and that her primary care team will continue to make recommendations as needed. *Id.*

Under these circumstances, Plaintiff cannot establish a likelihood of establishing an Eighth Amendment violation based on the denial of laser hair removal. Plaintiff nevertheless contends that Defendants are "knowingly denying her even the ability to shave more than once per week," while in protective custody. Mot. at 12. Plaintiff's contention is inaccurate. Although inmates in the SHU, including Plaintiff, are not allowed as a matter of general policy to possess razors in their cells for safety and security reasons, they are offered the opportunity to shower three times a week and to shave with a razor at that time. Shivers Decl. ¶ 13. Despite being offered this opportunity, Plaintiff frequently has declined to take advantage of it. *Id.* Plaintiff's decision to decline a razor cannot establish deliberate indifference on the part of Defendants.

### D.  Plaintiff Has Not Established a Likelihood of Success on her Sexual Harassment Claim.

Plaintiff's Motion references a "separate[]" Fifth Amendment equal protection claim based on alleged sexual harassment by prisoners and staff. Mot. at 14. As discussed below, although Plaintiff's claim for an injunction is mooted by her transfer to a female facility, it fails for the additional threshold reasons that she has failed to plead a sexual harassment claim or exhaust her administrative remedies.

First, Plaintiff cannot succeed on a Fifth Amendment sexual harassment claim because she has never pled it. Neither the Amended Complaint nor the proposed Second Amended Complaint contains a claim based on sexual harassment. *See generally* Am. Compl. ¶¶ 94-114; 2d Am. Compl. ¶¶ 95-115. "A preliminary injunction grants 'intermediate relief of the same character as that which may be granted finally.'" *Sai v. TSA*, 54 F. Supp. 3d 5, 8 (D.D.C. 2014) (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). To be potentially entitled to relief on a claim, a party must adequately plead it. *See* Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, because a claim that is not pled cannot lead to final relief, it cannot be a basis for preliminary relief either. *See Omega World Travel, Inc. v. Trans World*

*Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." (citation omitted)); *see also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (collecting cases).

Second, Plaintiff is procedurally barred from asserting a sexual harassment claim under the Prison Litigation Reform Act of 1995 ("PLRA"), Pub L. No. 104-134, 110 Stat. 1321–71 (Apr. 26, 1996), as amended, 42 U.S.C. § 1997e *et seq.* That statute requires exhaustion of administrative remedies before a prisoner can bring suit. 42 U.S.C. § 1997e(a). The last grievance concerning staff conduct that Plaintiff fully exhausted was filed more than a decade ago, when Plaintiff was housed at the U.S. Penitentiary Florence Admax facility. *See* Shivers Decl., Attach. 4 at 8 (administrative complaint 629356, originally filed March 15, 2011, exhausted July 14, 2011). Any alleged sexual harassment by BOP staff, whether direct or indirect, grieved at that time would have been barred by the applicable statute of limitations long ago. *See Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 751 (10th Cir. 2014) (two-year statute of limitations for *Bivens* claims in Colorado, six-years statute of limitations for claims against United States). Thus, Plaintiff could not succeed on any harassment claims, even if she had pled them. Plaintiff is therefore unable to demonstrate that she is likely to succeed on a Fifth Amendment sexual harassment claim.

Third, Plaintiff's sexual harassment claim is now moot. The relief she seeks for this claim is an injunction requiring her to be transferred to a female facility. Am. Compl. at 25 (Prayer for Relief ¶¶ c, d). Because Plaintiff is now scheduled for transfer to such a facility, there is no further relief for the Court to provide. Her claim is therefore moot and cannot succeed on its merits. *Santiago*, 196 Fed. Appx. at 417; *Lehn*, 364 F.3d at 871; *Moore*, 862 F.2d at 150.

**E.  Plaintiff Has Not Shown a Likelihood of Success on the Merits of Her Eighth Amendment Failure-to-Protect Claim.**

Plaintiff alleges that Defendants' denial of a transfer to a female facility violates her Eighth Amendment right to be free from a substantial risk of serious harm while incarcerated. Br. at 14-15. This claim fails for at least three reasons.

