**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CRISTINA NICHOLE IGLESIAS | ) | |
| *also known as* | ) | |
| CRISTIAN NOEL IGLESIAS, | ) | Case No. 19-cv-00415-JPG |
| #17248-018, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL BUREAU OF PRISONS, | ) | |
| MICHAEL CARVAJAL, CHRIS | ) | |
| BINA, IAN CONNORS, ALIX | ) | |
| MCLEAREN, THOMAS | ) | |
| SCARANTINO, <u>DAN SPROUL, DR.</u> | ) | |
| <u>JEFFERY ALLEN</u>, AND DONALD | ) | |
| LEWIS | ) | |
| | ) | |
| Defendants. | | |

<u>**PLAINTIFF'S SECOND AMENDED COMPLAINT**</u>

Plaintiff Cristina Nichole Iglesias for her <u>Second</u> Amended Complaint, states as follows:

**INTRODUCTION**

1.       Plaintiff, Cristina Nichole Iglesias, a transgender woman in the custody of the

Federal Bureau of Prisons ("BOP"), is being denied medically necessary treatment for her gender

dysphoria, including gender confirmation surgery ("GCS"), permanent hair removal, and social

transition treatment, causing her ongoing and significant harm. BOP officials have known that Ms.

Iglesias is transgender since 1994, but have consistently denied her adequate treatment, housed her

in facilities for men, and refused her requests to be transferred to a women's prison. By refusing

her proper medical treatment and refusing her requests for transfer to a women's prison, BOP

officials have knowingly disrupted her medically necessary social transition treatment and have

discriminated against her because of her sex and transgender status. BOP has also denied her

protection from the harm and grave risk of ongoing physical and sexual assaults that she faces every day because she is a woman housed in a men's prison.

2.     Ms. Iglesias brings this action for declaratory and injunctive relief to require Defendants to provide her the medical treatment they are obligated to provide her under the Eighth Amendment, to house her in a women's facility consistent with Defendants' obligations to provide her equal protection under the Fifth Amendment, and to protect her from the grave risk of serious physical and sexual assaults she faces on an ongoing basis as required by the Eighth Amendment.

## JURISDICTION AND VENUE

3.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a)(4), as this case arises under the laws and Constitution of the United States. Ms. Iglesias's claims against Defendants are for violations of her Eighth Amendment right to treatment for her serious medical needs, her Eighth Amendment right to be protected from assault, and her Fifth Amendment right to equal protection.  Ms. Iglesias seeks only declaratory and injunctive relief.

4.     Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because the majority of events giving rise to this action occurred in this District and because Defendants are subject to personal jurisdiction in this district.

## PARTIES

5.     Plaintiff Cristina Nichole Iglesias is a 46-year-old woman who was assigned male at birth. She is currently incarcerated and in the custody of BOP at Federal Correctional Institution-Fort Dix ("FCI-Fort Dix"), a men's prison.

6.     Defendant Federal Bureau of Prisons is the federal agency responsible for the incarceration of adult prisoners sentenced by the federal courts. BOP operates FCI-Fort Dix, as well as Federal Medical Center, Lexington ("FMC-Lexington") and United States Penitentiary-

2

Marion ("USP-Marion"), where Ms. Iglesias was previously housed. BOP is also responsible for Ms. Iglesias's medical treatment and for the decision to place her in a male, rather than female, facility. Finally, BOP is responsible for protecting Ms. Iglesias from physical harm and sexual abuse.  Ms. Iglesias brings this action against BOP for declaratory and injunctive relief directly under the Constitution for violations of her Fifth and Eighth Amendment Rights.  She does not bring any claims against BOP pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

7.     Defendant Michael Carvajal is the current Director of the BOP. As Director, Defendant Carvajal is the highest-level official in the BOP, and is responsible for administering and overseeing the operations of the BOP, including its policies and procedures, practices, employees, contractors, and agents. On information and belief, Defendant Carvajal is the final reviewer for treatment decisions made by the BOP Health Services, the BOP's Medical Directors and the BOP Transgender Executive Counsel. Defendant Carvajal is sued in his individual and official capacities.[1]

8.     Defendant Chris Bina is the Director of the BOP's Health Services, and was formally the Senior Deputy Assistant Director, Health Services Division of the BOP. As Director of Health Services, Defendant Bina is responsible for overseeing the psychiatric care, healthcare delivery, and medical designations for BOP prisoners. Defendant Bina serves as a member of the

---

[1] Seventh Circuit case law indicates that injunctive relief is available in cases brought pursuant to *Bivens*, 403 U.S. 388 , *see Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011) (stating that "prospective relief is available in a *Bivens* suit") (citing *Glaus v. Anderson,* 408 F.3d 381, 389 (7th Cir. 2005)), but that under *Bivens* plaintiffs may sue relevant officials in their individual capacity only. *Glaus*, 408 F.3d at 389. Accordingly, Ms. Iglesias has named individual defendants in their individual capacities pursuant to *Bivens,* as well as in their official capacities pursuant to the Constitution.

