IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS), | |
| Plaintiff, | Case No. 19-cv-00415-RJN |
| v. | Judge Nancy J. Rosenstengel |
| IAN CONNORS, *et al.*, | |
| Defendants. | |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Cristina Iglesias is a transgender woman in the custody of the Federal Bureau of Prisons ("BOP") at a male facility, Federal Correctional Institution-Fort Dix ("Fort Dix"), who seeks a preliminary injunction ordering gender-confirmation surgery ("GCS"), permanent hair removal, and transfer to a female facility. Defendants state they will move Ms. Iglesias to a female facility in their Opposition, but refuse the medically necessary GCS and permanent hair removal she needs to treat her gender dysphoria. Defendants' challenges to venue and their assertion that Ms. Iglesias's claims for transfer and protection from further violence are moot have no merit. They also fail to offer any legitimate medical basis for denying GCS and permanent hair removal.[1]

**I.    Venue Is Proper in the Southern District of Illinois Because a Substantial Part of the Events Giving Rise to This Action Occurred in This District.**

---

[1] Plaintiff has supported this reply with the information available to her. She and her counsel continue to seek copies of her medical records from BOP to no avail, *see* ECF No. 93 at 2 n.1, even as Defendants rely on some of those same medical records to support assertions before this Court, *see* Def. Opp. *passim*. Plaintiff again requested her medical records in April 2021 but has received no response. 2d Iglesias Decl. at ¶ 13. In response to Plaintiff's January 2021 FOIA request, a BOP information specialist informed her counsel that they could not even estimate a date for responding.

Venue is proper because a "substantial part of the events or omissions giving rise to [Ms. Iglesias's claims] occurred" in the Southern District of Illinois. 28 U.S.C. § 1391(b)(2), (e)(1). A plaintiff need only show that a "substantial part" of the events giving rise to her claim occurred in the forum district, "not that a majority of the events took place there." *United States ex rel. Hedley v. ABHE & Svoboda, Inc.,* No. 11-CV-0348-NJR-DGW, 2014 U.S. Dist. LEXIS 199394, at *15 (S.D. Ill. Sep. 16, 2014). Events are "substantial" when they are "part of the historical predicate" of the plaintiff's claim. *Id.* (internal quotes omitted).

Here, the events that occurred while Ms. Iglesias was housed in the Southern District at United States Penitentiary-Marion ("USP-Marion") are part of the historical predicate and form a substantial part of the events giving rise to her Fifth and Eighth Amendment claims.[2] Ms. Iglesias made multiple requests for GCS and permanent hair removal at USP-Marion. Iglesias Decl. at ¶¶ 13-15, 23. Dr. Randall Pass, USP-Marion's clinical director, confirmed that she met the World Professional Association for Transgender Health ("WPATH") criteria for GCS and should receive it. *Id.* at ¶ 15. Ms. Iglesias was also subjected to sexual and physical abuse and harassment by USP-Marion staff and prisoners, reported such behavior, and made numerous requests for transfer to a female facility. *Id.* at ¶¶ 24-34. Defendants' request for transfer of venue should be denied.[3]

## II. Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Claims for Necessary Medical Care, Transfer, and Protection from Assault and Harassment.

### A. Defendants' Denial of Medically Necessary Care Violates the Eighth Amendment.

---

[2] Whereas the *Graves* court found that venue in the Southern District is improper when "the complaint is completely devoid of allegations that anything occurred in Illinois," *Graves v. Pikulski*, 115 F. Supp. 2d 931, 934 (S.D. Ill. 2000); Def. Opp. at 10 (citing *Graves*), a substantial part of the events in this case occurred in the Southern District, as alleged in the First and Second Amended Complaints.

[3] Defendants ask the Court to transfer Plaintiff's case to some unspecified "appropriate judicial district," and suggest that inter-prison transfers render earlier events that occurred in this judicial district irrelevant. Def. Opp. at 10-11. This request is contrary to venue case law and, given their intent to transfer Plaintiff to an undisclosed facility, presents an unworkable standard.

