IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>IAN CONNORS, *et al.*,<br><br>　　　　　　　Defendants. | Case No. 19-cv-00415-RJN<br><br>Judge Nancy J. Rosenstengel |

**DECLARATION OF DR. RANDI ETTNER, Ph.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION REPLY**

I, Dr. Randi Ettner, hereby state:

1.　　I am a clinical and forensic psychologist retained by counsel for Plaintiff Cristina Iglesias. I have expertise and decades of experience in the diagnosis and treatment of gender dysphoria. I am providing this declaration to address some of the statements made by medical staff at the Federal Bureau of Prisons ("BOP"), specifically, Dr. Berhan Yeh and Dr. Alison Leukefeld. *See* Declaration of Dr. Berhan Yeh ("Yeh Decl."); Declaration of Alison Leukefeld ("Leukefeld Decl."). This declaration is based on my review of Dr. Yeh and Dr. Leukefeld's declarations, as well as the attached exhibits, which include some portion of Ms. Iglesias's medical records.

2.　　Dr. Leukefeld states that a committee of unnamed individuals, the Transgender Executive Council (the "TEC"), has a policy of refusing to provide someone gender-confirmation surgery if they have not achieved "target hormone levels." Leukefeld Decl. ¶ 10. There is no medical justification for this requirement and it does not appear in the World Professional Association for Transgender Health ("WPATH") Standards of Care. I am unaware of any research or any medical professional who treats gender dysphoria that has expressed such an opinion.

1

3. Dr. Leukefeld's medical justification of this requirement is equally lacking, both as a general matter and as it applies to Ms. Iglesias. Dr. Leukefeld justifies this policy on the grounds that transgender women become more feminine in appearance as a result of hormone therapy, including loss of muscle mass, lower libido, and an inability to achieve erections, which she says are necessary for a transgender woman to live in a female prison for the safety of the cisgender women who are housed there. Leukefeld Decl. ¶ 10. This is not a medical justification for denying a transgender woman gender-confirmation surgery.

4. Dr. Leukefeld's rationale also fails to explain why BOP has delayed both Ms. Iglesias's surgery and her transfer. Ms. Iglesias has been on hormone therapy since July 6, 2015. Yeh. Decl. ¶ 7. Maximum feminization of a transgender woman typically occurs by the time a transgender woman has been taking hormone therapy for twenty-four months. Thus, according to Dr. Leukefeld's reasoning, Ms. Iglesias should have been provided gender-confirmation surgery—or at least transferred to a female facility—by July 6, 2017.

5. The TEC's "target" or "goal" level rationale fails to justify the delay in Ms. Iglesias's surgery and transfer. Dr. Yeh expresses concern about Ms. Iglesias's reduced estradiol levels in February 25, 2020 (24 pg/ml), May 26, 2020 (60 pg/ml), and August 27, 2020 (26 pg/ml) in comparison to her April 14, 2021 level (75 pg/ml). Yeh Decl. ¶¶ 11, 12. Ms. Iglesias's testosterone levels, in contrast, have been suppressed for years and remained so even after her estradiol dosage was changed in November 2019. Yeh Decl., Attachment 1. If the TEC's "target levels" for estradiol are 75 pg/ml, then Ms. Iglesias reached those long before now according to her medical records. Dr. Yeh reports that Ms. Iglesias's estradiol levels were mostly at "goal" level as early as August 2016, Yeh Decl. ¶ 10, when they were actually much higher (197.9 pg/ml) than her most recent levels (75 pg/ml). Yeh Decl., Attachment 1.

6.       Dr. Leukefeld also asserts that the TEC has a policy that requires transgender inmates to live for a year in a facility consistent with their gender identity before they are provided surgery. Leukefeld Decl. ¶ 12. There is no medical justification for this requirement. There is no research to support that requirement and it is not found in the WPATH Standards of Care, which recommend only "12 continuous months of living in a gender role that is congruent with their gender identity" regardless of setting—a standard Ms. Iglesias has satisfied for decades. No one in the medical community of persons who treat gender dysphoria relies on a facility-based requirement of this type. These alleged requirements for qualifying for surgery—achieving target hormone levels and living in a sex-segregated environment with people of the same gender—have no support within the medical community.

7.       Dr. Leukefeld justifies the TEC requirement of living one year in a female prison on the grounds that "the TEC views the step of living in a prison consistent with a person's gender identity as a critical step," but fails to offer any medical justification for this facility-based requirement, because none exists. Leukefeld Decl. ¶ 12. Ms. Iglesias has already satisfied the WPATH one-year recommendation of living in a gender role congruent to her gender identity by living as a woman for many years, both before and during her time in BOP custody, even though her time in BOP custody has been in male facilities.

8.       Dr. Leukefeld's additional reasons for the TEC's facility-based requirement are that other transgender women have been transferred to female facilities and been returned to male facilities because they "acted in ways that made it unsafe to maintain them in a female prison," while others chose to return to a male facility "due to the stress they experience in a female prison." Leukefeld Decl. ¶ 23. I do not know what led to these transfers, but these are not medical reasons for denying someone gender-confirmation surgery. Nor is Ms. Leukefeld's speculation that a

transgender woman, such as Ms. Iglesias, would be at a higher risk in a male prison after surgery than she already is.

9. Permanent hair removal is a medical intervention for transgender women like Ms. Iglesias as treatment for gender dysphoria. It is used to treat the clinical distress associated with gender dysphoria and is not a cosmetic intervention. Permanent hair removal can mitigate some of the distress caused by gender dysphoria by removing masculinizing facial hair and other body hair. Permanent hair removal from the genital area is also a necessary step before genital reconstruction surgery can be performed.

10. Typically, my assessment would include more information than I have been provided. However, my interview of Ms. Iglesias, the declarations of Dr. Yeh and Dr. Leukefeld, as well as the records I have been provided, all strongly support my opinion that gender-confirmation surgery and permanent hair removal are medically necessary for her and that she is at risk of suffering lasting and worsening harm if she does not receive such medical treatment soon.

Pursuant to 28 U.S.C.§ 1746, I declare that the foregoing is true and correct.

Dated: 5/2/2021

Dr. Randi Ettner Ph.D.
Dr. Randi Ettner, Ph.D.