IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (also known as CHRISTIAN NOEL IGLESIAS),<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF PRISONS, MICHAEL CARVAJAL, CHRIS BINA, IAN CONNORS, DAN SPROUL, JEFFERY ALLEN, ALIX MCLEAREN, THOMAS SCARANTINO, and DONALD LEWIS,<br><br>Defendants. | Case No. 19-CV-415-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Dismiss Plaintiff Cristina Nichole Iglesias's Second Amended Complaint filed by the Federal Bureau of Prisons ("BOP"), Michael Carvajal, Chris Bina, Ian Connors, Alix McLearen, Thomas Scarantino, Dan Sproul, Dr. Jeffery Allen, and Donald Lewis, each in their official capacities (collectively, "Defendants"). (Doc. 129). For the reasons set forth below, the motion is denied.

**FACTUAL & PROCEDURAL BACKGROUND**

Plaintiff Cristina Nichole Iglesias, previously incarcerated at United States Penitentiary at Marion ("USP-Marion"), Federal Medical Center at Lexington, and Federal Correctional Institution at Fort Dix ("FCI-Fort Dix"), was recently transferred to Federal Medical Center at Carswell ("FMC-Carswell"), a women's facility. After a

threshold review of her Second Amended Complaint, Iglesias was permitted to proceed on the following claims:

> **Count I:**  Eighth Amendment claim for failure to provide necessary medical treatment against BOP, Carvajal, Bina, Connors, Sproul, Allen, McLearen, Scarantino, and Lewis.
>
> **Count II:**  Fifth Amendment right to equal protection claim against BOP, Carvajal, Bina, Connors, Sproul, Allen, McLearen, Scarantino, and Lewis for denial of placement in a women's facility.
>
> **Count III:**  Eighth Amendment failure to protect claim against BOP, Carvajal, Bina, Connors, Sproul, Allen, McLearen, Scarantino, and Lewis.

(Doc. 116). Defendants timely filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1), 12 (b)(3) and 12(b)(6). Specifically, Defendants challenge venue, Iglesias's official capacity claims, standing and mootness as to Counts II and III, and whether Count I states a claim under Rule 12(b)(6). (Doc. 129).

## ANALYSIS

### I. Venue

Venue for federal civil rights actions brought under 42 U.S.C. § 1983 are typically governed by 28 U.S.C. § 1391(b). When a defendant is an officer or employee of the United States and is sued in his or her official capacity, however, venue is proper where, among other locations, "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e).[1]

---

[1] Here, the parties stipulated to dismiss Iglesias's claims under *Bivens* against the defendants in their individual capacity, "but not in their official capacity, in exchange for the agreement and

Like Dr. Frankenstein—who stitched together mismatched parts to create a monster—Defendants stitch together a collection of district court cases to conclude that "when there is an amended complaint, the determination of venue is made at the time of the filing of the operative complaint." (Doc. 129) (citing). Defendants first use *Schneider v. Brennan*, 2016 WL 29642 (W.D. Wis. Jan. 4, 2016), for the following quote: "[d]istrict courts within the Seventh Circuit consistently follow the general rule that venue is determined at the time an action commences." *Id*. at *2.

*Schneider* does not help Defendants' argument. In *Schneider*, the plaintiff was alleging violations of the Privacy Act. *Id*. For claims under the Privacy Act, the court acknowledged that venue is proper in "the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia." *Id*. (quoting 5 U.S.C. § 552a(g)(5)). In that case, the plaintiff conceded that he resided in Florida when he filed suit. *Id*. But the plaintiff contended that "because he was a resident of the Western District [of Wisconsin] at the time *the cause of action arose*, the venue statute would allow suit in the Western District." *Id*. (emphasis added). Because he resided in Florida when he filed suit, the Could held that venue was improper in the Western District because the plaintiff only resided in the Western District at the time *the cause of action arose*. *Id*.

Like the plaintiff in *Schneider*, who resided in Florida when he filed suit, when

confirmation of the [BOP], which BOP hereby provides, that BOP is capable of providing all of the relief Iglesias seeks in her Second Amended Complaint and that Defendants will not argue that maintaining Bivens claims against any of the individual defendants is a prerequisite to Iglesias obtaining that requested relief." (Doc. 114, p. 1).

