1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3        CRISTIAN NOEL IGLESIAS,          )
                                          )
4                Plaintiff,               )
                                          )
5                vs.                      ) Case No.
                                          ) 3:19-cv-00415-NJR
6        WARDEN TRUE, et al.,             )
                                          )
7                Defendants.              )

8

9

10

11
                             MOTION HEARING
12

13

        BE IT REMEMBERED AND CERTIFIED that heretofore on the 22nd day
14       of November, 2021, HONORABLE NANCY J. ROSENSTENGEL, United
        States District Judge, presiding, the following proceedings
15      were recorded by mechanical stenography; transcript produced
                             by computer.
16

17

18

19

20

21

22
                    Karen E. Waugh, CSR, RPR, CRR
23                     IL CSR #084-003688
                        750 Missouri Avenue
24                   East St. Louis, IL  62201
                          618-482-9176
25                 karen_waugh@ilsd.uscourts.gov

```
 1                           APPEARANCES

 2

 3   FOR PLAINTIFF:         FEIRICH/MAGER/GREEN/RYAN
                            2001 West Main Street
 4                          PO Box 1570
                            Carbondale, IL  62903
 5                          By Ms. Angela M. Povolish

 6                          ROGER BALDWIN FOUNDATION OF ACLU, INC.
                            150 North Michigan Avenue, Suite 600
 7                          Chicago, IL  60601
                            By Mr. John A. Knight
 8                          By Mr. Joshua Blecher-Cohen

 9                          AMERICAN CIVIL LIBERTIES UNION
                            FOUNDATION
10                          125 Broad Street, 18th Floor
                            New York, NY  10004
11                          By Ms. Meredith Taylor Brown

12

13   FOR DEFENDANTS:        U.S. DEPARTMENT OF JUSTICE
                            1100 L Street, N.W.
14                          Washington, DC  20044
                            By Mr. John J. Robinson
15                          By Mr. Joshua Kolsky
                            By Ms. Kate Talmor
16
                            UNITED STATES ATTORNEY'S OFFICE
17                          9 Executive Drive
                            Fairview Heights, IL  62208
18                          By Ms. Laura J. Jones

19

20

21

22

23

24

25
```

1                          I N D E X

2

3    WITNESS                                          PAGE

4    CRISTINA NICHOLE IGLESIAS
        Direct Examination by Ms. Brown:              7
5
     DR. RANDI ETTNER
6       Direct Examination by Mr. Blecher-Cohen:      54
        Cross Examination by Ms. Talmor:              90
7       Redirect Examination by Mr. Blecher-Cohen:   123

8    DR. ALISON LEUKEFELD
        Direct Examination by Mr. Kolsky:            127
9       Cross Examination by Mr. Knight:             154
        Redirect Examination by Mr. Kolsky:          193
10

11

12                       E X H I B I T S

13
     EXHIBIT                          ID'd         Rcv'd
14
     Plaintiff's Exhibits Nos. 1-13:     6             6
15   Plaintiff's Exhibit No. 14:        59            59

16

17

18   Closing Argument by Mr. Knight:        Page 195

19   Closing Argument by Mr. Robinson:      Page 200

20

21

22

23

24

25

```
 1              (Court convened at 9:01 a.m.)
 2         THE CLERK:  The matter of Iglesias v. True, et al.,
 3  Case No. 19-cv-415, is called for a motion hearing.  Will the
 4  parties please identify themselves for the record?
 5         MR. KNIGHT:  Sorry, Your Honor.  John Knight,
 6  Meredith Taylor Brown, Leslie Cooper and Josh Blecher-Cohen
 7  for the plaintiffs.
 8         THE COURT:  All right.  Good morning, Counsel.
 9         MR. KNIGHT:  Good morning.
10         MR. KOLSKY:  Good morning, Your Honor.  Joshua Kolsky
11  from the Department of Justice.  With me are John Robinson,
12  Kate Talmor and Laura Jones, all from the Department of
13  Justice, and Ryan Nelson from the Bureau of Prisons.
14         THE COURT:  All right.  Good morning.
15         MR. KOLSKY:  Good morning.
16         THE COURT:  All right.  Is that everyone?  All right.
17  Well, just a few housekeeping things before we begin.  I've
18  said if you're vaccinated -- of course I have no way of
19  knowing that, I just have to trust you -- and you're
20  comfortable taking off your mask, I'm okay with you taking off
21  your mask.  I certainly want any witness to not have a mask on
22  and anyone who chooses to come to the podium.  Otherwise, if
23  you want to remain seated, as long as you can speak into the
24  microphone.  I have to take a call at 11 o'clock that
25  wouldn't -- shouldn't take too long, so we'll take a short
```

1    break then, and then depending on how we're doing, a short

2    break for lunch.

3           So I want to get right into the witness testimony.  I

4    am familiar, of course, with the posture of the case and the

5    background, and then at the end, assuming we have time today,

6    I'll ask for a brief closing argument.

7           Now, Mr. Knight, I understand -- I see that

8    Ms. Iglesias is handcuffed, and Deana said that you had

9    requested that she be uncuffed; is that correct?

10          MR. KNIGHT:  That's correct, Your Honor.

11          THE COURT:  Does she have some papers that she needs

12   to review or --

13          MR. KNIGHT:  We would just like her to be free, more

14   able to speak and use her hands.

15          THE COURT:  Okay.

16          MR. KNIGHT:  I don't think there are papers that

17   she's going to have to use.

18          THE COURT:  Okay.  Just for comfort?

19          MR. KNIGHT:  Just for comfort.

20          THE COURT:  Okay.  Well, whoever's in the room, I

21   would appreciate it if she could be uncuffed.  I assume

22   that -- I mean, at least her hands uncuffed, if she's in the

23   room by herself.  Can you hear me, Ms. Iglesias?

24          MS. IGLESIAS:  Yes.  I'm not in the room by myself.

25          THE COURT:  You are in the room by yourself?

```
 1              MS. IGLESIAS:  Can you hear?  No, I'm not.  My unit
 2   manager, Ms. Rex, is here.
 3              THE COURT:  Okay.
 4              MS. REX:  Your Honor, she cannot be uncuffed.  She's
 5   currently under disciplinary -- she's being segregated, so I'd
 6   have to get with the captain to have her uncuffed.
 7              THE COURT:  Okay.  Well, why don't -- whenever we
 8   take a break, why don't you discuss that with the captain, but
 9   I don't want to waste any time for that at this time.
10              So Ms. Iglesias will be your first witness; is that
11   correct, Mr. Knight?
12              MR. KNIGHT:  That's right.  Your Honor, we do have
13   some exhibits that Counsel for the Government has agreed can
14   be admitted.  These are the exhaustion records, and we've
15   marked them as Exhibit 1 through 13, so I would just seek
16   admission of those at this time.
17              THE COURT:  Okay.  1 through 13 will be admitted, if
18   you'll just hand those to Deana.
19              MR. KNIGHT:  All right.  We'll proceed, then.
20              MR. KOLSKY:  Your Honor, one thing, if I may.  Our
21   witness, Dr. Leukefeld, is in the courtroom now.  I just
22   wanted to make sure that was okay if she's present during
23   plaintiff's presentation.
24              THE COURT:  Any objection to that?
25              MR. KNIGHT:  Well, we have Dr. Ettner here and we
```

```
 1    would like her to remain in the courtroom.  I suppose we won't

 2    object if Counsel will not object to Ms. -- Dr. Ettner

 3    being --

 4           MR. KOLSKY:  We don't object to that.

 5           THE COURT:  Okay.  Then the witnesses may remain.

 6    All right.  You may proceed.  First, Deana, if --

 7    Ms. Iglesias, I'm going to ask you to take an oath.

 8      (Witness sworn.)

 9           COURTROOM DEPUTY:  And would you please state your

10    name for the record?

11           MS. IGLESIAS:  Cristina Nichole Iglesias.

12           THE COURT:  You may proceed.

13           MS. BROWN:  Thank you.

14           CRISTINA NICHOLE IGLESIAS, produced, sworn and

15    examined on behalf of the Plaintiff, testified as follows:

16                        DIRECT EXAMINATION

17    BY MS. BROWN:

18    Q.  Good morning, Cristina.  Can you hear me okay?

19    A.  Hi.  Yes.  Hi, Taylor.

20    Q.  Wonderful.  Okay.  Cristina, I want to get some background

21    information.  Can you tell me how old you are?

22    A.  I'm 47.

23    Q.  And, Cristina, where are you originally from?

24    A.  Florida.

25    Q.  Cristina, what is your gender?
```

```
 1   A.   Female.

 2   Q.   What was your sex assigned at birth?

 3   A.   Male.

 4   Q.   Cristina, when did you first know that you were female?

 5   A.   I really started noticing at the age of 12.

 6   Q.   And how did you know that you were female?

 7   A.   Because I was different from other people.  I wanted to be

 8   like my sister and I started wearing her training bras and

 9   having her concealer put on my face and stuff like that.

10   Q.   Okay.  And when you say different from other people,

11   anything else aside from that?

12   A.   Yeah.  I was attracted to guys and I wanted -- I felt like

13   a woman and did not identify with what I was born with.

14   Q.   Cristina, did you experience any distress related to your

15   gender not matching your body when you were young?

16   A.   Yes, I did.

17   Q.   Can you describe the distress?

18   A.   It was -- I wanted to kill myself.  I tied a jacket around

19   my neck in school.  I was hospitalized because of that.  I

20   also ran away a lot to New York City and San Francisco, trying

21   to find acceptance, and I was picked on in school and --

22   because of being feminine.

23   Q.   Cristina, did anyone diagnose you with gender dysphoria

24   when you were young?

25   A.   No.
```

```
 1   Q.  And could you have seen a health care provider at that
 2   time about the feelings and the distress you were
 3   experiencing?
 4   A.  No.
 5   Q.  And why not?
 6   A.  They didn't have that diagnosis when I was growing up as a
 7   child.
 8   Q.  Cristina, did there come a time when you began to express
 9   yourself as female?
10   A.  Yes.
11   Q.  How old were you?
12   A.  I was 13 to 14 years old.  I started dressing full time as
13   a girl.
14   Q.  And did you do anything else to express yourself as female
15   aside from dressing?
16   A.  I was called Kelly.  I didn't like my birth name, so I
17   went by Kelly, and I preferred she pronouns, which was very
18   hard at that time, because everybody identifies you as being
19   gay or a cross-dresser.
20   Q.  Did you --
21   A.  Even my school staff thought -- yeah.
22   Q.  Sorry.  You can finish what you were saying.  Even your
23   school staff?
24   A.  They thought I was just gay or a cross-dresser.
25   Q.  Did you wear makeup at that time?
```

1   A.  Yes.  Yes, I did, and earrings, yes.

2   Q.  Did you have a feminine hairstyle?

3   A.  Yes.

4   Q.  Why did you do all of those things, Cristina?

5   A.  Because I don't identify as a male and I identify as a

6   woman, and I was -- I'm not happy being identified as a male

7   and I was very adamant about that as a young child.

8   Q.  Did there come a time when you began to live as female all

9   of the time or express yourself as female all of the time?

10  A.  Yeah.

11  Q.  How old were you?

12  A.  Yes.  I was 15, going on 16.

13  Q.  During this time, did you want to change your body?

14  A.  Yes.  Yes, I did.

15  Q.  What kind of changes did you want?

16  A.  I wanted breast development, so I would stuff my training

17  bra or I would wear water balloons, three in one, and put

18  water, air in them, to have breasts.  I tucked full time.  I

19  wore panties.  I always had no hair on my body and I'd wear

20  full-on makeup and earrings.

21  Q.  Okay.  Did you want to change anything else on your body

22  aside from breast development and --

23  A.  Yes.  I wanted gender reassignment surgery.

24  Q.  Okay.  And what did gender reassignment surgery mean to

25  you?

1   A.   Freedom and being able to be a normal woman, like, my

2   sister's age.

3   Q.   When you were young, did you do anything medically to live

4   as female and change your body?

5   A.   Yeah.  I was taking -- I was running away and I was

6   getting birth control pills, trying to grow breasts, because I

7   heard they grow breasts, and I would take that.

8   Q.   And how did the birth control affect you?

9   A.   It made me feel like it was working.  Whether it did, I

10  don't know, but I felt like I was at least trying.

11  Q.   Cristina, when did you first enter the Bureau of Prisons'

12  custody?

13  A.   The first time was 1994.

14  Q.   And how old were you?

15  A.   Twenty.

16  Q.   What gender did you identify with whenever you entered the

17  Bureau of Prisons' custody?

18  A.   I identified as a female but was told because I'm in a

19  male's prison I have to go by a man.

20  Q.   Did you tell the Bureau of Prisons that you identified as

21  female?

22  A.   Yes, multiple times.

23  Q.   During this time when you first entered the Bureau of

24  Prisons' custody, did they diagnose you with anything?

25  A.   Yeah, gender identity disorder.

1   Q.  Did the Bureau of Prisons offer you treatment for gender

2   identity disorder?

3   A.  No, no.

4   Q.  Did you ask for treatment?

5   A.  Yes.

6   Q.  What kind of treatment did you ask for?

7   A.  Hormone therapy.

8   Q.  Who did you make these asks to?

9   A.  Medical.

10   Q.  And what was their response to your request for hormone

11   therapy?

12   A.  That because I wasn't on it prior to coming to the Bureau

13   of Prisons, their policy is they don't give it, and even if I

14   was on it prior to coming, they would reduce the dosage to

15   just 2 milligrams, so it wouldn't give me fully growth.  So

16   they denied it.

17   Q.  Has the Bureau of Prisons ever diagnosed you with gender

18   dysphoria?

19   A.  Yes.

20   Q.  When did they diagnose you with gender dysphoria?

21   A.  Around 2015.

22   Q.  Did the Bureau of Prisons ever provide you with hormone

23   therapy?

24   A.  Yes.

25   Q.  When did that happen?

```
1    A.   2015.

2    Q.   Have you been on hormone therapy since then?

3    A.   Yes, I have.

4    Q.   And how has hormone therapy affected you physically?

5    A.   It's helped me a lot.  It physically changed my

6    characteristics, you know, breast development, my body

7    changing to female.

8    Q.   And any other effects?

9    A.   Just helped.  That's it.

10   Q.   Has hormone therapy completely alleviated your gender

11   dysphoria?

12   A.   Absolutely not.

13   Q.   And why not?

14   A.   I still have facial hair on my face and I still have the

15   sex I was assigned at birth.

16   Q.   And, Cristina, have you asked for other treatments for

17   your gender dysphoria besides hormone therapy?

18   A.   Yes.

19   Q.   What have you asked for?

20   A.   Laser hair removal and gender-affirming surgery.

21   Q.   And where specifically did you request laser hair removal

22   for?

23   A.   On my face.  Is that what you're -- On my face, because I

24   get called a bearded woman by the inmate population.  I

25   also -- It's -- It is a nightmare every day having to shave
```

1    twice a day and wear makeup constantly to hide that I'm not a

2    female, and it causes me to stress and anxiety and a lot of

3    panic attacks.

4    Q.   Cristina, when did you first ask for facial laser hair

5    removal?

6    A.   2017.

7    Q.   And how many times have you asked for facial laser hair

8    removal?

9    A.   Over 14 times.

10   Q.   And who do you make these requests to?

11   A.   Psychology and medical services, health services.

12   Q.   And has psychology or health services ever provided you

13   with facial laser hair removal?

14   A.   No.

15   Q.   Cristina, did you ever pursue administrative remedies

16   related to your requests for facial laser hair removal?

17   A.   Yes, I did.

18   Q.   When did you do that?

19   A.   The end of 2017.

20   Q.   And, Cristina, can you explain the administrative remedies

21   process?

22   A.   Yeah.  The inmate, in order to go through the

23   administrative, you have to do a BP-8 first, which is an

24   informal resolution, and then when that comes back with a

25   response, you go to the warden, which is a BP-9, and when they

1  respond, they -- you go to the BP-11, which is the regional

2  office that you're in.  Wherever region you're in, you send it

3  to there.  And then the final step is BP-11, which is Central

4  Office appeal.

5  Q.  And are there any steps after the BP-11?

6  A.  No.

7  Q.  Cristina, did you file a BP-8 for laser hair removal for

8  your face?

9  A.  Yes, I did.

10  Q.  What was the response?

11  A.  That I was under review by the TEC.

12  Q.  What is the TEC?

13  A.  The Transgender Executive Council.

14  Q.  Did you ever receive a response from the Transgender

15  Executive Council about your request for facial laser hair

16  removal?

17  A.  No, I did not.

18  Q.  Cristina, did you file a BP-9 for facial laser hair

19  removal?

20  A.  Yes, I did.

21  Q.  And what was the response?

22  A.  The same as the BP-8.  I was under review by the TEC and

23  to keep my treatment options open.  I was to keep doing my

24  treatment that I'm currently doing, that I'd be notified.

25  Q.  Did you file a BP-10?

```
 1    A.  Yes.

 2    Q.  And what was the response to your BP-10?

 3    A.  The same as the BP-9.

 4    Q.  And, Cristina, what about a BP-11?  Did you file that?

 5    A.  Yes.

 6    Q.  And what was the response to your BP-11?

 7    A.  That I -- my request was under review by the TEC and that

 8    I would be notified when a decision was made, but at my last

 9    psychology contact I didn't report any distress and that they

10    advised me that any distress that I was under, I needed to go

11    to sick call or see psychology.

12    Q.  And had you reported the distress related to having facial

13    hair, male facial hair, to sick call and psychology?

14    A.  Yes.  Every month I get seen by a psychologist, and that

15    is part of my gender dysphoria.  I mean, that's part of my --

16    that causes -- between not having gender-affirming surgery and

17    the laser hair is my two main concerns.  So, yes, I definitely

18    did say that.

19    Q.  And have you told psychology services how it impacts you

20    to have male facial hair?

21    A.  Yes, I did.

22    Q.  What do you tell psychology services?

23    A.  That it's very -- it's torture and it's very painful and

24    every day that I have to wake up at five o'clock in the

25    morning before the inmate population and shave because it's
```

```
 1   embarrassing to be -- you know, transition to a female in a
 2   males' prison or a females' prison and I have to shave, and it
 3   causes me anxiety, causes me panic, and it makes me somewhat
 4   depressed and it causes me a lot of -- it does cause me a lot
 5   of anxiety, because I'm very conscientious of how I look on my
 6   face.
 7   Q.  And do you continue to tell psychology services about
 8   this?
 9   A.  Yes, I do.
10   Q.  Cristina, has the Bureau of Prisons offered you anything
11   to address the distress associated with your male facial hair?
12   A.  Other than shaving and, just recently here at Carswell,
13   Nair.
14   Q.  Cristina, does shaving help with the distress you feel
15   about having male facial hair?
16   A.  It helps.
17   Q.  Has it completely alleviated your gender dysphoria?
18   A.  No.
19   Q.  And why not?
20   A.  Because I constantly -- like, where I'm currently housed
21   in the SHU, I'm only allowed to shave now three times a week,
22   but before it was only one time, and I was feeling -- I was
23   digressing in my mental status because I -- having facial hair
24   causes a lot of torture for me.  It was painful and I was
25   feeling almost helpless.
```

1   Q.  And when you do shave, how long before facial hair is

2   visible again?

3   A.  Within a couple hours.

4   Q.  If you shave at night, how does your face look in the

5   morning?

6   A.  A five o'clock shadow.

7   Q.  And how does it feel to be a woman and have to shave your

8   face?

9   A.  A living hell.

10  Q.  Are you able to shave in private?

11  A.  No.

12  Q.  And where do you shave?

13  A.  I have to shave in the bathroom, which is a public

14  bathroom.

15  Q.  Are there other inmates present?

16  A.  Yes.

17  Q.  How does it feel to have to shave in front of other

18  people?

19  A.  It's extremely uncomfortable and very -- it's just -- it's

20  unnerving, mildly put.

21  Q.  And you testified that --

22  A.  Because they make you feel you're --

23  Q.  No, go ahead.  It makes you feel --

24  A.  Because it makes you feel that everybody knows you're

25  different.

1  Q.  And do you take any other steps aside from waking up at

2  5 a.m. to avoid being seen shaving?

3  A.  Yes.

4  Q.  And what do you do?

5  A.  I wear makeup 24 hours a day except in the shower, then I

6  reapply in the shower before I come out so I don't have any

7  look of facial hair.

8  Q.  Has anyone ever walked in on you shaving?

9  A.  Yes.

10 Q.  And what happened?

11 A.  It's just awkward.  It's very -- It's embarrassing because

12 they're looking at you like, "What?"  You know, it's just very

13 weird.  It's very -- There's no privacy and it causes me to be

14 anxiety and it makes me realize that, hey, you know, I'm

15 different.

16 Q.  Cristina, you said that the Bureau of Prisons has also

17 given you Nair for male facial hair.  Does the Nair work?

18 A.  No.  As a matter of fact, I tried it at the recommendation

19 of psychology and I actually burnt my face this weekend with

20 it.

21 Q.  Do you continue to use it?

22 A.  No.  I discontinued it as of Saturday.

23 Q.  And when you did use it, did it work at all?

24 A.  No, no.

25 Q.  And why not?  What was the result?

1    A.  I would still have to shave because the hair would not

2    come out.  I mean, it -- some would go, but I would still have

3    patches of hair where I would have to shave.

4    Q.  Cristina, I want to now turn to your request for

5    gender-affirming surgery to treat your gender dysphoria.

6    Cristina, who did you first make your request for

7    gender-affirming surgery to?

8    A.  Health services.

9    Q.  Did health services ever provide you with gender-affirming

10   surgery?

11   A.  No.

12   Q.  Did you pursue administrative remedies for your request

13   for gender-affirming surgery?

14   A.  Yes, I did.

15   Q.  When did you do that?

16   A.  2016.

17   Q.  And did you file a BP-8?

18   A.  Yes.

19   Q.  What was the response to your BP-8?

20   A.  That I was under review by the TEC.

21   Q.  And did you file a BP-9?

22   A.  Yes.

23   Q.  What was the response to your BP-9?

24   A.  That my request had been forwarded to the TEC for review.

25   Q.  And did you file a BP-10?

```
 1   A.   Yes.
 2   Q.   And what was the response to your BP-10?
 3   A.   The same, that I was currently under review.
 4   Q.   Under review by?
 5   A.   The TEC.
 6   Q.   And did you file a BP-11?
 7   A.   Yes, I did.
 8   Q.   And what was the response to your BP-11?
 9   A.   That I would be notified when a decision was made
10   determining if the TCCT would approve it or something to -- I
11   can't remember exactly that particular one, but it was
12   something like that.
13   Q.   Okay.  And what's the TCCT?
14   A.   The Transgender Clinical Care Team.
15   Q.   Okay.  Were you ever notified of a decision by the TEC or
16   the TCCT for any of these administrative remedies you filed
17   for facial laser hair removal?
18   A.   No.
19   Q.   Cristina, did you pursue administrative remedies for a
20   second time related to your request for gender-affirming
21   surgery?
22   A.   Yes, I did.
23   Q.   And when did you do that?
24   A.   The end of 2017.
25   Q.   Did you file the BP-8?
```

1   A.  Yes.

2   Q.  What was the response to your BP-8?

3   A.  That my request was forwarded for review by the -- I

4   believe that one said TEC.

5   Q.  And did you get a response?

6   A.  No.

7   Q.  Did you file a BP-9?

8   A.  Yes.

9   Q.  And what was the response to that?

10  A.  That I was under review, that the TEC had been -- yes, the

11  TEC had been notified of my request.

12  Q.  Did you file a BP-10?

13  A.  Yes.

14  Q.  And what was the response to your BP-10?

15  A.  The same as the BP-9.

16  Q.  And did you file a BP-11?

17  A.  Yes.

18  Q.  And what was the response to your BP-11?

19  A.  The same, that I would be notified when a decision was

20  made.

21  Q.  And notified by?

22  A.  The TEC.

23  Q.  And so were you ever notified of a decision by the TEC for

24  any of these second round of administrative remedies?

25  A.  No.

```
 1   Q.  Cristina, did you pursue administrative remedies for a

 2   third time related to your request for gender-affirming

 3   surgery?

 4   A.  Yes.

 5   Q.  And when did you do that?

 6   A.  2019.

 7   Q.  And did you file the BP-8?

 8   A.  Yes.

 9   Q.  And what was the response?

10   A.  That my request for gender-affirming surgery was sent to

11   the TCCT for review.

12   Q.  And just again, the TCCT is the --

13   A.  Transgender Clinical Care Team.

14   Q.  Okay.  Did you file a BP-9?

15   A.  Yes.

16   Q.  What was the response to that?

17   A.  The same as the BP-8.

18   Q.  And did you file a BP-10?

19   A.  Yes.

20   Q.  What was the response to your BP-10?

21   A.  The same.  The same.

22   Q.  And did you file a BP-11?

23   A.  Yes.

24   Q.  Cristina, before I ask you about the response to your

25   BP-11, I want to first ask, during the time you were going
```

1    through these administrative remedies process for the third

2    time, did anything occur that led you to believe that you

3    would be receiving gender-affirming surgery?

4    A.  Yes.

5    Q.  What happened?

6    A.  In November I was -- well, in the end of October I was

7    notified by my case manager, Miss Lamer, that I was being

8    transferred to FMC Lexington for evaluation and treatment for

9    gender-affirming surgery.

10   Q.  And you said the end of October.  What year was that?

11   A.  2019.

12   Q.  Did anyone tell you why you were being transferred to FMC

13   Lexington at USP Marion?

14   A.  Yeah.  Miss Lamer.

15   Q.  And who is Miss Lamer?

16   A.  She said I was being transferred per the TEC for

17   gender-affirming evaluation -- gender-affirming surgery

18   evaluation and treatment, meaning gender-affirming surgery.

19   Q.  And who is Ms. Lamer?

20   A.  My case manager.

21   Q.  Cristina, do you know if anyone at USP Marion had sent a

22   request for you to be evaluated for gender-affirming surgery?

23   A.  Yes.

24   Q.  Who?

25   A.  Dr. Pass.

1   Q.  And what was Dr. Pass' position at USP Marion?

2   A.  Clinical director.

3   Q.  Do you know if Dr. Pass supported you having

4   gender-affirming surgery?

5   A.  Yes, he did.

6   Q.  And how do you know that Dr. Pass supported you having

7   gender-affirming surgery?

8   A.  He was very vocal with it, but he always would tell me

9   that it's not in his control, that he would do everything he

10  could, because he realized gender dysphoria -- I was really

11  struggling not having the proper treatment, and he was very

12  pleased that I was -- like Dr. Munneke, they were very pleased

13  that I was not giving up hope and cutting myself and trying to

14  castrate myself or other things, that I was fighting, you

15  know, filing a lawsuit plus continuing to advocate for myself,

16  and that he would do everything he could, and he said that he

17  was submitting my paperwork to the TCCT, Dr. Stahl.

18  Q.  And you mentioned Dr. Munneke?

19  A.  Yes, the chief of psychology.

20  Q.  And the chief of psychology, just to be clear, at which

21  facility at the time?

22  A.  Marion.  Marion.

23  Q.  Okay.  And how do you know that Dr. Munneke supported you

24  having gender-affirming surgery?

25  A.  He actually told me himself that there was nothing

1    psychologically that would prevent me from receiving that

2    surgery, that he supported my request.  That was his words.

3    Q.  Did anyone else at USP Marion support you having

4    gender-affirming surgery?

5    A.  Yes, my primary psychologist, Dr. Lindsay Owings.

6    Q.  And how often did you meet with Dr. Owings?

7    A.  For about eight months, once a week.

8    Q.  And how do you know that she supported your request for

9    having gender-affirming surgery?

10   A.  She was very vocal and she, again, was very pleased that I

11   was advocating for myself, that I wasn't giving up, and that

12   she agreed that treatment is -- that the hormone therapy is

13   not alone enough, that she could only do so much on her end,

14   but she was very pleased that I was following administrative

15   remedies, not cutting myself, even though I was very vocal

16   that it's hard, plan B, it's always very difficult, and she

17   supported it.  She was very supportive of my efforts to

18   receive that because she believed that I was ready.

19   Q.  Okay.  And just to be clear, you said plan B.  What does

20   that mean?

21   A.  Castration or suicide.

22   Q.  After you were transferred to FMC Lexington, were you

23   evaluated for gender-affirming surgery?

24   A.  Yes.

25   Q.  Who did that evaluation?

1   A.  Tammy Thomas at the University of Kentucky.

2   Q.  Did -- And what was her title or position?

3   A.  I believe she's a registered nurse practitioner,

4   endocrinology department.

5   Q.  And did Nurse Practitioner Thomas say that you met the

6   criteria for gender-affirming surgery?

7   A.  She said I definitely met the criteria for

8   gender-affirming surgery.

9   Q.  Did you have gender-affirming surgery after her

10  evaluation?

11  A.  No.

12  Q.  Do you know why you didn't have it?

13  A.  Because University of Kentucky or no one in the state of

14  Kentucky could perform that surgery.

15  Q.  Did anyone else who treated you at FMC Lexington support

16  you having gender-affirming surgery?

17  A.  Yes, my psychologist, Dr. Hernandez.

18  Q.  And how do you know that Dr. Hernandez supported you

19  having surgery, gender-affirming surgery?

20  A.  Because she was very vocal with it, but she was also very

21  pleased that even after receiving the news that I wouldn't be

22  receiving gender-affirming surgery that I wasn't giving up

23  hope, I was still, you know, obviously filing the lawsuit and

24  still fighting for administrative rights and still going

25  forward, but she definitely supported it, but she was very

1    concerned that I was going to do something.

2    Q.  And when you say do something, what were those concerns

3    around?

4    A.  Take self-treatment, is what we call it, self-treatment,

5    which is mutilation.

6    Q.  And, Cristina, you testified earlier that prior to

7    receiving an answer to your third BP-11 in the administrative

8    remedies process for gender-affirming surgery, you were

9    transferred to FMC Lexington for evaluation for

10   gender-affirming surgery.  Did you receive a response to the

11   BP-11 you filed while you were at FMC Lexington?

12   A.  Yes, I did.

13   Q.  And what was the response to your BP-11?

14   A.  That in order for me to be considered for gender-affirming

15   surgery, that my hormone levels would have to be maximized

16   before I could be considered, because I would have to live in

17   a females' prison for one year.

