IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS (also
known as CHRISTIAN NOEL
IGLESIAS),

        Plaintiff,

v.

        **Case No. 19-CV-415-NJR**

FEDERAL BUREAU OF PRISONS,
MICHAEL CARVAJAL, CHRIS BINA,
IAN CONNORS, DAN SPROUL,
JEFFERY ALLEN,
ALIX MCLEAREN,
THOMAS SCARANTINO,
and DONALD LEWIS,

        Defendants.

# <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

Approximately 1,200 transgender inmates are in the custody of the Federal Bureau of Prisons ("BOP"). (Doc. 175, p. 182). Not all transgender inmates suffer from gender dysphoria. Not all inmates with gender dysphoria require gender confirmation surgery ("GCS").[1] Nevertheless, BOP found that GCS was not medically necessary for *any* <u>past</u> or <u>present</u> transgender inmate until *October 2021*. (*Id.* at pp. 182-183).

Just a couple months ago, BOP's Transgender Executive Council ("TEC")[2] recommended its first inmate for GCS. (*Id.* at p. 183). This does not guarantee the inmate

---

[1] For the purposes of this order, GCS refers to gender reassignment surgery or surgeries altering one's reproductive organs.
[2] "The TEC is a group of administrators who work in the central office and who oversee the provision of not day-to-day services for transgender inmates but the larger scale decisions about transgender individuals, specifically designation decisions and potentially surgery decisions." (*Id.* at pp. 130, 132).

will receive GCS. The inmate has more hurdles. Next, BOP's medical director, Dr. Stahl, and her staff must approve the transgender inmate for surgery. (*Id.* at p. 163). This includes making sure there are no contraindications. (*Id.*) Then, even after the medical director approves GCS, her staff must find a surgeon. (*Id.*).

Cristina Iglesias, a transgender woman in BOP custody and diagnosed with gender dysphoria, has even more hurdles to receive GCS, and she is running out of time.[3] As a result, Iglesias filed this action alleging the following three claims against Defendants: an Eighth Amendment claim for failing to provide necessary medical treatment for her gender dysphoria (Count I); a Fifth Amendment claim for denying her placement in a female facility (Count II); and an Eighth Amendment claim for failing to protect her (Count III). (Doc. 106).

Pending before the Court is Iglesias's Motion for Preliminary Injunction. (Doc. 93). Iglesias seeks an order enjoining Defendants (1) to provide Iglesias with the medically necessary healthcare she needs, including permanent hair removal and GCS; (2) to house Iglesias at a facility consistent with her gender identity; and (3) to protect Iglesias from the known and serious risks of harm she continues to face while housed in a male facility. (*Id.*).

The Court held an evidentiary hearing on November 22, 2021. (Doc. 175). After considering the evidence and relevant authority, the Court enters preliminary injunctive relief as set forth below, granting Iglesias's motion in part.

---

[3] According to the BOP's website, Iglesias is scheduled to be released on December 25, 2022. Federal Bureau of Prisons Inmate Locator, https://bop.gov/inmateloc/(last visited Dec. 26, 2021).

<u>BACKGROUND</u>

The Motion for Preliminary Injunction alleges the following:  Iglesias knew from a very young age that her body and sex assigned at birth did not match her true identity. (Doc. 93, p. 2). Shortly after arriving in BOP custody in 1994, Iglesias was diagnosed with gender identity disorder ("GID"). (*Id*.). Her diagnosis was updated to gender dysphoria to reflect the Diagnostic and Statistical Manual Version 5 ("DSM-5"). (*Id*.). Despite her diagnoses, Iglesias was denied hormone therapy until 2015. (*Id*. at p. 4).

By 2016, Iglesias made requests for GCS to treat her gender dysphoria. (*Id*.). BOP denied Iglesias's requests for GCS because she did not meet the requirements to be transferred to a female facility and her hormone levels had not been maximized or stabilized. (*Id*. at p. 5). Iglesias also alleges that she requires permanent hair removal as part of her treatment. (*Id*.). Yet BOP has denied her requests because she had not reported major emotional or environmental problems during her last visit with psychological services (*Id*.). Iglesias continues alleging that BOP repeatedly denied her requests for transfer to a female facility even though transfer would make her safer and is part of her treatment for gender dysphoria. (*Id*.).

Throughout her time in BOP custody, Iglesias has reported sexual abuse and harassment, but BOP staff has failed to protect her. (*Id*. at pp. 6-8). Iglesias's mental health has severely deteriorated because of the trauma she has experienced from being denied necessary treatment for her gender dysphoria and harassment at male facilities. (*Id*. at p. 9). Iglesias has been on suicide watch multiple times while in BOP custody and has attempted self-harm. Iglesias has and will continue to endure mental and physical harms

because of the BOP's mistreatment of her gender dysphoria. (*Id*. at p. 18).

Thirteen days after Iglesias filed her Motion for Preliminary Injunction, on April 19, 2021, the BOP's TEC recommended Iglesias's transfer to a female facility. (Doc. 111). On May 25, 2021, Iglesias arrived at Federal Medical Center at Carswell (FMC-Carswell), a female facility. (*Id*.).

FACTS

## I.    Gender Dysphoria and Standards of Care

At birth, humans are typically classified as male or female. Humans born with external physical characteristics of males typically identify as men, and humans born with external physical characteristics of females typically identify as women. When a human's internal sense of belonging to a particular gender—also known as gender identity—is different than the identity assigned at birth to that individual, he or she is transgender.

For some transgender individuals, the difference between the gender assigned at birth and gender identity results in gender dysphoria. Gender dysphoria is a serious medical condition characterized by "mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." *Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019) (citing AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013)).

The World Professional Association for Transgender Health ("WPATH") is a professional association dedicated to understanding and treating gender dysphoria. (Doc. 175, p. 56). WPATH has established standards of care for transgender individuals.

WORLD PROFESSIONAL ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, & GENDER NONCONFORMING PEOPLE 1 (7TH VERSION 2011). "BOP uses the WPATH standards as a guide, but [BOP] do[es]not follow them in entirety, and that's because they weren't developed specifically for correctional settings." (Doc. 175, pp. 134-135). Yet the American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, and the American Society of Plastic Surgeons endorse all the protocols in accordance with WPATH's Standards of Care. (*Id*. at pp. 78-79). Additionally, WPATH's Standards of Care are flexible. (*Id*. at p. 91). "Individual health professionals and programs may modify them." (*Id*. at p. 93).

Treatment options for gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and GCS. (*Id*. at pp. 75-78, 92-93). For GCS, current WPATH standards of care require the individual to live for "12 continuous months [] in a gender role that is congruent with gender identity." (*Id*. at p. 107). An individual also needs a medical clearance by a primary care provider and two referrals from mental health professionals. (*Id*. at p. 106). Finally, a surgeon still has the discretion to decide whether surgery is appropriate for the individual. (*Id*.).

## II.   *BOP Policies & Procedures*

### A.  *Hormone Treatment Policies*

Before 2010, only BOP inmates who received hormone therapy *prior to incarceration*

were eligible to receive hormones while in BOP custody. (*Id*. at p. 155); *see also* Stipulation for Compromise Settlement and Release Ex. A, *Adams v. Fed. Bureau of Prisons*, No. 09-10272-JLT (D. Mass. Sept. 29, 2011), *available at* http://www.clearing.net/detail.php?id=14130&search=source%7Cgeneral%C3BdocketSimpleYear%C7C2009%C3BdocketSimpleText%C7C10272%C3BtrialCourt%C7C38%C3Borderby%7CfilingYear %3B, *archived at* http://perma. cc/AEQ4-CURV.

After BOP was sued, it ended this policy and provided additional clarification for the evaluation and treatment of inmates with GID. *Id*.; *see also* BUREAU OF PRISONS, GENDER IDENTITY DISORDER EVALUATION AND TREATMENT (May 31, 2011). Per BOP, "[i]f a diagnosis of GID is reached, a proposed treatment plan will be developed which promotes the physical and mental stability of the patient." *Id*. "The development of the treatment plan is not solely dependent on services provided or the inmate's life experiences prior to incarceration." *Id*. "Each treatment plan or denial of treatment must be reviewed by the Medical Director or BOP Chief Psychiatrist." *Id*.

### B.  GCS Policies

In 2016, BOP developed clinical guidance for medical management of transgender inmates which "provides recommendations for the medical management and treatment of transgender federal inmates, referred to in these guidelines as individual(s) or person(s)." Federal Bureau of Prisons, *Medical Management of Transgender Inmates*, Clinical Guidance (December 2016), https://www.bop.gov/resources/pdfs/trans_guide_dec_2016.pdf. BOP recognizes that "[a]lthough individuals may live successfully as transgender persons without surgery, [GCS] may be appropriate for some and is

considered on a case-by-case basis." (*Id*.).

The BOP criteria for GCS includes:

In addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, *full-time real life experience in their preferred gender*, and consolidation of gender identity. The inmate must request consideration for and demonstrate via informed consent a practical understanding of [GCS] including, but not limited to, permanence, potential complications, and short and long-term treatment plans.

(*Id*. at p. 22) (emphasis added). BOP defines real-life experience as "[w]hen individuals live as the gender with which they identify." (*Id*. at p. 5).

At that time, "[r]equests for surgery [were] submitted to the BOP TCCT for initial review and recommendation to the Medical Director, who is the approving authority." (*Id*. at p. 22). The TCCT is the Transgender Clinical Care Team. Per BOP, this is "[a] multidisciplinary group of BOP personnel with [transgender] subject matter expertise." (*Id*. at p. 4). "The team provides assistance to [ ] staff and develops clinical treatment recommendations for the BOP [transgender] population." (*Id*.). After the TCCT's initial review, "[e]ach referral should include comprehensive medical and mental health summaries, a comprehensive psychosocial assessment (preferably by a licensed clinical social worker), and a criminal history and institutional adjustment report." (*Id*. at p. 22). The TEC now makes initial recommendations for surgery to the Medical Director. (Doc. 175, p. 151).

### C. *Transfer to Female Facility Polices*

By 2018, BOP developed the Transgender Offender Manual ("Manual"). (Doc. 100-

2, p. 10). The Manual lists the following assessments the TEC should make when considering transfer of a transgender woman inmate to a female facility:

-   The TEC will use biological sex as the initial determination for designation;

-   The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;

-   The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and

-   The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

(Doc. 100-2, p. 11). "The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history." (*Id*.).

### D. BOP's 12-Month Requirement, Target Hormone Level Requirement, and Low-Security Level Requirement

Besides the above policies, BOP noted additional policies at the preliminary injunction hearing and in its briefing. To receive GCS, BOP has an *unwritten* policy requiring transgender women inmates to live in a female facility for 12 continuous months ("12-month requirement"). (Doc. 175, pp. 138-139). But to be transferred to a female facility, BOP requires transgender women to achieve target hormone levels

("target hormone level requirement") and to be at low-security level facilities ("low-security level requirement"). (*Id*. at pp. 143-145).

To summarize, a transgender woman in BOP custody must meet the following criteria before the TEC recommends the inmate for GCS:

1. undergo hormone therapy for 12 months;

2. participate in psychotherapy;

3. meet BOP's target hormone level requirement;

4. meet BOP's low-security level requirement; and

5. meet BOP's 12-month requirement.

### E. *Inmate Security Level and Redesignation Polices*

Policies and procedures regarding an inmate's security level are found in BOP's Program Statement 5100.08. The Program Statement defines security level as:

Used to describe the structural variables and inmate-to-staff ratio provided at the various types of Bureau institutions (i.e., Minimum, Low, Medium, High). It also identifies the institution type required to house inmates based on their histories, institutional adjustment, and Public Safety Factors as well as the physical security of the institution to include mobile patrols, gun towers, perimeter barriers, housing, detection devices, inmate-to-staff ratio, and internal security.

