IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a., CRISTIAN NOEL IGLESIAS), <br><br> Plaintiff, <br><br> vs. <br><br> IAN CONNORS, ET AL., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 19-cv-00415-NJR <br> ) <br> ) <br> ) <br> ) |

### DECLARATION OF DR. ALIX M. MCLEAREN

I, Dr. Alix M. McLearen, make the following declaration, in accordance with the provisions of 28 U.S.C. § 1746:

1. I am currently employed by the Federal Bureau of Prisons ("BOP") as Acting Assistant Director of the BOP's Reentry Services Division. I have held my current position since December of 2021, and have been the Senior Deputy Assistant Director since May of 2020. I have been employed by the BOP for approximately 18 years.

2. As Acting Assistant Director of the BOP's Reentry Services Division, I am responsible for the oversight of Psychology Services, Residential Reentry Management, Community Reentry Affairs, Women and Special Populations, Education, and Chaplaincy.

3. Additionally, I oversee and serve as a member of the BOP's Transgender Executive Council (TEC). I began to participate in the TEC when it was established in 2016.

4. The TEC is led by the Reentry Services Division and consists of staff members from that Division as well as from the BOP's Health Services Division and the Correctional Programs Division. It is composed of staff with diverse specialty areas. Current TEC members include two psychologists, a psychiatrist, a pharmacist, and BOP designations experts. Three of the members are

1

Senior Deputy Assistant Directors, giving them a great deal of authority in decision making. Two are Branch Chiefs in relevant specialty areas (psychology and psychiatry) that support the Council's subject matter expertise.

5. Leadership from the BOP's Designations & Sentence Computation Center ("DSCC"), a unit within BOP created to centralize inmate designation (*i.e.*, placement) within BOP facilities, provides the TEC with expertise on placement options for transgender inmates. In designating inmates, DSCC considers Program Statement 5100.08, <u>Inmate Security and Custody Classification</u> ("Program Statement 5100.08"). The Program Statement focuses on three primary factors for making designation decisions: (1) the level of security and supervision the inmate requires; (2) the level of security and staff supervision the institution is able to provide; and (3) the inmate's program needs. Other factors to be considered include: the inmate's release residence; the level of overcrowding at an institution; any security, location or program recommendation made by the sentencing court; any Central Inmate Monitoring issues; any additional security measures to ensure the protection of victims/witnesses and the public in general; and, any other factor(s) which may involve the inmate's confinement, the protection of society, and/or the safe and orderly management of a BOP facility. The Transgender Offender Manual lists additional factors to be considered as well.

6. The TEC meets routinely (approximately twice per month) and offers direction related to the unique treatment and management needs of transgender inmates and/or inmates with Gender Dysphoria. It provides recommendations to BOP staff on issues such as health care, psychological care, housing assignments, clothing and commissary items, and security measures such as pat and visual searches.

7. TEC meetings generally consist of discussions of particular issues regarding the various inmates that are placed on the agenda for a given meeting. An inmate may be placed on the agenda for a variety of reasons, such as a request from an institution or Regional Office, or based on

an issue raised through the administrative remedy process.

8. When the TEC discusses a given inmate and the particular issues on which input is sought, each member of the TEC is free to offer opinions, ask questions, or otherwise to provide input to the group. Open discussion and collaboration amongst TEC members from different disciplines is important in formulating the best recommendations possible. TEC recommendations often require the use of correctional judgment, and each member provides input through the lens of their unique background and expertise. This approach is designed to lead to more informed outcomes, as often a decision regarding a particular inmate may involve multiple disciplines.

9. I am aware that in this case the Court issued a Preliminary Injunction requiring Defendants to, in addition to other things, "have the TEC meet to evaluate Iglesias's request for [Gender Confirming Surgery] GCS by Monday, January 24, 2022" and "[s]chedule a certified court reporter to be present at the TEC meeting to provide the Court a transcript of the TEC's meeting." (Doc. 177 at 1). In the event the TEC does not recommend GCS, the Court's order requires Defendants to provide the Court the full transcript of the TEC's meeting where it discussed Iglesias for GCS. *Id.* at 3. Pursuant to the Court's order, the TEC will meet to evaluate Ms. Iglesias's request for GCS on January 24, 2022.

10. The requirement that a transcript be prepared and potentially provided to the court would have a chilling effect on any discussion at the TEC meeting. If TEC members expected that their thoughts, opinions, and discussions would be disclosed to third parties they may be disinclined to participate in full and open discussions due to concern that disclosure of such deliberations could potentially subject them to outcomes such as litigation or public scrutiny.

11. The evaluation of an inmate for surgery, such as the court has ordered here, inherently involves the use of correctional judgment amongst multiple disciplines. However, if TEC members are disinclined to participate for fear of disclosure of their deliberations, TEC members may hold back from sharing observations, analyses and recommendations, or factual information.

12. Similarly, if this precedent were followed and future TEC meetings were subjected to transcription, TEC members may be disinclined to participate for fear of disclosure of their deliberations. This may undermine the development of adequate, thorough, thoughtful, soundly-based analysis.

13. To the best of my knowledge, no prior TEC meeting has been transcribed nor recorded in any way.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____ day of January 2022.

Dr. Alix M. McLearen