# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>Plaintiff,<br><br>v.<br><br>IAN CONNORS, *et al.*,<br><br>Defendants. | Case No. 19-cv-00415-RJN |

## NOTICE IN COMPLIANCE WITH
## DECEMBER 27, 2021 PRELIMINARY INJUNCTION

Defendants respectfully submit this Notice in compliance with the Court's December 27, 2021 Preliminary Injunction ("PI") in this case. In the PI, the Court ordered Defendants "to have the [Transgender Executive Council ("TEC")] meet to evaluate Iglesias's request for [Gender Confirmation Surgery ("GCS")] by Monday, January 24, 2022." PI, ECF No. 177, at 1. The Court further ordered that, if the TEC does not recommend Plaintiff for GCS, Defendants must "[f]ile a notice with the Court explaining all the reasons for TEC's decision within seven days and include the policies and procedures Iglesias does not meet, when the policies were established, all documents providing when the policies were established." *Id.* at 3. On January 19, 2022, the Court modified the PI, in part by ordering that Defendants "shall provide a sworn declaration from a member of the TEC explaining the reasons for the TEC's decision if the TEC does not recommend Plaintiff for surgery." ECF No. 181.

### I. The TEC's Recommendation

Defendants report that, as specified in the PI, the TEC met on January 24, 2022 to evaluate Plaintiff's request for GCS. As discussed in the attached Declaration of Dr. Alix M. McLearen (who

oversees and is a member of the TEC), the TEC "recommended that Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center ("RRC") (commonly referred to as a "halfway house")[.]" McLearen Decl. ¶ 6. The TEC made this recommendation on the "assum[ption that] she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate[.]" *Id.* Although the Court's PI anticipated that the TEC would either (a) recommend Plaintiff for surgery and immediately refer Plaintiff to BOP's Medical Director or (b) not recommend Plaintiff for surgery, the TEC's decision was to recommend referral to a surgeon for consultation for GCS at a future date provided no reasons develop that would make surgery inappropriate. Thus, assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate, the TEC does expect Plaintiff to be referred to a surgeon at the appropriate time.[1]

There are several reasons for the TEC's decision. First, the TEC determined that Plaintiff's impending transfer to an RRC in a state (Florida) distant from her current location (Texas) counsels against an immediate, unqualified referral for surgery. *Id.* ¶ 10. If Plaintiff is referred to a surgeon to begin consulting about GCS now, that process would be interrupted once she is transferred to Florida. *Id.* The TEC concluded that it is prudent to begin and complete any surgical procedures with a single team of physicians, mental health care professionals, and healthcare system located in the same geographic area. *Id.* BOP maintains a contract for the provision of comprehensive medical care, including referral for GCS, for inmates in RRCs. *Id.*

---

[1] Although the PI requires Defendants to file a notice only if the TEC does not recommend surgery, Defendants submit this notice because the TEC's recommendation does not involve an immediate referral for surgery.

Furthermore, the logistical process for referring Plaintiff for GCS once she is at an RRC would be more streamlined than the referral process at a secure facility such as FMC Carswell. *Id.* ¶ 11. Medical appointments for individuals in an RRC are arranged by a contractor through the Reentry Services Division, which Dr. McLearen oversees. *Id.* Therefore, when Plaintiff is housed in an RRC, the division Dr. McLearen oversees can arrange, through a contractor, for GCS consultation with the surgeon, instead of referring Plaintiff's request for GCS to BOP's Medical Director. *Id.*

The TEC also concluded that it was important to continue to monitor Plaintiff's placement at a female correctional facility while encouraging her to remain compliant with her mental health treatment. *Id.* ¶ 12. Since Plaintiff first arrived at a female facility, FMC Carswell, on May 25, 2021, she has demonstrated significant difficulty adjusting to living with women in a correctional setting, as reflected by her request in August 2021 to be transferred out of a female facility. *Id.* Plaintiff's behavioral issues led to her being placed in the Special Housing Unit in October 2021. *Id.* These behavioral issues and her request to be transferred back to a men's facility have created some concerns about whether she should remain in a female facility. *Id.* To date, however, those concerns have not risen to the level of requiring Plaintiff to be transferred to a men's facility. *Id.* Accordingly, the TEC believes it important to continue to monitor her adjustment to ensure that she can safely be housed in a female facility. *Id.* At the time that the TEC anticipates Plaintiff will be referred to a surgeon, Plaintiff will have been housed with other females for approximately eleven months—close to the 12-month period generally required by BOP policy (as discussed below), but allowing sufficient time for continued medical care before Plaintiff's anticipated release from BOP custody in December 2022.

II.     **Relevant BOP Policy**

Plaintiff has not yet met the BOP's policy generally requiring that an inmate seeking GCS first spend twelve months in a gender affirming facility prior to consideration of surgery. McLearen Decl. ¶¶ 6-7. That policy was incorporated into BOP's Transgender Offender Manual ("TOM") when it

was revised on January 13, 2022. *See* TOM at 9, attached as Exhibit 1 to the McLearen Declaration.[2] Prior to its incorporation into the TOM, the practice had been applied by the TEC in unwritten form since approximately 2016 or 2017. McLearen Decl. ¶ 7 n.2.

The twelve-month requirement serves important purposes relating to social transitioning as well as BOP's penological interests. First, the requirement is intended to allow time for an inmate to adjust, socially transition, and consolidate one's gender identity in relationship to peers. McLearen Decl. ¶ 8. In this way, BOP's requirement serves the same purpose as the similar requirement in the standards of care published by the World Professional Association for Transgender Health ("WPATH"). The WPATH standards of care define the criteria for GCS to include "12 continuous months of living in a gender role that is congruent with their gender identity."[3] The WPATH standards of care expressly recognize the importance of providing an "opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery[.]" *Id.* They explain further that "[c]hanging gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role." *Id.* These personal and social consequences are only magnified in the correctional setting, given the sex-segregated status of the prison system and the vast differences between men's and women's facilities.

In addition, BOP's 12-month policy serves important penological interests by helping to ensure that the inmate will be able to successfully stay in gender affirming housing. McLearen Decl.

---

[2] Page 1 of the TOM indicates that it was revised on January 13, 2022 and pages 1-2 explain that the TOM was revised to, among other things, add information about gender affirming surgery.

[3] *See* Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, The World Professional Association for Transgender Health (Version 7), at 60, available at: https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341.

¶ 8. After receiving GCS, a transgender female would by necessity be housed in a female facility, because housing such an individual in a male facility would present numerous safety and security concerns. *Id.* Accordingly, BOP needs to evaluate whether such placement in a female facility will itself pose any safety and security concerns, prior to an irreversible surgery being conducted. *Id.*

Dated:  January 31, 2022

STEVEN D. WEINHOEFT
United States Attorney

LAURA J. JONES
Assistant United States Attorney

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

*/s/ Joshua M. Kolsky*
GARY D. FELDON
JOSHUA M. KOLSKY
JOHN ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-7664
E-mail:  joshua.kolsky@usdoj.gov