IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>                Plaintiff,<br><br>v.<br><br>IAN CONNORS, *et al.*,<br><br>                Defendants. | Case No. 19-cv-00415-NJR<br><br>Judge Nancy J. Rosenstengel |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE OF JANUARY 31, 2022**

On January 31, 2022, Defendants filed a notice with this Court recommending that Plaintiff Cristina Nichole Iglesias receive gender-affirming surgery but declining to take any action to start that process until mid-April 2022, at the earliest. ECF No. 183 ("Def. Not."); ECF No. 183-1 ("McLearen Decl."). Per this Court's order, Plaintiff submits this response. ECF No. 185.

Gender-affirming surgery has been medically necessary for Ms. Iglesias for years. She will continue to suffer daily as Defendants still withhold that surgery, even after conceding its medical necessity for her. Every passing day makes it less and less likely that the lengthy process of preparing for and providing this surgery can occur before her sentence ends in December 2022—as she is keenly aware.

Accordingly, Plaintiff requests that this Court order Defendants to *immediately* begin the months-long and multifaceted process of scheduling, preparing for, and providing gender-affirming surgery, in order to ensure that the full surgery process can be completed before Ms. Iglesias exits Bureau of Prisons ("BOP") custody in less than eleven months. "Prison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatments." *Mitchell v. Kallas*, 895 F.3d 492, 496 (7th Cir. 2018).

I. **HAVING RECOMMENDED MS. IGLESIAS FOR NECESSARY SURGERY, DEFENDANTS CANNOT JUSTIFY FURTHER DELAYING HER CARE.**

A. **TIME IS RUNNING OUT.**

Following a November 2021 hearing, this Court ordered Defendants in December 2021 "to evaluate Iglesias's request for [gender-affirming surgery] **by Monday, January 24, 2022**" and either "*recommend*[] Iglesias for [surgery]" with an immediate referral or "*not* recommend Iglesias for [surgery]." ECF No. 177 at 1-3. At that time, the Court noted that "[a]llowing [BOP's Transgender Executive Council] to delay its recommendation until April 2022 will only delay the medical director's evaluation, referral to a surgeon, and the date of the [surgery]." *Id*. at 1. Troublingly, Defendants' own witness could not say "how long the whole process [of providing gender-affirming surgery] would ultimately take." *Id*. at 2. Given this uncertainty, the Court "s[ought] assurance that Iglesias will not fall victim to any further delays." *Id*.

With another month in the rearview mirror, Defendants *again* seek to put off acting on Ms. Iglesias's gender-affirming surgery until April 2022. McLearen Decl. at ¶ 6. Indeed, their January 31, 2022 notice to this Court guarantees further delays. By Defendants' own admission (and contrary to this Court's express order), they neither recommended Ms. Iglesias for surgery with immediate referral nor declined to recommend her for surgery. Def. Not. at 2. Instead, Defendants unilaterally created a third option, "recommend[ing] referral to a surgeon for consultation for [gender-affirming surgery] at a future date provided no reasons develop that would make surgery inappropriate." *Id*. Defendants concede that Ms. Iglesias needs surgery but seek to postpone starting the lengthy process of securing it until mid-April 2022—precisely the sort of delay this Court sought to prevent with its detailed order and timeline last December.

Time is running out. To complete Ms. Iglesias's gender-affirming surgery process by the time her sentence ends in December 2022, including all pre-surgery requirements and post-surgery

recovery, many steps—several time-consuming or dependent on third parties' availability—still need to happen. Defendants' recent decision to delay referral and take no action for months would not just hit pause for Ms. Iglesias. Instead, this delay could wholly foreclose her ability to complete the full surgery process before she leaves BOP custody later this year.

Before Ms. Iglesias's gender-affirming surgery can occur, Defendants must, among other important tasks:

(i) identify a surgeon who is sufficiently qualified to perform gender-affirming surgery, is willing to work with BOP or its contractor to do so, and has sufficient scheduling availability to fit Ms. Iglesias into a surgical calendar with enough time for her to have surgery and recover by December 2022;

(ii) solicit and receive the two required letters recommending surgery from mental-health providers familiar with WPATH criteria who have evaluated Ms. Iglesias, including scheduling and completing those evaluations if they have not yet occurred;

(iii) provide Ms. Iglesias permanent hair removal on her body at the surgery site, a process that requires multiple sessions and *will take months, possibly six months or more*;[1]

