IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS
(a.k.a. CRISTIAN NOEL IGLESIAS),

               Plaintiff,

v.

IAN CONNORS, *et al.*,

               Defendants.

Case No. 19-cv-00415-NJR

Judge Nancy J. Rosenstengel

**DECLARATION OF DR. RANDI ETTNER, Ph.D, IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE ON JANUARY 31, 2022**

I, Dr. Randi Ettner, hereby state:

1. I am a clinical and forensic psychologist retained by counsel for Plaintiff Cristina Nichole Iglesias.

2. I have decades of experience in the diagnosis and treatment of gender dysphoria. My qualifications are set forth in my April 5, 2021 Declaration (Dkt. 93-1), as well as my curriculum vitae attached as Appendix A to that Declaration.

3. I am providing this Declaration in response to the decision by the Federal Bureau of Prisons' Transgender Executive Council ("TEC") decision to conditionally approve Ms. Iglesias for consultation for vaginoplasty, a form of gender-confirming surgery ("GCS"), but to delay her referral to a surgeon until April 2022. This Declaration is based on my review of Defendants' Notice in Compliance with Preliminary Injunction (Dkt. 183) and the Declaration of Dr. Alix M. McLearen (Dkt. 183-1).[1]

4. Defendants' Notice recognizes that GCS is medically necessary for Ms. Iglesias and that she should be referred to a surgeon for consultation for GCS. Despite that medical need,

---

[1] Gender-confirmation surgery ("GCS") and gender-affirming surgery ("GAS") may be used interchangeably to refer to the care Ms. Iglesias is seeking.

1

the TEC intends to delay referring Ms. Iglesias for consultation for GCS until at least April 2022. The TEC's decision provides no medical reason to delay referring Ms. Iglesias for GCS. The proffered justifications have no basis in the accepted standards of care and medical practice by those with expertise in treating gender dysphoric individuals.

5. Having now been approved by the TEC, Ms. Iglesias should be immediately referred to a surgeon and should receive GCS as soon as possible.

6. In justifying the delay, the TEC grounds its decision in a newly codified policy that requires a transgender inmate to spend 12 months in a gender-affirming facility before they may be considered for GCS. While this policy is newly codified, it is the same policy that the TEC previously referred to earlier in this litigation to deny Ms. Iglesias GCS. Leukefeld Decl. ¶ 12. (Dkt. 99-2). There was no medical justification then or now for this requirement and, despite Dr. McLearen's assertion, this requirement does not comport with the accepted standards of care. Prior to consideration for GCS, *The World Professional Association for Transgender Health Standards of Care* (7th version, 2011) ("SOC") recommends that a transgender person have "12 continuous months of living in a gender role that is congruent with their gender identity." SOC at 106. This requirement does not mean that a person must spend 12 months in a sex-segregated facility.

7. Ms. Iglesias has long satisfied the 12 continuous months in a gender-congruent role criterion, as contemplated by the SOC. She first expressed the desire to receive GCS and to live as a female at the age of 12. By the time Ms. Iglesias was in tenth grade, she began socially transitioning and living as a woman by adopting stereotypically feminine hair and clothing styles and expressing her desire to others to be referred to by a female name and pronouns. Around this same time, Ms. Iglesias also began to use hormonal birth control medication to develop breasts. Ms. Iglesias identified and was living as female when she entered BOP custody in 1994 and has

continued to consistently assert her female identity and to live as female while in BOP custody, despite being placed by BOP in male facilities.

8. The TEC's decision additionally reserves the right to deny Ms. Iglesias referral for medically necessary GCS on the basis of her behavior. McLearen Decl. ¶ 12. Such a requirement has no basis in the SOC, which do not include social adjustment or behavior as a criterion for GCS. *See* SOC at 60. Behavior that falls short of indicating florid psychosis is not, and should not be used as, a contraindication for receiving GCS. *Id.* at 61.

9. The TEC's reliance on behavior potentially predicates Ms. Iglesias's access to medically necessary health care on the actions of other incarcerated persons. The behavior that the TEC points to arises from "an investigation into [Ms. Iglesias] incurring debts with the inmates at FMC Carswell and making false allegations against them in order to avoid repaying debts." McLearen Decl. ¶ 12. Ms. Iglesias cannot control the behavior of the individuals she is in custody with. Situations that arise because of Ms. Iglesias's interactions with other incarcerated persons are not medical contraindications and should not be used as a basis to delay or deny her medically necessary health care. The TEC's continued focus on behavior as a criterion for GCS indicates that it does not view gender dysphoria as a medical condition. For example, an incarcerated individual in need of spinal surgery would not be denied that surgery merely because the BOP was dissatisfied with their behavior and their ability to adjust to living with other incarcerated individuals.

10. In addition to the TEC's requirement that Ms. Iglesias live in a gender-affirming facility for at least 12 months and maintain satisfactory behavior, the TEC is delaying referring Ms. Iglesias for a consultation for medically indicated GCS until at least one month after she has entered a Residential Reentry Center because "it is prudent to begin and complete any surgical procedures with a single team of physicians, mental health care professionals, and healthcare

system located in the same geographic area" and that timeline "may allow for the [GCS] process to be more logistically streamlined than it would be if the referral was made while [Ms. Iglesias] was housed in a secure facility." McLearen Decl. ¶¶ 10, 11.

11. These rationales demonstrate that the TEC continues to underestimate the severity of Ms. Iglesias's gender dysphoria. Ms. Iglesias needs GCS as soon as possible. She has needed GCS and satisfied the SOC's requirements for GCS by 2017, if not earlier. Nothing provided by BOP states any medical or mental-health contraindication, nor did I find any when I evaluated Ms. Iglesias on March 23, 2021 and July 20, 2021. Because surgery is medically necessary, it should be performed immediately.

