IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (also known as CHRISTIAN NOEL IGLESIAS),<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF PRISONS, MICHAEL CARVAJAL, CHRIS BINA, IAN CONNORS, DAN SPROUL, JEFFERY ALLEN,<br>ALIX MCLEAREN,<br>THOMAS SCARANTINO,<br>and DONALD LEWIS,<br><br>    Defendants. | Case No. 19-CV-415-NJR |

## SHOW CAUSE ORDER

**ROSENSTENGEL, Chief Judge:**

Plinko is a popular game on *The Price is Right*. Contestants climb up the stairs and drop round flat discs, the Plinko chips, down a pegged field board. As a chip falls, the pegs deflect the chip causing it to bounce randomly from peg-to-peg making it impossible for both the contestants and the audience to predict which slot—$100, $500, $1,000, $0, or $10,000—the chip will land. **For television**, this *randomness* is entertaining because contestants and the audience wait in excitement to see where the chip will land.

The Federal Bureau of Prisons ("BOP") has been playing a version of Plinko, and Cristina Iglesias is the chip. The pegs deflecting Iglesias are BOP's everchanging reasons for delaying Iglesias's gender confirmation surgery ("GCS"). The slots at the bottom BOP's Plinko board are—"Iglesias Receives GCS" or "Time Runs Out."

Like *The Price is Right*'s Plinko board—where each row is offset from the previous row and the pegs cause chips to bounce randomly down the board—when Iglesias started her journey BOP **first** reported that it "made the reasoned *medical judgment* that gender-affirming surgery was not appropriate for Plaintiff at this juncture for two reasons." (Doc. 100, p. 16) (emphasis added). "First, Plaintiff had not lived in a gender-conforming role for twelve months since being incarcerated under the custody of BOP." (*Id*.). "Second, Defendants concluded that Plaintiff's placement in a female facility was not warranted until now because her hormone levels had fallen below their goal and had not been maximized." (*Id*. at p. 17). At the preliminary injunction hearing, however, BOP reported a third obstacle for Iglesias receiving the surgery. Specifically, Defendants noted that BOP could not have placed Iglesias in a female facility *even when her goal hormone levels had been maximized* because she still had a medium security threat level. (Doc. 175, p. 143).

The Court did not admonish BOP or its counsel when it played Plinko at the preliminary hearing or the additional games the Department of Justice ("DOJ") has been playing throughout this litigation. The Court has been patient, but now BOP is attempting to play Plinko with the Court.

In its preliminary injunction order, the Court ordered BOP to have the TEC meet to evaluate Iglesias's request for GCS by Monday, January 24, 2022. (Doc. 177). If the TEC recommended Iglesias for surgery, then BOP was ordered to refer Iglesias to BOP's medical director. If the TEC did **not** recommend Iglesias for surgery, then BOP was ordered to file a notice with the Court explaining all the reasons for the TEC's decision. (*Id*.).

The Court's preliminary injunction order laid out instructions for BOP based on BOP's process for evaluating and ordering GCS for inmates. Indeed, the Court specifically asked Dr. Leukefeld—a member of the Transgender Executive Council ("TEC") and administrator for the psychology services branch of BOP—about the process **under oath**:

> **THE COURT:** The psychiatrist, but the -- so would you make a referral, then, for a medical examination -- if the TEC was considering, say, that an inmate at a – seeking gender-confirming surgery at a female facility, hormone levels are stabilized, would you then refer her for a medical evaluation?
>
> **DR. LEUKEFELD:** Yes. For example, in the case where the TEC recently made a recommendation for surgery, we of course are working with the local health care professionals, and when we made that recommendation, we referred it to BOP's medical director, who will ensure that the individual is appropriate for surgery, that there are no contraindications, and look for a surgeon.

(Doc. 175, p. 151). Dr. Leukefeld continued testifying the following:

> **MR. KNIGHT:** So -- But Dr. Stahl does not determine whether someone gets surgery; is that right?
>
> **DR. LEUKEFELD: Correct. The TEC makes that recommendation, and then she and her staff would work to find a surgeon and make sure that there's -- that there are no contraindications that would preclude surgery.**

(*Id*. at p. 163).

