# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS
(a.k.a. CRISTIAN NOEL IGLESIAS),

      Plaintiff,

        v.

IAN CONNORS, *et al.*,

      Defendants.

Case No. 19-cv-00415-NJR

## DEFENDANTS' RESPONSE TO THE COURT'S FEBRUARY 10, 2022 ORDER TO SHOW CAUSE

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................3

LEGAL STANDARDS ........................................................................................................6

ARGUMENT ...................................................................................................................10

I.      Sanctions Are Not Warranted Against BOP Because It Complied with the Court's
        Preliminary Injunction ..........................................................................................10

        A.      BOP's Compliance With the Preliminary Injunction Precludes the Issuance of
                Sanctions ...................................................................................................11

        B.      The Preliminary Injunction Did Not Set Forth an Unambiguous Command
                Requiring BOP To Either Immediately Recommend or Conclusively Deny
                Surgery ......................................................................................................12

        C.      Sanctions Are Not Warranted Against Any Individuals .................................13

II.     BOP Has Consistently Explained Why It Believed Gender-Confirmation Surgery Was Not
        Yet Appropriate and the Process for Evaluating Plaintiff's Request .........................14

        A.      BOP's Reasons for Its Decision Not to Approve Surgery ...............................15

        B.      Dr. Leukefeld's Description of the TEC's Process .......................................16

III.    Counsel's Representations to the Court Have Been Accurate ..................................18

IV.     BOP Continues to Work Expeditiously to Address Plaintiff's Request ...................27

CONCLUSION ..................................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. City of Chicago,*
   2000 WL 1745180 (N.D. Ill. Nov. 27, 2000)................................................................9

*Bender v. Freed,*
   436 F.3d 747 (7th Cir. 2006)........................................................................................8

*Bentz v. Maue,*
   2020 WL 1938883 (S.D. Ill. Apr. 22, 2020) .................................................................7

*Black v. Brown,*
   2019 WL 3325840 (S.D. Ill. Mar. 25, 2019) ................................................................7

*Black v. Moore,*
   2019 WL 3322279 (S.D. Ill. July 24, 2019) .................................................................7

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ...................................................................................................6, 7

*Daniel v. Christian Care Ministry, Inc.,*
   2021 WL 4263181 (S.D. Ill. Sept. 20, 2021) ...............................................................9

*DR Distribs., LLC v. 21 Century Smoking, Inc.,*
   513 F. Supp. 3d 839 (N.D. Ill. 2021) ...........................................................................9

*Fries v. Helsper,*
   146 F.3d 452 (7th Cir. 1998)........................................................................................7

*Fullerton v. Maynard,*
   943 F.2d 57 (10th Cir. 1991)......................................................................................21

*Glob. Traffic Techs., LLC v. KM Enters., Inc.,*
   2016 WL 3912836 (S.D. Ill. July 19, 2016) .............................................................8, 9

*Green Tree Servicing, LLC v. Cook,*
   2015 WL 148508 (S.D. Ill. Jan. 12, 2015) ..................................................................8

*Grochocinski v. Mayer Brown Rowe & Maw, LLP,*
   719 F.3d 785 (7th Cir. 2013)....................................................................................8, 9

*Hartmax Corp. v. Abbound,*
   326 F.3d 862 (7th Cir. 2003)........................................................................................8

*IDS Life Ins. Co. v. Royal All. Assocs., Inc.,*
   266 F.3d 645 (7th Cir. 2001)........................................................................................8

*Illinois Tool Works, Inc. v. Metro Mark Prods., Ltd.,*
    43 F. Supp. 2d 951 (N.D. Ill. 1999) ........................................................................9

*In re Samsung Elecs. Co.,*
    2 F.4th 1371 (Fed. Cir. 2021)................................................................................21

*James v. Hale,*
    959 F.3d 307 (7th Cir. 2020) ..................................................................................9

*Johnson v. Cherry,*
    422 F.3d 540 (7th Cir. 2005) ........................................................................ 10, 14

*Jolly Grp., Ltd. v. Medline Indus., Inc.,*
    435 F.3d 717 (7th Cir. 2006) ................................................................... 8, 10, 12

*Larsen v. City of Beloit,*
    130 F.3d 1278 (7th Cir. 1997) ..............................................................................10

*Lorrison v. Berryhill,*
    Case No. 18-10289, 2019 WL 1324247 (E.D. Mich. Mar. 25, 2019).......................22

*Maynard v. Nygren,*
    332 F.3d 462 (7th Cir. 2003) ...................................................................... 7, 10, 12

*Morisch v. United States,*
    2009 WL 6506656 (S.D. Ill June 16, 2009) ...........................................................7

*Mustafa v. City of Chicago,*
    442 F.3d 544 (7th Cir. 2006) ..................................................................................9

*Nemsky v. Int'l Union of Operating Engineers, Loc. 399,*
    2008 WL 4853626 (S.D. Ill. Nov. 4, 2008) ...........................................................8

*Ogden v. Dyco,*
    2010 WL 11685292 (S.D. Ill. Mar. 22, 2010).........................................8, 10, 12, 20

*Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,*
    809 F.2d 451 (7th Cir. 1987) ..................................................................................9

*Peoples Nat. Bank, N.A. v. Am. Coal Co.,*
    2012 WL 1606014 (S.D. Ill. May 8, 2012) ........................................................ 8, 9

*Schmude v. Sheahan,*
    420 F.3d 645 (7th Cir. 2005) ..................................................................................7

*Secrease v. W.&S. Life Ins. Co.,*
    800 F.3d 397 (7th Cir. 2015) ..................................................................................7

*United States v. Johnson,*
  327 F.3d 554 (7th Cir. 2003) ................................................................................................7

*United States v. Rogers Cartage Co.,*
  794 F.3d 854 (7th Cir. 2015) ................................................................................................9

*White v. Dep't of Justice,*
  2018 WL 488719 (S.D. Ill. Jan. 19, 2018) ...................................................................... 8, 9

*Yonaka v. UPS, Inc.,*
  Case No. 06-cv-0464-MJR, 2006 WL 8455949 (S.D. Ill. Dec. 20, 2006) ..........................8

**Statutes**

28 U.S.C. § 1927 ...........................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 11 ...........................................................................................................*passim*

Fed. R. Civ. P. 56 ............................................................................................................ 6, 9

## INTRODUCTION

The Department of Justice and Federal Bureau of Prisons ("BOP") take their obligations to comply with court orders seriously. Defendants and their counsel likewise take seriously their duties of candor and to refrain from taking any action or making any representations for improper purposes, such as delay. Defendants deeply regret that their actions have caused the Court to question the truthfulness and intentions of BOP and Government counsel. As explained below and in the attached declarations from Dr. Leukefeld, Dr. McLearen, and the six Government attorneys involved in this matter, the Government never intended to mislead the Court, misrepresent the facts, or take action of any kind for the purpose of delaying these proceedings or Plaintiff's receipt of needed medical care. Defendants have endeavored to comply with all of this Court's orders, including its preliminary injunction order, and respectfully submit that any perceived noncompliance resulted from Defendants' reasonable, good-faith interpretation of that order, not any intent to disregard an order of the Court.

