IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a., CRISTIAN NOEL IGLESIAS), | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 19-cv-00415-NJR ) |
| IAN CONNORS, ET AL., | ) ) ) |
| Defendants. | ) |

## DECLARATION OF DR. ALIX M. MCLEAREN

I, Dr. Alix M. McLearen, make the following declaration, in accordance with the provisions of 28 U.S.C. §1746:

1. I am currently employed by the Federal Bureau of Prisons ("BOP") as Acting Assistant Director of the BOP's Reentry Services Division. I have held my current position since December of 2021, and have been the Senior Deputy Assistant Director since May of 2020. I have been employed by the BOP for approximately 18 years.

2. As Acting Assistant Director of the BOP's Reentry Services Division, I am responsible for the oversight of Psychology Services, Residential Reentry Management, Community Reentry Affairs, Women and Special Populations, Education, and Chaplaincy.

3. Additionally, I oversee and serve as a member of the BOP's Transgender Executive Council (TEC). I began to participate in the TEC when it was established in 2016. I am familiar with the TEC's recommendations regarding the Plaintiff, inmate Iglesias, Reg. No. 17248-018.

**Background**

4. The TEC recognizes that Iglesias's gender dysphoria is a serious condition and takes seriously its obligation to address her needs. The TEC has regularly reviewed Iglesias's housing

1

situation and needs. *See, e.g.* Decl. of Alison Leukefeld ¶¶ 8–10, Doc. 99-2 (explaining steps TEC has taken to address Plaintiff's requests). The TEC has consistently applied BOP policies and practices to Iglesias's request for gender confirmation surgery ("GCS"). *See id.* ¶¶ 11–14. The TEC has provided different recommendations over time depending on the facts that existed at the time of the recommendation. Those recommendations have been appropriately updated as Iglesias's treatment and condition has progressed.

5. The TEC has not sought to delay any decision on Iglesias's request for GCS. Rather, it is striving to take her mental health treatment and overall care in a correctional setting into account in providing appropriate care in a dynamic situation. Neither the TEC nor BOP has taken, nor asked its counsel to take, any steps in this litigation for the purpose of delay or to avoid providing Iglesias any necessary treatment.

**The Court's Show Cause Order (Doc. 187)**

6. I am aware that the Court ordered BOP to show cause why sanctions should not be imposed in this case. (Doc. 187). In its order, the Court first notes a concern that BOP has offered changing reasons for its conclusion that gender-confirmation surgery for Plaintiff was not yet appropriate. I respectfully disagree that BOP has offered changing reasons for its decision and believe that BOP has been consistent in the explanations it has given.

7. In support of its suggestion that BOP has offered changing reasons, the Court cites Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, which states that the TEC had not approved Iglesias for surgery for two reasons. "First, Plaintiff had not lived in a gender-conforming role for twelve months since being incarcerated under the custody of BOP." (Doc. 100 at 16) "Second, Defendants concluded that Plaintiff's placement in a female facility was not warranted until now because her hormone levels had fallen below their goal and had not been maximized." (*Id.* at 17).

8. Those statements were supported by the Declaration of Alison Leukefeld. The reference to Iglesias's hormone levels not being maximized was a reference to a TEC decision at a specific point in time, i.e. on or about March 9, 2020. (Doc. 99-2 ¶¶ 10-12).

9. At the preliminary injunction hearing, Dr. Leukefeld testified that, previously, Iglesias's medium security level had posed an obstacle to transfer to a female institution. (Doc. 175, pp. 143–45). However, that issue was also addressed in Dr. Leukefeld's declaration. Specifically, the declaration acknowledged that, in 2019, the TEC had recommended that Iglesias be placed at a low security male facility as a step toward placement in a female institution, and stated that this was "an important step toward [placement in] a female facility, for medium and high-security female transgender inmates, since all female institutions are low-or minimum security, and inmates do not typically skip security levels as they move down." (Doc. 99-2 ¶ 15). It also referenced Iglesias's transfer from USP Marion (a medium security facility) to FMC Lexington (a low security facility) in 2019. *Id.*

10. Therefore, the statements that the Court referenced in its Show Cause Order are consistent with the testimony at the preliminary injunction hearing "that BOP could not have placed Iglesias in a female facility even when her goal hormone levels had been maximized because she still had a medium security threat level." (Doc. 175, p. 143). The testimony at the preliminary injunction hearing regarding security levels was intended to describe BOP's decisions at the time "[w]hen [Iglesias's] hormone levels were within goal range" – i.e., prior to her transfer to FMC Lexington (a low security facility) in 2019. That is why, when describing the TEC's March 2020 decision, security level was not an obstacle, because by that point Iglesias had been moved to a low security male institution.

