## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CRISTINA NICHOLE IGLESIAS (also known as CHRISTIAN NOEL IGLESIAS),**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**FEDERAL BUREAU OF PRISONS, MICHAEL CARVAJAL, CHRIS BINA, IAN CONNORS, DAN SPROUL, JEFFERY ALLEN, ALIX MCLEAREN, THOMAS SCARANTINO, and DONALD LEWIS,**<br><br>   **Defendants.** | **Case No. 19-CV-415-NJR** |

## <u>NOTICE AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

The Department of Justice contends in its Response to the Court's February 10, 2022 Order to Show Cause the following:

> Regardless of the legal authority invoked, the Court must also comply with certain procedural requirements before imposing any sanctions. Specifically, "the imposition of sanctions requires that the party to be sanctioned receive notice of the possible sanction and an opportunity to be heard." *Larsen v. City of Beloit*, 130 F.3d 1278, 1286 (7th Cir. 1997). "A general notice that the court is contemplating sanctions is insufficient; rather, the offending party must be on notice of the specific conduct for which she is potentially subject to sanctions." *Johnson v. Cherry*, 422 F.3d 540, 551–52 (7th Cir. 2005). As explained below, no sanctions are warranted against BOP (or anyone else) under the legal principles that govern the exercise of the Court's authority under its inherent power, Rule 11, or section 1927.

(Doc. 191, p. 15).

The Court has not issued sanctions. Rather, the Show Cause Order provided notice

of possible sanctions and ordered the appropriate parties to respond by February 14, 2022. The Court also has ordered the appropriate parties to appear in the East St. Louis Courthouse before the undersigned tomorrow, February 22, 2022. (Docs. 187 & 188). At this hearing, the Court will allow the parties further opportunity to be heard.

Yet, the Department of Justice continues:

> Moreover, the individuals have not received "notice of the specific conduct for which [they are] potentially subject to sanctions," as required before the imposition of sanctions. *Johnson*, 422 F.3d at 551–52. Here, the Court has directed that "BOP is hereby ORDERED to SHOW CAUSE in writing on or before February 14, 2022, why sanctions should not be imposed." Doc. 187 at 5.
>
> Although the Show Cause Order requires the individuals to appear before the Court "to SHOW CAUSE for their failure to adhere to the Court's order dated December 27, 2021," and for DOJ counsel to be prepared to discuss their representations in various filings, the Show Cause Order does not state that the Court is considering issuing sanctions against the individuals and does not identify the specific conduct for which they could be sanctioned, or the particular provisions under which sanctions might be imposed.

(*Id.* at p. 19).

Counsel's use of *Johnson*, 422 F.3d 540, in response to the Court's Order to Show Cause is illustrative of what the Court has endured throughout this litigation. Rather than wasting time summarizing *Johnson*, here is the applicable section of *Johnson*:

> The district court did not comply with the notice requirement. As relevant here, the court sanctioned Clinite for making two statements to the court that the court believed to be false: (1) in asking the court to strike the substitution motion, Clinite had averred that she did not sign the substitution motion; and (2) in the follow-up briefing as to who might be responsible for the signature other than Clinite, Clinite had represented that she never instructed Johnson how to indicate that a document was being signed electronically. Prior to the August 31 hearing, the court did not warn Clinite that it was considering sanctions against her on these grounds. It

was not until the end of that hearing that the court determined that Clinite had, in fact, signed the substitution motion. And it was not until the following day, when the court issued its written sanctions order, that it found Clinite was untruthful about telling Johnson how to sign a document with a typewritten signature. Thus, Clinite was never given the opportunity to demonstrate why she should not be sanctioned on those particular grounds.

Of course, the court did convene the August 31 hearing—which is labeled in the record as a "show cause" hearing (R. 49 at 1)—for the purpose of ferreting out who was responsible for the signature on the substitution motion that Clinite claimed was not hers; and the court had issued a general warning that it would sanction the individual who was responsible. The written memoranda that Hammel, Johnson, and Clinite herself filed in advance of that hearing, and the statements they made at the hearing itself, reflect a common awareness that each of them had some amount of explaining to do and that sanctions were in the offing. Clinite, like the others, was given the opportunity before and at the hearing to recount her own version of events. This was not, then, a case in which the court made use of its power to sanction without any forewarning and without first hearing the parties involved.

But the August 31 hearing was convened to determine who was responsible for improperly affixing Clinite's signature to the substitution motion, and not until that hearing was nearly at an end could Clinite reasonably have appreciated that she herself might be subject to sanctions in that regard.[7] Prior to the hearing, the district court plainly accepted as true Clinite's representation that she did not sign the substitution motion. The court ordered the motion stricken and vacated its order allowing the substitution on the strength of that averment. *See* R. 20 at 1. It simultaneously "demand[ed] an account from the responsible party regarding the reason Ms. Clinite's *unauthorized* signature was used in a document filed with this Court." *Id.* (emphasis ours). When, after receiving written memoranda from the parties on the subject, the court issued its order scheduling the August 31 hearing in which it again referred to Clinite's signature as "unauthorized." R. 26 at 7. In advance of the hearing, then, Clinite had no reason to think that the court might reverse itself and conclude that she actually had signed the substitution motion. Nor had Clinite reason to suspect that she might be sanctioned for making a misstatement as to whether or not she had given Johnson instructions as to how to sign a document by typing Clinite's name with the "/s/" symbol. This was a subject that happened to come up in the parties' memoranda regarding Clinite's signature. It was not central to that question, as the

signature on the substitution motion was (purportedly) a traditional ink signature rather than a typewritten one. More to the point, the court gave no indication when it convened the hearing (or at any point prior to its sanctions order) that Clinite's representation was a potential basis for sanctions; the subject was not even discussed at the August 31 hearing.

