## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS
(a.k.a. CRISTIAN NOEL IGLESIAS),

       Plaintiff,

          v.

IAN CONNORS, *et al.*,

       Defendants.

Case No. 19-cv-00415-NJR

## DEFENDANTS' RESPONSE TO THE COURT'S
## FEBRUARY 21, 2022, NOTICE AND ORDER

## INTRODUCTION

Defendants recognize and understand that courts are naturally concerned when they perceive affronts to their authority, or calculated efforts by litigants to unfairly prejudice the rights and interests of opposing parties.  And Defendants sincerely regret and apologize that their conduct, and the conduct of their counsel—no matter how unintentionally—have led the Court to doubt their candor, their intentions, or their commitment to the fundamental fairness of the judicial process.  But Defendants respectfully submit that the circumstances are not as they may have seemed to the Court when it issued its Show Cause Order, or its recent Notice and Order.  We show herein, to the best of our ability within the time available to us, that Defendants' various motions, oppositions, status reports, notices, and their response to the Court's Show Cause Order, were well-founded, individually and collectively, in law and fact, and were not made for improper purposes of delay.  Defendants also demonstrate below that imposition of sanctions against individual attorneys at this juncture would not comport with minimum due-process requirements.  As explained herein, regardless of the authority invoked, sanctions may not be imposed without particularized notice and a reasonable opportunity to be heard. The Court's imposition of sanctions in this posture would be procedurally inadequate

## DISCUSSION

## I.   ISSUES CONCERNING DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The Court's Notice and Order (Doc. 198) raises two issues concerning representations in Defendants' Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction (Doc. 100) filed on April 20, 2021 ("Defendants' Opposition," or "Defs.' Opp.").  Notice and Order at 5-6. Defendants address each in turn.

### A. Standard for the Likelihood of Success

The Court's Notice and Order suggests that Defendants' Opposition misstated the standard for the likelihood of success that a plaintiff seeking a preliminary injunction must satisfy.  As the

Notice and Order observes, Defendants' Opposition described that standard as follows: "To obtain a preliminary injunction, 'a plaintiff must establish that [she] has some likelihood of success on the merits[.]'" Defs.' Opp. at 8 (quoting *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019)). Since Defendants filed their Opposition in April 2021, the Seventh Circuit has issued at least three decisions articulating the same standard. *Camelot Banquet Rooms, Inc. v. SBA*, 24 F.4th 640, 644 (7th Cir. 2022) (vacating preliminary injunction) (decided January 26, 2022); *Camelot Banquet Rooms, Inc. v. SBA*, 14 F.4th 624, 628 (7th Cir. 2021) (order granting stay pending appeal) (decided September 15, 2021); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539–40 (7th Cir. 2021) ("We recently clarified that a plaintiff must demonstrate that its claim has some likelihood of success on the merits . . . .") (decided Aug. 9, 2021); *see id.* at 543. *See also Decker v. Lammer*, 2022 WL 135429, at *1 (7th Cir. Jan. 14, 2022).

In its decision granting Plaintiff's motion for a preliminary injunction the Court cited *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) for the proposition that "[a] [preliminary injunction] movant's showing of likelihood of success on the merits must be 'strong.'" *Id* (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020)[1]). *See* Notice and Order at 5. (Notably, this standard actually was less favorable to Plaintiff than the standard as stated in Defendants' Opposition.) Defendants acknowledge that the Seventh Circuit has articulated the standard in varying terms, but respectfully submit, based on the cases cited above, that the formulation stated in their Opposition was a correct statement, even if not the only correct statement, of the applicable law.

---

[1] As observed in *Life Spine*, *Pritzker* actually was discussing the "the overlapping standard [of success] for granting a motion to stay[.]" 8 F.4th at 543 (citing *Pritzker*, 973 F.3d at 763).

### B. Use of *Lehn v. Holmes*, 364 F.3d 862 (7th Cir. 2004)

The Court next asks whether Defendants' Opposition misrepresented the Seventh Circuit's decision in *Lehn v. Holmes*, 364 F.3d 862 (7th Cir. 2004). Notice and Order at 5-6. Defendants respectfully submit that it did not. *Lehn* stated the "uncontroversial proposition" of law that "when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot." 364 F.3d at 871 (citing *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir.1995) (*per curiam*)). *Lehn* did not dispute that proposition; it merely held that it was inapplicable on the facts of that case. *Id.* at 871-72. That proposition was applicable to this case, however, because of the decision to transfer Plaintiff from a male BOP facility to another facility which houses female offenders, where she would no longer be adversely affected by BOP's policies regarding placement of prisoners in sex-segregated facilities. Hence, the instant case does not appear to be one where Plaintiff was "'transferred to a different facility within the same system where the objectionable policy also applies,'" Notice and Order at 6 (quoting *Lehn*, 364 F.3d at 871-72) (emphasis omitted)), and Defendants' reliance on the proposition stated in *Lehn* was apt.

## II. ISSUES CONCERNING DEFENDANTS' JULY 8, 2021, MOTION TO DISMISS

Defendants next address the Court's concerns regarding representations made in Defendants' Motion to Dismiss filed on July 8, 2021 (Doc. 129) ("Defs.' MTD").

### A. The Law Regarding Venue

The Court's Notice and Order suggests that Defendants' Motion to Dismiss misstated the law regarding venue when it argued that "[d]istrict courts within the Seventh Circuit consistently follow the general rule that venue is determined at the time an action commences." Notice and Order at 6; *see* Defs.' MTD at 8. But, as indicated in Defendants' motion, the statement in question is a direct quote from *Schneider v. Brennan*, 2016 WL 29642, at *2 (W.D. Wis. Jan. 4, 2016). *See* Defs.' MTD at 8. The Court's Notice and Order, at 6, states that "[t]he cases that follow *Schneider* are not the law," but

Defendants are still unaware of any decisions to the contrary, and the Notice and Order cites none. Whereas *Schneider* and the cases on which it relies may not be controlling authority, they are persuasive authority. Defendants respectfully submit, therefore, that it was permissible to rely on *Schneider* (and, by implication, the cases cited therein) absent controlling authority to the contrary.

