IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CRISTINA NICHOLE IGLESIAS (also known as CHRISTIAN NOEL IGLESIAS),**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**FEDERAL BUREAU OF PRISONS, MICHAEL CARVAJAL, CHRIS BINA, IAN CONNORS, DAN SPROUL, JEFFERY ALLEN, ALIX MCLEAREN, THOMAS SCARANTINO, and DONALD LEWIS,**<br><br>        **Defendants.** | **Case No. 19-CV-415-NJR** |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

As previously noted, throughout this litigation the Federal Bureau of Prisons ("BOP") has employed tactics similar to the game of Plinko on *The Price is Right*.[1] BOP was warned for employing these tactics, and it apologized. Now BOP's tactics are turning into a game of "whack-a-mole." Indeed, it appeared the last of BOP's moles had been "whacked." Then another one "popped-up." This time BOP represented it had an appointment with a surgeon for a consultation of gender confirmation surgery ("GCS") on April 7, 2022, but the surgeon does not even perform vaginoplasties.

---

[1] As noted previously, Plinko, contestants climb up the stairs and drop round flat discs, the Plinko chips, down a pegged field board. As a chip falls, the pegs deflect the chip causing it to bounce randomly from peg-to-peg making it impossible for both the contestants and the audience to predict which slot—$100, $500, $1,000, $0, or $10,000—the chip will land. **For television**, this *randomness* is entertaining because contestants and the audience wait in excitement to see where the chip will land.

For the following reasons, BOP is ordered to show cause why it should not be held in contempt for violating the Court's original preliminary injunction order. The Motion to Modify the Preliminary Injunction filed by Plaintiff Cristina Nichole Iglesias ("Iglesias") is granted in part. (Doc. 213). Finally, BOP and the DOJ's attorneys are ordered to show cause why sanctions should not be imposed.

BACKGROUND

## I.     The Preliminary Injunction and Evidentiary Hearing on November 22, 2021

Iglesias's Motion for Preliminary Injunction sought to order Defendants to provide her with the medically necessary healthcare she needs, including permanent hair removal and GCS.[2] (Doc. 93). An evidentiary hearing was held on November 22, 2021. (Doc. 175). At the evidentiary hearing, the Court specifically asked Dr. Leukefeld—a member of the Transgender Executive Council ("TEC") and administrator for the psychology services branch of BOP—about the process for evaluating and ordering GCS for inmates:

> **THE COURT:** The psychiatrist, but the—so would you make a referral, then, for a medical examination—if the TEC was considering, say, that an inmate at a—seeking gender-confirming surgery at a female facility, hormone levels are stabilized, would you then refer her for a medical evaluation?
>
> **DR. LEUKEFELD:** Yes. For example, in the case where the TEC recently made a recommendation for surgery, we of course are working with the local health care professionals, and when we made that recommendation, we referred it to BOP's medical director, who will ensure that the individual is appropriate for surgery, that there are no contraindications, and look for a surgeon.

---

[2] Like the 61-page order granting in part Iglesias's request for preliminary injunctive relief, GCS refers to gender reassignment surgery or surgeries altering one's reproductive organs. The Court has never referred to GCS as breast augmentation and facial feminization.

(Doc. 175, p. 151). Dr. Leukefeld continued testifying the following:

> **MR. KNIGHT:** So—But Dr. Stahl does not determine whether someone gets surgery; is that right?
>
> **DR. LEUKEFELD:** Correct. The TEC makes that recommendation, and then she and her staff would work to find a surgeon and make sure that there's –that there are no contraindications that would preclude surgery.

(*Id*. at p. 163).

> Dr. Leukefeld confirmed the following during the Court's questioning:

> **THE COURT:** Okay. And just so I'm clear, and you said that—I think we've—both things have been said here today. Is the committee going to recommend surgery in April or refer her at that time for an evaluation?
>
> **DR. LEUKEFELD:** The committee will make a determination about whether to recommend in April, and if it does, she would immediately be referred to the medical director to find—
>
> **THE COURT:** Okay. So first you have to recommend it and then she would be referred, and for the one that you just mentioned in October who was referred—were they referred or recommended?
>
> **DR. LEUKEFELD:** The TEC recommended surgery and referred her to the medical director. Medical director would not—will do surgery unless there's some kind of contraindication.
>
> **THE COURT:** And that's the BOP medical director?
>
> **DR. LEUKEFELD:** Correct.
>
> **THE COURT:** Okay. But you don't know how long that's going to take.
>
> **DR. LEUKEFELD:** I don't know how long it will ultimately take, but I—but it is underway.

(*Id*. at pp. 189-190).

Mr. Knight, former counsel for Iglesias, sought clarification of TEC's process, and

Dr. Leukefeld did not correct Mr. Knight, but confirmed the following:

MR. KNIGHT: Well, the question is, is Ms. Iglesias ever going to get surgery under the circumstances we're talking about here? The TEC still hasn't decided to recommend her for surgery to the medical director, has not made arrangements for permanent hair removal, has not made arrangements for a surgeon as far as I can tell, so my client, I think, would like to know if it's ever going to happen.

DR. LEUKEFELD: The TEC set a date to consider her for surgery. That takes into account her release date and will ensure that if she's recommended for surgery, she'll have time to recover in BOP custody. The TEC has provided her feedback over time about—has made requests of her to, you know, manage her behavior, to participate in treatment. She's done those things. I understand it's a process, and progression is happening.

(*Id*. at pp. 192-193).

After considering the evidence and relevant authority, the Court entered preliminary injunctive relief, granting Iglesias's motion in part. (Docs. 176, 177). The Court ordered BOP to have the TEC meet to evaluate Iglesias's request for GCS by Monday, January 24, 2022. (Doc. 177). If the TEC recommended Iglesias for surgery, then BOP was ordered to refer Iglesias to BOP's medical director. If the TEC did not recommend Iglesias for surgery, then BOP was ordered to file a notice with the Court explaining all the reasons for the TEC's decision. (*Id*.).