1.  Plaintiff Has Failed to Exhaust Her Administrative Remedies Under the PLRA.

Since Plaintiff was transferred to Fort Dix, she has not exhausted any administrative remedies with regard to any alleged failure by Defendants to protect her from mistreatment. At Fort Dix, Plaintiff has lodged only one grievance regarding the conditions of her confinement, which asserted that she would be unsafe if released from the SHU into the general population. Shivers Decl., Attach. 4 at 14 (grievance 1075354-F1). Plaintiff has not appealed the rejection of that grievance, so has not satisfied the PLRA's exhaustion requirement. *See id.*; 42 U.S.C. § 1997e(a).

2.  Plaintiff's Claim Is Unlikely to Succeed on Its Merits.

To make out a failure-to-protect claim, Plaintiff must demonstrate Defendant's deliberate indifference to a substantial risk of serious harm. *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020). This means that Plaintiff must show both exposure to an objectively serious risk of harm and that Defendants "must have known of and disregarded an excessive risk to the inmate's health or safety." *Id.* The second prong cannot be met if Defendants took "reasonable measures to abate the known risk." *Id.* at 655.

Although Plaintiff's Motion recounts numerous past incidents in which she was subjected to actual or threatened harm in other BOP facilities, the only ongoing harm she identifies while at Fort Dix is "fear . . . [from] remain[ing] in a male prison with prisoners who have threatened and assaulted her." Br. at 8; *see Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."). However, fear alone is insufficient

to state an Eighth Amendment claim challenging the conditions of confinement, *Babcock v. White*, 102 F.3d 267, 273 (7th Cir. 1996), and Defendants are not disregarding the risk of possible future assault. Rather, on the same day that Plaintiff informed staff about her mistreatment by other inmates at Fort Dix, BOP granted Plaintiff's request for protective custody. Iglesias Decl. ¶¶ 61-62.

Because the TEC has recommended Plaintiff's transfer to a female facility, her failure-to-protect claim will soon be moot. *Jones v. Butler*, 663 F. App'x 468, 470 (7th Cir. 2016) (transfer of inmate mooted claim for injunctive relief on failure-to-protect claim). And until Plaintiff's transfer to a female facility is finalized, protective custody "offer[s] reasonable protection" and therefore meets Defendants' Eighth Amendment obligations. *Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008) (protective custody acceptable alternative to transfer); *Jasmaine v. Gazoo*, No. 3:18-CV-00533-MR, 2021 WL 243865, at *7 (W.D.N.C. Jan. 25, 2021) (same); *Valenzuela v. Monson*, No. CV 19-05162-PHX-MTL (MHB), 2020 WL 6891414, at *3 (D. Ariz. Nov. 24, 2020) (same). Here, there is every reason to believe protective custody will offer such protection. Since entering protective custody, Plaintiff has suffered nothing more than verbal threats from a now-transferred inmate. Mot. at 8. Verbal harassment, including threats of physical harm, do not amount to an unconstitutional condition of confinement. *See Turner v. Mull*, 784 F.3d 485, 492 (8th Cir. 2015); *Widner v. Aguilar*, 398 F. App'x 976, 979 (5th Cir. 2010); *Booth v. King*, 228 F. App'x 167, 172 (3d Cir. 2007); *Walton v. Terry*, 38 F. App'x 363, 364-65 (9th Cir. 2002); *see Morgan v. Corr. Corp. of Am.*, No. 2:09CV97-B-A, 2010 WL 1710809, at *2 (N.D. Miss. Apr. 26, 2010) (holding no constitutional violation from "failure of prison guards to protect the plaintiff against verbal abuse from others."). Indeed, Plaintiff is in protective custody by her own request and has filed an administrative grievance to stay there Shivers Decl., Attach. 4 at 14 (grievance 1075354-F1). She cannot plausibly maintain that her continued housing in the SHU pending transfer to a female facility is not a reasonable measure to ensure her safety at Fort Dix.