BOP's Transgender Executive Counsel (*see* ¶ 12 below) and is responsible for responding to Ms. Iglesias's requests for treatment for her gender dysphoria, including her request for GCS. He is sued in his individual and official capacities.

9.      Defendant Ian Connors is the National Inmate Appeals Administrator, Office of the General Counsel for the BOP, and at all times relevant herein is responsible for reviewing and responding to Ms. Iglesias's administrative appeals for medical care and transfer to a female facility. He is sued in his individual and official capacities.

10.      Defendant <u>Dan Sproul</u> is the Warden of USP-Marion and is employed by the BOP. As Warden of USP-Marion, Defendant <u>Sproul</u> promulgates rules, regulations, policies and procedures for USP-Marion. Defendant <u>Sproul</u> is responsible for supervising all staff and managing operations at USP-Marion. <u>He</u> is sued in <u>his</u> individual and official capacities.

11.      <u>Non-defendant L.J.W. Hollingsworth is the former Warden of USP-Marion.  As the former Warden of USP-Marion, non-defendant Hollingsworth promulgated rules, regulations, policies and procedures for USP-Marion.  As described in further detail below, Hollingsworth was the Warden of USP-Marion when Ms. Iglesias was incarcerated at USP-Marion.</u>

12.      Defendant <u>Dr. Jeffery Allen</u> is the Medical Director of the BOP. Defendant Allen is responsible for final approval for Ms. Iglesias's medical requests. Defendant <u>Allen</u> is named in his individual and official capacities.

13.      Non-defendant BOP Transgender Executive Counsel ("TEC") is the BOP entity that reviews and makes decisions regarding treatment for transgender prisoners, including Ms. Iglesias. The TEC is comprised of BOP management personnel who oversee the BOP's clinical treatment recommendations for transgender prisoners in BOP custody. The defendants named in ¶¶ 12a-12c are individuals, like Defendant Bina, who serve on the TEC and are responsible for

4

considering and approving Ms. Iglesias's requests for evaluation for medical treatment, including GCS.

a.    Defendant Alix McLearen is the Administrator of the Female Offender Branch, Reentry Services Division of the BOP. She is a PhD clinical psychologist. Defendant McLearen serves as a member of the BOP's TEC and is responsible for responding to Ms. Iglesias's requests for treatment for her gender dysphoria, including her requests for GCS. Upon information and belief, Defendant McLearen has no expertise in evaluating or treating the serious medical needs of transgender patients. She is named in her individual and official capacities.

b.    Defendant Thomas Scarantino is the Senior Deputy Assistant Director, Correctional Programs Division of the BOP. Defendant Scarantino serves as a member of the BOP's TEC, and is responsible for responding to Ms. Iglesias's requests for treatment for her gender dysphoria, including her request for GCS. He is named in his individual and official capacities.

c.    Defendant Donald Lewis is a physician and the Chief of Psychiatry, Health Services Division of the BOP. Defendant Lewis serves as a member of the BOP's TEC, and is responsible for responding to Ms. Iglesias' requests for treatment for her gender dysphoria, including her request for GCS. He is named in his individual and official capacities.

## FACTUAL ALLEGATIONS

### I.    Gender Identity and Gender Dysphoria

14.    "Gender Identity" is a well-established medical concept, referring to a person's deeply felt, internal sense of their own gender, e.g., being a man, woman, or non-binary.

15.    All human beings develop and possess a gender identity. It is a core part of identity that cannot be altered by external factors.

16.     Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men. Individuals with a gender identity congruent with the sex they were assigned at birth are cisgender.  A cisgender man, for example, is a man who was assigned male at birth and who has a male gender identity.

17.     Transgender individuals have a gender identity that differs from the sex assigned to them at birth. A transgender woman is a woman who was assigned male at birth but who, like a cisgender woman, has a female gender identity. A transgender man is a man who was assigned female at birth but who, like a cisgender man, has a male gender identity.

18.     "Gender dysphoria" is the medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinically significant distress resulting from this incongruence. "Gender identity disorder" is the diagnostic label used in the past for this condition which was abandoned to acknowledge that neither a transgender person's identity nor gender incongruence are "disordered."

19.     Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") and International Classification of Diseases-10 ("ICD-10").

20.     If untreated or inadequately treated, gender dysphoria can lead to serious harms. These harms include clinically significant psychological distress, impairment of basic life activities, and debilitating depression. Untreated gender dysphoria is also associated with higher risks of unemployment, homelessness, victimization, and criminality. For some individuals, not receiving treatment results in self-harm, suicidal ideation, suicide, and death.

6

21.     The accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). WPATH is the leading international organization focused on transgender healthcare with a membership of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria.