Defendants acknowledge that Plaintiff's diagnosed gender dysphoria is a "serious medical condition that requires attention" under the Eighth Amendment and apparently acknowledge that surgery can be medically necessary to treat gender dysphoria, but claim that she is "not an appropriate candidate" for GCS "because her hormone levels ha[ve] not yet stabilized" and she has not "lived . . . for twelve months in a female prison." Def. Opp. at 1, 14. They also reject her claim for permanent hair removal, labeling it as "cosmetic." *Id.* at 20. None of these arguments provide a meritorious basis for denying Plaintiff these treatments.[4]

The mere provision of *some* medical care cannot defeat a deliberate-indifference claim. *See Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011). Inadequate or ineffective medical care can also support indifference: if Defendants insisted that "inmates with cancer must be treated only with therapy and pain killers," a court would easily deem such treatment "unconstitutional." *Id*. Here, Defendants refuse GCS and permanent hair removal to treat Plaintiff's gender dysphoria and thus unconstitutionally refuse "to provide effective treatment for a serious medical condition." *Id.*

1. **Defendants Fail to Offer a Legitimate Medical Basis for Denying Plaintiff Gender-Confirmation Surgery.**

There is no medical basis for denying Ms. Iglesias GCS. Defendants wrongly suggest that this case involves Plaintiff's disagreement "with Defendants' judgment that [GCS] is not yet appropriate for her." Def. Opp. at 14-15. But the reasons they offer for denying GCS are not actual *medical* reasons, have no sound medical basis, and result from Defendants' own refusal to properly monitor Ms. Iglesias's hormone levels and to transfer her to a female prison.

---

[4] Defendants err in stating that Plaintiff's motion lacks an Eighth Amendment claim "based on [her] placement in a male facility." Def. Opp. at 11 n.4. She did include such a claim. Mot. at 10 (Defendants deny "Medically Necessary Care . . . Including Social Transition" and citing law on "medically necessary social transition, including individualized placement determinations"); *id.* at 14-16 (making Eighth Amendment claim about "hous[ing] with male prisoners in male facilities").

Defendants claim that Ms. Iglesias "was not an appropriate candidate" for GCS "because her hormone levels had not yet stabilized, and she had not lived a real-life experience as a female for twelve months in a female prison." *Id.* at 14. Defendants link hormonal stability to BOP's requirement that it transfer transgender women "safely" to female institutions prior to their having GCS. *Id.* at 17. They allege safety concerns to justify their requirement that someone live in a female facility for a year prior to GCS, speculating that they might someday transfer a transgender woman who had GCS back to a male facility where she would be even more unsafe. *Id.* at 19. Such rank speculation about safety is insufficient to justify denial of necessary medical care, which "serves no valid penological purpose and amounts to torture." *Fields*, 653 F.3d at 556.

There is also no legitimate medical basis for these requirements. 2d Ettner Decl. at ¶¶ 2-5. The WPATH Standards of Care do not call for achieving target hormone levels nor a year of "real-life experience" in a sex-segregated facility prior to GCS. Nor are these requirements supported by medical professionals who treat gender dysphoria. *Id.* at ¶ 2. The current standard is "liv[ing] in the congruent gender role for twelve months," Ettner Decl. at ¶ 88, which Ms. Iglesias has done for decades. She has lived as a woman since she was a teenager, identified herself as a woman when she entered BOP custody in 1994, uses female pronouns, and wears female clothing and makeup. 2d Iglesias Decl. at ¶ 11; s*ee Konitzer v. Frank*, 711 F. Supp. 2d 874, 909 (E.D. Wis. 2010) (noting that "makeup, female undergarments, facial hair remover or growth items, and being referred to as a female" are part of living in a congruent gender role in a men's facility).[5]

---

[5] Defendants mischaracterize Dr. Ettner's statements as "internally inconsistent" and "support[ive of] Defendants'" refusal to provide GCS. Def. Opp. at 19. In fact, Dr. Ettner concluded both that placement in a women's facility is not a prerequisite to GCS, Ettner Decl. at ¶ 88, *and* that "transgender women with feminine characteristics are at elevated risk for harm when housed in male prisons," *id.* at ¶ 66. There is no inconsistency: Plaintiff needs GCS to treat gender dysphoria regardless of where she is housed *and* is at significant risk of harm as a woman in men's facilities, whether or not she has had surgery.

Further, even if BOP's GCS criteria had any medical basis, Defendants had sole control over Ms. Iglesias's ability to meet these requirements. Any instability in Ms. Iglesias's hormone levels is due to Defendants' failure to provide her adequate doses of hormone-therapy medication to maintain her target hormone levels.[6] 2d Iglesias Decl. at ¶ 5. Also, the only reason Ms. Iglesias has not met BOP's requirement for twelve months of "real-life experience" in a female facility is Defendants' repeated denial of her requests for transfer to a female facility. *Id*. at ¶ 12. Defendants challenge the reliability of Dr. Ettner's opinions but fail to acknowledge their responsibility for her being unable to reach more definitive conclusions by denying access to Plaintiff's medical records. Dr. Ettner's opinions are at least as reliable, if not more so, as those offered by Dr. Yeh and Dr. Leukefeld, who—unlike Dr. Ettner—have never spoken to Ms. Iglesias. *Id.* at ¶ 2.