Iglesias filed suit a substantial part of the events or omissions giving rise to her claims occurred at USP-Marion. Similar to the plaintiff's argument in *Schneider* regarding his residency in the Western District at the time *the cause of action arose*, Defendants argue that "BOP personnel at Fort Dix would then be responsible for providing medical care and/or for requesting a transfer for Plaintiff." (Doc. 129, p. 10). But like the venue statute in *Schneider*, where venue is proper in the district in which the plaintiff resides at the time the action is commenced—not in the district in which *the cause of action arose*—the venue statute applicable to Iglesias's case explains that venue is proper in the district "in which a substantial part of the events or omissions giving rise to the claim occurred[,]" 28 U.S.C. § 1391(b)—not in the district in which Defendants would now be responsible for providing medical care for Iglesias.

Defendants' second and third cases are not any more helpful. In *Smith v. Bond Cty. Jail*, 2017 WL 446967, at *5 (S.D. Ill. Feb. 2, 2017), the court failed to even mention venue or standing. Then in *Magee v. McDonald's Corp.*, 2017 WL 11178816, at *3 (N.D. Ill. Feb. 15, 2017), the court addressed standing—not venue.

Even if these cases were on point, the Seventh Circuit has repeatedly reminded courts and counsel that district court opinions have no precedential value. *See, e.g., Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457–58 (7th Cir. 2005). Further, the statute is clear. An action may be brought in "a judicial district in which a substantial part of the events or omissions *giving rise to the claim occurred*." 28 U.S.C. § 1391(b) (emphasis added). Here, a substantial part of Defendants' actions at USP-Marion gave rise to Iglesias's claims. Without these events, Iglesias would not have filed suit. The fact that

Iglesias's claims further developed out of the events or omissions at other BOP facilities does not change the Court's venue analysis. Defendants' arguments regarding improper venue are rejected.

## II.     Transfer

### A.  28 U.S.C. § 1406

Defendants double down on their venue argument by first moving for transfer under 28 U.S.C. § 1406. Under § 1406, a case must be dismissed or transferred when the case is brought in the "wrong division or district . . . ."

But when a case is in the *right* district, a transfer under § 1406 is "wholly inappropriate." *Willis v. Caterpillar Inc.*, 199 F.3d 902, 905 (7th Cir. 1999). In *Willis*, the plaintiff sued a forklift manufacturer. The plaintiff sought to transfer the case from the Central District of Illinois to the Western District of Mississippi under § 1406 contending "that the forklift was manufactured in Ohio 'established that venue in the State of Illinois is not proper.'" *Id.* at 905. The Seventh Circuit quickly noted that "venue was clearly proper in the Central District of Illinois" because the defendant's principal place of business is Peoria, Illinois. *Id.* The Court then explained that "[t]he new evidence that the forklift was actually manufactured by a subsidiary in another state—namely, Caterpillar Industrial in Ohio—whatever other questions it may raise, does not change the conclusion as to venue with respect to the suit as filed." *Id.* While noting that this new evidence may have made Ohio a proper venue, the Court acknowledged that the new evidence "does not eliminate the propriety of venue in Illinois in this lawsuit against [the defendant]." *Id.* On these facts, the Court held that because the plaintiff's suit against the

defendant was filed in a proper venue, "the district court was without the power to transfer the case under § 1406(a)." *Id.*

Like the plaintiff in *Willis*, who sought transfer under § 1406 based on the forklift being manufactured in Ohio, here Defendants are seeking transfer under § 1406 contending that Iglesias was incarcerated at FCI-Fort Dix in New Jersey when the Second Amended Complaint was filed and all of her "requests for a transfer to a women's facility as well as her requests for various medical treatments were considered by the TEC in Washington, D.C., which formulated recommendations to address Plaintiff's gender dysphoria." (Doc. 129, p. 10). Like the new evidence making Ohio a proper venue in *Willis*, the new facts in the complaint would only make New Jersey and Washington, D.C. a proper venue under 28 U.S.C. § 1391. But just as the new evidence did not eliminate the propriety of venue in Illinois in *Willis*, the new facts in the complaint do not eliminate the propriety of venue in Illinois because "[w]hile housed at USP-Marion, [ ] Iglesias has made requests to BOP staff members, including to Dr. Randall Pass, Clinical Director at USP-Marion, the clinical team at USP-Marion, and Hollingsworth." (Doc. 106). Additionally, while at USP-Marion, Iglesias made requests for gender confirmation surgery, laser hair removal, and revisions to the BOP's policy regarding prison placement for transgender inmates. (Doc. 1, pp. 64, 67, 80). Accordingly, transfer under § 1406 is inappropriate.