18   Q.  What did maximized mean to you?

19   A.  Hormone, female range.

20   Q.  And just to pause, Cristina, the camera shifted, but I

21   just want to make sure you can see us and hear us okay.

22   A.  Yes, I can see you.

23   Q.  Okay.  Thank you.  And so --

24   A.  Can you see me now?

25   Q.  I can hear you now.  Okay.  Great.  I'm going to repeat

1   the question.  Cristina, what did maximize mean to you in

2   regards to your hormones?

3   A.   Being in female range.

4   Q.   And at that time, how long had you been receiving hormone

5   therapy?

6   A.   Over four and a half years.

7   Q.   Do you know why your hormones weren't maximized?

8   A.   Because I changed from injections to oral medication and

9   the dosage was lower.

10  Q.   Did you request to be switched from injections to oral?

11  A.   Yes, I did.

12  Q.   And why did you request that change?

13  A.   Because at FMC Lexington, it's a medical center, so

14  there's a lot of emergencies, and I get my injection every

15  other -- at that point I was getting it every other Friday,

16  and they would forget to put me on the callout, and the other

17  transgenders that was there was on pills, so I just felt it

18  was better for me, because I actually had to go up there and

19  tell them that I needed my injection, so they had forgot, you

20  know, and so it was better for me to get on the pills instead

21  of being injections so I could have self-care and I take it

22  every day.

23  Q.   And you requested a different form of hormone therapy,

24  oral.  Did you request that the dosage be lowered?

25  A.   No, not at all.

```
 1   Q.  And do you know why the dosage was lowered?
 2   A.  I have no idea.
 3   Q.  Cristina, have your hormones been maximized since then?
 4   A.  Yes.
 5   Q.  And before the switch from injections to pills and the
 6   brief period where your hormone dosage was lowered, how long
 7   had your hormones been maximized?
 8   A.  Like, because I started noticing after -- because I'd been
 9   on hormones for so long, I can tell when my body's not high,
10   and so I went to sick call and said, hey, I don't think my
11   levels are the same, you know, I need to increase my dosage,
12   and so once the dosage was increased by 2 or 4 -- I can't
13   remember -- 2 milligrams, I think, I was starting to feel back
14   in maximized range again, and so when the last time I had my
15   blood prior to moving to FMC Carswell, my levels were back in
16   maximized range.
17   Q.  And before that drop in hormones, how long had your
18   hormones been maximized since you've been on hormone therapy?
19   A.  Years.  Years.
20   Q.  And how many years would you say?
21   A.  At least four.
22   Q.  Cristina, had you requested to be transferred to a female
23   facility at any point during the time that we just spoke of
24   when your hormones were maximized and prior to the drop in
25   dosage when you switched medication forms while at FMC
```

1    Lexington?

2    A.  Yes.

3    Q.  When was the first time that you requested to be

4    transferred to a female facility?

5    A.  2015.

6    Q.  How many times did you request to be transferred to a

7    female facility in the same time period, so prior to your

8    hormone dosage being temporarily reduced in 2019?

9    A.  At least ten times.

10   Q.  Have you been transferred to a female facility?

11   A.  Yes.

12   Q.  When were you transferred?

13   A.  May 25th of this year, 2021.

14   Q.  And what facility are you being housed at?

15   A.  Federal Medical Center Carswell.

16   Q.  Has being at FMC Carswell been helpful for your gender

17   dysphoria?

18   A.  Yes, it has.

19   Q.  And how has being at FMC Carswell affected your feeling of

20   safety?

21   A.  I don't worry about sexual assault.  I am able to navigate

22   this place a little well, better than in the men's prison.

23   I'm able to feel like staff -- Staff take things very serious

24   here, so I -- compared to a males' prison, where they let a

25   lot of things slip.  Here I'm not forced to prostitute or

1    anything like that, so -- for being a trans woman, so --

2    Q.  And that's regarding fear of sexual assault, but do you

3    feel physically safer?

4    A.  Yeah.  Yes.

5    Q.  Cristina, do you have any concerns that you might be

6    transferred back to a male facility?

7    A.  Yes, daily.

8    Q.  And why do you have those concerns?

9    A.  Because I'm constantly reminded by staff that if there's

10   problems here that I could always go back to a male prison,

11   and I've actually been verbally told by two staff members that

12   I was being sent back to a males' prison.

13   Q.  And which two staff members verbally told you that?

14   A.  Captain Buckner and Lieutenant Anthony.

15   Q.  And again, why have they told you that you're going to be

16   transferred back to a male facility?  We can wait.

17   A.  Can I say --

18   Q.  Just give it a moment and I'll re-ask the question.

19   A.  Okay.

20        MS. REX:  My apologies for the interruption.

21        MS. BROWN:  No problem.

22   Q.  (By Ms. Brown)  So, Cristina, I'm going to ask the

23   question again.  The camera's been moved down, so I can see

24   the top of your head.  I don't know if that happened whenever

25   Ms. Rex was -- oh, there we go.  Okay.

1    A.  Okay.

2         MS. REX:  My apologies.

3    Q.  And, Cristina, again, why have they told you that you are

4    under threat of being transferred back to a male facility?

5    A.  Because of me filing the PREA on women here.

6    Q.  And why did you file those PREAs?

7    A.  Because when I first got here, I -- there's three other

8    trans females in this facility.  I was the only one housed in

9    what they call the high rise, which is where they house just

10   general population females, which houses about 318 people in

11   the unit.  So when I got in there, it was different to adjust,

12   but I was okay.  However, the inmate rumors here are really,

13   really rampant, so it was determined that I still had the body

14   part of a male, so there was two women in my unit who were

15   plotting to file PREA and a lawsuit against me, the -- against

16   the BOP for housing me there, saying I provide -- that I was

17   not letting them live in a safe environment, that I was using

18   their bathrooms, so I got really nervous and I wrote the email

19   saying, well, I don't feel safe or comfortable, because I

20   thought I was getting set up, and so I sent that request back

21   in August reporting those two girls to the captain and the

22   warden.

23   Q.  Okay.  And so, Cristina, these women threatened to file

24   false PREA complaints against you.

25   A.  Right, because two girls -- one was trying to get in the

```
 1   shower with me butt naked and I was holding the door, and
 2   another one used to always touch my breasts and try to grab my
 3   crotch area, and I reported them and they were locked up in
 4   the SHU.
 5   Q.  And before you requested --
 6   A.  I wasn't.
 7   Q.  And before you -- you said that you made a request.  What
 8   was that request?
 9   A.  That I be sent back to a men's prison because I didn't
10   feel safe here, that I was scared of being set up.
11   Q.  And, Cristina, in requesting to be transferred back to a
12   male facility, were you requesting to be transferred away from
13   those women?
14   A.  Yes.
15   Q.  At the time, did you believe that you could be transferred
16   to a different female facility?
17   A.  No, I didn't believe that was an option, so I was trying
18   to get away from the situation.
19   Q.  Cristina, did you actually want to be transferred back to
20   a male facility?
21   A.  No, and I actually rescinded my request once Dr. Quick
22   explained to me that I would -- if anything, I'd be sent to
23   another females' prison, so I went back to the unit, and my
24   unit manager, sitting right here, I rescinded that request to
25   go back to a males' prison and just requested to be safe, once
```

1    I found out I would not be sent back to a males' prison just
2    because I filed PREA on somebody.
3    Q.  And how soon after you made the request did you rescind it
4    with Dr. Quick?
5    A.  The same day.
6    Q.  And --
7    A.  With the whole -- With the captain, Ms. Malone, which is
8    the SIA.  She asked me five questions and I rescinded it, so I
9    didn't want to -- I do not want to be sent back to a males'
10   prison.  I'm fear for that.
11   Q.  And, Cristina, what would going back to a male facility
12   mean for you?
13   A.  It would mean that I would have to go back prostituting
14   and living under people's rule and forcing me to be with men
15   as a trans female.  That's what happens.
16   Q.  Do you worry about your physical safety if you were sent
17   back to a male facility?
18   A.  Yes, I do, yes.  I would be forced to be in a relationship
19   to stay safe.
20   Q.  Do you worry about sexual assault if you were sent back to
21   a male facility?
22   A.  Absolutely, yes, I do.  I worry about that a lot, because
23   it's happened to me.
24   Q.  Would it have an impact on your gender dysphoria to be
25   sent back to a male facility?

1   A.   Yes, it does.

2   Q.   And what kind of impact?

3   A.   Because staff -- even though I'm able to purchase makeup

4   in the commissary, a lot of staff still call me a man, a dude,

5   a he/she, and that's the perception of what I am, so it makes

6   me -- it really -- it's not a good thing, no.

7   Q.   Cristina, have you requested gender-affirming surgery

8   since you've been at FMC Carswell?

9   A.   Yes, I have.

10  Q.   And have you received gender-affirming surgery now that

11  you're at a female facility and your hormones have been

12  maximized?

13  A.   No, I haven't.

14  Q.   Cristina, what is your current understanding of why you

15  have not received gender-affirming surgery?

16  A.   That the Bureau of Prisons is not offering that as current

17  treatment.

18  Q.   Has the Bureau of Prisons said anything about the length

19  of time in relation to your request for gender-affirming

20  surgery?

21  A.   The only thing that I was told is that the -- by

22  Dr. Langham, which is the clinical director here, when I made

23  my request for gender-affirming surgery, he told me that the

24  last person that he had requested, they told him that she

25  would have to be here a year.  Well, she's been here five

```
 1   years and still no gender-affirming surgery.
 2   Q.  And so when you say a year, a year where?
 3   A.  Here, or in a females' prison.
 4   Q.  Cristina, how long have you identified as a woman since
 5   you've been in the custody of the Bureau of Prisons?
 6   A.  All 28 years.
 7   Q.  And, Cristina, has anyone at FMC Carswell supported you
 8   having gender-affirming surgery?
 9   A.  Yes, they have.
10   Q.  Who?
11   A.  Dr. Langham.
12   Q.  Anyone else?
13   A.  Yes, Dr. Quick.
14   Q.  And anyone besides Dr. --
15   A.  And --
16   Q.  Go ahead.
17   A.  Yeah, Dr. Munneke.  Also, yeah, Dr. Langham.
18   Q.  And again --
19   A.  Those three for sure.
20   Q.  What is Dr. Langham's position at FMC Carswell?
21   A.  Clinical director.
22   Q.  And how do you know that Dr. Langham supports you having
23   gender-affirming surgery?
24   A.  Because he let me know that it's not him interfering with
25   my treatment and that if it was up to him, he would have
```

1  already had me scheduled, so -- and he would send my request

2  up for review again.

3  Q.  And what's Dr. Quick's position?

4  A.  He is my primary psychologist.

5  Q.  And how do you know that Dr. Quick supports you having

6  gender-affirming surgery?

7  A.  He's very vocal.  He's very -- He encourages me all the

8  time to keep going, that he's very pleased about this court

9  hearing, that he believes that it's going to help a lot of

10  people just like myself.  Very vocal with it.

11  Q.  And you said Dr. Munneke.  Is this the same Dr. Munneke

12  from USP Marion?

13  A.  Yes.  He's here as the chief of psychology as well.

14  Q.  And how do you know that Dr. Munneke supports you having

15  gender-affirming surgery?

16  A.  He's made that very vocal to me.  He said that he's very

17  proud, that I've come a long way from when I first came in the

18  prison system and he's very pleased that I advocate for myself

19  and that I'm not cutting myself and that I'm doing everything

20  I possibly can to get surgery and live as a fully functioning

21  female and that he let me know the day one that I arrived

22  here.  He brought Dr. Quick to me and told me that I have full

23  support of the psychology services at FMC Carswell and that no

24  one here is interfering with my treatment or surgery, it's

25  warranted, nothing.  He said that he supports my efforts to

1   get surgery to help cure my gender dysphoria.

2   Q.   Cristina, when you first arrived at FMC Carswell and

3   started being treated by Dr. Langham, did you have any reason

4   to believe that he would be sending up a request then for you

5   to have gender-affirming surgery?

6   A.   Yeah.  Yes, I did.

7   Q.   What gave you that impression?

8   A.   He told me that he would get it typed up and get

9   everything going and that he -- it wouldn't take him long, a

10  couple days, and he would have it sent off.

11  Q.   And who was he going to have it sent up to?

12  A.   Dr. Stahl.

13  Q.   And who is Dr. Stahl?

14  A.   The Transgender Clinical Care Team director.

15  Q.   Cristina, more recently, do you now have a better

16  understanding of what Dr. Langham has done in regard to your

17  request for gender-affirming surgery?

18  A.   Yes.

19  Q.   And what is that understanding?

20  A.   He let me know that he had not sent my request, he only

21  sent an email to Dr. Stahl inquiring where to send my request

22  to -- for me to have gender-affirming surgery, and that he

23  would be officially sending one in the near future.

24  Q.   And so prior to this conversation, did you believe that he

25  had already sent up your request for gender-affirming surgery?

1    A.  Yes, I did.

2    Q.  And based on what you just said, you understand that he

3    had not sent a request up.

4    A.  Right.

5    Q.  Has Dr. Langham evaluated you for gender-affirming

6    surgery?

7    A.  Yes.

8    Q.  And what kind of evaluation?

9    A.  He did a full physical exam, including measurements of my

10   biological sex.

11   Q.  When you say biological sex, what do you mean?

12   A.  He measured my penis.

13   Q.  And I know it's hard and difficult, so I can appreciate

14   that.  Is there anything else that Dr. Langham has done or

15   ordered for your evaluation for gender-affirming surgery?

16   A.  Yes.  He ordered a psychosocial, which was done by the

17   social worker, in reference to my request for gender-affirming

18   surgery, and he received a current diagnosis from Dr. Quick.

19   Q.  Has he received that diagnosis from Dr. Quick?

20   A.  Yes, he has.  It's current.

21   Q.  And just what's the diagnosis?

22   A.  Gender dysphoria.

23   Q.  And you said that you were -- you had a psychosocial

24   evaluation.

25   A.  Yes.

1    Q.   Who completed that?

2    A.   Miss Barr.

3    Q.   And what's Miss Barr's position again?

4    A.   Social worker here at FMC Carswell.

5    Q.   And what kind of questions were you asked during the

6    psychosocial evaluation?

7    A.   How long I identified as a woman, my support, how long

8    I've been incarcerated, if I was in the process of changing my

9    name legally, or just basic -- if I had support when I got

10   released, if I had support inside the prison and how long I

11   had been on hormone therapy, was I requesting to have sexual

12   reassignment surgery, did I know the pros and cons, the

13   reproductive, all of those questions; was I able -- what was

14   my belief in after the surgery, would I believe that

15   everything would go away, and, you know, obviously I said no,

16   but it would help.  So she said she would send it to

17   Dr. Langham, which was this past week, so --

18   Q.   And this past week meaning last week, the previous week

19   from today.

20   A.   Yes, Tuesday of last week.

21   Q.   Cristina, have you had new lab work done?

22   A.   No.

23   Q.   And so in your understanding, for your request, what is

24   the last thing that you're missing?

25   A.   The updated lab results.

1   Q.  Have you had any communication with anyone on your care

2   team since the physical and psychosocial evaluations?

3   A.  No.  Other than Dr. Quick, no.  I've not seen Dr. Langham.

4   Q.  And what did Dr. Quick say?

5   A.  He wasn't familiar other than he just said that my current

6   diagnosis was recurring, that Dr. Langham already received his

7   part of it, so that was it.

8   Q.  Have you had any notification from anyone, the TEC, the

9   TCCT or any of your providers, about your request for

10  gender-affirming surgery?

11  A.  No.

12  Q.  And so, Cristina, I want to go over just briefly your

13  prior testimony about your understanding of the BOP health

14  care providers who -- and the Bureau of Prisons' health care

15  providers who have supported you having gender-affirming

16  surgery.  Dr. Pass at USP Marion?

17  A.  Yes.

18  Q.  Dr. Owings at USP Marion?

19  A.  Yes.

20  Q.  Dr. Munneke at USP Marion and now FMC Carswell?

21  A.  Yes.

22  Q.  Dr. Hernandez at FMC Lexington?

23  A.  Yes.

24  Q.  Dr. Langham at FMC Carswell?

25  A.  Yes.

 1   Q.   And Dr. Quick at FMC Carswell.

 2   A.   Yes.

 3   Q.   Cristina, have you ever met Dr. Alison Leukefeld?

 4   A.   One time.

 5   Q.   And when was that?

 6   A.   That was 2015.

 7   Q.   And what were the circumstances around you all meeting?

 8   A.   I was in a psychology treatment program called the stages

 9   program, which is an Axis II diagnosis program, and that was

10   at FCI Terre Haute, and she was there observing, so we got to

11   meet her in person, who she was.

12   Q.   And when was that?

13   A.   When was that?

14   Q.   Yeah.  When was that?

15   A.   2015.  2015.

16   Q.   Okay.  And was she there multiple days?

17   A.   No, just one day.

18   Q.   And how -- did you speak with her?

19   A.   Just hello.  We introduced ourself in the group and that

20   was it.

21   Q.   Has Dr. Leukefeld ever treated you?

22   A.   No.

23   Q.   Has Dr. Leukefeld ever evaluated you?

24   A.   No.

25   Q.   Have you had any conversations with Dr. Leukefeld since

1    that one-time introduction?

2    A.   No.

3    Q.   What is your understanding of Dr. Leukefeld's role in the

4    Bureau of Prisons?

5    A.   She's the chief of health -- mental health services for

6    the BOP.

7    Q.   Cristina, have you ever met anyone else on the TEC?

8    A.   No.

9    Q.   Cristina, have you ever met Dr. Stahl?

10   A.   Never.

11   Q.   And have you ever been treated by Dr. Stahl?

12   A.   No.

13   Q.   And have you ever been evaluated by Dr. Stahl?

14   A.   No.

15   Q.   And what is your understanding of Dr. Stahl's role at the

16   Bureau of Prisons?

17   A.   She approves the medical aspect of, like, the laser hair

18   removal or gender-affirming surgery or anything regarding

19   health care as far as transgenders in the Bureau of Prisons is

20   concerned.

21   Q.   Cristina, are you still living with gender dysphoria?

22   A.   Yes.

23   Q.   What is having gender dysphoria like?

24   A.   It's extremely painful and it's basically a living hell.

25   It's more than torture.

1    Q.  And what kind of feelings do you have?

2    A.  A lot of anxiety, panic attacks.  I have extreme

3    nervousness, how I look, which causes me to sweat profusely,

4    and the fear of not getting treatment, honestly,

5    self-castration or suicide is always there.

6    Q.  And, Cristina, how often do you feel these feelings?

7    A.  It's pain --

8    Q.  Oh, go ahead.  I apologize.

9    A.  Every single moment.  Every single moment I wake up.

10   Q.  And so, Cristina, you testified that the Bureau of Prisons

11   has provided you with hormone therapy, shaving and Nair to

12   treat your gender dysphoria.  Has the Bureau of Prisons

13   provided to you or given you access to anything else to treat

14   your gender dysphoria?

15   A.  Yes.  I can purchase makeup and feminine products in the

16   commissary, and they give me bras and panties.

17   Q.  And how has having access to bras, panties and makeup

18   affected your gender dysphoria?

19   A.  It helps.  It helps.

20   Q.  Has it completely alleviated your gender dysphoria?

21   A.  Absolutely not.

22   Q.  And why not?

23   A.  Because it -- I still have the male body part that I'm --

24   was born with and I still have hair on my face, and it causes

25   me pain and torture every day.  Those products only help put

```
 1   Band-Aids on them.  It's like having a cancer and a growth, a
 2   cancer growth, and knowing there's treatment but you can't get
 3   it.  It feels like it's terminal at this point because I've
 4   been living with it for so long that the BOP -- it doesn't
 5   matter where they transfer you, it's the same bureaucracy,
 6   and, you know, no matter how hopeful you are to try to get
 7   help for gender dysphoria, it's the same.  It's the same
 8   bureaucracy.  Dr. Stahl, Dr. Leukefeld or the TEC, those are
 9   the people they always claim are -- you know, it's them.  So I
10   can't get treatment for gender dysphoria other than hormone
11   therapy and what they call psychotherapy, which is basically
12   just a counseling session to see how I'm doing and document
13   and make sure I'm not cutting myself or thoughts of killing
14   myself, but as far as psychology treating me for it, there's
15   no gender dysphoria treatment other than those things.
16   Q.  Cristina, do you take any steps to avoid seeing your
17   facial hair or facial hair shadow?
18   A.  Yes.
19   Q.  And what do you do?
20   A.  I shave twice a day, starting at 5 -- between 5 and 5:15
21   when I'm in general population, and I reapply makeup,
22   concealer, and shave again right before I get in the shower
23   and I reapply makeup, and I sleep with makeup and everything.
24   Q.  And how often do you wear makeup?
25   A.  Every day, other than being in the shower or shaving.
```

```
 1    Q.   And do you wear makeup when you sleep?

 2    A.   Yes.

 3    Q.   And why do you wear it when you sleep?

 4    A.   So I don't feel that I look different and that I'll wake

 5    up, look in the mirror, and I have a five o'clock shadow.

 6    Q.   And do you want to wear makeup when you sleep?

 7    A.   No.

 8    Q.   And you said that you wear makeup in the shower?

 9    A.   I wash it off, and then before I get out of the shower I

10    apply it so when I'm out of the shower -- when I come out of

11    the shower, I look like I did when I went in.

12    Q.   And why do you do that?

13    A.   So no one can see me having facial hair and so that I

14    don't feel like I have facial hair.

15    Q.   Cristina, do you take any steps to avoid seeing your

16    genitals?

17    A.   Yes.

18    Q.   And what do you do?

19    A.   I wear two pair of panties and a maxi pad and I tuck.

20    Q.   Cristina, what is tucking?

21    A.   It is where I put my penis between my inner thighs and

22    push my testicles up into a little hole on top so you can't

23    see anything.

24    Q.   Is tucking painful?

25    A.   It is painful, yes, very so.
```

```
 1   Q.  Can you describe the pain?

 2   A.  It's physically painful.  You -- You're pulling your body

 3   part in places it shouldn't be, but I'm doing it so I don't

 4   see I have a penis and it looks like I have a vagina in my

 5   pants, so sitting down sometimes, I have to sit back up

 6   because I sit on the penis, so it's very difficult.  You have

 7   to be very delicate.  And sometimes the panty has cut me from

 8   having to tuck underneath and the small part under the panties

 9   cut me, so it's painful.  It's torture.

10   Q.  And how long do you stay tucked?

11   A.  All the time except for when I'm in the shower.  I wash my

12   area and I go right back in, or I sit down to pee and I'm

13   right back.  Any other time, I'm fully tucked, sleeping, any

14   other time, other than those two times.

15   Q.  And you said also when you shower?

16   A.  Yes.

17   Q.  And so how do you shower?

18   A.  I use one pair of panty.  I don't ever become completely

19   naked in the shower.  I use one pairs of -- one pair of panty

20   and I turn towards the showerhead and I clean my private area,

21   and as soon as I'm clean I retuck myself so that I can go

22   ahead and perform other shower duties that I know that I don't

23   look like I have a penis.

24   Q.  And, Cristina, why do you wear a maxi pad when you tuck

25   and wear two pairs of underwear?
```

```
1   A.  Because it's a safety mechanism to where I -- it --

2   there's no way that anything can show that I have any male

3   body parts for any reason.

4   Q.  Cristina, have you thought about performing

5   gender-affirming surgery on yourself?

6   A.  All the time, yes, I do, and it's been recently more

7   because I've been in the SHU and haven't been able to shave,

8   and knowing -- I mean, it's hard, yes.  I do, Taylor.

9   Q.  Okay.  And you said a little bit, but why do you have

10  those thoughts?

11  A.  Because I am very tired of being tormented every day with

12  this cancer that I have.

13  Q.  Cristina, have you ever tried to perform gender-affirming

14  surgery on yourself?

15  A.  Yes.

16  Q.  What happened?

17  A.  I used a razor blade and tried to split my penis in half.

18  Q.  And when did you do that?

19  A.  That was -- The first time, 2009.

20  Q.  Is that the only time?

21  A.  No.

22  Q.  When was the --

23  A.  And in --

24  Q.  Go ahead.

25  A.  2014 I tried to cut my testicles off.
```

1    Q.  And so what happened the first time, in 2009?

2    A.  I seen the blood and I stopped, and nothing.

3    Q.  Did you notify anyone at the Bureau of Prisons when this

4    happened?

5    A.  No, because they would give you an incident report and not

6    help you, lock you in the SHU for self-mutilation, and I

7    didn't want that.  I let it heal and never told anybody till

8    years later.  They see the scar.  They look for the scar, they

9    see the scar, but that's it.

10   Q.  And how long did it take you to heal?

11   A.  A little bit.  It was about six months, because the area

12   is very -- I was constantly having to clean myself and use

13   powder and stuff, because it's moist in that area, and for

14   tucking, when you're in a hot environment, you become sweat,

15   so you leave sweat, so it's tough.

16   Q.  Were you tucking even after you had performed this?

17   A.  Yes, yeah, and it was even painfuller.  I was getting

18   paper towels and -- or toilet paper and wrapping it around.

19   Q.  And the time when you removed your testicles, what -- or

20   tried to remove your testicles, I should say, what happened

21   then?

22   A.  I couldn't handle the pain.  It didn't bleed at the time,

23   but I just could not handle the pain, so I gave up.

24   Q.  And how long did it take you to heal from that?

25   A.  That was faster, because it wasn't really big.

1   Q.  And just again, were you still tucking after that?

2   A.  Yes.

3   Q.  And was it painful?

4   A.  Yeah.

5   Q.  Cristina, I know this is difficult, but have you had

6   thoughts of suicide?

7   A.  Yeah.

8   Q.  Why do you have these thoughts, Cristina?

9   A.  I have lost the faith in the Bureau of Prisons providing

10  me any type of treatment.  I've actually been told by staff

11  prior to coming here that the BOP was just trying to run the

12  clock out on my lawsuit and that they were not trying to give

13  me any kind of treatment, so that -- I just -- and after

14  coming here and seeing the way that they treat -- they do --

15  this place tries to give you what you need, but to see that it

16  stopped in Central Office or wherever it stopped and not here,

17  it just -- I don't feel like anything's going to change.

18  Q.  And when you say run the clock out, when's your projected

19  release date?

20  A.  December 25th of 2022.

21  Q.  Cristina, do you want to commit suicide?

22  A.  I don't.

23  Q.  And what do you need to treat your gender dysphoria?

24  A.  The hair removal on my face, to alleviate the pain from

25  having facial hair, as well as sexual reassignment surgery at

```
 1   least to help heal me and stop this torture of how I feel

 2   every day, knowing that I'm -- have a cancer growth on me.  I

 3   feel like it's terminal.

 4   Q.  Cristina, you testified that the last rationale given to

 5   you from the BP-11, which is the Central Office of

 6   Administrative Remedies Division, the final step in the

 7   administrative remedies process for why you're being denied

 8   surgery was because you were not eligible for a transfer to a

 9   female facility because your hormones were not maximized?

10   A.  Uh-huh.  Yes.

11   Q.  Cristina, are your hormones maximized?

12   A.  Yes.

13   Q.  And are you in a female facility?

14   A.  Yes.

15   Q.  And you testified that you started requesting a transfer

16   to a female facility in 2016.

17   A.  Yeah.

18   Q.  And again, before your transfer to FMC Lexington whenever

19   you experienced a drop in dosage, had your hormones been

20   maximized?

21   A.  Yes.  Oh, yes, absolutely.  The whole three years -- two

22   and a half years I was at Marion, they were fully maximized.

23   Q.  And, Cristina, was the last response you received from the

24   Central Office of Administrative Remedies Division in response

25   to your BP-11 regarding male facial hair -- are you
```

1    comfortable?

2    A.  Yes.  I can hear you.

3    Q.  Okay.  I'll start over.  Cristina, was the last response

4    you received from the Central Office of Administrative Remedy

5    Division regarding your request for facial hair removal for

6    the treatment of gender dysphoria, that last rationale was

7    because you have not reported -- you had not reported in your

8    previous visit with psychology any emotional problems.

9    A.  Right, which was not true.

10   Q.  And the BOP allows you to shave and use Nair to treat your

11   gender dysphoria relating to having male facial hair.

12   A.  Yeah.

13   Q.  And from your testimony, neither of those work.

14   A.  No.

15   Q.  And lastly, Cristina, given everything that we've

16   discussed today, again, you've testified to this before, but I

17   just want to make it very clear for the record, have you

18   received facial laser hair removal or gender-affirming

19   surgery?

20   A.  No, no.

21          MS. BROWN:  No further questions, Your Honor.

22          THE COURT:  All right.  Cross examination.

23          MR. KOLSKY:  Thank you, Your Honor.  We have no

24   questions for Ms. Iglesias.