(Doc. 100-2, p. 44). The BOP's five security levels are minimum, low, medium, high, and administrative. (*Id*. at p. 37). "Female security level [facilities] are classified as Minimum, Low, High and Administrative." (*Id*. at p. 39). [4]

---

[4] Dr. Leukefeld's sworn declaration on April 20, 2021, notes "all female institutions are low- or minimum-security, and inmates do not typically skip security levels as they move down." (*Id*. at p. 7). At the hearing, Dr. Leukefeld testified that "[f]emale prisons only are classified as low or minimum . . . ." (Doc. 175, p. 143). Dr. Leukefeld continued explaining that the BOP's "classification system has really just two levels for women, and they're minimum and low, and there's one very small unit—it's actually FMC Carswell—that

Inmates are classified based on the following factors:

- The level of security and supervision the inmate requires;

- The inmate's program needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc.

(*Id.* at p. 37). The Program Statement also lists additional factors when designating an inmate to a particular facility including, but not limited to the following:

- The inmate's release residence;

- The level of overcrowding at a facility;

- Any security, location or program recommendation made by the sentencing court;

- Any Central Inmate Monitoring issues;

- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and

- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

(*Id.* at pp. 37-38).

The Program Statement then explains:

Initial designations to BOP institutions are initiated, in most cases by staff at the Designation and Sentence Computation Center (DSCC), Grand Prairie, Texas, who assess and enter information from the sentencing court, U.S. Marshals Service, U.S. Attorneys Office or other prosecuting authority and the U.S. Probation Office about the inmate into a computer database (SENTRY).

---

houses—. . . seven women who are—one was on death row and the others were very, very high security, but it's a very small kind of singular unit for women who don't fit into those other two classifications. (*Id.* at p. 153).

(*Id*. at p. 38). "SENTRY then calculates a point score for that inmate which (for example, 18 points) is then matched with a commensurate security level [facility]." (*Id*.). The Program Statement includes the following chart:

| Security Level | Custody Level | Male | Female |
|---|---|---|---|
| MINIMUM | COMMUNITY and OUT | 0-11 points | 0-15 points |
| LOW | OUT and IN | 12-15 points | 16-30 points |
| MEDIUM | OUT and IN | 16-23 points | * |
| HIGH | IN and MAXIMUM | 24+ points | 31+ points |
| ADMINISTRATIVE | All custody levels | All point totals | All point |

(*Id*.).

One of the factors when determining an inmate's security point total is the severity of current offense. (*Id*. at p. 62). The severity of current offense includes scores of "0" for lowest, "1" for low moderate, "3" for moderate, "5" for high, and "7" for greatest. (*Id*.). Inmates with a current offense of toxic substances and chemicals where they weaponize the substance to endanger human life receive the "greatest severity" score. (*Id*. at p. 127). Inmates with a current offense of making threatening communications receive a "high severity" score. (*Id*. at p. 128).

Besides the severity of current offense, an inmate's criminal history score is another factor used to calculate the inmate's security point total. (*Id*. at p. 40). The criminal history score is "derived from the Criminal History Points whereby the Criminal History Points fall into one of six categories." (*Id*.). SENTRY automatically converts the criminal history points to the criminal history score. (*Id*. at p. 63).

The BOP also considers an inmate's history of violence. (*Id*. at p. 64). "History of Violence points combine both seriousness and recency of prior violent incidents to assess the propensity for future violence." (*Id*.). When assessing the number of points for history of violence, BOP acknowledges that "verbal threats (such as Code 203—Threatening Bodily Harm) are to be viewed as minor violence." (*Id*. at p. 65).

Age is another factor. (*Id*. at p. 67). Inmates who are fifty-five and older receive 0 points; inmates between the ages of fifty-four and thirty-six receive 2 points; inmates between the ages of thirty-five and twenty-five receive 4 points; and inmates twenty-four or less receive 8 points. (*Id*.).

An inmate's education level is another factor. Inmates with no verified high school degree or GED and not participating in the GED Program receive 2 points. (*Id*.). Inmates enrolled in and making satisfactory progress in GED program receive 1 point. (*Id*.). Inmates with verified high school degree or a GED do not receive any points. (*Id*.)

The BOP factors in drug and alcohol abuse. (*Id*. at p. 68). "Examples of drug or alcohol abuse include: a conviction of a drug or alcohol related offense, a parole or probation violation based on drug or alcohol abuse, positive drug test, a DUI, detoxification, etc." (*Id*.) "Absent any information similar to the above, an inmate's self-report is sufficient to score this item." (*Id*.). An inmate receives 1 point if the drug or alcohol abuse occurred less than five years ago. (*Id*.). But if the drug or alcohol abuse occurred greater than five years ago the inmate does not receive any points.

In addition to an inmate's security point score, BOP also applies public safety factors and management variables which "could effect [sic] placement at either a higher

or lower level [facility] than the specified point total indicates." (*Id*. at p. 39). For example, one of the public safety factors is "threat to government officials." (*Id*. at p. 80). When "[a] male or female inmate [is] classified with a Central Inmate Monitoring assignment of Threat to Government Official [the] [inmate] will be housed in at least a Low security level [facility], unless the PSF has been waived." (*Id*. at p. 80). Other public safety factors include sentence length, serious telephone abuse, disruptive group, greatest severity offense, sex offender, deportable alien, violent behavior, serious escape, prison disturbance, and juvenile violence. (*Id*. at pp. 78-84).

Transfers or redesignations are "considered in much the same manner using many of the same factors used at the time of initial designation." (*Id*. at p. 39). But "the inmate's institutional adjustment and program performance are also carefully reviewed when redesignation is considered." (*Id*.). BOP also conducts custody classifications where an inmate is assigned a level of supervision. (*Id*. at p. 85). During the custody classification process, BOP does a computation that "adjusts the inmate's total security points . . . ." (*Id*. at p. 98). Thus, an inmate's security level may be impacted during the custody classification process. BOP conducts its custody classification every 12 months. (*Id*. at p. 85). Additionally, BOP purportedly reviews an inmate's security level classification every six months. (Doc. 175, p. 174).

### III.    Iglesias's Course of Treatment

Iglesias has been in BOP custody since 1994. (Doc. 129, p. 4). Around that time, she was diagnosed with GID. (*Id*.). By 2015, Iglesias's diagnosis was changed to gender dysphoria by BOP's Chief Psychologist, Dr. Lewis. (*Id*.).

On July 6, 2015, Iglesias started receiving "spironolactone 50 mg by mouth once daily and estradiol 2 mg by mouth twice daily for the treatment of her GID." (Doc. 100-7, p. 3). "Iglesias subsequently reported not achieving the desired degree of feminization while using estradiol, and requested an increase in the dosage of spironolactone." (*Id*.). This request was granted in December 2015, and her "spironolactone was initially increased to 50 mg twice daily and then to 50 mg three times daily." (*Id*. at p. 4). "Shortly thereafter, based on tests of Iglesias's testosterone and estradiol levels, her dosages were increased to 100 mg of spironolactone twice daily and 8 mg of estradiol daily." (*Id*.).

As early as January 2016, Iglesias noted desire for GCS through BOP's Administrative Remedy Program. (Doc. 100-3, p. 10). On June 20, 2016, the TEC met to review Iglesias's file because of her recent BP-9 which requested GCS. (Ex. 15, p. 2). At this meeting, the TEC did not grant Iglesias's request for GCS, but realized that after almost a year of providing Iglesias hormone treatment, BOP still had not developed an individual transgender treatment plan for her. (*Id*. at p. 69).

By June 2016, Iglesias began requesting to be transferred to a female facility. (Doc. 100-3, p. 10). On September 12, 2016, the TEC met to review Iglesias's file for placement in a female facility. (Ex. 15, p. 4). The TEC Meeting Notes report that Iglesias is "doing 'very well' according to Dr. Gray, who is considering lowering to CARE2-MH." (*Id*.). Iglesias had no problematic behavior since arrival and was "enrolled in transgender and emotion self-regulation groups." (*Id*.). The TEC concluded that more information needed to be obtained about Iglesias and added Iglesias to the September 26, 2016 TEC agenda. (*Id*. at p. 67).

At the September 26, 2016 TEC meeting, the TEC reviewed Iglesias's file for placement in a female facility. (*Id*. at p. 6). The TEC again reported that Iglesias had no problematic behavior since arrival at Butner. (*Id*.). The TEC did not transfer Iglesias at that time, but noted the officials at Butner "will update team when or if they feel inmate is ready for a female facility." (*Id*. at p. 66).

In late January and early February 2017, the TEC met and noted that "Iglesias has requested transfer to a female facility, and was reviewed a few months ago and it was determined she should continue to demonstrate stability and be re-reviewed in the future." (*Id*. at pp. 7-8). According to the meeting notes, "[s]ince her last review, she has continued to participate in treatment and has remained stable, even with the recent PREA [Prison Rape Elimination Act] incident." (*Id*.). Despite remaining stable, the TEC did not transfer Iglesias to a female facility. (*Id*. at p. 64).

On June 12, 2017, Iglesias was transferred to USP-Marion. (Doc. 129-1, p. 2). In September 2017, the TEC reviewed Iglesias's file to determine if she should be placed in a female facility. (Ex. 15, pp. 11-12). According to the TEC meeting notes, "[Iglesias] [is] adjusting poorly to her environment and has filed frequent complaints." (*Id*. at p. 12). The TEC decided that Iglesias will remain at a male facility. (*Id*. at p. 61).

For over two years, the TEC did not meet to discuss Iglesias. Despite the lack of TEC meetings, Iglesias was still receiving estradiol injections to increase estrogen levels, spironolactone to lower testosterone levels, and finasteride to help with male-pattern baldness. (Doc. 19-1, p. 7). In fact, in June 2018, Iglesias's "hormone levels have been adjusted such that she has very low testosterone level (18) and high estradiol level (200),

which are typical for a female." (*Id*.). And in June 2019, Iglesias had a clinical encounter that recorded her hormone levels with estradiol 173 and testosterone 13. (*Id*. at p. 2).

Iglesias then filed this lawsuit in April 2019 and approximately six months later, the TEC finally met to continue discussing her request for GCS. The TEC meeting handout reports that "[Iglesias] has consistently manifested her desire to live as female since [2015]."[5] (Ex. 16). Iglesias has "consistently attempted to portray a female appearance, to the extent possible," and Iglesias's hormone levels were appropriate for a transgender female. (*Id*.). The TEC decided to transfer Iglesias to a lower security male facility. (Ex. 15, p. 47).

On November 14, 2019, Iglesias was transferred to FMC Lexington—a low level security facility. Iglesias's hormone therapy was doing well. (Doc. 85-1, p. 48). "However, [she] [was] interested in switching from injectable estradiol to PO estradiol if possible." (*Id*.). BOP complied with this request, and "[f]ollowing consultation with an endocrinologist, oral estradiol 4 mg once daily was prescribed starting on December 19, 2019." (Doc. 100-7, p. 4).

Unfortunately, changing the estradiol route to oral administration caused Iglesias to fall below her target estrogen levels. (*Id*.). BOP recorded that Iglesias's "blood levels of estradiol had been consistently lower than with the injectable administration based on blood tests taken on February 25, 2020 (24 pg/ml), May 26, 2020 (60 pg/ml); and August 27, 2020 (26 pg/ml)." (*Id*.).