(iv) refer Ms. Iglesias to the surgeon for an initial consultation, including assembling and furnishing copies of her medical records;

(v) schedule and complete at least one consultation between Ms. Iglesias and the surgeon, which will involve reviewing her medical history, developing a treatment plan, and making a determination of adequate hair removal at the surgery site;

(vi) contract with that surgeon to perform the surgery;

(vii) determine logistics, costs, and payment processes for the surgery by coordinating with the surgeon's office, BOP, BOP's contractor, and any other necessary parties;

(viii) secure a surgery date;

(ix) schedule and complete a preoperative medical evaluation before the surgery date to ensure medical clearance;

(x) perform any other pre-surgery requirements the surgeon stipulates;

(xi) develop a full plan for post-surgery recovery in the weeks and months after surgery, in consultation with the surgeon's office, including arrangements for dilation; and

(xii) develop a plan for transport, lodging, food, finances, and other basic necessities for the periods preceding and following the surgery, including personal support to assist with day-to-day activities for the period immediately following surgery.

---

[1] Permanent hair removal is crucial to a successful surgical outcome (as it ensures that hair does not grow at sites moved inside the body) and cannot be rushed (as several cycles of treatment are needed to destroy hair follicles at different stages of growth). N. Yuan et al., *Comparison of Permanent Hair-Removal Procedures Before Gender-Affirming Vaginoplasty*, 18 J. SEXUAL MEDICINE S74, S74 (2021) (noting the need for "[a]dequate depilation" and, further, that achieving "complete hair removal without re-growth" required an average of 27 sessions every 2 to 4 weeks of electrolysis or an average of 10 sessions every 5 to 6 weeks of laser hair removal).

*See* Ettner Decl. at ¶¶ 12-13, 16-20. Completing these steps will take several months at minimum, even assuming no obstacles or bureaucratic delays arise. *Id*. at ¶¶ 16-17. Indeed, surgery-site hair removal alone will take multiple months. *See* Yuan et al., *supra* note 1 (providing estimates for both laser hair removal and electrolysis); Ettner Decl. at ¶ 20. These steps must be completed before surgery can be performed. *See id*. at ¶¶ 16-18, 20.

Gender-affirming surgery itself is generally a one-day procedure, barring any unforeseen developments. *Id*. at ¶ 13. After surgery, Ms. Iglesias will need to remain in the hospital on bed rest for about a week, with careful monitoring to prevent complications. *Id*. Once released from the hospital, she will be significantly limited in her mobility as she heals and will need regular follow-up appointments with medical personnel in the weeks and months after surgery. *See id*. This aftercare is necessary to determine if any medical issues arise and if any surgical revisions are necessary, but can generally be overseen by local healthcare providers rather than the surgeon, depending on the surgeon's policies. *Id.*

Plaintiff's concern about timing is well-founded. Even though the Transgender Executive Council ("TEC") approved another prisoner for gender-affirming surgery in October 2021, it appears that as of January 2022, BOP *still* had not even identified a surgeon for her nor scheduled any surgical appointment. Iglesias Decl. at ¶ 7.

Crucially, Defendants cannot afford to squander valuable months by delaying Ms. Iglesias's initial referral to a surgeon until April 2022. There are only a small number of adequately skilled providers who perform the gender-affirming surgery Ms. Iglesias requires, a highly specialized procedure, across the country. Ettner Decl. at ¶ 19. The waitlists for both consultations and surgery dates for these providers fill up months and sometimes even years in advance. *Id*. Defendants seem to assume that Ms. Iglesias's gender-affirming surgery will take place in Florida,

4

Def. Not. at 2, but offer no evidence that they have located a surgeon near the Miami residential reentry center ("RRC") who (i) is adequately trained and skilled in performing gender-affirming surgery; (ii) is willing to work with BOP or BOP's contractor to provide such surgery; and (iii) has sufficient availability of surgical slots to perform Ms. Iglesias's surgery and allow for post-surgery recovery before she completes her sentence.