12. Given the complexity of gender-confirmation surgery, there are more important factors than geography when choosing a surgeon. These factors include competence, experience, skill, type of GCS being performed, advantages and disadvantages of a particular surgeon's techniques, past surgical outcomes, past complication rates, schedule availability, length of a potential waitlist, and WPATH membership. *See* SOC at 56. Additionally, Ms. Iglesias' surgeon must be willing to work with the Federal Bureau of Prisons to coordinate her care.

13. It is not necessary for a GCS patient to receive treatment in their geographic region. On the contrary, the SOC expressly contemplates that patients may travel "long distances" to receive GCS. SOC at 64. If no complications arise, the patient will be hospitalized for about a week – the surgery is a one-day procedure and patients typically require approximately one week of post-surgical monitoring and bed rest to prevent complications. After the immediate postoperative period, the patient will not need to be surrounded by the medical team that performed the surgery. In general, "[a]ffordable local long-term aftercare in [the patient's] geographic region" is sufficient. *Id*. After the surgery, Ms. Iglesias will require a safe place to recover and dilate, but

this does not generally require local access to her surgeon, though this may depend on a particular surgeon's policies.

14. The TEC fails to understand the process involved in obtaining GCS, as evidenced by their: 1) misapprehension of WPATH standards (i.e., the 12-month requirement), 2) insistence on "target levels of hormones."

15. Dr. McLearen's Declaration notes that when the TEC considered Ms. Iglesias for surgery on October 12, 2021, her "hormones were at target levels." McLearen Decl., ¶ 12. The TEC's focus on "target levels" of hormones reveals their inexperience in evaluating patients for GCS. There is no medical justification or requirement in the SOC for patients to achieve a "target" hormone level before receiving GCS. I do not know of any research or medical professional who treats gender dysphoria that has opined otherwise.

16. There are many steps involved in providing gender-confirmation surgery, including necessary steps before and after the surgery itself. These steps are time-consuming and are prerequisites to surgery. These steps include, but are not limited to: obtaining two referral letters for surgery from mental-health providers who have evaluated the patient; finding and contracting with a surgeon the patient is comfortable with; securing a surgery date; beginning and completing permanent hair removal at the surgery site; attending a pre-surgical consultation with a surgeon; arranging logistics, such as travel, lodging, payment and insurance; completing a preoperative medical evaluation prior to surgery; planning post-surgery recovery and care, including dilation and provision of basic necessities during recovery.

17. Multiple months of planning, hair removal, and patient visits are required to complete these pre-surgical steps.

18. Given the time-consuming nature of these steps, the TEC must begin this process immediately to ensure that Ms. Iglesias can receive surgery before the end of 2022. Before Ms. Iglesias may receive GCS, she must obtain two referral letters from providers who have evaluated her and are familiar with the SOC. While I am willing to provide one of the necessary referral letters if asked to do so, under the SOC, Ms. Iglesias will need an additional letter. *See* SOC at 27. To my knowledge, BOP has not provided information on who will provide this additional letter nor if they even have anyone qualified under the SOC to provide it. Failure to timely obtain the necessary referral letters will further delay Ms. Iglesias' medically necessary surgery.

19. GCS is a highly specialized procedure that few medical providers are qualified to perform. As a result, surgeons who perform GCS have very long waitlists, with patients booking surgery dates months, sometimes years, in advance of the procedure. Surgical waitlists have only increased due to COVID-19, which forced some patients to delay or reschedule their surgeries. Long waitlists, coupled with BOP's determination that Ms. Iglesias is qualified for GCS, means that BOP needs to secure a surgical consultation and surgery date for Ms. Iglesias as soon as possible to ensure she can complete surgery before the end of 2022. BOP must also be prepared to provide Ms. Iglesias' medical records to the surgeon upon referral to avoid further delay.

20. Permanent hair removal at the surgical site is crucial to the success of gender-confirmation surgery. Most surgeons require that at least 80% of the hair at the surgical site be permanently removed prior to a vaginoplasty. Achieving this level of hair removal requires multiple sessions and can take about three to six months, or even more than six months, depending on the patient's hair. As a result, Ms. Iglesias must begin the permanent hair-removal process immediately to ensure that she can receive surgery before the end of 2022. If BOP waits until mid-

April to begin permanent hair removal, it is possible that Ms. Iglesias would not be able to undergo sufficient permanent hair removal to allow for schedule surgery before the end of 2022.

21. Even once Ms. Iglesias receives GCS, she will still require additional treatment for gender dysphoria. GCS will not permanently remove Ms. Iglesias' facial hair. In addition to GCS, Ms. Iglesias requires permanent facial hair removal to fully treat her gender dysphoria. In the community, transgender women typically undergo permanent facial hair removal prior to GCS, and there is no necessary sequence between the two. Immediate permanent facial hair removal is medically necessary for Ms. Iglesias.

22. Finally, I am concerned about the effect that BOP's proposal to delay GCS will have on Ms. Iglesias. Based on my evaluation of her on March 23, 2021 and July 20, 2021, Ms. Iglesias suffers extreme distress every day due to living with severe gender dysphoria. While BOP delays surgery, Ms. Iglesias shaves and tucks and faces the fear and shame of exposure. Ms. Iglesias has a history of suicidal ideation and self-harm. I am concerned that this delay will have further detrimental effects on her mental health, particularly because the delay will cause Ms. Iglesias's hope of receiving treatment and her resilience to erode.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Dated: 2/7/2022

Dr. Randi Ettner, Ph.D.