It gets worse. Dr. Leukefeld confirmed the following during the Court's questioning:

> **THE COURT:** Okay. And just so I'm clear, and you said that -- I think we've -- both things have been said here today. Is the committee going to recommend surgery in April or refer her at that time for an evaluation?
>
> **DR. LEUKEFELD: The committee will make a determination about**

> **whether to recommend in April, and if it does, she would immediately be referred to the medical director to find –**
>
> **THE COURT:** Okay. So first you have to recommend it and then she would be referred, and for the one that you just mentioned in October who was referred -- were they referred or recommended?
>
> **DR. LEUKEFELD:** The TEC recommended surgery and referred her to the medical director. Medical director would not -- will do surgery unless there's some kind of contraindication.
>
> **THE COURT:** And that's the BOP medical director?
>
> **DR. LEUKEFELD:** Correct.
>
> **THE COURT:** Okay. But you don't know how long that's going to take.
>
> **DR. LEUKEFELD:** I don't know how long it will ultimately take, but I -- but it is underway.

(*Id*. at pp. 189-190).

Despite explaining the process at least **three times** in a court proceeding, BOP waited until the last possible day to file its "Notice of Compliance with December 27, 2021 Preliminary Injunction" and employed its familiar Plinko-like tactics with the Court:

> [T]he TEC "*recommended that Iglesias be referred to a surgeon* for consultation for GCS approximately one month after she is placed in a Residential Reentry Center ("RRC") (commonly referred to as a "halfway house")[.]" McLearen Decl. ¶ 6. The TEC made this recommendation on the "assum[ption that] she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate[.]" *Id*. **Although the Court's PI anticipated that the TEC would either (a) recommend Plaintiff for surgery and immediately refer Plaintiff to BOP's Medical Director or (b) not recommend Plaintiff for surgery**, the TEC's decision was to recommend referral to a surgeon for consultation for GCS at a future date provided no reasons develop that would make surgery inappropriate.

(Doc. 183, p. 2).

This tactic was inappropriate at prior stages of the litigation, but employing this tactic after repeated court filings and proceedings is troubling. **There was never a third option**. Nowhere did BOP, DOJ, or Dr. Leukefeld explain that the TEC could refer Iglesias to a surgeon for consultation for GCS directly. BOP even had an opportunity to contest the Court's order on the preliminary injunction, but used that opportunity to only contest the transcription of the TEC meeting. BOP explained "**[they] do not seek relief from any of these other requirements**." (Doc. 178, p. 3). BOP **never** refuted its process.

From the Court's perspective it appears either:

1. BOP directly ignored the injunction **and** is doing exactly what it wanted to do—delay this process until April 2022;

2. BOP made a recommendation for surgery. *See* Doc. 183, p. 2 (noting that "[a]lthough the PI requires Defendants to file a notice only if the TEC does not recommend surgery, Defendants submit this notice because the TEC's *recommendation* does not involve an immediate referral for surgery."). Per the preliminary injunction, if the TEC recommends surgery, then the next step is the medical director; or

3. BOP is inappropriately deviating from its policy to continue with the medical director to shield itself.

Whatever the reason,[1] the Court is concerned with BOP's compliance with its preliminary injunction order and the actions of its attorneys.

Accordingly, BOP is hereby **ORDERED** to **SHOW CAUSE** in writing on or before **February 14, 2022**, why sanctions should not be imposed. BOP shall address the Court's legal authority to impose sanctions beyond its inherent authority, and discuss reasons why the Court should not impose sanctions under Rule 11, Rule 56, and 28 U.S.C. § 1927.

---

[1] If the Court provided ten more reasons, BOP and its attorneys would magically pluck another reason out of the air.

*See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458 (4th Cir. 1993) ("the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit"); *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988) ("[L]awyers owe a duty of candor to the tribunal. Counsel for appellant would be well-advised to observe that violations of this duty can lead to sanctions even more severe than payment of an opponent's fees and costs").