The Court's December 27, 2021 preliminary injunction order first directed BOP's Transgender Executive Council ("TEC") to meet to evaluate Plaintiff for gender-confirmation surgery by Monday, January 24, 2022. Doc. 177. After that point, the injunction takes a bifurcated approach. If the TEC recommended Plaintiff for surgery, the Court directed Defendants to, among other things, refer Plaintiff immediately to BOP's medical director. But if the TEC did not recommend Plaintiff for surgery, the Court directed Defendants instead to file a notice explaining the reasons for the TEC's decision. The TEC met as required on January 24 and did not recommend Plaintiff for immediate surgery. Instead, it recommended that she be referred to a surgeon approximately one month after she is placed in a Residential Reentry Center—which is scheduled to happen less than one month from now, on March 10, 2022—presuming that Plaintiff can continue to be safely housed in a women's facility and barring new developments in her medical care. Doc. 183. Because the TEC did

not make an unconditional recommendation of surgery as described under the first branch of the Court's injunction, Defendants concluded that its recommendation must be treated as falling under the second set of instructions, requiring Defendants to file a notice and supporting declaration explaining all of the reasons for the TEC's decision not to recommend surgery immediately. Defendants did so, and respectfully submit that their actions complied with the Court's order.  At a minimum, there is no basis for sanctions under any of the authorities the Court has invoked, even if Defendants have misconstrued the injunction, because Defendants have acted reasonably and in good faith.

The Court also suggested in its order to show cause that BOP has offered changing reasons for its conclusion that gender-confirmation surgery for Plaintiff was not yet appropriate, and inconsistent explanations of the process for evaluating Plaintiff's request for surgery.  Doc. 187 ("Show Cause Order") at 1–4.  But, as explained below, BOP has been consistent in its explanations throughout this litigation.  Specifically, BOP has consistently maintained that there were two reasons why the TEC decided in its March 2020 meeting that gender-confirmation surgery was not yet appropriate for Plaintiff: (i) Plaintiff had not lived in a gender-confirming role for twelve months, and (ii) her hormone levels were not maximized at that time.  In her testimony at the preliminary injunction hearing, Dr. Leukefeld also addressed the separate, but related, issue of why BOP had not recommended transferring Plaintiff to a women's facility before 2021, explaining that her medium security level was not previously consistent with assignment to a women's prison.  But Plaintiff's security level was not a new or changing reason for declining to approve surgery; rather, it was an explanation as to why Plaintiff had been not transferred to a women's facility sooner.

Moreover, when Dr. Leukefeld explained at the preliminary injunction hearing that the process for approving requests for gender-confirmation surgery involves a referral to BOP's medical director, she was describing the process for individuals, like Plaintiff, housed in secure BOP facilities.  The

process for referring an individual for gender-confirmation surgery is different in the halfway house context.  Dr. McLearen explained in her January 31 declaration that the TEC in that context could refer Plaintiff to a surgeon directly, without having to go through the additional process of seeking the medical director's approval.  Again, there was no attempt to mislead the Court.

Finally, the Court has also directed counsel to appear at the February 22, 2022 hearing to address representations made in eight specific filings.  In contrast to BOP, the Court does not provide explicit notice of an intent to issue sanctions against Government counsel, or identify the provisions under which such sanctions might issue.  Nevertheless, to address the Court's stated concerns regarding the accuracy of representations made by counsel in Defendants' filings, we explain below that the Government's representations in all of these filings were accurate.  The Government advanced these arguments because it believed—and continues to believe—that they were well supported by the facts and the law, not to delay these proceedings or Plaintiff's receipt of medical care.  Moreover, as detailed below, BOP continues to make progress toward expeditiously resolving Plaintiff's request for surgery.  For example, to avoid any delay, BOP has notified its contractor of Iglesias's pending transfer, and has been informed that the contractor has located an appropriate surgeon.  BOP will provide updates on any further progress made between now and the February 22 hearing.

For these reasons, as discussed more fully below, sanctions against BOP (or anyone else in this matter) are unwarranted.

## BACKGROUND

On December 27, 2021, the Court granted in part Plaintiff's motion for a preliminary injunction.  *See* Doc. Nos. 176, 177.  Specifically, the Court ordered Defendants to have the TEC meet to evaluate Plaintiff's request for gender-confirmation surgery by Monday, January 24, 2022.  Doc. No. 177 at 1.  The Court further ordered that "if the TEC *recommends* Iglesias for GCS," then Defendants were to (i) file a notice to the Court within two days of the recommendation, (ii) refer

3

Plaintiff to the BOP's medical director immediately, and (iii) ensure that BOP's medical director assess Plaintiff for surgery as soon as possible, but no later than thirty days after receiving the TEC's recommendation. *Id.* at 2 (emphasis in original). If the TEC "*does not* recommend Iglesias for GCS," then Defendants were to (i) file a notice with the Court explaining all of the reasons for the TEC's decision within seven days and include the policies and procedures Plaintiff does not meet, when the policies were established, and all documents providing when the policies were established and (ii) provide the Court the full transcript of the TEC's meeting where it discussed Plaintiff for gender-confirmation surgery. *Id.* at 3 (emphasis in original). After Defendants moved for partial reconsideration of the requirement that the TEC transcribe its meeting, the Court modified the preliminary injunction to remove that requirement and instead directed Defendants to provide a sworn declaration from a member of the TEC explaining the reasons for its decision if the TEC did not immediately and unconditionally recommend Plaintiff for surgery. Doc. 181.

Pursuant to the Court's order, the TEC timely met to evaluate Plaintiff's request for gender-confirmation surgery on January 24, 2022. The TEC did not immediately recommend Plaintiff for GCS, so on January 31, 2022, Defendants filed their Notice in Compliance with December 27, 2021 Preliminary Injunction and a supporting declaration from Dr. Alix M. McLearen. Doc. Nos. 183, 183-1. The McLearen declaration explained that the TEC "recommended that Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center ('RRC,' commonly referred to as a 'halfway house')." Doc. No. 183-1 ¶ 6. Dr. McLearen explained that the TEC made this recommendation on the "assum[ption that Plaintiff] does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate[.]" *Id.*

The McLearen declaration explained that there were several reasons for the TEC's decision. First, the TEC determined "given Iglesias's impending transfer to an RRC . . . in Florida, the principles of continuity of care weigh in favor of making the referral after Iglesias is transferred, rather than beginning the process while she is at FMC Carswell, only for it to be interrupted by her transfer to Florida." *Id.* ¶ 10. The TEC also concluded that in light of the different logistical processes for referring Plaintiff for GCS once she is at an RRC, referring her to a surgeon after approximately one month in an RRC "may allow for the process to be more logistically streamlined than it would be if the referral was made while Iglesias was housed in a secure facility." *Id.* ¶ 11. Additionally, the TEC believed that it was important to continue to monitor Plaintiff's placement at a female correctional facility while encouraging her to remain compliant with her mental health treatment. *Id.* ¶ 12.

Defendants' Notice in Compliance acknowledged that "[a]lthough the Court's PI anticipated that the TEC would either (a) recommend Plaintiff for surgery and immediately refer Plaintiff to BOP's Medical Director or (b) not recommend Plaintiff for surgery," the TEC's decision was "to recommend referral to a surgeon for consultation for GCS at a future date provided no reasons develop that would make surgery inappropriate." Doc. No. 183 at 2. Defendants did not understand the PI to direct the TEC to make either one decision or the other, if that were contrary to its medical and penological judgments. But because the TEC did not make an unequivocal recommendation for immediate surgery, Defendants concluded that the PI required them to treat the decision as falling under the second set of instructions in the Court's injunction, and thus to explain the reasons for the TEC's decision. Defendants' notice explained, accordingly, that although the PI required Defendants to file a declaration only if the TEC did not recommend surgery, they were providing an explanatory declaration "because the TEC's recommendation d[id] not involve an immediate referral for surgery." *Id.* at 2 n.2.