11. The TEC has based its decisions regarding Iglesias on the facts as they existed at the time of each evaluation of her status. For example, Iglesias began hormone therapy in 2015. Her hormone levels were largely at goal from 2016 to 2019. (Doc. 99-4). In 2019, TEC recommended

3

she be transferred to a low security facility as a step toward placement in a female facility. However, shortly after transfer to a low security facility, the Federal Medical Center at Lexington, Kentucky, her hormone levels were not at goal. Doc. 99-4. Those hormone levels then stabilized and later returned to goal levels in April 2021. (Doc. 99-4). At that point, for the first time, Iglesias was both simultaneously housed in a low security facility and with target hormone levels. Consequently, shortly thereafter, Iglesias was transferred to a female facility in May 2021.

12. As the Court is aware, the TEC recently recommended Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center ("RRC," commonly referred to as a "halfway house"), assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate for Iglesias.

**Compliance with the Court's preliminary injunction**

13. The TEC takes its compliance with the Court's orders seriously. After the Court issued its December 27 preliminary injunction, BOP carefully reviewed the order to ensure that we acted in accordance with it. As explained in my prior declaration (Doc. 183-1), the TEC met on January 24, 2022, to evaluate Iglesias's request for GCS by January 24 in response to the Preliminary Injunction (Doc. 177).

14. The TEC did not understand the court's order (Doc. 177) to be intended to limit it to only two options—either (1) immediate referral to medical director or (2) denial of request for surgery.

15. The TEC made what it viewed was the best recommendation for the wellbeing of the patient given all factors. The TEC did not make this recommendation for purposes of delaying or denying Iglesias surgery. As I have explained, the TEC did not believe that immediate referral to the medical director was appropriate given the pending transfer to the Residential Reentry Center,

4

because surgery will take place while the inmate is in the community placement.

16. As explained in my declaration (Doc. 183-1), the TEC decided to recommend that Iglesias be referred to a surgeon by mid-April, assuming that no other reasons develop that would make gender confirmation surgery inappropriate, because of continuity-of-care concerns and the importance of continuing to monitor Iglesias in a female facility.

17. The recommendation for referral to a contract surgeon does not represent a change in reasoning to delay GCS for Iglesias. Rather, as explained in my declaration (Doc. 183-1), the process for referring an RRC inmate does not require the Medical Director's involvement, as it would for an inmate in a secure facility. In that regard, the decision to recommend referral directly to a surgeon by mid-April, without referral to BOP's Medical Director, should streamline the process for Iglesias and be less time consuming than if referral to the Medical Director was required.

18. The continuity-of-care and monitoring concerns are legitimate practical and treatment reasons that are based on ensuring that Iglesias receives appropriate care.

19. The TEC is continuing to work to provide the best care to this individual. Iglesias is in an operationally unique situation as she is currently at a secure facility, but soon to be transferred to an RRC. Accordingly, referring her to the BOP Medical Director is not prudent, as Iglesias is scheduled to soon be transferred to an RRC, at which point any treatment she receives will be provided by providers in the community who provide treatment to inmates in RRCs pursuant to a contract. Normally, medical appointments for inmates in RRCs are not scheduled prior to the inmate's arrival at the RRC.

20. Moreover, BOP is not waiting until Plaintiff's transfer to the RRC to develop a plan to provide Plaintiff with GCS. Indeed, to avoid delay in this case, BOP, has notified the contractor of Iglesias's pending transfer and has been informed they have located an appropriate surgeon. The surgeon has been contacted and given preliminary patient information, and we will provide updates to the Court on any further progress made between now and the February 22 hearing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my belief. Executed on this 14th day of February 2022.

                                                                          Dr. Alix M. McLearen