Clinite therefore was deprived of the opportunity to confront the court's belief that she had engaged in sanctionable conduct and to convince the court (or to try) that she should not be sanctioned. The case that Clinite has mustered on appeal demonstrates that she was prejudiced, at least in part, by the lack of such an opportunity: once apprised of the court's basis for imposing sanctions, she has been able to demonstrate that one of the principal grounds for sanctions was based on a factual finding (that she actually signed the substitution motion) that quite possibly was clearly erroneous.[8] Clinite presumably could have made the same case to the district court directly by filing a motion to reconsider the sanctions order (she did make similar arguments in her response to the rule to show case). But the opportunity to make her case after the court has imposed sanctions is not an adequate substitute for an opportunity to be heard in full before sanctions are ever imposed. *Johnson v. Waddell & Reed, Inc., supra,* 74 F.3d at 151.

We must therefore vacate the award of sanctions insofar as it was based on the two grounds that Clinite has challenged on appeal. Respecting the district court's role as the finder of fact, we leave it to that court whether it still wishes to contemplate sanctions against Clinite on these two grounds. Any further proceedings as to potential sanctions must, however, afford Clinite notice of the specific bases on which the court is contemplating sanctions and an adequate opportunity to respond.

*Johnson*, 422 F.3d at 552–53. Here, the Court **has** **not** issued sanctions. The Court **has** provided notice of specific conduct by DOJ attorneys in specific filings of the Court. Upon further review of counsels' filings, counsel is hereby **FURTHER ORDERED** to address the following issues in writing before **8 a.m.** on **February 22, 2022**:

I.   **Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction filed on April 20, 2021 (Doc. 100)**

> A.  *Did Defendants Provide the Correct Standard for the Likelihood of Success for a Preliminary Injunction?*

The Court noted the following standard:

> A movant's showing of likelihood of success on the merits must be **strong**."
> *Tully*, 977 F.3d at 613 (internal quotation marks omitted). "A 'strong'
> showing ... does not mean proof by a preponderance....But it normally
> includes a demonstration of how the applicant proposes to prove the key
> elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63
> (7th Cir. 2020).

(Doc. 176). On April 20, 2021, Gary Feldon noted the following standard:

> To obtain a preliminary injunction, "a plaintiff must establish that [she] has
> some likelihood of success on the merits; that [she] has no adequate remedy
> at law; [and] that without relief [she] will suffer irreparable harm." *GEFT
> Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

(Doc. 100, p. 8).

> B.  *Counsel's use of Lehn v. Holmes, 364 F.3d 862 (7th Cir. 2004).*

Mr. Feldon argues that Iglesias's failure-to-transfer claim is moot and she cannot

establish a likelihood of success on the merits of that claim. Feldon then uses a string cite

of Seventh Circuit cases to support this assertion. During the string cite, Feldon cites *Lehn*,

364 F.3d 862, and includes the following parenthetical:

> [W]hen a prisoner who seeks injunctive relief for a condition specific to a
> particular prison is transferred out of that prison, the need for relief . . .
> become[s] moot.

(Doc. 100, p. 12). Is this a misrepresentation of *Lehn*?

*Lehn* contains the quote in Feldon's parenthetical, but the full part of the quote

includes:

[*Higgason*] stands only for the uncontroversial proposition that **when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot**. *Id.* at 811. *Higgason* did not confront the issue raised in Lehn's case: **whether a prisoner who seeks relief from a condition that stems from a system-wide policy, who is then transferred to a different facility within the same system where the objectionable policy also applies, states a claim**. Neither *Higgason* nor any of the cases following it address this point.

*(Id.* at 871-72) (emphasis added).

## II.   Defendants' Motion to Dismiss Filed on July 8, 2021 (Doc. 129)

*A.   Defendants' representation of the law regarding venue.*

The Court noted the following as the law regarding venue:

When a defendant is an officer or employee of the United States and is sued in his or her official capacity, however, venue is proper where, among other locations, "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e).

(Doc. 160). On July 8, 2021, Joshua Gardner asserted that venue is improper in this district. (Doc. 129, p. 9). Gardner contended that "[d]istrict courts within the Seventh Circuit *consistently* follow the general rule that venue is determined at the time an action commences." *Schneider v. Brennan*, No. 15-CV-263-JDP, 2016 WL 29642, at *2 (W.D. Wis. Jan. 4, 2016) (collecting cases) (emphasis added). That is not the law. The cases that follow *Schneider* are not the law.

"[A] lawyer may not take a position with the Court that is against the state of the law unless he informs the Court that he is doing so and presents the current state of the law." *United States v. Fears*, No. 15 C 756-1, 2018 WL 10436370, at *3 (N.D. Ill. Feb. 22, 2018).