The Court's Notice and Order, at 7, states that "the venue statute specific to this case"—28 U.S.C. § 1391(e)(1)(B)—constitutes such controlling adverse authority. The relevant terms of the venue statute provide that where a defendant is an officer or employee of the United States, venue is proper in a district where "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" Defendants did not contest the applicable standard for determining venue in their Motion to Dismiss; to the contrary, they acknowledged it. *See* Defs.' MTD at 8. Rather, Defendants argued that the determination of venue must be based on the facts and circumstances at the time of the operative complaint. *Id.* at 8-9. Nothing in the terms of section 1391(e)(1)(B) addresses this issue of *when* the venue determination is made—at the time suit is filed, or the time of the operative complaint. Thus, Defendants respectfully submit that section 1391(e)(1)(B) is not controlling authority that foreclosed their venue argument. At the very least, the argument was reasonable, made in good faith, and based on the authority they cited.

In their response to the Court's February 10, 2022, Show Cause Order (Doc. 187), Defendants cited *In re Samsung Elecs. Co.*, 2 F.4th 1371, 1376 (Fed. Cir. 2021) and *Fullerton v. Maynard*, 943 F.2d 57 (10th Cir. 1991) (unpublished table decision), as further persuasive authority supporting the proposition that venue is determined based on the operative complaint. Defs.' Show Cause Resp. at 21-22 (Doc. 191). The Court's Notice and Order, at 8, asks whether *Samsung Electronics* stated that this would be the case even if venue was proper under the initial complaint. *Samsung Electronics* did not say so in as many words, but the appellants *argued* that venue was proper under the initial complaints, an

argument that the Federal Circuit unequivocally rejected, because once the amended complaints in that case were filed, "the original complaints were dead letters and no longer performed any function in the cases," "including for purposes of venue." 2 F.4th at 1376 (cleaned up, citations omitted). The court in *Samsung Electronics* gave no indication that the outcome might have been different if venue were proper under the original complaints.

The Court's Notice and Order, at 8-9, also questions the applicability of *Fullerton*, pointing out that whereas the amended complaint in that case did not reference or incorporate allegations in the original complaint, here Plaintiff "included allegations regarding what took place at USP-Marion" in her second amended complaint. Defendants expressly argued in their Motion to Dismiss, however, that Plaintiff's allegations concerning events at USP Marion were too tangential to the claims for relief raised in her second amended complaint to support a conclusion that "a substantial part of the events or omissions giving rise to the claim[s]" occurred in this district. 28 U.S.C. § 1391(e)(1)(B); *see* Defs.' MTD at 9-10. Thus, viewed in light of the *operative* facts in Plaintiff's second amended complaint, *Fullerton* is applicable to this case, and supports Defendants' legal position on the venue question (the original issue raised in the Court's Show Cause Order, at 7 n.3).

In short, Defendants respectfully submit that their venue argument was appropriate, at a minimum reasonable, and in all events made in good faith.

**B. Reliance on *Thanongsinh v. Board of Education***

The Court's Notice and Order next asks, at 9-10, whether *Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 771 n.7 (7th Cir. 2006)—just one of several pertinent cases that Defendants cited in support of dismissing Plaintiff's claims against the official-capacity defendants, *see* Defs.' MTD at 11-12—is "binding on the Court's analysis" of that issue. Defendants agree that *Thanongsinh*, was a Title VII action, as the Court observes. But the legal proposition for which Defendants cited that case—that an official-capacity claim "is a claim against [the individual's] office, for which his employer . . . would

be liable, [and] is no different than [the plaintiff's] claim against the [employer] itself"—*see* Defs.' MTD at 11 (citing *Thanongsinh*, 462 F.3d at 771 n.7), is a general legal principle directly applicable to this case. It is also true that the Seventh Circuit observed that the *reason* for the duplicative nature of the claim in *Thanongsinh* was the fact that the *respondeat superior* doctrine made the employer responsible for the actions of its employees, *id.*; *see* Notice and Order 10.  But the fact of duplication is no less true in this case, where Defendants have acknowledged that "Plaintiff can obtain any appropriate injunctive relief directly against BOP."  Defs.' MTD at 12.[2]

Accordingly, Defendants believe that reliance upon the cases cited in their motion to dismiss in support of the dismissal of the official capacity claims is warranted, and certainly not a basis for the imposition of sanctions.

**C. Defendants' Standing and Mootness Arguments**

The Court's Notice and Order raises several issues concerning the standing and mootness arguments in Defendants' Motion to Dismiss.  First, the Court suggests that Defendants did not accurately state the law of standing when they argued that "because the decision to transfer Plaintiff to a women's facility was made before the filing of her Second Amended Complaint, Plaintiff lacks an injury that can be redressed by an order of the Court."  Notice and Order at 10 (quoting Defs.' MTD at 13).  The Notice and Order points to the Court's opinion denying Defendants' motion, which

---

[2]  In denying the Defendants' motion to dismiss the official-capacity defendants, the Court cited to *Tolentino v. Baker*, 679 F. App'x 503, 504 (7th Cir. 2017), for the proposition that "[a] warden, named officially, is a proper party in a suit where a prisoner seeks injunctive relief from prison staff because the warden would be responsible for ensuring that the order is carried out."  *See* Notice and Order at 10.  Respectfully, *Tolentino* did not address whether it is appropriate to maintain suit against individuals sued in their official capacity where (as here) an agency is also sued.  In that case the only defendants were "Baker and the unknown tactical officers; then-warden of Menard, Kimberly Butler (in her official capacity only); and the internal affairs officers."  679 F. App'x at 503.  Because neither the prison itself nor the Illinois Department of Corrections was a named defendants in *Tolentino*, the Seventh Circuit had no occasion to address whether the claims against the official-capacity defendants were duplicative of claims against the employer.