## II.   Defendants' Response to the Court's Preliminary Injunction Order and the Court's Show Cause Order

Despite the evidence and testimony on BOP's process for evaluating and ordering GCS for inmates, on January 31, 2022, Defendants filed their Notice of Compliance with December 27, 2021 Preliminary Injunction, noting:

The TEC "recommended that Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center ("RRC") (commonly referred to as a "halfway house")[.]" McLearen Decl. ¶ 6. The TEC made this recommendation on the

"assum[ption that] she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate[.]" *Id.* Although the Court's PI anticipated that the TEC would either (a) recommend Plaintiff for surgery and immediately refer Plaintiff to BOP's Medical Director or (b) not recommend Plaintiff for surgery, the TEC's decision was to recommend referral to a surgeon for consultation for GCS at a future date provided no reasons develop that would make surgery inappropriate.

(Doc. 183, p. 2).

There was never this option. Nowhere did BOP, DOJ, or Dr. Leukefeld explain that the TEC could refer Iglesias to a surgeon for consultation for GCS directly. (Doc. 199, p. 15). BOP even had an opportunity to contest the Court's order on the preliminary injunction, but used that opportunity to only contest the transcription of the TEC meeting. BOP explained "[they] do not seek relief from any of these other requirements." (Doc. 178, p. 3).

As a result of this new option, the Court ordered the BOP to show cause in writing on or before February 14, 2022, why sanctions should not be imposed. (Doc. 187). The Court also ordered that Dr. Leukefeld, Dr. Alix McLearen, Joshua Gardner, John Robinson, Joshua Kolsky, and Kate Talmor[3] appear before the Court on Tuesday, February 22, 2022, to show cause for their failure to adhere to the Court's Preliminary Injunction (dated December 27, 2021). (*Id.*).

In their written response, Defendants reported they complied with the preliminary injunction. Defendants noted that "[g]iven that the TEC had not immediately and

---

[3] The Court later found that Kate Talmor did not need to appear because her role was limited to the cross-examination of Plaintiff's expert witness, Dr. Ettner. (Doc. 195).

unconditionally 'recommend[ed] Iglesias for GCS,' its recommendation did not fall under the injunction's first set of instructions, and BOP therefore complied with the preliminary injunction by following the alternate set of instructions that applied '[i]f the TEC [did] not recommend Iglesias for GCS.'" (Doc. 191, p. 17). Defendants continued construing what happened as "*[a] single instance [ ] [ ] involving an inadvertent error.*"[4] (*Id*. at p. 32) (emphasis added). Defendants also noted that "BOP has notified its contractor of Iglesias's pending transfer, and has been informed that the contractor has located an *appropriate surgeon*." (*Id*. at p. 8) (emphasis added).

### III.   The Court's Additional Notice of Conduct in Specific Filings to the Court, Defendants' Responses, and the February 22, 2022 Show Cause Hearing

The Court responded to Defendants' Response to the Court's February 10, 2022 Order to Show Cause by laying out a pattern of oversight, misrepresentations of the law, misrepresentations of the record, disingenuous estimates in time to meet the Court's discovery orders, and material errors. (Doc. 198). Following the Court's response, DOJ attorneys and BOP personnel made additional concessions regarding errors, oversights, and regrets. (Doc. 214).

---

[4] According to Defendants, the single inadvertent error was the following:

> The Court also asked Dr. Leukefeld, regarding Plaintiff, if the TEC was "going to recommend surgery in April or refer her at that time for an evaluation?" Show Cause Order at 3. Dr. Leukefeld responded: "The committee will make a determination about whether to recommend in April, and if it does, she would immediately be referred to the medical director to find – [.]" Id. at 3-4. Due to an inadvertent oversight, Dr. Leukefeld's response did not address the fact that a referral to the Medical Director would not be necessary in April if Plaintiff were then living in a halfway house.

(Doc. 191, pp. 22-23).

At the show cause hearing, DOJ and BOP personnel formally apologized to the Court. (Doc. 206, p. 14). "[They] acknowledge[d] that [they] made *mistakes* in this case and [ ] are very sorry about them." (*Id.*) (emphasis added). Defendants specifically "acknowledge[d] that [they] failed to clearly communicate the different referral processes for inmates in secure facilities versus halfway houses, and [they] recognize[d] that the Court crafted its preliminary injunction based on its understanding of the process and then felt misled when [they] filed [their] notice describing a different process." (*Id.* at pp. 14-15).

Besides the additional concessions of BOP and DOJ personnel, Dr. McLearen testified that the "[TEC] decided that it was appropriate to move forward with recommending that [ ] Iglesias meet with a surgeon for consultation after her successful transition to the residential reentry center, which was coming very soon, that she would hopefully be placed before a surgeon within a month of that transition." (Doc. 206, p. 23). Dr. McLearen continued testifying the following:

> **MR. ROBINSON**: So, Dr. McLearen, I think you were talking about the process of reaching out to a contractor who was reaching out to a surgeon. So, if you could proceed with that.
>
> **DR. McLEAREN**: Okay. Forgive me if I am repeating myself now. I got a little lost. We provided electronic medical records, about two years worth of patient history, we asked that a surgeon be secured. We are still waiting to hear—We are trying to walk a line between pressuring this person, but making clear that we would like to know, so the contractor has been reaching out repeatedly. We reach to the contractor, the contractor reaches to the surgeon trying to get a commitment, and we have held the earliest available date that we were able to identify on the calendar as an appointment. We were given two dates, April 4th and 7th, and we asked that the contractor hold one of those. We also sent information to the contractor to clarify that we wanted to make clear that this process was

inclusive of hair removal and are just continuing to check in daily with the contractor to have something secured.

(*Id*. at p. 28).

Defendants were then ordered to file the following items:

1. any additional supplement to their responses to the Court's Notice and Order (Doc. 198);

2. a brief as to the procurement process, bids (if any are required), what a contract allows third parties to do or not to do, and any other information relevant to Ms. Iglesias's request for surgery and related medical treatment to the Court by 5:00 p.m. on Wednesday, March 2, 2022; and

3. weekly updates on contacts with the surgeon, the surgeon's response, and any other items relating to Ms. Iglesias's care on Friday, February 25, 2022, by 5:00 p.m., and every Friday thereafter by 5 p.m. until further notice.