## F.   PLAINTIFF FAILS TO SHOW IRREPARABLE HARM

Because Plaintiff has failed to establish a likelihood of success on the merits, the Court need not proceed further to consider the remaining preliminary injunction factors. *See GEFT Outdoors*, 922 F.3d at 367-68 (noting that if a plaintiff cannot show a likelihood of success on the merits, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'"). Even if the Court were to proceed, however, it should find that Plaintiff has failed to show the requisite irreparable harm necessary to justify an injunction.

Plaintiff contends that the deprivation of her constitutional rights constitutes irreparable harm. Mot. at 17. But as explained above, BOP has agreed to transfer her to a female facility. This transfer will eliminate much of the asserted irreparable harm. BOP also has provided—and will continue to provide—appropriate medical care to Plaintiff for the treatment of her gender dysphoria and appropriate protection from other harms. Under these circumstance, Plaintiff cannot establish any violation of her constitutional rights or any irreparable harm pending the ultimate resolution of her claims. *Mudica v. Warden*, No. 3:19-cv-1090, 2020 WL 1685718, *3 (N.D. Ind. Apr. 6, 2020) (holding that where prison provided medical care to inmate, and that care would continue absent a preliminary order from the court, the inmate could not establish irreparable harm); *Robertson v. Deputy Commissioner*, No. 3:19-cv-938-DRL-MGG, 2019 WL 7403678, *3 (N.D. Ind. Dec. 30, 2019) (holding that inmate failed to establish irreparable harm in the absence of an injunction where medical care provided was adequate).

## G.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST AGAINST A PRELIMINARY INJUNCTION

Even if Plaintiff could establish a likelihood of success on the merits and irreparable harm, the equities and public interest weigh against issuing an injunction. *See Winter*, 555 U.S. at 32. These merged factors are especially important "when a prisoner seeks a preliminary injunction against

correctional officials" because "[t]he public interest in the safe and orderly management of prisons is great." *Buck v. Briley*, No. 2001 C 1153, 2001 WL 619523, at *2 (N.D. Ill. May 23, 2001). "While federal courts must take cognizance of prisoners' valid constitutional claims, federal courts cannot manage prisons, and must give substantial deference to those who do." *Id.* "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Mays*, 974 F.3d at 820 (concluding that district court erred in failing "to defer to correctional administrators in a matter implicating safety and security concerns").

This is not an instance in which Defendants are failing to address the issues Plaintiff complains of in her Motion. Defendants are actively addressing her security concerns and providing her medical care for her gender dysphoria. Rather, Plaintiff is seeking to have the Court substitute its judgment concerning the proper remedies for these issues for the judgment of BOP, the federal agency entrusted by Congress to administer the federal prison system. BOP possesses the penological and medical expertise and knowledge of available resources to make the best decision concerning how to address Plaintiff's needs without harming the overall prison system. The Court should defer to that expertise and knowledge because the public interest favors the orderly administration of the prison system by the most capable party. *See Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009) (noting "the legitimate institutional interest in the safety and security of . . . order within the [prison] facility, and the efficiency of the facility's operations" (quotation omitted)).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction should be denied.

Dated:  April 20, 2021                    Respectfully  submitted,

STEVEN D. WEINHOEFT                       BRIAN M. BOYNTON
United States Attorney                    Acting Assistant  Attorney General
                                          Civil Division
LAURA J. JONES
Assistant  United  States  Attorney       ALEXANDER K. HAAS
                                          Director, Federal Programs Branch

                                          JOSHUA E. GARDNER
                                          Special Counsel

                                          _/ s/ Gary Feldon_____
                                          GARY D. FELDON
                                          Trial Attorney
                                          United States Department of Justice
                                          Federal Programs Branch
                                          1100 L St. NW, Room 11104
                                          Washington, DC 20530
                                          (202) 598-0905
                                          Email:  gary.d.feldon@usdoj.gov

                                          *Counsel for Federal Bureau of Prisons*