22.     The WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("WPATH Standards of Care").[2] The current version of the Standards of Care—Version 7—was released in September 2011 following a five-year process in which 18 gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. The WPATH Standards of Care are the prevailing standards of care used by mental health providers and medical professionals treating gender dysphoria.

23.     The goals of medical treatments for gender dysphoria are (1) to alleviate clinically significant distress and impairment of functioning associated with gender dysphoria, and (2) to maximize overall psychological well-being.

24.     The WPATH Standards of Care apply equally to incarcerated persons and expressly state:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the [Standards of Care] can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or

---

[2] Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 Int'l J. of Transgenderism 165 (2011), https://wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf (visited Aug. 13, 2020).

indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized are of health care.

WPATH Standards of Care at 67-68.

25.     There is broad agreement among leading medical and mental-health professional associations and organizations—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and the World Professional Association for Transgender Health—that gender dysphoria is a serious medical condition and that treatment for gender dysphoria is medically necessary.

26.     The National Commission on Correctional Health Care ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.[3]

27.     The WPATH Standards of Care are designed to help individuals live in accordance with their gender identity, eliminating the clinically significant distress associated with an incongruence between a person's gender identity and sex assigned at birth. Treatment protocols include social transition (dressing, grooming, and living in accordance with one's gender identity in all areas of life), legal transition, hormone therapy, and GCS. The particular course of medical treatment varies based on the individualized needs of the person.

---

[3] NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009; reaffirmed with revision April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings (visited Aug. 15, 2020) (footnote omitted).

## II.   Ms. Iglesias's History of Gender Dysphoria

28.    From a very young age, Ms. Iglesias has understood that she was a girl even though her body did not match who she knew herself to be. Ms. Iglesias expressed herself in what she understood to be a feminine manner.

29.    At the age of 12, Ms. Iglesias even told her mother that she wanted to have GCS in order to live as a girl.

30.    During childhood, Ms. Iglesias expressed herself in what she understood to be a feminine manner. As a result, Ms. Iglesias experienced physical and emotional abuse at the hands of her father who did not understand why she behaved femininely and identified as a girl.

31.    After withdrawing from school in tenth grade, Ms. Iglesias began to socially transition, living her life as a woman. She wore her hair in stereotypically feminine styles, wore stereotypically feminine clothing, and took birth control as a method to develop breasts.

32.    Ms. Iglesias entered BOP custody in 1994. Soon thereafter, in or around 1994, she was diagnosed with gender identity disorder by a Dr. Brian Gray, a BOP psychologist who treated her. In 2015, Dr. Lewis, BOP's Chief Psychologist, changed Ms. Iglesias's diagnosis from gender identity disorder to gender dysphoria to reflect the updated diagnosis in the DSM-V, published in 2013.

33.    As a result of the BOP's medically insufficient treatment of her gender dysphoria, described further below, Ms. Iglesias has engaged in numerous acts of self-harm. This includes a 2009 attempt to castrate herself. Ms. Iglesias has experienced suicidal thoughts repeatedly because of the lack of effective treatment for her gender dysphoria. As a result, she has been placed on suicide watch several times by BOP staff.

34.     Ms. Iglesias first requested hormone therapy from BOP medical staff in 2011, but was denied treatment. Four years later, in 2015, medical staff finally approved her to begin hormone therapy. She has experienced a number of changes in her secondary sex characteristics as a result of the hormone therapy, such as developing breasts.

35.      Ms. Iglesias has done everything she can to live fully and authentically as a woman while in prison. She wears a bra and women's underwear and uses make up and female grooming items when they are available to her. However, she continues to be placed in a men's prison and some prison staff continue to refer to her by male pronouns. Misgendering and otherwise challenging and rejecting Ms. Iglesias's female gender by keeping her in a men's prison is devastating for her.

36.     Despite receiving hormone therapy and her efforts to socially transition while housed in a men's prison, Ms. Iglesias continues to suffer from severe gender dysphoria, which has caused her extreme mental and physical anguish. She experiences severe depression, anxiety, and suicidal ideation as a result of the inadequacies in the treatment she is receiving. Ms. Iglesias has informed BOP medical staff that denying her the treatment she needs has caused her to experience suicidal ideation, anxiety, depression, and to engage in dangerous acts of self-treatment.

37.     Ms. Iglesias's distress caused by being denied GCS (as discussed further below) is extreme and unremitting. To Ms. Iglesias, her genitalia feel like an abnormal and life-threatening growth on her body, like a malignant tumor from cancer that needs to be removed. She feels dirty and disgusted with seeing and touching genitals that are incongruent with her female gender identity.