### 2. Defendants Fail to Offer a Medical Basis for Denying Permanent Hair Removal.

Permanent hair removal is not a "nonmedical cosmetic accommodation" as Defendants claim. Def. Opp. at 20. Rather, it is a medical treatment used to lessen the "clinically significant distress" that such hair causes transgender women and is "a necessary step before [GCS] can be performed." 2d Ettner Decl. at ¶ 9. Defendants' denial that permanent hair removal is medical, not cosmetic, treatment lacks any medical basis, *id*., and shows this is not a situation where "prison officials followed accepted medical standards" for treating gender dysphoria, *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019).[7] Indeed, permanent hair removal and other social transition

---

[6] Defendants reduced the dosage of one of her hormone medications, estradiol, in December 2019 because she requested to receive oral medication after missing doses when BOP left her off the call-out list for her injections. 2d Iglesias Decl. at ¶ 4. Consequently, her estrogen levels appeared reduced in February 2020, May 2020, and August 2020. *Id.* at ¶ 5. Defendants never informed Ms. Iglesias that her hormone levels had fallen and only increased them after she requested her dosage be increased because of how her change in hormone levels made her feel and look. *Id.* at 4.

[7] Nor are Defendants' other case citations apt. Unlike Plaintiff's allegations in the instant case, the *Murillo* court considered a plaintiff who "d[id] not allege facts indicating that [permanent hair removal was] 'medically necessary.'" *Murillo v. Godfrey*, No. 2:18-cv-02342, 2020 WL 1139811,

5

efforts "are not merely cosmetic treatments but, instead, medically necessary treatments to address a serious medical disease." *Hicklin v. Precynthe*, No. 4:16-cv-01357-NCC, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018) (citing "medical evidence" and "clear" case law to reject a prison's assessment that hair removal was not medically necessary); *see Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012); Ettner Decl. at ¶ 36.[8]

### B. Plaintiff's Request to be Housed in a Female Facility and to Be Protected from Assault and Harassment Are Not Moot.

Plaintiff's request for a preliminary-injunction order that Ms. Iglesias be housed in a female facility is not moot. Though Defendants recently agreed to transfer Ms. Iglesias to a female facility, ECF No. 103, she has not been transferred and remains in a male facility. Moreover, it is well established that a defendant's "voluntary cessation of the complained of action is not sufficient to moot litigation." *Rabinowitz v. Bd. of Junior Coll. Dist. No. 508*, 507 F.2d 1255, 1256 (7th Cir. 1974). The party asserting mootness bears the "heavy burden" to show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

Defendants have not met that burden. Ms. Iglesias has not yet been transferred and, even if she is, Defendants have not made it "absolutely clear" that they cannot "reasonably be expected" to transfer her back to a male facility. *Id.*; *see Vitek v. Jones*, 445 U.S. 480, 487 (1980) (request for

---

at *14 (C.D. Cal. Mar. 9, 2020). Defendants' reliance on *Renee* is also misplaced as that case is silent on permanent hair removal. *See Renee v. Neal*, 483 F. Supp. 3d 606 (N.D. Ind. 2020).

[8] Factually, Defendants denied Plaintiff the ability to shave more than once weekly until April 26, 2021, despite contrary representations to this Court. *See* Def. Opp. at 21; Shivers Decl. at ¶ 13. Though Plaintiff declined showers on non-shaving days due to fears of abuse from correctional officers and because the showering facilities expose her breasts to male prisoners, she never declined a shower on a day on which she would be permitted to shave. 2d Iglesias Decl. at ¶ 6.

transfer from a state hospital to a prison psychiatric ward not moot when plaintiff remained under threat of retransfer to the hospital). While four transgender prisoners are now in BOP facilities consistent with their gender identity, "approximately the same number of transgender female inmates have been previously placed in gender affirming settings, but have been released or returned to male facilities." Leukefeld Decl. at ¶ 14. Any future transfer of Ms. Iglesias to a female facility cannot moot her Fifth and Eighth Amendment claims because there is a strong likelihood that Defendants could unilaterally transfer her back to a male facility.