### B.  28 U.S.C. § 1404

Next, Defendants seek transfer under 28 U.S.C. § 1404. "[I]n considering a motion for transfer, the trial judge is limited to the three factors specifically mentioned in

§ 1404(a), *viz.*, the convenience of the parties, the convenience of the witnesses, and the interest of justice, . . . these factors are best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986) (citations omitted). The party moving for a transfer "has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." *Id.* at 219-20.

Here, Defendants neither argue that transfer would "relate to the efficient administration of the court system" nor "look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy . . ." *Research Automation, Inc. v. Schrader-Bridgeport Inter., Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (internal citations omitted). Because the interest of justice analysis may be determinative, even if the convenience of the parties and witnesses calls for a different result, *Coffey*, 796 F.2d at 220, Defendants have not carried their burden, and the motion to transfer under § 1404 must be denied.

### III. Official Capacity Claims Against Individual BOP Employees

Defendants next contend that Iglesias's official capacity claims against the individual defendants should be dismissed. (Doc. 129, p. 12). This argument also fails.

The Seventh Circuit has held that "[a] warden, named officially, is a proper party in a suit where a prisoner seeks injunctive relief from prison staff because the warden would be responsible for ensuring that the order is carried out." *Tolentino v. Baker*, 679 F.

App'x 503, 504 (7th Cir. 2017) (citing *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (finding that a prison warden was a proper defendant to a § 1983 claim "because he would be responsible for ensuring that any injunctive relief is carried out")). In *Tolentino*, the plaintiff alleged that prison employees refused to provide medical care that, "according to him, is obviously necessary, and he [sought] an injunction ordering that care." *Id.*

Like the plaintiff in *Tolentino*, Iglesias is alleging that BOP employees refused to provide medical care, and she is seeking an injunction ordering that care. Accordingly, those employees are proper parties, and Defendants' argument is rejected.

## IV.     Standing as to Counts II & III

After not challenging standing in their briefing opposing Iglesias's Motion for Preliminary Injunction, Defendants now argue that "because the *decision to transfer* Plaintiff to a women's facility was made *before the filing* of her Second Amended Complaint, Plaintiff lacks an injury that can be redressed by an order of the Court." (Doc. 129, p. 14) (emphasis added). This sudden change in strategy could easily be explained, but the Court finds it significant that Defendants previously note that "[b]ecause the TEC has recommended Plaintiff's transfer to a female facility, her failure-to protect claim will *soon be moot*." (Doc. 100, p. 24) (emphasis added). If a claim is not yet moot, then a plaintiff would have already established standing to sue in the first place.

Defendants' new theory is that standing is based on the *operative complaint*. But the Seventh Circuit analyzes standing based on what was pled at the moment the suit is filed. *See Pollack v. U.S. Dep't Of Just.*, 577 F.3d 736, 743 (7th Cir. 2009) (finding that "a plaintiff

must establish standing at the time suit is filed and cannot manufacture standing afterwards"); *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (acknowledging that "[s]tanding is evaluated at the time suit is filed") (citations omitted). When Iglesias filed her suit, she was not at a women's facility, but at USP-Marion.[2]

Even if the Court analyzes standing based on the Second Amended Complaint, Defendants still fail because the *decision to transfer* Iglesias is not the same thing as whether Iglesias has *already been transferred*. As Justice Ginsburg explained in *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000):

> When, for example, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, *Olmstead v. L.C.*, 527 U.S. 581, 594, n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), despite the fact that she would have lacked initial standing had she *filed* the complaint *after the transfer*.

(emphasis added). In other words, the same mentally disabled patient would have standing if she *filed* the complaint *before transfer*.