25          THE COURT:  All right.  Thank you.  Well,

```
1   Ms. Iglesias is going to stay connected to watch these

2   proceedings, so plaintiffs may -- plaintiff may call their

3   next witness.

4           MR. KNIGHT:  Plaintiffs call --

5           MR. BLECHER-COHEN:  We will call Dr. Ettner.

6           MR. KNIGHT:  Oh, I'm sorry.  Go ahead.

7           THE COURT:  All right.  Dr. Ettner, come on up to the

8   witness stand.  Deana will administer the oath.

9     (Witness sworn.)

10          COURTROOM DEPUTY:  Please state your name for the

11  record.

12          DR. ETTNER:  Randi Ettner.

13          DR. RANDI ETTNER, produced, sworn and examined on

14  behalf of the Plaintiff, testified as follows:

15                          DIRECT EXAMINATION

16  BY MR. BLECHER-COHEN:

17  Q.  Good afternoon, Dr. Ettner.

18  A.  Good morning.

19  Q.  Good morning.  You're right.  Time flies.  Could you

20  please state your name once more?

21  A.  Randi Ettner.

22  Q.  Dr. Ettner, what do you do?

23  A.  I'm a clinical and forensic psychologist.

24  Q.  Where do you currently reside and work?

25  A.  Evanston, Illinois.
```

```
 1   Q.  I'd like to start, Dr. Ettner, by asking you a bit about
 2   your training and education.  What degrees have you received
 3   and from where?
 4   A.  I received a bachelor's degree from Indiana University, I
 5   received a master's from Roosevelt University and a Ph.D. from
 6   Northwestern University.
 7   Q.  Are you licensed as a psychologist?
 8   A.  In the state of Illinois.
 9   Q.  Have you done work in transgender health, Dr. Ettner?
10   A.  Yes.
11   Q.  How did you first begin work in the field of transgender
12   health?
13   A.  I volunteered at Cook County Hospital when I was a
14   student.  They had a -- what was then called a sex
15   reassignment clinic, and I was volunteering and I was asked to
16   run groups of individuals who were awaiting sex reassignment
17   surgery.
18   Q.  What other training did you complete early on in this
19   field?
20   A.  I -- After graduating, I -- and passing my licensing test,
21   I mentored with Harry Benjamin's protégé, Dr. Leah Schaefer,
22   from approximately 1994 to 2008.  I joined WPATH and I became
23   active in this field.
24   Q.  And when you say you were mentored, what did that entail?
25   A.  Dr. Schaefer had been a student of Kinsey and she was a
```

1   close colleague of Harry Benjamin, and as you may know, WPATH

2   was named after Harry Benjamin prior to changing their name,

3   and I studied with her and received supervision from her

4   until -- basically until she passed away.

5   Q.  You've mentioned WPATH.  What is WPATH?

6   A.  WPATH stands for the World Professional Association of

7   Transgender Health.  It's 2500 professionals, mental health,

8   endocrinologists, primary care providers and surgeons and

9   attorneys, people who practice some aspect of transgender

10  health care, and WPATH promulgates the standards of care for

11  the treatment of gender dysphoria.

12  Q.  Dr. Ettner, what is forensic testing?

13  A.  It's using testing to provide data for any aspect of

14  litigation, so it might require an individual to determine

15  whether someone's fit to -- you know, competent.  Some

16  forensic testing is used in custody cases.  It's used to test

17  if there's emotional damage or malingering, for example.

18  Q.  Have you had training in forensic testing, Dr. Ettner?

19  A.  Yes.

20  Q.  Can you describe that training?

21  A.  I've had training at the University of Minnesota and

22  elsewhere through the American Psychological Association.

23  They offer continuing education and training for forensic

24  psychology.

25  Q.  Have you published in the field of transgender health and

1   gender dysphoria?

2   A.  Yes.

3   Q.  Can you describe your publishing history?

4   A.  I've published numerous articles in peer-reviewed

5   journals.  I've written four books.  Two are textbooks that

6   I've edited and authored chapters of that are medical and

7   surgical textbooks used in universities, and University of

8   Vanderbilt asked me to author their chapter on surgery in

9   their lesbian, gay and transgender health care handbook.  I've

10  also written chapters in other people's books dealing with

11  transgender health care issues.

12  Q.  Have you had clinical experience in the field of

13  transgender health and gender dysphoria?

14  A.  Yes.  I have worked with in excess now of 3,000

15  individuals with gender dysphoria.

16  Q.  Have you ever trained others to treat people with gender

17  dysphoria?

18  A.  Yes.  I supervise psychologists, and have for years, who

19  work with gender diverse populations.  I have taught courses

20  at universities in gender.  I have lectured and given grand

21  rounds at university hospitals.  I have developed WPATH's

22  global education initiative curriculum in mental health and

23  have trained professionals in places including Vietnam and

24  South America, and WPATH brings their training to interested

25  groups who are new to the field.

```
 1   Q.  Do you consult with others about the treatment of
 2   transgender individuals?
 3   A.  Yes.  I'm on staff at Weiss Hospital.  I'm on their
 4   medical staff and I consult with the physicians there.
 5   Q.  Can you tell us a bit more about what you do at Weiss?
 6   A.  I work with their team.  They have a team that consists of
 7   not only a plastic surgeon, but a urologist, social workers,
 8   primary care providers, physicians' assistants and physical
 9   rehabilitation people, and I consult with them about mental
10   health issues.  I present -- We do presentations and we have
11   journal clubs where we come together as a group.
12   Q.  You mentioned WPATH before.  Do you hold any positions
13   with WPATH?
14   A.  I'm the immediate past secretary of WPATH.  I was a board
15   member for 12 years.  I'm an author of the standards of care
16   and I chair the Committee for Institutionalized Persons.
17   Q.  Have you received any recognition for your work in the
18   field of transgender health?
19   A.  Yes.  In 2017 I was invited along with Dr. Rachel Levine
20   to address the director of the Office of Civil Rights of the
21   Department of Health and Human Services regarding transgender
22   issues.  I was awarded the WPATH Distinguished Award in
23   Education.  I'm the honoree of the externally funded Fred --
24   Randi and Fred Transgender Health Fellowship at the University
25   of Minnesota, and the University of Minnesota's Institute of
```

 1   Sexual and Gender Health awarded me one of 50 sexual and

 2   gender revolutionaries in the world.  Oh, and in 2019 I

 3   received a commendation from the U.S. House of Representatives

 4   for my work.

 5   Q.  Can you describe your previous work concerning individuals

 6   with gender dysphoria who live in institutionalized settings?

 7   A.  I have visited and interviewed and evaluated individuals

 8   in correctional facilities throughout the countries,

 9   throughout this country.  I've been in more than 50 such

10   institutions, including military prisons, state prisons,

11   federal prisons, institutions for the criminally insane and

12   many jails, and I've also consulted with two prisons about

13   their policies for transgender prisoners.

14   Q.  And in the course of that work, have you been involved in

15   interviewing people who are in institutionalized settings?

16   A.  Yes.

17   Q.  And have you reviewed records as well?

18   A.  I have, yes.

19   Q.  And that's in addition to your work on WPATH's committee

20   concerning how the standards of care apply in

21   institutionalized settings?

22   A.  Yes.  That's separate work.

23        MR. BLECHER-COHEN:  I'd like to present Plaintiff's

24   Exhibit 14, which is Dr. Ettner's CV, and move to admit it.

25        THE COURT:  All right.  14 will be admitted.

1    Q.  (By Mr. Blecher-Cohen)  Dr. Ettner, I'd like to turn now

2    to the work that you've done in this case concerning

3    Ms. Iglesias.  What work is it that you have been asked to do

4    in this case?

5    A.  I was asked to provide an opinion about the adequacy of

6    the care Ms. Iglesias was receiving, is receiving, from the

7    Bureau of Prisons.

8    Q.  What materials and interactions did you review to form

9    your opinions in this case?

10   A.  I reviewed the medical and mental health records that were

11   provided to me.  I reviewed some declarations.  I reviewed

12   Dr. Leukefeld's deposition.  I reviewed the Transgender

13   Executive Council meeting documents that I was provided with

14   and I reviewed some grievances that Ms. Iglesias had

15   submitted, and I think that's the extent, although I may be

16   omitting something.

17   Q.  And did you also speak with Ms. Iglesias directly?

18   A.  Yes.  In March I spoke by phone with Ms. Iglesias for

19   approximately 30 minutes, and in July I conducted an

20   assessment of Ms. Iglesias, a two-hour assessment.

21   Q.  What did your 30-minute phone call with Ms. Iglesias in

22   March involve?

23   A.  Introducing myself and speaking with her and trying to get

24   information about her current clinical status and about her

25   gender dysphoria which had been diagnosed according to the

1    records, but to have a sense of her as an individual with

2    gender dysphoria.

3    Q.  Do you recall your impressions from that call?

4    A.  I do.

5    Q.  And what were they?

6    A.  At the time, Ms. Iglesias was distressed.  She seemed

7    hopeless.  She was very outspoken about her distaste for her

8    genitalia.  She described it as a cancer, as she has again

9    today, and I asked her about her treatments, her hormone

10   treatments, her medical treatments, her mental health

11   treatments, to see if anything was particularly helpful.  And

12   excuse me, but is there any more --

13   Q.  I've put a water for you -- next to you.

14   A.  Thank you.

15   Q.  What did your July 2021 evaluation of Ms. Iglesias

16   involve?

17   A.  I performed a clinical interview with Ms. Iglesias and I

18   conducted psychological testing.

19   Q.  What tests did you administer?

20   A.  The Beck Depression Inventory number 2, the Beck Anxiety

21   Inventory, the Beck Hopelessness Scale and the Traumatic

22   Symptom Inventory-2.

23   Q.  Why did you perform these tests?

24   A.  The Traumatic Symptom Inventory-2 is a test that the

25   military uses.  It's a very comprehensive test that has the

```
 1   benefit of including validity factors, so it gives information
 2   about whether a person is answering honestly, whether they're
 3   exaggerating their responses to appear more damaged than they
 4   may be, and it has an -- at least 12 different components to
 5   assess chronic and acute trauma separate from the
 6   demoralization of just being in prison and gives a great deal
 7   of information, because trauma affects everybody differently.
 8   The depression inventory, the anxiety inventory are typical
 9   inventories that psychologists use because they have validity
10   that relates to the DSM-5 and they give information about
11   different aspects of anxiety and depression.  So anxiety,
12   laypeople tend to think of this as just one being anxious, but
13   like pain, anxiety and depression can mean different things.
14   Pain from a headache is different from pain from a kidney
15   stone, and so these tests tell us whether the depression is
16   affecting systems in the body or whether the depression is
17   just sort of a cognitive feeling guilty or affective, for
18   instance, feeling unhappy, so it gives the clinician
19   information that informs treatment.
20           THE COURT:  Can I just interrupt real quick?  Was
21   your -- This evaluation in July, was this in person?
22           DR. ETTNER:  It was via Zoom.
23           THE COURT:  All right.  Thank you.
24   Q.  (By Mr. Blecher-Cohen)  And why did you administer the
25   hopelessness test?
```

1    A.   Because the literature has proven that hopelessness is a

2    better indicator of suicide even than depression, and

3    hopelessness underlies many mental conditions.

4    Q.   Are these tests appropriate for use in a prison setting?

5    A.   Yes.

6    Q.   How do you know that?

7    A.   Because they're often used in prison settings and because

8    they have several good validity and reliability indices.

9    Q.   And have they been validated with appropriate norms?

10   A.   Yes.  In fact, the trans -- several of them have been

11   validated with the norms for incarcerated people.

12   Q.   Was Zoom a sufficient platform for you to run these tests

13   and make your evaluation of Ms. Iglesias in July?

14   A.   Yes.  As we all discovered during COVID, Zoom can be a

15   good alternative to an in-person evaluation.

16   Q.   And did you interact with other of your clients via Zoom?

17   A.   Yes.  Well, with clients in my private practice, but I

18   also did several evaluations via Zoom or other platforms.

19   Q.   And, Dr. Iglesias -- or Dr. Ettner -- so sorry -- did you

20   reach a conclusion based on the records you reviewed and your

21   interactions with Ms. Iglesias about her treatment?

22   A.   Yes.

23   Q.   What conclusions were those?

24   A.   Well, my conclusion was that she did have gender

25   dysphoria, she had the most severe form of gender dysphoria,

1    and that the treatment she was receiving was inadequate to

2    treat that severe gender dysphoria.

3    Q.  And what does it mean when we say severe gender dysphoria?

4    A.  Like most medical conditions, severity exists on a

5    continuum, so some people can have an elevated AIC or they can

6    have diabetes.  People can have gender dysphoria that can be

7    treated with cross-sex hormones, but for people with severe

8    gender dysphoria, hormonal management is not sufficient.

9    Q.  And are the materials that you relied on to form your

10   opinions in this case similar to the kinds of materials in the

11   field of clinical psychology that are -- others rely on to

12   form comparable opinions?

13   A.  In terms of gender dysphoria?

14   Q.  Yes.

15   A.  Yes.  If they're -- If they are qualified mental health

16   professionals, they would rely on those materials or similar

17   materials.

18   Q.  And were the materials and interactions that you had

19   access to sufficient to form your conclusions?

20   A.  Yes.

21         MR. BLECHER-COHEN:  Your Honor, I'd like to tender

22   Dr. Ettner as an expert in the field of transgender health,

23   including treatment of gender dysphoria.

24         THE COURT:  All right.  She will be accepted as such.

25         MR. BLECHER-COHEN:  Thank you, Your Honor.

1    Q.   (By Mr. Blecher-Cohen)   Dr. Ettner, let's talk a bit about

2    your examination of Ms. Iglesias and her medical and mental

3    health records in a bit more detail.   You mentioned before

4    that you concluded that Ms. Iglesias has severe gender

5    dysphoria.   What is the basis for that conclusion?

6    A.   The basis of the conclusion is her history, her

7    hormonal -- her long time on hormones without relief.   At a

8    very early age Ms. Iglesias showed the signs of childhood

9    gender dysphoria, which persisted into adolescence, and we

10   know that early onset gender dysphoria tends to be more severe

11   than a later onset.   She was cross-dressing at an early age.

12   At 13 she left home and was traveling to appear as a female.

13   She took birth control pills to alter her anatomy, even

14   without understanding the nature of her condition.   She has

15   always had a deep internal inner sense of being female, which

16   she didn't have the vocabulary or the knowledge really or

17   assistance to get treatment for at the time.   In 2009 she

18   attempted auto-penectomy, and surgical self-treatment is --

19   unfortunately it's not uncommon in prisons, but we only see it

20   when people are inadequately or inappropriately treated.   She

21   requested cross-sex hormones in 2011 and she received them in

22   2015.   She has been on hormones for years.   She has a

23   well-consolidated female identity but she has severe

24   anatomical dysphoria.   Her genitals are so repugnant to her

25   that she continuously fights the thought of surgical

1    self-treatment.  And so hormones alone and social role

2    transition are not sufficient, and in these cases, surgery is

3    the cure for gender dysphoria.

4    Q.  Dr. Ettner, does gender dysphoria increase as one ages?

5    A.  Gender dysphoria intensifies particularly at middle age,

6    so just as non-transgender women go through a perimenopause

7    period or a menopause period and they may experience some

8    emotional distress, transgender women will also have an

9    acceleration that occurs around mid life and does intensify.

10   Cortisol rises with normal aging, and that causes a diminution

11   of DHEA and other factors, and so we see that that creates an

12   intensification.  When I reviewed Ms. Iglesias' mental health

13   records, I noticed that in 2019 there was an intensification

14   of her gender dysphoria and that her treating provider, mental

15   health provider, at that time was noting month after month

16   that this was becoming more and more intense, and we do see

17   that in the community as well.

18   Q.  What treatment is Ms. Iglesias currently receiving for her

19   gender dysphoria?

20   A.  She's receiving social role transition.  She's

21   appropriately living with females.  She has access to female

22   accoutrements and she's receiving cross-sex hormones.

23   Q.  Is that treatment adequate to treat her gender dysphoria?

24   A.  Those treatments are necessary but not sufficient.

25   Q.  Why not?

1   A.  Because of the anatomical dysphoria.  Gender-affirming

2   surgery has two therapeutic purposes.  The removal of the

3   testicles eliminates the circulating nascent androgens in the

4   body.  It also gives the individual appropriate functioning

5   and typical-appearing genitalia, both of which are essential

6   and both of which virtually provide a cure for gender

7   dysphoria.

8   Q.  And what treatment is medically indicated to treat

9   Ms. Iglesias' gender dysphoria adequately?

10  A.  Presently she requires safe and permanent hair removal and

11  genital reconstruction.

12  Q.  And is that in addition to the cross-sex hormones and

13  social role transition she's already receiving?

14  A.  Yes.  She will require hormonal treatment throughout her

15  lifetime.

16  Q.  Let's talk first about gender-affirming surgery.  Can

17  Ms. Iglesias' gender dysphoria be treated without

18  gender-affirming surgery?

19  A.  It can be partially treated, but unfortunately, as time

20  goes by, the failure to treat it entirely will lead to one

21  of -- likely lead to one of three trajectories; psychological

22  decompensation, surgical self-treatment or suicide.

23  Q.  And so to be clear for the record, can Ms. Iglesias'

24  gender dysphoria be adequately treated without

25  gender-affirming surgery?

1    A.   No.

2    Q.   And why precisely is that?

3    A.   Because hormone treatment and even living fully in social

4    role do not rid the body of the testosterone or create body

5    congruence, which are now the key individualized medically

6    necessary treatments that Ms. Iglesias requires and which are

7    medically indicated for her.

8    Q.   Has Ms. Iglesias attempted to perform her own surgery

9    while she's been in the Bureau of Prisons' custody?

10   A.   Yes.

11   Q.   What conclusions do you draw from that?

12   A.   We know from the literature and from experience that

13   people attempt auto-castration, auto-penectomy, not as a

14   mutilation, not as a borderline might cut, but in an attempt

15   to address the medical needs that they have that are being

16   unattended to.

17   Q.   And does -- do these attempts suggest anything to you

18   about the adequacy of Ms. Iglesias' treatment?

19   A.   Yes.  We only see these in situations where people are

20   receiving inadequate or inappropriate treatment, and too often

21   they result in severe injury or actual death.  People fairly

22   frequently misunderstand the amount of blood that accompanies

23   these surgeries, and with orchiectomy, the spermatic cords can

24   retract, and these are not easy procedures to perform on

25   oneself, needless to say.

1    Q.  Dr. Ettner, has Ms. Iglesias attempted suicide?

2    A.  Yes.

3    Q.  Has she been evaluated for suicidality while in BOP

4    custody?

5    A.  Yes.  Ms. Iglesias has several risk factors for suicide,

6    the first being that she's attempted it before, and we know

7    that prior suicidal attempts are the most likely cause of

8    future and lethal suicides, and she's also engaged in

9    something called method switching, which is also a serious

10   risk factor.  People who use different methods to attempt

11   suicide are more likely to complete a suicide, and my review

12   of mental health and medical records indicated that the Bureau

13   of Prisons had at least 37 times assessed her for suicide.

14   Q.  Do you have an opinion, Dr. Ettner, regarding the impact

15   on Ms. Iglesias if the Bureau of Prisons continues to deny her

16   gender-affirming surgery?

17   A.  My opinion is that Ms. Iglesias would execute what she

18   refers to as plan B, which is an attempt at surgical

19   self-treatment.

20   Q.  And by surgical self-treatment, what do you mean?

21   A.  Removal of the genitalia that she currently has and that

22   she views in her own words as a living death sentence, a

23   cancer, tumor that needs to be removed, etc.

24   Q.  Is the question regarding whether Ms. Iglesias needs

25   gender-affirming surgery a difficult one?

1    A.  In my opinion, no.  I think specialists in this field

2    would all come to the same opinion that I have.

3    Q.  And why is that?

4    A.  Because the criteria for gender dysphoria as listed in the

5    DSM-5 are straightforward, and specialists who have experience

6    with different presentations and have seen different symptoms

7    and different variations of gender non-conforming

8    presentations and to do a thorough assessment would see that

9    this is a straightforward case of an individual who has a very

10   severe form of gender dysphoria, severe enough that she would

11   attempt to remove her own genitals.

12   Q.  And, Dr. Ettner, are you aware of any other medications

13   that Ms. Iglesias is taking besides her cross-sex hormones?

14   A.  Yes.

15   Q.  What medications are those?

16   A.  She's currently taking or she was, as far as I know,

17   receiving two antidepressant medications and one anxiolytic,

18   an antianxiety medication, and these medications are very

19   efficacious for depressive disorders and anxiety disorders.

20   However, if the root cause of that anxiety or depression is

21   the gender dysphoria, they will not be efficacious, and so

22   even though she's taking those three drugs, she still has

23   anxiety, depression and gender dysphoria.

24   Q.  So is it safe to say, then, that those drugs aren't

25   efficacious with respect to Ms. Iglesias right now?

1   A.  Not for gender dysphoria.  Those drugs would be

2   efficacious if she had other coexisting conditions that also

3   needed to be treated, and she may, but if the question is are

4   they helpful in treating gender dysphoria in her case, the

5   answer is no.

6   Q.  And what, if any, conclusions do you draw from the fact

7   that they aren't being helpful in treating her gender

8   dysphoria?

9   A.  Well, like psychotherapy, they are not the treatment when

10  medical or surgical treatments are required, so by analogy, if

11  an individual had diabetes and needed insulin, psychotherapy

12  wouldn't be the appropriate treatment, and so we know what the

13  treatment is, what's medically indicated for this individual,

14  and it's not psychotropic medication.

15  Q.  To take a step back, does Ms. Iglesias need

16  gender-affirming surgery now?

17  A.  Yes.

18  Q.  Has she needed gender-affirming surgery in the past?

19  A.  She's needed it for some time.  I wouldn't say in --

20  when -- going how far past.  She's needed it for quite a

21  while, yes.

22  Q.  For years?

23  A.  Yes.

24  Q.  I'd like to talk a bit now about permanent hair removal as

25  well.  You mentioned earlier that Ms. Iglesias needs permanent

1   hair removal as part of her treatment.  What is the basis for

2   that conclusion?

3   A.  Facial hair, extensive facial hair, is a secondary sex

4   characteristics of males, and if you look at the criteria

5   for -- in the DSM-5 for gender dysphoria, it is to rid oneself

6   of primary and/or secondary sex characteristics.  Facial hair

7   is the most visible and therefore can be the most disturbing

8   stigmata of masculinity, and as Ms. Iglesias has described

9   today, having to shave her face daily is extremely

10  distressing.  Most transgender women who have coarse or dark

11  facial hair, in the community, the first treatment they seek

12  is permanent hair removal, and a recent study that was done of

13  281 transgender women demonstrated that following safe hair

14  removal that anxiety and depression were decreased and gender

15  dysphoria also decreased.

16  Q.  Is permanent hair removal medically necessary for

17  Ms. Iglesias?

18  A.  Yes.

19  Q.  Why is it medically necessary?

20  A.  Because it kindles the gender dysphoria and causes her

21  great distress, and the standards of care are clear that hair

22  removal is part of the medical treatment for gender dysphoria.

23          THE COURT:  All right.  I'm going to stop you there

24  so I can take my call.  We'll resume at 11:15.  I will just

25  note for the record that just a few moments ago Ms. Iglesias'

1    handcuffs were removed, so thank you for reaching out to the

2    captain for that.  We'll be in recess until 11:15.

3      (Brief recess taken.)

4          THE COURT:  We can resume with Dr. Ettner's direct

5    examination.

6    Q.  (By Mr. Blecher-Cohen)  Good morning, Dr. Ettner.

7    A.  Good morning.

8    Q.  Just wanted to prove that I -- Let's start again where we

9    left off.  Ms. Iglesias has been -- Has Ms. Iglesias been

10   diagnosed with gender dysphoria?

11   A.  Yes.

12   Q.  And why is permanent hair removal medically necessary?

13   A.  Again, because it's a secondary characteristics of males,

14   not females.  It causes her extreme distress.  It kindles

15   gender dysphoria and it requires her to shave, and that is not

16   an effective way of removing hair from the face, and it is

17   medically necessary to have some permanent form of hair

18   removal in order to attenuate the gender dysphoria.

19   Q.  And is it also medically necessary because there's an

20   underlying medical diagnosis?

21   A.  That's what differentiates it from a cosmetic procedure.

22   If there's an underlying medical diagnosis -- and for hair

23   removal that would be gender dysphoria or polycystic ovarian

24   disease -- then those procedures are not considered cosmetic.

25   Q.  So to be clear, when you say that Ms. Iglesias has a

1    medical need for permanent hair removal, that is not a

2    cosmetic treatment?

3    A.   Correct.

4    Q.   And what is the importance of permanent hair removal in

5    treating gender dysphoria?

6    A.   Well, hair grows back on a certain schedule, so it needs

7    to be removed permanently, and then I think after six weeks

8    there's regrowth, so even for surgery there needs to be hair

9    removal in the genital area, and it needs to begin early

10   because of that regrowth cycle.

11   Q.   And are there psychological effects related to hair

12   removal and permanent hair removal specifically as well?

13   A.   Yes, and I think that Ms. Iglesias has described that.

14   The embarrassment, the humiliation of having to shave daily,

15   to have to cover that with makeup is very distressing, and it

16   continuously reminds her that she is other, that she's unlike

17   the other people that she lives with who are not shaving and

18   trying to hide that beard growth.

19   Q.   And does treatment for gender dysphoria call for the

20   elimination of certain secondary sex characteristics?

21   A.   Treatment is on an individualized basis, and not everybody

22   requires all treatments, but, yes, it -- hair removal is one

23   of the treatments for gender dysphoria.

24   Q.   And are shaving or chemical hair removal adequate

25   long-term solutions for Ms. Iglesias' gender dysphoria?

1    A.   No.

2    Q.   Why not?

3    A.   Because they're not permanent, and chemical hair removal

4    is not safe.  It can cause burning to the skin, and so laser

5    or electrolysis are typically what's required.

6    Q.   And both laser hair removal and electrolysis are permanent

7    hair removal techniques?

8    A.   They've been referred to as permanent hair reduction.

9    There will always be some facial hair, but, yes, they are

10   permanent and they are safe.

11   Q.   I'd like to talk a bit about social transition, including

12   housing.

13   A.   And I'm sorry.  I didn't hear you.

14   Q.   Social transition, including housing.  Dr. Ettner, what is

15   social transition?

16   A.   Living in one's affirmed gender.

17   Q.   And what role does social transition play in treatment for

18   gender dysphoria?

19   A.   Given that the sine qua non of the medical condition of

20   gender dysphoria is that one's gender identity doesn't match

21   one's appearance, attaining the appearance of the affirmed

22   gender is of the utmost importance.  Looking in the mirror and

23   seeing reflected back the person that you know you are is what

24   the gender dysphoric individual seeks, and social role

25   transition involves clothing, wearing clothing possibly,

1    hairstyles, mannerisms, cosmetics in the case of transgender

2    females, changing one's name and one's pronouns and living to

3    the fullest extent possible or the fullest extent comfortable

4    in one's affirmed gender.

5    Q.  Was Ms. Iglesias socially transitioning when she was held

6    in men's prisons in BOP custody?

7    A.  To the best of her ability in that context, yes.

8    Q.  How was she doing so?

9    A.  She was wearing makeup, as I understand it, and she was

10   growing her hair.  She was wearing female undergarments and

11   she had requested a name -- that her name be changed and that

12   her pronouns -- proper pronouns be used.

13   Q.  What role does being at a women's prison now play in

14   Ms. Iglesias' social transition?

15   A.  Well, it furthers her ability to socially transition, of

16   course.  She's now provided with the same products and the

17   same female accoutrements that female prisoners are, and

18   importantly, she's safe from the sexual exploitation and abuse

19   that she experienced in the male prisons.

20   Q.  And is social transition a medical treatment for gender

21   dysphoria?

22   A.  Yes, in that it reduces gender dysphoria.

23   Q.  Have you reached any conclusion about whether Ms. Iglesias

24   should remain in a women's prison?

25   A.  I have.

1    Q.   And what is that?

2    A.   It's appropriate for Ms. Iglesias to be in a male -- in a

3    female prison.

4    Q.   And why is that?

5    A.   Because she's female.

6    Q.   I'd like to ask you briefly about what is the role of

7    therapy in treating gender dysphoria?

8    A.   By therapy, do you mean psychotherapy?

9    Q.   Yes.

10   A.   That depends on the individual.  So in the community where

11   people may have more access to people who specialize in

12   working with gender diverse individuals, therapy can be very

13   helpful in working with families, in helping people navigate

14   human resources in companies they work for, in helping to

15   build resilience, and so -- and in treating any coexisting

16   mental conditions that occur alongside the gender dysphoria,

17   so psychotherapy can be a useful component in the treatment of

18   gender dysphoria.  It does not, however, obviate the need for

19   medical or surgical treatments when those treatments are

20   indicated.  So by analogy, diet and education can be important

21   components for an individual who has diabetes, but they don't

22   obviate the need for insulin if a diabetic patient requires

23   that.

24   Q.   Dr. Ettner, what is cognitive and behavioral therapy?

25   A.   It's a form of treatment that helps people -- It's a

```
 1    psychotherapeutic treatment that helps people reconstruct
 2    cognitions so they can alter some negative thinking patterns,
 3    in a nutshell.
 4    Q.  What is the role, if any, of cognitive and behavioral
 5    therapy in treating gender dysphoria?
 6    A.  It's not a cure for gender dysphoria.  It may be helpful
 7    for some coexisting conditions that gender dysphoric people
 8    have, but it does not treat gender dysphoria.  There's never
 9    been a form of psychotherapy that has been a cure for gender
10    dysphoria.
11    Q.  I'd like to talk now about WPATH again.  You mentioned
12    them earlier.  What are the WPATH standards of care?
13    A.  The standards of care are treatment guidelines that inform
14    care throughout the world.
15    Q.  Are the WPATH standards of care accepted as the prevailing
16    medical authority in treating people with gender dysphoria?
17    A.  Yes.  They're translated now, I think, into 18 different
18    languages.  They're accepted by all medical or most medical
19    associations, including the World Health Organization, the
20    American Medical Association, the American Psychiatric
21    Association, the American Psychological Association, the
22    Endocrine Society, the European Endocrine Society.  The
23    American College of Obstetrics and Gynecology endorse the
24    WPATH standards, as do the American Academy of Pediatrics, the
25    National Association of Social Workers, the American Society
```

1    for Plastic Surgeons, the American Society of Surgeons, and

2    I'm -- the National Commission on Correctional Health, and I'm

3    sure I'm leaving out many others.

4             THE COURT:  Let me just ask you something there.

5    That was one thing I noted in your declaration.  You'd said

6    that they -- all of these entities endorse protocols in

7    accordance with WPATH standards of care.  Do these

8    organizations endorse all of those protocols or just certain

9    ones?

10            DR. ETTNER:  All of them.

11            THE COURT:  All right.  Thank you.

12   Q.  (By Mr. Blecher-Cohen)  Do the WPATH standards of care

13   apply to people with gender dysphoria in prison settings?