---

[5] The TEC meeting notes state that Iglesias "initially received a diagnosis of gender dysphoria in 2014." (Ex. 16). But Dr. Leukefeld's declaration notes Iglesias was diagnosed with gender dysphoria in 2015. (Doc. 100-2, p. 4).

On January 27, 2020, February 10, 2020, and February 24, 2020, the TEC met to review Iglesias for GCS. (Ex. 15, pp. 13-20, 44-45). It was not until March 2020 that the TEC met to review Iglesias's most recent labs. At the March meeting, Iglesias's current labs were reviewed and her hormone levels "[fell] well below goal and have not been maximized." (*Id*. at p. 44). Accordingly, the TEC decided that GCS and transfer to a female facility were inappropriate, and Iglesias would remain at a male facility and "maximize gender-affirming hormones." (*Id*.).

On October 21, 2020, Iglesias requested an increase in the dose of oral estradiol to 8 mg as she was unsatisfied with her body changes at the current dose. (Doc. 100-7, p. 4). The BOP increased the daily oral dose to 6 mg. (*Id*. at p. 5). By December 2020, Iglesias was transferred to FCI Fort Dix. (Doc. 100-7, p. 5). On April 14, 2021, Iglesias's blood estradiol level was 75 pg/ml. (*Id*.). On April 19, 2021, TEC reviewed Iglesias and received new blood test results. The test reflected that Iglesias's hormone levels were at goal levels. Accordingly, TEC recommended that Iglesias be transferred to a female facility. (Ex. 15, pp. 32-33).

On May 25, 2021, Iglesias arrived at FMC Carswell, Texas, a female facility. The TEC met on October 12, 2021, to follow-up on Iglesias's status. (*Id*. at pp. 23-24). At the recent evidentiary hearing, Dr. Leukefeld testified the TEC will meet in April 2022, one full month before meeting 12-month requirement, to assess Iglesias for GCS. (Doc. 175, p. 149).

## IV.   Iglesias's Testimony

At birth, Iglesias was assigned male, but for much of her life she has identified as

a female. (*Id*. at pp. 8-11). Around the tenth grade, Iglesias began socially transitioning by wearing her hair in a female hairstyle, wearing female clothes, and taking birth control medication. (*Id*.).

Iglesias was twenty years old when she entered BOP custody in 1994. (*Id*. at p. 11). She identified as a female at that time, but was told she was a male and had to go to male facility. (*Id*.). Despite being diagnosed with GID when she first entered BOP custody, the BOP did not provide any treatment. (*Id*. at p. 12).

More than twenty years later, around 2015, the BOP diagnosed Iglesias with gender dysphoria and provided her with hormone therapy. (*Id*. at pp. 12-13). Hormone therapy helped Iglesias a lot. (*Id*. at p. 13). She testified that it changed her characteristics, helped her develop breasts, and her body started changing to female. (*Id*.).

But hormone therapy has not completely alleviated Iglesias's gender dysphoria because she still has facial hair and male genitals. (*Id*.). As a result, Iglesias has asked for laser hair removal and GCS. (*Id*.). Iglesias requested facial hair removal specifically because she is called a "bearded woman" by the inmate population. (*Id*.). She testified that having to shave twice a day is a nightmare. (*Id*.). Iglesias has a lot of stress, anxiety, and panic attacks. (*Id*. at p. 14).

Iglesias recalled first asking for facial laser hair removal in 2017 and has made this request over fourteen times. (*Id*.). After psychology and health services denied her requests, Iglesias pursed administrative remedies near the end of 2017. (*Id*. at pp. 14-17). Even after filing a BP-8, BP-9, BP-10, and BP-11 to no avail, Iglesias still explains to her psychologists that her facial hair is torture. (*Id*. at p. 16). Shaving helps with her distress,

but it has not completely alleviated her gender dysphoria. (*Id.* at p. 17).

Iglesias also testified that she first requested GCS to health services in 2016. (*Id.* at p. 20). Because health services never provided her with GCS, Iglesias pursed administrative remedies. (*Id.*). After filing a BP-8, BP-9, and BP-10, Iglesias was notified that her request was under review by the TEC. (*Id.* at pp. 20-21). After filing a BP-11, Iglesias was informed that she would be notified when a decision was made by the TCCT. (*Id.* at p. 21).

In 2017, Iglesias pursued administrative remedies a second time for GCS. (*Id.*). Again, she filed a BP-8, BP-9, BP-10, and BP-11, and after each was notified that her request was under review by the TEC. (*Id.* at p. 22). But the TEC never notified her of a decision. (*Id.*).

In 2019, Iglesias pursued GCS through administrative remedies a third time. (*Id.* at p. 23). After filing a BP-8, BP-9, and BP-10, Iglesias was informed that her request was sent to the TCCT for review. (*Id.*).

Later in 2019, Dr. Pass, clinical director at USP Marion, requested Iglesias to be evaluated for GCS. (*Id.* at pp. 24-25). Dr. Pass explained that final approval of GCS itself was out of his control, but he was trying to do everything he could. (*Id.* at p. 25). Dr. Munneke, chief of psychology at USP Marion, told Iglesias that there was nothing psychologically that would prevent her from receiving GCS, and supported Iglesias's request. (*Id.* at pp. 25-26). Besides Dr. Pass and Dr. Munneke, Iglesias's primary psychologist at USP Marion, Dr. Lindsay Owing, was supportive of Iglesias receiving GCS. (*Id.* at p. 26).

By the end of October 2019, Iglesias's case manager, Ms. Lamer, notified Iglesias that she would be transferred to FMC Lexington for evaluation for GCS. (*Id*. at p. 24). At FMC Lexington, Iglesias was evaluated for GCS by Tammy Thomas at the University of Kentucky. (*Id*. at pp. 26-27). Ms. Thomas told Iglesias that she met the criteria for GCS. (*Id*. at p. 27). Iglesias's psychologist at FMC Lexington, Dr. Hernandez, also supported Iglesias's request for GCS and was very concerned that Iglesias was going to self-treat. (*Id*. at pp. 27-28).

It was not until Iglesias was at FMC Lexington that she received an answer to her third BP-11. (*Id*. at p. 28). But this time the BOP told Iglesias that in order for her to be considered for GCS, her hormone levels would have to be maximized and she would have to live in a female facility for one year. (*Id*.). Iglesias later learned that her hormones were not maximized because she changed to oral medication with a lower dosage. (*Id*. at p. 29). Iglesias explained that she made this request because she was worried that staff at FMC Lexington would forget to put her on the callout list for her injections, and by taking oral medication she would get her hormones more consistently. (*Id*.). Iglesias did not know that the hormone dosage would be lower. (*Id*.).

Prior to changing to oral medication, Iglesias had maximized her hormones for years. (*Id*. at p. 30). Iglesias further explained that before this change of oral medication—back in 2015—she requested to be transferred to a female facility. (*Id*. at p. 31). She made this request ten times before her hormone dosage was temporarily reduced in 2019. (*Id*.).

Since being transferred to a female facility, Iglesias feels safer because she does not have to worry about sexual assault or being forced to prostitute herself. (*Id*.). But Iglesias

still has daily concerns about being transferred back to a male facility because two staff members, Captain Buckner and Lieutenant Anthony, told her that she was going to be sent back to a male facility. (*Id*. at p. 32). The two staff members told Iglesias this after she filed a PREA complaint against two women. (*Id*. at pp. 32-33). Iglesias testified she filed the PREA complaint because she felt the two women were plotting to file their own false PREA lawsuits against her. (*Id*. at pp. 33-34). So, Iglesias filed the PREA complaint against them and requested to be sent back to a male facility. (*Id*. at p. 34). On the same day, however, Iglesias rescinded her request and explained that returning to a male facility would threaten her physical safety, and she would be forced to prostitute or be in a relationship to stay safe. (*Id*. at pp. 34-35).

Iglesias has requested GCS since being at the female facility. (*Id*. at p. 36). In response, BOP told her that it is not offering that as current treatment. (*Id*.). But the clinical director at FMC Carswell, Dr. Langham, told her that the last person who requested GCS was told that she had to be at the female facility for a year. (*Id*.).

According to Iglesias, three medical professionals—Dr. Langham, Dr. Quick, and Dr. Munneke—support her request for GCS. (*Id*. at p. 37). Dr. Langham told Iglesias that he is not interfering with her treatment, and if it was up to him he would have sent her request up for review again. (*Id*. at pp. 37-38). Dr. Quick, Iglesias's primary psychologist, supports Iglesias and encourages her to "keep going." (*Id*. at p. 38). Dr. Munneke, now the chief psychologist of Carswell, is proud of Iglesias and thinks she has come a long way from when she first came into the prison system. (*Id*.). Dr. Munneke even brought Dr. Quick to Iglesias and told her that she has "full support of the psychology services at

FMC Carswell and that no one here is interfering with [her] treatment or surgery . . . ." (*Id*.).

Dr. Langham performed a full exam on Iglesias. (*Id*. at p. 40). Dr. Langham ordered a psychosocial evaluation, and he received a diagnosis from Dr. Quick. (*Id*.). Dr. Langham then told Iglesias that he would be sending a request for Iglesias to have GCS to Dr. Stahl, the director of the Transgender Clinical Care Team. (*Id*. at p. 39). But Dr. Langham did not send in an official request. (*Id*.). Instead, he sent an email to Dr. Stahl inquiring where to send her request. (*Id*.).

Iglesias testified that having gender dysphoria is a living hell. (*Id*. at p. 44). Again, she suffers from anxiety every single moment and panic attacks as well. (*Id*. at p. 45). Iglesias explained that "self-castration or suicide is always there." (*Id*.). While she has access to bras, panties, and makeup, Iglesias's gender dysphoria is not completely alleviated. (*Id*.). In fact, Iglesias still painfully tucks her penis between her inner thighs and pushes her "testicles up into a little hole on top so [she] can't see anything." (*Id*. at p. 47). Besides tucking, Iglesias has thought again about performing GCS on herself or committing suicide and has been told by staff that "the BOP was just trying to run the clock out on [her] lawsuit and that they were not trying to give [her] any kind of treatment . . . ." (*Id*. at pp. 49-51). Iglesias has these thoughts because she is tired of being tormented every day. (*Id*. at p. 49).

## V.   Iglesias's Expert Testimony – Dr. Randi Ettner

Dr. Randi Ettner is a clinical and forensic psychologist with a specialty in the assessment and treatment of gender dysphoria. (*Id*. at pp. 54-55). She received a Ph.D.

from Northwestern University and is licensed as a psychologist. (*Id*.). She has authored numerous articles in peer-reviewed publications on transgender health and treated over 3,000 individuals with gender dysphoria. (*Id*. at p. 57). For years, Dr. Ettner has supervised psychologists in treating people with gender dysphoria. (*Id*.). Dr. Ettner is on staff at Weiss Hospital in Chicago and consults with the physicians there. (*Id*. at p. 58). Specifically, Dr. Ettner consults about mental health issues with Weiss's team which includes: a plastic surgeon, a urologist, social workers, primary care providers, physician assistants, and physical rehabilitation people. (*Id*.).

Dr. Ettner is the immediate past secretary of WPATH. (*Id*.). Dr. Ettner has received the University of Minnesota's Transgender Health Fellowship. (*Id*.). Further, the University of Minnesota's Institute of Sexual and Gender Health identified her as one of the 50 sexual and gender revolutionaries in the world. (*Id*. at p. 59). Dr. Ettner even received a commendation from the U.S. House of Representatives for her work. (*Id*.).