Indeed, there is no guarantee that any such surgeon exists in the Miami area, which would require Ms. Iglesias to go elsewhere for the surgery all parties now agree she needs. Concerned about timing, Plaintiff's counsel has reached out to twenty-two surgical practices across the country that provide gender-affirming surgery to assess them on the three criteria outlined above.[2] Santoro Decl. at ¶¶ 2-3. Through these inquiries, Plaintiff's counsel have found varying levels of waitlist availability for both initial consultations and surgery dates—ranging from months to years—and have been urged by surgeons' offices to submit a referral to begin the process as soon as possible. *Id*. at ¶¶ 9-11. Several practices have indicated a lack of willingness or an inability to perform Ms. Iglesias's surgery, and many others have particular policies that would make coordinating difficult or time-prohibitive. *Id*. at ¶¶ 6, 11, 12. Notably, and despite their best efforts, Plaintiff's counsel have been unable to identify any Florida-based surgeon who meets the criteria of skill, willingness, and availability. *Id*. at ¶ 7. At this point, Plaintiff's counsel have identified a single surgeon who does meet these three criteria and would be willing to perform the surgery, barring any unforeseen obstacles, though they do not practice in Florida. *Id*. at ¶ 14.

Ms. Iglesias cannot afford to wait until mid-April 2022 for Defendants to first try to refer her to a surgeon, with the very real possibility that locating someone for an initial consultation will take months and may even, if BOP imposes geographical limits, come up entirely short. (Of course,

---

[2] In the interest of getting Ms. Iglesias the medical care she urgently needs, Plaintiffs' counsel are of course willing to provide the Court and Defendants with more specific information about this outreach.

identifying a surgeon is just one preliminary step in the months-long process that must happen before gender-affirming surgery can occur.) In the meantime, Ms. Iglesias continues to suffer daily because Defendants are not adequately treating her severe gender dysphoria. Ettner Decl. at ¶ 22; Iglesias Decl. at ¶¶ 2-5, 9, 11. She is at risk of life-threatening consequences as delays accumulate and her hope and resiliency erode, Ettner Decl. at ¶ 22, and is acutely aware of how few months remain in her sentence to get treatment, Iglesias Decl. at ¶ 4.

### B. DEFENDANTS' JUSTIFICATIONS FOR DELAYING MS. IGLESIAS'S SURGERY ARE UNFOUNDED.

Defendants offer three reasons to justify further delaying the medical care they finally agree Ms. Iglesias needs. All three justifications lack any medical basis, have already been rejected by this Court, and are unsupported by credible evidence of an underlying BOP policy.

#### 1. MS. IGLESIAS'S LONG-EXPECTED MOVE TO A RESIDENTIAL REENTRY CENTER CANNOT PRECLUDE NECESSARY MEDICAL CARE.

Defendants claim that "Plaintiff's impending transfer to an RRC in a state (Florida) distant from her current location (Texas) counsels against an immediate, unqualified referral for surgery" because "the process would be interrupted" and "it is prudent to begin and complete any surgical procedures with a single team." ECF No. 183 at 2.

This is flatly not a medical reason to deny necessary care now, despite Defendants' implication to the contrary. Vague notions of prudence or convenience cannot preclude medically necessary treatment. *See Mitchell*, 895 F.3d at 498 ("Failing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute deliberate indifference. So too can inexplicable delays in treatment where the delays serve no penological purpose." (citation omitted)); *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011) ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose

6

Case 3:19-cv-00415-NJR   Document 186   Filed 02/08/22   Page 7 of 19   Page ID #2517

and amounts to torture."); *see also Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("Deliberate indifference can include the intentional delay in access to medical care. A delay in treating [even] non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (citation omitted)). That is all the more true where, as here, Defendants have already confirmed that gender-affirming surgery is medically necessary and approved it, but seek to delay implementation.

Ms. Iglesias needs gender-affirming surgery urgently. Ettner Decl. at ¶¶ 4, 5, 22. It is deliberately indifferent to delay beginning the surgery-provision process now, just as it would be to withhold chemotherapy from a prisoner with cancer for reasons of "prudence" or staffing preferences. Indeed,

> [i]t seems exceedingly unlikely that [Defendants] would refuse to commence a course of treatment for an inmate who was about to leave, just because continuity of care protocols would require a hand-off to a different provider. Would it really refuse to address breathing problems, or cardiac problems, or even a broken leg, just because one doctor begins the treatment and another completes it?