Further, **IT IS HEREBY ORDERED** that **Dr. Leukefeld**, **Dr. Alix McLearen**, **Joshua Gardner**, **John Robinson**, **Joshua Kolsky**, and **Kate Talmor** appear before the undersigned Chief District Judge at the United States District Court for the Southern District of Illinois, 750 Missouri Avenue, East St. Louis, IL 62201, on **Tuesday, February 22, 2022, at 9 a.m.**, to **SHOW CAUSE** for their failure to adhere to the Court's order dated December 27, 2021. (Docs. 176, 177). Iglesias's counsel may question **Dr. Leukefeld** and **Dr. McLearen** as to the contents of their previous affidavits and inquire as to BOP's surgeons specializing in GCS in Florida, whether BOP has contacted surgeons, determined their waitlists, the tasks touched on page three of Doc. 186, additional administrative hurdles by Iglesias being in an RRC in Florida, and other items the Court deems relevant.

Joshua Gardner, John Robinson, Joshua Kolsky, and Kate Talmor shall be prepared

to discuss their representations in Docs. 100,[2] 129,[3] 130, 147,[4] 157, 161,[5] 178, and 183.[6]

**IT IS SO ORDERED.**

**DATED:  February 10, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

---

[2] In Defendants' Opposition to Iglesias's motion for preliminary injunction, Joshua Gardner argued that the TEC "conducted an individualized assessment of Plaintiff and concluded that she was not an appropriate candidate for gender affirming surgery at this juncture because her hormone levels had not yet stabilized, and she had not lived a real-life experience as a female for twelve months in a female prison." (Doc. 100, p. 14). However, Dr. Leukefeld's Declaration noted "the TEC has not denied Iglesias gender affirming surgery." (Doc. 100-2, p. 6).

[3] Defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1), 12 (b)(3) and 12(b)(6) is particularly worrisome. DOJ's venue argument stitched together a collection of district court cases to conclude that "when there is an amended complaint, the determination of venue is made at the time of the filing of the operative complaint." (Doc. 129). The Court compared this venue argument to Dr. Frankenstein—who stitched together mismatched parts to create a monster—and reminded the Department of Justice that the Seventh Circuit has repeatedly reminded courts and counsel that district court opinions have no precedential value. *See, e.g., Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457–58 (7th Cir. 2005). The Court raised additional concerns with the quality of DOJ's arguments on Standing, Mootness, and the Eighth Amendment Claim Denial of Medical Care.

[4] In Defendants' Opposition to Plaintiff's Motion to Compel Expedited Discovery, Joshua Gardner argued that "Plaintiff has had the opportunity twice to seek expedited discovery and made the strategic decision to seek only the deposition of Dr. Leukefeld." (Doc. 147, p. 4). The Court noted that Defendants mischaracterized the record. At the hearing on August 30, 2021, it was Defendants who explained that they did not need to depose Dr. Ettner and were unlikely to call witnesses. Defendants changed course by September 10, 2021, when they explained that they intended to call Dr. Alison Leukefeld as a witness and scheduled the deposition of Dr. Ettner. Also, it was not the *parties* who were instructed to inform the Court by September 10 whether any additional depositions or discovery was needed before the hearing over Plaintiff's preliminary injunction on September 21, 2021. Rather, "*Defendants* [were] further instructed to provide the Court notice by September 10, 2021 regarding 1) whether Defendants will depose Dr. Ettner, 2) when the deposition is scheduled, and 3) whether any additional depositions or discovery is needed to be completed before the hearing over Plaintiff's preliminary injunction on September 21, 2021." (Doc. 143) (emphasis added). Defendants were instructed to provide this information because Defendants filed a motion to exclude Dr. Ettner's expert testimony and argued it was untimely and undisclosed.

[5] DOJ attorneys represented that it could not comply with the Court's discovery order on expedited discovery by framing that "an average processing rate (i.e., review and redaction) of twenty-five documents per hour and eight-hour review days, it will take twenty-six full days to review the approximately 5,200 collected documents, absent further narrowing." (Doc. 161). The Court did not admonish counsel's representation of the time it would take, but noted that DOJ's estimate is based on *one attorney doing this work*. They had *five attorneys entered in on this case*.

[6] As pointed out by Iglesias's counsel, "transfer to an RRC is not a new development that might require a new plan. Defendants told the Court in November 2021 that they would move Ms. Iglesias to an RRC in March 2022." (Doc. 186). BOP never explained that the transfer to an RRC would impact the next step—which has always been the referral of the recommendation to BOP's medical director. (Doc. 175).