On February 10, 2022, the Court issued an order requiring BOP to show cause "why sanctions should not be imposed." Show Cause Order at 5. The Order suggests that BOP failed to comply with the Court's preliminary injunction by neither immediately recommending nor denying Plaintiff for gender-affirming surgery, and was seeking to "delay [the] process." *See id.* at 5. The Court directed BOP to address the Court's legal authority to impose sanctions "beyond its inherent authority, and discuss reasons why the Court should not impose sanctions under Rule 11, Rule 56, and 28 U.S.C. § 1927." *Id.*

The Court also set a show-cause hearing for February 22, 2022, *id.*, at which it directed Dr. Leukefeld, Dr. Alix McLearen, and four Department of Justice attorneys who at various times and to varying extents have represented BOP in this case, to appear and show cause "for their failure to adhere to the Court's" PI, *id.* at 6. The Court also directed counsel to be "prepared to discuss their representations in Docs. 100, 129, 130, 147, 157, 161, 178, and 183." *Id.* at 6–7 (footnotes omitted). The order does not, however, instruct these individuals to show cause why they should not be sanctioned, or identify the legal authorities under which sanctions against them might issue.

## LEGAL STANDARDS

The Court's Show Cause Order instructs BOP to address four sources of a court's authority to impose sanctions: (1) a court's "inherent power" to impose "appropriate sanction[s] for conduct which abuses the judicial process," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991); (2) the discretion under Rule 11(c)(1) of the Federal Rules of Civil Procedure to "impose an appropriate sanction" on an attorney or party for submitting a pleading, motion, or other paper for an improper purpose, or without support in law or fact, in violation of Rule 11(b); (3) the authority under 28 U.S.C. § 1927 to assess attorneys' fees and costs against an attorney who "unreasonably and vexatiously" "multiplies the proceedings" in a case; and (4) the discretion under Rule 56(h) to assess fees and costs against a party that submits "an affidavit or declaration under [Rule 56] . . . in bad faith or solely for

delay." Show Cause Order at 5. Settled principles govern the exercise of a court's power under each of these authorities.

**Inherent Powers:** "A district court has inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. W.&S. Life Ins. Co.*. 800 F.3d 397, 401 (7th Cir. 2015) (internal quotation marks omitted). "Because of their very potency," however, a court's inherent powers "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also United States v. Johnson*, 327 F.3d 554, 562 (7th Cir. 2003); *Black v. Brown*, 2019 WL 3325840, at *1 (S.D. Ill. Mar. 25, 2019), *report and recommendation adopted sub nom. Black v. Moore*, 2019 WL 3322279 (S.D. Ill. July 24, 2019). Chief among these restraints is the requirement that the subject of the sanction acted with "willful disobedience or bad faith." *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003) (holding that "[t]he district judge's finding of no willfulness . . . preclude[d] any sanction . . . under the inherent powers of the court"); *see also Schmude v. Sheahan*, 420 F.3d 645, 649–50 (7th Cir. 2005); *Johnson*, 327 F.3d at 562-63; *Morisch v. United States*, 2009 WL 6506656, at *1 (S.D. Ill. June 16, 2009) (inherent-power sanctions "should not be imposed unless there is willful disobedience, bad faith, or fraud"). A court has "no authority" under its inherent powers to issue sanctions for "mere negligence." *Maynard*, 332 F.3d at 471.

**Rule 11:** Rule 11(b) provides that by presenting a pleading, written motion, or other paper to the court, an attorney certifies to the best of their knowledge, information, and belief, based on reasonable inquiry, (i) that "it is not being presented for any improper purpose," including, *inter alia*, "unnecessary delay," and (ii) that "the claims, defenses, and other legal contentions" therein, as well as the "the factual contentions" and "denials of factual contentions" are warranted. Fed. R. Civ. P. 11(b)(1)-(4). "[A]fter notice and a reasonable opportunity to respond . . . the court may impose an appropriate sanction on any attorney . . . or party" for a violation of Rule 11(b). *Id.* § 11(c)(1); *see Bentz v. Maue*, 2020 WL 1938883, at *1 (S.D. Ill. Apr. 22, 2020) ("A court may impose [Rule 11] sanctions

on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." (quoting *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998)); *Yonaka v. UPS, Inc.*, No. 06-cv-0464-MJR, 2006 WL 8455949, at *1 (S.D. Ill. Dec. 20, 2006). "Rule 11 sanctions 'are to be imposed sparingly,'" however. *Peoples Nat. Bank, N.A. v. Am. Coal Co.*, 2012 WL 1606014, at *3 (S.D. Ill. May 8, 2012) (quoting *Hartmax Corp. v. Abbound*, 326 F.3d 862, 867 (7th Cir. 2003)). The "mere absence of legal precedent . . . or the failure to prevail on the merits of a particular legal contention . . . cannot justify a finding of frivolousness," which "connote[s] that the legal contention . . . is utterly implausible and lacks any arguable basis[.]" *Ogden v. Dyco*, 2010 WL 11685292, at *2 (S.D. Ill. Mar. 22, 2010); *see also Nemsky v. Int'l Union of Operating Engineers, Loc. 399*, 2008 WL 4853626, at *10 (S.D. Ill. Nov. 4, 2008). Likewise, "factual statements" that are "subject to interpretation that could render them accurate or [as] presenting a genuine issue of fact" do not warrant sanctions under Rule 11(c). *White v. Dep't of Justice*, 2018 WL 488719, at *7 (S.D. Ill. Jan. 19, 2018).

**28 U.S.C. § 1927:** Section 1927 "permits [a] district court to award attorneys' fees as a sanction against an attorney who unreasonably and vexatiously"—which is to say "gratuitously and injuriously"—"multiplies the proceedings in any case." *Bender v. Freed*, 436 F.3d 747, 751 (7th Cir. 2006) (internal quotation marks omitted); *IDS Life Ins. Co. v. Royal All. Assocs., Inc.*, 266 F.3d 645, 653 (7th Cir. 2001). "[A] court has discretion to impose § 1927 sanctions when an attorney has acted in an objectively unreasonable manner by engaging in serious and studied disregard for the orderly process of justice; pursue[d] a claim that is without a plausible legal or factual basis and lacking in justification; or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound[.]" *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (internal quotation marks and citations omitted; alteration in original); *see also Green Tree Servicing, LLC v. Cook*, 2015 WL 148508, at *1 (S.D. Ill. Jan. 12, 2015); *Peoples Nat. Bank, N.A.*, 2012 WL 1606014, at *4. This

standard is not satisfied by "simple negligence," *Glob. Traffic Techs., LLC v. KM Enters., Inc.*, 2016 WL 3912836, at *4 (S.D. Ill. July 19, 2016); *see also Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013), or merely because counsel's arguments "may not have won the day." *Daniel v. Christian Care Ministry, Inc.*, 2021 WL 4263181, at *2 (S.D. Ill. Sept. 20, 2021); *see also Grochocinski*, 719 F.3d at 801; *Mustafa v. City of Chicago*, 442 F.3d 544, 549-50 (7th Cir. 2006); *White*, 2018 WL 488719, at *7. "[I]f the conduct under consideration had an objective colorable basis" then a finding of "subjective bad faith" is required. *Peoples Nat. Bank*, 2012 WL 1606014, at *4; *see Glob. Traffic*, 2016 WL 3912836, at *5. By its terms, section 1927 applies only against attorneys and "cannot be used to impose sanctions against a party," such as BOP. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 862 (7th Cir. 2015).