In Defendants' Response to the Court's February 10, 2022 Order to Show Cause, Counsel contests that the legal contention is not sanctionable because it is "warranted by existing law," or at a minimum by "a nonfrivolous argument . . . establishing new law" in the Seventh Circuit. Fed. R. Civ. P. 11(b)(2). (Doc. 191, pp. 25-26). Defendants continue arguing the following:

> Based on extensive research, Defendants concluded that neither the Supreme Court nor the Seventh Circuit has squarely addressed the question of how the venue inquiry is affected when a party's earlier pleading alleges a basis for venue that no longer applies at the time the party files an amended pleading. Defendants therefore relied on district court decisions in the Seventh Circuit for the principles supporting their legal contention that venue is considered based solely on the amended pleading. Defendants made this contention based on a good faith understanding of the law, and neither Plaintiff's opposition to Defendants' motion to dismiss nor the Court's order on that motion identified any contrary authority from the Seventh Circuit or Supreme Court.

(*Id*. at p. 26). The problem is Defendants are trying to frame the law as unsettled. Defendants argue that "in the absence of controlling authority a party may rely on persuasive authority without running afoul of any ethical obligations." (*Id*. at p. 27). But there is controlling authority: the venue statute specific to this case. *See Christian v. St. Anthony Med. Ctr.*, Inc., 117 F.3d 1051, 1052 (7th Cir. 1997) (one "cannot find a case on the question, but the answer seem obvious—maybe that's why there are no cases").

Defendants appear to double down on the lack of controlling authority and point to *In re Samsung Elecs. Co., Ltd.*, 2 F.4th 1371 (Fed. Cir. 2021), and *Fullerton v. Maynard*, 943 F.2d 57 (10th Cir. 1991). *In re Samsung Elecs. Co., Ltd.* involved the patent venue statute 28 U.S.C. § 1400(b). Under Section 1400(b), an action for patent infringement may be brought either: (1) in the judicial district where the defendant resides; or (2) where the

defendant has committed acts of infringement and maintains a regular and established place of business. Does this case from the Federal Circuit address the question of how the venue inquiry is affected when a party's earlier pleading alleges a basis for venue that no longer applies at the time the party files an amended pleading? To put it another way, in this case under the venue statute, did the plaintiff meet the venue statute when the initial complaint was filed?

In *Fullerton*, 943 F.2d 57, the district court dismissed a civil rights action for lack of proper venue. The plaintiff filed the action in the Eastern District of Oklahoma alleging "officials at the Jackie Brannon Correctional Center (JBCC) in McAlester, Oklahoma were deliberately indifferent to his serious medical needs." *Id*. "McAlester is located in the Eastern District of Oklahoma." *Id*. To save the Court's time from summarizing *Fullerton*, here are the applicable sections of *Fullerton*:

> On April 13, 1990, Fullerton was transferred to the Clara Waters Community Treatment Center (CWCTC) in Oklahoma City, Oklahoma. Oklahoma City is located in the Western District of Oklahoma. On May 11, 1990, Fullerton filed an amended complaint asserting several claims not previously asserted in his original complaint. Among these claims, Fullerton asserts he was transferred from JBCC to CWCTC in retaliation for filing a civil rights lawsuit and that the transfer denied and delayed his access to the courts. The amended complaint names four defendants not named in the original complaint and refers to these defendants as "additional defendants." Copies of the amended complaint were not served on the defendants named in the original complaint. Although the defendants named in the amended complaint were served with copies of that document, they were not served with the original complaint.
>
> On July 31, 1990, Fullerton filed a motion to withdraw his amended complaint. In this motion, he explained that he had filed the amended complaint intending to include additional violations of his constitutional rights and present newly discovered evidence supporting his original allegations.

On December 5, 1990, the district court entered an order dismissing Fullerton's action based on improper venue. The court stated that "an amended complaint supersedes and replaces the original complaint and renders it a nullity, unless the amended complaint specifically refers to or adopts the earlier pleading." The court determined Fullerton's amended complaint "did not reference or incorporate those allegations contained in the original complaint" and thus these claims had been abandoned by Fullerton. Based on his reading of the amended complaint, the district judge determined "all defendants reside in the Western District of Oklahoma and the asserted claims arose in the Western District of Oklahoma" and thus, according to the general venue provisions of 28 U.S.C. § 1391(b), venue was improper in the Eastern District of Oklahoma.

*Id.* Notably, in *Fullerton*, when the plaintiff amended his complaint he did **not** include counts against the officials in Eastern District of Oklahoma. When Iglesias amended her complaint (Doc. 106), she included allegations regarding what took place at USP-Marion. How is *Fullerton* applicable to this situation?

    B. *Defendants' representation of the law in its argument regarding Iglesias's claims against individual BOP employees in their official capacity.*

The Court noted the following as the law regarding the proper party of a suit when a prisoner seeks injunctive relief from prison staff:

The Seventh Circuit has held that "[a] warden, named officially, is a proper party in a suit where a prisoner seeks injunctive relief from prison staff because the warden would be responsible for ensuring that the order is carried out." *Tolentino v. Baker*, 679 F. App'x 503, 504 (7th Cir. 2017) (citing *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) (finding that a prison warden was a proper defendant to a § 1983 claim "because he would be responsible for ensuring that any injunctive relief is carried out")). In *Tolentino*, the plaintiff alleged that prison employees refused to provide medical care that, "according to him, is obviously necessary, and he [sought] an injunction ordering that care." *Id.*

(Doc. 160).