concluded that "[t]he Seventh Circuit analyzes standing based on what was pled at the moment the suit was filed." *Id.* (quoting Mem. & Order at 8-9 (Doc. 160)). But in support of their position Defendants cited the Supreme Court's decision in *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007), which explained that while ordinarily "subject-matter jurisdiction," which includes standing, "depends on the state of things at the time of the action brought," "when a plaintiff . . . voluntarily amends [a] complaint, courts look to the amended complaint to determine jurisdiction." *See* Defs.' MTD at 6-7. Indeed, in *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921 (7th Cir. 2013), cited by the Court in its decision denying Defendants' Motion to Dismiss, *see* Notice and Order at 10, the Seventh Circuit analyzed the plaintiff's standing based on the allegations contained in its amended complaint. 708 F.3d at 927-28. And here, although Plaintiff's transfer post-dated the filing of the second amended complaint (as the motion acknowledged), the decision to transfer Plaintiff pre-dated that filing. That decision regarding transfer was the basis for the standing argument raised. Respectfully, therefore, Defendants' argument that Plaintiff's standing should be assessed as of the time she filed her second amended complaint was well-founded, and is not a basis for issuing sanctions.[3]

---

[3] The Court also observes that in contrast to Defendants' Motion to Dismiss, Defendants' opposition to Plaintiff's motion for a preliminary injunction did not challenge Plaintiff's standing, but instead argued that upon her transfer to a female facility her failure-to-protect claim would be moot. Notice and Order at 10 (citing Doc. 100 at 24). The Court then suggests that Defendants' reliance solely on mootness was a tacit concession that Plaintiff had standing. *Id.* at 11. The difference is explained by the different procedural posture of the case at those different points in time. At the time Defendants filed their preliminary injunction opposition, the operative complaint was the first amended complaint, which was filed prior to BOP's decision to transfer Plaintiff. *See* Doc. 52. Plaintiff did not file her second amended complaint until April 30, 2021, following both the decision to transfer her and Defendants' opposition to her preliminary injunction motion. Doc. 106. Accordingly, because standing is measured at the time of the operative complaint, *see supra* at 7, Defendants moved to dismiss Counts II and III on standing grounds (in addition to mootness) because BOP already had decided to transfer Plaintiff to a female facility before she had filed her second amended complaint.

The Court further asks whether Defendants' counsel, when preparing Defendants' Motion to Dismiss, were familiar with the Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167 (2000)—in particular, the Supreme Court's discussion of mootness—which the Court reads as implying that Plaintiff had standing to raise her failure-to-transfer claim because she filed her second amended complaint before her transfer.  Notice and Order at 11 (citing *Friends of the Earth*, 528 U.S. at 190-91).  The Court also asks whether Defendants' counsel believe that *Friends of the Earth* is inapplicable to this case.  *Id.*  Defendants' counsel were, in fact, familiar with *Friends of the Earth* and cited it in support of Defendants' Motion to Dismiss.  Defs.' MTD at 6.  And respectfully, *Friends of the Earth*, which turned on the voluntary-cessation exception to the mootness doctrine, not standing, *see* 528 U.S. at 174, 189-93, is inapplicable to the standing issue here.  As explained, Defendants had already decided to transfer Plaintiff to a female facility before she filed her second amended complaint.  Defendants therefore argued that she lacked standing to challenge claims related to her placement in a male institution, because she lacked an injury that could be redressed by an order of the Court.  Defs.' MTD at 12-13.  Nothing held, or stated, in *Friends of the Earth* foreclosed that argument.[4]

The Court also notes that Defendants' Motion to Dismiss did not cite to the Seventh Circuit's decision in *Lehn v. Holmes*, 364 F.3d 862 (7th Cir. 2004), and asks whether counsel for Defendants believe the case constitutes mandatory authority.  Notice and Order at 11 n.1.  Defendants agree that

---

[4] That is true as well of the Supreme Court's passing discussion of the capable-of-repetition-but-evading-review exception to the mootness doctrine, cited in the Court's Notice and Order, at 11 (quoting *Friends of the Earth*, 528 U.S. at 190-91).  As an illustration of that exception, *Friends of the Earth* cited *Olmstead v. L.C.*, 527 U.S. 581, 594 n.6 (1999), in which the Court affirmed the lower courts' application of that exception where a mentally disabled patient had been "confined eighteen different times at the same psychiatric hospital," thus making it "likely that [she] may be returned" there, and where "the complexity of the issues involved and instability of her placements" made it "likely that any future claim for relief will evade [judicial] review."  *L.C. by Zimring v. Olmstead*, 138 F.3d 893, 895 n. 2(11th Cir. 1998).  Plaintiffs' case does not resemble the situation in *Olmstead*.

*Lehn*, as a published Seventh Circuit decision, is binding, but, respectfully, Defendants do not believe that *Lehn* controls this case. In *Lehn*, the Seventh Circuit held that a state inmate's challenge to a system-wide practice "of housing nonsmoking inmates in the same cell with smoking inmates" would not be mooted by his transfer "to a different facility within the same system where the objectionable policy also applies." 364 F.3d at 871-72. Unlike the case in *Lehn*, by the time Plaintiff filed her second amended complaint Defendants had already agreed "to house Ms. Iglesias at an institution consistent with her gender identity," thus "protect[ing] [her] from the known and serious risks of harm she continue[d] to face while housed in a men's prison[.]" 2d Am. Compl. (Doc. 106) (Prayer for Relief). *Lehn* therefore is inapposite, because by virtue of the decision to transfer Plaintiff, she would no longer be in a facility where she was harmed by the "objectionable policy."

### D. Defendants' Reliance on *Campbell v. Kallas* to Support Dismissal of Plaintiffs' Eighth Amendment Claims

The Court next identifies concerns with Defendants' reliance upon the Seventh Circuit's decision in *Campbell v. Kallas*, 936 F.3d 536 (7th Cir. 2019), states that Defendants misstated the holding in the case, that they failed to appreciate the difference in procedural posture between that case and the instant case, and questions whether Defendants' reliance on *Campbell* is frivolous. Notice and Order at 11-12. Respectfully, Defendants correctly cited to *Campbell* and do not believe the difference in procedural posture is material to the arguments made in Defendants' motion to dismiss.