(Doc. 200). The matter as to whether sanctions against BOP should be imposed was taken under advisement.

DISCUSSION

## I.     BOP Violated the Court's Preliminary Injunction Orders

"The district court has wide latitude to craft civil contempt sanctions to coerce obedience to the court's orders and compensate the plaintiff for losses." *Teledyne Techs. Inc. v. Shekar*, 739 F. App'x 347, 351 (7th Cir. 2018). "Contempt orders have been levied against executive branch officials and agencies without even so much as a hint that such orders offend separation of powers." *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996).

"To hold a party in contempt, the district court 'must be able to point to a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the

party in contempt violated." *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989) (citations omitted). "A district court ordinarily does not have to find that the violation was 'willful' to find a party in contempt, [ ] and it may find a party in civil contempt if he has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Id.* (citing *Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 784 n. 9 (7th Cir. 1981); quoting *American Fletcher Mortgage Co. v. Bass*, 688 F.2d 513, 517 (7th Cir. 1982)). However, "[a] district court may not enter an order of civil contempt unless it finds by clear and convincing evidence that a party has violated the express and unequivocal command of a court order." *In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010).

### A. *TEC Never Met to Evaluate Iglesias's Request for GCS*

First, the Court ordered Defendants to have the TEC meet to evaluate Iglesias's request for GCS by Monday, January 24, 2022. (Docs. 176, 177). Defendants represented that "the TEC met on January 24, 2022 to evaluate Plaintiff's request for GCS." (Doc. 183, p. 1). The following section in Defendants' status report reveals, however, that the TEC failed to evaluate Iglesias's request for GCS on January 24, 2022:

> Dr. McLearen explained at the show-cause hearing, BOP's goal was to "send [Ms. Iglesias] to a surgeon who's an expert and they are going to decide what exactly is needed and how much and how long and work with their team," noting that while "we call it gender confirmation surgery, . . . it's really gender confirmation surgeries." Hr'g Tr. 102:15–21; see also Hr'g Tr. 62:3–9 ("The surgeon will be a recommender of what needs to come next . . . . [W]hile I am aware of what is likely to be needed, every case is different and I am giving that deference to the surgeon.").

(Doc. 237, p. 6). Indeed, Dr. McLearen, who oversees the TEC, confirmed that the TEC

did not evaluate Iglesias's request for GCS when she testified as follows:

> Again, we have done all the things that I believe and that the TEC believes are appropriate to do at this time, and now the ball is in the surgeon's Court, so to speak. So, we are waiting. The surgeon will be a recommender of what needs to come next. Timeline-wise what's appropriate, I am not a surgeon. So, while I am aware of what is likely to be needed, every case is different and I am giving that deference to the surgeon. My priority has been on getting Ms. Iglesias in front of the surgeon and making clear the scope of things that we want to secure.

(Doc. 206, p. 62).

Accordingly, when the TEC met on January 24, 2022, it did not evaluate Iglesias's request for GCS, but merely evaluated whether to recommend Iglesias to a surgeon for consultation for GCS. (Doc. 183, p. 2). Defendants violated the Court's order.[5]

### B. *TEC Delayed its Decision*

Even if the Court construes Defendants actions as following the first step in the preliminary injunction order, Defendants still violated the Court's preliminary injunction order. At best, Defendants did not recommend Iglesias for GCS and then "explain[ed] all the reasons for TEC's decision within seven days and include[d] the policies and procedures Iglesias does not meet, when the policies were established, all documents providing when the policies were established." (Docs. 176, 177). But that's not what happened. Rather, TEC delayed its decision until "one month after she is placed in a [RRC] *assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate for Iglesias.*" (Doc. 183-1, p. 2) (emphasis added).

---

[5] Notably, there is no transcript of the TEC meeting from January 24, 2022.

In other words, BOP did not deny, but was delaying its decision—and conditioning the

very outcome of their future decision on what "other reasons develop[.]" (*Id.*).

Defendants argue that "the Court's preliminary injunction does not contain an

unambiguous command requiring BOP to either immediately and unconditionally

recommend surgery or conclusively deny surgery." (Doc. 191, p. 17). The Court did not

use the words "unconditionally" or "conclusively" in its specific instructions, but the

Court included the following in its order:

> **Allowing the TEC to delay its recommendation until April 2022 will only
> delay the medical director's evaluation, referral to a surgeon, and the date
> of the GCS.** At the hearing on November 22, 2021, Dr. Leukefeld testified
> that the TEC recommended GCS for the first time in October 2021.
> (Doc. 175, p. 146). Significantly, Dr. Leukefeld neither knew how long it
> would take for BOP's medical director to refer the transgender inmate to a
> surgeon nor how long the whole process would ultimately take. (*Id.* at
> p. 190). The Court does not fault Dr. Leukefeld for not knowing how long
> the process will take, but the undersigned seeks assurance that Iglesias will
> not fall victim to any further delays.

(Docs. 176, 177) (emphasis added). The order was clear. The Court ordered BOP to not

delay its decision regarding Iglesias's request for GCS. The unambiguous demand was

made for a specific reason. Iglesias is suffering from gender dysphoria, and time is

running out.

Defendants attempt to defend their position by noting that "Iglesias's impending

transfer to an RRC in a state (Florida) distant from her current location (Texas) counsels

against an immediate, unqualified referral for surgery." (Doc. 183, p. 2). "If Plaintiff is

referred to a surgeon to begin consulting about GCS now, that process would be

interrupted once she is transferred to Florida." (*Id.*). The Court did not order a referral for

surgery because ordering Defendants to refer Iglesias for surgery would have violated the PLRA. Defendants must explain.