10

38.     Having stereotypically male facial hair further compounds Ms. Iglesias's distress but BOP has denied Ms. Iglesias's requests for permanent hair removal. Furthermore, even if shaving were an appropriate alternative, Ms. Iglesias is currently not permitted to shave every day. As a result, she has to endure being called a "bearded woman" by prison staff and other prisoners. This, and her placement in male facilities further increases the devastating impact of BOP's refusal to provide her GCS.

39.     Notwithstanding her ongoing and extreme distress and psychological harm due to the deficiencies in her treatment, BOP continues to deny Ms. Iglesias transfer to a women's facility, permanent hair removal and GCS.

## III.   Defendants' Denials of Ms. Iglesias's Request for Gender Dysphoria Treatment

### A. Gender Confirmation Surgery

40.     Since 2016, Ms. Iglesias has made numerous formal and informal requests to be evaluated and approved for GCS to alleviate her extreme and unrelenting distress. While housed at USP-Marion, Ms. Iglesias has made requests to BOP staff members, including to Dr. Randall Pass, Clinical Director at USP-Marion, the clinical team at USP-Marion, and Hollingsworth.

41.     Dr. Pass confirmed Ms. Iglesias met the WPATH criteria for GCS and should receive it.

42.     Ms. Iglesias has also pursued administrative appeals to have her request for GCS approved.

43.     On January 6, 2018, Ms. Iglesias appealed Hollingsworth's and the Regional Director's denials of her request for GCS to the Central Office Administrative Remedies Division. (Ex. 1, January 6, 2018 Remedy Appeal No. 920251-A1). In her appeal, Ms. Iglesias explained

that delaying GCS has caused her emotional and psychological distress, depression, anxiety, stress, and thoughts of self-mutilation.

44.     On March 2, 2018, Defendant Connors issued his response acknowledging that BOP's Transgender Clinical Care Team ("TCCT"), which is overseen by the TEC, had received Ms. Iglesias's parent institution's request for her to receive GCS and deferring to the TCCT to make a decision. (Ex. 2, March 2, 2018 Remedy Response No. 920251-A1).

45.     In November 2019, Iglesias was transferred from USP-Marion to FMC-Lexington for what she believed to be her final evaluation for approval for GCS.

46.     On December 3, 2019, Ms. Iglesias filed an appeal to the Central Office Administrative Remedies Division requesting to receive GCS and all treatments necessary to prepare Ms. Iglesias for GCS, as called for by the WPATH Standards of Care.

47.     On December 18, 2019, Ms. Iglesias had a consultation with Tammy C. Thomas, a Nurse Practitioner with the Endocrinology Department at University of Kentucky HealthCare. The consultation was arranged by BOP to evaluate Ms. Iglesias for GCS. After her evaluation, Ms. Thomas told Ms. Iglesias that she met the WPATH criteria for GCS, and would recommend surgery. However, Ms. Thomas also informed Ms. Iglesias that there were no surgeons in the State of Kentucky with any expertise or experience in performing GCS.

48.     On March 13, 2020, in response to Ms. Iglesias's December 3, 2019 Remedy Appeal, Defendant Connors, who is not a medical doctor or psychologist, issued the BOP's response determining that Ms. Iglesias does not qualify for GCS for two reasons: (1) she does not meet the qualifications to be transferred to a female facility; and (2) her hormone levels "have not been maximized or stabilized." (Ex. 3, March 13, 2020 Remedy Response No. 991304-A1).

### B.  Transfer to a Women's Prison

49.     Defendants BOP, Connors, <u>Allen</u>, Bina, McLearen, Scarantino, <u>Sproul</u> and Lewis and <u>non-defendant Hollingsworth</u> have also denied Ms. Iglesias's requests to transfer to a women's prison.

50.     Transferring Ms. Iglesias to a women's prison would also allow Ms. Iglesias to live in accordance with her gender identity by permitting her to further socially transition (e.g., dressing, grooming, and living in accordance with her gender identity in all areas of life), which is medically necessary treatment for gender dysphoria as set forth in the WPATH Standards of Care. (WPATH Standards of Care at 9, 68, 106). This treatment for Ms. Iglesias is severely impaired while she remains in a men's facility.

51.      There is no legitimate penological purpose for BOP to refuse to house Ms. Iglesias at a women's facility.

52.     In pursuit of this necessary treatment, Ms. Iglesias has made repeated requests and appeals for transfer to a women's prison. To date, all of these requests have been denied by Defendants.

53.     For example, on November 21, 2016 Ms. Iglesias requested a transfer to a women's facility by sending a request to Loretta Lynch, the United States Attorney General at that time. Her request was forwarded to the warden at the Federal Correctional Complex in Butner, North Carolina. Ms. Iglesias received a response on December 21, 2016, stating that her request was "under review as part of an ongoing process." (Ex. 4, December 21, 2016 Response).