In addition, any future transfer cannot moot Ms. Iglesias's claims related to her placement in male facilities because she remains subject to Defendants' discriminatory housing policies that house transgender prisoners based on their gender assigned at birth, transfer them to facilities consistent with their gender identity only "in rare cases," and leave them subject to retransfer to male prisons. Leukefeld Dec. Atch. 1; *see Lehn v. Holmes*, 364 F.3d 862, 872 (7th Cir. 2004) (reversing a finding of mootness where a prisoner "seeks relief from a condition that stems from a system-wide policy, [and] is then transferred to a different facility within the same system where the objectionable policy also applies").[9]

### C. Defendants' Failure to Transfer Ms. Iglesias to a Female Prison, Resulting in Her Assaults and Harassment in Male Prisons, Violates the Fifth Amendment.

Ms. Iglesias has a strong likelihood of success on her Fifth Amendment equal-protection claim. Whether she stays in a male facility or is transferred to a female facility, she remains subject

---

[9] Unlike Ms. Iglesias's challenge to Defendants' system-wide housing policy, the plaintiff in *Santiago* sought injunctive relief "for a condition specific to a particular prison." *See Santiago v. Walls*, 196 Fed. App'x 416, 417 (7th Cir. 2006) (quoting *Lehn*, 364 F.3d at 871). Further, unlike in *Moore v. Thieret*, here there are strong "reason[s] on the present record to suppose that [Plaintiff] is likely to be sent back to" a male facility, 862 F.2d 148, 150 (7th Cir. 1988), including Defendants' declarant testimony that several "transgender female inmates have been previously placed in gender affirming settings, but . . . returned to male facilities," Leukefeld Decl. at ¶ 14.

7

to Defendant's policies that "house[] inmates, by default, in the prison of their gender assigned at birth," *Tay v. Dennison*, 457 F. Supp. 3d 657, 680 & n.13 (S.D. Ill. 2020), and transfer transgender prisoners based on gender identity "only in rare cases," while routinely transferring some back to noncongruent facilities. Leukefeld Decl. Atch. 1. The existence of these policies is unconstitutional sex discrimination and ensures that Ms. Iglesias remains at risk of placement in a male facility.

Even if Defendants are correct that an "individualized determination" of an inmate's housing designation under current policies passes constitutional muster, Def. Opp. at 11, they have not shown that Ms. Iglesias's housing situation has been evaluated under such an individualized framework. Defendants initiated their evaluation of Plaintiff's housing designation only after she moved for preliminary injunctive relief. *Id.* at 6 (noting that the transgender council met on April 19, 2021). Defendants claim her transfer was approved because she achieved a target estrogen level but admit that she achieved that level as early as August 2016. Yeh Decl. at ¶ 10. They fail to explain what circumstances, if any, changed to justify their sudden transfer decision, other than the filing of Ms. Iglesias's motion.

Ms. Iglesias has also shown a likelihood of success on her sexual-harassment claim in violation of equal protection. Defendants' arguments to the contrary should be rejected. Plaintiff's Second Amended Complaint includes a claim for relief under the Fifth Amendment and sufficient allegations of sexual harassment in Defendants' custody to satisfy notice-pleading standards and support preliminary relief. *See* 2d Am. Compl. at ¶¶ 2, 3, 82, 84-86, 88, 91, 94, 103, 108. Plaintiff's sexual-harassment claim falls squarely within her assertion that "Defendants' discriminatory treatment . . . on the basis of sex and her transgender status deprives [her] of her right to equal protection of the laws guaranteed by the Fifth Amendment." *Id.* at ¶ 108. In addition, Plaintiff satisfied PLRA exhaustion by raising issues of staff and prisoner assaults and harassment while at

several BOP male facilities. *See* Leukefeld Decl. Atch. 4; *Cherer v. Williams*, No. EDCV 08-771-AG (OP), 2010 WL 7697474, at *5 (C.D. Cal. July 27, 2010) (noting that "the administrative remedy process does not start over each time an inmate is transferred to a new BOP institution").

### D. Defendants' Failure to Protect Plaintiff Violates the Eighth Amendment.

Plaintiff has a strong likelihood of success on her Eighth Amendment failure-to-protect claim insofar as she remains subject to retransfer to a male facility. Plaintiff's risk of retransfer to a male facility, experiences of violence at male facilities, and experiences at Fort Dix after she made clear to Defendants that her life was in danger, underscore that Defendants cannot be trusted to keep her safe absent relief from this Court. Iglesias Decl. at ¶¶ 31-43, 48-62.