Iglesias filed her Second Amended Complaint on April 30, 2021. (Doc. 106). She was not transferred to FMC-Carswell until May 25, 2021. (Doc. 129, p. 6). Following

---

[2] The Seventh Circuit recognizes "exceptions to the principle that once jurisdiction, always jurisdiction, *notably where a case becomes moot in the course of the litigation*." *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 807 (7th Cir. 2010) (emphasis added) (citations omitted). Certainly, "if the plaintiff amends away jurisdiction in a subsequent pleading, the case must be dismissed." *Id*. (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007)). But Defendants' use of *Rockwell Int'l Corp*. is consistent with the standing analysis in *Scahill v. D.C.*, 909 F.3d 1177 (D.C. Cir. 2018), a District of Columbia Circuit case holding that a plaintiff may cure a standing defect by amending the pleading to allege facts that arise after the filing of the original complaint. The standing analysis in *Scahill* is not binding.

*Friends of the Earth, Inc.*, Iglesias has standing to bring Counts II and III because she filed the Second Amended Complaint *before transfer* to FMC-Carswell.

Additionally, a prisoner, who is transferred from a facility will <u>still</u> allege a "concrete, particularized, [and] actual injury" when he or she seeks relief from a condition that stems from a system-wide policy that applies at the new facility. *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004). In *Lehn*, a prisoner brought an Eighth Amendment claim seeking to enforce "his right to an environment that is not filled with dangerous levels of ETS." *Id.* at 865. The district court dismissed this claim as moot when the prisoner was transferred to another facility. *Id.* at 870. On appeal, the Seventh Circuit "independently asked the parties to brief whether Lehn has standing to challenge IDOC's 'practice of housing nonsmoking inmates in the same cell with smoking inmates.'" *Id.*

In *Lehn*, the Court held that the prisoner "[did] not have to allege anything further in order to satisfy the Article III's standing requirements" because the "[prisoner's] complaint alleges a concrete, particularized, actual injury that is directly traceable to IDOC's system-wide practice of housing non-smoking inmates with smokers." *Id.* at 871. The Court found that the prisoner's "injury would be redressable by a decision forcing IDOC to change its practice." *Id.* The Court continued noting "[a]t this juncture in the proceedings, questions of proof are premature: [prisoner's] complaint states that IDOC's practice threatens his future health and causes him presently to suffer from headaches and burning eyes." *Id.* Like the system-wide practice in *Lehn*, Iglesias's complaint alleges an injury that is redressable by a decision forcing the BOP to change its system-wide

practice of "biological-sex" based housing in Counts II and III. For all these reasons, Defendants' standing argument must be rejected.

## V. Mootness as to Counts II & III

Alternatively, Defendants argue that their conduct—placing Iglesias in a women's facility—moots Counts II and III. (Doc. 129, p. 14). But it is well-established that a defendant's voluntary cessation of the complained of action does not necessarily moot a case. *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 925 (7th Cir. 2007). The standard for determining whether a defendant's conduct moots a case is "if subsequent events make it *absolutely clear* that the allegedly wrongful behavior could not *reasonably be expected to recur*." *Friends of the Earth, Inc.*, 528 U.S. at 170. (emphasis added) (citing *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). The Seventh Circuit applying this standard in *Moore v. Thieret*, 862 F.2d 148 (7th Cir. 1988) noted the following:

> Nothing is "absolutely clear," but these words from *Phosphate* and *Vitek* must be read in conjunction with the additional words "could not reasonably be expected to recur," with the purpose of the doctrine of mootness, with later Supreme Court cases, notably *City of Los Angeles v. Lyons*, 461 U.S. 95, 109–10, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983), written by the author of *Vitek*, and with the procedural setting of the present case.

*Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988). In *Thieret*, the prisoner alleged that staff were allowing inmates to repeatedly assault him. The prisoner sought a preliminary injunction, but it was denied. On appeal, the Court noted that "*[i]f the likelihood is small (it is never zero), the case is moot.*" *Id*. (emphasis added). While the Court found "no indication why [the] plaintiff [ ] was transferred from [the] [prison], and no reason on the present record to suppose that he is likely to be sent back to [the] [prison][,]" the Court did not

dismiss the suit. *Id*. The Court "only [ ] dismiss[ed] the appeal from the denial of a preliminary injunction[,]" and noted that "[i]f and when the state tries to return him to [the] [prison], he can renew his motion for a preliminary injunction and appeal to us if the motion is again denied." *Id*.