14   A.  Yes.  Since 1998 the standards of care have discussed the

15   treatment of incarcerated persons, and basically that

16   treatment according to the standards of care should mirror

17   what's available in the community, just like the treatment for

18   other medical conditions doesn't differ.  We don't treat

19   people who have cardiac issues different if they're

20   incarcerated than if they're non-incarcerated.

21   Q.  And when you refer to what's available in the community,

22   what do you mean by that?

23   A.  I mean people who are not institutionalized and who have

24   agency to seek out providers.

25   Q.  Do the standards of care provide guidance about competency

1   requirements for treating people with gender dysphoria?

2   A.   They do.   I'm familiar with the competency requirements

3   for mental health providers.

4   Q.   And what are those requirements?

5   A.   Those requirements are in the standards of care at

6   Section 20 to 23, and they state that mental health providers

7   should have at a minimum credentials in their own discipline,

8   which for example would be Ph.D. for a psychologist or M.D.

9   for a psychiatrist.   They need to be licensed.   They need to

10  be familiar with the DSM-5 or the ICD, which is the

11  International Classification of Diseases.   They need to be

12  trained and competent in psychotherapy or counseling.   They

13  need to be able to diagnose gender dysphoria and to

14  distinguish it from other coexisting conditions.   They need to

15  be knowledgeable about the vast variety of gender diverse

16  presentations and identities, and importantly, to be

17  knowledgeable about assessment and treatment of gender

18  dysphoria.   They need to have continuing education in

19  assessment and treatment.   They need to be familiar with the

20  growing body of scientific literature and to be culturally

21  competent by attending meetings, workshops and other ongoing

22  information imparting scientific meetings, and the standards

23  also state that providers who are new to this field,

24  irregardless of their expertise or training in other fields or

25  in other specialties, if they're not expert in this field,

1    they need to seek supervision or mentorship with someone with

2    demonstrated competence in assessing and treating gender

3    dysphoric individuals.

4    Q.  Is self-study sufficient to meet the continuing education

5    criterion?

6    A.  No.

7    Q.  Is self-study sufficient to meet the formal education or

8    supervision criteria?

9    A.  No.

10   Q.  Do you know, Dr. Ettner, what reasons the Bureau of

11   Prisons has given for denying Ms. Iglesias gender-affirming

12   surgery?

13   A.  It's my understanding that the Bureau of Prisons

14   identified something called a target hormone range and stated

15   that prisoners who were not -- who did not attain that target

16   range would not meet the criteria for surgery, and that there

17   was a further requirement that the Bureau of Prisons stated

18   that an individual had to live with other individuals in -- of

19   the same gender for a period of a year before they could be

20   eligible for surgery.

21   Q.  Is it appropriate to withhold gender-affirming surgery on

22   either of these bases?

23   A.  No, it's not -- not if it's medically necessary, no.

24   Q.  Are there any contraindications to gender-affirming

25   surgery?

1   A.   Yes.

2   Q.   What are they?

3   A.   Well, medical contraindications for gender-affirming

4   surgery would be a history of hypercoagulable disease,

5   cardiovascular disease that is not well controlled, liver

6   failure, and a rare condition of hypothermia which makes

7   general anesthesia not possible for an individual, and

8   psychological or psychiatric contraindications would be if

9   someone was having -- was in the midst of a psychotic break,

10   if they were floridly psychotic, or if they had a major mental

11   illness that was not well controlled.

12   Q.   Are any of these medical or psychological

13   contraindications present in Ms. Iglesias?

14   A.   No.

15   Q.   What are you basing that conclusion on?

16   A.   On my review of her medical and mental health records and

17   my own assessment of her.

18   Q.   Do those records and assessments indicate that

19   Ms. Iglesias has ever had any of these medical or

20   psychological contraindications?

21   A.   Those records do not indicate that.

22   Q.   Let's take the Bureau of Prisons' reasons for denying

23   gender-affirming surgery one at a time.  Is optimization of

24   hormone levels or failure to meet target hormone levels a

25   valid reason to withhold gender-affirming surgery from

1    Ms. Iglesias?

2    A.   No.  Optimization of hormone levels occurs after 24 months

3    of hormonal usage, and so by that criteria, she would have

4    been eligible in 2017 for surgery, and the idea that there's a

5    target range that is a criteria for surgery is not something

6    that I have ever heard.  That's not part of the standards of

7    care and it's not a reasonable reason to deny someone surgery

8    if they've been on hormones for at least a year.

9    Q.   And is length of time in a women's facility a valid reason

10   to withhold gender-affirming surgery from Ms. Iglesias?

11   A.   No.  Ms. Iglesias has lived as a female to the best of her

12   ability for decades, I believe, and nowhere does it state in

13   the standards of care or have I heard that it is a requirement

14   to live in a context that's female.  It's -- The requirement

15   is 12 months of continuous living in role.

16   Q.   And that requirement of living in role is from the WPATH

17   standards of care?

18   A.   Correct.

19   Q.   Has Ms. Iglesias satisfied WPATH's criterion?

20   A.   She has more than satisfied those criterion.

21   Q.   How has she done so?

22   A.   Well, the criteria are to have a well-documented diagnosis

23   and to have had persistent gender dysphoria.  She's surpassed

24   that criteria.  She's been on hormones for decades -- well,

25   since -- for a long time, and took hormones as a teen in the

1    form of birth control pills.  She's lived in role for more

2    than 12 months and she's above the age of majority in the

3    country in which she resides, and any medical or mental health

4    issues that she has are well controlled, and those are the

5    requirements.

6    Q.  And to be clear, the standards of care don't require that

7    someone satisfy the living in role criterion through living in

8    a sex-specific environment.

9    A.  No, they do not.

10   Q.  And do they suggest that -- strike that.  Are you aware,

11   Dr. Ettner, of other prisoner systems that have provided

12   gender-affirming surgery to transgender women?

13   A.  I'm aware of four in which I have been involved as an

14   expert, and those occurred in the states of Washington, Idaho,

15   Massachusetts and California, and there may be more, but those

16   are the ones that I'm familiar with where surgery occurred.

17   Q.  Do you know who at the Bureau of Prisons decides whether

18   Ms. Iglesias can get gender-affirming surgery?

19   A.  My understanding is that it's the Transgender Executive

20   Council.

21   Q.  And what are you basing that understanding on?

22   A.  The documents that I reviewed and Dr. Leukefeld's

23   deposition.

24   Q.  In your opinion, should a committee such as the

25   Transgender Executive Council be making decisions about

1    whether someone receives gender-affirming surgery?

2    A.   My opinion is that administrative bodies should not be

3    making medical decisions, particularly if they haven't

4    assessed the individual.

5    Q.   And why is it important that someone involved in making

6    decisions about treating gender dysphoria have met the

7    individual being treated?

8    A.   Well, all medical decisions and best practices are based

9    upon a case-by-case basis, and not every individual who has

10   gender dysphoria is the same, and so everybody needs to have

11   an individual assessment to see if they have met the

12   eligibility and readiness criteria that I just set forth from

13   the standards of care and to do an assessment to understand

14   that individual and their particular needs and what's

15   medically indicated for them.

16   Q.   And, Dr. Ettner, were you in the courtroom today when

17   Ms. Iglesias testified that she had never met anyone on the

18   Transgender Executive Council with the exception of a brief

19   meeting of Dr. Leukefeld?

20   A.   I was.

21   Q.   Should a committee whose members have never examined

22   Ms. Iglesias be involved in decisions about her treatment for

23   gender dysphoria?

24   A.   No.

25   Q.   And, Dr. Ettner, based on the records you've reviewed, do

1   you have an understanding about whether there are people who

2   are not specialists in treating gender dysphoria on the

3   Transgender Executive Council?

4   A.   That's my understanding, but I was unable to -- in the

5   records that I received, much of which were redacted, I was

6   unable to really know what the qualifications were of all

7   those individuals, but I don't believe any of them were

8   specialists in gender dysphoria.

9   Q.   Should a committee whose members are not specialists in

10  gender dysphoria or transgender health be involved in making

11  decisions about an individual's treatment for gender

12  dysphoria?

13  A.   No, not about medical treatments.

14  Q.   And why is that?

15  A.   Because they don't have the competency to make those

16  individualized decisions about this specialized area of

17  medicine.

18  Q.   Overall, Dr. Ettner, do you have an opinion about the

19  Transgender Executive Council's fitness to make decisions

20  about Ms. Iglesias' treatment for gender dysphoria?

21  A.   My opinion is that they're not qualified to make that

22  decision for Ms. Iglesias.

23  Q.   And why is that?

24  A.   Because they lack the qualifications necessary to make

25  those medical decisions, to make referrals for surgery, to

```
1    understand what's involved in surgery and to understand how to
2    evaluate and generate a treatment plan for a gender dysphoric
3    individual.
4    Q.  And stepping back once again, Dr. Ettner, what is your
5    conclusion about the treatment Ms. Iglesias is currently
6    receiving for her gender dysphoria?
7    A.  My conclusion is the treatment she's receiving is not
8    adequate for her gender dysphoria.
9    Q.  What is the treatment she requires?
10   A.  She requires vaginoplasty and hair removal, laser hair
11   removal.
12   Q.  Based on Ms. Iglesias' testimony this morning in addition
13   to the materials you've reviewed and your previous
14   interactions with her, what is the psychological impact of her
15   not getting gender-affirming surgery and permanent hair
16   removal?
17   A.  She will -- Her psychological condition will deteriorate.
18   Her thoughts of performing her own surgery, surgical
19   self-treatment, will exacerbate, and whether or not her
20   resilience will erode to the point where she cannot control
21   her impulse to do that, as many people who are incarcerated
22   cannot, she will unfortunately resort to that or to
23   psychological decompensation.
24   Q.  And just briefly, what is psychological decompensation?
25   A.  It's when an individual has lost their ability to cope,
```

1   and so their ability to function, their global assessment of

2   functioning plummets and they're no longer able to function

3   and to have the same level of adjustment to carry out the

4   daily activities of living and to be able to maintain at the

5   level that they currently are.  They start to go down an

6   ingravescent course, and ultimately they either physically

7   harm themselves or sometimes they attempt suicide.

8           MR. BLECHER-COHEN:  Thank you, Dr. Ettner.

9           THE COURT:  I have just a few questions and then I'll

10  let you clarify if you want.  You said that you've reviewed

11  some medical and mental health records.  Do you think you had

12  everything or were there things that you were not able to

13  review that you wanted to see?

14          DR. ETTNER:  I had everything that was provided to

15  me.  I don't know if that included everything.  I just know

16  what I received.

17          THE COURT:  Okay.  And do hormones help with facial

18  hair growth?

19          DR. ETTNER:  What hormones do is they make the facial

20  hair a bit finer, less coarse, but that's about all.  They'll

21  do that for the body hair and the facial hair.  So in the

22  community, Your Honor, we recommend that people don't start

23  hair removal until after they've begun hormones because

24  they're sort of wasting their money, because they'll need less

25  electrolysis or less laser if they wait until the hormones

1    will sort of make it a little easier to remove the hair.

2              THE COURT:  Okay.  And is Ms. Iglesias on

3    spironolactone?

4              DR. ETTNER:  Yes.

5              THE COURT:  Okay.  Will the surgery -- would that

6    help with the facial hair?

7              DR. ETTNER:  Yes, because it completely removes the

8    androgen, the testosterone, but it doesn't -- it won't help

9    enough, so it's -- she will still have the facial hair.  She

10   may find that her body hair is a bit softer, a little finer,

11   but she will still require laser or electrolysis, and she will

12   need genital hair removal, because when they do the

13   vaginoplasty, they use the scrotal tissue, and the scrotum has

14   hair on it, and when that tissue is used to make the vaginal

15   canal, if they don't remove that hair, the individual has hair

16   in the vagina, that grows in the vagina, so they will do

17   genital electrolysis prior to surgery, and that is why it

18   should begin early as a way to get all the regrowth.

19             THE COURT:  Okay.  And I think I got this from your

20   testimony, but based on your review of everything that you've

21   reviewed, when is the earliest in your opinion that she would

22   have been ready for surgery?

23             DR. ETTNER:  Probably 2016 or 2017.

24             THE COURT:  All right.  Do you want to follow up on

25   any of that?

```
 1              MR. BLECHER-COHEN:  Nothing further, Your Honor.

 2              THE COURT:  Okay.  Why don't we take a break for

 3    lunch.  We'll resume at 12:30 with cross examination.

 4       (Court recessed from 11:56 a.m. to 12:30 p.m.)

 5              THE COURT:  Let's get Dr. Ettner back in the stand.

 6              MR. KNIGHT:  Your Honor, if I could just identify,

 7    Angela Povolish is actually at counsel table from the case.

 8              THE COURT:  Okay.

 9              MR. KNIGHT:  She was a little bit late because of

10    some confusion about -- she went to Benton, I think.

11              THE COURT:  I heard that.  I'm sorry to hear you went

12    to Benton.

13              MS. POVOLISH:  My apologies, Your Honor.

14              THE COURT:  No problem.  All right.  Dr. Ettner, if

15    you'll come on up and take the stand again.  All right.  You

16    may begin your cross examination.

17              MS. TALMOR:  Thank you, Your Honor.

18                         CROSS EXAMINATION

19    BY MS. TALMOR:

20    Q.  Good afternoon, Dr. Ettner.  It's nice to meet you.

21    A.  Good afternoon.

22    Q.  I'd like to start with some questions about the WPATH

23    standards of care, please.  So as I understand, you are one of

24    the authors of the 7th edition of the WPATH standards of care,

25    correct?
```

1   A.   Yes.

2   Q.   And the 7th edition was published in 2011?

3   A.   Yes.

4   Q.   And as one of the authors of the WPATH standards of care,

5   it's fair to say that you agree with the content of that

6   document, correct?

7   A.   At the time it was written, yes.

8   Q.   And you stand behind those standards?

9   A.   Yes.

10   Q.   Let's take a look at those standards.  I'd like to draw

11   your attention to page 2 of the WPATH standards for care under

12   the heading of "The Standards of Care are Flexible Clinical

13   Guidelines."  Now, you agree that the standards of care are

14   flexible clinical guidelines?

15   A.   Yes, although I can't really read this.

16         THE COURT:  You can zoom in on it.

17   A.   Thank you.

18   Q.   Just to clarify, you agree that the standards of care are

19   flexible clinical guidelines?

20   A.   Yes.

21   Q.   And you interpret guidelines as recommendations rather

22   than mandatory standards?

23   A.   Yes.

24   Q.   Further down in the middle paragraph on this page, which

25   has been highlighted here --

```
 1              MR. BLECHER-COHEN:  I'm sorry.  Could I just --
 2   Dr. Ettner had eye surgery recently, so I just want to make
 3   sure that -- is Dr. Ettner -- are you able to read the
 4   documents in this way or is there another accommodation just
 5   so you can follow along?
 6   A.  I can -- I would prefer to have -- I think I can read
 7   this.  Thank you.
 8   Q.  I'm happy, if it's okay with Chief Judge Rosenstengel, to
 9   bring the paper copy if that would be easier.  What would you
10   prefer?
11   A.  This is probably larger than the paper copy.
12   Q.  I can zoom in a bit more also if it would be helpful.
13   A.  Thank you.  And you're talking about just this highlighted
14   area now?
15   Q.  Well, now, that's correct.
16   A.  Okay.  Yes.
17   Q.  Thank you, Dr. Ettner.  So the highlighted portion, which
18   is from, again, page 2 of the WPATH standards of care, it
19   states, "As in all previous versions of the standards of care,
20   the criteria put forth in this document for hormone therapy
21   and surgical treatments for gender dysphoria are clinical
22   guidelines," correct?
23   A.  Yes.
24   Q.  And you agree with that, correct?
25   A.  I do.
```

1    Q.  And after that it states, "Individual health professionals

2    and programs may modify them."  You agree with that?

3    A.  Yes.

4    Q.  I would like to take a -- talk a bit about WPATH, the

5    organization.  So you are aware that the WPATH standards of

6    care identify the mission of the WPATH organization?

7    A.  In the 7th iteration?

8    Q.  Correct.

9    A.  Yes.  That's not what's broadcast here, though, correct?

10   Q.  Correct.  Let me go to page 1.  Is that legible?

11   A.  Yes.

12   Q.  So this is page 1 of the WPATH standards of care.

13   A.  Yes.

14   Q.  So they identify the mission of the WPATH organization,

15   correct?

16   A.  Yes.

17   Q.  And a part of WPATH's mission is advocacy for transgender

18   health?

19   A.  Yes.

20   Q.  In fact, the WPATH standards of care expressly state that

21   WPATH is committed to advocacy for changes in public policies

22   and legal reform?

23   A.  Are you asking me if that's written here or --

24   Q.  I'm asking you if you understand that the standards of

25   care expressly state that WPATH is committed to advocacy for

1    changes in public policy and legal reform.

2    A.  I don't see legal reform here.  I see evidence-based care,

3    education, research, advocacy, public policy and respect for

4    transgender health.

5    Q.  Is it your understanding that the WPATH organization

6    advocates for legal reform?

7    A.  That is not my understanding, that it advocates in the

8    sense that other medical associations advocate, like American

9    Psychological Association lobbying in congress.  We don't

10   lobby, but if you consider the fact that we support human

11   rights, then -- and that that might lead to legal change such

12   as in changing identification documents, I would agree with

13   that.

14   Q.  WPATH has a Legal Issues Committee, correct?

15   A.  We have a legal committee.

16   Q.  And WPATH's Legal Issues Committee will draft on behalf of

17   the organization legal briefs as needed to address specific

18   cases?

19   A.  We have at times asked the legal -- asked to participate

20   in providing amicus briefs to various courts.  That's the

21   extent of what we've done.

22   Q.  It's a little bit hard to center there, but what I have

23   placed on the screen here is just a printout from WPATH's

24   website discussing the Legal Issues Committee, and it says

25   here, does it not, that the WPATH's Legal Issues Committee

1   will draft on behalf of the organization legal briefs as

2   needed to address specific cases at bar?

3   A.   It says that, although to my knowledge, we've not done

4   that.

5   Q.   So to your knowledge, WPATH has not participated in

6   drafting legal briefs to address specific cases?

7   A.   I don't think we've drafted briefs.   As I said, we have

8   signed on to amicus briefs, but when I was secretary, I was

9   secretary of committees, and our legal committee did not draft

10  any briefs.

11  Q.   And it states here that WPATH's Legal Issues Committee

12  seeks to improve societal recognition of the equal dignity,

13  respect and rights of transgender people when the rights and

14  dignity of those peoples may be or have been violated; is that

15  correct?

16  A.   Yes.

17  Q.   And you mentioned earlier on direct that you'd received an

18  award from WPATH.   Isn't it correct that that award was for

19  distinguished education and advocacy?

20  A.   I believe so.   I think that's now two different awards

21  that they're providing.

22  Q.   But isn't it correct that you list in your CV that you

23  received an award for distinguished education and advocacy?

24  A.   Probably, yes, that is the reward I received.

25           MS. TALMOR:   I will not be using this for now.   It's

1    possible I may need to use it again, but I don't need it for

2    now.

3    Q.  (By Ms. Talmor)  Now, the current version of the WPATH

4    standards of care were issued in 2011, correct?

5    A.  Yes.

6    Q.  And you believe that they were based on the best available

7    scientific evidence at that time.

8    A.  I do.

9    Q.  Now, WPATH members have suggested changes for future

10   iterations of the WPATH standards of care?

11   A.  Have WPATH members suggested them?

12   Q.  Isn't it true that WPATH members have suggested changes

13   for future iterations of the standards of care?

14   A.  Members, authors of the new standards and the mushrooming

15   body of literature, changes in terminology, have all required

16   that we update the standards.

17   Q.  But isn't it correct that WPATH members themselves have

18   suggested changes?

19   A.  I assume that's true.  I don't know that as a fact,

20   though.

21   Q.  Are you familiar with Gail Knudson?

22   A.  Yes.

23   Q.  And Gail Knudson is the former president of WPATH,

24   correct?

25   A.  Yes.

1   Q.  You are aware that Ms. Knudson wrote WPATH membership in
2   May 2017 and stated that membership had concerns with the lack
3   of scientific evidence to ground the current standards of
4   care?
5   A.  I'm not aware of that in particular.  I'm aware that based
6   on the Executive Committee, we decided to have an independent
7   evidence-based review of our forthcoming standards, which is
8   being conducted by Johns Hopkins.
9   Q.  Isn't it true that at the hearing held in the matter *Edmo*
10  that you testified as to awareness that Gail Knudson had
11  written to WPATH membership in May 2017 and expressed concern
12  that there was a lack of scientific evidence to ground the
13  standards of care?
14  A.  I believe in *Edmo* I was asked if I knew Gail Knudson and I
15  said yes, and that someone brought forth something she wrote
16  in a newsletter, which I don't believe I had read, but I may
17  be mistaken about that.
18  Q.  Didn't you testify at the *Edmo* hearing that Mrs. --
19  Ms. Knudson had specified in her written communication to
20  WPATH membership that one of the primary concerns that members
21  of WPATH had related to the increased need for scientific
22  evidence to ground the standards of care?
23  A.  I think we're all in agreement that we need to have
24  standards of care that reflect our current science knowledge.
25  However, I don't remember having said that specifically in my

1    testimony at the *Edmo* case.  If you have a document that says

2    I did, then I would like to see that.

3    Q.  Certainly.  Thank you.  I apologize.  I think this green

4    highlighting is going to be slightly unhelpful.

5    A.  So according to this, I said that I was aware of that.  I

6    don't believe I read that, actually.  The president sends

7    newsletters monthly typically to the membership, so I may not

8    have read that, but I do agree that we did need a revision and

9    that the revision needed to be evidence-based.

10   Q.  So it states here, the question is, "And you're aware of a

11   letter or email that she wrote to membership on May 23rd,

12   2017, where she discussed, did she not, that membership had

13   concerns with the lack of scientific evidence to ground the

14   statements of care?"  And your response says, "Yes, which is

15   why our Standards of Care 8 are now being evidence reviewed by

16   an outside authority as a result of not only Gail's concerns

17   but, as mentioned in deposition, new information about

18   children and adolescents"; is that correct?

19   A.  Yes.

20   Q.  Okay.  And as stated here, those concerns are one of the

21   reasons why the revisions to the standards of care are being

22   evidence reviewed by an outside authority at Johns Hopkins,

23   correct?

24   A.  Would you repeat that?

25   Q.  Certainly.  These concerns that we've been discussing,

```
 1   those are one of the reasons why the revisions to the
 2   standards of care are currently being evidence reviewed by an
 3   outside authority at Johns Hopkins, correct?
 4   A.  Yes.
 5   Q.  And there is an 8th edition of the WPATH standards of care
 6   that is in development now, correct?
 7   A.  Yes.
 8   Q.  And the 8th edition of the WPATH standards of care is
 9   expected to be released in 2022, correct?
10   A.  Yes.
11   Q.  And the 8th edition of the WPATH standards of care will be
12   the first to be developed using an evidence-based approach by
13   an external organization?
14   A.  Yes.
15   Q.  Now, with respect to the upcoming 8th edition of the WPATH
16   standards of care, there is voluminous new evidence which
17   needs to be incorporated and an abundance of literature which
18   needs to be reviewed and graded for the level of evidence,
19   correct?
20   A.  I believe so.  I'm only involved with the chapter that I
21   work on, and we have been asked not to discuss the forthcoming
22   standards of care.
23   Q.  Isn't it correct that at your deposition in this matter
24   you testified -- and I quote -- that -- well, strike that.
25   Isn't it correct that at your deposition in this matter you
```

1    testified regarding the upcoming 8th edition of the WPATH

2    standards of care that there is, quote, "voluminous new

3    information which needs to be incorporated and an abundance of

4    literature which needs to be reviewed and graded for the level

5    of evidence," end quote?

6    A.  Yes, that's true.

7    Q.  But you cannot disclose at this time whether there have

8    been recommended changes to the standards of care as it

9    relates to incarcerated individuals, correct?

10   A.  I cannot disclose the contents of the standards of care

11   8th edition.

12   Q.  Isn't it also correct that you cannot disclose whether or

13   not there have been any changes with regard to incarcerated

14   individuals?

15   A.  I cannot.

16   Q.  And that's because the chairs of the standard committee

17   and the researcher at Johns Hopkins have asked you not to

18   discuss the contents until they are finalized, correct?

19   A.  Until it's disseminated.

20   Q.  Thank you for that clarification.  And you agree that the

21   field of transgender health care is a rapidly revolving

22   interdisciplinary field, correct?

23   A.  Yes, I agree that it's a multidisciplinary field and that

24   there is a great deal of new information that's being

25   published and has been published since 2011, yes.

1    Q.  And you believe the standards of care need to reflect what
2    we know now, correct?
3    A.  Yes.
4    Q.  And you agree that we are developing a better
5    understanding of the condition of being transgender in 2021
6    than we had in 2011, correct?
7    A.  Not only transgender, but in relation to all gender
8    diverse individuals.
9    Q.  But you agree that our understanding has changed in the
10   intervening ten years, correct?
11   A.  If by "our" you mean the medical community, yes.
12   Q.  Yes.  Thank you.  And you agree, don't you, that
13   challenges in caring for transgender individuals in
14   correctional settings has -- and the means of addressing that
15   condition have not been well explored in the literature?
16   A.  I agree that there's not a great deal of literature,
17   although there is more literature now than there was in 2011.
18   Q.  But you would agree, wouldn't you, that the challenges in
19   caring for transgender individuals in correctional settings
20   has not been well explored in the literature at this point?
21   A.  I think the challenges have been well explored.
22   Q.  Isn't it true that you testified in your deposition in
23   this matter that the challenges in caring for transgender
24   individuals in correctional settings and the means of
25   addressing them have not been well explored in the literature?

1   A.  Are you talking about now or since 2011?

2   Q.  Have not been well explored in the literature generally,

3   so at this time.

4   A.  In 2011, when that chapter was written, there were very

5   little references.  Now there are quite a few more, but there

6   still is not a tremendous amount of literature about

7   incarcerated transgender people.

8   Q.  Thank you for clarifying.  You also agree, don't you, that

9   there's a lack of national corrections-based practice

10  guidelines concerning caring for transgender people?

11  A.  I'm sorry.  I don't understand the question.  Could you

12  repeat it?

13  Q.  Certainly.  You also agree, don't you, that there's a lack

14  of national corrections-based practice guidelines concerning

15  the care for transgender individuals?

16  A.  I -- My experience is that individual correctional

17  facilities have their own policies which they follow.

18  Q.  But don't you agree that there is a lack of national

19  corrections-based guidelines concerning caring for transgender

20  individuals in a correctional setting?

21  A.  I think the national guidelines for care or the standards

22  of care, they don't differ, just as treatment or guidelines

23  for diabetic patients in prison don't differ, so I believe

24  that the guidelines are there, but not all facilities follow

25  those guidelines.

1   Q.  But haven't you testified in this matter that there is a

2   lack of national corrections-based practice guidelines for the

3   care of transgender individuals?

4   A.  I would have to see what I said in regards to that, but I

5   believe that with the exception of PREA, there is not a --

6   national guidelines that differs from the standards of care

7   that exist.

8   Q.  So there is not a national guideline that is specific to

9   the correctional setting, correct?

10          MS. BROWN:  Objection, Your Honor.  Asked and

11  answered.  She's asked this question several times.

12          THE COURT:  Well, it's cross examination.  I'll allow

13  it.

14  Q.  (By Ms. Talmor)  I'm sorry.  Could you give a verbal

15  answer, please?

16  A.  Yes.  I'm not certain what you mean by national guidelines

17  other than the standards of care, and again, when we -- when a

18  study was done writing to every state prison asking what

19  guidelines they followed, only 26 prisons responded, so I

20  don't know what a national guideline would be, but I don't

21  think there is one.

22  Q.  Let me try to ask differently, because I may not be being

23  clear.  Wouldn't you agree that there is not a set of national

24  guidelines for the care of transgender individuals that are

25  specific to the correctional setting?

1    A.  Other than the ones that are in the standards of care.

2    Q.  Which are not specific to the correctional setting,

3    correct?

4    A.  Well, they are -- they do address the correctional

5    setting.

6    Q.  But the standards of care are for the treatment of

7    transgender individuals generally rather than only in the

8    correctional setting, correct?

9    A.  No, there's a separate part that deals specifically with

10   transgender people who are incarcerated, and it has since

11   1998.

12   Q.  Didn't you testify in your deposition in this matter that

13   the lack of national corrections-based guidelines leaves

14   correctional administrators and health care providers with

15   limited guidance for optimizing the care and safety of

16   transgender inmates?

17   A.  If I said that in my deposition -- and I would like to see

18   that -- then I agree with that, although I'm not certain what

19   that was in response to.

20   Q.  Certainly.  So here the question asked is:  "Do you agree

21   that challenges in caring for transgender people in

22   correctional settings and means of addressing them have not

23   been well explored in the literature?"  Answer:  "Yes."

24   Question:  "Do you agree that there's a lack of national

25   corrections-based practice guidelines concerning caring for

1    transgender people?"  Answer:  "Yes."  Question:  "Do you

2    agree that this lack of national corrections-based guidelines

3    leaves correctional administrators and health care providers

4    with a limited guidance for optimizing the care and safety of

5    transgender individuals?"  Answer:  "I assume that that's

6    true, yes."  Did I read that correctly?

7    A.  Yes.

8    Q.  Thank you.  I'd like to change gears a bit and ask about

9    your opinions in this case.  You are offering an opinion about

10   the standards of care for gender-affirming surgery?

11   A.  Yes.

12   Q.  You are also offering an opinion that plaintiff satisfies

13   the standards of care for gender-affirming surgery.

14   A.  I am.

15   Q.  Now, gender-affirming surgery is medical surgery, correct?

16   A.  Yes.

17   Q.  And earlier you testified that in plaintiff's case, gender

18   confirmation surgery is medically necessary, correct?