Dr. Ettner was asked to provide an opinion about the adequacy of care Iglesias is receiving from the BOP. (*Id*. at p. 60). She reviewed Iglesias's medical and mental health records, declarations, Dr. Leukefeld's deposition, the TEC's meeting documents, and some of Iglesias's grievances. (*Id*.). In March 2021, Dr. Ettner spoke to Iglesias for 30 minutes. (*Id*.). During the 30-minute phone call, Iglesias was distressed and hopeless and expressed distaste for her genitalia. (*Id*. at p. 61). Then in July 2021, Dr. Ettner conduced a two-hour assessment of Iglesias. (*Id*. at p. 60). During the assessment, Dr. Ettner performed a clinical interview and psychological testing. (*Id*. at p. 61). The tests included

the Beck Depression Inventory number 2, the Beck Anxiety Inventory, the Beck Hopelessness Scale and the Traumatic Symptom Inventory 2. (*Id.*).

Dr. Ettner concluded Iglesias has the most severe form of gender dysphoria. (*Id.* at pp. 63-64). For individuals with the most severe form of gender dysphoria, hormone treatment is insufficient. (*Id.* at p. 64). Dr. Ettner noted that Iglesias showed signs of childhood gender dysphoria, and individuals with early onset gender dysphoria tend to have the most severe form of gender dysphoria. (*Id.* at p. 65).

Dr. Ettner then testified that gender dysphoria increases as one ages. (*Id.* at p. 66). In fact, when Dr. Ettner reviewed Iglesias's mental health records, she noticed that in 2019 there was an intensification of her gender dysphoria. (*Id.*). Social role transition, living with females, access to female accoutrements, and hormone treatment is not sufficient treatment for Iglesias's gender dysphoria. (*Id.*). Instead, GCS is the cure of Iglesias's gender dysphoria because it eliminates the circulating nascent androgens in the body and would give Iglesias the appropriate functioning and appearing genitalia. (*Id.* at p. 67).

If left partially treated, Iglesias is on three trajectories: psychological decompensation, surgical self-treatment, or suicide. (*Id.*). Dr. Ettner explains that Iglesias's past attempts to perform her own GCS suggests that Iglesias is receiving inadequate treatment. (*Id.* at pp. 68). Iglesias also has several risk factors for suicide including her prior attempts, the different methods in which she has attempted suicide, and the 37 times she has been assessed for suicide. (*Id.* at p. 69). Dr. Ettner later clarified, however, that she did not think that Iglesias would immediately attempt or complete suicide. (*Id.* at p. 117). Also, Dr. Ettner clarified that "[Iglesias] will not attempt surgical

self-treatment unless she is convinced or it remains uncertain as to whether she will be provided with medically indicated treatments." (*Id*.).

Dr. Ettner acknowledged that specialists in gender dysphoria would have no difficulty in agreeing that Iglesias needs GCS. (*Id*. at pp. 69-70). As for Iglesias's medications, Dr. Ettner explained they will not be effective because she will still have the anxiety for her gender dysphoria. (*Id*. at pp. 70-71). Instead, Iglesias needs GCS now. (*Id*. at p. 71).

Besides GCS, Iglesias requires permanent hair removal to treat her gender dysphoria. (*Id*. at p. 67). Dr. Ettner bases her conclusion on the fact that facial hair is a secondary sex characteristic of males, and the criteria in DSM-5 for gender dysphoria is to rid oneself of primary and secondary sex characteristics. (*Id*. at p. 72). Dr. Ettner explained that facial hair is the most visible—and can be the most disturbing—stigmata of masculinity. (*Id*.).

Dr. Ettner also concluded that Iglesias should remain at a female facility. (*Id*. at p. 76). Remaining at a female facility furthers Iglesias's ability to socially transition. (*Id*.). At a female facility, Iglesias is provided the same products and accoutrements as female inmates. (*Id*.). Dr. Ettner also stressed that it allows Iglesias to be safe from the sexual exploitation and abuse she experienced in male facilities. (*Id*.).

Dr. Ettner also testified about WPATH's standards of care and how they have discussed the treatment of incarcerated persons since 1998. (*Id*. at p. 79).[6] Dr. Ettner

---

[6] At the same time, Dr. Ettner agreed there is a lack of national guidelines for treating transgender people specific to the correctional setting. (*Id*. at pp. 102-105).

explained that BOP's target hormone level and 12-month requirements are neither medically necessary nor part of the WPATH standards. (*Id*. at p. 81). Regarding the target hormone level requirement, Dr. Ettner never heard of a "target range" as a criterion for surgery, but noted that optimization of hormone levels occurs after 24 months of usage, and thus Iglesias would have been eligible in 2017 for surgery. (*Id*. at p. 83). As for the 12-month requirement, Dr. Ettner found that Iglesias has lived as a female to the best of her ability for decades. (*Id*.).

Dr. Ettner opined that Iglesias has satisfied WPATH's criterion because she has a well-documented diagnosis of gender dysphoria; she has been on hormones for years; she has lived in her role for more than 12 months; she is above the age of majority in the country in which she resides; and any medical or mental health issues that she has are well controlled. (*Id*. at pp. 83-84). Notably, however, the current WPATH standard requires two referrals by mental health professionals for surgery—and Dr. Ettner admitted she has not seen two referrals for Iglesias. (*Id*. at pp. 106-107).

Dr. Ettner did not offer an opinion as to when it would have been appropriate to place Iglesias in a low-security level facility. (*Id*. at p. 112). But Dr. Ettner opined that administrative bodies should not be making medical decisions "particularly if they haven't assessed the individual." (*Id*. at p. 85). Dr. Ettner did not believe any of the TEC members were specialists in gender dysphoria. (*Id*. at p. 86). Dr. Ettner noted that a committee whose members are not specialists in gender dysphoria or transgender health should not be involved in making decisions about an individual's treatment for gender dysphoria because they lack the competency to make those individualized decisions.

(*Id*.). Thus, Dr. Ettner found that the TEC is unqualified to make decisions about Iglesias. (*Id*.).

## VI.   Defendants' Witness – Dr. Leukefeld's Testimony

Dr. Leukefeld earned her Ph.D. in counseling psychology from the University of Oregon and is a licensed psychologist in the state of Arkansas. (*Id*. at pp. 128-129). Since earning her degree, Dr. Leukefeld has been employed with BOP. (*Id*.). She is now the administrator for the psychology services branch of BOP. (*Id*. at p. 127). Dr. Leukefeld has held this position for a year and a half. (*Id*. at p. 128). In her position, Dr. Leukefeld is responsible for writing and revising policies, training, and oversight of psychologists and mid-level mental health providers. (*Id*.).

Dr. Leukefeld does not regard herself as a specialist or expert in the treatment of gender dysphoria. (*Id*. at pp. 132, 160). Dr. Leukefeld does not treat any patients. (*Id*. at p. 132). She has not treated patients for gender dysphoria. (*Id*.). Yet, Dr. Leukefeld is responsible for providing guidance on the psychological care of transgender inmates. (*Id*. at p. 130).

Despite not being a specialist or expert, Dr. Leukefeld is involved in developing policies related to the care of transgender inmates. (*Id*. at p. 129). Specifically, she "worked to help negotiate the transgender offender manual, which is the primary policy for transgender individuals, and also some of the other policies such as the treatment and care of individuals with . . . mental illness, which might relate to some individuals who are transgender. (*Id*.). Dr. Leukefeld and her staff have provided a specific training to all psychologists on the transgender manual and on transgender care when that policy was

issued. (*Id*.). Also, she has worked to provide additional trainings on transgender issues to BOP psychologists. (*Id*.). Sometimes this involves bringing in experts from the outside and providing smaller scale trainings to specific staff. (*Id*.).

Dr. Leukefeld then testified about the TEC. The TEC is made up of two psychologists, one psychiatrist, one pharmacist, and also staff members with expertise in designations and case management. (*Id*. at p. 130). The TEC is required to meet monthly, but it typically meets every other week. (*Id*.). The TEC works with other parts of BOP to ensure it considers placements that are consistent with the inmate's security classification. (*Id*. at p. 131).

Although Dr. Leukefeld is not an expert in gender dysphoria or treating transgender inmates, she testified that she serves on the TEC because of her "broad education in mental health issues and also psychopathology." (*Id*. at p. 133). Dr. Leukefeld has staff who have expertise in the treatment of gender dysphoria. (*Id*.). Besides her staff, there are opportunities for BOP psychologists to consult specialists in gender dysphoria, and there have been circumstances in which BOP psychologists have reached out to specialists on gender dysphoria. (*Id*. at p. 134).

Dr. Leukefeld confirmed that BOP uses the WPATH standards as a guide, but does not follow them entirely because they were not developed specifically for correctional settings. (*Id*. at pp. 134-135). Dr. Leukefeld noted that the WPATH standards are limited because correctional facilities have safety as the primary goal. (*Id*. at p. 135). As a result, BOP developed its own guidance for treatment of transgender inmates. (*Id*. at p. 136). One example is BOP's low-security level requirement. (*Id*.). Another example is BOP's 12-

month requirement *before they even consider GCS*. (*Id.* at p. 136). Dr. Leukefeld explained that the 12-month requirement "really is an adaptation of the WPATH standard which talks about living in one's gender role for 12 months prior to surgery." (*Id.* at p. 138). Later, Dr. Leukefeld testified that if an inmate could not meet BOP's 12-month requirement, and "if the surgery was *really needed*, [BOP] would have to think hard about how to individualize care, but [she] [didn't] have an answer for how that would happen right now." (*Id.* at p. 181) (emphasis added).

According to Dr. Leukefeld, BOP's 12-month requirement has been applied to approximately 20 to 30 transgender women other than Iglesias. (*Id.* at p. 139). Out of the 20 to 30 transgender women in female facilities,[7] Dr. Leukefeld recalled two situations where transgender inmates were placed in female facilities and later transferred back to male facilities. (*Id.* at p. 137). In one situation, "the transgender woman was in a female facility and requested to return to a male facility." (*Id.*). The inmate "didn't feel comfortable around her peers and ultimately decided that she would feel more comfortable back at a male institution." (*Id.*). In the other situation, Dr. Leukefeld reported that a transgender woman disrobed outside in the open and used vulgar language when talking about her attraction to female inmates. (*Id.*). Dr. Leukefeld testified that she was aware that Iglesias had requested transfer back to a male facility. (*Id.*). Dr. Leukefeld thought Iglesias's request was significant because it shows the social

---

[7] Dr. Leukefeld's declaration from April 20, 2021, however, notes that there are "four inmates who are identified in BOP's recordkeeping system as transgender are living in institutions consistent with their identified gender." (Doc. 100-2, p. 7). "Approximately the same number of transgender female inmates have been previously placed in gender affirming settings, but have been release or returned to male facilities." (*Id.*).

adjustment and challenges transgender women must make when moving from a male facility to a female facility. (*Id*. at p. 138).

Dr. Leukefeld then testified that the TEC did not recommend Iglesias's transfer before this year for two reasons. (*Id*. at p. 143). "One is that her security level was not consistent with a female prison prior to this." (*Id*.). The other was that when the TEC looked at transferring Iglesias to a female facility "her hormones were not at the goal level, so it was not a good time to move her then." (*Id*.). Dr. Leukefeld conceded that Iglesias had previously met BOP's target hormone level requirement before the TEC had looked at transferring her to a female facility. (*Id*. at p. 144). The TEC did not recommend Iglesias to be transferred to a female facility at that time, however, because she was "still classified as a medium security male, which is a significantly higher security classification that is appropriate for a low-security female [facility]." (*Id*. at p. 145). Dr. Leukefeld noted that Iglesias "has been classified as a medium—or high-security inmate for much of her time in BOP, and a lot of different considerations go into that classification, and [she] [is] not a case management expert, but those would include things like her initial crime, her adjustment, her compliance with prison rules, all of those things, and so that custody classification system is what makes—along with her behavior and her adjustment in prison is what determines her security level." (*Id*. at p. 172).