*Mitchell*, 895 F.3d at 501. In *Mitchell*, the prison refused to provide a transgender prisoner with hormone therapy because she was leaving prison shortly (based on an alleged unwritten policy only codified during the course of litigation). The Seventh Circuit noted that the prison was deliberately indifferent if it denied treatment either because "there was no such policy" despite its contentions *or* because the prison's provider "failed to assess whether application of the policy was appropriate in [the prisoner's] case." *Id*. Here, there is no underlying formal policy denying care due to a future transfer *and* there no genuine assessment of any such policy's appropriateness as applied to Ms. Iglesias. Indeed, Defendants provide no evidence of any underlying policy or procedure delaying care for prisoners scheduled for transfer to an RRC in another state, in violation

of the Court's order. *See* ECF No. 177 at 3 (requiring Defendants to furnish all "policies and procedures Iglesias does not meet"); Def. Not. at 2; McLearen Decl. at ¶ 10.

Crucially, Ms. Iglesias's transfer to an RRC is not a new development that might require a new plan. Defendants told the Court at the November 2021 hearing that they would move Ms. Iglesias to an RRC in March 2022, Hearing Trans. at 149; it strains credulity to raise continuity-of-care issues for the first time on January 31, 2022, as an obstacle to surgery. Moreover, the Court already expressly contemplated this scenario in its December 27, 2021 order, ordering Defendants to, if Ms. Iglesias were approved, begin processing that referral "immediately" while still at FMC-Carswell, even knowing that Ms. Iglesias would later be transferred to an RRC in March 2022. ECF No. 177 at 2. Indeed, this Court required Defendants—if Ms. Iglesias were approved—to file a notice "addressing the implications of Iglesias receiving [surgery] while serving the rest of her time at the Residential Reentry Center in Florida." *Id*.

Even if these prudential reasons could supersede medical necessity as to a surgical consultation, they would not support the total denial of pre-surgical care until mid-April 2022. In the interim, there are other necessary and time-consuming steps to prepare for surgery, including permanent hair removal and assembling referral letters. *See* Ettner Decl. at ¶¶ 16-18, 20. Moreover, consultations can take months to schedule and surgery waitlists are even longer; waiting 2.5 more months to refer Ms. Iglesias to a surgeon to schedule an initial consultation will only further delay this process. *See id.* at ¶ 19. Defendants seem to assume that a skilled and willing gender-affirming surgeon will be available near the RRC in Miami. But with no such surgeon currently identified or contracted, that is far from guaranteed. *See id.* at ¶¶ 12-13, 19. Contrary to Defendants' assumptions, Ms. Iglesias may very well have to complete some part of the process via telehealth

and ultimately travel for certain pre-surgery exams, surgery itself, and her initial recovery, regardless of whether she is based at FMC-Carswell or an RRC. *See id.*

Finally, if Defendants feel that a transfer to an RRC in March 2022 would disrupt the continuity of Ms. Iglesias's care, Defendants have the authority to move her to an RRC immediately to ensure she gets the necessary medical care they are obliged to provide. ECF No. 129-1 at ¶ 9 (Declaration of Alison Leukefeld) ("Iglesias may be eligible for halfway house placement as soon as December 25, 2021.").[3]

### 2. DEFENDANTS' LOGISTICAL CONVENIENCE CANNOT DELAY MS. IGLESIAS'S NECESSARY MEDICAL CARE.

Defendants claim that "the logistical process for referring Plaintiff for [gender-affirming surgery] once she is at an RRC would be more streamlined than the referral process at a secure facility such as FMC Carswell" because it avoids the intermediate step of "referring Plaintiff's request for [gender-affirming surgery] to BOP's Medical Director." Def. Not. at 3.

This too is not a medical reason to deny necessary care. As discussed above, Seventh Circuit case law is clear that claims of logistical convenience cannot stand in the way of medically necessary care. And, as this Court noted, "administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, [but] the Constitution is violated when they are considered *to the exclusion of*

---

[3] *See* 18 U.S.C. § 3624(c)(1) ("The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility."); *see also* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment . . . . The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted."); BOP Program Statement 7310.04 ("A CCC [community corrections center, i.e. halfway house] meets the definition of a 'penal or correctional facility.'").

*reasonable medical judgment* about inmate health." ECF No. 176 at 43 (quoting *Roe v. Elyea,* 631 F.3d 843, 863 (7th Cir. 2011)).