**Rule 56(h):** "There is very little case law" on Rule 56(h) (or its predecessor, Rule 56(g)), but "when sanctions have been awarded" under this rule, "the conduct has been particularly egregious." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 950 (N.D. Ill. 2021) (citing cases). The rule has been interpreted to require, *inter alia*, "direct evidence of a prior inconsistent statement," that the court "must have relied on the affidavit," and "that the affidavit be based on subjective bad faith, or [submitted] solely for delay." *Id.* at 950-51 (citing authorities); *see also Barnes v. City of Chicago*, 2000 WL 1745180, at *3 (N.D. Ill. Nov. 27, 2000). Most pertinent here, "Rule 56[(h)] by its terms specifically pertains to affidavits submitted in connection with summary judgment motions[.]" *Illinois Tool Works, Inc. v. Metro Mark Prods., Ltd.*, 43 F. Supp. 2d 951, 963 (N.D. Ill. 1999); *see also Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.*, 809 F.2d 451, 454 (7th Cir. 1987) ("[A]ffidavits used in moving for summary judgment are covered by Rule 56[(h)].”); *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (Rule 56(h) applies to "an affidavit offered in response to a summary-judgment motion[.]"). Because at this stage of the proceedings BOP has not offered any affidavit or declaration in support of or in response to a motion for summary judgment, Rule 56(h) does not apply here.

**Notice:**  Regardless of the legal authority invoked, the Court must also comply with certain procedural requirements before imposing any sanctions.  Specifically, "the imposition of sanctions requires that the party to be sanctioned receive notice of the possible sanction and an opportunity to be heard." *Larsen v. City of Beloit*, 130 F.3d 1278, 1286 (7th Cir. 1997).  "A general notice that the court is contemplating sanctions is insufficient; rather, the offending party must be on notice of the specific conduct for which she is potentially subject to sanctions." *Johnson v. Cherry*, 422 F.3d 540, 551–52 (7th Cir. 2005).  As explained below, no sanctions are warranted against BOP (or anyone else) under the legal principles that govern the exercise of the Court's authority under its inherent power, Rule 11, or section 1927.

## ARGUMENT

### I.   Sanctions Are Not Warranted Against BOP Because It Complied with the Court's Preliminary Injunction

The Court's Show Cause Order suggests that BOP failed to comply with the Court's preliminary injunction by neither unequivocally and immediately recommending Plaintiff for gender-affirming surgery nor conclusively denying her request.  Show Cause Order at 5.  As explained below, however, Defendants acted in good faith to abide by the terms of the preliminary injunction and did not violate its plain terms.  Even if the Court determines that Defendants failed to comply with the intent underlying certain terms of the Court's injunction, they did not act "with willful disobedience or bad faith," as required for inherent-power sanctions, *Maynard*, 332 F.3d at 470; with "serious and studied disregard for the orderly process of justice," as would be required under section 1927 (if section 1927 applied to parties), *Jolly Group*, 435 F.3d at 720; nor did they advance a position that is "utterly implausible and lack[ing] any arguable basis," as would be necessary for sanctions under Rule 11, *Ogden*, 2010 WL 11685292, at *2.  Sanctions predicated on a failure to comply with the preliminary injunction would therefore be improper.

### A.   BOP's Compliance With the Preliminary Injunction Precludes the Issuance of Sanctions

The Court should not issue sanctions because BOP complied with this Court's preliminary injunction order.   Under that order, BOP was required first to "have the TEC meet to evaluate Iglesias's request for GCS by Monday, January 24, 2022."[1]  Doc. 177 at 1.  It is undisputed that the TEC satisfied this aspect of the preliminary injunction, and met on January 24, 2022 to evaluate Plaintiff's request for surgery.  *See* Doc. 183-1 ¶ 5.  The preliminary injunction further provides that "if the TEC recommend[ed] Iglesias for GCS," then Defendants were to, among other procedural steps, "refer her to BOP's medical director immediately."  Doc. 177 at 2.  On the other hand, "[i]f the TEC [did] not recommend Iglesias for GCS, then the Court ORDER[ED] Defendants to . . . [f]ile a notice with the Court explaining all the reasons for [the] TEC's decision within seven days and include the policies and procedures Iglesias does not meet, when the policies were established, and all documents providing when the policies were established."  *Id.* at 3 (emphasis omitted).

The TEC met on January 24, as ordered, and "recommended that Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center"—which, as discussed above, would eliminate the step of seeking approval for the surgery from the BOP medical director.  Doc. 183-1 ¶ 6.  In the declaration explaining the bases for that determination, the BOP official who oversees the TEC explained that Plaintiff's continuity of care would be better if she were to undergo treatment in one location (*i.e.*, the halfway house to which she is currently scheduled to be transferred on March 10, 2022).  Doc. 183-1 at 2, 4.  She further stated that the TEC anticipated approving Plaintiff's surgery one month thereafter, presuming Plaintiff is

---

[1] The Court also ordered that BOP "[s]chedule a certified court reporter to be present at the TEC meeting to provide the Court a transcript of the TEC's meeting," and, if the TEC did not recommend GCS, give the Court "the full transcript of the TEC's meeting where it discussed Iglesias for GCS." Doc. 177 at 1, 3.  The Court later modified this aspect of the injunction and instead required only a sworn declaration, which BOP timely provided to the Court.  Doc. 181.

able to adjust to her female facility (a condition based in both medical and safety and security concerns). *Id.* at 5. This timing would also allow for continued monitoring of "Iglesias's placement at a female correctional facility while encouraging her to remain compliant with her mental health treatment." *Id.*

Given that the TEC had not immediately and unconditionally "recommend[ed] Iglesias for GCS," its recommendation did not fall under the injunction's first set of instructions, and BOP therefore complied with the preliminary injunction by following the alternate set of instructions that applied "[i]f the TEC [did] not recommend Iglesias for GCS." Doc. 177 at 2-3. Specifically, BOP timely filed their Notice in Compliance and the accompanying "sworn declaration from a member of the TEC explaining the reasons for the TEC's decision," as required by the Court's January 19, 2022 minute order, Doc. 181. *See* Doc. 183, 183-1. To Defendants' understanding, this filing fully complied with the preliminary injunction. *See, e.g.*, McLearen Decl. ¶¶ 13–15; Feldon Decl. ¶ 10; Kolsky Decl. ¶ 7; Robinson Decl. ¶¶ 4–5. Because Defendants thus complied with the preliminary injunction, they cannot be subject to sanctions for violating that order. At the very least, as explained in the attached declarations, Defendants acted based on their reasonable, good-faith understanding of what the order required, thus precluding an imposition of sanctions under the standards governing the inherent power, section 1927, and Rule 11. *See Maynard*, 332 F.3d at 470; *Jolly Group*, 435 F.3d at 720; *Ogden*, 2010 WL 11685292, at *2.

**B.    The Preliminary Injunction Did Not Set Forth an Unambiguous Command Requiring BOP To Either Immediately Recommend or Conclusively Deny Surgery**

Sanctions are also unwarranted because, at a minimum, the Court's preliminary injunction does not contain an unambiguous command requiring BOP to either immediately and unconditionally recommend surgery or conclusively deny surgery.