Defendants refer to *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, as the law. *See*

Doc. 129, p 12 ("As the Seventh Circuit has held, an official capacity claim 'is a claim against [the individual's] office, for which his employer . . . would be liable, [and] it is no different than [the plaintiff's] claim against the [employer] itself'"). The problem is *Thanongsinh* is a Title VII case, and the Seventh Circuit specifically grounded its reasoning in that case in the application of *respondeat superior* under the federal statute. Is *Thanongsinh* binding on the Court's analysis regarding official capacity claims against individual BOP employees?

C. *Defendants' representation of the law in its argument regarding Standing as to Counts II & III.*

The Court noted the following as the law regarding standing:

The Seventh Circuit analyzes standing based on what was pled at the moment the suit is filed. *See Pollack v. U.S. Dep't Of Just.*, 577 F.3d 736, 743 (7th Cir. 2009) (finding that "a plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards"); *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (acknowledging that "[s]tanding is evaluated at the time suit is filed") (citations omitted).

(Doc. 160). Defendants did not provide the law here. Instead, Defendants argue that "because the *decision to transfer* Plaintiff to a women's facility was made *before the filing* of her Second Amended Complaint, Plaintiff lacks an injury that can be redressed by an order of the Court." (Doc. 129, p. 14) (emphasis added).

Defendants did not challenge standing in their briefing opposing Iglesias's Motion for Preliminary Injunction. Indeed, Defendants noted that "[b]ecause the TEC has recommended Plaintiff's transfer to a female facility, her failure-to protect claim will *soon be moot*." (Doc. 100, p. 24) (emphasis added).

If a claim is not yet moot, then a plaintiff would have already established standing to sue in the first place. Correct? Is *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000), directly on point? In *Friends of the Earth, Inc.*, Justice Ginsburg explained:

> When, for example, a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, *Olmstead v. L.C.*, 527 U.S. 581, 594, n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), despite the fact that she would have lacked initial standing had she *filed the complaint after the transfer*.

(emphasis added). In other words, the same mentally disabled patient would have standing if she *filed* the complaint *before transfer*.

Did counsel find *Friends of the Earth, Inc.* during their research for bringing the Motion to Dismiss? Does counsel believe *Friends of the Earth, Inc.* is inapplicable?[1]

D. *Defendants' representation of the law in its argument regarding Count I – Eighth Amendment Claim Denial of Medical Care.*

The purpose of a Rule 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case or decide whether a plaintiff will ultimately prevail. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In Defendants' Motion to Dismiss, attorney Gardner made the following argument:

---

[1] Notably, it appears counsel did not cite to *Lehn*, 364 F.3d 862, in the motion to dismiss. Does counsel believe that *Lehn* is not mandatory authority?

> [T]he legal issue presented here is a narrow one: whether Defendants violated the Eighth Amendment where they have provided Plaintiff medical care for her gender dysphoria, and where she disagrees with Defendants' judgment that gender-affirming surgery is not yet appropriate for her.

> As the Seventh Circuit has explained, the Eight Amendment is not violated under these circumstances.

(Doc. 129, pp. 18-19). Counsel does not end there, but makes the following representation as to the holding in *Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019):

> The Seventh Circuit held that 'prisons aren't obligated to provide every requested treatment once medical care begins.

(Doc. 129, p. 19). In *Campbell*, did the Seventh Circuit hold that "prisons aren't obligated to provide every requested treatment once medical care begins?" No. *Campbell* held that "*when* the defendants denied [plaintiff's] request for sex-reassignment surgery, *no case* clearly established a right to gender-dysphoria treatment beyond hormone therapy." *Id.* at 549 (emphasis added).

In *Campbell*, was the issue whether the plaintiff alleged facts sufficient to establish an Eighth Amendment violation based on defendants' deliberate indifference? No. In *Campbell*, the issue was whether summary judgment should be granted on qualified immunity grounds. Would Defendants agree that there was difference in the procedural posture between *Campbell* and the procedural posture when Defendants filed the motion to dismiss? How is this argument not frivolous?

## III.   Defendants' Opposition to Plaintiff's Motion to Compel Expedited Discovery Filed on October 4, 2021 (Doc. 147)

In response to the Court's order to Show Cause (Doc. 191), Defendants brush-off

the crucial fact that Iglesias's counsel was not required to inform the Court of her position on discovery on September 10, 2021. (Doc. 191, p. 28). To better illustrate that this is not a minor mistake, the Court will lay out the record.

The hearing on Iglesias's Motion for Preliminary Injunction was set for July 28, 2021. (Doc. 121). On July 7, 2021, the parties were ordered to email the Court the names of all witnesses who would appear at the hearing by July 26, 2021. (Doc. 128). Less than two weeks before the hearing, Defendants moved to exclude the untimely and undisclosed expert testimony of Dr. Ettner because she was scheduled to examine Iglesias on July 20, 2021. (Doc. 130). The Court postponed the hearing over Iglesias's motion for preliminary injunction until after August 9, 2021. (Doc. 133). Then to allow Defendants the opportunity to know the precise nature of Dr. Ettner's opinions, the Court held a status conference on August 30, 2021. After the status conference, the Court instructed "[Defendants] to provide the Court notice by September 10, 2021 regarding (1) whether Defendants will depose Dr. Ettner, (2) when the deposition is scheduled, and (3) whether any additional depositions or discovery is needed to be completed before the hearing over Plaintiff's preliminary injunction on September 21, 2021." (Doc. 143). The Court reset the hearing as to Iglesias's Motion for Preliminary Injunction for September 21, 2021. Then for docket management purposes, the Court reset the hearing for October 19, 2021.