Defendants cited to *Campbell* in their motion to dismiss for the legal proposition that "prisons aren't obligated to provide every requested treatment once medical care begins." Defs.' MTD at 18 (citing *Campbell*, 936 F.3d at 548). The Seventh Circuit did not cabin this legal proposition to the issue of qualified immunity or to the fact that it was reviewing a summary judgment decision. To be sure, the Court also ultimately concluded that because "clearly established law did not require Wisconsin prison officials to provide Campbell with gender-dysphoria treatment beyond hormone therapy, the defendants are immune from damages liability." *Id.* at 549. But Defendants accurately cited *Campbell*

9

for the legal propositions undergirding the decision in that case, and those legal principles apply equally in the context of a motion to dismiss.  Defendants' arguments were not frivolous and were made in good faith.

## III.  ISSUES CONCERNING DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL EXPEDITED DISCOVERY

The Court's Notice and Order, at 12-13, next asserts that Defendants, in responding to the Court's show-cause order, "brush[ed]-off the crucial fact that Iglesias's counsel was not required to inform the Court of her position on discovery on September 10, 2021."  Respectfully, Defendants sought to respond to, not to short-shrift, the Court's stated concerns about their opposition to Plaintiff's motion to compel expedited discovery.  Specifically, Defendants sought to explain that, whether required or not, at the time Defendants opposed expedited discovery, Iglesias's counsel had in fact twice reported that Iglesias would limit her pre-hearing discovery to Dr. Leukefeld and did not intend to seek additional discovery.  Defs.' Show Cause Resp. at 23-24.

Defendants recognize and regret that their opposition to Plaintiff's request for expedited discovery misstated the Court's August 31, 2021 order:  the Court had ordered only Defendants, not "the parties," to notify the Court by September 10, 2021, whether additional depositions or discovery were needed prior to the preliminary-injunction hearing.  Defendants apologize for that misstatement but also wish to make clear that it was an inadvertent error, not made with any intent to deceive.  As explained in Defendants' response, Defendants' broader argument—that Iglesias twice had had the opportunity to seek expedited discovery and made the strategic decision to seek only Dr. Leukefeld's deposition—is accurate and supported by the record. Defs.' Show Cause Resp. at 23.  This is so because, whether under court order to do so or not, Iglesias had emailed the Court her intent not to seek additional discovery, prior to changing course and moving to compel additional expedited discovery.  Defendants respectfully contend that Iglesias's change in course provided sufficient ground for Defendants to oppose her request, and Defendants' opposition therefore is not sanctionable.

10

The Court's Notice and Order, at 14, maintains that the above-referenced misstatement, , was used by Defendants "to make it look like Iglesias's counsel was in violation of the Court's order" and "portray [] the actions of Iglesias's counsel as improper when Iglesias's counsel had **no duty to notify the Court on September 10th.**"   Again, Defendants apologize for and regret their inadvertent misstatement regarding the Court's order.  But Defendants respectfully must disagree with the Court's assumption that the misstatement was intended.  The block quote from Defendants' opposition that is reproduced in the Court's Notice and Order makes no mention of the Court's August 31, 2021, order, does not suggest that Iglesias had violated any order, and instead accurately conveys that (1) Iglesias had notified the Court twice that she didn't anticipate additional discovery and (2) Iglesias's counsel later changed course, then waited more than an additional week to move to compel expedited production of additional documents.  These statements are accurate and do not imply that Iglesias had engaged in impropriety—only that her change in litigation strategy and resulting prejudice to Defendants should be considered in deciding whether to authorize expedited discovery.

## IV.  ISSUES CONCERNING DEFENDANTS' OCTOBER 22, 2021, STATUS REPORT

The Court's Notice and Order, at 15-18, also takes issue with explanations in Defendants' response to the Show Cause Order concerning representations made in Defendants' Status Report (Doc. 161) filed October 22, 2021.  In particular, Defendants' status report explained that Defendants could not be certain of their ability to complete their outstanding production of documents by the November 22, 2021, preliminary injunction hearing because, "[a]ssuming an average processing rate (*i.e.*, review and redaction) of twenty-five documents per hour and eight-hour review days, it [would] take twenty-six full days to review the approximately 5,200 collected documents, absent further narrowing."  Defendants' Status Report at 2 & n.1.  In response to the statement in the Court's show-cause order that this estimate was based on "one attorney doing this work" when Defendants had "five attorneys entered in on this case," Show Cause Order at 7 n.5, Defendants explained that they

"did not intend to suggest that only a single attorney would be reviewing documents," but instead sought to provide the court with the aggregate number of personnel hours necessary to complete the review." Defs.' Show Cause Resp. at 26.

The Court's Notice and Order rejects this explanation, *inter alia*, as "concocted" and "disingenuous[ ]," stating that if Defendants truly wanted to provide the Court with the aggregate number of personnel hours, then they "could have noted the hours." Notice and Order at 17-18. Defendants recognize that they could have, and should have, been clearer in their footnote regarding what they were attempting to convey. Nonetheless, there is no factual basis for discounting Defendants' explanation of their intent. The explanation in Defendants' show-cause response rests on the sworn attestations of Defendants' counsel that they had made a good-faith attempt to estimate the cumulative time required based on the number of documents, an estimated rate of review "per hour," and the estimated average number of hours available for review among the three trial attorneys then working on the case, each with responsibilities in other litigation to attend to at the time. Defs.' Status Report at 2 n.1; Gardner Decl. ¶ 15 & n.1 (Doc. 191-4); Feldon Decl. ¶ 9 (Doc. 191-7). Simply reporting the total, 208 hours, would not have been meaningful for scheduling purposes, and so Defendants reported the number of 8-hour days that the task was estimated to consume.[5] Defendants acknowledge and apologize that the basis of the estimate was not conveyed more precisely, but it was made in good faith, as counsel have attested, Gardner Decl. ¶ 15, and Feldon Decl. ¶ 9, and was borne out, moreover, by the actual time required to complete the review and production. Feldon Decl. ¶ 9.