### C. *BOP Failed to Take Steps to Reasonably and Diligently Comply with the Order*

Although the TEC is required to meet monthly, but typically meets every other week, the TEC waited until the last possible day—January 24, 2022—to meet. The TEC had four weeks to meet as the Court's preliminary injunction order was filed on December 27, 2021. (Docs. 176, 177). Two DOJ attorneys even had a call on December 27, 2021, with BOP's counsel "to discuss the injunction and to ensure that BOP could comply with its terms." (Doc. 214-4, p. 3).

Approximately two weeks after the Court's order, on or around January 10, 2022, the TEC still had not met. Nonetheless, Dr. McLearen was "considering as a potential option recommending to the TEC that Plaintiff be referred to a surgeon for consultation one month after she is placed in a halfway house." (*Id*. at pp. 3-4). Then on January 13, 2022, BOP revised its Transgender Offender Manual—which now includes the condition that surgery is generally considered after one year at a gender affirming facility.[6]

Besides these events, on January 14, 2022—18 days after the Court's order and only 10 days before the final day for the TEC to meet—Defendants filed a motion for partial reconsideration of the Court's preliminary injunction order. BOP had an opportunity to seek clarification of the Court's order at that time, but used that opportunity only to contest the transcription of the TEC meeting. (Doc. 178, p. 3).

---

[6] Dr. Leukefeld confirmed that the final changes to the revised Transgender Offender Manual was in response to this litigation. (Doc. 206, p. 160).

To make matters worse, "[t]he DOJ attorneys recognized that the TEC's January 24 decision—recommending surgery at a future date, assuming certain conditions are satisfied—*did not fit neatly into either of the two types of decisions anticipated by the Court's preliminary injunction order . . .[,]*" but still decided to take a route that delayed their decision until January 31, 2022. (Doc. 214, pp. 12-13) (emphasis added). The other route would have required Defendants to file a notice by January 26, 2022. Indeed, the TEC *recommended* that Iglesias be referred to a surgeon for consultation for GCS at a later date, and the route where TEC *recommends* Iglesias for GCS required BOP to file a notice to the Court within two days of the recommendation. (Docs. 176, 177). Based on the record and Defendants' representations, BOP did not reasonably and diligently comply with the Court's order. Defendants must explain.

### D. *Order to Show Cause Why Civil Contempt Sanctions Should Not Be Imposed*

Based on the above, the Court is considering holding Defendants in contempt for violating the Court's preliminary injunction order. Defendants are ordered to show cause in writing by **April 28, 2022**, why civil contempt sanctions, which can include remedial financial sanctions, should not be imposed due to Defendants' failure to follow the Court's preliminary injunction order. Failure to respond to this Order will result in the undersigned entering an order of contempt sanctions. In the meantime, Iglesias's counsel may submit a fee petition to the Court on or before **May 6, 2022**.

## II.    Modifying the Preliminary Injunction

The Seventh Circuit has acknowledged that "district judge[s] ha[ve] discretion to revise a preliminary remedy if persuaded that change had benefits for the parties and the

public interest." *Commodity Futures Trading Comm'n v. Battoo*, 790 F.3d 748, 751 (7th Cir. 2015). "There is [ ] no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). "The source of the power to modify is of course the fact that an injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Id.* "Firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided." *Id.*

"A court must find prospective relief that fits the remedy to the wrong or injury that has been established." *Salazar v. Buono*, 559 U.S. 700, 718 (2010) (citations omitted). "Because injunctive relief 'is drafted in light of what the court believes will be the future course of events, ... a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'" *Id.* at 714–15 (quoting Wright & Miller § 2961, at 393–394).

The preliminary injunction order was based on the parties' briefing, representations, and testimony at the evidentiary hearing on November 22, 2021. A month after the order, BOP presented *new facts and circumstances* which it believed allowed it to depart from the Court's instructions. One of the new facts was the TEC's ability to directly refer Iglesias to a surgeon for consultation for GCS. Labeling this as a

new fact is the least of Defendants' worries, as it is only a "new fact." Defendants failed to provide evidence at <u>or</u> before the November 22 evidentiary hearing about the differences between the TEC's process for individuals housed at secure BOP facilities and the TEC's process for individuals housed in halfway houses.

Iglesias requests the Court to modify the preliminary injunction requiring the Defendants to do the following:

1. develop a detailed plan to provide Iglesias GCS;

2. provide Iglesias with gender-affirming surgery, including all necessary pre-surgical preparation and post-surgery recovery; and

3. do so prior to the expiration of her sentence on December 22, 2022.

(Doc. 213, p. 2). The Court finds that part of Iglesias's requested modification is in the public interest and will benefit the parities.

**A.** *Likelihood of Success on the Merits*

Back in December 2021, the Court went into great detail about the evidence, and whether Iglesias met her burden of showing a likelihood of success on the merits as to her deliberate indifference claim regarding GCS. (Doc. 176). Almost four months later, BOP has done the following:

1. Had one consultation appointment with the first surgeon who merely "discussed options for breast augmentation and facial feminization with [ ] Iglesias." (Doc. 233);

2. Contacted a second surgeon, but was notified the second surgeon declined to see Iglesias;

3. Contacted a third surgeon, but was notified the third surgeon declined to see Iglesias;

4.   Scheduled a consultation for GCS with a fourth surgeon;

5.   Cancelled the consultation for GCS with the fourth surgeon;

6.   Began evaluating whether it might be feasible to have Iglesias referred to the Chicago-based surgeon identified by Plaintiff's counsel;

7.   Inquired with the Office of Probation and Pretrial Services at the Administrative Office for the United States Courts regarding housing Iglesias in Chicago;

8.   Began evaluating whether the Chicago-based surgeon identified by Plaintiff's counsel would present any procurement or contracting issues;

9.   Considered expanding its search for a surgeon to include the surrounding area in Florida;

10. Secured two letters of referral from mental health professionals recommending Iglesias for surgery;

11. Had one consultation appointment with a dermatologist for permanent hair removal on March 24, 2022;

12. Scheduled a second dermatologist appointment for April 26, 2022; and

13. Scheduled a "tele-consult" on April 11, 2022, with a fifth surgeon.

(Docs. 204; 212; 220; 227; 229; 231; 233).