54.     On May 31, 2017, Ms. Iglesias appealed the Regional Director's decision denying her request to be transferred to a women's facility to the Central Office Administrative Remedies Division. In her appeal, Ms. Iglesias explained that she is "transitioning to a female with the end

result of having gender affirming surgery. Part of my treatment is to live 'real time experience' as a female and gender consolidation meaning female. I request this transfer to a female prison so that I can continue my treatment, the next phase, as well [as it will] be safer for me." (Ex. 5, May 31, 2017 Remedy Appeal No. 897368 at 1).

55.     On July 6, 2017, Defendant Connors responded, acknowledging Ms. Iglesias's request as "repetitive" of earlier appeals for transfer to a women's prison but denied her appeal. (Ex. 6, July 6, 2017 Remedy Response at 1).

56.     Defendant's Connors denied Ms. Iglesias's renewed appeals for transfer as recently as March 13, 2020. In response to Ms. Iglesias's appeal for GCS, Defendant Connor's recognized that "[g]ender-affirming surgery is considered after real life experience in your preferred gender." (Ex. 3, March 13, 2020 Remedy Response No. 991304 at 1). Despite recognizing the need for Ms. Iglesias to socially transition in order for her to receive GCS, Defendant Connors stated that Ms. Iglesias had been "reviewed for transfer to a female facility" but that "it was determined that [her] current designated facility is appropriate." (*Id.*).

57.     On the same day as Defendant Connor's March 24, 2020 denial, Ms. Iglesias filed another request, this time to the Warden at FMC-Lexington, to be transferred to a women's facility in order to have "real time living experience" as a woman to treat her gender dysphoria. As she explained, "I have been on hormone therapy for 5 years with a diagnosis of Gender Dysphoria, my hormone levels for well over 4 years have been consistent with female levels. . . . [I]n order for me to complete my existence as a woman, I have to complete the 'real time living as the gender desired, female.' … I have severe gender dysphoria because without [GCS] I see no normal life and it is torturous to live life daily without GCS." (Ex. 7, March 24, 2020 Request to Staff at 1).

14

58.     Defendant BOP, Defendants Bina, McLearen, Scarantino, and Lewis, as members of the TEC, and Defendant Allen, as Medical Director of the BOP, in addition to Defendant Connors, have reviewed Ms. Iglesias's requests to transfer to a women's prison as part of the necessary treatment for her severe gender dysphoria. Defendants know of Ms. Iglesias's medical condition and that she is transgender, but Defendants have failed to authorize Ms. Iglesias's transfer to a women's prison.

### C. Hair Removal

59.     Defendants BOP, Connors, Allen, Bina, McLearen, Scarantino, Sproul, and Lewis and non-defendant Hollingsworth have also failed to provide Ms. Iglesias medically necessary treatment for permanent hair removal treatment even though Ms. Iglesias's body and facial hair has and continues to cause her extreme anxiety and distress, which she has been unable to relieve by shaving.

60.     Hollingsworth and BOP's Regional Director denied Ms. Iglesias's requests for hair removal, so she appealed on March 7, 2018. On April 6, 2018, Defendant Connors denied her appeal on the grounds that Ms. Iglesias did not report major emotional or environmental problems during her last encounter with Psychological Services and that her clinical provider had not indicated the need for hair removal as part of her treatment for gender dysphoria.

61.     Repeatedly denying Ms. Iglesias social transition, permanent hair removal and surgery have caused her extreme and longstanding emotional and psychological distress, depression, anxiety, stress, and thoughts of self-mutilation.

62.     Despite Ms. Iglesias's diagnosis of gender dysphoria, her repeated requests for GCS, transfer to a women's prison, and hair removal, Dr. Pass's recommendation for GCS, and a recommendation for GCS from Nurse Practitioner Thomas at the Endocrinology Department of

15

UK HealthCare, Defendants have refused to provide her with the medically necessary care she requires. Defendants BOP, Connors, Allen, Bina, McLearen, Scarantino, and Lewis are aware of her serious and untreated gender dysphoria and her need for medical treatment in the form of GCS, transfer to a women's prison, and permanent hair removal to address her depression, anxiety, and suicidality because of Ms. Iglesias's persistent requests for GCS, as well as the recommendations from BOP and UK HealthCare professionals that she be evaluated for surgery.

IV.   **The BOP's Discriminatory Changes to Its Transgender Offender Manual**

63.    Since January 2017, the Federal Bureau of Prisons has followed Program Statement No. 5200.04,[4] the "Transgender Offender Manual" ("TOM"). The TOM's purpose is "[t]o ensure the Bureau of Prisons ("BOP") properly identifies, tracks, and provides services to the transgender population." *Id*. at § 1.

64.    The TOM created the TEC "to offer advice and guidance on unique measures related to treatment and management needs of transgender prisoners and/or prisoners with [gender dysphoria], including designation issues." *Id*. § 3(a)(5). It provided that the council would "recommend housing by gender identity when appropriate." *Id.*

65.    The TOM referenced the implementing regulations of the Prison Rape Elimination Act of 2003, 28 C.F.R pt. 115 ("PREA regulations").