As noted above, the administrative remedy process regarding Defendants' unconstitutional and dangerous housing policies does not begin anew each time Defendants transfer Plaintiff. *Cherer*, 2010 WL 7697474, at *5. Further, while the PLRA requires exhaustion, a plaintiff need only exhaust "such administrative remedies as are available." 42 U.S.C. § 1997e(a); *Ross v. Blake*, 136 S. Ct. 1850, 1858-60 (2016) (noting that prisoners "need not exhaust unavailable [remedies]"). Here, Ms. Iglesias's motion about failure to protect came after she was again raped, assaulted, and under persistent risk of life-threatening harm. Iglesias Decl. at ¶¶ 51-55. Where "circumstances present an imminent danger to an inmate," as here, "a time-consuming administrative procedure . . . presents no 'possibility of some relief'" for PLRA exhaustion purposes. *Sowell v. T.D.C.J.*, 2020 WL 2113603, at *3 (S.D. Tex. May 4, 2020) (quoting *Ross*, 136 S. Ct. at 1859).

### III. Plaintiff Satisfies the Remaining Elements to Support Preliminary Injunctive Relief.

Defendants fail to seriously challenge Ms. Iglesias's argument that she satisfies the other elements to support preliminary injunctive relief. She has no adequate remedy at law absent such relief, which Defendants do not dispute. She also continues to suffer irreparable harm. Defendants'

putative future transfer of Ms. Iglesias to a female facility does not extinguish the ongoing violation of her constitutional rights. And, as described above, Defendants defend their grossly inadequate treatment of her gender dysphoria, leading to further irreparable mental and physical harm.[10]

The balance of harms and public interest support injunctive relief. Defendants note their interest in maintaining order and security, Def. Opp. at 26, but make no showing that providing Ms. Iglesias constitutionally adequate healthcare and ensuring her safe housing conflicts with those interests. Absent relief from this Court, the violation of Plaintiff's rights and serious threats to her health and safety will continue unabated. Plaintiff seeks only that Defendants discharge their longstanding obligations under the Fifth and Eighth Amendments.[11] *See Monroe v. Baldwin*, 424 F. Supp. 3d 526, 546 (S.D. Ill. 2019) (finding the "highest" public interest in preventing "violation of a party's constitutional rights") (quoting *United States v. Raines*, 362 U.S. 17, 27 (1960)).

## CONCLUSION

For these reasons, the Court should enter a preliminary injunction as requested by Plaintiff.

---

[10] Defendants' case citations are not apt. The Constitution requires that medical treatment "reflect[] professional judgment." *Robertson v. Deputy Comm'r*, No. 3:19-cv-938-DRL-MGG, 2019 WL 7403678, *3 (N.D. Ind. Dec. 30, 2019). Such judgment is absent here where Defendants proffer grounds to deny GCS and permanent hair removal that have no medical basis. As Defendants have denied Plaintiff appropriate treatment and transfer for years—and made certain changes only in response to her instant motion—nothing in the record suggests she will receive constitutionally adequate care for gender dysphoria absent relief from this Court. *Cf. id.* (resting an irreparable-harm inquiry on "nothing in the record suggesting that an injunction is necessary to ensure . . . care"); *Mudica v. Warden*, No. 3:19-cv-1090, 2020 WL 1685718, *3 (N.D. Ind. Apr. 6, 2020) (same).

[11] Defendants try to shield their conduct from judicial review by emphasizing "medical expertise" on "Plaintiff's needs," Def. Opp. at 26, but show no such expertise. Instead, they offer opinions from declarants who never interacted with her, 2d Iglesias Decl. at ¶ 2, and deny care on grounds that lack medical basis and contravene treatment standards for gender dysphoria, 2d Ettner Decl. ¶¶ 2-9.

Dated: May 3, 2021

        Respectfully submitted,

        */s/ Kevin Warner*

**Kevin Warner**
**Frank Battaglia**
**Katherine D. Hundt**
**Courtney Block**
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600
kwarner@winston.com
fbattaglia@winston.com
khundt@winston.com
cblock@winston.com

**John A. Knight**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740, 335
jaknight@aclu.org

**Angela M. Povolish**
FEIRICH MAGER GREEN RYAN
2001 West Main Street
P.O. Box 1570
Carbondale, IL 62903
(618) 529-3000
apovolish@fmgr.com

**Taylor Brown**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7887
tbrown@aclu.org

*Attorneys for Plaintiff Cristina Noel Iglesias*