Seven years later, in *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996), the Seventh Circuit relied on *Thieret* to dismiss a prisoner's claims for injunctive relief as moot. But relying on *Higgason* or *Thieret* is imprecise because the prisoners were not challenging a system-wide practice. As acknowledged in *Lehn*, 364 F.3d at 871-72:

> [*Higgason*] stands only for the uncontroversial proposition that when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot. *Id.* at 811. *Higgason* did not confront the issue raised in Lehn's case: whether a prisoner who seeks relief from a condition that stems from a system-wide policy, who is then transferred to a different facility within the same system where the objectionable policy also applies, states a claim. Neither *Higgason* nor any of the cases following it address this point.

Applying the mootness analysis in *Lehn*, the Court finds that Counts II and III are not moot.

Setting aside *Lehn*, Defendants have not met their burden to show that their allegedly wrongful behavior could not reasonably be expected to recur. Defendants point out that the burden "is a significantly easier showing for a governmental defendant to make." (Doc. 129, p. 15); *see also Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991) (noting that "[w]hen the defendants are public officials, however, we place greater stock in their acts of self-correction, so long as they appear genuine"). "The crucial inquiry is 'whether there has been complete discontinuance, whether effects continue

after discontinuance, and whether there is any other reason that justifies decision and relief.'" *Id.* (citing C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.6, at 350).

Here, Defendants have provided no evidence of the discontinuance of the alleged "biological-sex" based housing policy. Defendants may point out that Iglesias is scheduled to be transferred to a women's Residential Reentry Center in Florida around March 2022 "for the final portion of her sentence, which is currently projected to end on December 25, 2022[,]" (Doc. 148, pp. 1-2), but this does not address the possibility that Iglesias could be transferred back to a men's facility.[3] Without Iglesias completing her sentence, the BOP changing its policy, or other facts confirming the allegedly wrongful behavior could not reasonably be expected to recur, Counts II and III are not moot.

## VI. Count I – Eighth Amendment Claim Denial of Medical Care

The purpose of a Rule 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case or decide whether a plaintiff will ultimately prevail. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff need not plead detailed factual allegations, but must provide "more than labels and conclusions, and a formulaic recitation of the elements." *Id.* For purposes of a

---

[3] Without turning this into a motion for summary judgment, the Court notes that Dr. Leukefeld's declaration provides that "transgender female inmates have been previously placed in gender affirming settings, but have been released or returned to male facilities." (Doc. 99-2, p. 7).

motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all possible inferences in favor of the plaintiff. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012).

### A. BOP's Decision Concerning Iglesias's Request for Gender Confirmation Surgery

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, (1994); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). Here, gender dysphoria is a serious medical condition. *See Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997) (acknowledging gender dysphoria as a "serious psychiatric disorder"). As for the second step, the Court needs to consider whether Iglesias alleged facts stating a claim that Defendants were deliberately indifferent to her condition.

Defendants' argument does not challenge whether Iglesias alleged Defendants were aware of an existing substantial risk of serious harm, or that Iglesias failed to allege Defendants' subjective response was so inadequate that it demonstrated an absence of professional judgment. *See Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 (7th Cir. 2021) (noting that "[t]o state a claim for deliberate indifference against [ ] defendants, [plaintiff] must allege that they were 'aware . . . that a substantial risk of serious harm exist[ed],' *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, and that their 'subjective response was

so inadequate that it demonstrated an absence of professional judgment,' *Arnett*, 658 F.3d at 751"). Rather, Defendants cite to a Seventh Circuit case which purportedly supports the notion that the Eighth Amendment is not violated when "[Defendants] provided Plaintiff medical care for her gender dysphoria, and where she disagrees with Defendants' judgment that gender-affirming surgery is not yet appropriate for her." (Doc. 129, p. 18).

Indeed, Defendants' reliance on *Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019), is imprecise. In *Campbell*, the issue was <u>not</u> whether the plaintiff alleged facts sufficient to establish an Eighth Amendment violation based on defendants' deliberate indifference, but it was whether summary judgment should be granted on qualified immunity grounds. The Seventh Circuit acknowledged that when determining qualified immunity courts "evaluate '(1) whether the facts, taken in the light most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Id.* at 545 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009)).