19   A.  Yes.

20   Q.  But you're not a medical doctor.

21   A.  Correct.

22   Q.  And you testified earlier today, didn't you, that

23   plaintiff has, to your knowledge, no medical

24   contraindications?

25   A.  No contraindications for vaginoplasty that would

1    absolutely be a contraindication.

2    Q.  But you don't have a medical license, correct?

3    A.  Correct.

4    Q.  And so your examination of the plaintiff was a

5    psychological and cognitive exam, not a medical exam, correct?

6    A.  A clinical exam, yes.

7    Q.  And now speaking generally, not just in plaintiff's case,

8    but if a psychologist concludes that the WPATH standards of

9    care are satisfied for a particular patient, the surgeon still

10   has discretion to decide whether surgery is appropriate for

11   that individual, correct?

12   A.  Yes.

13   Q.  And isn't it true that an individual receiving

14   gender-affirming surgery needs a medical clearance before

15   receiving such surgery?

16   A.  By medical clearance, do you mean a physical exam by a

17   primary care provider?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Now, the current WPATH standards of care requires two

21   referrals for surgery, correct?

22   A.  From mental health professionals, yes.

23   Q.  And you have not seen two referrals for surgery for

24   Ms. Iglesias, correct?

25   A.  Would you repeat that, please?

1   Q.  In reviewing Ms. Iglesias' files, you have not seen two

2   referrals for surgery for Ms. Iglesias, correct?

3   A.  Within her files I have not seen letters of referral that

4   correspond to what the standards of care require.

5   Q.  So to your knowledge, Ms. Iglesias has not received two

6   referrals for surgery at this time, correct?

7   A.  Not that I'm aware of.

8   Q.  And you have concluded that plaintiff has met and exceeded

9   the five enumerated criteria for gender confirmation surgery

10  as stated in the WPATH standards of care, correct?

11  A.  Yes.

12  Q.  And one of the criteria listed for a vaginoplasty for male

13  to female patients is 12 continuous months living in a gender

14  role that is congruent with gender identity, correct?

15  A.  Yes.

16  Q.  Now, you were not personally involved in the development

17  of that particular provision of the standard of care, correct?

18  A.  I think that in a sense, every author was personally

19  involved in the criteria.

20  Q.  Isn't it true that at your deposition in this matter you

21  were asked, "Were you personally involved in the development

22  of that particular provision of the standard of care?" and you

23  answered, "I was not"?

24  A.  I didn't write that provision, nor did I generate it, but

25  it goes through a review process, so we all opined on that and

1  how it differs from our prior iterations.

2  Q.  So are you saying now that you were personally involved in

3  the development contrary to what you testified before or --

4  A.  No.  I'm saying as a group we reviewed every line of the

5  standards of care.  To that extent I was involved.

6  Q.  Didn't you testify at your deposition in this matter that

7  you do not know how the 12-month period was developed or

8  derived?

9  A.  I don't know exactly how it was derived.  I know that it

10 was a deviation from our prior standard, which was different,

11 and that we reviewed literature that talked about the

12 necessity for real-life experiences, real-life tests, and that

13 that was the wording that ultimately came out, and then we all

14 reviewed it.  So I don't know the precise generation of that

15 language, but I signed off on it.

16 Q.  Here this is page 62, lines 1 through 11 of the deposition

17 in this matter.  So the question asked is, "Where it says in

18 the WPATH standards of care 12 continuous months living in a

19 gender role that is congruent with their gender identity, do

20 you know how the 12-month period was developed or derived?"

21 Answer:  "No, not specifically.  I don't."  Question:  "Can

22 you tell me whether that same criteria is going to be present

23 in the 8th edition of the standards of care?"  Answer:  "I'm

24 sorry, I cannot.  I have no idea about that."  Did I read that

25 correctly?

```
 1    A.  Yes.
 2    Q.  And so the WPATH standards of care, the current version,
 3    explains that the rationale for this requirement is, quote,
 4    "the expert clinical consensus that this experience provides
 5    ample opportunity for patients to experience and socially
 6    adjust in their desired gender role before undergoing
 7    irreversible surgery," correct?  I don't have that up, but I'd
 8    be glad to place it up if you'd like me to refresh.
 9    A.  No, that's fine.
10    Q.  Do you want me to repeat the question?
11    A.  Please.
12    Q.  The WPATH standard of care explains that the rationale for
13    the 12-month requirement is, quote, "the expert clinical
14    consensus that this experience provides ample opportunity for
15    patients to experience and socially adjust in their desired
16    gender role before undergoing irreversible surgery"?
17    A.  Yes.
18    Q.  And you agree with the standards of care that, quote,
19    "changing gender roles can have profound personal and social
20    consequences," correct?
21    A.  Yes.
22    Q.  Now, you've also opined that there is no medical
23    justification for the Bureau of Prisons' policy requiring
24    transgender inmates to live for a year in a facility
25    consistent with their gender identity before they will be
```

1  considered for surgery, correct?

2  A.  Yes.

3  Q.  But you also have testified, correct, that transgender

4  women with feminine characteristics are at elevated risk for

5  harm when housed in male prisons?

6  A.  Yes.

7  Q.  And transgender female inmates are at a heightened risk of

8  sexual assault when placed in a male facility, particularly if

9  they have developed secondary sex characteristics, correct?

10 A.  Would you repeat that second part, please?

11 Q.  I'll repeat the entire question for clarity.

12 A.  Thank you.

13 Q.  Transgender female inmates are at a heightened risk of

14 sexual assault when placed in a male facility, particularly if

15 they have developed secondary sex characteristics, correct?

16 A.  Yes.

17 Q.  And by secondary sex characteristics, that refers, among

18 other things, to breast development, correct?

19 A.  Yes.

20 Q.  Softened skin?

21 A.  Correct.

22 Q.  Or redistribution of body fat?

23 A.  Yes.

24 Q.  I'd like to change gears a bit to your opinion about

25 placement in a female facility.  Now, one of your opinions is

1    that Ms. Iglesias previously was not placed in an appropriate

2    facility consistent with her gender identity, correct?

3    A.  Yes.

4    Q.  You are not familiar with the general policies for housing

5    inmates by the Federal Bureau of Prisons, correct?

6    A.  Only what I read in the material that I received.

7    Q.  Isn't it true that you testified at your deposition that

8    you do not have familiarity with the general policies for

9    housing inmates by the Bureau of Prisons?

10   A.  Correct, only what I was -- only what I received; was not

11   elaborate.

12   Q.  You're not familiar with how the determinations of where

13   to house inmates are made by the Bureau of Prisons, correct?

14   A.  Not specifically, no.

15   Q.  You've never personally been responsible for the

16   designation of inmates in a federal prison?

17   A.  Correct.

18   Q.  You're not familiar with the factors that the Bureau of

19   Prisons uses in considering the placement of inmates in

20   various federal facilities?

21   A.  I am not personally familiar with that.

22   Q.  But you are aware, correct, that federal prisons include

23   maximum-, medium- and low-level security facilities, correct?

24   A.  Yes.

25   Q.  But you don't know what factors are used in designated a

1    federal prison as a high-level facility?

2    A.  Not specifically.

3    Q.  And you don't know what factors are used in designating a

4    facility as a medium-level facility?

5    A.  Correct.

6    Q.  And you also aren't aware of how a federal inmate's

7    security level is calculated, correct?

8    A.  Correct.

9    Q.  And so in offering your opinion about the appropriateness

10   of placing Ms. Iglesias in a women's prison, you did not give

11   consideration to her security level, correct?

12   A.  Correct.

13   Q.  And you have no opinion as to when it would have been

14   appropriate to place Ms. Iglesias in a low-level security

15   federal institution?

16   A.  My opinion was based on binary nature of the prisons, male

17   and female, and that Ms. Iglesias, being female, belonged in a

18   female facility.

19   Q.  Let me clarify just a bit, because my question is a little

20   different.  Isn't it correct that you are not offering an

21   opinion today as to when it would have been appropriate to

22   place Ms. Iglesias in a low-level federal institution?

23   A.  I have not offered that opinion.

24   Q.  You also opined that Ms. Iglesias requires permanent hair

25   removal, correct?

1    A.  Yes.

2    Q.  Let's take a look at the WPATH standards of care again.

3    Is that legible?

4    A.  Yes.

5    Q.  The section is entitled "Options for Social Support and

6    Changes in Gender Expression," correct?

7    A.  Yes.

8    Q.  And one of the options that is considered to be in

9    addition to psychological and medical treatment are options

10   for hair removal, correct?

11   A.  Yes.

12   Q.  And it lists as hair removal options electrolysis, laser

13   treatment or waxing, correct?

14   A.  Yes.

15   Q.  So by their own terms, the standards of care don't express

16   a preference for one hair removal process over another,

17   correct?

18   A.  That's why they're flexible guidelines.

19   Q.  Thank you.  The WPATH standards of care don't distinguish

20   between the efficacy of electrolysis, laser treatment or

21   waxing with respect to gender dysphoria, correct?

22   A.  Correct.  That depends on the patient's ethnic heritage

23   and how much hair they have.

24   Q.  But isn't it --

25   A.  Some patients don't require any hair removal.  It's done

1    on an individual basis, the decisions.

2    Q.  Isn't it correct that the standards of care by their own

3    terms don't express any preference for one being more

4    effective than the other?  Correct?

5    A.  They don't address efficacy.

6    Q.  You state in your July declaration that Ms. Iglesias

7    having to shave her face is humiliating and compounds her

8    distress, correct?

9    A.  Yes.

10   Q.  You are aware now that the Bureau of Prisons has provided

11   Ms. Iglesias with hair removal lotion, correct?

12   A.  Did you say hair removal lotion?

13   Q.  Yes.  Let me repeat it just for clarity.  You are aware,

14   are you not, that the Bureau of Prisons has provided

15   Ms. Iglesias with hair removal lotion?

16   A.  I'm aware that she was provided with that.  I don't know

17   currently if that's being provided.

18   Q.  Did you hear Ms. Iglesias' testimony this morning that she

19   has been provided with hair removal lotion?

20   A.  I thought I heard that.

21   Q.  You have not expressed an opinion, correct, on whether

22   there's a period of time that someone should use hair removal

23   lotion before determining whether it's efficacious or not?

24   A.  I haven't expressed any opinions about that.

25   Q.  And you have testified previously in this matter that

1   you're not an expert on lotion removal of facial hair,

2   correct?

3   A.   That's true, yes.

4   Q.   So you have no opinion as to whether if Ms. Iglesias were

5   provided and is -- was using hair removal lotion whether that

6   would be consistent with the standards of care?

7   A.   I'm sorry.  Would you repeat that?

8   Q.   Certainly.  Isn't it true that you've stated that you have

9   no opinion as to whether if Ms. Iglesias were provided and was

10  using hair removal lotion whether that would be consistent

11  with the WPATH standards of care?

12  A.   It would be inconsistent with what WPATH has on their

13  website about hair removal being medically necessary.

14  Q.   Didn't you testify previously in this matter that you were

15  not offering an opinion as to whether if Ms. Iglesias was

16  provided and using hair removal lotion whether that would be

17  consistent with the standards of care?

18  A.   I don't believe I offered an opinion about that.

19  Q.   You agree, don't you, that the medical -- It's a good time

20  for water.

21  A.   I could use some myself if anyone has an extra.  Thank

22  you.

23  Q.   You agree, don't you, that the medical necessity of

24  electrolysis should be determined according to the judgment of

25  the referring physician?

1   A.   In consultation with the patient and their own experience

2   of distress and how effective depilatories are for that

3   individual.

4   Q.   But you have testified that you agree that the medical

5   necessity of electrolysis should be determined according to

6   the judgment of the treating physician, referring physician,

7   correct?

8   A.   I testified to that?

9   Q.   Do you agree with that statement, that the necessity

10  should be determined by the referring physician?

11  A.   I think that the necessity should be determined by the

12  individual and after initiating hormones, and then it would be

13  a choice between electrolysis and laser in terms of removing

14  that hair permanently.

15  Q.   This is page 89 at 15 through 22 from your deposition in

16  this matter, and the question asked is, "Now, this letter from

17  July 15th, 2016, says that it's WPATH's position that the

18  medical necessity of electrolysis should be determined

19  according to the judgment of the referring physician.  Do you

20  see that?"  Answer:  "Yes."  Question:  "Okay.  Do you agree

21  with that statement?"  Answer:  "Yes."  Did I read that

22  correctly?

23  A.   Yes.

24  Q.   And you don't know, do you, whether Ms. Iglesias ever

25  provided the Bureau of Prisons with a request from her medical

1   provider for permanent hair removal?

2   A.  I don't know that.

3   Q.  I'd like to change gears again.  This past July -- You

4   testified that this past July you conducted a full

5   psychological examination of Ms. Iglesias to determine her

6   current status, correct?

7   A.  Yes.

8   Q.  And in your opinion presently, Ms. Iglesias is not at risk

9   for attempting or completing suicide?

10  A.  In her present situation, is that what you -- Would you

11  repeat the question?

12  Q.  In your opinion, presently Ms. Iglesias is not at risk for

13  attempting or completing suicide?

14  A.  I don't think that she would do that in her present

15  situation as we sit here today.

16  Q.  You also do not believe that Ms. Iglesias is currently at

17  risk for surgical self-treatment at this point in time?

18  A.  As of today, I believe that she will not attempt surgical

19  self-treatment unless she is convinced or it remains uncertain

20  as to whether she will be provided with medically indicated

21  treatments.  If she's not and if she -- if the uncertainty

22  around that continues, I believe she's at risk for one of

23  three trajectories which I mentioned earlier.

24  Q.  Isn't it correct that in your deposition in this matter

25  you testified -- and I quote -- "As I sit here today, I don't

1    believe she is at risk for surgical self-treatment at this

2    point in time"?

3    A.  Yes, as of July and my evaluation with her, that was my

4    opinion.

5    Q.  And on that same day, isn't it true that you testified --

6    and I quote -- "My opinion is that presently Ms. Iglesias is

7    not at risk for attempting or completing a suicide"?

8    A.  That was my opinion at that time, yes.

9    Q.  Just a few final questions.  Isn't it correct that you

10   have been retained in at least 20 lawsuits against

11   correctional institutions involving a transgender inmate?

12   Correct?

13   A.  Correct.

14   Q.  You've never been retained by lawyers representing a

15   correctional institution, correct?

16   A.  Correct.

17   Q.  And over the course of your career, you have evaluated

18   over 40 inmates with gender dysphoria?

19   A.  That sounds appropriate, yes.

20   Q.  And all of those evaluations were done for litigation

21   purposes, correct?

22   A.  Yes.

23   Q.  And out of all of those evaluations, so over 40 inmates,

24   you concluded that approximately three inmates were getting

25   adequate care and didn't require additional care, correct?

```
 1   A.   If that's what I stated at that time, that was correct.

 2   Was that as of July you're referring to?

 3   Q.   This is from the transcript in the *Monroe* hearing.

 4   A.   Then that was true as of that time.

 5   Q.   Have you since concluded that additional inmates --

 6   transgender inmates were getting adequate and appropriate

 7   care?

 8   A.   I believe that there are inmates, yes, that are getting

 9   adequate care.

10   Q.   I'm sorry.  That wasn't my question.  Out of the

11   evaluations that you have completed for litigation purposes,

12   which we've established was over 40, isn't it correct that

13   approximately three of those evaluations you concluded that an

14   individual was getting adequate and appropriate care?

15   A.   I've since learned that there are others that are now

16   getting adequate care.

17   Q.   You're not a board certified psychiatrist?

18   A.   I am not.

19   Q.   And you're not a licensed psychiatrist, correct?

20   A.   Correct.  I'm not a psychiatrist.

21   Q.   You chair the WPATH Committee for Incarcerated Persons,

22   correct?

23   A.   Yes.

24   Q.   And you initiated the formation of that committee in 2009?

25   A.   Yes.
```

1    Q.  And one thing the WPATH Committee for Incarcerated Persons

2    does is discuss lawsuits establishing precedent?

3    A.  We did that on one occasion.

4    Q.  Another function of the WPATH Committee for Incarcerated

5    Persons is discussing potential revisions to the WPATH

6    standards of care as it relates to institutionalized

7    individuals, correct?

8    A.  Correct.

9    Q.  You are not a certified correctional health care

10   professional, correct?

11   A.  Correct.

12   Q.  And a certified correctional health care professional is a

13   designation from the National Commission of Correctional

14   Health, correct?

15   A.  I don't know.

16   Q.  Didn't you testify in the *Edmo* hearing that you understood

17   that a certified correctional health professional receives a

18   designation from the National Commission of Correctional

19   Health?

20   A.  I assume that's so.  I don't know that as a fact now.

21   Q.  You have never been published in a peer-reviewed journal

22   on a topic relating to providing care to transgender

23   individuals in prison?

24   A.  I currently have a publication in press in a surgical

25   atlas on health care for prisoners.

1  Q.  But at this time you do not have a published peer-reviewed

2  journal article on this topic, correct?

3  A.  I don't believe it's published at this time, correct.

4  Q.  You have not gone to any correctional institutes to

5  provide training on the care for transgender inmates, correct?

6  A.  To any correctional institutions?  Correct.

7  Q.  You are familiar with the Prison Rape Elimination Act, or

8  PREA, correct?

9  A.  Yes.

10  Q.  But you do not regard yourself as an expert in the PREA

11  standards, correct?

12  A.  Correct.

13  Q.  And none of the work you've done with prisons has involved

14  compliance with PREA obligations, correct?

15  A.  PREA has been involved in some cases, but it has not been

16  my -- but that's not my area of expertise.

17  Q.  Let me clarify.  I'm asking whether any of the work that

18  you've done with prisons involved their compliance with PREA

19  obligations.

20  A.  Only my review of records that have shown that they've

21  been in compliance with PREA recommendations.

22  Q.  You don't make the determination as to whether a prison is

23  in compliance with its PREA obligations, correct?

24  A.  Correct.

25  Q.  You've never been employed by a federal, state or local

```
 1  prison before, correct?
 2  A.  Correct.
 3  Q.  And you've never been to a federal or state prison for any
 4  purpose other than possibly observing an inmate's behavior or
 5  interviewing an inmate, correct?
 6  A.  Correct.
 7  Q.  And you've never treated a patient of yours who at the
 8  time you provide treatment was an incarcerated person,
 9  correct?
10  A.  They weren't incarcerated at that time.  They were
11  either -- incarcerated previously.
12  Q.  But you've never had a psychologist/patient, client
13  relationship with an individual who's currently incarcerated,
14  correct?
15  A.  I have not been the provider, correct.
16  Q.  And you have no formal training in prison operations?
17  A.  Correct.
18  Q.  You have no formal training in prison security issues.
19  A.  Correct.
20  Q.  And you do not regard yourself as an expert in
21  correctional security, correct?
22  A.  I do not.
23          MS. TALMOR:  Thank you, Dr. Ettner.  I have no
24  further questions.
25          THE COURT:  Dr. Ettner, I just have one question.  I
```

1   understand that you can't disclose what the revised standards

2   of care are going to be in the 8th edition, but would any of

3   your opinions change here today based on those revisions?

4          DR. ETTNER:  No.

5          THE COURT:  All right.  Thank you.  Any redirect?

6          MR. BLECHER-COHEN:  Yes, Your Honor.

7                      REDIRECT EXAMINATION

8   BY MR. BLECHER-COHEN:

9   Q.  Are you all set with water, Dr. Ettner?

10  A.  I am.  Thank you.

11  Q.  Just a few brief questions.  Dr. Ettner, do other medical

12  organizations sign on to amicus briefs?

13  A.  Yes.

14  Q.  Do they sometimes write legal briefs?

15  A.  I imagine they do.

16  Q.  Are the WPATH standards of care based on scientific

17  evidence?

18  A.  Scientific evidence and expert consensus, yes.

19  Q.  Do you have any concerns about the scientific basis for

20  the opinions you shared today about Ms. Iglesias' treatment?

21  A.  No.

22  Q.  And does the current research in the field of transgender

23  health support those opinions?

24  A.  Yes.

25  Q.  And, Dr. Ettner, have you written referrals before to

```
 1    surgeons for gender-affirming surgery?

 2    A.  Many.

 3    Q.  And are the materials and interactions that you review

 4    when writing those letters similar to those that you've

 5    conducted and seen about Ms. Iglesias?

 6    A.  No.  Typically they're less extensive.  I usually don't

 7    review an individual's entire medical and mental records to

 8    the extent that I reviewed Ms. Iglesias.

 9    Q.  If asked, would you feel able to write a letter in support

10    of Ms. Iglesias' receiving gender-affirming surgery to a

11    surgeon?

12    A.  Yes.

13    Q.  My colleague asked you a bit about waxing.  Is waxing an

14    appropriate treatment for Ms. Iglesias' specifically gender

15    dysphoria?

16    A.  Not waxing for facial hair.

17    Q.  Why not?

18    A.  Because waxing would not remove the extent of hair that

19    needs to be removed.  It might be appropriate for an underarm

20    or something like that where the hair is less visible and less

21    coarse and less dense.

22    Q.  You're saying that while waxing might be -- for the face

23    might be an appropriate treatment for some people, for

24    Ms. Iglesias it wouldn't be?

25    A.  Correct.
```

1    Q.  And my colleague also mentioned electrolysis and referring

2    physicians.  To be adequate treatment, would a referring

3    physician recommending any treatment for gender dysphoria need

4    to be one that's competent in the treatment of gender

5    dysphoria?

6    A.  Yes.

7    Q.  And why is that?

8    A.  In order to understand the phenomenology and the distress

9    that a gender dysphoric person experiences when these

10   secondary sex characteristics are obvious, in the same way

11   that a transgender man would bind their breasts until they

12   were able to have surgical removal because the presence of

13   that secondary sex characteristics is so abhorrent to the

14   individual.

15   Q.  And, Dr. Ettner, is -- if somebody is a transgender woman

16   living in a men's prison and experiencing violence, does that

17   mean that they're not -- or strike that.  Does the threat of

18   violence for a transgender woman in a men's prison affect

19   whether or not they're living in a gender congruent role?

20   A.  No.

21   Q.  Does real-life experience or experience in a gender

22   congruent role require you to be living with people of the

23   same gender?

24   A.  No.

25   Q.  And, Dr. Ettner, do you have an opinion about the

1   psychological effect on Ms. Iglesias if she does not receive

2   gender-affirming surgery and permanent hair removal?

3   A.  Yes.  As she noted in her conversations with her therapist

4   when discussing this, she states that it is so distressing

5   that it generates these -- this impulse to -- for surgical

6   self-treatment, the ideation, that it's extremely distressing

7   for her, and I think she described in great detail today the

8   way she has to work around the -- being in a situation where

9   other people can see that she's removing her hair, so she has

10  to try to cover her shadow with makeup and shave daily or

11  twice daily and that this was extremely distressing for her,

12  and I think she described that herself.

13  Q.  And, Dr. Ettner, do you have experience evaluating the

14  medical aspects that relate to whether somebody needs

15  gender-affirming surgery?

16  A.  Yes.  That's the role of the mental health professional,

17  is to refer the person to the surgeon.

18          MR. BLECHER-COHEN:  Your Honor, if I could confer

19  with my colleagues for a brief minute.

20          THE COURT:  You may.

21    (Off the record.)

22          MR. BLECHER-COHEN:  No further questions.  Thank you,

23  Dr. Ettner.

24          THE COURT:  All right.  Thank you, Dr. Ettner.  Does

25  the plaintiff have any additional witnesses?

 1          MR. KNIGHT:  No, Your Honor, we do not.

 2          THE COURT:  All right.  The defense may call their

 3   first witness.

 4          MR. KOLSKY:  Thank you, Your Honor.  Defendants call

 5   Dr. Alison Leukefeld.

 6          THE COURT:  All right.  Dr. Leukefeld, come on up to

 7   the stand.  Before you sit down, I'll have you take an oath.

 8      (Witness sworn.)

 9          COURTROOM DEPUTY:  Please be seated, and please state

10   your name for the record and spell your last name.

11          DR. LEUKEFELD:  My name is Alison Leukefeld,

12   L-E-U-K-E-F, as in Frank, E-L-D.

13          DR. ALISON LEUKEFELD, produced, sworn and examined on

14   behalf of the Defendants, testified as follows:

15                    DIRECT EXAMINATION

16   BY MR. KOLSKY:

17   Q.  Good afternoon, Dr. Leukefeld.

18   A.  Good afternoon.

19   Q.  Where are you currently employed?

20   A.  I'm employed for the Federal -- with the Federal Bureau of

21   Prisons.

22   Q.  And what is your job position at the Federal Bureau of

23   Prisons?

24   A.  I'm the administrator for the psychology services branch.

25   Q.  How long have you held this position?

1    A.  A year and a half.

2    Q.  And what are your job responsibilities?

3    A.  I'm responsible for oversight in the Federal Bureau of

4    Prisons of psychology services.  That includes the writing and

5    revision of policies, training and oversight of psychologists

6    and mid-level mental health providers.

7    Q.  Do you have any responsibilities with regard to BOP's

8    Transgender Executive Council?

9    A.  Yes.  I'm a member of the Transgender Executive Council.

10   Q.  Before going into more detail about your current job

11   responsibilities, can you briefly describe your work

12   experience?

13   A.  Yes.  I earned my Ph.D. in counseling psychology at the

14   University of Oregon, and since then I've been employed with

15   the Federal Bureau of Prisons, first at the Correctional

16   Federal Complex in Forrest City, Arkansas, where I worked as a

17   drug treatment specialist, a staff psychologist, a drug abuse

18   program coordinator and the chief psychologist.  After that I

19   came to the Central Office, and in the Central Office I was

20   first employed as the chief of mental health services and more

21   recently in my current position.

22   Q.  And you mentioned the Central Office.  What is the Central

23   Office?

24   A.  The Central Office is the Bureau of Prisons' headquarters.

25   It's located in Washington D.C. and it's where administrators

1    work.

2    Q.  What degrees do you hold?

3    A.  I hold a bachelor's degree, a master's degree in

4    counseling psychology and a doctorate in counseling

5    psychology.

6    Q.  And are you a licensed psychologist?

7    A.  I am.  I'm licensed in the state of Arkansas.

8    Q.  What, if any, involvement have you had in developing

9    policies related to the care of transgender inmates?

10   A.  I worked to help negotiate the transgender offender

11   manual, which is the primary policy for transgender

12   individuals, and also some other policies such as the

13   treatment and care of individuals with mental health -- with

14   mental illness, which might relate to some individuals who are

15   transgender.

16   Q.  What sort of trainings concerning transgender inmates have

17   you provided or overseen?

18   A.  My staff and I provided a training to all psychologists on

19   the transgender offender manual and transgender care when that

20   policy was issued.  We have also worked to provide training to

21   psychologists throughout the Bureau on transgender issues, and

22   that has involved bringing in experts from the outside as well

23   as providing smaller scale trainings to specific staff.

24   Q.  Are you responsible for providing any guidance to BOP

25   psychologists concerning the care of transgender inmates?

1    A.   Yes.   My staff and I are responsible for providing

2    guidance on the psychological care of transgender inmates to

3    approximately 600 psychologists who work across the agency.

4    Q.   And earlier you mentioned that you're a member of the

5    Transgender Executive Council.   I'm going to refer to that

6    today as the TEC.   What is the TEC?

7    A.   The TEC is a group of administrators who work in the

8    Central Office and who oversee the provision of not day-to-day

9    services for transgender inmates but the larger scale

10   decisions about transgender individuals, specifically

11   designation decisions and potentially surgery decisions.

12   Q.   What division at BOP is responsible for leading the TEC?

13   A.   The Reentry Services Division is the TEC.

14   Q.   And which other offices within BEP -- within -- excuse

15   me -- within BOP are on the TEC?

16   A.   The Correctional Programs Division and the Health Services

17   Division also have staff who are represented on the TEC.

18   Q.   What sorts of disciplines are represented on the TEC?

19   A.   Myself and another member are psychologists.   There is a

20   psychiatrist and a pharmacist, and there are also staff

21   members who have expertise in designations and case

22   management.

23   Q.   How often does the TEC meet?

24   A.   By policy it's required to meet monthly.   Typically it

25   meets every other week.

1    Q.   What is the Designations and Sentence Computation Center,

2    or DSCC?

3    A.   That is a section within the Correctional Programs

4    Division that oversees the placement of inmates in the BOP.

5    They make initial designations decisions, and then when

6    inmates are transferred they make decisions about the

7    redesignation.   They're experts in case management and

8    security and they ensure that inmates go to placements where

9    they'll be safe and that are appropriate for them.

10   Q.   What role does the DSCC have on the TEC?

11   A.   The DSCC plays a great support role on the TEC by ensuring

12   that as we discuss inmates and their placement, those

13   placements that are considered are consistent with the

14   inmate's security classification and also that we wouldn't be

15   placing an inmate, for example, at an institution where they

16   have a separatee, so those kinds of security and safety

17   issues.

18   Q.   Within BOP, who is primarily responsible for the

19   day-to-day health care needs of transgender inmates?

20   A.   The local staff at each institution are responsible for

21   the day-to-day care of transgender inmates.   Health services

22   would oversee decisions about hormones and psychology services

23   would oversee mental health care, and other staff are also

24   charged with decisions that affect transgender inmates;

25   commissary staff, for example.

1    Q.  So what role does the TEC play in transgender health care?

2    A.  The TEC looks at much larger decisions about transgender

3    health care and management, so as I mentioned before, the TEC

4    makes initial decisions about -- when inmates are new, they

5    make decisions about initial designations.  They also review

6    inmates at each designation decision, so whenever a

7    transgender inmate is put in for a transfer, the TEC considers

8    the case at that time.  As I mentioned before, they would also

9    make large scale decisions about surgery and support

10   institutions that they come -- if they're trying to make a

11   decision about something they're unfamiliar with, we would

12   provide guidance.

13   Q.  Doctor, do you currently treat any patients with gender

14   dysphoria?

15   A.  No, I don't.

16   Q.  And why not?

17   A.  I don't treat any patients in my present role as an

18   administrator.

19   Q.  Have you previously treated patients for gender dysphoria?

20   A.  No, I have not.

21   Q.  And do you regard yourself as a specialist in the

22   treatment of gender dysphoria?