Dr. Leukefeld had no knowledge of Dr. Langham's support of Iglesias. In fact, she testified that Dr. Langham told her that he did not say the things Iglesias claims. (*Id*. at p. 147). Dr. Leukefeld noted that she also had a conversation with Dr. Quick, "who indicated he did not tell Ms. Iglesias that she was, you know, to have surgery." (*Id*. at

p. 148). Dr. Leukefeld also testified that she had a conversation with Dr. Pass, "who informed [her] that he did not tell Ms. Iglesias that he was submitting her for surgery." (*Id*.). Regarding Dr. Munneke, Dr. Hernendez, and Dr. Owings, Dr. Leukefeld did not see anything that supports Iglesias's testimony. (*Id*.). Also, these doctors could have informed the TEC if they supported Iglesias for GCS. (*Id*.).

Regarding Iglesias's testimony that staff at Carswell allegedly told her that she would be transferred back to a male prison, Dr. Leukefeld explained that any transfer would have to be approved by the TEC. (*Id*. at p. 146). Dr. Leukefeld testified that the TEC did not have any plans to transfer Iglesias back to a male facility, and the only reason Iglesias would be transferred back is if she were not able to be safe at the female facility. (*Id*.). Besides safety, Dr. Leukefeld also testified that if a transgender woman were having difficulty with peers at a female facility and made a request to be transferred to a male facility, then BOP would transfer the transgender woman to a male facility. (*Id*. at pp. 176-177).

Dr. Leukefeld testified that the TEC approved a transgender inmate for GCS for the first time in October 2021. (*Id*. at p. 146). The transgender inmate had met BOP's 12-month requirement. (*Id*.). As of November 22, 2021, however, the inmate had not received surgery. (*Id*. at p. 151). Dr. Leukefeld did not know how long the process takes after the TEC recommends GCS. (*Id*. at pp. 151-152). But she explained that the next step is for BOP's medical director, Dr. Stahl, and her staff to work on finding a surgeon and making sure there are no contraindications precluding surgery. (*Id*. at p. 163).

<u>DISCUSSION</u>

## I.     Venue

Defendants argue that "none of the operative facts occurred in this judicial district, much less the 'substantial part' required for venue." (Doc. 100, p. 10). The Court disagrees. Here, a substantial part of Defendants' actions at USP-Marion gave rise to Iglesias's claims. Without these events, Iglesias would not have filed suit. The fact that Iglesias's claims further developed out of the events or omissions at other BOP facilities does not change the Court's venue analysis. Defendants' arguments regarding improper venue are rejected.

## II.     Mootness as to Count II

Defendants argue that Iglesias's "failure-to-transfer claim is moot and she cannot establish a likelihood of success on the merits of that claim." (Doc. 100, p. 12). Again, the Court disagrees. As explained in the Court's order on Defendants' Motion to Dismiss, "Defendants have not met their burden to show that their allegedly wrongful behavior could not reasonably be expected to recur." (Doc. 160, p. 12). Without Iglesias completing her sentence, the BOP changing its policy, or other facts confirming the allegedly wrongful behavior could not reasonably be expected to recur, Count II is not moot.

## III.     Exhaustion of Administrative Remedies

Before addressing the merits of Iglesias's motion for preliminary injunction, the Court must determine whether she has exhausted her administrative remedies with regard to the injunctive relief she seeks.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be

brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is a precondition to bringing suit, and the Seventh Circuit requires strict adherence to the PLRA's requirements. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Failure to exhaust administrative remedies is an affirmative defense; defendants bear the burden of proving a failure to exhaust. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Under the PLRA, an inmate must take all steps required by the prison's grievance system to properly exhaust his or her administrative remedies. *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004). The purpose of exhaustion is to give prison officials an opportunity to address the inmate's claims internally, prior to federal litigation. *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). When officials have been afforded this opportunity, the prisoner has properly exhausted all available remedies. *Id.*

### A. Fifth Amendment - Sexual Harassment Claim[8]

Defendants argue that the "last grievance concerning staff conduct that Plaintiff *fully exhausted* was filed more than a decade ago, when Plaintiff was housed at the U.S. Penitentiary Florence Admax facility." (Doc. 100, p. 22) (emphasis added). Defendants continue arguing that "[a]ny alleged sexual harassment by BOP staff, whether direct or indirect, grieved at that time would have been barred by the applicable statute of

---

[8] A discussion on the exhaustion of administrative remedies for Iglesias's Eighth Amendment claim regarding BOP's failure to provide necessary medical treatment and Fifth Amendment claim regarding BOP's denial of placement in a female facility are omitted because Defendants either fail to argue that Iglesias has not exhausted or outright concede that Iglesias has exhausted. (Doc. 100, pp. 10-11).

limitations long ago." (*Id*.).

Whether Iglesias exhausted her administrative remedies as to her Fifth Amendment sexual harassment claim is separate from the statute of limitations analysis.[9] Because Defendants concede that Iglesias has fully exhausted, their exhaustion argument is rejected.

### B. Eighth Amendment - Failure to Protect Claim

Defendants argue that "Plaintiff has lodged only one grievance regarding the conditions of her confinement, which asserted that she would be unsafe if released from the SHU into the general population." (Doc. 100, p. 23).

Iglesias argues that her "motion about failure to protect came after she was again raped, assaulted, and under persistent risk of life-threatening harm." (Doc. 107, p. 9). Iglesias continues noting "[w]here 'circumstances present an *imminent danger* to an inmate,' as here, 'a time-consuming administrative procedure . . . presents no 'possibility of some relief'' for PLRA exhaustion purposes." (*Id*.) (quoting *Sowell v. T.D.C.J.*, 2020 WL 2113603, at *3 (S.D. Tex. May 4, 2020)). But the Seventh Circuit does not recognize an "imminent danger" exception to exhaustion. *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010). Accordingly, the Court finds that Iglesias has failed to exhaust her failure to protect claim.

## IV.    Motion for Preliminary Injunction

Preliminary injunctions are extraordinary and drastic remedies that should not be

---

[9] Moreover, Defendants have neither identified which statute of limitation applies nor whether any doctrines of tolling apply.

granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "To merit such relief, a movant must make a threshold showing that: (1) absent preliminary injunctive relief, she will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) she has a reasonable likelihood of success on the merits." *Tully v. Okeson*, 977 F.3d 608, 612–13 (7th Cir. 2020) (internal quotation marks omitted). "[I]f the movant makes this threshold showing, the court proceeds to consider the balance of harms between the parties and the effect of granting or denying a preliminary injunction on the public interest." *Id*. at 613 (internal quotation marks omitted).

The PLRA applies to suits filed by incarcerated individuals and limits the equitable relief a district court can order. 42 U.S.C. § 1997e; 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a)). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

### A.  Likelihood of Success on the Merits

"A movant's showing of likelihood of success on the merits must be strong." *Tully*, 977 F.3d at 613 (internal quotation marks omitted). "A 'strong' showing . . . does not mean proof by a preponderance . . . . But it normally includes a demonstration of how the

applicant proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). Iglesias contends she will succeed on the merits because Defendants have violated: (1) the Eighth Amendment by failing to provide necessary medical treatment for her gender dysphoria; (2) the Fifth Amendment's equal protection guarantee by housing her in a male facility and exposing her to sexual harassment; and (3) the Eighth Amendment by failing to protect her from sexual abuse and harassment.[10]

### i.  *Eighth Amendment Failure to Provide Necessary Medical Treatment*

Here, Iglesias alleges Defendants are deliberately indifferent in their treatment of her gender dysphoria. "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, (1994); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). The parties agree that gender dysphoria is a serious medical condition, but they dispute whether Defendants were deliberately indifferent to Iglesias's gender dysphoria.

### *Gender-Confirmation Surgery ("GCS")*

Defendants argue that the "BOP's decision not to approve [Iglesias's] request for [GCS] at this juncture does not violate the Eighth Amendment." (Doc. 100, p. 14).

---

[10] Because the Court finds that Iglesias failed to exhaust her Eighth Amendment claim regarding BOP's failure to protect, the Court cannot find that Iglesias is likely to succeed on the merits of this claim.

According to Defendants, "the issue presented here is a narrow one: whether Defendants violated the Eighth Amendment where they have provided Plaintiff medical care for her gender dysphoria, and where she disagrees with Defendants' judgment that [GCS] is not yet appropriate for her." (*Id*. at pp. 14-15).

Defendants previously reported that they "made the reasoned *medical judgment* that gender-affirming surgery was not appropriate for Plaintiff at this juncture for two reasons." (*Id*. at p. 16) (emphasis added). "First, Plaintiff had not lived in a gender-conforming role for twelve months since being incarcerated under the custody of BOP." (*Id*.). "Second, Defendants concluded that Plaintiff's placement in a female facility was not warranted until now because her hormone levels had fallen below their goal and had not been maximized." (*Id*. at p. 17).

At the preliminary injunction hearing, Defendants reported a third obstacle for Iglesias receiving the surgery. Specifically, Defendants noted that they could not have placed Iglesias in a female facility *even when her goal hormone levels had been maximized* because she still had a medium security threat level. (Doc. 175, p. 143).

Iglesias responds that the reasons Defendants "offer for denying GCS are not actual medical reasons, have no sound medical basis, and result from Defendants' own refusal to properly monitor Ms. Iglesias's hormone levels and to transfer her to a female prison." (Doc. 107, p. 3). According to Iglesias, "[t]he WPATH Standards of Care do not call for achieving target hormone levels nor a year of 'real-life experience' in a sex-segregated facility prior to GCS." (*Id*. at p. 4). Rather, "[t]he current standard is 'liv[ing] in the congruent gender role for twelve months.'" (*Id*.). Iglesias continues, noting "[a]ny

instability in [ ] hormone levels is due to Defendants' failure to provide her adequate doses of hormone-therapy medication to maintain her target hormone levels." (*Id.* at p. 5). "Also, the only reason Ms. Iglesias has not met BOP's requirement for twelve months of 'real-life experience' in a female facility is Defendants' repeated denial of her requests for transfer to a female facility." (*Id.*).

Defendants are well-aware that inmates with gender dysphoria are at a higher risk of suffering from mental health issues and resorting to self-harm. Iglesias's grievances and medical records document a pattern of genital mutilation and suicide attempts. (Doc. 19-2; Doc. 100-7; Doc. 106; Doc. 175). Despite these known risks, there is evidence that BOP denied and delayed the treatment of Iglesias's gender dysphoria without a medical basis or penological purpose.

Notably, Iglesias did not have an individualized transgender treatment plan until *six months* after requesting GCS and after almost *a year* of the BOP providing her hormone treatment. (Ex. 15, p. 69).[11] Besides the delay in an individualized transgender treatment plan, Iglesias had to wait years to receive hormone treatment. During these periods, the BOP placed Iglesias on suicide watch *twelve times*. (Doc. 19-2, p. 21). Iglesias "rehearsed strangulation in 2006 and again in 2015." (Doc. 19-2, pp. 20-21). Iglesias attempted self-castration in 2009 and 2014. (Doc. 175, pp. 49-50).