Moreover, the Court already expressly contemplated navigating BOP's internal administrative process in its December 2021 order, instructing Defendants to refer Ms. Iglesias immediately to BOP's medical director if she were approved. ECF No. 177 at 2. Defendants provide no evidence of any underlying policy or procedure that authorizes delaying medical care for prisoners scheduled for transfer to an RRC, including for reasons of administrative logistics or inefficiencies. *See id.* at 3 (requiring Defendants to furnish all "policies and procedures Iglesias does not meet"); Def. Not. at 3; McLearen Decl. at ¶ 11.

If, in fact, Defendants' internal bureaucracy is such that it is more efficient to arrange for Ms. Iglesias's surgery when she is at an RRC as opposed to a women's prison, then Defendants can and should transfer her to the RRC now. Federal law, BOP policy statements, and Defendants' own witness testimony expressly confirm her eligibility for such a transfer, see *supra* note 3, and, having been approved, there is no reason to delay the start of preparations for her care any longer.

### 3. DEFENDANTS' CONTINUED RELIANCE ON THEIR TWELVE-MONTH REQUIREMENT IS MISPLACED.

Defendants claim that "Plaintiff has not yet met the BOP's policy generally requiring that an inmate seeking [gender-affirming surgery] first spend twelve months in a gender affirming facility prior to consideration of surgery." ECF No. 183 at 3. Defendants' notice grounds this requirement in two rationales. "First, the requirement is intended to allow time for an inmate to adjust, socially transition, and consolidate one's gender identity in relationship to peers." *Id*. at 4. "In addition, BOP's 12-month policy serves important penological interests by helping to ensure that the inmate will be able to successfully stay in gender affirming housing." *Id*.

10

But reliance on the twelve-month requirement is misplaced for several reasons. To begin, this Court has already ruled on the twelve-month requirement for TEC consideration, based on representations from Defendants at the November 2021 hearing, and held that the claimed requirement could not justify delays until April 2022.

> If the TEC does not recommend Iglesias for GCS and bases its decision on the 12-month requirement, Defendants are reminded that Dr. Leukefeld appeared in this Court and provided the following sworn testimony: '[a]s you can see in Ms. Iglesias' case, we're working to be <u>flexible</u>, and we said the TEC would review [Iglesias] in April, which is slightly less than a year, **but we'd give her time to receive surgery before the end of her sentence.**' If the 12-month requirement would not automatically bar the TEC from recommending Iglesias for GCS at the proposed April 2022 meeting, then it would not automatically bar the TEC from recommending Iglesias for [gender-affirming surgery] by **Monday, January 24, 2022**.

ECF No. 176 at 61 (citations omitted).

The claimed twelve-month policy, under any interpretation, also lacks any medical basis and is sharply at odds with the WPATH Standards of Care. The Standards do not require living in a sex-segregated facility for twelve months as a condition of being considered for or receiving gender-affirming surgery. Ettner Decl. at ¶ 6 (citing WPATH Standards of Care at 106). Further, Ms. Iglesias has lived as a woman *for decades* and fully consolidated her gender identity long ago; she more than meets both the correct WPATH standard of a year living in a congruent gender role—as well as BOP's unfounded and more stringent bar. *Id*. at ¶ 7; *see also* ECF No. 176 at 42 ("The problem is that Defendants failed to explain why its 12-month requirement cannot be flexible in the *manner* in which a transgender inmate develops the real-life experience. Indeed, Dr. Ettner, an expert in transgender health, found that Iglesias has lived as a female to the best of her ability for *decades*.").

In addition, the penological rationale is especially misplaced as to Ms. Iglesias. This Court has already recognized Defendants' lack of evidence for this rationale, even without considering

the impact of Ms. Iglesias's upcoming transfer out of BOP's prison facilities and into an RRC on the likelihood of any potential return to men's facilities. *See* ECF No. 176 at 53 ("The Court is concerned that BOP repeatedly stresses safety yet provides merely *two* situations where transgender women have experienced difficulties or posed a threat to other inmates upon transfer to a female facility . . . . This falls far short of an individualized determination for Iglesias. She of course had nothing to do with those incidents. And if a gender-assigned female had an issue at a female facility—whether that was a physical fight or an inappropriate or illegal sexual act—the BOP would never consider a transfer of that individual to a male facility.").[4]