The Court's injunction instructed BOP to take certain actions and file certain notices "if the TEC recommend[ed] [Plaintiff] for GCS," Show Cause Order at 2-3, and to "[f]ile a notice with the Court explaining all the reasons for [the] TEC's decision," together with a supporting declaration, "if the TEC d[id] not recommend Plaintiff for surgery." *Id.* at 3; Doc. 181. Because of the medical and penological reasons explained in Defendants' Notice in Compliance, the TEC neither immediately approved nor conclusively denied Plaintiff's request for gender-confirmation surgery, but conditionally recommended that she be referred to a surgeon approximately 30 days after transfer to an RRC, assuming no other developments in the meantime that would make the surgery inappropriate. Doc. No. 183. If the Court instead intended the preliminary injunction to require BOP to either: (a) immediately recommend surgery; or (b) conclusively deny surgery, and to foreclose alternatives that the TEC might consider more appropriate in its best medical and penological judgment, Defendants respectfully submit that such an intent is not plain from the face of the order. At best the order is ambiguous, which precludes sanctions for any unintentional noncompliance. *Cf.* Fed. R. Civ. P. 65(d)(1) (requiring that every injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required"); *Int'l Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). In short, BOP acted on the basis of a reasonable, good-faith interpretation of the Court's preliminary injunction, *see* McLearen Decl. ¶¶ 13–15, and its best medical and penological judgments. The issuance of sanctions in these circumstances would therefore be inconsistent with the standards governing a court's authority under the inherent power, section 1927, and Rule 11.

## C.      Sanctions Are Not Warranted Against Any Individuals

The Court's Show Cause Order identifies two BOP officials and four DOJ attorneys and orders them to appear before the Court "to SHOW CAUSE for their failure to adhere to the Court's order dated December 27, 2021." Show Cause Order at 6. Defendants respectfully submit that, even

were the Court potentially considering sanctions against these individuals, there is no basis for any such sanctions. First, the individuals are not derivatively responsible for any perceived violation of the preliminary injunction by BOP because, as discussed above, BOP did not violate the Court's preliminary injunction. Thus, there was likewise no violation by any of the individuals.

Moreover, the individuals have not received "notice of the specific conduct for which [they are] potentially subject to sanctions," as required before the imposition of sanctions. *Johnson*, 422 F.3d at 551–52. Here, the Court has directed that "BOP is hereby ORDERED to SHOW CAUSE in writing on or before February 14, 2022, why sanctions should not be imposed." Doc. 187 at 5. Although the Show Cause Order requires the individuals to appear before the Court "to **SHOW CAUSE** for their failure to adhere to the Court's order dated December 27, 2021," and for DOJ counsel to be prepared to discuss their representations in various filings, the Show Cause Order does not state that the Court is considering issuing sanctions against the individuals and does not identify the specific conduct for which they could be sanctioned, or the particular provisions under which sanctions might be imposed. Accordingly, Defendants do not currently understand the listed individuals to be the target of potential sanctions. Regardless, Defendants take the Court's expressed concerns with the utmost seriousness—and for that reason, have submitted the attached declarations that, as discussed further below, demonstrate that the relevant individuals at both DOJ and BOP have acted in good faith at all times in this litigation, and thus sanctions against individuals would be unwarranted in any event.

## II.   BOP Has Consistently Explained Why It Believed Gender-Confirmation Surgery Was Not Yet Appropriate and the Process for Evaluating Plaintiff's Request

In its Show Cause Order, the Court expressed concerns about BOP's candor with the Court, suggesting that BOP has offered changing reasons for its conclusion that gender-confirmation surgery was not yet appropriate for Plaintiff, and changing explanations of its process for evaluating Plaintiff's

request.  Show Cause Order at 1–4.  The record as a whole confirms, however, that BOP has been candid in its explanations to the Court.

###    A.    BOP's Reasons for Its Decision Not to Approve Surgery

The Court correctly notes that BOP offered two reasons why the TEC decided in its March 9, 2020 meeting that gender-confirmation surgery was not yet appropriate for Plaintiff.  Doc. 100 at 16.  First, Plaintiff had "not lived in a gender confirming role for twelve months."  Doc. 99-1, Leukefeld Decl. ¶ 11.  Second, Plaintiff's hormone levels "had fallen below their goal and were not . . . maximized" and so Defendants "recommended [Plaintiff] remain at her current facility and maximize gender affirming hormones."  *Id.* ¶ 12.  These two reasons accurately describe why the TEC had determined that gender-confirmation surgery was not appropriate for Plaintiff.

Defendants focused primarily on these two reasons at the preliminary injunction hearing because they were the reasons on which the TEC had relied.  PI Hr'g Tr. 202 ("The Bureau has offered two reasons why it has not approved surgery up to this point.").  In her testimony, Dr. Leukefeld also addressed a separate, but related issue—why BOP had not recommended transferring Plaintiff to a women's facility before 2021.  Dr. Leukefeld explained that Plaintiff's "[medium] security level was not consistent with [assignment to] a female prison prior to this [year]."  *Id.* at 143.  Dr. Leukefeld provided this explanation in response to an argument Plaintiff had advanced in her preliminary injunction reply brief that Plaintiff had achieved target hormone levels "as early as August 2016" and thus, in Plaintiff's view, should have been transferred to a women's facility sooner.  Doc. 107 at 8.

The Court appears to have inferred from Dr. Leukefeld's explanation that BOP was offering "a third obstacle for Iglesias receiving the surgery" at the preliminary injunction hearing.  Show Cause Order at 2.  Respectfully, that was not the intended purpose of Dr. Leukefeld's testimony, and Defendants regret any confusion.  BOP has consistently maintained that there were two reasons why the TEC did not approve Plaintiff's request for surgery when it met to evaluate the request in March

2020.  Dr. Leukefeld's explanation concerning Plaintiff's security level related to the separate, but related question of why Plaintiff had not been transferred to a women's facility sooner, in response to Plaintiff's point that her hormones had achieved target levels in prior years.  In its March 2020 decision, however, the TEC did not rely on Plaintiff's security level as an obstacle to surgery because, by that point, Plaintiff had already been transferred to a low-security prison.  *See* Second McLearen Decl. ¶¶ 7–12.  Thus, Plaintiff's security level was not a new or "everchanging reason[]" for declining to approve surgery in 2020, *id.* at 1, but rather an explanation as to why Plaintiff was not transferred to a women's facility in prior years when her hormones had achieved target levels.  Defendants respectfully submit the testimony and their legal filings were accurate, but regret any confusion this point.

### B.    Dr. Leukefeld's Description of the TEC's Process

The Show Cause Order also quotes from Dr. Leukefeld's testimony at the preliminary injunction hearing about BOP's process for approving requests for gender-confirmation surgery by persons within BOP custody.  Show Cause Order at 3–4.  In her testimony, Dr. Leukefeld explained that the process would involve a referral by the TEC to the BOP Medical Director.  With one exception discussed below involving an inadvertent misstatement, Dr. Leukefeld's testimony was accurate.

The process for referring an individual for gender-confirmation surgery is different if the individual is housed at a secure BOP facility than if the individual is housed in a halfway house.  For individuals housed in a secure BOP facility (the large majority of individuals within the custody of BOP), medical care is overseen by the Health Services Division.  For such individuals, the process involves the TEC making a referral to BOP's Medical Director, who would then determine whether to refer the individual to a surgeon.  On January 13, 2022, this established process was included in the BOP's updated Transgender Offender Manual, which states:

16

> The TEC is the sole body who may determine that all milestones and individual goals for surgical consideration have been met.  When this occurs, the case is referred to the agency's Medical Director for medical consideration.  He or she may review existing records and/or interview the inmate, institution staff, and members of the TEC.  After this individualized assessment, the Medical Director will determine if the surgery is medically appropriate for referral to a gender affirming surgeon.