Defendants selectively started with August 30 in their Opposition to Plaintiff's Motion to Compel Expedited Discovery. (Doc. 147). Besides starting their briefing with the events following August 30, 2021, counsel writes "[o]n August 31, 2021, the Court issued a minute order instructing counsel for the *parties* to inform the Court by September

10, 2021, regarding, among other things, 'whether any additional depositions or discovery is needed to be completed before the hearing over Plaintiff's preliminary injunction on September 21, 2021." (Doc. 147, p. 2) (emphasis added).

This is the misstatement. Doc. 143 is clear: "**Defendants** are further instructed to provide the Court notice by September 10, 2021 regarding (1) whether Defendants will depose Dr. Ettner, (2) when the deposition is scheduled, and (3) whether any additional depositions or discovery is needed to be completed before the hearing over Plaintiff's preliminary injunction on September 21, 2021."

Defendants then used that **misstatement** of the Court's order to make it look like Iglesias's counsel was in violation of the Court's order:

> On September 10, after the conclusion of Dr. Leukefeld's deposition, Plaintiff's counsel notified the Court that "[t]hey have taken the deposition of Dr. Leukefeld and do not anticipate the need for any additional depositions or discovery before that hearing." Ex. 5.
>
> Despite this representation to the Court, Plaintiff changed course only ten days later, when her attorneys emailed Defendants to request additional documents. Ex. 6. Defendants' counsel responded the following day, referring Plaintiff to previous correspondence explaining the impropriety of such a request. Id. Plaintiff then waited another eight days, until less than three weeks remained before the preliminary injunction hearing, and filed her motion to compel production of the requested documents on an expedited basis.

(Doc. 147, pp. 2-3). By misstating the Court's August 31 order to include the *parties* and continuing with the above argument, Defendants were portraying the actions of Iglesias's counsel as improper when Iglesias's counsel had **no duty to notify the Court on September 10th**. Indeed, by not including the full background, Defendants mischaracterized *why* it was *Defendants* who had the duty in the first place.

### IV.  Defendants' October 22, 2021 Status Report (Doc. 161)

On October 15, 2021, the Court granted in part Iglesias's Motion to Compel Expedited Discovery. (Doc. 156). In the order, the Court ordered Defendants to provide the following documents by October 19, 2021:

> (1) the agendas, minutes, and records from all Transgender Executive Council ("TEC") and Transgender Critical Care Team ("TCCT") meetings where Ms. Iglesias was discussed that have not already been produced;
>
> (2) all documents about Ms. Iglesias considered by members of the TEC and TCCT;
>
> (3) all medical and mental-health records for Ms. Iglesias that have not already been produced for the period of 2019 to present, including unit-staff-only filings; and
>
> (4) all communications about Ms. Iglesias sent to or from the TEC, TCCT, and/or Dr. Elizabeth Stahl since May 2021.

(*Id*.).

The day before the hearing, on October 18, 2021, Defendants filed a Motion for Relief From Full Compliance With the Court's October 15 Order. (Doc. 157). In the motion, Defendants alleged that "it will be impossible to complete production of the fourth category of documents encompassed by the Court's October 15, 2021 order by Tuesday's evidentiary hearing." (*Id*. at p. 2). Defendants noted that they had already produced the first three of the four categories reflected in the Court's discovery order, and had produced 886 pages of documents in the last 48 hours. (*Id*.).

After the Court granted Defendants relief from complete compliance by October 19, 2021 (Doc. 159), Defendants filed a status report three days later where attorneys

represented the following under the headline "Any Additional Reasons or Considerations as to Why the Preliminary Injunction Hearing Cannot Be Held by November 22, 2021":

> As discussed above, at this time Defendants *are uncertain whether they can complete their production of the documents subject to the Court's Order by November 22, 2021.* If the Court believes that completion of the document production is necessary before proceeding with the preliminary injunction hearing, it may make sense to finalize the preliminary injunction hearing schedule after Defendants report back to the Court with a more concrete schedule for production, which (as discussed above) they anticipate doing next week.

(Doc. 161, p. 2) (emphasis added). Defendants then proposed a deadline to comply with the Court's order on expedited discovery by November 22, 2021. In support of this proposed expedited discovery deadline, Defendants note that "an average processing rate (i.e., review and redaction) of twenty-five documents per hour and eight-hour review days, it will take twenty-six full days to review the approximately 5,200 collected documents, absent further narrowing." (*Id*. at p. 2).

Like much of the Department of Justice's arguments, where the attorneys continuously attempt to muddle the Court's assertions or representations, in response to the Court's Show Cause Order, Defendants assert:

> Defendants did not represent to the Court that they "could not comply with the Court's discovery order." Rather, as explained in Defendants' status report, Defendants expressed uncertainty as to whether they could produce all responsive, non-privileged documents by November 22, 2021, given the large volume of documents and the short time for review.

(Doc. 191, pp. 30-31). Scoring points on the difference between representing to the Court that they "could not comply with the Court's discovery order" and expressing

uncertainty as to whether they could produce all documents responsive to the Court's discovery order gets Defendants nowhere. Especially when the Court allowed Defendants to comply by Friday, November 5, 2021. (Doc. 163).

Defendants continue noting the following:

Moreover, Defendants did not intend to suggest that only a single attorney would be reviewing documents. Rather, the intention was to provide the court with the aggregate number of personnel hours necessary to complete the review. Defendants sought in good faith to provide the Court with a conservative estimate so that the Court could decide whether it made sense to briefly delay the evidentiary hearing.