Nor, similarly, did Defendants seek to "[s]cor[e] points" on the Court's reference to the uncertainty expressed in Defendants' status report as a statement that Defendants "could not comply

---

[5] The Court observes that "[t]wenty-six full days from October 22, 2021 would have been November 17, 2021, not November 22, 2021." Notice and Order at 17. However, 26 business days, as opposed to calendar days, would have extended significantly past November 22.

with the Court's discovery order." Notice and Order at 16-17. Rather, in a situation where Defendants evidently have failed to express themselves as clearly and unambiguously as circumstances required, they merely wished to avoid any further potential for miscommunication.

## V.   ISSUES CONCERNING DEFENDANTS' NOTICE IN COMPLIANCE WITH THE PRELIMINARY INJUNCTION

The Court's second Order to Show Cause raises several questions regarding Defendants' and their attorneys' actions and representations related to the preliminary-injunction hearing or compliance with the injunction itself. As explained elsewhere in this response, the 23-hour time allotted for Defendants to file this response, over a federal holiday and a day in which both BOP officials and Defendants' counsel all are traveling from Washington, D.C. to the St. Louis area for the show-cause hearing, has not afforded the time and opportunity for preparation that ideally would be available to thoroughly address the issues raised in the Notice and Order. Specifically, the short timeframe has made it impractical to prepare additional sworn declarations from each team member. But undersigned counsel have spoken with the relevant individuals and addresses the Court's questions based on representations from the relevant individuals:

A.   When did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon first learn about the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process [for] individuals housed in halfway houses?

- Mr. Feldon was unaware of any difference between the processes until the issue arose in connection with reporting the TEC's decision after the Court's preliminary injunction. Mr. Feldon was not present at the hearing and did not know Dr. Leukefeld had spoken on the issue. of the surgery-referral process.

- Mr. Kolsky is not sure when he first learned of the differences; he learned in October 2021 that Dr. McLearen would be the deciding official once Iglesias is transferred to a halfway house, but does not believe he knew the details of the two processes at the time of the hearing.

- Mr. Robinson does not believe he personally knew about the different processes until the week of January 10. He does not believe he knew that there were two different processes during the hearing.

- Mr. Gardner states that, to the best of his recollection, he learned that the processes for medical care may differ for individuals placed in secure facilities versus halfway houses in October 2021.

B. Did the BOP or its attorneys explain the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals housed in halfway houses between October 4, 2021, to November 22, 2021? Please point where in the record this was explained.

- Neither BOP nor its attorneys are aware of any filing explaining this distinction within the given timeframe.

C. Where in the record (before Defendants Notice by All Defendants in Compliance with the Preliminary Injunction (Doc. 183)) did the BOP or DOJ explain the difference between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals housed in halfway houses?

- Neither BOP nor its attorneys are aware of any filing explaining this distinction prior to Doc. 183.

D. Did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon alert the Court before the filing of Defendants Notice by All Defendants in Compliance with the Preliminary Injunction (Doc. 183) that BOP's Transgender Offender Manual was revised on January 13, 2022? If so, please point to the document(s) in the record.

- No.

E. Did Mr. Robinson, Mr. Kolsky, or Ms. Talmor clarify Dr. Leukefeld's testimony or correct the alleged inadvertent error at the Preliminary Injunction hearing? Please point the Court to the pages in the transcript where this is discussed.

- No.

F. Did Mr. Robinson, Mr. Kolsky, Mr. Gardner, and Mr. Feldon read the Court's order over the preliminary injunction from December 27, 2021?

- Yes.

G. In the Court's order over the preliminary injunction, did the Court differentiate between TEC's process for individuals housed at secure BOP facilities and TEC's process for individuals in halfway houses?

- No.

H. If the Court did not differentiate between secure BOP facilities and halfway houses, then explain where in the order BOP could deviate from the process discussed by Dr. Leukefeld?

- As stated in Defendants' response to the order to show cause, at 10-13, nobody at BOP or DOJ understood the Court's preliminary injunction to constrain the TEC's discretion to make recommendation it determined was most appropriate. Thus, Defendants did not understand their actions to deviate from the order.

I. In Mr. Robinson's closing argument, did he explain the difference between TEC's process between individuals housed at secure BOP facilities and individuals housed in halfway houses?

- Mr. Robinson did not explain the difference between the two different processes during his closing argument at the hearing. As noted, Mr. Robinson was not personally aware of the different processes at the time of the preliminary injunction hearing and did not become aware of the different processes until the issue arose in the context of reporting the TEC's decision in connection with the preliminary injunction.

- Mr. Robinson did not state that the TEC would refer Plaintiff to a surgeon because the TEC had not decided to refer Plaintiff to a surgeon at the time of the preliminary-injunction hearing. Rather, the TEC had stated that it would reconsider Plaintiff's request for surgery at its April 2022 meeting. Mr. Robinson accurately conveyed this to the Court. The TEC did not decide to refer Ms. Iglesias to a surgeon until its January 24, 2022 meeting.

- Mr. Robinson correctly conveyed that the TEC planned in April of 2022 to consider Plaintiff for surgery.