Defendants are aware of Iglesias's suffering, but since December 2021, Iglesias has had only one appointment with a surgeon who *does not even perform vaginoplasties* and attended one dermatologist appointment, even though Defendants have yet to confirm that the procedures identified by the dermatologist are necessary in furtherance of GCS. (Doc. 233). This factor weighs in favor of modifying the preliminary injunction.

**B.   *Irreparable Harm & Inadequate Remedy at Law***

Iglesias testified back in November 2021 that the lack of proper treatment for

gender dysphoria "causes [her] pain and torture every day." (Doc. 175, p. 45). She suffers from panic attacks. (*Id.*). Iglesias is "very tired of being tormented everyday with this cancer that [she] [has]." (*Id.* at p. 49). Iglesias made it clear that "self-castration or suicide is always there." (*Id.* at p. 45).

After the April 7 appointment, Iglesias "feels humiliated, angry, and scared." (Doc. 234-2). Iglesias "allowed [her]self to be hopeful that [she] was finally going to see a surgeon on April 7 who could help provide [her] gender-affirming surgery." (*Id.*). "Every day that [she] [does] not get the surgery causes [her] harm and psychological distress." (Doc. 234-2, p. 3).[7]

Dr. Ettner also testified back in November 2021 that untreated gender dysphoria will cause Iglesias's psychological condition to deteriorate. (Doc. 175, p. 87). Dr. Ettner continued that "[Iglesias's] thoughts of performing her own surgery, surgical self-treatment, will exacerbate, and whether or not her resilience will erode to the point where she cannot control her impulse to do that, as many people who are incarcerated cannot, she will unfortunately resort to that or to psychological decompensation." (*Id.*).

Additionally, the ongoing deprivation of Iglesias's Fifth and Eighth Amendment rights is an irreparable harm sufficient to warrant preliminary injunctive relief. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly

---

[7] Iglesias's declaration in support of Plaintiff's response to Defendants' April 8, 2022 Status Report is not signed by Iglesias. Rather, Iglesias's counsel "spoke with [ ] Iglesias on April 11, 2022 by telephone." (Doc. 234-2). "During this conversation [ ] Iglesias authorized Plaintiff's counsel to file this declaration on her behalf." (*Id.*). "Plaintiff's counsel will supplement this declaration with a signed copy from [ ] Iglesias once it is returned to them by U.S. Mail from [ ] Iglesias." (*Id.*).

would serve the public interest."); *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r*, 194 F.Supp.3d 818, 835 (S.D. Ind. 2016) (finding that the "presumption of irreparable harm also applies to equal protection violations").

There is an inadequate remedy at law as money will not make Iglesias whole. She is at risk for suicide, and her psychological condition will continue to deteriorate. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017) (suicide and diminished well-being do not have an adequate remedy at law and are irreparable harms); *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (acknowledging that in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy"); *Foster v. Ghosh*, 4 F.Supp.3d 974, 983 (N.D. Ill. 2013) (granting preliminary injunction to prisoner requiring medical attention; no adequate remedy at law exists because "the consequence of inaction at this stage would be further deteriorated vision in both eyes").

### C. *Balance of Harms and Public Interest*

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker*, 858 F.3d at 1054. To do so, the Court considers: (1) "the irreparable harm the movant party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted;" and (2) "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest")." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The court weighs the balance of

potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he [or] [she] is to win, the less the balance of harms must weigh in his [or] [her] favor; the less likely he [or] [she] is to win, the more it must weigh in his [or] [her] favor." *Id.*

Here, the balance of harms weighs heavily in Iglesias's favor. As noted in the Court's December 2021 order, Iglesias suffers daily and is at risk of self-mutilation and suicide. Defendants have not identified any harm they will suffer if the injunction is modified. Instead, Defendants argue that "[t]he Court should not impose rigid requirements or timetables upon the performance of a complicated medical procedure, without allowing for the judgment of a surgeon as to the proper steps to be completed, and their timing, or making allowances for any new developments, or new information, that may impact the medically appropriate course for ensuring that Plaintiff receives proper care." (Doc. 222, p. 13). The problem is the only surgeon to see Iglesias does not even perform vaginoplasties.

The public has the "highest" interest in ensuring that Iglesias's constitutional rights are not violated by Defendants. *See United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."). Also, "[t]he public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *Flynn v. Doyle*, 630 F.Supp.2d 987, 993 (E.D. Wis. 2009). Accordingly, Iglesias has met her burden in moving for a modification of the preliminary injunction.

D. *Injunctive Relief*

The Court "[has] absolutely no interest in running the Bureau of Prisons." (Doc. 206, p. 10); *see also Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985) ("The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial . . ."). Further, the PLRA applies to suits filed by incarcerated individuals and limits the equitable relief a district court can order. 42 U.S.C. § 1997e; 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a)). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

Accordingly, the Court **GRANTS in part** Iglesias's request for modification of preliminary injunctive relief, (Doc. 213), and the Court **ORDERS** Defendants to:

1. Provide the Court a timeline regarding preparation the BOP and NaphCare must do to ensure both it and Iglesias are ready for surgery, timeline for Iglesias's recovery, and any other time sensitive information the Court or parties must consider by **April 28, 2022**.

2. In the timeline, BOP must identify and provide the Court a list of **all surgeons within the United States** who are qualified to perform GCS, are willing to work with BOP and NaphCare, and have sufficient scheduling availability to fit Iglesias into a surgical calendar with enough time for her

to have surgery and recover by December 2022. For each surgeon, BOP shall provide the Court with the following information: who from BOP initiated the contact; to whom BOP contacted; dates BOP contacted the surgeons; the method of contact; whether the surgeons have contacted them back; the surgeon's schedule; what the surgeon requires for hair removal at the surgical area; who the surgeon recommends for hair removal; and/or confirming that the hair removal specialist contracted by BOP/NaphCare is qualified to perform the procedures necessary in furtherance of GCS that the surgeon requires.