66.    On May 11, 2018, the BOP approved Change Notice No. 5200.04 CN-1[5] ("Change Notice").

67.    The purported purpose of the Change Notice "is to ensure that the TEC considers issues related to prison management and security in determining appropriate housing of

---

[4] https://www.bop.gov/policy/progstat/5200.04.pdf.
[5] https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf.

transgender inmates, including risks posed to staff, other inmates, and members of the public," and to "establish appropriate expectations for the inmate population concerning designations." *Id*. at 1.

68. The Change Notice removed the sentence that read: "The TEC will recommend housing by gender identity when appropriate" and added that although "[i]n deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis," nevertheless "[t]he TEC will use biological sex as the initial determination for designation. It also added that "[t]he designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history." *Id.* at 3.

69. The Change Notice fails to define "biological sex" or explain how the TEC determines a person's "biological sex." However, because it distinguishes "biological sex" from "gender identity," "biological sex" apparently refers to someone's sex assigned at birth. *See generally id.*

70. The Change Notice also fails to explain why the designation of transgender person to a facility consistent with that person's gender identity "would be appropriate only in rare cases" and only "where there has been significant progress towards transition." *See id*. at 4.

71. On information and belief, Ms. Iglesias states that since the change notice Defendants have assigned transgender prisoners to facilities solely based on their sex assigned at birth and have failed to transfer any transgender prisoners to facilities that accord with their gender identity, rather than their sex assigned at birth.

**V.    BOP Knows that Placing Transgender Prisoners, Such As Ms. Iglesias, in Prisons Based On Their Sex Assigned At Birth Puts Them At a Substantial Risk of Harm**

72.    According to the National PREA Resource Center:[6] "Being transgender is a known risk factor for being sexually victimized in confinement settings." *See* National PREA Resource Center, at https:/www.prearesourcecenter.org/node/3927.

73.    Additionally, the U.S. Department of Justice's Bureau of Justice Statistics reported in 2014 that almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general. U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12, Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, Dec. 2014.[7]

74.    Under the PREA regulations, BOP officials are required to make an individualized determination of appropriate housing when it comes to housing assignments for transgender prisoners. The regulation states:

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety and whether the placement would present management or security problems.

28 C.F.R. § 115.42(c).

75.    PREA regulations also require BOP officials to give serious consideration to an prisoner's own subjective views of his or her own safety. *See* Section 115.42(d) ("A transgender

---

[6] The National PREA Resource Center (PRC) is a project of the U.S. Department of Justice Bureau of Justice Assistance. The PRC's aim is to provide assistance to those responsible for state and local adult prisons and jails, juvenile facilities, community corrections, lockups, tribal organizations, and prisoners and their families in their efforts to eliminate sexual abuse in confinement. *See* National PREA Resource Center, at https://www.prearesourcecenter.org/about.

[7] https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.").

76.     PREA's requirements and its focus on protecting the health and safety of transgender prisoners, as well as numerous widely circulated studies regarding the high risk of sexual abuse faced by transgender women in federal prisons and jails, have placed all Defendants on notice of the serious risks that Ms. Iglesias faces by being held in male facilities and by Defendants' refusal to transfer Ms. Iglesias to a women's facility.

77.     BOP purports to comply with PREA regulations, but it has clearly not done so with respect to Ms. Iglesias.

78.     BOP's treatment of Ms. Iglesias not only runs counter to PREA regulations, but it is also counter to generally professional accepted standards in the medical and mental health fields.

79.     The American Medical Association (AMA) has issued a policy statement supporting prison housing policies that allow transgender prisoners to be placed in correctional facilities that reflect their affirmed gender status.

80.     As AMA Immediate Past Chair Patrice A. Harris, M.D. stated, "[t]he problem facing the safety and health of transgender prisoners is severe and well-documented.… Transgender prisoners are disproportionately the victims of sexual assault, suffering higher rates of sexual assault than general population inmates." *See* American Medical Association, *AMA Urges Appropriate Placement of Transgender Prisoners* (June 11, 2018), at https://www.ama-assn.org/press-center/press-releases/ama-urges-appropriate-placement-transgender-prisoners.

81.     Further, the WPATH Standards of Care provide that:

Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the

external genitalia may not be appropriate and may place the individual at risk for victimization.

Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.

WPATH Standards of Care at 67.

## VI.  Defendants Know Ms. Iglesias Has Suffered Abuse, and Faces a Substantial Risk of Additional Abuse, Because She Is Denied Housing In a Women's Prison

82.     Since entering BOP custody in 1994, Ms. Iglesias has been exclusively housed in male prisons.

83.     While in BOP custody Ms. Iglesias has been subjected to extensive sexual abuse, physical abuse, and harassment by BOP staff and other prisoners. Most recently, she was abused and harassed while in BOP custody at FMC-Lexington.