The difference in procedural posture between *Campbell* and this case is crucial. Even the Court in *Campbell* distinguished its case from two cases out of the Fourth and Ninth Circuits. *Id.* at 547. Specifically, in *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013), the Fourth Circuit reversed an order dismissing a prisoner's Eighth Amendment claim for failure to provide necessary medical treatment when defendants continuously denied her of consideration for gender confirmation surgery. In *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015), the Ninth Circuit reversed an order dismissing a prisoner's Eighth

Amendment claim for failure to provide necessary medical treatment when defendants denied her of consideration for gender confirmation surgery despite "the recommendation of a physician's assistant with no experience in transgender medicine."

Defendants may point out that "just as in a motion-to-dismiss posture, in a qualified immunity interlocutory appeal [courts] must draw inferences and resolve factual disputes in the plaintiff's favor." *Campbell*, 936 F.3d at 554 (Wood, D. dissenting). But Judge Diane Wood's dissent in *Campbell* does not assist Defendants here because Judge Wood explained that "when viewed in the light most favorable to Campbell, *the evidence* shows that despite being treated with hormones, Campbell's gender dysphoria has not improved." *Id*. (emphasis added). To be clear, the Court is not looking at the evidence at this stage.

When accepting all well-pleaded facts as true and drawing all possible inferences in favor of the plaintiff, Iglesias has engaged in numerous acts of self-harm. (Doc. 106). Defendants are aware of Iglesias's suffering as "Ms. Iglesias has informed BOP medical staff that denying her the treatment she needs has caused her to experience suicidal ideation, anxiety, depression, and to engage in dangerous acts of self-treatment. (*Id*. at p. 10). Dr. Randall Pass, Clinical Director at USP-Marion, allegedly "confirmed [ ] Iglesias met the WPATH criteria for GCS and should receive it." (*Id*. at p. 11). Iglesias also allegedly "had a consultation with Tammy C. Thomas, a Nurse Practitioner with the Endocrinology Department at University of Kentucky HealthCare . . . [and] Ms. Thomas told Ms. Iglesias that she met the WPATH criteria for GCS, and would recommend surgery." (*Id*. at p. 12).

Because Iglesias alleges that Defendants were aware of an existing substantial risk of serious harm, Defendants' Motion to Dismiss as to Count I's gender confirmation surgery claim must be denied.

### B. BOP's Decision Concerning Iglesias's Request for Hair Removal

Similar to the argument above, Defendants do not challenge whether Iglesias alleges facts to state a claim for permanent hair removal. Again, Defendants rely on *Campbell*, 936 F.3d at 549, arguing that "the Eighth Amendment does not mandate that prisoners receive cosmetic hair removal." (Doc. 129, p. 20). The problem is "inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his [or] [her] condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011).

Notably, the Court in *Campbell* rejected the plaintiff's argument that *Elyea* "establish[es] a right to individualized medical judgment." *Campbell*, 936 F.3d at 546. Not only is the Court not using *Elyea* for this proposition, but also any analysis of the Court's discussion of *Elyea* in *Campbell* would require an acknowledgement that the Court's inquiry was "whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone therapy." *Id*.

This Court's inquiry is not the same as the Seventh Circuit's inquiry in *Campbell*. Instead, the Court must review Iglesias's complaint to determine whether she has pled facts to support the claim that her gender dysphoria is being treated inadequately. Defendants may disagree whether hair removal is part of her gender dysphoria

treatment, but this a question for another time—not on a motion to dismiss.

Here, Iglesias alleges that "[t]he National Commission on Correctional Health Care ("NCCHC") recommends that the medical management of prisoners with gender dysphoria 'should follow accepted standards developed by professionals with expertise in transgender health,' citing the [WPATH] Standards of Care." (Doc. 106). Iglesias continues alleging that WPATH's Standards of Care include grooming. (*Id.*). Iglesias then notes that she is "currently not permitted to shave every day." (*Id.* at p. 11). "As a result, she has to endure being called a 'bearded woman' by prison staff and other prisoners." (*Id.*). Besides the name calling, Iglesias's body and facial hair "has and continues to cause her extreme anxiety and distress, which she has been unable to relieve by shaving." (*Id.* at p. 15). Because Defendants have allegedly denied Iglesias's requests for hair removal as part of her treatment for gender dysphoria, Iglesias has pled enough facts, and Defendants' motion to dismiss as to Count I's permanent hair removal claim must be denied.

## CONCLUSION

For these reasons, the Motion to Dismiss by Defendants (Doc. 129) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:** October 22, 2021

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**