23   A.  No, I do not.

24   Q.  Why do you serve on the TEC if you're not a specialist in

25   treating gender dysphoria?

1    A.  I'm a psychologist, and so I have a broad education in

2    mental health issues and also psychopathology.  I also oversee

3    mental health services throughout the agency, so as the TEC

4    thinks about where we might place transgender inmates, I'm

5    able to ensure that they go to institutions that have adequate

6    supports for them and that provide the kind of care that they

7    need.

8    Q.  And how has your broader psychological training prepared

9    you, if at all, to serve on the TEC?

10   A.  Well, as I mentioned before, as a psychologist, I'm very

11   familiar with psychopathology.  I'm familiar with gender

12   dysphoria.  I'm familiar with many of the mental health

13   concerns that transgender inmates may have in addition to

14   potentially gender dysphoria, and I'm well aware of the kinds

15   of services that we can provide to those inmates.

16   Q.  Do you have staff who have expertise in the treatment of

17   gender dysphoria?

18   A.  Yes, I do.

19   Q.  To what extent do you rely upon the expertise of your

20   staff in developing policies and providing advice concerning

21   gender dysphoria?

22   A.  I rely on them considerably.  So I have staff who have

23   provided a great deal of transgender care in the field before

24   they came to work for me in the Central Office, and they

25   support the kinds of guidance that we give to the field.  They

1   support policies and they help to devise training for the

2   field as well.

3   Q.  And roughly how many people are encompassed within your

4   staff?

5   A.  About 40 people work for me in the Central Office.

6   Q.  If a BOP psychologist felt the need to consult a

7   specialist in gender dysphoria, are there opportunities to do

8   so?

9   A.  Yes, absolutely.

10  Q.  And have there been circumstances in which BOP

11  psychologists have reached out to specialists on gender

12  dysphoria?

13  A.  Yes, and in addition, my staff and I support those types

14  of outreach.  So for example, we've arranged for staff from

15  our institutions to travel to WPATH conferences and we have

16  arranged for experts to visit institutions where psychologists

17  are supporting transgender inmates.

18  Q.  I want to ask you some questions about the guidance and

19  standards that BOP uses to provide care to transgender

20  inmates, but first, you mentioned WPATH.  Are you familiar

21  with the standards of care developed by WPATH?

22  A.  I am.

23  Q.  To what extent does BOP follow the WPATH standards of care

24  in providing care and treatment to transgender inmates?

25  A.  BOP uses the WPATH standards as a guide, but we do not

1    follow them in entirety, and that's because they weren't

2    developed specifically for correctional settings.

3    Q.  Do the BOP -- or excuse me.  Did the WPATH standards of

4    care state that they apply to correctional institutions?

5    A.  I believe they state that they apply to correctional

6    institutions, but they don't provide great detail in regard to

7    how they would be adapted to correctional institutions.

8    Q.  So in your view, what, if any, limitations did the WPATH

9    standards of care have as applied to correctional

10   institutions?

11   A.  Correctional institutions have safety as a primary goal

12   always in everything that we do, and so when we think about

13   the placement of inmates in different institutions, we have to

14   always consider where they would be safe, how the placement of

15   any particular inmate would impact the safety of their peers,

16   and those kinds of decisions by necessity have to be a

17   priority, and they impact our ability to, for example, place a

18   transgender woman into a female facility.

19   Q.  Doctor, are you familiar with the Prison Rape Elimination

20   Act, also known as PREA?

21   A.  I am.

22   Q.  At a high level, what does PREA require of BOP?

23   A.  At the highest level it requires that we prevent sexual

24   assault and sexually abusive behavior in our prisons, and

25   there are some specific provisions as well for transgender

1    individuals in regard to keeping them safe.

2    Q.  Do the WPATH standards of care address BOP's obligations

3    under PREA?

4    A.  No, they don't.

5    Q.  Given the limitations of the WPATH standards of care, has

6    BOP developed its own guidance for the treatment of

7    transgender inmates?

8    A.  Yes, BOP has.

9    Q.  What guidance has BOP developed?

10   A.  Well, one example would be that we work to move inmates

11   from higher -- transgender women, for example, from higher

12   level security to lower security level institutions as a part

13   of their transition, and that's so that we can eventually move

14   them into female facilities.

15   Q.  And are there any policies that BOP has developed

16   regarding the care of transgender inmates?

17   A.  Yes.  I believe you're referring to the idea that we

18   keep -- that we would like to see those inmates placed --

19   transgender women placed in a female facility for 12 months

20   before we consider surgery, and that allows for them to be

21   able to adjust, to socially transition to living with female

22   peers, and also allows us to ensure that they're going to be

23   able to stay in that placement successfully before providing

24   surgery which is permanent.

25   Q.  Have there been circumstances where transgender inmates

1    have been placed in female facilities and later were

2    transferred back to male facilities?

3    A.   Yes, there have.

4    Q.   Under what circumstances?

5    A.   I can think of two cases where that has happened.   In one

6    of the cases, the transgender woman was in a female facility

7    and requested to return to a male facility.   She didn't feel

8    comfortable around her peers and ultimately decided that she

9    would feel more comfortable back at a male institution.   In

10   the other case I'm aware of, the transgender woman was placed

11   in a female facility and didn't behave in a way that

12   ultimately we felt was safe for her peers, so on two occasions

13   she disrobed in the institution, outside in the open compound,

14   and she also used some strong and vulgar language really to

15   talk about her attraction to her female peers.   Ultimately we

16   decided that she was not safe there with her peers, and so we

17   moved her -- or she was making her peers feel unsafe, and so

18   we moved her back to a male institution.

19   Q.   Do you know if Ms. Iglesias has ever requested to be

20   transferred from her female facility back to a male facility?

21   A.   She did request that, I believe about three months after

22   she arrived.

23   Q.   And did she withdraw that request?

24   A.   Yes, she did.

25   Q.   What significance, if any, do you attribute to

1   Ms. Iglesias' request to be transferred back to a male

2   facility?

3   A.   I think that the social adjustment of moving from a male

4   prison to a female prison is significant and it can be

5   challenging, and because that adjustment is so large, living

6   in a female institution is so very different, that's why we've

7   stated that we would like to see transgender women live for

8   12 months in a female facility before surgery.

9   Q.   Do all transgender inmates request to be placed in prisons

10  consistent with their gender identity?

11  A.   No, they don't.

12  Q.   How did BOP develop the 12-month requirement?

13  A.   Well, the 12-month requirement really is an adaptation of

14  the WPATH standard which talks about living in one's gender

15  role for 12 months prior to surgery.

16  Q.   Do you know the reason why WPATH recommends a 12-month

17  period of living in one's preferred gender before approving

18  gender confirmation surgery?

19  A.   Yes.  I believe it's because they recommend that period

20  for social adjustment and engagement and really living in

21  one's role and consolidating those experiences.

22  Q.   So how does the WPATH 12-month standard compare to BOP's

23  12-month standard?

24  A.   In many ways it's quite similar.  It's an opportunity to

25  socially adjust and to engage with peers and to consolidate

1    one's gender identity in relationship to peers, which although

2    parts of that can be done for a transgender woman living in a

3    male prison, other parts of it simply can't, and living with

4    female peers in a prison is a unique experience, and that is

5    where the individual would be housed following surgery, so

6    it's important that they can be successful in that setting.

7    Q.  Is the BOP's 12-month requirement written into BOP policy?

8    A.  No, it's not.

9    Q.  Why not?

10   A.  Well, I think it's something that we -- that evolved as we

11   were looking to consider how we would transition people who

12   were requesting that transition to happen, and it seems like

13   an appropriate application of the WPATH standard and also a

14   way to ensure safety of inmates, both transgender individuals

15   and peers.

16   Q.  Has BOP's -- excuse me.  Has BOP's 12-month requirement

17   been applied to inmates other than Ms. Iglesias that are

18   seeking gender confirmation surgery?

19   A.  Yes, it has.

20   Q.  Can you approximate the number of other inmates the

21   12-month requirement has been applied to?

22   A.  I believe I can.  I'm not -- Not all inmates who are

23   requesting to be moved to a female facility are also

24   requesting surgery, so a very broad estimate might be 20 to

25   30.

1   Q.  Now, you've testified about the security concerns with

2   placing an anatomically female inmate into a male prison.  Has

3   BOP ever placed a male transgender inmate who was anatomically

4   female into a male prison?

5   A.  Yes, we have.

6   Q.  How, if at all, are the safety and security concerns

7   different or similar between the placement of a transgender

8   man in a men's prison and the placement of a postsurgical

9   transgender female in a men's prison?

10   A.  They would be the same.

11   Q.  And why did the TEC recommend transfer of the male

12   transgender inmate into a men's prison given those concerns?

13   A.  Yes.  The TEC had significant concerns about the

14   transgender man's safety in a male prison and wanted for him

15   to have the opportunity to progress in his transition at his

16   request, and so we worked very carefully to ensure that we

17   would -- we chose with, for example, the designation staff the

18   most appropriate setting, the most appropriate unit and

19   institution, where we provided training to staff before the

20   placement took place.  We went -- We did as much as we could

21   to make sure that that placement would be safe and successful.

22   Q.  And that individual had requested to be placed in a men's

23   prison.

24   A.  Correct.

25   Q.  I want to turn to BOP's care and treatment of

1   Ms. Iglesias.  Are you aware that Ms. Iglesias has been

2   diagnosed with gender dysphoria?

3   A.  I am.

4   Q.  What treatments or accommodations for gender dysphoria has

5   BOP provided to Ms. Iglesias?

6   A.  So BOP has provided a number of treatments and

7   accommodations to Ms. Iglesias, many of which have been

8   discussed today.  She's been on hormones, I believe since

9   2015.  She is able to receive female commissary items and was

10  even when she was in a male prison.  She's been placed at a

11  female prison.  She receives female pat searches.  I may have

12  missed something, but those are the ones that I recall right

13  now.

14  Q.  Do you know if Ms. Iglesias has received any mental health

15  treatment during her time at BOP?

16  A.  Yes.

17  Q.  Can you talk about what sort of treatment?

18  A.  She's received a great deal of mental health treatment in

19  her time at BOP.  She has participated in a number of

20  residential treatment programs, which typically involve four

21  hours a day of counseling and treatment, and she has been

22  classified since the care level system was put into place as

23  either care level 2 or 3, which means that she's required to

24  meet with a psychologist once a month if her classification is

25  care 2 and once a week if her classification is care 3.  She's

1  participated in many, many groups and individual treatment

2  sessions to support her mental health.

3  Q.  And she's participated in residential programs?

4  A.  Yes, she has.

5  Q.  How long do those residential programs last?

6  A.  Those residential programs typically last nine months to a

7  year.  I don't know if she finished all of the residential

8  programs that she participated in, but they're long-term

9  programs that, as I mentioned before, include half-day mental

10  health treatment and also provide a milieu where there's lots

11  of support and engagement both from staff and from inmate

12  peers.

13  Q.  And you testified that Ms. Iglesias has been classified as

14  level care 2 or 3?

15  A.  Uh-huh.

16  Q.  What percentage of BOP's inmate population is at a

17  level 2, 3 or 4?

18  A.  5 percent, so she's among a group -- a small group of

19  inmates who are getting a great deal of care.

20  Q.  Approximately how long have these various accommodations

21  been in place?

22  A.  As I mentioned, the hormones have been in place since

23  2015.  Her mental health care has been in place throughout her

24  incarceration and has only increased in 2014.  That's when the

25  care level system came into place, so she would have been

1  care 2 or 3 after that, and she's been receiving psychiatric

2  medicine as well, so --

3  Q.  Where is Ms. Iglesias currently housed?

4  A.  She's housed in FMC Carswell.

5  Q.  And is FMC Carswell a women's prison?

6  A.  It is.

7  Q.  Is she currently in protective custody at Carswell?

8  A.  She is.

9  Q.  When was Ms. Iglesias transferred to Carswell?

10 A.  She was transferred to Carswell in May of this year, I

11 believe.

12 Q.  Why didn't the TEC recommend Ms. Iglesias' transfer before

13 this year?

14 A.  Before this year, two reasons.  One is that her security

15 level was not consistent with a female prison prior to this.

16 Female prisons only are classified as low or minimum, and

17 Ms. Iglesias was a male low or medium or high security inmate

18 prior to recently.  In addition, there was a time when we

19 looked at moving her recently, and at the time we looked, her

20 hormones were not at the goal level, and so it was not a good

21 time to move her then.

22 Q.  Okay.  So I want to ask you about each of those, the

23 security level and the hormones.  Why does the TEC require a

24 transgender inmate's hormone levels to reach the goal range

25 before recommending transfer to a female facility?

1   A.   Sure.   Transgender inmates typically want their hormones

2   to be within the goal level, that they give the effects that

3   they're looking for such as softer skin, but they also serve a

4   number of purposes that are related to security concerns, so

5   when inmates -- when female transgender inmates are on

6   hormones and those hormones are at goal level, their libido is

7   lowered, they have less muscle mass and they're less likely to

8   have erections, and those are important for security concerns

9   in a correctional setting.

10  Q.   If an inmate is a transgender female, why is there still a

11  concern about the ability to maintain erections and sexual

12  activity in a female facility?

13  A.   Sexual orientation and gender identity are two separate

14  constructs that run on different continuums, so there's no

15  reason to assume a transgender female is necessarily attracted

16  to men or to assume that she is heterosexual.   A transgender

17  female could be heterosexual or have a different sexual

18  orientation.

19  Q.   Are you aware that Ms. Iglesias had previously met hormone

20  target levels before the TEC had recommended her transfer to a

21  women's prison?

22  A.   Yes, I am.

23  Q.   And why didn't the TEC recommend Ms. Iglesias be

24  transferred to a women's prison at that time when her hormone

25  levels had met the goal range?

1    A.  When her hormone levels were within goal range, she was

2    still classified as a medium security male, which is a

3    significantly higher security classification than is

4    appropriate for a low-security female prison.

5    Q.  Why does the TEC believe it is important that an inmate

6    not be transferred directly from a higher level men's prison

7    to a lower level women's prison?

8    A.  Well, it's for safety and security of the inmate peers who

9    will be there in prison with the transgender individual who

10   would be skipping security levels down to a much lower

11   facility.  The BOP has a classification system that's designed

12   to keep inmates safe and to ensure that a more dangerous

13   individual isn't put with less dangerous peers.

14   Q.  So did the TEC recommend that Ms. Iglesias be transferred

15   to a lower level men's prison?

16   A.  Yes, it did.  She was at USP Marion, which is a medium,

17   and we made a recommendation specifically to aid in her

18   transition that she move to FMC Lexington, which is a

19   low-security male prison.

20   Q.  And what is an FMC?

21   A.  It's a federal medical center.

22   Q.  What is a federal medical center?

23   A.  It's a hospital that also functions as a prison.

24   Q.  Now, did you hear Ms. Iglesias' testimony this morning

25   that staff at FMC Carswell allegedly told her that she would

1   be transferred back to a male prison?

2   A.  I did.

3   Q.  Would any such transfer have to be approved by the TEC?

4   A.  It absolutely would.

5   Q.  Does the TEC have any plans to transfer Ms. Iglesias back

6   to a men's prison?

7   A.  None.  The only reason she would be transferred back is if

8   she were not able to be -- if her peers were not able to be

9   safe there, and that has not been the case.  The TEC is not

10  considering that at this time.

11  Q.  I next want to ask you about gender confirmation surgery.

12  Has the TEC ever recommended gender confirmation surgery for a

13  transgender inmate at BOP?

14  A.  Yes, it has.

15  Q.  When did it do so?

16  A.  It did so in October of this year.

17  Q.  Had that inmate been in a prison consistent with her

18  gender identity for more than 12 months?

19  A.  Yes, she had.

20  Q.  Has Ms. Iglesias made requests for gender confirmation

21  surgery?

22  A.  Yes, she's made those requests.

23  Q.  Has the TEC recommended Ms. Iglesias for surgery?

24  A.  Not at this time, because she's not yet been in a female

25  prison for 12 months.

1   Q.  Has the TEC conducted a psychological or psychiatric

2   evaluation of Ms. Iglesias?

3   A.  No, the TEC has not.  We would rely on local prison staff

4   to do that.

5   Q.  Are you aware that Ms. Iglesias has stated that

6   Dr. Langham, one of her treating physicians, supports her

7   request for gender confirmation surgery?

8   A.  I'm aware she's stated that.

9   Q.  What reaction, if any, do you have to Ms. Iglesias' claim

10  about Dr. Langham?

11        MR. KNIGHT:  Objection to the extent this calls for

12  hearsay.

13        MR. KOLSKY:  Your Honor, my understanding is the

14  Seventh Circuit has ruled that hearsay may be considered at a

15  preliminary injunction hearing, and this also goes to the

16  TEC's knowledge of this claim.  As I understand it, plaintiffs

17  are claiming that the TEC ignored requests from providing --

18  from medical providers, and so it's relevant to know what the

19  TEC's knowledge about that is.

20        THE COURT:  All right.  I'll allow it.

21  Q.  (By Mr. Kolsky)  I'll re-ask the question.  What reaction,

22  if any, do you have to Ms. Iglesias' claim about Dr. Langham?

23  A.  I was surprised to hear that claim, as I have no knowledge

24  of it.  I did have a conversation with Dr. Langham, and he

25  indicated that he did not say that to Ms. Iglesias.

1    Q.  Same question concerning Dr. Quick, Ms. Iglesias' treating

2    psychologist.

3    A.  I also had a conversation with Dr. Quick, who indicated he

4    did not tell Ms. Iglesias that she was, you know, to have

5    surgery.

6    Q.  And same question about Dr. Pass, the clinical director at

7    USP Marion.

8    A.  The same.  I had a conversation with Dr. Pass, who

9    informed me that he did not tell Ms. Iglesias that he was

10   submitting her for surgery.

11   Q.  Now, this morning, did you hear Ms. Iglesias' --

12   Ms. Iglesias list some additional health care professionals

13   that she believes support her request for surgery;

14   specifically, Dr. Munneke, Dr. Hernandez and Dr. Owings?

15   A.  I heard that.

16   Q.  Have you seen anything to corroborate Ms. Iglesias'

17   testimony in that regard?

18   A.  I see nothing in the record that supports that.

19   Q.  If those individuals supported Ms. Iglesias' request for

20   surgery, could they have informed the TEC?

21   A.  Yes, they could have and should have if they wanted for

22   something to move forward in that regard.

23   Q.  To your knowledge, have they so informed the TEC?

24   A.  No.

25   Q.  Has BOP made any determinations regarding placement of

1  Ms. Iglesias in a residential reentry center, otherwise known

2  as a halfway house?

3  A.  Yes.  Ms. Iglesias is ending -- nearing the end of her

4  sentence, and the BOP has determined that she should go to a

5  halfway house in March.

6  Q.  March of what year?

7  A.  March of 2022.

8  Q.  Thank you.  What is the gender of the inmates in the RRC

9  that Ms. Iglesias will be placed in?

10  A.  Female.

11  Q.  And who will be responsible for Ms. Iglesias' medical care

12  while she is in the halfway house?

13  A.  The BOP is responsible for inmates' medical care in the

14  halfway house.

15  Q.  Has the BOP determined when it will next assess

16  Ms. Iglesias for surgery after she is transferred to the

17  halfway house?

18  A.  Yes.  She's transferred in March, and the TEC determined

19  that they would assess her for surgery in April.  That's

20  slightly less than 12 months, but if she's assessed in April,

21  that will allow enough time potentially for her to have

22  surgery and recover before the end of her BOP term.

23          MR. KOLSKY:  Thank you, Doctor.  I have no further

24  questions at this time.

25          THE COURT:  I have just a few I want clarification.

1    I think you just answered one of my questions, but I was

2    wondering if her transfer to the RRC would impact her ability

3    to meet that 12 months.  So you're saying that they will still

4    evaluate her even after she has been transferred?

5                DR. LEUKEFELD:  We'll still evaluate her even after

6    she has been transferred and one month prior to the 12-month

7    mark.

8                THE COURT:  Okay.  And if a transgender inmate is

9    receiving medications -- antidepressant medications and

10   antianxiety medications and yet they're still suffering from

11   depression and anxiety, would you agree that those symptoms

12   would stem, then, from gender dysphoria?

13               DR. LEUKEFELD:  I'm sorry.  Can you say that again?

14               THE COURT:  So if they're on antidepressant

15   medications and antianxiety medications but yet still have

16   depression and anxiety and they've been diagnosed with gender

17   dysphoria, would you agree that then those conditions are

18   coming from the gender dysphoria?

19               DR. LEUKEFELD:  Not necessarily.  There are a number

20   of -- Medications and psychotherapy may be working to a

21   certain extent but may not have achieved all of their

22   potential, and I don't believe that medications work in such a

23   way that they treat certain kinds of depression and anxiety

24   but not other kinds, so I think that it's possible that gender

25   dysphoria exists and depression and anxiety exist, and the

1    extent to which they're interrelated is difficult to pull

2    apart.

3              THE COURT:  Okay.  And you talked about the makeup of

4    the TEC.  There are no medical doctors on it, correct?

5              DR. LEUKEFELD:  Correct.

6              THE COURT:  All right.  So the -- if a --

7              DR. LEUKEFELD:  I'm sorry.  There's a psychiatrist,

8    so yes.

9              THE COURT:  The psychiatrist, but the -- so would you

10   make a referral, then, for a medical examination -- if the TEC

11   was considering, say, that an inmate at a -- seeking

12   gender-confirming surgery at a female facility, hormone levels

13   are stabilized, would you then refer her for a medical

14   evaluation?

15             DR. LEUKEFELD:  Yes.  For example, in the case where

16   the TEC recently made a recommendation for surgery, we of

17   course are working with the local health care professionals,

18   and when we made that recommendation, we referred it to BOP's

19   medical director, who will ensure that the individual is

20   appropriate for surgery, that there are no contraindications,

21   and look for a surgeon.

22             THE COURT:  Okay.  Has that person who was recently

23   recommended for surgery received the surgery?

24             DR. LEUKEFELD:  They have not, because that process I

25   just discussed is happening right now.

1          THE COURT:  Okay.  And how long does it take once the

2   TEC approves that for that next stage to go on?

3          DR. LEUKEFELD:  I don't know for certain, but I don't

4   think that it takes a very long time.  I anticipate that a

5   surgeon will be identified in the near future.

6          THE COURT:  Okay.  Are there any transgender inmates

7   in BOP's custody who have received surgery?

8          DR. LEUKEFELD:  No.

9          THE COURT:  All right.  And do you know how many BOP

10  has evaluated for surgery?

11         DR. LEUKEFELD:  This will be the first.

12         THE COURT:  Okay.  And so your testimony is that

13  there's no medical provider who has recommended that

14  Ms. Iglesias receive surgery; is that correct?

15         DR. LEUKEFELD:  Correct.  BOP's procedure is that the

16  TEC would be making that recommendation and medical providers

17  would refer the person in consideration to the TEC.

18         THE COURT:  Okay.  Do you want to follow up on any of

19  that?

20         MR. KOLSKY:  No.  No further questions.

21         THE COURT:  Why don't we take a short break.  We'll

22  resume at 2:15 with cross examination.

23    (Brief recess taken.)

24         THE COURT:  Before you begin, I remembered another

25  question that I had.  You had mentioned about female

1   facilities being low or minimum.

2           DR. LEUKEFELD:  Uh-huh.

3           THE COURT:  I would assume -- I don't know -- but

4   aren't there women who come into BOP who are at a medium or a

5   high security level?

6           DR. LEUKEFELD:  Our classification system has really

7   just two levels for women, and they're minimum and low, and

8   there's one very small unit -- it's actually FMC Carswell --

9   that houses -- the last time I looked, it was seven women who

10  are -- one was on death row and the others were very, very

11  high security, but it's a very small kind of singular unit for

12  women who don't fit into those other two classifications.

13          THE COURT:  Okay.  Didn't know that.  All right.

14  Cross examination.

15          MR. KNIGHT:  Your Honor, I have binders of some of

16  the documents to -- I'm hoping this makes it easier for people

17  to be able to see the documents, so I can provide one to the

18  Court and one to the witness.

19          THE COURT:  Has Counsel been given these or you have

20  one for Counsel as well?

21          MR. KNIGHT:  I do have one for Counsel as well.

22          THE COURT:  Do you happen to have an extra for my law

23  clerk?

24          MR. KNIGHT:  No, unfortunately, I don't.

25          THE COURT:  Okay.  That's fine.

```
 1              MR. KNIGHT:  I am going to use some additional
 2    documents which are not binders, and I may not actually seek
 3    admission of all the things that are in the binder, but --
 4              THE COURT:  All right.  You may proceed.
 5              MR. KNIGHT:  I'm ready.
 6                        CROSS EXAMINATION
 7    BY MR. KNIGHT:
 8    Q.  Dr. Leukefeld, nice to meet you.  I'm John Knight.  I
 9    represent the plaintiffs.  We met, I think, at your
10    deposition.  Okay.  Dr. Leukefeld, you would agree that gender
11    dysphoria is a serious medical condition?
12    A.  Yes.
13    Q.  Okay.  And you would agree that untreated, it can result
14    in suicide, self-castration, self-mutilation?  You understand
15    that?
16    A.  Yes.
17    Q.  The same can be true of inadequately treated gender
18    dysphoria, right?
19    A.  Correct.
20    Q.  And whether gender dysphoria is adequately treated is
21    going to be judged against the professional standards of care
22    applicable to treatment of that condition, right?
23    A.  Yes.
24    Q.  And the prevailing standards for treatment of gender
25    dysphoria are the WPATH standards of care, correct?
```

1    A.   They are the most -- Yes, they are the standard.

2    Q.   Hormone therapy is a form of treatment for gender

3    dysphoria?

4    A.   Yes.

5    Q.   And it can be medically necessary for transgender

6    prisoners?

7    A.   Yes.

8    Q.   Okay.  And you understand and I think you talked about is

9    that the Bureau of Prisons has not always provided that for

10   people who were not on hormones prior to being incarcerated.

11   A.   There was a time when BOP did not provide hormone therapy,

12   that's true.

13   Q.   They had a -- what was called a freeze frame policy?

14   A.   Correct.

15   Q.   They would not -- Someone who didn't have them before,

16   they would not provide them, correct?

17   A.   Correct.

18   Q.   And --

19   A.   That is no longer the case, but that was the case --

20   Q.   Right.  That changed in 2011; do you recall that?

21   A.   I don't recall the exact year, but, yes, that did change,

22   and it was some time ago.

23   Q.   Okay.  And it changed as a result of a lawsuit.  You must

24   be aware of that.  Social transition, I believe you've talked

25   about, or if I'm remembering correctly, you understand that's

1    access to clothing, grooming items, correct?

2    A.  Yes.

3    Q.  And that can be medically necessary for treatment of some

4    people with gender dysphoria.

5    A.  Yes.  My understanding is it includes access to those

6    items as well as the utilization of them with peers and people

7    with whom you have relationships.

8    Q.  Right.  And use of correct pronouns for someone as well as

9    names, a gender appropriate name that someone chooses,

10   correct?

11   A.  Yes.

12   Q.  Being searched by persons of your gender, I believe you

13   talked about that.  That's part of social transition, correct?

14   A.  Correct.

15   Q.  And that can be medically necessary for some people.

16   A.  Yes.

17   Q.  Hair removal, permanent hair removal, can be medically

18   necessary for some transgender individuals.  You would agree

19   with that?

20   A.  For some people, yes.

21   Q.  And that can include electrolysis or laser hair removal.

22   You know that, correct?

23   A.  Correct.

24   Q.  I'm sorry.  It's just important for the record that we get

25   an answer.  Has the Bureau of Prisons ever provided permanent

1    hair removal for any transgender women?

2    A.  Not that I'm aware of.

3    Q.  So effectively, they've got a blanket rule against it at

4    this stage.

5    A.  I wouldn't agree with that, but it has not been done.

6    Q.  Well, a de facto rule against it.  It's just never

7    happened.

8    A.  It has never happened.

9    Q.  And surgery, that's medically necessary for some

10   transgender people?  You would agree with that?

11   A.  I agree.

12   Q.  Okay.  But again, I think as you testified before, the

13   Bureau of Prisons has never provided surgery to any

14   transgender individual.

15   A.  We're in the process of doing that for the first time now,

16   but we have never done it before.

17   Q.  Whether someone needs surgery is a medical decision,

18   correct?

19   A.  A medical and a mental health decision, yes.

20   Q.  Okay.  And I believe you -- if I recall correctly, you had

21   said that you believe that cognitive behavioral therapy is a

22   treatment for gender dysphoria.  Did I misunderstand?

23   A.  I believe that it is a treatment for gender dysphoria,

24   yes.

25   Q.  Okay.  You would agree, though, that even if that's true,

1    it's not sufficient for some transgender individuals, is it?

2    A.  For some people, I agree, it's not sufficient.

3    Q.  The Bureau understands that transgender women face serious

4    risks of harm in male facilities.

5    A.  Yes.

6    Q.  They often face sexual harassment and even rape.

7    A.  Yes.

8    Q.  And for some transgender women in male facilities -- some

9    transgender women in male facilities have experienced those

10   things, sexual assault and rape.

11   A.  Yes, they have.

12   Q.  And you would agree that the risk of those things

13   happening is much greater for a transgender woman in a male

14   facility than in a female facility.

15   A.  Yes.  There's potential risk for all prisoners and BOP

16   works hard to mitigate that, and it is greater in a male

17   facility.

18   Q.  For transgender women it would certainly be greater in a

19   male facility than in a female facility.

20   A.  Yes.

21   Q.  Okay.  We've talked about the Transgender Executive

22   Council, and I -- you've talked about the fact that there are

23   two psychologists; yourself; Dr. McLearen, I believe, is a

24   psychologist on that committee; is that right?

25   A.  Correct.

1    Q.  And Dr. Lewis is the chief psychiatrist?

2    A.  Uh-huh.  Yes.

3    Q.  Ms. Epplin.  Now, I take it Ms. Epplin -- and correct me

4    if it's Dr. Epplin, but is Ms. Epplin a psychologist?