As early as December 2015, Iglesias stated to BOP personnel that "she feels *frustrated* and *anxious* for not being able to get what she has been asking for." (Doc. 100-

---

[11] In August 2016, Iglesias was still requesting for her treatment plan that Central Office had referred to. (Doc. 100-7, p. 39).

7, p. 19) (emphasis added). In September 2016, Iglesias reported that being in a male facility is *psychologically damaging to her*, but BOP refused to further provide Iglesias treatment. (Ex. 15, p. 6). A year later, in September 2017, the TEC even recognized that Iglesias "[was] adjusting poorly to her environment and has filed frequent complaints." (*Id.* at pp. 11-12). By December 2017, Iglesias was still expressing her desire for GCS at a clinical encounter with BOP personnel. (Doc. 100-7, p. 61).

In June 2018, Dr. Pass, clinical director at USP Marion, noted that Iglesias "[was] *upset* that she is being denied more aggressive treatment . . . ." (*Id.* at p. 70) (emphasis added). Six months later, Iglesias told BOP personnel that "she is *still frustrated* that her requests for . . . [GCS] are in limbo." (*Id.* at p. 78) (emphasis added). At this encounter, BOP personnel "discussed that at this point those procedures are not something [they] can initiate today, and she understands this and she is actively working to advocate for change at the national level[.]" (*Id.*).

In June 2019, Iglesias shared with Dr. Pass that she "[f]ollows regularly with [p]sychology, has a lot of *angst* related to her inability to obtain the [GCS] that she wishes." (Doc. 100-7, p. 81) (emphasis added). At the clinical encounter, Dr. Pass discussed Iglesias's gender dysphoria "quite a bit [ ] – she declines offer for antidepressant medication – says that the sessions with Psychology are helpful but that she really needs the [GCS] – *she understands that there has been no further directions from our central office regarding how/when/where this surgery will be done*." (*Id.* at p. 84) (emphasis added).

In light of this evidence, Iglesias has made a strong showing that BOP has been

deliberately indifferent to her gender dysphoria. For instance, BOP first delayed Iglesias's treatment because of the low-security level requirement. But there is no documentation showing BOP's evaluation of Iglesias's security level from 2015 to July 2020. Instead, there is <u>one</u> document from July 2020 discussing Iglesias's BP337 and BP338. (Doc. 100-5, pp. 1-3). Even at the recent hearing, Dr. Leukefeld did not testify as to Iglesias's security point total and how it did not fall within the low-security level until October 2019. From the Court's perspective, BOP did not move Iglesias to a low-level facility until after she filed the lawsuit in 2019.

BOP also relies on its target hormone level requirement as another reason for delaying Iglesias further treatment. The problem is, years before Iglesias changed the estradiol route to oral administration, BOP knew of Iglesias's frustration, anxiousness, angst, and reported psychological damage as a result of the lack of treatment. Yet, BOP made this change without warning about its target hormone level requirement or advising how the change could impact Iglesias's hormone levels.

Significantly, the change to oral administration happened in December 2019. (Doc. 100-7, p. 4). The TEC met in January 2020 and February 2020—where Iglesias's hormone levels were not discussed. Then after months of receiving a lower dosage, the TEC met in March 2020 and found that "[Iglesias's] hormone levels fallen well below goal and have not been maximized (note: inmate Iglesias requested medication change)[,] [r]emain at current facility and maximize gender-affirming hormones." (Ex. 15, p. 44).

Setting aside the change to a lower dosage and the target hormone level requirement, in October 2020, Iglesias requested an increase in the dose of oral estradiol.

(Doc. 100-7, pp. 4-5). BOP increased the dosage to 6 mg, but it was not until Iglesias filed her motion for preliminary injunction that BOP's TEC recommended Iglesias's transfer to a female facility. (Doc. 111). There are no documents of Iglesias's blood tests between October 21, 2020, to April 14, 2021. (Doc. 100-7). From the Court's perspective, BOP did not monitor Iglesias's hormone levels until eight days after Iglesias filed the motion for a preliminary injunction.

BOP's reliance on the 12-month requirement suffers from similar issues. Back in 2016, BOP's criteria for GCS included "at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, *full-time real life experience in their preferred gender*, and consolidation of gender identity." Federal Bureau of Prisons, *Medical Management of Transgender Inmates*, Clinical Guidance (December 2016), https://www.bop.gov/resources/pdfs/trans_guide_dec_ 2016.pdf (emphasis added). BOP defined real-life experience as "[w]hen individuals live as the gender with which they identify." (*Id.* at p. 5). BOP neither included *12 months* of full-time real-life experience in its criteria for GCS nor included in its definition of "real-life experience" that one must *live at the facility consistent with one's gender identity*. Even accepting the potential for further clarification through the *unwritten* 12-month requirement, Defendants never explained *when* the *unwritten* policy was developed.[12]

---

[12] Rather, Dr. Leukefeld testified this was something "that evolved as [BOP] w[as] looking to consider how [BOP] would transition people who were requesting that transition to happen, and it seems like an appropriate application of the WPATH standard and also a way to ensure safety of inmates, both transgender individuals and peers." (*Id.* at p. 139).

Besides not knowing *when* the *unwritten* 12-month requirement came about, Dr. Leukefeld testified that BOP uses the WPATH standards as a guide. (Doc. 175). The very standards BOP relies on—the WPATH standards—are flexible. Dr. Leukefeld even recognized that BOP is flexible with the 12-month requirement as they plan to evaluate Iglesias at 11 months. (*Id*. at p. 192). The problem is that Defendants failed to explain why its 12-month requirement cannot be flexible in the *manner* in which a transgender inmate develops the real-life experience. Indeed, Dr. Ettner, an expert in transgender health, found that Iglesias has lived as a female to the best of her ability for *decades*. (*Id*. at p. 83). Dr. Ettner also testified surgery can be medically necessary to treat gender dysphoria— yet BOP has only *recommended* <u>one</u> transgender inmate for surgery. (*Id*. at p. 146). And to be clear, the inmate has not received the surgery (at least as of approximately one month ago). (*Id*.).

Defendants have repeatedly referred to *Campbell*, 936 F.3d 536, throughout the litigation and rely on it for the proposition that "the denial of [GCS] does not violate the Eighth Amendment when an inmate receives other forms of treatment, such as hormone therapy, and an individualized determination is made that additional medical care is unwarranted." (Doc. 100, p. 15). But even the Seventh Circuit in *Campbell* acknowledged that "[d]enying a specific therapy in a particular case might amount to a constitutional violation . . . ." *Campbell*, 936 F.3d at 549.

Blindly applying *Campbell* would ignore Seventh Circuit precedent which notes: "[t]he failure to consider an individual inmate's condition in making treatment decisions is . . . precisely the kind of conduct that constitutes a substantial departure from accepted

professional judgment, practice, or standards, [such] as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 862-63 (7th Cir. 2011) (internal quotations and citations omitted)). In *Elyea*, the Court noted "inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his [or] [her] condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Id*. at 859-860 (citing *Collignon v. Milwaukee 860 Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)). The Court also acknowledged that treatment protocols are acceptable, but "[w]ith respect to an individual case, however, prison officials still must make a determination that application of the protocols result in adequate medical care." *Id*. at 860. In fact, *Elyea* clarified that "administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health." *Id*. at 863 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

The Court in *Campbell* distinguished *Elyea* by noting that "*Elyea* amounts to a general admonition that officials must exercise medical judgment rather than mechanically apply categorical rules." *Campbell*, 936 F.3d at 547. The Court also noted that "[in] [*Elyea*] prison officials refused to provide any treatment for serious diseases based solely on categorical rules." *Id*.

Crucially, in *Campbell*, the prison officials consulted an expert in the field of gender dysphoria. *Id*. at 540. The expert diagnosed the plaintiff with gender dysphoria "but stopped well short of recommending sex-reassignment surgery." *Id*. The expert then

"explained that the 12-month real-life experience required by the [WPATH] could not be fully implemented in the prison setting." *Id*. "She noted that [plaintiff] had 'never had the opportunity to meaningfully consolidate [her] preferred female identity into a successful life' and would 'not be able to do such consolidation in the restrictive environment of incarceration.'" *Id*. The expert determined that GCS was "wholly contraindicated." *Id*. After the expert's determination, the Gender Dysphoria Committee adopted the expert's recommendations. *Id*. at 541. Then, when the plaintiff submitted a request for GCS, the Department of Corrections ("DOC") Mental Health Director followed the Committee's recommendation and denied the plaintiff's request by citing the expert's finding and explanation. *Id*. at 541.

The plaintiff in *Campbell* filed additional surgery requests, and prison officials consulted the same expert again. This time the expert reviewed plaintiff's file, talked with the treating psychologist, and met with the plaintiff "face to face." *Id*. In her second report, the expert "explained that given 'the persistent presence of severe anatomic dysphoria[,] inmate [ ] may be a candidate for' sex reassignment." *Id*. The expert also explained that the DOC's "[r]eluctance to embark on a social experiment" was "understandable and prudent." *Id*. And given these challenges, the expert concluded that "conservative approaches . . . for incarcerated individuals are wholly warranted." *Id*. When the plaintiff in *Campbell* filed another request for GCS, the DOC Mental Health Director, with the Committee's recommendation, denied the plaintiff's request and referred to the expert's second report. *Id*. On these facts, the Court acknowledged that the "DOC officials consulted an expert in the field and, facing a gray area of professional

opinion, decided to deny the 'last and . . . most considered step' of gender-dysphoria treatment." *Id*. at 547.

Defendants here fall well short of what the defendants did in *Campbell*. Unlike the DOC in *Campbell*, which consulted an expert in the field and where the expert determined that GCS was wholly contraindicated, BOP has not consulted an expert. The TEC instead refuses to evaluate Iglesias until she meets system categorical requirements. Dr. Leukefeld noted that "the TEC has not [even] denied Iglesias [GCS]." (Doc. 100-2, p. 6).

Indeed, unlike the defendants in *Campbell*, who relied on an expert who met with the plaintiff face to face, reviewed the plaintiff's file, and talked with the plaintiff's treating psychologist, here BOP personnel are waiting on a decision from the central office. The problem is that the central office will not be making a decision until Iglesias meets all of its categorical requirements. (Doc. 100-7, p. 84) (noting that Iglesias "understands that there has been no further directions from our central office regarding how/when/where this surgery will be done"). Defendants point out that BOP "has evaluated plaintiff's suitability for gender affirming surgery and reached the professional medical penological judgment that she is not currently suitable." (Doc. 100, p. 16). But the administrative body that makes the decision—the TEC—did not evaluate or treat Iglesias. (Doc. 175, p. 165). In fact, the TEC never conducted a psychological or psychiatric evaluation of Iglesias. (*Id*. at p. 147). And the TEC never provided Iglesias medical treatment (*Id*. at p. 160). The TEC's members are not experts at treating gender dysphoria. (*Id*.). And, while the BOP has consulted experts in gender dysphoria in the past, BOP has not consulted an expert in Iglesias's situation. (*Id*. at p. 134).

Further, the issue in *Campbell* was whether summary judgment should be granted on the basis of qualified immunity. To determine whether qualified immunity applies, courts evaluate "whether that constitutional right was clearly established at the time of the alleged violation." *Campbell*, 936 F.3d at 545 (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009)). The Court in *Campbell* found "[n]o case in the Federal Reporter could have warned these DOC officials that their treatment choice was unconstitutional." *Id*. at 547. In a footnote, however, the Court was quick to distinguish *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013), and *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015), **where both defendants never allowed the plaintiffs to be evaluated by specialists**.