More broadly, the twelve-month requirement simply does not apply at this stage of BOP's administrative process, where the TEC has already approved Ms. Iglesias for gender-affirming surgery. Defendants have consistently represented that the twelve-month requirement is a bar on the TEC's *consideration* of an individual for gender-affirming surgery—but that part of the process already happened in January for Ms. Iglesias. *See* McLearen Decl. at ¶ 5 (noting TEC evaluation on January 24, 2022); *id*. at 15 (Transgender Offender Manual) ("For transgender inmates in Bureau custody, surgery . . . is generally *considered* only after one year . . . at the gender affirming facility. Once that period elapses, an inmate may submit a request to his or her Warden requesting surgical *consideration*." (emphases added)); Hearing Trans. at 136 (testimony of Dr. Alison Leukefeld) ("Q. And are there any policies that BOP has developed regarding the care of transgender inmates? A. Yes. I believe you're referring to the idea that we keep -- that we would like to see those inmates placed -- transgender women placed in a female facility for 12 months

---

[4] Defendants have kept Ms. Iglesias separated in the Special Housing Unit ("SHU") at FMC-Carswell since October 2021, McLearen Decl. at ¶ 12 & n.4, but appear to count that time toward the twelve-month requirement. While she has had some contact with peers, *see, e.g.*, Iglesias Decl. at ¶ 10, this months-long separation from the general population suggests Defendants' concerns about "social adjustment" to cisgender peers, McLearen Decl. at ¶ 8, are pretextual. Ms. Iglesias also disputes Defendants' stated rationale for her extraordinarily long time in the SHU, which has denied her access to social transition to treat her gender dysphoria. *See infra* note 6; Iglesias Decl. at ¶¶ 8, 19.

before we *consider* surgery." (emphasis added)). Ms. Iglesias has already been considered and approved for gender-affirming surgery by the TEC, so the twelve-month requirement for TEC consideration is irrelevant on its own terms.[5]

Of course, even if the twelve-month requirement were a medically legitimate bar and applicable at this stage of the administrative process, Ms. Iglesias's inability to meet it would be entirely due entirely to Defendants' refusal to transfer her to a women's facility until May 2021. As this Court recognized, Plaintiff is likely to prevail as to her claim that housing her in men's prisons was unconstitutional. ECF No. 176 at 52-55.

## II. THIS COURT SHOULD ORDER DEFENDANTS TO IMMEDIATELY BEGIN THE LENGTHY PROCESS OF PROVIDING GENDER-AFFIRMING SURGERY AND TO COMPLETE THAT PROCESS BEFORE DECEMBER 2022.

All parties now agree that gender-affirming surgery is medically necessary for Ms. Iglesias but Defendants indicate their intent to delay *even starting the referral process* until mid-April 2022 at the earliest. This Court should order the process of providing surgery to begin immediately and not countenance yet further delays for Ms. Iglesias, who has suffered long enough.

Specifically, this Court should order Defendants to immediately begin the lengthy process of providing gender-affirming surgery by identifying a surgeon and referring Ms. Iglesias for consultation in order to secure a specific surgery date as soon as possible and ensure that the full process is completed before Ms. Iglesias's sentence finishes in December 2022. Defendants should be enjoined to obey the steps this Court ordered them to take if they approved Ms. Iglesias for gender-affirming surgery, which the TEC now did more than two weeks ago:

---

[5] Beyond its inapplicability on its own terms, the twelve-month requirement cannot be afforded any weight as a genuine BOP policy, despite claims that it has been applied "in unwritten form since approximately 2016 or 2017." Def. Not. at 4. Indeed, it was only codified during the present litigation and *after* this Court ordered Defendants in December to provide copies of all its policies used to deny Ms. Iglesias gender-affirming surgery. *Id*. at 3-4 (noting revision date of January 13, 2022).

13

 (i) "File a notice to the Court within **two days** . . . including a plan for Iglesias to receive [gender-affirming surgery]. This plan shall include: a list of known and/or approved [gender-affirming] surgeons, a timeline regarding preparation the BOP must do to ensure both it and Iglesias are ready for surgery, timeline for Iglesias's recovery, and any other time sensitive information the Court or parties must consider;"

 (ii) "File notices regarding the progress of securing a surgeon every **seven days** until a surgeon is secured and a surgery is scheduled. In each notice, Defendants shall provide the Court with the following information: who Defendants contacted, dates Defendants contacted the surgeons, the method of contact, whether the surgeons have contacted them back, and the surgeon's schedule;"

 (iii) "File a notice to the Court within **fourteen days** . . . addressing the implications of Iglesias receiving [gender-affirming surgery] while serving the rest of her time at the Residential Reentry Center in Florida, commonly referred to as a 'half-way house;'"

 (iv) "Upon scheduling of [gender-affirming surgery], Defendants should file notices with Court confirming [surgery] is still to proceed as scheduled every **seven days**."