Transgender Offender Manual at 9 (Doc. 183-1).

BOP follows a different process for individuals living in a halfway house.  Medical care for such individuals is overseen, not by the Health Services Division, but by the Reentry Services Division.  *See* Defs' Notice in Compliance With Dec. 27, 2021 Prelim. Inj., Doc. 183, at 3.  Therefore, for individuals living in a halfway house, the Reentry Services Division would arrange, through a contractor, for GCS consultation with a surgeon.  *Id.*; *see also* Decl. of Alix M. McLearen, Doc. 183-1, ¶ 11.  It would not be necessary to refer such individuals to the Medical Director.

Accordingly, when the Court asked Dr. Leukefeld whether the TEC would refer an individual "seeking gender-confirming surgery at a female facility" for a medical evaluation, Dr. Leukefeld correctly testified "yes" and discussed the example of the individual who the TEC had recently referred for GCS.  Show Cause Order at 3.  That individual is housed in a secure BOP facility (FMC Carswell) and was referred by the TEC to the Medical Director.  Doc. 175 at 151, 190.

Similarly, Dr. Leukefeld correctly testified that "[t]he TEC makes that recommendation, and then [the Medical Director] and her staff would work to find a surgeon and make sure that there's – that there are no contraindications that would preclude surgery."  Show Cause Order at 3.  Here, Dr. Leukefeld accurately described the general process applicable to individuals in BOP secure facilities.

Also, when the Court asked about the individual whom Dr. Leukefeld "just mentioned in October who was referred," Dr. Leukefeld correctly testified that the TEC had referred that individual to BOP's Medical Director.  Show Cause Order at 4.

The Court also asked Dr. Leukefeld, regarding Plaintiff, if the TEC was "going to recommend surgery in April or refer her at that time for an evaluation?"  Show Cause Order at 3.  Dr. Leukefeld

responded: "The committee will make a determination about whether to recommend in April, and if it does, she would immediately be referred to the medical director to find – [.]" *Id.* at 3-4.  Due to an inadvertent oversight, Dr. Leukefeld's response did not address the fact that a referral to the Medical Director would not be necessary in April if Plaintiff were then living in a halfway house.  *See* Decl. of Alison Leukefeld ¶ 9 (filed herewith).[2]  At the time of her testimony, the TEC had only recommended one individual for surgery, and that individual was in a secure facility, so the process for referring that inmate to the Medical Director was uppermost in Dr. Leukefeld's mind.  Decl. of Alison Leukefeld ¶ 9.  And, as noted, Plaintiff was housed in a secure facility at the time.  *Id.*  Since the large majority of individuals in BOP custody are housed in secure facilities rather than RRCs, Dr. Leukefeld considers the process for referring individuals in RRCs to be the exception to the general rule of referral to the Medical Director.  *Id.* ¶ 7.  Dr. Leukefeld did not intend to mislead and did her best to provide accurate information during her examination.  *Id.* ¶¶ 9-10.

In short, when BOP's explanations of its decisions and its decision-making processes are considered in their full context, it is apparent that BOP has not made intentionally false, misleading, or factually unfounded representations to the Court, as would be necessary to impose sanctions under any of the authorities identified by the Court.  Nonetheless, Defendants apologize for and regret the inadvertent misstatement with respect to Dr. Leukefeld's testimony.

### III.   Counsel's Representations to the Court Have Been Accurate

In its Show Cause Order, the Court instructed counsel for Defendants to be prepared to speak to certain factual and legal contentions made in various past filings, with footnotes indicating which contentions in some of those filings were of particular interest to the Court.  The signatory to a filing complies with Rule 11(b) when, following a reasonable inquiry, the signatory has a good faith belief

---

[2] At the time Dr. Leukefeld testified, Plaintiff was (and still is) housed at a secure facility, but Plaintiff was scheduled to be transferred to a halfway house in March.  Doc. 175, at 148:25-149:7.

that all "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and all factual contentions have "evidentiary support or, if specifically so identified, will have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(2), (b)(3).

Because the trial counsel in this matter wish to assure the Court of their candor in as complete and expeditious a manner as possible, Defendants explain below, and in counsel's accompanying declarations, that Defendants' counsel fully complied with their ethical obligations to the Court, and their Rule 11 obligations, in preparing and submitting each of the documents identified by the Court.

### A. Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction (Doc. 100)

The Court first suggested that there is a conflict between Defendants' factual contention in their PI opposition that the TEC "conducted an individualized assessment of Plaintiff and concluded that she was not an appropriate candidate for gender affirming surgery at th[e relevant] juncture because her hormone level had not yet stabilized, and she had not lived a real-life experience as a female for twelve months in a female prison," and the statement in Dr. Leukefeld's declaration that the "TEC has not denied Iglesias gender affirming surgery."  Show Cause Order at 7 n.2.  But when viewed in full context, both statements were factually accurate when made, and consistent with each other.

As Dr. Leukefeld stated in her declaration, "[g]ender affirming surgery was not appropriate at the time Iglesias was last reviewed by the TEC, nor is it currently appropriate."  Doc. 100-2 at ¶ 11. Dr. Leukefeld noted that Plaintiff had not yet lived in a gender congruent role for twelve months and explained the penological reasons why such an experience was important before considering surgery. *Id.* at ¶¶ 11–12.  She also observed that at the time the TEC reviewed Plaintiff for surgery on March 9, 2020, Ms. Iglesias' "hormone levels had fallen below their goal and were not been maximized."  *Id.* ¶ 10.  Thus, the statements in Defendants' PI opposition that Plaintiffs' GCS had not yet been

approved because of her hormone levels, and lack of residential time in a female prison, are all directly supported by Dr. Leukefeld's declaration.

Dr. Leukefeld also stated, as the Court observes, that "the TEC has not denied Iglesias gender affirming surgery," and went on to explain that "<u>Rather, it has not approved placement in a female facility, which is a necessary and appropriate step toward surgery</u>." *Id.* at ¶ 13 (emphasis added). Taken together these two statements do not contradict the representations in Defendants' PI opposition (or the earlier statements in Dr. Leukefeld's own declaration). They merely explained one of the reasons given by Defendants as to why Plaintiff could not yet be approved as an appropriate candidate for gender-confirming surgery when the TEC considered her request in March 2020. Moreover, the fact that an inmate may not be an appropriate candidate for GCS at a particular moment in time because they fail to meet certain preconditions does not equate to a "denial" of providing that surgery, because the surgery may later be approved as circumstances change.

Thus the representations in Defendants' PI opposition were well-founded in the record, and were not made for an improper purpose such as delay. Gardner Decl. ¶ 11. As such, they would not support the imposition of sanctions.

### B.    Defendants' Motion to Dismiss (Doc. 129)

Next, the Court's order questions the argument in Defendants' motion to dismiss that venue is improper because no legally significant events occurred in this judicial district when Plaintiff filed her Second Amended Complaint, the operative pleading in this case.[3]  Show Cause Order. at 7 n.3.