(Doc. 191, p. 31). This is nonsense. Defendants represented on **October 22, 2021** that "it will take **twenty-six full days** to review the approximately 5,200 collected documents, absent further narrowing." (Doc. 161, p. 2) (emphasis added). Twenty-six full days from October 22, 2021 would have been **November 17, 2021**. Again, Defendants represented to the Court that they were uncertain as to whether they could produce all responsive, non-privileged documents by **November 22, 2021**. To support this assertion and show that it "made sense to briefly delay the evidentiary hearing" (Doc. 191, p. 31), Defendants concocted a calculation based on one attorney doing this work.

If Defendants truly wanted to "provide the [C]ourt with the aggregate number of personnel hours necessary to complete the review[,]" (*id*.) then Defendants could have noted the total hours. But Defendants didn't, and the reason is simple. They wanted to support their assertion as to their uncertainty in meeting the November 22, 2021 deadline by estimating that it would take twenty-six full days to review.[2] This was disingenuous,

---

[2] Although the Court does not know how many documents Defendants had to search to produce 886 documents, even if the Court accepts the pace of 886 documents in 48 hours—at that pace Defendants

and the fact that counsel does not concede on this point is ridiculous.

## V.   Defendants' Notice in Compliance with the Preliminary Injunction (Doc. 183)

In Defendants' response to Show Cause, Defendants contend that "[e]xcept in the single instance noted above involving an inadvertent error, *see* p. 18, *supra*, the information provided to the Court concerning the process for awarding gender-confirming surgery—both in written filings and through live testimony—was consistent and accurate." (Doc. 191, p. 32).

A. When did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon first learn about the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process individuals housed in halfway houses?

B. Did the BOP or its attorneys explain the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals housed in halfway houses between October 4, 2021, to November 22, 2021? Please point where in the record this was explained.

C. Where in the record (<u>before</u> Defendants Notice by All Defendants in Compliance with the Preliminary Injunction (Doc. 183)) did the BOP or DOJ explain the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals housed in halfway houses?

D. Did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon alert the Court <u>before</u> the filing of Defendants Notice by All Defendants in Compliance with the Preliminary Injunction (Doc. 183) that BOP's Transgender Offender Manual was revised on January 13, 2022? If so, please point to the document(s) in the record.

E. Did Mr. Robinson, Mr. Kolsky, or Ms. Talmor clarify Dr. Leukefeld's testimony or correct the alleged inadvertent error at the Preliminary Injunction hearing? Please point the Court to the pages in the transcript where this is discussed.

F. Did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon read the Court's order over the preliminary injunction from December 27, 2021?

---

should have been able to get through the remaining 5,200 documents in less than six days.

G. In the Court's order over the preliminary injunction, did the Court differentiate between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals in halfway houses?

H. If the Court did not differentiate between secure BOP facilities and halfway houses, then explain where in the order BOP could deviate from the process discussed by Dr. Leukefeld?

I. In Mr. Robinson's closing argument, did he explain the difference between TEC's process between individuals housed at secure BOP facilities and individuals housed in halfway houses?

    1. Mr. Robinson explained the following during the hearing:

> Second, since plaintiff filed her motion for a preliminary injunction, she has been scheduled to be transferred to a halfway house in March—on March 24th, 2022, which is approximately four months from today, and third, the Bureau of Prisons Transgender Executive Council has announced that it will meet in April of 2022 to consider Ms. Iglesias for surgery, and while that's slightly shorter than her 12-month anniversary in a women's prison, the Bureau has decided to do it at that time to make sure that she has sufficient time to recover if she's approved for surgery before she is released in December of 2022, released from BOP custody in December of 2022.

(Doc. 175, p. 201). In the above closing argument, did Mr. Robinson mention that the TEC would *refer her to a surgeon*?

In his closing argument:

    2. Mr. Robinson is clear: the TEC planned to "in April of 2022 to consider Ms. Iglesias for surgery." Correct?

    3. Mr. Robinson discussed the 12-month requirement. The 12-month requirement is to receive GCS. Correct?

    4. The 12-month requirement is **not** in order to then be referred to a surgeon for consultation of GCS. Correct?

J. The Court is simply tired of the word games Defendants' counsel continuously employ. Words are important. Being precise is a skill. But playing word games

when the Court is weighing sanctions is ludicrous. The Court now asks whether Mr. Gardner or his clients have ever been sanctioned by a court because Mr. Gardner makes the following assertion in his declaration:

> In my twenty-two years of practice I have never been sanctioned by a Court for *alleged misconduct*.

(Doc. 191-4, p. 10) (emphasis added). The Court is aware of *State v. United States Dep't of Com.*, 461 F. Supp. 3d 80 (S.D.N.Y. 2020). In *State*, the Court held:

> To be sure, this was not DOJ's finest hour. At best, DOJ failed to produce more than ten percent of the documents that Defendants were required to produce as part of this litigation. But the Court cannot conclude from the record before it that further investigation into possible sanctionable conduct is warranted in the circumstances of this case. **Accordingly, and as an exercise of the Court's "wide discretion,"** *S. New England Tel. Co.*, **624 F.3d at 144 (internal quotation marks omitted), the Court will not impose sanctions on Defendants beyond the litigation defeat they have already suffered, or the fee award in which they have acquiesced — except to order that Defendants pay the costs and fees associated with a portion of this motion and its embedded disputes.**

*Id.* at 95 (emphasis added). In that case, Mr. Gardner sought to withdraw (Doc. 618), but the Court denied his motion. (Doc. 623). Was Mr. Gardner sanctioned in this litigation? What is the Court missing?