- The 12-month requirement is not "to receive GCS." Rather, BOP's Transgender Offender Manual states, "surgery may be the final stage in the transition process and is generally considered only after one year of clear conduct and compliance with mental health, medical, and programming services at the gender affirming facility." Doc. 183-1 at 15 (emphasis added). This is consistent with Dr. Leukefeld's testimony at the preliminary-injunction hearing, where she explained that the TEC "would assess [Plaintiff] for surgery in April." *See* Doc. 175 at 149 (emphasis added). Dr. Leukefeld explained that even though "[t]hat's slightly less than 12 months," if "she's assessed in April, that will allow enough time potentially for her to have surgery and recover before the end of her BOP term." *Id.*

- As explained above, the 12-month requirement is that the TEC will consider surgery only after an individual has lived in a gender-affirming facility for at least one year. As explained in Dr. McLearen's January 31, 2022 declaration, although the Transgender Offender Manual contemplates referral to the BOP Medical Director if the TEC recommends surgery, this step is not necessary once an individual is housed in a Residential Reentry Center. *See* Doc. 183-1 ¶ 11. Rather, the TEC in that scenario can refer the individual directly to a contract medical provider in the community. *Id.* Accordingly, in Plaintiff's case, the TEC decided

to make the referral to the surgeon directly, in part because it would be "more logistically streamlined than it would be if the referral was made while Iglesias was housed in a secure facility." *Id.*

Finally, the Court asks "whether Mr. Gardner or his clients have ever been sanctioned by a court because Mr. Gardner" asserted in his February 14, 2021 declaration that, in his "twenty-two years of practice [he has] never been sanctioned by a Court for *alleged misconduct.*" Notice and Order at 19-20 (citing Gardner Decl. at 10). The Court also asked specifically whether Mr. Gardner was sanctioned in *State v. Dep't of Comm.*, 461 F. Supp. 3d 80 (S.D.N.Y. 2019), and whether Mr. Gardner has "ever been admonished by any court for his litigation tactics"? Notice and Order at 20. As discussed below, Mr. Gardner was not sanctioned in litigation related to the 2020 U.S. census, or in any other matter during his two-plus decades in practice, and the statement made in his declaration is accurate.

Specifically with regard to *State v. Dep't of Commerce*, the NYIC Plaintiffs' Motion for Sanctions, Dkt. No. 635, expressly acknowledged that plaintiffs were not alleging that the career DOJ attorneys assigned to the matter (including Mr. Gardner) had engaged in misconduct, and stated: "Indeed, those ethical considerations are heightened in this case, where the misconduct appears to have been perpetrated by senior Commerce and DOJ officials—not the career DOJ line attorneys who litigated this case on behalf of Defendants." Dkt. No. 635 at 3. The Court ultimately ordered Defendants, which included the United States Department of Justice, rather than the career DOJ attorneys representing Defendants, to pay the reasonable costs and attorney's fees, pursuant to Federal Rule of Civil Procedure 37(b)(2)(C), based on a "lapse" in the Defendants' response to the plaintiffs' document requests. Dkt. No. 694 at 20. Under Rule 37(b)(2)(C), the Court "must order <u>the disobedient party, the attorney advising that party, or both</u> to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

Accordingly, the court expressly did not sanction Mr. Gardner or the other trial attorneys in that case, and the statement made in his declaration that he has never been sanctioned by a court is accurate.

The Court also raises questions regarding the fact that Mr. Gardner "sought to withdraw" from the census litigation "but the Court denied his motion." Doc. 198 at 20. In that litigation, the government repeatedly had represented, and a career scientist with the Census Bureau had testified, that the census questionnaire must be finalized by June 2019 in order for the constitutionally mandated census to stay on track. On July 2, 2019, after the Supreme Court ruled against the government and set aside the Secretary of Commerce's decision to add a citizenship question, counsel for defendants emailed counsel for plaintiffs confirmation "that the questionnaire for the 2020 Decennial Census had been sent to the printer, without a question inquiring about respondents' citizenship status." *State v. Dep't of Comm.*, No. 1:18-cv-2921-JMF, ECF No. 613. Shortly thereafter, however, the previous administration asked the "Departments of Justice and Commerce … to reevaluate all available options following the Supreme Court's decision and whether the Supreme Court's decision would allow for a new decision to include the citizenship question." *Id.*  Less than one week later, in a single filing *all eight* attorneys who had appeared on the docket and actively were representing defendants in that litigation—seven career attorneys, including Mr. Gardner, along with one political appointee—asked to withdraw from the litigation. *State v. Dep't of Comm.*, No. 1:18-cv-2921-JMF, ECF No. 618. Counsel explained that the government "will be represented in this matter by different counsel from the Department of Justice," because "new attorneys from the Civil Division will be entering their appearances." *Id.* As this Court noted, the Southern District of New York denied counsels' motion to withdraw. That does not change the fact that sanctions never were entered against Mr. Gardner or his DOJ co-counsel.

The Court also cites to the *Department of Commerce* court's November 20, 2018 Order denying the Defendants' letter motion to stay further proceedings (Dkt. No. 544), and asks whether

"Mr. Gardner [has] ever been admonished by any court for his litigation tactics?" Dkt. No. 198 at 20. Mr. Gardner acknowledges that the Court in *Department of Commerce* denied Defendants' letter motion to stay further proceedings, and further acknowledges that the Court in that order expressed frustration with Defendants' request.  But the Court expressly did not sanction Defendants or Mr. Gardner in the context of that motion, and the *Department of Commerce* Order does not contradict Mr. Gardner's statement that he has never been sanctioned by a Court for alleged misconduct.

## VI.  THE TOTALITY OF COUNSEL'S CONDUCT

Finally, the Court characterizes the totality of counsel's actions and representations cited in its Show Cause Order, and more recently in its Notice and Order, as a pattern of misrepresentations and frivolous filings intended to delay these proceedings.  Notice and Order at 21-23.  Defendants and their counsel are greatly troubled and sincerely apologize that they have made statements or advanced arguments in this case, no matter how unintentionally, to leave the Court with that impression.  They also recognize that the Court is dismayed at what it perceives to be calculated disrespect for the dignity of the Court, the goals of the judicial process, and the rights of the Plaintiff.  In the foregoing pages, and in Defendants' show-cause response, Defendants have done their utmost through the sworn attestations of all counsel assigned to this matter, and fulsome explanation of the positions they have taken, to address and dispel the Court's concerns.  They stand ready to do so again at today's hearing.