3. The Court recognizes that a second appointment with the dermatologist is scheduled for April 26. (Doc. 233, p. 2). However, BOP notes that "[i]n advance of that appointment, BOP intends to confirm with a physician that the procedures identified by the Dermatologist are necessary in furtherance of [GCS]." (*Id*.). Notably, BOP has not identified which physician will be confirming that the procedures are in furtherance of GCS. BOP is ordered to identify which physician will be making this confirmation by **April 28, 2022**.

4. While BOP is identifying and providing the Court a list of all surgeons within the United States who are qualified to perform GCS (see #2), Defendants are further ordered to identify and provide the Court a list of **all** dermatologists or hair removal specialists within the United States who are qualified to perform the procedures necessary in furtherance of GCS by **April 28, 2022** (separate from those dermatologists recommended by the GCS surgeons in #2).

5. Additionally, BOP shall finish evaluating and provide a final determination by filing a notice with the Court as to whether using the Chicago-based surgeon identified by Plaintiff's counsel would present any procurement or contracting Defendant's issues by **April 28, 2002.** The notice should list and identify the specific procurement and contracting issues.

6. File notices with the Court about the earliest BOP can transfer Iglesias to another jurisdiction, like Chicago, for surgery (first notice due by **April 21st and updating the Court in its weekly status reports)**. These notices shall identify the following:

   a. which jurisdictions the Office of Probation and Pretrial Services at the Administrative Office for the United States Courts can move Iglesias to;

   b. the earliest date Iglesias can be moved for each jurisdiction;

      c.   any and all details regarding the process for coordinating Iglesias's possible move for each jurisdiction; and

      d.   details regarding the individual or individuals at the Office of Probation and Pretrial Services at the Administrative Office for the United States Courts Defendants' have been in contact with including: Dates Defendants contacted the individuals; the method of contact; whether the individuals have contacted them back.

7.   File notices regarding the progress of securing a surgeon every **Friday** until a surgeon (qualified and able to perform GCS) is secured and a surgery (for GCS) is scheduled. In each notice, Defendants shall provide the Court with the following information: who Defendants contacted, dates Defendants contacted the surgeons, the method of contact, whether the surgeons have contacted them back, and the surgeon's schedule.

8.   Upon scheduling of GCS, Defendants should file notices with Court confirming GCS is still to proceed as scheduled every **Friday**; these notices shall include the following:

      a.   Determination of the logistics, costs, and payment processes for the surgery by coordinating with the surgeon's office, BOP, NaphCare, and any other necessary parties;

      b.   A plan for post-surgery recovery in the weeks and months after surgery, in consultation with the surgeon's office, including arrangements for dilation; and

      c.   A plan for transport, lodging, food, finances, and other basic necessities for the periods preceding and following the surgery, including personal support to assist with day-to-day activities for the period immediately following surgery.

### E.   *Sanctions*

"[B]efore a court may impose sanctions *sua sponte*, it must give the offending party notice of its intent to do so and the opportunity to be heard." *Johnson v. Cherry*, 422 F.3d 540, 551 (7th Cir. 2005). "Providing such notice and a hearing prevents

misunderstandings between the offending party and the sanctioning judge, provides an orderly manner and calm forum in which each party has had time to prepare adequately, and certainly aids our review on appeal." *United States v. 1948 S. Martin Luther King Dr.*, 270 F.3d 1102, 1116 (7th Cir. 2001). "A general notice that the court is contemplating sanctions is insufficient; rather, the offending party must be on notice of the specific conduct for which she is potentially subject to sanctions." *Johnson*, 422 F.3d at 551–52 (citing *In re Rimsat, Ltd.*, 212 F.3d 1039, 1045 (7th Cir. 2000)).

Both BOP and the DOJ attorneys continue to push this Court to impose sanctions—or at the very least utilize "other weapons in [its] armamentarium." *United States v. Horn*, 29 F.3d 754, 766 (1st Cir. 1994). Besides all the conduct explained in the Court's orders in Doc. 187 and Doc. 198, Defendants and their counsel have repeatedly asserted that Defendants had located an appropriate surgeon since February 14, 2022. The Court is considering imposing sanctions pursuant to Rule 11(c)(1) of the Federal Rules of Procedure and the Court's inherent power to sanction.

### i. BOP

BOP is hereby **ORDERED** to **SHOW CAUSE** in writing on or before **April 28, 2022**, why sanctions should not be imposed. Specifically, BOP shall address the following in writing:

#### Representations that First Surgeon Was an Appropriate Surgeon

In Defendants' most recent status report, Defendants reported the following:

Dr. McLearen clarified that her knowledge was not derived from any sort

of formal analysis of [first] [surgeon's] qualifications, and was instead based on her own informal research. *See id*. at 75:10-12 ("I looked at the basic facts out of my own desire to know, and this person appears to do this work and have credentials."). And Dr. McLearen acknowledged at the hearing that, although she understood that [the] [first] [surgeon] performed gender confirmation surgeries, she did not know "how many past gender-affirming bottom surgeries" [the] [surgeon] had performed.

(Doc. 237, p. 4). The show cause hearing took place February 27, 2022. Yet, on the February 14, 2022, Defendants reported "BOP has notified its contractor of Iglesias's pending transfer, and has been informed that the contractor has located an *appropriate surgeon*." (Doc. 191, p. 8) (emphasis added). Thus, Dr. McLearen neither performed a formal analysis of the first surgeon's qualifications nor knew how many past gender-affirming bottom surgeries the first surgeon performed, but Defendants reported that an *appropriate surgeon* was located. Defendants and Dr. McLearen must explain.

- Was Dr. McLearen relying on the first surgeon's website?

- Was Dr. McLearen relying on BOP's contractor?

- Did the first surgeon misrepresent the ability to perform vaginoplasties before the show cause hearing in any additional way besides the website as discussed in Doc. 237?

- Was the first time Dr. McLearen or Defendants learned on March 3, 2022?