84.     Ms. Iglesias has made numerous requests to BOP staff to be transferred to a women's facility in order to avoid further harm. (See ¶¶ 48 to 57 above.)

85.     Ms. Iglesias reported numerous instances of sexual abuse, including rape, physical abuse, and/or harassment in 2001, 2013, 2015, 2016, 2017, 2019, and 2020. (*See* Ex. 8, June 16, 2017 BOP Psych. Services Report at 1; Ex. 9, November 22, 2019 BOP Health Services Report at 3-4; Ex.10, February 25, 2020 Client Medical Record at 9). Ms. Iglesias requested to be placed in protective custody. While some of these requests were granted, being placed in protective custody did not prevent her from being harmed by other prisoners or prison staff.

86.     During Ms. Iglesias's time in BOP custody, other prisoners have frequently exposed themselves to her, groped her, and demeaned her in other ways, including by asking to see her breasts.

87.     Ms. Iglesias has suffered numerous sexual assaults in BOP custody because of her transgender status. In November 2019, Ms. Iglesias was raped by another prisoner. (*See* 9, November 22, 2019 BOP Health Services Clinical Encounter at 3-4).

88.     In January 2020, Ms. Iglesias was held hostage by her cell mate. This male prisoner objected to being housed with a transgender woman and would not release her until prison staff used force to get him to release Ms. Iglesias.

89.     Also in January 2020, when Ms. Iglesias refused to allow a male prisoner to prostitute her, he placed a "hit" on her, offering to pay $500 to another prisoner for the opportunity to hurt Ms. Iglesias. BOP staff at FMC-Lexington entered a separation order between this prisoner and Ms. Iglesias, but Ms. Iglesias continues to be at serious risk due to his presence in the same facility.

90.     In addition to BOP's failure to keep Ms. Iglesias safe, BOP staff at FMC-Lexington have threatened to lock Ms. Iglesias in a cell with a convicted sex offender if she does not refrain from making complaints about her safety and need for medical treatment.

91.     Ms. Iglesias lives in constant fear of further physical or sexual violence as a result of being a transgender woman in a male prison. Ms. Iglesias should not have to await the next act of violence to be placed in a women's facility.

92.     Transferring Ms. Iglesias to women's facility would reduce the serious risk of physical and sexual violence she faces every day that she is in a men's prison.

93.     There is no legitimate penological purpose for BOP to refuse to house Ms. Iglesias at a women's facility. Defendants BOP, Carvajal, Bina, Allen, Sproul, Connors, McLearen, Scarantino, and Lewis are aware that Ms. Iglesias has been severely harmed and continues to be at risk of physical and sexual violence as a result of being housed in a male prison. Defendants are

further aware that transferring Ms. Iglesias to a women's prison would significantly reduce the risk of further physical and sexual violence. Yet Defendants have and continue to deny her requests for transfer to a women's prison.

94.     As a result of BOP's inaction, Ms. Iglesias has suffered and will continue to suffer irreparable harm, including severe and ongoing distress and psychological harm and the known and substantial risk of sexual and physical abuse and harassment by other prisoners and correctional staff.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Failure to Provide Medically Necessary Treatment
### in Violation of the Eighth Amendment

*Against BOP, Defendant Carvajal, Defendant Bina, Defendant Connors, Defendant Sproul, Defendant Allen, Defendant McLearen, Defendant Scarantino, Defendant Lewis*

95.     Ms. Iglesias repeats and re-alleges the allegations in paragraphs 1 - 93 as if fully set forth herein.

96.     Defendants, including BOP, Bina, Allen, McLearen, Scarantino, Sproul, and Lewis are responsible for providing adequate and necessary medical treatment for Ms. Iglesias's gender dysphoria.

97.     As members of the TEC, Defendants Bina, McLearen, Scarantino, and Lewis are responsible for providing advice and guidance to the BOP regarding transgender prisoners' treatment, housing, and management needs.

98.     Defendants are aware that Ms. Iglesias is a transgender woman who has been diagnosed with gender dysphoria, a serious medical condition. Defendants are all aware the Ms. Iglesias has not received the medically necessary GCS, permanent hair removal, and social

transition treatment. The denial of these necessary treatments has caused her serious physical and mental injury.

99.     Defendants' denial of necessary medical treatment to Ms. Iglesias constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

100.     Under Defendants' "biological-sex" based housing policy all transgender prisoners are placed in men's or women's prisons based on their sex assigned at birth, which BOP Policy identifies as "biological sex." (*See* BOP Transgender Offender Policy Section 5 and Section 7).

101.     To the extent that Defendants denied Ms. Iglesias placement in a women's prison due to this policy, it did so in violation of the Eighth Amendment.