5    A.  She is not.

6    Q.  Okay.  Does she have medical training or mental health

7    training?

8    A.  She has case management background.

9    Q.  Okay.  And then there are the Correctional Service

10   Division individuals; Ms. Jeter, correct?

11   A.  Correct.

12   Q.  And some of her staff who participate?

13   A.  That's right.

14   Q.  And then Ms. Robbins, who's the chief of the DSCC.  So

15   those individuals -- none of those individuals have medical

16   training, right?

17   A.  Correct.  Ms. Robbins works for Ms. Jeter at DSCC, and,

18   no, Dr. Lewis, as you mentioned before, is a psychiatrist with

19   medical training, and Chris Bina is a pharmacist.

20   Q.  Okay.  And you said that you don't consider yourself to be

21   an expert in treating gender dysphoria, right?  And I'm

22   assuming the same is true for several of these other

23   individuals.  Would you agree that -- Mr. Bina is a

24   pharmacist, for example.  You would not consider him an expert

25   in treatment of gender dysphoria, would you?

1   A.   I wouldn't speak for him on that.   I don't know what his

2   training as a pharmacist is in regard to the medications that

3   might be used.

4   Q.   Okay.  But you would not call him an expert in that field,

5   would you, in the treatment of gender dysphoria?  I mean, he

6   addresses pharmacy issues for everything, doesn't he?

7   A.   Yes, that's correct.

8   Q.   Are any of these individuals experts in the field of

9   treatment of gender dysphoria?

10  A.   All of these individuals have expertise in the

11  correctional management of individuals who identify as

12  transgender.

13  Q.   But you -- okay.  Correctional management, right?  Right.

14  But not the medical treatment of gender dysphoria.

15  A.   That's correct.  Now, the expertise may come from local

16  staff who work in our prisons and are providing the treatment

17  on a day-to-day basis.

18  Q.   Okay.  And you've never provided medical treatment for

19  Ms. Iglesias?

20  A.   Correct.

21  Q.   And nobody else on the TEC has provided medical treatment

22  for her directly, has it?

23  A.   Correct.

24  Q.   Okay.  And you said it's involved in placement, but the

25  TEC also makes the decision about surgery, correct?

1    A.  Yes, the TEC makes a recommendation for surgery that is

2    passed to the chief medical officer, who then would make

3    arrangements for surgery.

4    Q.  So -- But no one's going to get surgery unless they get

5    past the TEC; is that right?

6    A.  The TEC is the body that makes the recommendation for

7    surgery, that's correct.

8    Q.  So -- But in other words, if the TEC doesn't approve

9    someone having surgery, it's not going to happen.

10   A.  That's correct.

11   Q.  Okay.  And the TEC has also made recommendations about

12   other forms of medical treatment, like hair removal.

13   A.  It can.

14   Q.  And it has.

15   A.  I'm not sure.

16   Q.  Okay.  But that's something that might come before the

17   TEC.

18   A.  It possibly is, because an institution could go ahead and

19   provide hair removal, but they might look to the TEC for

20   advice on something like that if they hadn't done it before.

21   Q.  Okay.  But when we're -- I think you said before that the

22   BOP has never provided permanent hair removal, right?

23   A.  I said I didn't believe it has.

24   Q.  Okay.  But -- So when you're talking about hair removal at

25   this moment, you're talking about shaving and lotions, is that

1    right, for hair removal; Nair, for example?

2    A.   I think you -- I thought you were speaking about permanent

3    hair removal.

4    Q.   Right, and I'm asking, is that the kind of thing that

5    would come before the TEC?

6    A.   Potentially, but it also might be done at -- by the

7    institution-level staff.   They're not required to ask the TEC

8    about that intervention.

9    Q.   Could the local staff provide permanent hair removal to an

10   individual without the TEC approval?

11   A.   I believe they could.   They've not been told that they

12   have to ask for that.

13   Q.   Okay.   But as far as you know, it's never happened.

14   A.   As far as I know, but like I said, I wouldn't necessarily

15   know of everything that happens locally.

16   Q.   Well, doesn't the local staff have to look to the TEC for

17   guidance on a number of medical issues, like surgery?

18   A.   On surgery, yes.

19   Q.   So definitely surgery, but you're not -- but maybe not

20   about hair removal.

21   A.   Correct.

22   Q.   Okay.   I believe that my client, Ms. Iglesias, represented

23   a reference to Dr. Stahl.

24   A.   Uh-huh.

25   Q.   And Dr. Stahl is not on the TEC, is she?

1   A.   No.  She's the BOP's medical director.

2   Q.   Okay.  And she's part of the -- is there still a

3   Transgender Care -- Clinical Care Team, or do you know?

4   A.   Dr. Stahl was a physician in the field, and at that time

5   she was on the TCCT.

6   Q.   And --

7   A.   Now she is the chief medical officer for the Agency.

8   Q.   So -- But Dr. Stahl does not determine whether someone

9   gets surgery; is that right?

10   A.   Correct.  The TEC makes that recommendation, and then she

11   and her staff would work to find a surgeon and make sure that

12   there's -- that there are no contraindications that would

13   preclude surgery.

14   Q.   And I believe you said that the TCCT does not make the

15   final decisions regarding health care.

16   A.   Correct.

17   Q.   For -- They don't make -- okay.

18   A.   Correct.

19   Q.   There's no formal relationship between the TCCT and the

20   TEC, correct?

21   A.   Correct.

22   Q.   Okay.  And the TEC meets, you said, typically every other

23   week?

24   A.   The -- Yes, the TEC meets every other week typically.

25   Q.   And that's for between 20 minutes and an hour?

1   A.  Yes, depending on how many cases we review.

2   Q.  Okay.  And the TEC members do not get materials about

3   prisoners or typically don't get materials about prisoners in

4   advance of those meetings, do they?

5   A.  Yes, they do.  They receive a brief write-up with key

6   information about the inmates who will be reviewed, and then

7   each professional on the TEC would look to the records in

8   their area so that they could come to the meeting informed and

9   ready to discuss the individuals.

10  Q.  Okay.  You've worked your entire career at the Bureau of

11  Prisons, Dr. Leukefeld?

12  A.  I have.

13  Q.  And for the last 12 to 13 years you've been in the Central

14  Office doing administration, correct?

15  A.  Correct.

16  Q.  So you only treated prisoners for about four years?

17  A.  Yes, four and a half years in the field and a year before

18  that at FMC Lexington on my internship.

19  Q.  Okay.  And you've not had specific training in treatment

20  of gender dysphoria?

21  A.  Correct.

22  Q.  Okay.  You don't consider yourself an expert in the field.

23  A.  Well, I have had specific training in gender dysphoria

24  through specific continuing education, and I don't consider

25  myself an expert.

1    Q.   Okay.  And I believe you said this, but you've never

2    treated a transgender prisoner for gender dysphoria.

3    A.   Correct.

4    Q.   And you've not evaluated or treated Ms. Iglesias.

5    A.   Correct.

6    Q.   Nor have any of the other people on the TEC.

7    A.   That is true, but as I mentioned, we all look to the

8    records that relate to the individuals we discuss on TEC, and

9    we call professionals in the field who are the treating

10   professionals to discuss those individuals and to ask

11   questions of them.

12   Q.   The TEC has known that Ms. Iglesias has been suicidal for

13   a long time.

14   A.   Physically she has been suicidal and has engaged in

15   self-harm at some point in her -- during her prison sentence,

16   but I don't know that I would characterize it to say that

17   she's been suicidal for a long time.  She's had episodes of

18   suicidality.

19   Q.   She's -- Right.  She's had multiple episodes of threats

20   or -- where suicide was a serious concern --

21   A.   Correct.

22   Q.   -- at the Bureau of Prisons.

23   A.   Yes.

24   Q.   Okay.  I'd like to take a look at the TEC records.  You

25   understand that Ms. Iglesias has been seeking surgery for a

1    very long time.

2    A.  Yes.

3    Q.  The TEC's aware of that.

4    A.  Yes.

5    Q.  And has known that she's been seeking it since 2016.

6    A.  I can't speak to 2016, as of that date, but, yes, she's

7    been seeking it for a long time.

8    Q.  Well, let's take a look at some of the TEC records, and

9    the first record is in the binder, which is -- make sure I've

10   got this at the right place.  Okay.  It should be at number 7,

11   and these are selected pages Bates number 370 through 682, and

12   I'd like to look through some of those with you.  Now, I

13   thought that I had put together all of -- a group of all of

14   the different committee meetings, but then I discovered that

15   some were not included in this batch that was produced to us,

16   so I'll have to cover those separately as we get to them, but

17   let's take a look.  In 2016 Ms. Iglesias is on the agenda.

18   You see that's on the -- on page -- the very first page of

19   this group?

20   A.  Yes.

21   Q.  Now, it says that she's -- there's a BP-9 that's come to

22   the TEC saying that she's requesting gender reassignment

23   surgery.  Do you see where I'm reading on the second page,

24   Bates 373?

25   A.  Yes.  Yes.

1    Q.   Okay.  And then the -- there's a question for the team,

2    discussion on BP-9, consider transfer.  You see where I'm

3    reading?

4    A.   Yes, I do.

5    Q.   So as early as 2016, there was a discussion of surgery and

6    then there was also a question raised for the team about

7    transfer.

8    A.   Yes.

9    Q.   That's right?  Okay.  Let's look again on the next time

10   she comes up, which is September 12th.  This time it looks

11   like she's -- she herself is requesting transfer to a female

12   facility, and the information about her indicates that she's

13   doing very well, no problematic behavior, attending therapy,

14   suspected of being in a relationship but no allegations or

15   investigations made, no inappropriate behavior, okay?  And

16   then she's up again, it looks like, February 6.  Again, she's

17   up -- here she's reporting that she's a victim of a sexual

18   assault, she no longer feels safe, and as I understand it,

19   she's still requesting transfer.

20   A.   Yes.

21   Q.   And this -- I'm sorry?

22   A.   Yes, she is.  She's also in a medium-security facility,

23   which is one of the challenges in terms of moving her to a

24   female facility.

25   Q.   Okay.  It does indicate she's -- that she had requested

1    transfer -- I'm reading in the middle -- and was reviewed a

2    few months ago and was determined that she should continue to

3    demonstrate stability and be reviewed in the future.  Since

4    her last review she's continued to participate in treatment

5    and has remained stable.  So according to these notes, she was

6    stable at the time, and that's what you were looking for,

7    stability.

8    A.  Yes, that's a part of what the TEC would look at.  She was

9    stable, and that's good, and she's also a medium-security

10   inmate, which makes it inappropriate to transfer her to a

11   low-security female facility at that time, so the TEC is

12   asking for her to continue to engage in treatment and to not

13   get incident reports, no misbehavior, and that is what

14   supports her ability to move to lower security facilities.

15   Q.  Okay.  And then she -- But you did not move her to a

16   low-level male security institution at that time, did you?

17   A.  I don't believe at that time we did, and that may well

18   have been because her custody classification didn't support it

19   yet.

20   Q.  Okay.  Well, I'm not going to go through each one of

21   these, but if -- as we walk through this, she's requested

22   surgery, transfer multiple times.  It's come up repeatedly

23   before the TEC, and yet she's always denied --

24   A.  Well --

25   Q.  -- both of those things.

1    A.   Yes.   When I flip to the next page, I see this is when she

2    was moved to FMC Lexington, which -- so she was moved to a

3    lower security facility.

4    Q.   This is September 11, 2017?

5    A.   I'm sorry.   I don't know if I'm -- January 27, 2020, it

6    looks like, and then the next page where she was at Lexington,

7    so the previous review would have been when we made that

8    recommendation.

9    Q.   Okay.   Well, we can continue going through this, but

10   repeatedly she's sought transfer and repeatedly there's one

11   barrier or another to transfer or surgery, until a few months

12   ago.

13   A.   I don't agree with that.   She was moved to Lexington,

14   which was a lower security prison, and that was a step toward

15   female facility for her, and she had left Lexington for

16   Fort Dix and she was reviewed at Fort Dix, and that's when she

17   was moved to a female facility.

18   Q.   All right.   Let's take a look at -- I think is in the

19   binder at 8, and this is October 7th, 2019.

20   A.   But not the first page.   Oh, I see.

21   Q.   Oh, I'm sorry.   Right.

22   A.   We're looking at the second page, correct?

23   Q.   Right.   So this is Iglesias A 0001, 0004, and this is the

24   October 7th, 2019, meeting, and this is when she's transferred

25   to --

1   A.  Here she's at Marion, correct.

2   Q.  Right.  Okay.  This is when she's in Marion, and indicates

3   she's -- initially was diagnosed in 2014 with gender

4   dysphoria, has consistently manifested her desire to live as a

5   female since that time.  You would agree with that.

6   A.  Yes.

7   Q.  And she's consistently attempted to portray a female

8   appearance to the extent possible.

9   A.  Yes.

10  Q.  And she's received hormone therapy consistently since 2015

11  as in compliant hormone levels are appropriate for a

12  transgender female, she's adjusted well, has a good

13  therapeutic relationship.  You would agree with all of that.

14  A.  Yes, that's what's written on the page when she was

15  considered for transfer at Marion, and that's when we moved

16  her to a low-security facility.

17  Q.  Okay.  And then she's up -- binder number 4, which is the

18  March 9th, 2020, this indicates that she was considered --

19  this is a review of her --

20          THE COURT:  Can I --

21          MR. KNIGHT:  I'm sorry?

22          THE COURT:  You said binder number 4.  Are you

23  still --

24          MR. KNIGHT:  I'm sorry.  Number 9, which I'm not sure

25  if there's -- I may have -- so this would be the March 9th,

1   2020, records.  I may have messed up my binder numbers.  This

2   is Iglesias A 24.

3           THE COURT:  Okay.  That's the first page under tab 8.

4           MR. KNIGHT:  Okay.

5           DR. LEUKEFELD:  I'm sorry.  The first page where?

6           THE COURT:  Under tab 8.

7           DR. LEUKEFELD:  Oh, okay.

8   Q.  (By Mr. Knight)  So this would be the March 9, 2020,

9   meeting, and you reviewed the labs regarding compliance,

10  additional labs have been ordered.  So what happens on

11  March 9th?  Why isn't she transferred to a female facility at

12  that point?

13  A.  So it looks to me like we reviewed the labs but they

14  weren't current, and new labs were requested so that we could

15  use current information.

16  Q.  Okay.  Well, looking at what's binder 7, this is -- and

17  it's Bates number 656 -- this, I believe, is where you say

18  you're not transferring her because her hormones level --

19  hormone levels have fallen below goal, have not been

20  maximized.

21  A.  Yes, yes.

22  Q.  Okay.  So those were -- those obviously had been maximized

23  well before.  We talked about that.  They had been for a

24  number of years, and yet BOP had not transferred her until it

25  finally transferred her to -- it had not transferred her to a

1    female facility, had not transferred her to a low-level

2    security until I believe it was 2019, when she was transferred

3    to FMC Lexington; is that right?

4    A.  I believe it was 2019, yes, she was transferred.  When her

5    security classification qualified her for low-security

6    institution, we moved her to Lexington, and then when she was

7    considered at Lexington for her next move, her hormones were

8    not at goal, but she needed to move, so she went to Fort Dix.

9    Q.  Ms. Iglesias has not had a history of violence at the

10   Bureau of Prisons.  You understand -- I mean, I can show you

11   the records that indicate that, that there was no -- there's

12   been no history of violence on her part.

13   A.  Ms. Iglesias has been classified as a medium- or

14   high-security inmate for much of her time in BOP, and a lot of

15   different considerations go into that classification, and I'm

16   not a case management expert, but those would include things

17   like her initial crime, her adjustment, her compliance with

18   prison rules, all of those things, and so the custody

19   classification system is what makes -- along with her behavior

20   and her adjustment in prison is what determines her security

21   level.

22   Q.  So ultimately, I think what you're saying is that her

23   behavior and whatever her history of her crime is the reason

24   she's not gotten surgery; is that right?  Her disciplinary

25   history and her original crime, that's the reason why she's

1    not gotten surgery.

2    A.  All of that plays into her ability to progress, which is

3    not entirely -- I guess her ability to progress to a female

4    institution is related to her institution adjustment and her

5    history and her behavior as she moves through our prison.

6    Q.  But ultimately, I think it's clear what you're saying is

7    that because of her -- whatever the classification and however

8    her discipline or her criminal -- original crime are the

9    reason she was not transferred much earlier to a female

10   facility, and ultimately that's the reason why she's not

11   gotten the surgery she needs.

12   A.  Not necessarily, but those are a piece of the progression.

13   Those impact her transition and her progression.

14   Q.  Well, ultimately, she could not have -- I think what

15   you've said clearly is that she could not get surgery until

16   the Bureau of Prisons moved her to a female facility, and

17   because of her classification level, it was not going to do

18   that.

19   A.  I think what I'm trying to communicate is that following

20   surgery she would be required to be housed at a female

21   facility and there would really be no other appropriate place

22   to house her, and it's important that her female peers in that

23   facility are safe in terms of who they're placed with and that

24   she's safe along the way as well.

25             THE COURT:  How -- Let me just ask you, how often --

1    so I'm familiar with sending people to BOP, that they get an

2    initial security classification.  How often is that

3    reevaluated?

4           DR. LEUKEFELD:  It's reevaluated every six months.

5           THE COURT:  Every six months, for every inmate.

6           DR. LEUKEFELD:  For every inmate, until the very last

7    year, I think, or the last, and then it's every -- it's

8    multiple, frequent.

9           THE COURT:  Okay.

10          MR. KOLSKY:  Your Honor, if I may interrupt, I've

11   just -- I've been informed that BOP needs to move Ms. Iglesias

12   back to secured housing at 3:30, so I just wanted to inform

13   the Court of --

14          THE COURT:  Okay.  Well, hopefully we'll be wrapping

15   up at that point.

16   Q.  (By Mr. Knight)  Okay.  And I believe that the TEC has

17   stated that it's recommending Ms. Iglesias for surgery one

18   month after placement in a residential reentry center.

19   A.  Right.

20   Q.  Is that correct?  Has it considered and denied her request

21   for permanent hair removal?

22   A.  I don't believe that the TEC has considered that request.

23   I've reviewed records, and I just didn't see that that was

24   something that the TEC considered.

25   Q.  You're aware, though, that the -- she has grieved the

1    denial of permanent hair removal and the -- and Central Office

2    has denied that request for permanent hair removal.

3    A.  Yes, I heard the testimony earlier today.

4    Q.  But it -- But that's never been the TEC who made that

5    denial as far as you're aware.

6    A.  As far as I'm aware.

7    Q.  Okay.  Let's talk about the reasons -- the one-year

8    requirement.  So you -- the policy's not written down -- I

9    think you said that before -- this one-year requirement.

10   A.  Correct.

11   Q.  It -- The TEC's concern is that a transgender woman might

12   seek to be transferred back to a male facility and we're not

13   going to know whether that's going to happen until a year has

14   passed.  Is that the concern?

15   A.  There are two concerns with placing transgender women in

16   female facilities before surgery.  One is whether they will

17   feel comfortable in which to stay, and it's -- we've seen that

18   it's a challenging transition and that some women do request

19   to leave, even when we encourage them to stay, and I'm glad

20   Ms. Iglesias decided to stay.  The other concern is the safety

21   of peers, female peers in those facilities, and ensuring that

22   they are safe and that we can safely house that individual

23   with their peers.

24   Q.  So to be clear, if -- and you're basing that on the fact

25   that one transgender woman requested transfer back.  You've

1    got an example of one where that's happened.

2    A.  Ms. Iglesias did request it once, although she pulled back

3    her request, and then we did have one transgender woman who

4    requested to go back and did.  We've also had a transgender

5    woman who we were not able to maintain at a female facility.

6    Q.  So I believe you said that there are clearly

7    transgender -- I'm sorry -- cisgender women who present

8    disciplinary problems, who engage in sex with other women, who

9    have problems, but you would never transfer a cisgender woman

10   back to a male facility.

11   A.  That's correct, and we would also never transfer a

12   postsurgical transgender woman back to a male facility.

13   Q.  And, I mean, you're aware, of course, that cisgender women

14   at a women's facility might not be entirely accepting of

15   transgender women there.

16   A.  That's possible.

17   Q.  That could easily be the reason why they would request a

18   transfer back, they don't feel comfortable.

19   A.  That's possible and unfortunate, and I think it's

20   important to note that that could persist following surgery.

21   Q.  So if a cisgender woman were having difficulty with peers

22   at a female facility, you wouldn't transfer her to a male

23   facility, would you?

24   A.  No, and I want to say that we didn't transfer the woman

25   who requested to go back due to difficulty with peers.  We

1    transferred her because of her request.

2    Q.  Right, but her request was based on difficulty with peers.

3    A.  Yes.

4    Q.  That was your testimony.

5    A.  Oh, yes, that's why she requested it, but if she would

6    have wished to stay at the facility and -- you know, despite

7    difficulty, we would have supported that and we would have

8    tried to work to ameliorate that difficulty.

9    Q.  Right, but again, assume that a cisgender woman had said,

10   I've got difficulty with peers, I want to go to a male

11   facility, or for whatever reason, I want to go to a male

12   facility.  You wouldn't allow that, would you?

13   A.  No, we wouldn't.

14   Q.  Even if she requested it.

15   A.  No.  I mean, I think it speaks to the difficult space that

16   transgender women are in.

17   Q.  Well, I think it speaks to the fact that the Bureau of

18   Prisons doesn't see transgender women as women.

19   A.  No, I don't agree with that.

20   Q.  Well, and you're clearly treating transgender women quite

21   differently than you're treating cisgender women.

22   A.  Are you suggesting that we should transfer all women aside

23   from their requests, all transgender women?

24   Q.  I'm saying do you think that -- do you really think that

25   Ms. Iglesias if she had surgery would seek transfer back to a

1    male facility?

2    A.  I don't know the answer to that.  I can't answer that.

3    Q.  Well, I mean, clearly -- we don't have to speak for all

4    transgender women, because clearly, I mean, there's a range of

5    experiences in treatment of transgender people.  It's an

6    individualized treatment modality.  But Ms. Iglesias you know

7    has been seeking transfer to a female facility since 2016

8    consistently, over and over and over.

9    A.  I know that she has.

10         MR. KOLSKY:  Objection.  Counsel's testifying.  I

11   don't think there was a question there, Your Honor.

12         MR. KNIGHT:  That was a question.

13         THE COURT:  I think that was a question.  You can

14   answer.

15   A.  What I would say is that Ms. Iglesias has already

16   requested once to return to a male facility, and she pulled

17   that back and I'm pleased for it, but it's a difficult

18   transition, and I think part of the value of transition is

19   giving time to people to allow them to work through those

20   issues.

21   Q.  (By Mr. Knight)  Well, isn't part of the difficulty of the

22   transition something that the Bureau of Prisons needs to work

23   on?  In other words, the acceptance of a transgender woman in

24   the women's facility is something that is the Bureau of

25   Prisons' responsibility, isn't it?

1    A.   It is, and those are the kinds of things that I do think

2    we've taken important steps towards.  We have worked to

3    train -- We worked to train staff at Carswell before we put

4    transgender women in Carswell.  We did training with all staff

5    at Danbury before we put a transgender man in that setting.

6    We've provided specialized training to mental health providers

7    and medical providers, so, yes, I agree that that's important,

8    and that is something that we've done.

9         THE COURT:  Do you do any training for inmates?

10        DR. LEUKEFELD:  I do not believe that we've done

11   specialized training for inmates, partly due to the privacy of

12   the individual who's moving in.  They might want to deal with

13   that, or disclose or not disclose.

14   Q.   (By Mr. Knight)  Dr. Leukefeld, can you think of any other

15   medical care that can only be provided someone after they've

16   been transferred to and successful in a particular prison or a

17   particular security level?

18   A.   We certainly do offer treatment -- Treatment and the

19   environment interact in all cases, and so there are some

20   treatments that are offered at some security levels and not at

21   others.  However, I see your point, that this is one of the

22   very challenging aspects of managing transgender individuals

23   in prison and supporting and treating them, and so the Bureau

24   has worked hard to balance security and care needs.

25   Q.   So you had said that the one-year requirement serves to

```
 1    ensure that housing placement works out after surgery for a
 2    transgender woman; is that -- am I understanding that right?
 3    A.  Yes, that's one of the reasons.
 4    Q.  So does that mean that if the placement doesn't work out,
 5    you would deny the woman a -- the transgender woman the
 6    surgery she needs?
 7    A.  If a transgender woman cannot be safely housed in a female
 8    facility, then we would not maintain her there, if her peers
 9    couldn't be safe in a female facility.
10    Q.  So in that instance, you would believe that a postsurgical
11    transgender woman would present a safety risk in -- to the
12    cisgender woman.  Is that what you're saying?  Actually, I'm
13    talking about the instance of someone who you're going to deny
14    this.  So you're going to deny someone surgery because of
15    their -- the discipline that they underwent at the female
16    facility.
17              MR. KOLSKY:  Objection.  Calls for a hypothetical.
18              THE COURT:  I'm not sure I understand your question.
19    Can you rephrase it?
20    Q.  (By Mr. Knight)  Sure.  Sorry.  You -- I just want to
21    understand, Dr. Leukefeld, you're saying that if a transgender
22    woman -- if things didn't work out for a transgender woman,
23    she engaged in some kind of activity that -- and was
24    disciplined for it, you would deny her the surgery that she
25    needs.
```

1          MR. KOLSKY:  Same objections.  Calls for speculation.

2          THE COURT:  I'll let her answer.

3   A.  No, I'm not saying that because of any disciplinary

4   infraction we would return a transgender woman to a male

5   facility.  That's not the case at all.  As you pointed out,

6   cisgender women have disciplinary infractions in female

7   prisons.  What I'm talking about is something more than

8   disciplinary infractions.  If an individual can't be safely

9   housed around female peers, we would not maintain them in that

10  prison, and as was stated before, all care is individualized,

11  and that may mean that they would return potentially to a male

12  prison and other forms of care would be provided as necessary

13  and appropriate.

14  Q.  (By Mr. Knight)  Okay.  Well, I think that -- I think

15  you're saying what I'm asking, which is that if things didn't

16  work out for the transgender woman and she was -- you felt

17  like you couldn't safely house her there, then you're not

18  going to give her the surgery.

19  A.  I think if the surgery was really needed, we would have to

20  think hard about how to individualize care, but I don't have

21  an answer for how that would happen right now.

22  Q.  Okay.  And I think I asked a version of this, but is there

23  any other woman -- a cisgender woman whose medical treatment

24  would be contingent on lowering their security level?

25  A.  I think I answered that before.  Some types of treatment

```
 1    and care are available at some types of institutions and not

 2    others based on either security level or the sex of the

 3    inmates who are housed in those institutions, so, yes, we

 4    certainly do have those kinds of situations.

 5    Q.  So the Bureau of Prisons -- I'm sorry.  Were you finished?

 6    A.  There's some types of care that are offered only at

 7    certain types of facilities, and so it's true that if an

 8    individual doesn't necessarily qualify for that institution,

 9    we would select a different type of care to provide to them

10    that would try to achieve the same goals, but it might be a

11    different program of care.

12    Q.  Okay.  But if there is only one form of care that's going

13    to work to resolve someone's medical condition, is there any

14    other condition other than gender dysphoria where you would

15    deny that care to a prisoner because of their security level?

16    A.  I think the answer is no, but I am not -- you're asking me

17    something that's difficult to respond to.  I don't have

18    another thing in mind, so --

19    Q.  Can't think of anything.

20    A.  No.

21    Q.  Okay.  And I believe you said that there are

22    transgender -- I'm sorry -- 1200 transgender people living in

23    BOP custody?

24    A.  Correct.

25    Q.  And never has BOP found that any of them -- that surgery
```

```
 1    is medically necessary for any of those 1200 transgender
 2    individuals until now.
 3    A.  We -- In October we put someone forward.  We -- TEC
 4    recommended surgery.
 5    Q.  Okay.  And I think we've said this, but the -- you
 6    understand that the BOP 12-month standard is different from
 7    the WPATH standard.  In other words, your -- this is the BOP's
 8    interpretation of the WPATH standard.
 9    A.  We consider it an adaptation of the WPATH standard.
10    Q.  There's not any other prison that has a similar one-year
11    requirement for surgery that you're aware of, is there?
12    A.  I don't know if there are or not.
13    Q.  So BOP has a program statement that talks about -- sets a
14    very high barrier for transfers.  You're aware of that, the
15    transgender offender manual, and that is number 6 in the
16    binder?
17    A.  Yes, I'm aware of that.
18    Q.  So you're aware of that.  And it says that the designation
19    to a facility of the inmate's identified gender would be
20    appropriate only in rare cases.  Is that why it's taken so
21    long to transfer Ms. Iglesias to a female facility?  She's one
22    of the rare cases?
23    A.  No, it's not why it's taken as long as it's taken.
24    Q.  So this program statement played no role in the BOP's
25    waiting this long to make the transfer.
```

1    A.  That language was in the program statement for only part

2    of the program statement's existence, and no.  Ms. Iglesias

3    has been working toward -- she's been requesting it actively,

4    she's been working toward it, and the TEC has been reviewing

5    her case and made a recommendation when her security level

6    allowed her a low-security prison, and then she was

7    transferred to a female prison.

8            MR. KNIGHT:  Okay.  May I have a moment, Your Honor?

9            THE COURT:  You may.

10     (Off the record.)

11   Q.  (By Mr. Knight)  Okay.  I'm sorry.  This is -- I think

12   we've talked about this, but just to nail down, you -- the BOP

13   will not provide surgery to someone unless they've been in a

14   female facility for a year, correct?

15   A.  Typically, yes.  As you can see in Ms. Iglesias' case,

16   we're working to be flexible, and we said the TEC would review

17   in April, which is slightly less than a year, but we'd give

18   her time to receive surgery before the end of her sentence.