Even if the BOP allowed Iglesias to be evaluated by an expert or specialist, *Campbell*'s holding is not "the denial of [GCS] does not violate the Eighth Amendment when an inmate receives other forms of treatment, such as hormone therapy, and an individualized determination is made that additional medical care is unwarranted." (Doc. 100, p. 15). The Court in *Campbell* held that "*when* the defendants denied [plaintiff's] request for sex-reassignment surgery, *no case* clearly established a right to gender-dysphoria treatment beyond hormone therapy." *Campbell*, 936 F.3d at 549 (emphasis added).

The Court's analysis in *Campbell* was limited because it had not decided *Mitchell v. Kallas*, 895 F.3d 492 (7th Cir. 2018), when DOC officials were making decisions about the plaintiff's care. In *Mitchell*, defendants denied an inmate's request for hormone therapy despite an expert's endorsement of the treatment. *Id*. at 501. The defendants explained that the inmate was ineligible for treatment because "she was scheduled to be released

that month." *Id*. at 497. The defendants continued noting that the "DOC starts inmates on hormone therapy only when they have at least six months left on their sentences, in order to allow for the several-month process of getting the person stabilized on the medication." *Id*. Accordingly, the inmate claimed the defendants were deliberately indifferent based on their "fail[ure] to provide [recommended] care for a non-medical reason" and "inexplicable delays." *Id*. at 498.

On these facts, the Court in *Mitchell* rejected the defendants' qualified immunity defense to the failure-to-treat claim. The Court framed the question as "whether a prison doctor would have known that it was unconstitutional *never* to provide" hormone therapy. *Id*. at 499 (emphasis added). As the Court in *Campbell* pointed out, the Court in *Mitchell* interpreted the refusal to begin hormone therapy as a complete denial of care, and observed that "[p]rison officials have been on notice for years that leaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference." *Id*.

The Court in *Campbell* distinguished *Mitchell* by noting the following:

> *Mitchell* illustrates the difference between a complete denial of care and context-specific judgment calls. **A plausible interpretation of the record in *Mitchell* was that the DOC offered the inmate no treatment whatsoever**. As we've explained, our caselaw clearly establishes that regardless of the disease or injury at issue, utterly failing to treat a serious medical condition constitutes deliberate indifference. Campbell, by contrast, received extensive treatment in the form of hormone therapy, counseling, and various lifestyle accommodations.

*Campbell*, 936 F.3d at 549 (emphasis added).

But the plaintiff in *Mitchell* was receiving treatment for her gender dysphoria.

*See Mitchell*, 895 F.3d at 500 (acknowledging that plaintiff received occasional visits with psychologists). The Court in *Mitchell* found that "even if the therapy sessions addressed [plaintiff's] gender dysphoria to a degree, she may still recover if they did nothing actually to treat her condition." *Id.* (citing *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011)) ("Although DOC can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder [gender dysphoria].").

Like the plaintiff in *Mitchell*—who was receiving treatment, but it did nothing to actually treat her gender dysphoria—Iglesias is receiving hormone therapy, but purportedly needs GCS. Thus, even if the hormone therapy addressed Iglesias's gender dysphoria to a degree, she is still likely to recover if Defendants did nothing to further treat her condition.

Even if the Court's analysis of *Mitchell* is incorrect, "[t]he question whether a particular course of treatment for an objectively serious medical condition amounts to deliberate indifference can be answered only with evidence from the medical community." *Campbell*, 936 F.3d 536, 552 (Wood, D. dissenting). The Court "cannot look to outdated factual evidence from past cases[,] [like] [*Campbell*][,] to determine whether some course of treatment is within acceptable boundaries." *Id.* "If the medical community uniformly decides that a recent advance is the only proper course of treatment, a defendant cannot rely on a case[,] [like] [*Campbell*][,] from before that advance occurred to say that her outdated treatment choice was reasonable." *Id.* at 552-53. Judge Wood continued, "[a] court's role is only to determine whether a plaintiff has put forward

sufficient evidence to allow a factfinder to conclude that the treatment she received was so far outside the bounds of medical professional judgment that it amounted to deliberate indifference." *Id*. at 553.

Here, the Court's role at the preliminary injunction stage is to determine whether Iglesias has made a strong showing that she can prove her deliberate indifference claim. At the preliminary injunction hearing and in briefing, Iglesias has demonstrated how she will prove the key elements of her claim. Specifically, her gender dysphoria has not improved during her hormone treatment. Iglesias continues to threaten self-castration and suicide. (Doc. 175, pp. 26-28, 45). Defendants are aware of Iglesias's suffering, but have delayed her treatment without evaluating her medically. Dr. Ettner opined that specialists in gender dysphoria would all agree that Iglesias needs GCS, and the decision is not difficult. (*Id*. at pp. 69-70). Accordingly, Iglesias has met her burden of showing a likelihood of success on the merits as to her deliberate indifference claim regarding GCS.

### *Refusal to Provide Permanent Hair Removal*

Defendants argue that Iglesias's "claim for hair removal is unlikely to succeed because the Eighth Amendment does not mandate that prisoners receive cosmetic hair removal." (Doc. 100, p. 20). Iglesias responds that permanent hair removal and other social transition efforts are not cosmetic—but instead medically necessary—to address gender dysphoria. (Doc. 107, pp. 5-6). Dr. Leukefeld agreed that electrolysis or laser hair removal can be necessary for some transgender individuals. (Doc. 175, p. 156). Yet, the BOP has never provided permanent hair removal for *any* transgender women. (*Id*. at p. 157).

When ruling on whether denials of a transgender inmate's requests for electrolysis amount to a Constitutional violation, the Seventh Circuit has found that "[its] cases offer no indication that denying arguably nonmedical cosmetic accommodations violates the Eighth Amendment." *Campbell*, 936 F.3d at 549. In dissent, Judge Wood emphasized her agreement with much of the majority's opinion, but noted that "[w]e diverge only on the description of the clearly established right and whether [plaintiff] has presented enough evidence to show (if believed by a trier of fact) that [defendant] violated that right." *Id.* at 550. Judge Wood's dissent then discusses GCS, but not electrolysis. *Campbell* is inapplicable here, however, because it only evaluated electrolysis through the lens of qualified immunity. Defendants have not moved for summary judgment based on qualified immunity.

At least one district court within the Seventh Circuit has found that "a reasonable jury could find that the defendants were deliberately indifferent to [plaintiff]'s serious medical need when they failed to provide him with the second step of treatment from the Standards of Care, the real-life experience, . . ." which included hair removal. *Konitzer v. Frank*, 711 F.Supp.2d 874, 908 (E.D. Wis. 2010). In *Konitzer*, a prisoner with GID was trying to live as a female while in prison. *Id.* at 880. After receiving hormone therapy, the prisoner still engaged in nine acts of self-harm. *Id.* at 905. Defendants contended that they had not been deliberately indifferent to the prisoner's medical need based on their failure to follow the WPATH's Standards of Care. *Id.* Defendants also justified their decisions for

not providing the prisoner with "the real-life experience" because of "a legitimate penological interest." *Id*.[13]

In its analysis, the district court in *Konitzer* noted that this is a case "where the treatment offered for GID is arguably inadequate because the patient keeps exhibiting the behavior seen in GID sufferers, repeated self-castration attempts." *Id*. at 908. The Court then noted that "[t]he next level of treatment for [the] [prisoner], according to the Standards of Care, is the real-life experience." *Id*. Most aspects of the real-life experience were unavailable to the prisoner, however, because the aspects were contrary to a DOC policy. The court in *Konitzer* then held:

> Taking all reasonable inferences in a light most favorable to [the] [plaintiff], as the court must do at this stage, a reasonable jury could find that the defendants were deliberately indifferent to [plaintiff]'s serious medical need when they failed to provide him with the **second step of treatment from the Standards of Care, the real-life experience**, in the face of his repeated self-mutilations and suicide attempts. **Clearly, what the defendants were doing to treat [plaintiff] was not working.**

*Id*. (emphasis added). Regarding the DOC's justifications, the court acknowledged:

> [A]lthough a jury may well find that the defendants are justified in having a blanket policy that does not allow [plaintiff] to experience life as a female (through the use of modest makeup, womens' undergarments, female strip searches, facial hair remover, and being referred to as a female) in a male institution, on this record the court cannot grant summary judgment. Taking the facts in [plaintiff's] favor, modest makeup, female undergarments, facial hair remover or growth items, and being referred to as a female are part of the real-life experience.

---

[13] "According to the defendants, when an inmate enhances his differences in appearance or identity, such as appearing more feminine or homosexual in a male prison population, it significantly increases the likelihood that the inmate will be the target of aggression or the center of conflict among the prison population." *Id*. at 908. The defendants in *Konitzer* explained that "[t]he consequences of providing [plaintiff] with property items typically associated with females while housed in a male correctional environment, could compromise [plaintiff's] safety and security, especially considering [plaintiff's] lengthy sentence structure." *Id*. at 908–09.

*Id.*

While *Konitzer* is not binding, the situation in *Konitzer* is reminiscent of *Mitchell*, 895 F.3d 492. Recall in *Mitchell*, the inmate was receiving therapy, but the defendants failed to provide her with hormone therapy. The Court in *Mitchell* acknowledged that "even if the therapy sessions addressed [plaintiff's] gender dysphoria to a degree, she may still recover if they did nothing actually to treat her condition." *Id.* at 500.

Here, however, the next step is GCS, and GCS includes genital hair removal. (Doc. 175, pp. 74, 192). GCS also helps with facial hair. (*Id.* at p. 89). The Court is sensitive to Iglesias's anxiety regarding facial hair, but she is allowed to shave, socially transition, and she receives hormone therapy. Because the next step is GCS, Iglesias has not made a strong showing, at this time, of proving her deliberate indifference claim regarding permanent hair removal.

### ii.    *Fifth Amendment Claim Denial of Placement in a Female Facility*

The record is clear. BOP houses inmates, by default, in the prison of their gender assigned at birth. Thus, a sex-based classification is used, and intermediate scrutiny will be applied. "Under intermediate scrutiny, the question becomes: is [BOP]'s policy of placing transgender inmates in the prison of their assigned sex at birth substantially related to the achievement of prison security?" *Hampton v. Baldwin,* No. 18-cv-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018).

Here, Iglesias has shown a likelihood of success on the merits of her equal protection claim. BOP's own relevant policies provide that housing decisions should not be made solely on the basis of genitals. (Doc. 100-2, pp. 11-12). Yet BOP places

transgender women in male facilities until they meet the target hormone level requirement and low-security level requirement. (Doc. 100, p. 17; Doc. 100-2, p. 5; Doc. 175, pp. 143-145).

The Court is concerned that BOP repeatedly stresses safety yet provides merely *two* situations where transgender women have experienced difficulties or posed a threat to other inmates upon transfer to a female facility. (*Id*. at p. 135). In one situation, "the transgender woman was in a female facility and requested to return to a male facility." (*Id*. at p. 137). The inmate "didn't feel comfortable around her peers and ultimately decided that she would feel more comfortable back at a male institution." (*Id*.). In the other situation, Dr. Leukefeld reported that a transgender woman disrobed outside in the open and used vulgar language when talking about her attraction to female inmates. (*Id*.). This falls far short of an individualized determination for Iglesias. She of course had nothing to do with those incidents. And if a gender-assigned female had an issue at a female facility—whether that was a physical fight or an inappropriate or illegal sexual act—the BOP would never consider a transfer of that individual to a male facility. (*Id*. at pp. 176-177).