ECF No. 177 at 2-3.

In addition, this Court should order Defendants to take certain concrete steps that are necessary for gender-affirming surgery and whose delay will push Ms. Iglesias's surgery back yet further. The vast majority of pre-surgery steps described in Part I above are not even *implicated* by the (ultimately unfounded) reasons Defendants cite to justify a further delay to April 2022, and can—and should—be started as soon as possible.

First, Defendants should immediately provide permanent hair removal for Ms. Iglesias at the surgery site. Starting hair removal now is necessary to even keep open the possibility of surgery later this year; the process takes months and must be complete before a surgeon can operate. *See supra* note 1. Hair removal should begin immediately and continue regardless of whether Ms. Iglesias is at FMC-Carswell or an RRC; courts have previously ordered pre-surgery hair removal to occur in prison facilities. *See Monroe v. Meeks*, No. 3:18-CV-00156-NJR, 2021 WL 5882129 at *1 (S.D. Ill. Dec. 13, 2021) (noting this Court's order that a prison "finalize contracts for outside . . . hair removal services" for transgender class members).

14

Defendants have represented to this Court that permanent hair removal does not require approval from BOP's Transgender Executive Council and could be authorized at the local facility level. Hearing Trans. at 162 (testimony of Dr. Leukefeld) ("Q. Could the local staff provide permanent hair removal to an individual without the TEC approval? A. I believe they could. They've not been told that they have to ask for that."). But Ms. Iglesias's providers at FMC-Carswell have said that, in fact, they cannot authorize such treatment without permission from BOP's central office. Iglesias Decl. at ¶¶ 12-14. Specifically, Dr. Quick told Ms. Iglesias that he found out after investigating that the TEC must recommend permanent hair removal, that facility-level providers cannot authorize the procedure because it is considered cosmetic, and that the TEC would have to authorize the procedure as an exception for gender dysphoria so that the local facility can get funds to pay for the treatment. *Id*. at ¶ 14.[6]

Second, Defendants should immediately assemble surgery-referral letters. Any surgeon will require two letters recommending gender-affirming surgery from professionals who have examined Ms. Iglesias before they will commit to performing the procedure. *See* Ettner Decl. at ¶ 18 (citing WPATH Standards of Care at 27). Defendants do not mention this necessary step, Def. Not., and do not appear to have made any progress on this front, Iglesias Decl. at ¶ 6. Dr. Ettner

---

[6] Ms. Iglesias still has a medical need for permanent hair removal on her face as well. The Court noted in December 2021 that it was "sensitive to Iglesias's anxiety regarding facial hair, but she is allowed to shave, socially transition, and she receives hormone therapy" in deciding not to order permanent facial hair removal "at th[at] time." ECF No. 176 at 52. In fact, however, because Ms. Iglesias has been segregated in the SHU since October 2021, she was originally denied a razor to shave and is now able to shave only rarely; has had her supply of hair-removal cream cut off at various points; and is denied makeup and other gender-affirming items. Iglesias Decl. at ¶¶ 8-11. In addition, while gender-affirming surgery may "help[] with facial hair," ECF No. 176 at 52, no one contends that such surgery will permanently remove Ms. Iglesias's facial hair, Ettner Decl. at ¶ 21; Hearing Trans. at 88 ("THE COURT: Okay. Will the surgery -- would that help with the facial hair? DR. ETTNER: Yes, because it completely removes the androgen, the testosterone, but it doesn't -- it won't help enough, so it's -- she will still have the facial hair. She may find that her body hair is a bit softer, a little finer, but she will still require laser or electrolysis.").
   In these circumstances, Plaintiff believes it would be appropriate for this Court to order that the provider contracted to perform permanent hair removal at the surgery site also perform permanent hair removal on her face.

15

has consistently indicated her willingness to write one such letter based on her evaluations of Ms. Iglesias. Ettner Decl. at ¶ 18; *see* Hearing Trans. at 124.