---

[3] In the same footnote to the Show Cause Order, the Court also noted its "concerns with the quality of DOJ's arguments on Standing Mootness, and the Eighth Amendment Claim [for] Denial of Medical Care" in Defendants' motion to dismiss. Although the Court found these arguments unpersuasive, its Show Cause Order does not identify any reason those arguments might violate Rule 11. *See Ogden*, 2010 WL 11685292, at *2 (mere "failure to prevail on the merits of a particular legal contention . . . cannot justify a finding of frivolousness"). The Court's order on the motion to dismiss similarly did not state that those arguments were frivolous, or misrepresented the applicable law.

Defendants' legal contention is not sanctionable because it is "warranted by existing law," or at a minimum by "a nonfrivolous argument . . . establishing new law" in the Seventh Circuit. Fed. R. Civ. P. 11(b)(2).

Based on extensive research, Defendants concluded that neither the Supreme Court nor the Seventh Circuit has squarely addressed the question of how the venue inquiry is affected when a party's earlier pleading alleges a basis for venue that no longer applies at the time the party files an amended pleading. Defendants therefore relied on district court decisions in the Seventh Circuit for the principles supporting their legal contention that venue is considered based solely on the amended pleading. Defendants made this contention based on a good faith understanding of the law, and neither Plaintiff's opposition to Defendants' motion to dismiss nor the Court's order on that motion identified any contrary authority from the Seventh Circuit or Supreme Court. Insofar as the issue remains unsettled, Defendants' arguments were "warranted," Fed. R. Civ. P. 11(b)(2), on the basis of persuasive authority—albeit not binding precedent—in this Circuit, and were made in good faith. Feldon Decl. ¶¶ 6–8.

Following the Court's Show Cause Order, Defendants again looked for any relevant authority on this issue. In doing so, they did not locate any binding authority foreclosing the argument, and instead identified two decisions from other U.S. Courts of Appeal that accord with Defendants' legal contention. As the Federal Circuit recently explained, once parties "filed their amended complaints, the original complaints were 'dead letter[s]' and no longer performed any function in the case[s]' . . . including for purposes of venue." *In re Samsung Elecs. Co.*, 2 F.4th 1371, 1376 (Fed. Cir. 2021) (citation omitted) (first two alterations in original). And the Tenth Circuit reached the same conclusion in a case factually analogous to the one at bar. In *Fullerton v. Maynard*, a prisoner was transferred to a different judicial district between the filing of his original complaint and his amended pleading. 943 F.2d 57, 57 (10th Cir. 1991) (unpublished table decision). Under those circumstances, the Tenth

Circuit concluded that, "[b]ecause the amended complaint supersedes the original complaint, proper venue . . . must be established from facts alleged in the amended complaint."  Both the district court decisions cited by Defendants in their motion and these two newly discovered circuit court cases are persuasive even if not binding authority that constitute "existing law" warranting Defendants' legal contention.

Defendants acknowledge that, as the Court noted in the Show Cause Order, "district court opinions have no precedential value."  Show Cause Order at 7 n.3.  But in the absence of controlling authority, a party may ordinarily rely on persuasive authority without running afoul of any ethical obligations.  *See Lorrison v. Berryhill*, No. 18-10289, 2019 WL 1324247, at *6 n.4 (E.D. Mich. Mar. 25, 2019) ("Absent binding precedent, courts and parties are free to turn to persuasive authority.").  Accordingly, Defendants appropriately relied on persuasive authority here to make good faith arguments in their motion to dismiss, and Defendants respectfully submit that such reliance is not a basis on which to issue sanctions.

### C.    Defendants' Motion to Exclude Untimely and Undisclosed Expert Testimony and Request for Expedited Consideration (Doc. 130)

Although the Court references Defendants' motion to exclude the newly proffered opinions of Plaintiff's expert, Dr. Ettner, the Show Cause Order does not reference any specific issue or representation in that filing that could be a basis for sanctions.  Show Cause Order at 7 (citing Doc. 130).  Defendants moved in good faith on the ground that submission of Dr. Ettner's previously undisclosed opinions less than two weeks before the preliminary injunction hearing would unfairly prejudice Defendants, particularly given that Plaintiff could have had Dr. Ettner evaluate Plaintiff and formulate those opinions at any earlier time in the litigation.  To Defendants' knowledge, all the contentions they made in support of that motion were legally and factually accurate.  Plaintiff did not contest the legal or factual accuracy of Defendants' contentions in opposing that motion, arguing instead that Defendants were responsible for the delay in Dr. Ettner forming her opinions.  Doc. 131.

22

And the Court appeared to credit many of Defendants' contentions by noting several in a minute order before ordering the hearing rescheduled.  Doc. 133.  In filing this motion, Defendants acted in good faith, accurately recited both the facts and the law, and did not make this motion for the purpose of unnecessarily delaying proceedings.  *See* Gardner Decl. ¶ 12.

### D.   Defendants' Opposition to Plaintiff's Motion to Compel Expedited Discovery (Doc. 147)

The Show Cause Order reiterates the Court's statement from a footnote in its order on Plaintiff's motion for expedited discovery that Defendants' opposition "mischaracterized the record" when it stated that "Plaintiff has had the opportunity twice to seek expedited discovery and made the strategic decision to seek only the deposition of Dr. Leukefeld."  Show Cause Order at 7 n.4; Doc. 156 at 5 & n. 2.  Respectfully, however, Defendants' statement accurately reflects the record.  Plaintiff's counsel's emails of August 30, 2021 (Exhibit 2 to Defendants' opposition) and September 10, 2021 (Exhibit 5 to Defendants' opposition) both stated Plaintiff's intent to limit her pre-hearing discovery to deposing Dr. Leukefeld.  Docs. 147-2, 147-5.  It is true, of course, as the Show Cause Order notes, that Plaintiff was not required to inform the Court of her position on discovery on September 10, 2021.  Show Cause Order at 7 n.4.  Nevertheless, the e-mails of Plaintiff's counsel show that in fact she did advise the Court of her position, before reversing course.  Thus Defendants' statement noting this change of Plaintiff's position was firmly founded in the record.

The Show Cause Order goes on to repeat the remainder of the Court's earlier footnote, which focuses on Defendants' positions regarding discovery.  *Id.* (quoting Doc. 156 n. 2).  Respectfully, however, the change in Defendants' position on discovery does not alter the fact that Defendants accurately described the change in Plaintiff's position.  Moreover, Defendants' own change of position on pre-hearing discovery is not suggestive of bad faith.  As Defendants stated at the August 30, 2021 hearing, they did not at that time believe that it was necessary to depose Dr. Ettner and were unlikely to call witnesses.  *Id.*  However, the day after the August 30 hearing, Plaintiff provided Defendants

with the results of Dr. Ettner's July 20, 2021 psychological evaluation of Plaintiff, which led Defendants to reconsider and revise their conclusion about the need to depose Dr. Ettner. Defendants informed the Court of their revised position on September 10, as the Court ordered.  *Id.* Defendants' change in position was reasonably based on new information, not any intent to deceive or delay. *See* Gardner Decl. ¶ 13.

### E.  Defendants' Motion for Relief From Full Compliance With the Court's October 15 Order (Doc. 157)

The Show Cause Order states that Defendants should be prepared to discuss their representations in their motion for relief from the Court's October 15 order authorizing Plaintiff to conduct discovery, but does not identify particular representations that the Court questions.  Order at 7 (citing Doc. 157).  In that motion, Defendants sought partial relief from the Court's October 15 order insofar as it required complete compliance with the production of documents by the date of the then-scheduled October 19, 2021 preliminary injunction hearing.  Doc. 157 at 1-2.