Mr. Gardner also makes the following assertion in his declaration:

> *As in every matter I handle on behalf of the United States*, I have endeavored to adhere to the *highest ethical standards in litigating this case*.

(Doc. 191-4, p. 10) (emphasis added). Has Mr. Gardner ever been admonished by any court for his litigation tactics? Specifically, the Court would like to point out in *State v. United States Dep't of Com.*, 1:18-cv-02921-JMF, it appears Mr. Gardner filed a letter to the Court where he contended that "[i]n light of the Supreme Court's order granting certiorari, the most prudent course would be for this Court to stay further trial proceedings, including entry of a final decision, until the Supreme Court resolves the proper scope of this Court's review." (Doc. 540). In the Court's order over Mr. Gardner's letter, the Court noted the following:

> **What makes the motion most puzzling, if not sanctionable, is that they sought and were denied virtually the same relief only weeks ago — from**

**this Court, from the Second Circuit, and from the Supreme Court itself.**
*See In re Dep't of Commerce*, — S. Ct. —, No. 18A455, 2018 WL 5778244 (U.S.
Nov. 2, 2018); *In re U.S. Dep't of Commerce*, Nos. 18-2856 & 2857, 2018 WL
5603576 (2d Cir. Oct. 26, 2018); *New York v. U.S. Dep't of Commerce*, No. 18-
CV-2921 (JMF), 2018 WL 5307097 (S.D.N.Y. Oct. 26, 2018), as amended, 2018
WL 5791968 (Nov. 5, 2018). In fact, if anything, their request is significantly
weaker this time around, as the trial is complete and the onus is now on the
Court to issue a ruling that facilitates timely and definitive higher-court
review. Moreover, Defendants themselves now concede, as they must, that
a ruling from this Court will not hinder a higher court from granting full
relief on appeal. (See Defs.' Motion 1). Unless burdening Plaintiffs and the
federal courts with make-work is a feature of Defendants' litigation
strategy, as opposed to a bug, it is hard to see the point. To borrow from
Camus, "[o]ne must imagine Sisyphus happy." ALBERT CAMUS, THE
MYTH OF SISYPHUS 123 (Alfred A. Knopf 1991).

(Doc. 544, p. 2) (emphasis added). Attorney Gardner must explain.

## VI.   Totality of BOP counsels' actions, representations, and errors throughout litigation.

There is a pattern of oversight,[3] misrepresentations of the law, misrepresentations

of the record,[4] disingenuous estimates in time to meet the Court's discovery orders,[5] and

material errors.[6] The Court cannot stress the seriousness of what has gone on. The Court

gave Defendants' counsels the benefit of the doubt throughout the litigation, but

Counsels' response to the Court's Show Cause Order and the declarations in support are

unacceptable.

---

[3] In Mr. Kolsky's Declaration, he notes he was "not aware of any inaccuracy in the testimony until the
court's show cause order." (Doc. 191-5). Did Mr. Kolsky not review the transcript from the Preliminary
Injunction Hearing?
[4] Defendants' Opposition to Plaintiff's Motion to Compel Expedited Discovery (Doc. 147).
[5] Defendants' October 22, 2021 Status Report (Doc. 161).
[6] In Defendants' Response to the Court's February 10, 2022 Order to Show Cause (Doc. 191), Counsel
represents for the first time that Dr. Leukefeld testified incorrectly when "Dr. Leukefeld's response did not
address the fact that a referral to the Medical Director would not be necessary in April if Plaintiff were then
living in a halfway house." At best, this is a material error that Defendants did not alert the Court until
February 14, 2022. At worst, this is a direct attempt to avoid sanctions by falsely labeling Dr. Leukefeld's
testimony as an error.

And perhaps most disturbingly, rather than recognizing what has gone on, the Department of Justice goes on the attack. The Department of Justice asserts that the Court's Preliminary Injunction Order is ambiguous. (Doc. 191, p. 18). It is not. Then the Department of Justice improperly minimalizes the misrepresentations in:

a) estimating the time to meet the Court's discovery orders;

b) representing that it was <u>both</u> parties who had to inform the Court by September 10, 2021 of any additional discovery needs ("August 31st Order"); and

c) Dr. Leukefeld's testimony on November 22, 2021.

To minimize their misrepresentations, DOJ conveniently paints them as "errors" with no intent to deceive the Court. *See* Doc. 191, pp. 29, 31-32. But after laying out in further detail the misrepresentations in this order, the Court notices that these were not just "errors" with no intent to deceive the Court. Each time an alleged "error" was committed it was to Defendants' benefit. For example, the "error" in the representation of Defendants' estimation of time to meet the Court's discovery order was made in a way that conveniently made Defendants' argument more persuasive. The "error" in the representation of the Court's August 31st Order conveniently depicted Iglesias's counsel in a bad light. Finally, accepting Dr. Leukefeld's testimony on November 22, 2021 as an "error" would conveniently give credence to the notion that Defendants did not violate the Court's Preliminary Injunction Order or that the Court's Preliminary Injunction was ambiguous.