The Court also draws particular attention to filings made and arguments advanced by counsel that ultimately persuaded the Court to delay the preliminary-injunction hearing from July 28 to November 22, 2021.  Notice and Order at 23-25.  Viewing these submissions through a lens of alleged misrepresentations and frivolous filings, the Court also construes these filings and arguments by counsel as calculated to advance a strategy of delay.  But Defendants again assure the Court, as attested by their counsel, that neither Defendants nor their counsel have filed any motion or made any argument or representation herein for improper purposes such as delay.  Rather, the filings and

contentions cited on pages 23-25 of the Notice and Order argued in good faith that Plaintiff had

untimely disclosed expert testimony, that it was impracticable to comply with the Court's October 15,

2021, discovery order in three days' time, and that (following Dr. Ettner's illness), convening and then

adjourning the preliminary injunction hearing before testimony was completed would unfairly

prejudice Defendants' interests.  All of these positions were reasonable on their face and were taken

by counsel in good faith to protect the legal rights of their clients, as was their duty.[6]  Respectfully,

they cannot now be faulted as having been made in furtherance of a strategy of misrepresentation and

delay that the record does not support, either collectively or as to any individual action.

## VII.  SUFFICIENT NOTICE AND OPPORTUNITY TO RESPOND HAVE NOT BEEN PROVIDED TO PERMIT SANCTIONS AGAINST INDIVIDUAL ATTORNEYS

Although the Court has indicated that it "will allow the parties further opportunity to be

---

[6] The Court also singles out as "suspect" Defendants' citation to *J.M. by & through Lewis v. Crittendon,* 2018 WL 7080041, (N.D. Ga. Apr. 10, 2018), as support for their motion to exclude Dr. Ettner's untimely and undisclosed expert testimony.  Notice and Order at 23 n.7.  Defendants respectfully submit that both "*J.M.* and the additional cases [relied on in their motion] are applicable," *id.*  While Defendants knew that Dr. Ettner would be testifying at the preliminary-injunction hearing, admitting his newly formed opinions about Plaintiff only eight days before the hearing would have prejudiced Defendants' ability to prepare for that hearing.  Defendants thus sought to exclude *those opinions*, not Dr. Ettner's ability to testify at all.  Defendants cited to *J.M.* in support of that remedy because there the court found that exclusion of testimony was an appropriate remedy for late disclosure of potentially testifying witnesses.  *See* 2018 WL 7080041 at *1.  Defendants certainly did not mean to suggest that *J.M.* was factually indistinguishable, but respectfully contend that the case still supports their position, in that the rationale in *J.M.* turned on the failure timely to disclose the *contents* of proffered expert testimony, just as in this case.  Defendants also cited *Jindal v. U.S. Dep't of Education,* 2015 WL 2405950, (M.D. La. May 18, 2015)).  There a fact witness was disclosed on the last day of discovery, leading the *Jindal* court to conclude that the non-propounding party would be prejudiced in its preparations for a forthcoming hearing.  2015 WL 24005950, at *1, 3.  Despite certain factual differences, the underlying principle that exclusion is an appropriate remedy for late disclosure of witness testimony also applied in this case.  Defendants also analogized to *Rao v. Rusch*, No. 14 C 66, 2017 WL 4278541, at *2 (N.D. Ill. June 21, 2017) and *Ridge Chrysler Jeep L.L.C. v. Daimler Chrysler Servs. N. Am., L.L.C.*, No. 03 C 760, 2004 WL 3021842, at *3–4 (N.D. Ill. Dec. 30, 2004).  In both cases, courts deemed it appropriate to exclude expert testimony disclosed shortly before a trial because of the prejudice to the non-propounding party.  Defendants used the "*cf.*" citation to make clear that the facts of these cases less directly on point than *J.M.* and *Jindal.*  To the extent Defendants' citations to those cases suggested that the factual circumstances or procedural posture of those cases was identical to those at bar, Defendants regret that implication.

heard" during today's hearing, Defendants respectfully contend that the Court's Orders to Show Cause have not provided adequate notice and opportunity to be heard regarding issuance of sanctions against individual attorneys, and therefore any such sanctions would not satisfy due-process requirements.  As noted in Defendants' February 14, 2022 show-cause response, regardless of whether sanctions are issued under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, or a court's inherent authority, prior notice and a reasonable opportunity to respond must be afforded. *Larsen v. City of Beloit*, 130 F.3d 1278, 1286-87 (7th Cir. 1997).  Federal Rule of Civil Procedure 11(c)(3) makes plain that, when sanctions under that rule are contemplated on a court's own initiative, the court first must "order [the] attorney, law firm, or party to show cause why *conduct specifically described in the order* has not violated Rule 11(b)" (emphasis added).

Although the Court's February 21, 2022 Order makes plain that, in the Court's view, it "**has** provided notice of specific conduct by DOJ attorneys," ECF No. 198 at 4, Defendants respectfully contend that the Court's February 10 Show Cause Order lacks the requisite specificity to comport with due process. "An order from the court must describe the specific conduct which appears to violate Rule 11 and direct the party or counsel to show cause why it has not violated the rule. The formality imposed on district judges when acting on their own initiative under Rule 11(c)(1)(B) [now 11(c)(3)] was intended to ensure due process." *Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147, 151 (7th Cir. 1996). "The party sought to be sanctioned is entitled to particularized notice including, at a minimum, 1) the fact that Rule 11 sanctions are under consideration, 2) the reasons why sanctions are under consideration, and 3) the form of sanctions under consideration. *Only with this information can a party respond to the court's concerns in an intelligent manner.*" *Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994) (quotation omitted, emphasis added).[7] That notice furthermore must alert the party to the "particular

---

[7] Although these authorities discuss procedural requirements under Rule 11, the same principles

factors that he must address if he is to avoid sanctions." *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 100 (3d Cir. 1999). Defendants respectfully contend that the Court's February 10 show-cause order identifying eight filings for which DOJ attorneys "shall be prepared to discuss their representations" did not suffice to provide adequate notice as to their conduct or as to an intent to consider sanctions against them personally, notwithstanding the inclusion of footnotes pointing to certain concerns with those filings. ECF No. 187 at 6-7 & ns. 2-6.