- Why has Dr. McLearen stopped providing declarations? (Notably, after Dr. McLearen made her declaration in Defendants' first status report, Jenna Epplin has been providing declarations to Defendants' status reports)[8]

- Is Dr. McLearen still the one personally involved in seeing GCS though? (Doc. 206, p. 59).

---

[8] Every time a BOP representative makes an inaccurate statement, the BOP representative stops providing declarations or affidavits and a new individual is introduced into this lawsuit.

*Keeping the Appointment with the First Surgeon After Learning the First Surgeon Only Refers Patients Out to Others for Vaginoplasty*

In Defendants' most recent status report, Defendants insist that they have acted in good faith and with candor to the Court by noting that:

> [A] consultation with [first] [surgeon] was an appropriate next step because, among other things, such a consultation would afford [ ] Iglesias an opportunity to discuss gender confirmation surgery with a surgeon who specializes in that general area and who BOP understood could coordinate [ ] Iglesias's care and refer her to other providers for vaginoplasty and/or hair removal.

(Doc. 237, p. 3). "BOP also believed it appropriate to proceed with [first] [surgeon] because, to the best of BOP's knowledge, [ ] Iglesias has never stated that vaginoplasty is the only procedure that she is seeking, and so a consultation with [first] [surgeon] would provide [ ] Iglesias an opportunity to discuss other procedures (such as breast augmentation and facial feminization) and for [first] [surgeon] to accept [ ] Iglesias as a patient for whichever procedures she could perform." (*Id.*).

Again, the 61-page preliminary injunction order was clear: "GCS refers to gender reassignment surgery or surgeries altering one's reproductive organs." (Doc. 176, p. 1). The Court ordered the TEC to meet to evaluate Iglesias's request for GCS. As a result of the Court's order, Defendants represented that TEC recommended that Iglesias be referred to a surgeon for consultation for GCS. Then on February 14, 2022, BOP represented that "the contractor has located an *appropriate surgeon*." (Doc. 191, p. 8) (emphasis added). On February 23, 2022, Defendants' counsel provided the name of the first surgeon and an internet link about the surgeon. (Doc. 201). The link noted that the

surgeon was trained in gender affirmation surgery.[9] The link also noted that the surgeon's mission is to provide genital affirmation procedures for gender-diverse individuals in South Florida. Two days later, in Defendants' first status report, Defendants reported that the surgeon has not yet made a decision about whether the surgeon would accept Iglesias as a patient for surgery, but the surgeon appears to be open to potentially accepting Iglesias as a patient if certain requirements are satisfied (psychological evaluation, letters of support from qualified mental health providers, and an evaluation prior to the surgeon offering to perform any procedures), and indicated that surgery could feasibly be completed by December 2022. (Doc. 204). Indeed, Dr. McLearen made a sworn declaration noting the following:

> The surgeon also asked what exactly the surgeon was being asked to decide. The surgeon indicated that [ ] Iglesias would need to go through a psychological evaluation and get letters of support, and that [the] [surgeon] would need to be evaluated prior to the surgeon offering to perform any procedures. The surgeon noted that the criteria for any gender affirming surgery include good control of medical and psychiatric issues as well as letters of referral from qualified mental health providers (two letters for any type of bottom surgery ). The surgeon further indicated that if [ ] Iglesias only wants bottom surgery, that could feasibly all be accomplished in the given time frame (i.e. by December 2022).

(Doc. 204-1, p. 2).

In Defendants' second status report, Defendants reported that "BOP was advised by BOP's contractor that Surgeon 1 has scheduled an appointment for consultation with Plaintiff for April 7, 2022." (Doc. 212, p. 1). BOP explained it planned on moving forward with the appointment. (*Id*.). BOP also reported that it had provided Iglesias's counsel with

---

[9] The link can be found in Doc. 201, but to protect the identity of the first surgeon the Court will not be providing a formal citation.

the name of surgeon "who has agreed to meet with Plaintiff for a consultation for gender confirmation surgery." (*Id*.). But BOP requested that Iglesias's counsel not reach out to the surgeon until the surgeon has decided whether to accept Iglesias as a patient. (*Id*. at pp. 1-2).

The third status report noted "BOP's contractor has scheduled an appointment with a surgeon for a consultation for gender-confirmation surgery on April 7, 2022." (Doc. 220, p. 1). Defendants' fourth and fifth status reports continue confirming that "BOP's contractor has scheduled an appointment with a surgeon, [first] [surgeon], for a consultation for gender-confirmation surgery on April 7, 2022." (Docs. 227, 229). BOP also reported that it "continues to evaluate whether it might be feasible to have [ ] Iglesias referred to the Chicago-based surgeon identified by Plaintiff's counsel." (Doc. 229). "BOP [ ] inquired with the Office of Probation and Pretrial Services at the Administrative Office for the United States Courts regarding housing [ ] Iglesias in Chicago." (*Id*.). "Additionally, BOP [ ] beg[a]n [ ] evaluat[ing] whether using the Chicago-based surgeon identified by Plaintiff's counsel would present any procurement or contracting Defendant's issues." (*Id*.).

In Defendants' sixth status report, they again confirm that "BOP's contractor has scheduled an appointment with a surgeon (Surgeon 1) for a consultation for gender-confirmation surgery on April 7, 2022." (Doc. 231, p. 1). As for transferring Iglesias to another jurisdiction, like Chicago, for surgery, the Office of Probation and Pretrial Services at the Administrative Office for the United States Courts "explained the process for coordinating the move of an inmate to another jurisdiction and the importance of

stability in a location for the reentry planning process, and requested transfer issues be revisited after the surgical consultation, which is scheduled for April 7, 2022." (*Id*. at p. 2).