## SECOND CLAIM FOR RELIEF

### Denial of Placement in Female Facility in Violation of
### Fifth Amendment Right to Equal Protection

*Against BOP, Defendant Carvajal, Defendant Bina, Defendant Connors, Defendant Sproul, Defendant Allen, Defendant McLearen, Defendant Scarantino, Defendant Lewis*

102.     Ms. Iglesias repeats and re-alleges the allegations in all proceeding paragraphs as if fully set forth herein.

103.     Under the Fifth Amendment's guarantee of equal protection, discrimination on the basis of sex is unconstitutional and subject to heightened scrutiny.

104.     Defendants have and continue to discriminate against Ms. Iglesias by implementing and enforcing a "biological-sex" based housing policy for all transgender prisoners by which Defendants determined Ms. Iglesias's transfer requests based on her sex assigned at birth, which BOP Policy identifies as "biological sex." (*See* BOP Transgender Offender Policy Section 5 and Section 7).

105.     Defendants have denied Ms. Iglesias's requests for transfer to a women's facility based on this policy.

106.    Defendants' housing of Ms. Iglesias based on her "biological" sex, and not her gender identity, discriminates against her on the basis of her sex and transgender status.

107.    Ms. Iglesias is similarly situated to cisgender women in BOP custody except for the fact Ms. Iglesias is transgender.

108.    Defendants' discriminatory treatment of Ms. Iglesias on the basis of sex and her transgender status deprives Ms. Iglesias of her right to equal protection of the laws guaranteed by the Fifth Amendment to the United States Constitution.

109.    Defendants' discrimination against Ms. Iglesias because of sex and/or gender identity is not substantially related to any important governmental interest. Defendants' discrimination against Ms. Iglesias on the basis of her sex and transgender status is also not reasonably related to any legitimate penological interests.

110.    Defendants' discriminatory placement of Ms. Iglesias in male facilities in violation of her Fifth Amendment right to equal protection causes her extreme and irreparable harm.

### THIRD CLAIM FOR RELIEF

**Failure to Protect in Violation of the Eighth Amendment**

*Against BOP, Defendant Carvajal, Defendant Bina, Defendant Connors, Defendant Sproul, Defendant Allen, Defendant McLearen, Defendant Scarantino, Defendant Lewis*

111.    Ms. Iglesias repeats and re-alleges the preceding paragraphs as if fully set forth herein.

112.    The Eighth Amendment requires Defendants to protect Ms. Iglesias from known and substantial risks of serious harm while in BOP custody.

113.    Defendants have been and continue to be deliberately indifferent to the known and substantial risk of serious harm Ms. Iglesias faces from both prison staff and other incarcerated persons as a transgender woman in a men's prison.

24

114.   Defendants are aware that other prisoners wish to harm Ms. Iglesias due to her status as a transgender woman in men's prisons. Nevertheless, they continue to disregard the substantial risk that Ms. Iglesias will be harmed by other incarcerated persons by failing to take any measures to meaningfully reduce that risk, in violation of Ms. Iglesias's Eighth Amendment rights.

115.   Defendants' failure to protect Ms. Iglesias from known and substantial risks of serious harm from prison staff and other incarcerated persons as a transgender woman in a men's prison constitutes deliberate indifference in violation of the Eighth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Iglesias requests entry of judgment in her favor and against Defendants as follows:

For injunctive and declaratory relief, including:

a.   Enjoining Defendants to have Ms. Iglesias evaluated by medical personnel qualified to treat her condition;

b.    Enjoining Defendants to provide Ms. Iglesias with the medically necessary health care she needs, including (1) permanent hair removal, and (2) gender confirmation surgery;

c.   Enjoining Defendants to house Ms. Iglesias at an institution consistent with her gender identity;

d.   Enjoining Defendants to protect Ms. Iglesias from the known and serious risks of harm she continues to face while housed in a men's prison;

e.   For an award from Defendants of her attorneys' fees, litigation expenses, and costs incurred in connection with this action;

f.      For such further relief as the Court may deem just, proper, and appropriate.

Respectfully submitted,

Dated: <u>April 30, 2021</u>          <u>/s/ Kevin Warner</u>
**Kevin Warner**
**Frank Battaglia**
**Katherine D. Hundt**
**Courtney Block**
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600
kwarner@winston.com
fbattaglia@winston.com
khundt@winston.com
cblock@winston.com

**John A. Knight**
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740, 335
jaknight@aclu.org

**Angela M. Povolish**
FEIRICH MAGER GREEN RYAN
2001 West Main Street
P.O. Box 1570
Carbondale, IL 62903
(618) 529-3000
apovolish@fmgr.com

**Taylor Brown** (*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7887
tbrown@aclu.org

*Attorneys for Plaintiff Cristina Noel Iglesias*