19   Q.  So that's 11 months.

20   A.  Uh-huh.

21   Q.  Right.  So if 11 months, why not 10 months?  I mean, I'm

22   just having trouble with this.  I mean, it seems like an

23   absolute very arbitrary bar.

24   A.  It's the same bar set by WPATH for 12 months living in

25   one's gender.

1    Q.   Okay.  But it was --

2    A.   That's where the BOP's guidance comes from.

3    Q.   Right.  Well, and as we've clearly established, the WPATH

4    standards are flexible.  There's no -- But the reality is

5    Ms. Iglesias has lived as a woman for -- in every possible way

6    for years and years.  You understand that.  The BOP

7    understands that.

8    A.   She's lived as a woman in many, many ways.  She's not

9    lived as a woman in a female facility, so I wouldn't say every

10   possible way.

11   Q.   So it's -- So you can only be a woman if you live in a

12   women's facility.  Is that the BOP's position?

13   A.   No, that's not what I said.  I said she's lived as a woman

14   in many, many ways but not every possible way.  You said every

15   possible way, and I disagree with that part of your statement.

16   Q.   Well, I mean -- okay.  The reality is, your view -- BOP's

17   view is that real-life or the social transition living as a

18   woman is only possible if you're living in a women's facility.

19   A.   That's an important part of social transition.

20   Q.   Well, and for BOP, correct?

21   A.   Yes, for prison inmates, that's an important part of

22   social transitioning.

23   Q.   Okay.  The -- And just to be clear, if things don't work

24   out for Ms. Iglesias and you transfer her back to a male

25   facility -- and I know you said that's not what the TEC

1  intends to do, but you haven't taken that off the table.

2  You've certainly done it in the past.  Well, you mentioned

3  before you've done it once in the past.  You've sent someone

4  back because of misconduct.

5  A.  Egregious misconduct, yes.

6  Q.  Okay.  Well, but if that were to happen, you would deny

7  her the surgery she needs no matter how clearly medically

8  necessary it is.

9  A.  I don't know the answer to that.  As we've said, care is

10 individualized, and I don't imagine Ms. Iglesias will be

11 returning to a male prison, but in any case, it appears she'll

12 go to a halfway house in March, and so those are -- there are

13 a lot of changes on her horizon, and we would try to be

14 flexible as we considered what was best for her in terms of

15 care.

16 Q.  When Ms. Iglesias lived in male facilities, she certainly

17 was around women in those facilities, right?  She was around

18 female staff.

19 A.  She was around female staff.  I think female staff and

20 female peers are two very different groups that would bring on

21 very different social roles and interactions.

22 Q.  Well, and she was around other transgender women.

23 A.  Yes.

24 Q.  And those are women.

25 A.  Yes.

1   Q.   So she was interacting with women, in fact; just not in a

2   women's facility, all-women's facility.

3   A.   Yes, she had some transgender peers in those facilities.

4   Q.   And just to be clear, at this point the Bureau of Prisons

5   hasn't taken a position on whether Ms. Iglesias has a medical

6   need for surgery.

7   A.   Correct.

8   Q.   Because all it's done is say she's close enough to the one

9   year that we'll have someone else evaluate her.

10  A.   I'm not sure I -- The TEC's --

11  Q.   The TEC.

12  A.   The TEC's position is that we will evaluate her for

13  surgery in April.

14  Q.   Okay.  And so she's -- Ms. Iglesias has been seeking

15  surgery since 2016 and we're in 2021, and it's going to be

16  2022 before she's even evaluated for surgery.

17  A.   That's correct.  She's had a lengthy transition because

18  she's had to move down in security level in order to go to a

19  female facility.  Now she's there and she's experiencing life

20  with female peers, and we'll evaluate her earlier than typical

21  because we recognize that she will be released.

22          MR. KNIGHT:  I would like to seek some admission of a

23  couple of these documents, which maybe it's best if I organize

24  myself in -- if that's all right, Your Honor.  I'm sorry.  I

25  know I've taken a lot of the Court's time.

1           THE COURT:  We can do it at the end.  Okay.  I have a

2      few questions too.  Just so that I'm clear, you're saying

3      there was only one transgender woman who was a threat to

4      others or had egregious behavior and was transferred back to a

5      male facility; is that correct?

6           DR. LEUKEFELD:  That's correct.

7           THE COURT:  Okay.  And what are the types of

8      conditions where you were talking with Mr. Knight about some

9      things aren't offered at some facilities and so there might be

10      an alternative treatment?  Like, what's an example of that?

11           DR. LEUKEFELD:  Sure.  So for example, the challenge

12      program is -- that's a high-security male drug treatment

13      program.  It's only offered at penitentiary, only at

14      high-security institutions.  For a long time -- and happily,

15      we have resolved it -- our trauma treatment program was only

16      offered at female facilities.  So there are certain types of

17      programs that are only offered for certain -- at certain --

18      either male or female or certain security levels, and we would

19      always work to make sure that they have their needs met, even

20      if a particular program wasn't there.

21           THE COURT:  Are any of those other conditions for

22      which treatment is being sought considered a serious medical

23      condition?

24           DR. LEUKEFELD:  Yes, and we would definitely work

25      around that.  So, I mean, I think of serious mental illness,

1    right?  Some institutions are going to have programs and

2    others aren't, but we would -- there's just more flexibility.

3    When it comes to prisons, they come in male and female, and

4    those are the only two types of prisons that we have, so, yes,

5    there are serious medical or mental health conditions that

6    can't be treated at certain types of institutions, but we've

7    got more flexibility to work around them.

8            THE COURT:  And what do you do with a -- and I'm

9    sorry if you covered this, but just so that I'm clear -- with

10   a cisgender woman who can't get along with her peers and has

11   multiple disciplinary infractions?  How do you handle that

12   person?

13           DR. LEUKEFELD:  She would never go to a male

14   institution.  She would potentially get a rise in security

15   level; maybe she was minimum and she would become a low.

16   There would be progressive discipline if the behavior was

17   under her control, and potentially, hopefully for a short

18   time, she could be placed in restrictive housing, but those

19   would really be the options.

20           THE COURT:  Okay.  And just so I'm clear, and you

21   said that -- I think we've -- both things have been said here

22   today.  Is the committee going to recommend surgery in April

23   or refer her at that time for an evaluation?

24           DR. LEUKEFELD:  The committee will make a

25   determination about whether to recommend in April, and if it

1  does, she would immediately be referred to the medical

2  director to find --

3        THE COURT:  Okay.  So first you have to recommend it

4  and then she would be referred, and for the one that you just

5  mentioned in October who was referred -- were they referred or

6  recommended?

7        DR. LEUKEFELD:  The TEC recommended surgery and

8  referred her to the medical director.  Medical director would

9  not -- will do surgery unless there's some kind of

10 contraindication.

11       THE COURT:  And that's the BOP medical director?

12       DR. LEUKEFELD:  Correct.

13       THE COURT:  Okay.  But you don't know how long that's

14 going to take.

15       DR. LEUKEFELD:  I don't know how long it will

16 ultimately take, but I -- but it is underway.

17       THE COURT:  All right.  Mr. Knight, do you want to

18 follow up on any of that?

19       MR. KNIGHT:  I'm sorry.  I'm not entirely sure this

20 is specifically following your questions, Your Honor.

21 Q.  (By Mr. Knight)  I guess I'm -- If -- Let me -- I'm sorry.

22 So I believe in response to Your Honor's questions you said --

23 you talked about some different alternative programs, you said

24 it's medically necessary, but those are alternatives, right,

25 so --

1    A.  They are.

2    Q.  You're not -- Okay.  Didn't want to cut you off.  So --

3    But you're not suggesting that there's an alternative to

4    surgery for Ms. Iglesias.  Medically -- If surgery is

5    medically necessary for her -- and clearly you recognize that

6    it can be.  You haven't said one way or the other whether it

7    is, but -- because you haven't gotten to that point, right?

8    A.  Uh-huh.

9    Q.  But if it's medically necessary for her, there's no

10   alternative, is there?

11   A.  You're right.  I think that's the challenge we have in

12   prisons with treating transgender individuals, is trying to

13   both safely house them and meet their needs.

14   Q.  Okay.  And I guess I'm -- the biggest thing I'm having

15   trouble with is that the Bureau of Prisons seriously thinks

16   that Ms. Iglesias after living as a woman for decades is

17   suddenly going to decide she doesn't want to continue to do

18   that.  Is that what you're saying?

19   A.  That's not what I'm saying.

20   Q.  Well, why -- if she's not living as a woman and she's not

21   presenting as a woman, why would you send her back to a male

22   facility?

23   A.  I don't think the Agency has any interest in sending her

24   back to a male facility, but the goal is for her to have the

25   opportunity to do a full social transition, to engage with

1  peers and to consolidate her identity, to not move through

2  this very, very quickly, and to ensure safety and

3  thoughtfulness as we move through this.  As I mentioned, it is

4  flexible.  We say 12 months and we're -- we've made a plan to

5  reevaluate at 11 months to ensure that the opportunity is

6  available to her if the TEC makes a recommendation for

7  surgery.

8  Q.  Has the TEC made arrangements for permanent hair removal

9  for Ms. Iglesias?

10  A.  No.  As I mentioned, I don't believe the TEC has

11  considered that.

12  Q.  Well, you understand that she needs permanent hair removal

13  before she can have surgery.

14  A.  Oh, in regard to surgery, that -- I understand that that

15  is a piece of surgery.

16  Q.  And has the TEC taken that into account?  I mean, I guess

17  my concern is that this is never going to happen under the

18  circumstances we're talking about here.  Can you tell me

19  otherwise?

20  A.  No, I'm not sure what the question is.

21  Q.  Well, the question is, is Ms. Iglesias ever going to get

22  surgery under the circumstances we're talking about here?  The

23  TEC still hasn't decided to recommend her for surgery to the

24  medical director, has not made arrangements for permanent hair

25  removal, has not made arrangements for a surgeon as far as I

1    can tell, so my client, I think, would like to know if it's

2    ever going to happen.

3    A.   The TEC set a date to consider her for surgery.  That

4    takes into account her release date and will ensure that if

5    she's recommended for surgery, she'll have time to recover in

6    BOP custody.  The TEC has provided her feedback over time

7    about -- has made requests of her to, you know, manage her

8    behavior, to participate in treatment.  She's done those

9    things.  I understand it's a process, and progression is

10   happening.

11            MR. KNIGHT:  No further questions.

12            THE COURT:  All right.  Do you have any redirect?

13            MR. KOLSKY:  A few questions, Your Honor.

14            THE COURT:  Okay.  Just a few, then we'll excuse

15   Ms. Iglesias and I'll take closing arguments.

16            MR. KOLSKY:  Thank you, Your Honor.

17                      REDIRECT EXAMINATION

18   BY MR. KOLSKY:

19   Q.   Dr. Leukefeld, Mr. Knight asked you -- I think the

20   question was can you think of any other medical care that can

21   only be provided after transfer to a particular facility.  Do

22   you recall that question?

23   A.   Yes.

24   Q.   I have two questions related to that.  First, are BOP

25   prisons segregated by gender?

1    A.  Yes, they are.

2    Q.  And second, can you think of any other medical care that

3    changes a person's gender?

4    A.  No.

5    Q.  Counsel also asked you about the 1200 -- roughly 1200

6    identified transgender inmates in BOP custody and asked how

7    many of them have received surgery.  Do all transgender

8    inmates in BOP custody request gender confirmation surgery?

9    A.  No, they don't all request surgery, and many of them don't

10   request to move to female facilities or facilities that align

11   with their gender.

12   Q.  Do most of them request surgery?

13   A.  No.

14   Q.  You were asked a number of questions about transfer to a

15   female facility.  So just to be clear, is Ms. Iglesias

16   currently housed in a female facility?

17   A.  Yes, she is.

18   Q.  And does the TEC have any plans to transfer her back to a

19   men's facility?

20   A.  No plans whatsoever.

21            MR. KOLSKY:  Thank you.  No further questions.

22            THE COURT:  All right.  Thank you.  You may step

23   down.

24            All right.  So I'm told Ms. Iglesias needs to go

25   back, so I think -- well, I'm operating under the assumption

1    that that was your only witness.  Is that correct?

2              MR. KOLSKY:  Yes, Your Honor.

3              THE COURT:  All right.  So I will excuse

4    Ms. Iglesias.  Let's take about a ten-minute break, and at

5    3:40 I'd like just brief -- very brief closing arguments about

6    the testimony here today.

7      (Brief recess taken.)

8              THE COURT:  Who will give the arguments for

9    plaintiff?  And let's try to keep it to about ten minutes.

10             MR. KNIGHT:  I will keep it quick.  All right.  Your

11   Honor, plaintiffs have met -- have shown Ms. Iglesias meets

12   the four factors for granting a preliminary injunction;

13   likelihood of success, inadequacy of legal remedies,

14   irreparable harm from being denied surgery and hair removal,

15   and that the balance of harms favors the relief she seeks.

16             Now, at the closing of Dr. Leukefeld's testimony, to

17   justify why this medical treatment can be denied someone, she

18   said that there's no other surgery that can change a person's

19   gender, so effectively, the Bureau of Prisons is saying

20   Ms. Iglesias is not a woman until she has surgery.  That's, I

21   think, the implication of the testimony, and that means

22   ultimately -- and I -- and at another point she said that if

23   medically -- if the classification got in the way or somehow

24   prevented access to medically necessary care or the treatment

25   that is needed, we'd have to work something out, so the

1    question, I think, is ultimately, why hasn't the Bureau of

2    Prisons worked something out years ago?  Ms. Iglesias has

3    needed surgery for years, and I think the testimony is

4    abundantly clear of that.  Dr. Ettner is the only one who

5    offered testimony today about the medical necessity of surgery

6    and permanent hair removal for Ms. Iglesias.  The Bureau of

7    Prisons did not rebut that testimony.  They simply said, we

8    haven't considered it, we're going to consider that down the

9    way; first we're going to require a month -- I'm sorry --

10   12 months but now we're going to require 11 months and we're

11   not going to actually have her evaluated to determine whether

12   she needs the surgery and gets started with the treatment that

13   she needs until 11 months have passed, and even then they're

14   just going to make a recommendation to the director,

15   Dr. Stahl.  Needless to say, that's -- the evidence I think

16   overwhelmingly shows, Your Honor, delay after delay after

17   delay on the part of the Bureau of Prisons in terms of

18   providing the medically necessary care that Ms. Iglesias

19   needs.

20          The only reasons that the Bureau of Prisons has given

21   for denying her permanent hair removal and surgery -- well,

22   let's talk about surgery in particular, because they've

23   offered no reason why she shouldn't have the permanent hair

24   removal.  The only reason they've offered for denying her the

25   surgery is that she's not at the right security level, needs

1   to be stable, they said at one point needs to be in a female

2   facility, but those are not medical reasons, and where

3   security gets in the way of necessary medical care, again,

4   Dr. Leukefeld said, we'd have to figure something out.  Well,

5   the Bureau of Prisons should have figured something out by

6   now.  There is simply no reason to wait the -- what is it --

7   we're in November -- the four or five additional months to

8   even consider her for surgery.  That, I think, is the evidence

9   that shows a violation of the Eighth Amendment and also a

10  violation of the Equal Protection Clause.

11         Ms. Iglesias is clearly treated differently from

12  cisgender women because she is transgender.  She's being

13  treated differently both in terms of access to medically

14  necessary care and in her placement.  She's been seeking

15  placement for years.  Dr. Leukefeld agreed that all cisgender

16  women are placed in a female facility.  What this case asks is

17  not that all transgender women be placed in a women's

18  facility.  What it asks is simply that that -- the Bureau of

19  Prisons' treatment of Ms. Iglesias for many, many years

20  differently from other women because she is transgender not be

21  the barrier to her getting the necessary medical care that she

22  needs, gender-affirming surgery.  That's what the Bureau of

23  Prisons has created.  That violates both the Equal Protection

24  Clause and the Eighth Amendment.  The evidence shows that this

25  treatment is objectively inadequate.  Dr. Ettner's testimony

1    shows that clearly, and that is unrebutted testimony, and the

2    Bureau of Prisons knows that the care that it has provided is

3    inadequate and has for years, and that fulfills the subjective

4    prong of the Eighth Amendment.  We believe that a preliminary

5    injunction should be entered, Your Honor.

6         THE COURT:  And as of today, what is it exactly that

7    you're asking for in the preliminary injunction?  Because now

8    that she's housed at a female facility, you had asked for

9    that, and to protect from the known and serious risks of harm

10   she continues to face while housed in a men's prison.  So

11   you're seeking an injunction to provide her with medically

12   necessary health care, including permanent hair removal and

13   gender-confirming surgery?

14        MR. KNIGHT:  Yes, but we're also asking for an order

15   that she not be returned to a male facility, because where she

16   was, she faced serious incidents for years, and the evidence

17   shows that, and the Bureau of Prisons has indicated that it

18   has sent some transgender women back to male facilities.

19   Absent an order to prevent that, it's always a risk that we're

20   seriously concerned about.

21        THE COURT:  Okay.  And is there anything in the

22   record, any medical records to substantiate Ms. Iglesias'

23   testimony here today that doctors have recommended her for

24   surgery or said that she would be a good candidate for

25   gender-confirming surgery?

1          MR. KNIGHT:  We -- Your Honor, we don't have those

2   records.  I guess I would simply say that those -- I -- you

3   know, we -- I was not a part of this conversations with those

4   entities.  They didn't testify here today.  Those

5   individuals -- I'm sorry -- entities -- individuals,

6   Dr. Quick, Dr. Langford, I think it is, may -- I mean, and I'm

7   not sure that Dr. Leukefeld actually said that they don't

8   believe she is qualified for a surgery.  She said that they

9   haven't conducted a formal evaluation, so I think ultimately

10  we don't have records that support it.  I don't think that

11  Dr. Leukefeld's testimony precludes the fact that in fact they

12  did examine her and say she needs surgery, but ultimately

13  those -- all of those individuals report to the Bureau of

14  Prisons.  Their paycheck comes from the Bureau of Prisons.

15  They want to hold on to their jobs, and ultimately they know

16  that the Bureau -- the TEC makes the final determination, so

17  they may say, well, yes, we support you, but we can't formally

18  move forward with your need for surgery until the TEC says we

19  can.

20          THE COURT:  Okay.  I get it.  All right.  Thank you.

21          MR. KNIGHT:  Thank you.

22          THE COURT:  Who will give closing arguments for

23  defendants?

24          MR. ROBINSON:  I will, Your Honor.  John Robinson for

25  the United States.

1            THE COURT:  All right.

2            MR. ROBINSON:  Good afternoon.  At the outset, I just

3    want to thank the Court and the Court's staff for their time

4    today.  I know it's been a long day, and we appreciate their

5    time and your time, of course.

6            I also want to emphasize at the outset, as I hope was

7    clear through our briefing and through the presentations

8    today, including Dr. Leukefeld's testimony, that there is no

9    dispute from the Government that Ms. Iglesias' gender

10   dysphoria is a serious medical condition that requires

11   attention, that Ms. Iglesias deserves our respect, and the

12   Bureau of Prisons takes its obligation extremely seriously to

13   protect her from harassment and harm.

14           I also want to emphasize three developments that we

15   heard today that I think are important to the resolution of

16   plaintiff's motion for preliminary injunction, because none of

17   them had taken place at the time they filed their motion

18   several months ago.  First, as the Court heard, in May of 2021

19   of this year, Ms. Iglesias was transferred from a men's

20   facility to a women's facility, where she's currently being

21   held in protective custody, and Dr. Leukefeld testified that

22   the TEC has no plans to transfer her back to a men's facility.

23   If that were even considered, the TEC would -- it would come

24   before the TEC, and we would of course notify plaintiffs and

25   the Court immediately if that was something that was being

1    considered.  It is not being considered.

2          Second, since plaintiff filed her motion for a

3    preliminary injunction, she has been scheduled to be

4    transferred to a halfway house in March -- on March 24th,

5    2022, which is approximately four months from today, and

6    third, the Bureau of Prisons Transgender Executive Council has

7    announced that it will meet in April of 2022 to consider

8    Ms. Iglesias for surgery, and while that's slightly shorter

9    than her 12-month anniversary in a women's prison, the Bureau

10   has decided to do it at that time to make sure that she has

11   sufficient time to recover if she's approved for surgery

12   before she is released in December of 2022, released from BOP

13   custody in December of 2022.

14          So what is in dispute, and what's in dispute is the

15   question of deliberate indifference, and I really want to

16   emphasize at the outset that this is an Eighth Amendment cruel

17   and unusual punishment deliberate indifference claim, and we

18   would respectfully submit, Your Honor, that plaintiff has not

19   met her burden to establish entitlement to what would

20   effectively amount to not just a preliminary injunction but a

21   permanent mandatory irreversible injunction that would

22   ultimately give her the relief that she's seeking in this case

23   in the context of gender confirmation surgery.

24          So I'll just touch briefly on the merits of her

25   gender confirmation claim and her hair removal claim and then

1    on irreparable harm.  So I hope that the record has been clear

2    that the Bureau of Prisons has not simply ignored plaintiff's

3    request for gender confirmation surgery.  They are aware of it

4    and they are addressing it.  The Bureau has not rejected her

5    request and in fact is planning to meet in April to consider

6    it again.

7         The Bureau has offered two reasons why it has not

8    approved surgery up to this point.  The first is the 12-month

9    requirement that we've heard a lot about today, and that is

10   the requirement that the Bureau has imposed based on the

11   recognized WPATH standards, that the Bureau believes it's

12   important for a transgender inmate, in this case a transgender

13   woman, to live in a facility with other women for 12 months

14   before performing major irreversible surgery.  This is not a

15   policy that applies only to plaintiff.  Dr. Leukefeld

16   testified today that the Bureau has applied it to 20 or 30

17   other inmates, and respectfully, Your Honor, the Bureau is

18   entitled to come up with a reasonable policy and apply it

19   evenhandedly to prisoners.  The Eighth Amendment does not

20   prohibit that.  If this were an APA case, a case under the

21   Administrative Procedure Act, which our office deals with all

22   the time, we would be asking questions such as, well, why

23   can't we make an exception for Ms. Iglesias, which I think was

24   the primary point that Counsel made in his closing argument,

25   or why isn't this policy overinclusive or underinclusive, and

1    we would have to defend why it's reasonable and not arbitrary.

2    That's not this case.  This is a cruel and unusual punishment

3    case, so the standard is whether the Bureau has exhibited

4    total unconcern for the inmate's care, and we would just

5    respectfully submit that that is not the case.  The Bureau has

6    prescribed her hormones, has ensured that only women officers

7    are performing pat-downs, that officers use female pronouns

8    when interacting with Ms. Iglesias.  Recently, as noted, the

9    Bureau has transferred her to a women's facility and has

10    provided her with facial hair removal cream.  So the

11    deliberate indifference standard, we would submit, has not

12    been met.

13         The Bureau has offered two reasons for the 12-month

14    requirement.  The first is that it's important for the health

15    and safety of the inmate and important for her social

16    adjustment -- and that comes straight from WPATH -- that she

17    experience living as a woman for 12 months.  Now, prisons are

18    unique.  They are same-sex institutions, and the Bureau

19    believes that it's important that in a -- that a transgender

20    woman live in that facility for 12 months before she undergo

21    irreversible surgery.  The second reason for the 12-month rule

22    is that there are safety concerns with placing a transgender

23    woman who has already undergone surgery in a male facility,

24    and as we heard today, there have been cases -- just a few,

25    but there have been cases where transgender women have

1    requested to go back to a male facility, including

2    Ms. Iglesias just a few months after she was transferred.

3    Now, she withdrew that request and it is not an issue today,

4    but I think it does help to demonstrate the reasonableness of

5    the Bureau of Prisons' policy.  You know, I haven't heard from

6    plaintiffs in argument that no amount of time is reasonable,

7    that if an inmate has just been transferred to a women's

8    facility, they should be entitled to surgery immediately.  So

9    the question comes down to is 12 months unconstitutionally

10   reasonable, and we would submit that it's not.

11          I know there's been a lot of discussion about why

12   it's taken so long, and I just want to briefly touch on the

13   reasons that the Court heard from Dr. Leukefeld.  I mean, for

14   a substantial period of time Ms. Iglesias was in a

15   medium-security facility and the Bureau reasonably concluded

16   that it was not appropriate to move her immediately from that

17   facility to a low-security women's facility.  Instead, the

18   Bureau took the intermediate step of transferring her to a

19   lower level men's facility in Lexington, Kentucky, before

20   transferring her to a women's facility.  She was considered at

21   one point for transfer and surgery.  Her hormone levels were

22   not maximized.  That is a reasonable policy given the security

23   concerns that would be present to taking a transgender woman

24   whose hormones have not maximized and placing her immediately

25   in a men's facility, but that's not an issue anymore.  They

1   are maximized.  But it is one of the reasons why it has taken

2   as long as it has.

3           Now, it's been clear today that Dr. Ettner and

4   plaintiff disagree with these policies and disagree with the

5   reasons behind them, but again, we would submit that that

6   disagreement is not sufficient to show a cruel and unusual

7   punishment.  There are several circuit courts of appeals, as

8   we pointed out in our briefs, that have held that there's no

9   constitutional violation even where prisons have an outright

10  blanket ban on gender confirmation surgery.  That's not

11  necessarily the case in the First Circuit case, but, you know,

12  the First Circuit case, most notably in *Kosilek*, rejected a

13  constitutional claim for gender confirmation surgery, but it's

14  not just the First; the Fifth Circuit just recently in a case

15  called *Gibson*, the Tenth Circuit in a case called *Lamb*, the

16  Eleventh Circuit in a case called -- forget the name right

17  now, but we cited it in our brief.  So several courts of

18  appeals have held that this is not a constitutional right at

19  all, and the Seventh Circuit, while it hasn't addressed the

20  question directly, just two years ago in the *Campbell* case

21  said that it wasn't a clearly established right for purposes

22  of qualified immunity.  So -- And again, what distinguishes

23  this case from the handful of cases that have found a

24  constitutional violation is that this is not an outright

25  rejection.  The Bureau is considering it and in fact will meet

1   again in just a few months to consider plaintiff's request.

2           Just briefly on the hair removal claim, again,

3   plaintiff has been provided with facial hair removal lotion.

4   That was back in June.  We heard today for the first time that

5   she stopped that on I think it was last Saturday, she said

6   that that wasn't working.  Again, it's the first we've heard

7   of that.  Plaintiff hasn't grieved that request, and our main

8   point on this argument is that we require -- the Bureau

9   requires that it be medically indicated, that her medical

10  providers come to the conclusion that it is clinically

11  necessary for her.  She did not present that when she

12  requested this to the Bureau of Prisons.  She still hasn't

13  requested it, and Dr. Ettner today, I believe, admitted that

14  she can't offer an opinion about whether the provisions that

15  are being made today, the ability to shave twice a day and the

16  facial hair removal cream, that that's medically inadequate.

17  If she brings that to her doctor and the doctor brings it to

18  the attention of the Bureau, obviously that'll be considered,

19  but she hasn't done so at this time.

20          So just finally, on irreparable harm, I mean, when

21  plaintiff filed her motion, she was in a men's facility.  She

22  alleged that her life was at risk, and today, the world is

23  very different.  She is in a women's facility.  She is

24  scheduled to be transferred to a halfway house in March.  She

25  is scheduled to have her request reviewed in April, and

1    Dr. Ettner testified that she is not in her opinion presently

2    at the risk of suicide, is not presently at the risk of

3    self-treatment, so we would request that the Court -- there is

4    no legal basis to grant plaintiff's motion for a preliminary

5    injunction, plaintiffs have not shown a constitutional

6    violation, they have not shown irreparable harm.  Deny it

7    without prejudice.  If the TEC in April denies her request for

8    surgery, of course nothing would prevent her from bringing her

9    motion again, but at this time we would respectfully submit

10   that plaintiff has not met her burden to entitlement of the

11   extraordinary remedy of a preliminary injunction.

12           THE COURT:  All right.  And I just have one question

13   for you.  So Dr. Leukefeld testified that every six months the

14   security classification is reevaluated, and obviously it went

15   quite a while from when she entered BOP to the time it was

16   lowered that she could go to Lexington.  Do you know if

17   there's anything in the record that shows what was occurring

18   through that time as far as disciplinary infractions or

19   something that didn't change -- that caused her security

20   classification to remain the same?

21           MR. ROBINSON:  I'm afraid I personally don't.  We

22   will certainly take a look, and if there is something in the

23   record, we can provide that to the Court.

24           THE COURT:  I think there are some, and I can go back

25   and look at that, in your reply, perhaps, but -- okay.  All

1    right.  Thank you.

2             MR. ROBINSON:  Thank you.

3             THE COURT:  All right.  Well, thanks, Counsel.  I

4    appreciate everyone's efforts to get this concluded today, and

5    everyone was prepared and organized, and I appreciate that.

6    Mr. Knight, if you will just meet with Counsel and Deana, and

7    if you're in agreement on the exhibits, then I'll accept those

8    that you're offering if you narrowed it down to specific

9    pages.  Did you do that?

10            MR. KNIGHT:  I did.  The documents were 7, 8 -- I can

11   actually just work this out right now rather than taking the

12   Court's time.

13            THE COURT:  Okay.  Why don't you work them out and

14   confer with Deana.  If I need to come back, I will.  All

15   right.  Everyone be careful going home and have a happy

16   Thanksgiving, and I'll take the motion under advisement and

17   get an order out just as soon as I can.

18                  (Court adjourned at 4:03 p.m.)

19

20

21

22

23

24

25

1                           -oOo-

2                  REPORTER'S CERTIFICATE

3          I, Karen E. Waugh, CSR, RPR, CRR, Official Court

4   Reporter for the U.S. District Court, Southern District of

5   Illinois, do hereby certify that I reported with mechanical

6   stenography the proceedings contained in pages 1 - 208; that

7   the same is a full, true, correct and complete transcript

8   from the record of proceedings in the above-entitled matter.

9

10         DATED this 6th day of December, 2021.

11

12

13

14          */s/Karen E. Waugh, CSR, RPR, CRR*

15

16

17

18

19

20

21

22

23

24

25