The TEC's reports also fail to reflect *any* discussion of Iglesias's security level impacting transfer to a female facility—indicating it may be a forbidden *post hoc* justification created in response to litigation. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017) ("[w]hen a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive," not just a hypothesized or *post hoc* justification

created in response to litigation). For example, on June 20, 2016, the TEC met to discuss Iglesias's request for GCS. (Ex. 15, p. 2). Even though she had a medium security level, the TEC considered transferring Iglesias to a female facility. (*Id*.). The TEC failed to mention it denied Iglesias's transfer because of her security level, and instead noted it "will follow up with BP-9 and clinical team." (*Id*. at p. 69). The TEC noted that they "[c]an place [Iglesias] back on agenda at later time." (*Id*.). Why would the TEC consider transfer to a female facility when a transgender inmate fails to meet the low-security level requirement to begin with?

The TEC meeting on September 12, 2016, also hurts the BOP's argument that it denied and delayed Iglesias because of the low-security level requirement. [14] Not only do the documents fail to mention that Iglesias should be denied because of her security level, but also the TEC concluded that *more information needed to be obtained about Iglesias* and added Iglesias to the September 26, 2016 TEC agenda. (*Id*. at pp. 3-4, 67). Why would the TEC need any more information when a transgender inmate fails to meet the low-security level requirement to begin with?

The TEC meeting on September 26, 2016, raises more questions. At that meeting, the TEC noted that "[t]hey will update team when or if they feel inmate is ready for a female facility." (*Id*. at p. 66). When would BOP personnel ever "feel an inmate is ready for a female facility" if the transgender inmate is at a medium security level? The

---

[14] Just as troubling, the majority of TEC's meeting reports indicate that Iglesias does not have a history of sexual offenses, but on September 12, 2016, the TEC notes that Iglesias had a history of sexual offenses. (Ex. 15, p. 4). This misinformation is especially serious when the BOP is considering safety as part of its analysis.

transgender inmate first would have to be at a low-security level before considering transfer to a female facility.

The TEC meetings from January 23, 2017, February 6, 2017, and September 11, 2017, also fail to reflect that Iglesias was denied because of her security level. (*Id*. at pp. 7-12, 64-65). Even the later TEC meetings from October 7, 2019, January 27, 2020, February 10, 2020, and February 24, 2020, fail to reflect this low-security level requirement. (*Id*. at pp. 13-20, 44-45, 47; Ex. 16, pp. 1-2).[15]

Then when Iglesias met the low-security level requirement, the BOP started discussing the target hormone level requirement as *another reason* to deny her a transfer to a female facility. Again, it was not until March 2020 that the TEC even mentioned the target hormone level requirement. (Ex. 15, p. 44).[16] Because this discussion was not until after Iglesias's complaint and after Iglesias met the low-security level requirement, this appears to be another forbidden *post hoc* justification created in response to litigation.

Iglesias has made a strong showing that the BOP's decision to house Iglesias in male facilities was not based on any legitimate penological purpose. Assignment to a female facility not only affirms Iglesias's gender identity, but continues to place Iglesias in an atmosphere where she is protected from ongoing sexual assault and harassment. Accordingly, Defendants are unlikely able to establish that Iglesias's placement in male facilities was substantially related to an important government interest.

---

[15] The October 7, 2019 TEC meeting notes that Iglesias will be transferred to a lower security male facility. (Ex. 15, p. 47). But there is no discussion of a low-level security requirement to be transferred to a female facility.

[16] At best, the notes from the October 2019 TEC meeting mention that Iglesias's "[h]ormone levels are appropriate for a transgender female." (Ex. 16).

### iii.    *Fifth Amendment Sexual Harassment Claim*

Defendants note that Iglesias's Fifth Amendment sexual harassment claim fails because Iglesias never pled it, and "[t]o be potentially entitled to relief on a claim, a party must adequately plead it." (Doc. 100, p. 21). The Court agrees.

Iglesias fails to bring a violation of the equal protection clause related to sexual harassment. Iglesias mentions sexual harassment in her complaint, but she does not allege that she was subjected to harassment due to her gender identity. Instead, Iglesias alleges that the sexual harassment is due to the denials in being housed in a women's prison. Accordingly, the Court finds that Iglesias is unlikely to succeed on her Fifth Amendment Sexual Harassment Claim.

### B.  Irreparable Harm and Inadequate Remedy at Law

The party moving for a preliminary injunction must demonstrate that "'irreparable injury is likely in the absence of an injunction.'" *Ill. Republican Party*, 973 F.3d at 763 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The moving party also must demonstrate there is no adequate remedy at law because "any award would be seriously deficient as compared to the harm suffered." *Whitaker*, 858 F.3d at 1046 (internal quotations omitted).

Here, Iglesias testified that the lack of proper treatment for gender dysphoria "causes [her] pain and torture every day." (Doc. 175, p. 45). She suffers from panic attacks. (*Id.*). Iglesias is "very tired of being tormented everyday with this cancer that [she] [has]." (*Id.* at p. 49). Iglesias made it clear that "self-castration or suicide is always there." (*Id.* at p. 45). Dr. Ettner also testified that untreated gender dysphoria will cause Iglesias's

psychological condition to deteriorate. (*Id.* at p. 87). Dr. Ettner continued that "[Iglesias's] thoughts of performing her own surgery, surgical self-treatment, will exacerbate, and whether or not her resilience will erode to the point where she cannot control her impulse to do that, as many people who are incarcerated cannot, she will unfortunately resort to that or to psychological decompensation." (*Id.*).

Additionally, the ongoing deprivation of Iglesias's Fifth and Eighth Amendment rights discussed above is an irreparable harm sufficient to warrant preliminary injunctive relief. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r*, 194 F.Supp.3d 818, 835 (S.D. Ind. 2016) (finding that the "presumption of irreparable harm also applies to equal protection violations").

There is an inadequate remedy at law as money will not make Iglesias whole. She is at risk for suicide, and her psychological condition will continue to deteriorate. *See Whitaker*, 858 F.3d at 1045-46 (suicide and diminished well-being do not have an adequate remedy at law and are irreparable harms); *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (acknowledging that in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy"); *Foster v. Ghosh*, 4 F.Supp.3d 974, 983 (N.D. Ill. 2013) (granting preliminary injunction to prisoner requiring medical attention; no adequate remedy at law exists because "the consequence of inaction at this stage would be further deteriorated vision in both eyes").

## C. *Balance of Harms and Public Interest*

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker*, 858 F.3d at 1054. To do so, the Court considers: (1) "the irreparable harm the movant party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted;" and (2) "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest")." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he [or] [she] is to win, the less the balance of harms must weigh in his [or] [her] favor; the less likely he [or] [she] is to win, the more it must weigh in his [or] [her] favor." *Id.*

Here, the balance of harms weighs heavily in Iglesias's favor. Iglesias suffers daily and is at risk of self-mutilation and suicide. Defendants have not identified any harm they will suffer if an injunction is granted. Instead, Defendants argue that "[t]he Court should defer to [BOP's] expertise and knowledge because the public interest favors the orderly administration of the prison system by the *most capable party*." (Doc. 100, p. 26) (emphasis added). Defendants are wrong. The public has the "highest" interest in ensuring that Iglesias's constitutional rights are not violated by Defendants. *See United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."). Also, "[t]he public has a strong interest

in the provision of constitutionally-adequate health care to prisoners." *Flynn v. Doyle*, 630 F.Supp.2d 987, 993 (E.D. Wis. 2009). Accordingly, Iglesias has met her burden in moving for a preliminary injunction.

## INJUNCTIVE RELIEF

For the reasons set forth above, the Court **GRANTS in part** Iglesias's request for preliminary injunctive relief. (Doc. 93). The Court **ORDERS** Defendants to have the TEC meet to evaluate Iglesias's request for GCS **by Monday, January 24, 2022**. The Court **FURTHER ORDERS** Defendants to:

1. Schedule a certified court reporter to be present at the TEC meeting to provide the Court a transcript of the TEC's meeting.

Allowing the TEC to delay its recommendation until April 2022 will only delay the medical director's evaluation, referral to a surgeon, and the date of the GCS. At the hearing on November 22, 2021, Dr. Leukefeld testified that the TEC recommended GCS for the first time in October 2021. (Doc. 175, p. 146). Significantly, Dr. Leukefeld neither knew how long it would take for BOP's medical director to refer the transgender inmate to a surgeon nor how long the whole process would ultimately take. (*Id.* at p. 190). The Court does not fault Dr. Leukefeld for not knowing how long the process will take, but the undersigned seeks assurance that Iglesias will not fall victim to any further delays. Thus, if the TEC *recommends* Iglesias for GCS, the Court **FURTHER ORDERS** Defendants to:

2. File a notice to the Court within **two days** of the recommendation;

3. Refer Iglesias to the BOP's medical director **immediately**;

4.  The BOP's medical director shall assess Iglesias for GCS **as soon as possible**, but no later than **thirty days** of receiving TEC's recommendation.

If the BOP's medical director finds Iglesias is suitable for GCS, the Court

**FURTHER ORDERS** Defendants to:

5.  File a notice to the Court within **two days** of the medical director's approval including a plan for Iglesias to receive GCS. This plan shall include: a list of known and/or approved GCS surgeons, a timeline regarding preparation the BOP must do to ensure both it and Iglesias are ready for surgery, timeline for Iglesias's recovery, and any other time sensitive information the Court or parties must consider;

6.  File notices regarding the progress of securing a surgeon every **seven days** until a surgeon is secured and a surgery is scheduled. In each notice, Defendants shall provide the Court with the following information: who Defendants contacted, dates Defendants contacted the surgeons, the method of contact, whether the surgeons have contacted them back, and the surgeon's schedule;

7.  File a notice to the Court within **fourteen days** of the medical director's approval addressing the implications of Iglesias receiving GCS while serving the rest of her time at the Residential Reentry Center in Florida, commonly referred to as a "half-way house," starting on March 24, 2022;

8.  Upon scheduling of GCS, Defendants should file notices with Court confirming GCS is still to proceed as scheduled every **seven days**.

If the TEC *does not* recommend Iglesias for GCS, then the Court **ORDERS**

Defendants to:

9.  File a notice with the Court explaining all the reasons for TEC's decision within **seven days** and include the policies and procedures Iglesias does not meet, when the policies were established, all documents providing when the policies were established.

10. Provide this Court the full transcript of the TEC's meeting where it discussed Iglesias for GCS. The transcript must be emailed to chambers within **fourteen days**, and shall be sent to njrpd@ilsd.uscourts.gov.

If the TEC does not recommend Iglesias for GCS and bases its decision on the 12-month requirement, Defendants are reminded that Dr. Leukefeld appeared in this Court and provided the following sworn testimony: "[a]s you can see in Ms. Iglesias' case, we're working to be <u>flexible</u>, and we said the TEC would review [Iglesias] in April, which is slightly less than a year, ***but we'd give her time to receive surgery before the end of her sentence***." (*Id*. at p. 184) (emphasis added). If the 12-month requirement would not automatically bar the TEC from recommending Iglesias for GCS at the proposed April 2022 meeting, then it would not automatically bar the TEC from recommending Iglesias for GCS by **Monday, January 24, 2022**. [17]

If BOP's medical director finds Iglesias is unsuitable for surgery, then the Court **FURTHER ORDERS** Defendants to:

11. File a notice with the Court explaining all medical reasons for the medical director's decision within **seven days**.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

**IT IS SO ORDERED.**

**DATED:  December 27, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[17] Indeed, Dr. Leukefeld's promise to evaluate Iglesias in April 2022 would otherwise be illusory.