Third, once Defendants secure a surgeon, they should ensure the surgeon meets with Ms. Iglesias *as soon as possible* to confirm a timeline for surgery and identify any additional pre-surgical requirements. Having represented that this referral process would be "more streamlined" at an RRC than at a women's prison, Def. Not. at 3, Defendants should transfer her immediately to an RRC to facilitate that referral. Defendants have the authority to do so, *supra* note 3, and have already recently moved up Ms. Iglesias's transfer date from March 24, 2022 to March 10, 2022, *compare* MacLearen Decl. at ¶ 6 (March 10) *with* ECF No. 148 (Defendant's Notice of Case Developments) (March 24). Shifting Ms. Iglesias's transfer date by a further few weeks from March 2022 to February 2022 would also serve Defendants' stated interest in ensuring continuity of care. Def. Not. at 2. Regardless, if Defendants locate a specific surgeon before Ms. Iglesias moves to an RRC, they should begin the consultation process by telehealth or some other means.

As a final note, Defendants' notice to this Court leaves them significant leeway to decide not to provide Ms. Iglesias with gender-affirming surgery, despite "expect[ing] Plaintiff to be referred to a surgeon" in April 2022. Def. Not. at 2. These vague caveats are especially concerning given Defendants' history of ever-shifting rationales for denying Ms. Iglesias gender-affirming treatment. *See* ECF No. 176 at 53, 55 (noting the appearance of "forbidden *post hoc* justification[s] created in response to litigation"). Indeed, Defendants have reserved the right to later withdraw their approval and, in April, still refuse to refer Ms. Iglesias to a surgeon if they unilaterally decide that she has engaged in unspecified "behavior[s]" or triggers unspecified "other reasons," even as

the clock ticks down to December 2022.[7] Def. Not. at 2 (quotation marks omitted). The Court should reject this sort of conditional approval, which contemplates yet further delays or denials, and order Defendants to begin the process of providing gender-affirming surgery immediately.

## CONCLUSION

Cristina Nichole Iglesias has been ready for gender-affirming surgery since at least 2017. Ettner Decl. at ¶ 11; Hearing Trans. at 89. More than five years later, Defendants now acknowledge that gender-affirming surgery is medically necessary to treat Ms. Iglesias's severe gender dysphoria. Yet they propose doing *nothing* to even begin the months-long process that surgery requires until mid-April 2022, at the earliest. For the foregoing reasons, Plaintiff respectfully requests that this Court immediately order the Defendants to carry out the steps detailed above.

In addition, this Court's February 1, 2022 order, ECF No. 185, requested that Plaintiff furnish dates of availability for a hearing, which she emailed to chambers as requested. Given urgent concerns about whether sufficient time remains to complete the surgery process, Plaintiff respectfully requests that the hearing be held as soon as the Court's schedule may permit. To the extent that Defendants plan to have witnesses testify at a hearing, Plaintiff also requests the opportunity to depose any such witnesses in advance.

---

[7] Behavioral concerns are straightforwardly not a medical reason to deny Ms. Iglesias gender-affirming surgery. Ettner Decl. at ¶¶ 8-9. Using such concerns to deny gender-affirming surgery "has no basis in the [WPATH Standards of Care]" and "predicates Ms. Iglesias's access to medically necessary health care on the actions of other[s]." *Id.*

Dated: February 8, 2022

Respectfully submitted,

/s/ Joshua D. Blecher-Cohen
**Joshua D. Blecher-Cohen**
ROGER BALDWIN FOUNDATION OF ACLU, INC.
150 N. Michigan, Suite 600
Chicago, IL 60601
(312) 201-9740
jblechercohen@aclu-il.org

**Taylor Brown**
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
(212) 519-7887
tbrown@aclu.org

**Frank Battaglia**
**Shannon Lemajeur**
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600
fbattaglia@winston.com
slemajeur@winston.com

**Angela M. Povolish**
FEIRICH MAGER GREEN RYAN
2001 West Main Street
P.O. Box 1570
Carbondale, IL 62903
(618) 529-3000
apovolish@fmgr.com

*Attorneys for Plaintiff Cristina Nichole Iglesias*

## **CERTIFICATE OF SERVICE**

I certify that on February 8, 2022, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.

Dated: February 8, 2022                          /s/ Joshua D. Blecher-Cohen
                                                 Joshua D. Blecher-Cohen