Defendants informed the Court that that they "had made every effort to comply with the Court's order as quickly as possible, and [were] working to collect the documents encompassed by the Court's Order and prepare them for production."  *Id.* at 1.  Defendants noted that they had already produced the first three of the four categories reflected in the Court's discovery order and had produced 886 pages of documents in the previous 48 hours.  *Id.* at 2.  Defendants explained, however, that it would be impossible to complete production of the final category of documents by the October 19 hearing because it required "electronic custodial searches of a number of BOP employees, and the initial collection efforts resulted in hundreds of thousands of pages of emails."  *Id.* Defendants' preliminary review indicated that a substantial proportion—and likely a large majority— of the documents collected were either privileged or non-responsive, and they needed additional time to process, review, and produce the documents.  *Id.*  For those reasons, Defendants explained, the review could not be completed in time for the preliminary injunction hearing scheduled for the

following day.  *Id.*  These statements were factually accurate, and made in good faith.  *See* Gardner

Decl. ¶ 14.

**F.  Defendants' October 22, 2021 Status Report (Doc. 161)**

The Court expresses concern with the statement in Defendants' status report concerning the

amount of time they estimated it would take to review and produce documents as required by the

October 15 order.  Defendants provided this estimate in response to the Court's October 19, 2021

minute order that asked, among other things, for "defendants['] proposed deadline to []comply with

the Court['s] order on expedited discovery[.]"  In that status report, Defendants noted that, after de-

duplication and agreements with the Plaintiff to narrow the scope of the search, approximately 5,200

documents still required review.  *See* Doc. 161 at 2.  Defendants noted that they anticipated providing

to Plaintiff responsive, non-privileged documents on a rolling basis and that they hoped to complete

their productions by November 22, 2021 (*i.e.*, in less than one month).  *Id.*  Defendants further noted

that assuming an averaging process rate of twenty-five documents per hour and eight-hour review

days, "it will take twenty-six full days to review the approximately 5,200 collected documents, absent

further narrowing."  *Id.* at 2, n.1.  For this reason, Defendants noted that they were "uncertain whether

they can complete their production of documents subject to the Court's order by November 22,

2021."  *Id.* at 2.

The Court states in its Show Cause Order that "DOJ attorneys represented that it could not

comply with the Court's discovery order on expedited discovery" based on the number of personnel

hours estimated to complete the review, and further noted that the estimate assumed a single attorney

doing the work when "five attorneys entered in on this case."  Order at 7 n.5.  But, as stated above,

Defendants did not represent to the Court that they "could not comply with the Court's discovery

order."  Rather, as explained in Defendants' status report, Defendants expressed uncertainty as to

whether they could produce all responsive, non-privileged documents by November 22, 2021, given

the large volume of documents and the short time for review. Moreover, Defendants did not intend to suggest that only a single attorney would be reviewing documents. Rather, the intention was to provide the court with the aggregate number of personnel hours necessary to complete the review. Defendants sought in good faith to provide the Court with a conservative estimate so that the Court could decide whether it made sense to briefly delay the evidentiary hearing. To the extent Defendants' explanation was unclear, the lack of clarity was unintended, not meant to mislead the Court, and Defendants regret any confusion. And the representations in this filing were not made for the purpose of improperly delaying  Gardner Decl. ¶ 15.

### G.      Defendants' Motion for Reconsideration (Doc. 178)

The Court references Defendants' motion for reconsideration of the portion of the preliminary injunction requiring transcription of the TEC's January 24, 2022 meeting, but does not identify particular representations of concern in that filing. Show Cause Order at 7 (citing Doc. 178). Defendants' motion was based on arguments that requiring BOP to transcribe the TEC meeting would represent an unnecessary infringement of BOP's deliberative process privilege and represent inappropriate judicial supervision of an executive agency, particularly given the Prison Litigation Reform Act's limit on injunctive relief in this context. Doc. 178. Those arguments were supported by applicable legal authority, and the factual representations on which they were based were accurate. Further, Defendants filed their motion to protect BOP's legitimate interests identified in that filing, and not for any improper purpose. Gardner Decl. ¶ 16; Kolsky Decl. ¶ 9; Robinson Decl. ¶ 7. Thus, reliance on the motion for reconsideration as a basis for sanctions would be unwarranted.

### H.      Notice by All Defendants in Compliance with the Preliminary Injunction (Doc. 183)

The Show Cause Order suggests that BOP should have informed the Court that the Medical Director is not directly involved in approving medical procedures for inmates in halfway houses prior to filing their January 24 Notice in Compliance, given that Defendants earlier anticipated providing

Plaintiff surgery once she has transitioned to a halfway house.  Show Cause Order at 7 n. 6 (citing Doc. 183).  Except in the single instance noted above involving an inadvertent error, *see* p. 18, *supra*, the information provided to the Court concerning the process for awarding gender-confirming surgery—both in written filings and through live testimony—was consistent and accurate. Defendants and their counsel simply did not anticipate the need to explain that the Medical Director does not play a role in authorizing and arranging medical care for inmates placed in halfway houses until the TEC's recommendation (for a surgical referral after Plaintiff's transfer to a halfway house) made that information relevant.  Defendants apologize that this omission affected the Court's understanding of BOP's procedures for approval of gender-confirming surgery.  However, the omission was born of oversight, without intent to deceive the Court on this point.

Because all of the filings identified in the Court's Show Cause Order were made in good faith, for appropriate purposes, without intent to mislead or delay, and are well-founded in law and fact, they would not furnish grounds for imposing sanctions against counsel under the Court's inherent power, section 1927, or Rule 11, even if the Show Cause Order indicated that the Court were contemplating that course of action.  *See* McLearen Decl. ¶¶ 13–15; *see generally* Haas Decl. ¶¶ 5–11; Gardner Decl. ¶¶ 5–17; Feldon Decl. ¶¶ 3–12 ; Kolsky Decl.; ¶¶ 3-12 Robinson Decl. ¶¶ 2–9; Talmor Decl. ¶¶ 7–9.

## IV.    BOP Continues to Work Expeditiously to Address Plaintiff's Request

As explained above and in the attached declaration of Dr. Alix McLearen, BOP has worked diligently to address Plaintiff's request for gender-confirmation surgery.  *See* McLearen Decl. ¶¶ 4–5, 13-20.  The TEC has not sought to delay its decision but rather is striving to take the medical and safety considerations into account in providing the best possible care in a dynamic situation.  *Id.*  Dr. McLearen and others at BOP are continuing to work diligently to address Plaintiff's request for surgery.  *Id.* ¶¶ 19–20.  For example, BOP is not waiting until Plaintiff's transfer to the RRC to develop

a plan to provide Plaintiff with surgery.  *Id.*  Instead, to avoid any delay, BOP has notified its contractor of Plaintiff's pending transfer and has been informed that the contractor has located an appropriate surgeon.  *Id.* ¶ 20.  The surgeon has been contacted and given preliminary patient information, and Dr. McLearen will provide a further update to the Court on any progress made at or before the February 22 hearing.  *Id.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that sanctions are not warranted, and this Court should formally discharge its Order to Show Cause, Doc. 187.

Dated:  February 14, 2022

Respectfully submitted,

STEVEN D. WEINHOEFT
United States Attorney

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

LAURA J. JONES
Assistant United States Attorney

BRIAN D. NETTER
Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel

*/s/ Daniel Schwei*
DANIEL SCHWEI
Special Counsel
United States Department of Justice
Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC 20530
Tel.:    (202) 305-8693
Fax:    (202) 616-8470
Email:  Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*