Even if the Court were to accept all of these errors as unintended, the Court cannot ignore the circumstances surrounding the pattern of Defendants' behavior and counsels'

actions. Again, this is a unique case because Iglesias is running out of time to receive GCS, and Defendants have successfully delayed GCS for years. Defendants' counsel is certainly aware of the urgency, but they have flooded this Court with arguably frivolous filings after Iglesias moved for a preliminary injunction on April 6, 2021. What's worse is how every time this Court attempted to set a hearing over Iglesias's Preliminary Injunction—Defendants' counsel found a way to delay proceedings.

A. *The hearing set for July 28, 2021.*

On July 16, 2021, two weeks before the hearing, Defendants filed their Motion to Exclude Untimely and Undisclosed Expert Testimony and Request for Expedited Consideration. (Doc 130). The Court gave the Defendants the benefit of the doubt and postponed the hearing until after August 9, 2021. (Doc. 133).[7]

B. *The hearing set for October 19, 2021.*

Besides the representations in Doc. 147, **<u>one day</u>** before the Court was to have the preliminary injunction evidentiary hearing, Defendants filed a Motion for Relief From Full Compliance With the Court's October 15 Order. (Doc. 157). Like a football team that

---

[7] In Defendants' Motion, counsel cites to a number of cases. One case cited was *J.M. by & through Lewis v. Crittendon*, No. 1:18-CV-568-AT, 2018 WL 7080041, at *1 (N.D. Ga. Apr. 10, 2018). Defendants then included the following parenthetical:

> excluding expert opinions by witness at preliminary injunction hearing when opposing party lacked notice such that he could conduct discovery.

There is a significant difference between *J.M. by & through Lewis v. Crittendon* and Defendants' issues in Dr. Ettner's untimely and undisclosed expert testimony. In *J.M.*, the court noted it would not extend the preliminary injunction hearing to allow Dr. Schuessler and Dr. Zurbrugg to testify. The court explained that "[d]efense counsel never indicated before or at the April 5, 2018 hearing an intent to call either of these two doctors to testify at the preliminary injunction hearing." Here, Defendants knew that Dr. Ettner would be testifying at the preliminary injunction hearing. *J.M.* is inapplicable and Defendants' use is suspect. Defendants are ordered to explain how *J.M.* and the additional cases are applicable.

sticks to favorite plays, attorney Gardner first attempts to muddle the Court's order by noting the following: "[a]lthough a compliance deadline is not on the face of the Order, the Court appears to contemplate that the Defendants will produce all responsive, non-privileged documents by the October 19, 2021 preliminary injunction hearing, i.e., two business days from the date of the Order." (Doc. 157).

Not only did Gardner wait until the last second to attack the alleged ambiguities of the Court's order, but also Gardner made the following suggestion in his filing:

> To avoid any potential prejudice to Plaintiff, Defendants would agree to keep the preliminary injunction hearing record open for a period of two weeks after Defendants complete their production to permit Plaintiff to submit any additional information received as a result of Defendants' production.

(Doc. 157, pp. 2-3). Then later that same day, Counsel for Iglesias and attorney Gardner contacted chambers explaining that Dr. Ettner was having an emergency procedure and will not be able to be at the hearing scheduled for October 19, 2021. Like the Government, who would agree to keep the preliminary injunction hearing record open for a period of two weeks (as set forth above), counsel for Iglesias explained that they are ready and able to continue, but would like to keep the record for the preliminary injunction hearing open until Dr. Ettner can provide testimony.

During this discussion with chambers, Gardner insisted that it would be *unfair* and *inefficient* to only hear half of Plaintiff's case at the October 19, 2021 hearing, but hear the Government's full case because it would give Iglesias's counsel an advantage. According to Gardner, the advantage would be Dr. Ettner being able to see, prepare, and change her testimony based on the Government's full case, and after hearing Dr. Leukefeld's

testimony. In response to Gardner's unfairness argument, Iglesias's counsel responded they would be okay with allowing Dr. Leukefeld testify on October 19, 2021, and then again after Dr. Ettner testifies. Gardner continued objecting that this would be unfair depending on the time between Dr. Ettner's testimony and Dr. Leukefeld's second round of testimony because Dr. Leukefeld may not have as much time to prepare.

When asked if there was anything that the Court could do at the October 19 hearing, Iglesias's counsel suggested that he could have Iglesias testify. But attorney Gardner insisted about the inefficiencies of carrying out the preliminary injunction hearing in this manner. Also, Gardner pointed out that still having the parties put on Iglesias would not speed things up because Defendants are still struggling and likely will not have all the documents to Iglesias by October 19, 2021, and Dr. Ettner would still need to testify. Again, the Court gave Defendants the benefit of the doubt and postponed the hearing.

C. *The hearing set for November 22, 2021.*

In one final attempt to delay the preliminary injunction hearing, attorney Gardner filed Defendants' October 22, 2021 Status Report. (Doc. 161). The Court has explained in excruciating detail the serious misstatement in counsel's estimation and further representation to the Court.

CONCLUSION

Again, the Court has not issued sanctions. The Court provides this order to give further notice of specific conduct by Defendants' counsel in specific filings to the Court. In the interest of judicial economy and to provide Defendants' counsel an opportunity to

further clarify the record, Defendants' counsel shall address the issues outlined above

in writing by **8 a.m.** on **February 22, 2022**.

      **IT IS SO ORDERED.**

      **DATED:  February 21, 2022**

                                     _____
                                     **NANCY J. ROSENSTENGEL**
                                     **Chief U.S. District Judge**