The Court's Show Cause Order also afforded Defendants only four days—and only two intervening business days, due to the weekend—in which to respond to the Court's concerns by February 14, 2022. Although counsel have not identified any authority mandating a specific minimum time to respond to an order to show cause, and recognize that "the precise form of counsel's opportunity to respond will vary with the circumstances and is a decision committed to the discretion of the court," *Simmerman*, 27 F.3d at 64, Defendants respectfully contend that the four days, over a weekend, provided by the Court did not allow Defendants or their counsel an adequate opportunity to respond to the Court's concerns, particularly in light of the fact that much of the Court's order was focused on actions of BOP—not DOJ counsel—and thus necessitated significant focus on declarations and supporting argument related to the conduct of Defendants themselves, rather than their attorneys.

Seven days after Defendants' Response to the Order to Show Cause—and one day prior to the evidentiary hearing on that Order—the Court issued its Notice and Order, stating that, "[u]pon further review of counsels' filings, counsel is hereby FURTHER ORDERED to address the following issues in writing before 8 a.m." the following day. Notice and Order at 4. Although the Notice and

---

apply to sanctions imposed under other authorities because "[t]he Due Process Clause of the Fifth Amendment requires a federal court to provide notice and an opportunity to be heard before sanctions are imposed on a litigant or attorney." *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995).

Order sets forth with specificity certain additional representations, filings, and purported conduct the

Court wishes counsel to address (albeit without identifying the authority under which sanctions may

be imposed or the factors counsel should address in opposing them), the roughly 23 hours afforded

by the Court's order do not, respectfully, provide an adequate or reasonable opportunity to respond.

The fewer-than-24 hours in which to respond to a 27-page Order also fell over a federal holiday during

which each attorney on this case team was traveling from Washington, D.C. to the Southern District

of Illinois to attend the show-cause hearing.  Between the time necessary to travel from their homes

to the airport, fly to St. Louis, rent a car, drive to and check into their hotels, and sleep a few hours,

at least, before today's hearing, each attorney was unavailable for substantial parts of the 23 hours

during which they could respond. Although counsel have not identified authority proscribing a set

minimum amount of time required to respond to a show-cause order, persuasive authority establishes

that the opportunity to fully brief and address contemplated sanctions is key. "Providing the

[sanctioned party] with an opportunity to mount a defense 'on the spot' does not comport with due

process." *Cf. 1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1292 (5th Cir. 1991). The opportunity to

mount a vigorous defense at today's evidentiary hearing cannot cure a defective opportunity to be

heard by briefing the issues raised in the Court's Notice and Order, because "[h]olding that notice at

the hearing itself was adequate would effectively nullify the show cause procedure specifically added

to the rule by the 1993 amendments." *Hutchinson v. Pfeil*, 208 F.3d 1180, 1185 (10th Cir. 2000); *see also*

*Kirschner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1083 (9th Cir. 1988) (two-day notice of intent to seek

sanctions, "arriving during the weekend … undoubtedly left [sanctioned party] inadequate time to

prepare a defense and to travel from its offices … to attend the hearing").

The Court's February 21, 2022 Order to Show Cause also directs Defendants' counsel to

explain or address a substantial number of actions or filings that significantly predate the recent entry

of a preliminary injunction and Defendants' actions to comply with it. Although undersigned counsel

has not found Seventh Circuit authority specifically addressing delayed action by a court in initiating sanctions proceedings against attorneys appearing before it, persuasive authority suggests that delayed action by the court may be an abuse of discretion. *See Brown v. Baden (In re Yagman)*, 796 F.2d 1165, 1183 (9th Cir. 1986) (criticizing district court for "imposing sanctions" based on "an accumulation of all perceived misconduct, from filing through trial, with a reevaluated determination that it was far more serious than appeared at the time," a procedure that "flies in the face of the primary purpose of sanctions, which is to deter subsequent abuses"); *Simmerman v. Corino*, 27 F.3d 58, 62-63 (3d Cir. 1994) (finding district court abused its discretion by imposing sanctions three months after deciding motions for summary judgment and dismissal because court had all needed information to impose sanctions when motions were decided and "[n]othing was to be gained by delay"); Fed. R. Civ. P. 11, 1983 adv. cmte. notes ("The time when sanctions are to be imposed rests in the discretion of the trial judge. However, it is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation, and *in the case of motions at the time when the motion is decided or shortly thereafter.*" (emphasis added)). Defendants respectfully contend that imposing sanctions for conduct unrelated to BOP's compliance with the Court's preliminary injunction—particularly related to defenses raised or arguments that the Court found unpersuasive, but are not contrary to controlling authority—would be inappropriate here.

Moreover, multiple federal courts of appeals have cautioned that special solicitude should be given before a court imposes sanctions *sua sponte* because such a "show cause order deprives a lawyer against whom it is directed of the mandatory twenty-one day 'safe harbor' provision provided by" Rule 11 when sanctions are sought by motion of an opposing party. *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 151 (4th Cir. 2002). Indeed, "[t]he Advisory Committee contemplated that a sua sponte show cause order would only be used 'in situations that are akin to a contempt of court,'" *id.*; *see also Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (noting that multiple "[o]ther

circuits apply the 'akin to contempt' rationale to court-initiated" sanctions and that sua sponte sanctions "must be reviewed with 'particular stringency'"). This Court has not identified conduct that would meet a contempt-of-court rationale—nor has it afforded Defendants a reasonable opportunity to brief any allegations of contemptuous conduct—thus further evidencing why sua sponte sanctions are not appropriate here.

## CONCLUSION

For the foregoing reasons, and those stated in Defendants' February 14, 2022, response to the Court's Show Cause Order, Defendants respectfully submit that sanctions are not warranted, and the Court's Show Cause Order should be discharged.

Dated:  February 22, 2022

STEVEN D. WEINHOEFT
United States Attorney


LAURA J. JONES
Assistant United States Attorney

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


BRIAN D. NETTER
Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel

*/s/   Daniel Schwei*
DANIEL SCHWEI
Special Counsel

Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Tel.: (202) 305-8693

Daniel.S.Schwei@usdoj.gov

*Counsel for Defendants*