Defendants' seventh status report is the first time where Defendants clearly represented that the first surgeon merely "refers patients out to other providers for vaginoplasty." (Doc. 233). But Defendants learned that the surgeon merely refers patients out to other providers for vaginoplasty as early as March 3, 2022. (Doc. 237, pp. 5-6). Defendants point out that they filed in a "public filing" that the first surgeon refers patients out to other providers for vaginoplasty on March 4, 2022. This public filing is an unsworn declaration from Jenna Epplin[10]—where she explains in the last sentence of the sixth paragraph—that BOP was advised that the first surgeon refers patients out for vaginoplasty. The Court has detailed what was represented before March 4, 2022—and after. More importantly, Defendants did not report this information in the second status report or in other status reports until April 8, 2022. Defendants must explain.

Not only did Defendants and Dr. McLearen represent that an *appropriate surgeon* was located, but Defendants continued a process where they knew the first surgeon would only provide Iglesias with breast augmentation and facial feminization in Florida. Recall, the "TEC determined 'given Iglesias's impending transfer to an RRC . . . in Florida, the principles of continuity of care weigh in favor of making the referral after Iglesias is transferred, rather than beginning the process while she is at FMC Carswell, only for it to be interrupted by her transfer to Florida.'" (Doc. 191, p. 10). Defendants have now spent

---

[10] Defendants must confirm Jenna Epplin's involvement before March 4, 2022, and point out where the record Jenna Epplin is mentioned or discussed prior to March 4, 2022.

months on a process while Iglesias has been in Florida—knowing that this surgeon does

not even perform vaginoplasties—but at the same time considering the feasibility to have

"the surgery performed in Chicago . . . ." (Doc. 227, p. 3). Defendants must explain.

    ii.   ***DOJ Attorneys***

The Court and DOJ attorneys have spent a significant amount of time addressing

the following events:

1. The Postponement of the July 28, 2021 Hearing;[11]

2. The Misrepresentation of the Court's Order in Doc. 147;

3. The Postponement of the October 19, 2021 Hearing;

4. The Disingenuous Estimates in Time to Meet the Court's Discovery Orders;

5. The Absence of Any Evidence Presented At or Before the Preliminary Injunction Hearing Regarding TEC's Process for Individuals Housed in Halfway Houses;

6. Defendants' Only Witness Provided Inaccurate Testimony on November 22, 2021; and

7. The Failure to Clarify Dr. Leukefeld's Inaccurate Testimony Until the Court Ordered Defendants to Show Cause.

(Docs. 187, 191, 198, 199, 206, 214). DOJ attorneys first characterized what occurred as a

single instance involving an inadvertent error. (Doc. 191, p. 32). Now for seven weeks,

DOJ attorneys have represented that the BOP has scheduled an appointment with a

surgeon for a consultation for GCS—despite the fact that BOP was "advised that

Surgeon 1 refers patients out to other providers for vaginoplasty and was advised the

---

[11] Defendants were ordered to explain how *J.M. by & through Lewis v. Crittendon*, No. 1:18-CV-568-AT, 2018 WL 7080041, at *1 (N.D. Ga. Apr. 10, 2018) and the additional cases relied upon were applicable. (Doc. 198, p. 23). Counsel shall confirm where this explanation can be found.

contractor would find out who those providers are." (Doc. 212, p. 2).

DOJ attorneys are hereby **ORDERED** to **SHOW CAUSE** in writing on or before **April 28, 2022**, why sanctions should not be imposed. Specifically, the DOJ attorneys shall address their continued representations in Docs. 204, 212, 220, 221, 227, 229, and 231. It was not until the seventh status report that DOJ attorneys clearly represented that the first surgeon merely "refers patients out to other providers for vaginoplasty." (Doc. 233). This scenario looks disturbingly familiar. Previously, the DOJ attorneys noted the following:

> Ultimately, the DOJ attorneys did not realize the scope of confusion in this case—or the serious concerns that the Court had with respect to the series of events recounted above—until the Court issued its Order to Show Cause on February 10, 2022. *See* Doc. 187. At that point, the DOJ attorneys realized that Dr. Leukefeld had previously provided inaccurate testimony at the preliminary injunction hearing regarding BOP's surgery approval processes; that the Court had relied on that inaccurate testimony in crafting the terms of its preliminary injunction; and that the Court had serious concerns about the United States' conduct in this case.

(Doc. 214, p. 15). Until that time, "none of the three attorneys appreciated the potential significance of BOP's different approval processes to Plaintiff's then pending preliminary injunction motion." (*Id*. at p. 8). Like the scenario where Dr. Leukefeld supposedly provided inaccurate testimony at the November 22, 2021 hearing, Dr. McLearen appears to have provided inaccurate testimony. Certainly, the DOJ attorneys can appreciate the difference between referring Iglesias to a surgeon who can perform GCS and a surgeon unable to perform GCS. DOJ attorneys must explain.

## CONCLUSION

For these reasons, the Motion to Modify the Preliminary Injunction filed by

Plaintiff Cristina Nichole Iglesias ("Iglesias") is **GRANTED in part**. (Doc. 213). Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the modified preliminary injunctive relief set forth above in a separate document.

BOP and its attorneys are hereby **ORDERED** to **SHOW CAUSE** in writing on or before **April 28, 2022**, why sanctions should not be imposed and address the items listed above.

Further, **IT IS HEREBY ORDERED** that **Dr. Alix McLearen**, **Jenna Epplin**, **John Robinson**, **Joshua Kolsky**, **Joshua Gardner**, **Gary Feldon**, **Daniel Schwei**, and **Brian M. Boynton** appear before the undersigned Chief District Judge to **SHOW CAUSE** why sanctions should not be imposed. The show cause hearing will be set by separate order. At the hearing, Iglesias's counsel may question **Dr. McLearen and Jenna Epplin** as to the contents of their previous affidavits and inquire as to NaphCare/BOP's surgeons specializing in GCS, whether BOP/NaphCare has contacted surgeons, determined their waitlists, the tasks touched on page three of Doc. 186, additional administrative hurdles by Iglesias being in an RRC in Florida, and other items the Court deems relevant.

Iglesias's counsel may submit a fee petition to the Court on or before **May 6, 2022**.

**IT IS SO ORDERED.**

**DATED:  April 18, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**