## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| CRISTINA NICOLE IGLESIAS (a.k.a., CRISTIAN NOEL IGLESIAS), | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 19-cv-00415-NJR |
| IAN CONNORS, *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' RESPONSE TO THE COURT'S
## MEMORANDUM AND ORDER OF APRIL 18, 2022

Dated:  July 1, 2022

STEVEN D. WEINHOEFT
United States Attorney

LAURA J. JONES
Assistant United States Attorney

BRIAN D. NETTER
Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel

United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C.  20530
Telephone: (202) 514-3358
E-mail:  james.gilligan@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 4

I.    BOP'S RESPONSE TO THE COURT'S PRELIMINARY INJUNCTION ..................... 4

II.   THIS COURT'S FEBRUARY 10, 2022, SHOW CAUSE ORDER AND
DEFENDANTS' RESPONSE ...................................................................................... 6

III.  DEFENDANTS' MARCH 4 STATUS REPORT AND SUBSEQUENT REPORTS .... 13

IV.  MS. IGLESIAS'S APRIL 7, 2022 CONSULTATION WITH SURGEON ONE ........... 15

V.   THIS COURT'S APRIL 18, 2022 SHOW CAUSE ORDER ........................................ 18

VI.  THE PARTIES' SETTLEMENT EFFORTS AND STIPULATED ORDER
RESOLVING MS. IGLESIAS'S CLAIMS ................................................................ 19

VII. BOP'S CONTINUING EFFORTS TO PROVIDE MS. IGLESIAS WITH THE
HEALTH CARE SHE SEEKS ................................................................................... 20

ARGUMENT .................................................................................................................... 23

I.    CIVIL CONTEMPT SANCTIONS AGAINST BOP ARE UNWARRANTED ............. 23

    A.   Legal Standards for Civil Contempt ................................................................. 23

    B.   The TEC Evaluated Ms. Iglesias's Request for GCS and Issued a
Recommendation that Authorized BOP to Refer Her for Surgery ................... 25

    C.   The TEC Did Not Postpone Its Decision ......................................................... 29

    D.   The TEC Acted Diligently to Comply with the December 27 Injunction ......... 31

    E.   Civil Contempt Sanctions Would Be Improper in the Current Posture of
this Case ........................................................................................................... 32

        1.   Coercive contempt sanctions are inappropriate because the
settlement and Stipulated Order have eliminated any conceivable
need to compel compliance with the December 27 injunction. ............. 33

        2.   A compensatory sanction is also unavailable because the parties have
settled, there is no evidence of a need for further compensatory relief,
and such relief would be precluded by sovereign immunity. ................. 35

II.   BOP'S GOOD-FAITH EFFORTS TO OBTAIN GENDER-CONFIRMATION
SURGERY FOR MS. IGLESIAS, AND TO INFORM THE COURT OF ITS
PROGRESS, DO NOT MERIT THE IMPOSITION OF SANCTIONS. ........................ 38

    A.   Legal Standards Applicable to Inherent-Power and Rule 11 Sanctions ............ 39

B.  BOP Reasonably and Truthfully Informed the Court That Its Contractor Had Reported Locating an "Appropriate Surgeon."....................................................41

C.  It Was Not Sanctionable of BOP to Describe the Intended Purpose of the April 7 Appointment With Surgeon One as a GCS Consult, or Keep the Appointment.........................................................................................................48

III.  THE REPRESENTATIONS OF DOJ COUNSEL WERE TRUTHFUL, MADE IN GOOD FAITH, AND ARE NOT SANCTIONABLE. ................................................. 52

IV.  DEFENDANTS WOULD APPRECIATE THE OPPORTUNITY TO ADDRESS ANY REMAINING CONCERNS THE COURT MAY HAVE.................................... 58

CONCLUSION................................................................................................................ 60

## TABLE OF AUTHORITIES

**Cases**

*Autotech Techs. LP v. Integral Research & Dev. Corp.*,
  499 F.3d 737 (7th Cir. 2007),
  *cert. denied*, 552 U.S. 1231 (200) .......................................................................... 24, 25

*Backo v. Local 281, United Bhd. of Carpenters & Joiners of Am.*,
  438 F.2d 176 (2d Cir. 1970),
  *cert. denied*, 404 U.S. 858 (1971) ............................................................................ 35, 37

*Bentz v. Maue*,
  2020 WL 1938883 (S.D. Ill. Apr. 22, 2020) ................................................................42

*Black v. Brown*,
  2019 WL 3325840 (S.D. Ill. Mar. 25, 2019) ...............................................................41

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ................................................................................................ 38, 41

*Coleman v. Espy*,
  986 F.2d 1184 (8th Cir. 1993),
  *cert. denied*, 510 U.S. 913 (1993) ..............................................................................40

*D. Patrick, Inc. v. Ford Motor Co.*,
  8 F.3d 455 (7th Cir. 1993) ...........................................................................................25

*DeParcq v. U.S. Dist. Ct. of S.D. Iowa*,
  235 F.2d 692 (8th Cir. 1956) .......................................................................................35

*Fries v. Helsper*,
  146 F.3d 452 (7th Cir. 1998) .......................................................................................42

*FTC v. Trudeau*,
  579 F.3d 754 (7th Cir. 2009) .................................................................................. 25, 38

*Fuery v. City of Chicago*,
  900 F3d 450 (7th Cir. 2018) ................................................................................... 42, 51

*Goluba v. School Dist. of Ripon*,
  45 F.3d 1035 (7th Cir. 1995) .......................................................................................24

*Gompers v. Buck's Stove & Range Co.*,
  221 U.S. 418 (1911) ................................................................................. 34, 35, 36, 37

*Harris v. Texas & Pac. Ry. Co.*,
  196 F.2d 88 (7th Cir. 1952) .........................................................................................35

*Hartmax Corp. v. Abbound*,
   326 F.3d 862 (7th Cir. 2003) .................................................................................43

*In re North*,
   62 F.3d 1434 (D.C. Cir. 1994) ...............................................................................39

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ..............................................................................................25

*Ismie Mut. Ins. Co. v. U. S.Dep't of Health & Hum. Servs.*,
   2007 WL 9815957 (N.D. Ill. Mar. 22, 2007) .......................................................39

*J.M. by & through Lewis v. Crittendon*,
   NO. 1:18-CV-568-AT, 2018 WL 7080041 (N.D. Ga. Apr. 10, 2018) ................61

*Lane v. Pena*,
   518 U.S. 187 (1996) ..............................................................................................38

*Maynard v. Nygren*,
   332 F.3d 462 (7th Cir. 2003),
   *cert. denied*, 543 U.S. 1049 (2005) ...........................................................41, 42, 51

*Metro. Sanitary Dist. of Greater Chicago v. U.S. Dep't of Navy*,
   722 F. Supp. 1565 (N.D. Ill. 1989) ......................................................................39

*Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*,
   8 F.3d 441 (7th Cir. 1993) ....................................................................................42

*Morisch v. United States*,
   2009 WL 6506656 (S.D. Ill. June 16, 2009) ........................................................42

*Nemsky v. Int'l Union of Operating Eng'rs, Loc. 399*,
   2008 WL 4853626 (S.D. Ill. Nov. 4, 2008),
   *aff'd*, 574 F.3d 859 (7th Cir. 2009) .......................................................................43

*Ogden v. Dyco*,
   2010 WL 11685292 (S.D. Ill. Mar. 22, 2010) .....................................................43

*Ohr ex rel. NLRB v. Latino Exp., Inc.*,
   776 F.3d 469 (7th Cir. 2015) ...........................................................................34, 36

*Peoples Nat'l Bank, N.A. v. Am. Coal Co.*,
   2012 WL 1606014 (S.D. Ill. May 8, 2012) ..........................................................43

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
   826 F.2d 392 (5th Cir. 1987) ...........................................................................35, 36

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus. B.V.*,
   525 U.S. 533 (7th Cir. 2008) ........................................................................*passim*

*Prods. Co., Ltd. v. United States,*
   406 F.3d 1377 (Fed. Cir. 2005) ........................................................................40

*Ramirez v. T&H Lemont, Inc.,*
   845 F.3d 772 (7th Cir. 2016) ..........................................................................42

*Resolution Trust Corp. v. Miramon,*
   935 F. Supp. 838 (E.D. La. 1996) ...................................................................39

*Roadway Express, Inc. v. Piper,*
   447 U.S. 752 (1980) ........................................................................................38

*Ruckelshaus v. Sierra Club,*
   463 U.S. 680 (1983) ........................................................................................38

*S. Suburban Housing Ctr. v. Berry,*
   186 F.3d 851 (7th Cir. 1999) ..........................................................................25

*Schmude v. Sheahan,*
   420 F.3d 645 (7th Cir. 2005) ..........................................................................42

*Secrease v. W.&S. Life Ins. Co.,*
   800 F.3d 397 (7th Cir. 2015) ..........................................................................41

*Shillitani v. United States,*
   384 U.S. 364 (1966) ........................................................................................35

*Teledyne Techs., Inc. v. Shekar,*
   739 F. App'x 347 (7th Cir. 2018) ...................................................................36

*Tranzact Tech., Inc. v. 1Source Worldsite,*
   406 F.3d 851 (7th Cir. 2005) ..........................................................................25

*United States v. Horn,*
   29 F.3d 754 (1st Cir. 1994) .......................................................................38, 39

*United States v. Johnson,*
   327 F.3d 554 (7th Cir. 2003),
   *cert. denied,* 540 U.S. 1111 (2004) .........................................................41, 42

*United States v. Slaughter,*
   900 F.2d 1119 (7th Cir. 1990) .............................................................34, 35, 36

*United States v. Waksberg,*
   881 F. Supp. 36 (D.D.C.1995) ........................................................................39

*White v. Dep't of Justice,*
   2018 WL 488719 (S.D. Ill. Jan. 19, 2018) .....................................................43

*Yancheng Baolong Biochem. Prods. Co., Ltd. v. United States*,
   406 F.3d 1377 (Fed. Cir. 2005)................................................................................40

*Yates v. United States*,
   355 U.S. 66 (1957)...................................................................................................35

*Yonaka v. UPS, Inc.*,
   2006 WL 8455949 (S.D. Ill. Dec. 20, 2006)...........................................................42

**Statutes**

18 U.S.C. § 401 ..................................................................................................................39

**Rules**

Fed. R. Civ. P. 11(b) .........................................................................................................57

Fed. R. Civ. P. 11(b)(1)-(4) ..............................................................................................42

## INTRODUCTION

Defendants respectfully submit this response to the Court's April 18, 2022, Memorandum and Order (Doc. 238) ("Mem. & Order") ordering the Bureau of Prisons ("BOP") and six Department of Justice ("DOJ") attorneys to show cause why BOP should not be held in contempt and why sanctions should not be imposed. Defendants acknowledge the frustration the Court must have felt when it learned that Ms. Iglesias's April 7, 2022, consult with Surgeon One did not include a discussion of or referral for vaginoplasty, the gender-confirming procedure that Ms. Iglesias most desires; and when it became aware, perhaps for the first time, that Surgeon One does not perform vaginoplasties. Defendants and their DOJ attorneys can appreciate the disappointment Ms. Iglesias must have felt as well. Defendants and their counsel, too, were surprised and disappointed at the outcome of the April 7 consult and share the Court's frustration. *See* Declaration of Dr. Alix McLearen (July 1, 2022) ¶ 68 (filed herewith); Declaration of Brian M. Boynton (June 30, 2022) ¶ 11 (filed herewith) Declaration of Alexander K. Haas (June 30, 2022) ¶¶ 3, 10 (filed herewith).

Defendants acknowledge, too, that their failure to more prominently highlight the fact that Surgeon One refers patients to other providers for vaginoplasties gave rise to expectations about the April 7 consult that ultimately were not met and contributed to the frustration that the Court, Ms. Iglesias, and Defendants all felt afterward. Defendants and their counsel deeply regret the confusion and distress their actions have caused, and the doubts their actions have planted about the good faith of Defendants' intentions to provide Ms. Iglesias the health care she requires. *See* McLearen July 1 Decl. ¶¶ 7-9, 38, 48, 86; Boynton June 30 Decl. ¶¶ 8, 11; Haas June 30 Decl. ¶¶ 3, 5, 8, 10, 12.

Defendants are just as deeply gratified that this frustration and disappointment did not keep the parties from coming together to create a new path forward, in the form of the Court's Stipulated Order, that will lead Ms. Iglesias to the treatment she seeks. Under the Stipulated Order, she will receive a vaginoplasty from the Chicago-based surgeon, Surgeon Two, identified by her counsel,

(assuming Surgeon Two accepts Ms. Iglesias as a patient), and breast augmentation and facial feminization—surgeries that she also desires—from Surgeon One. The first of two facial-feminization procedures with Surgeon One has already been scheduled, and the parties are awaiting a date for an in-person consult with Surgeon Two. *See* McLearen July 1 Decl. ¶¶ 10-13. Defendants are encouraged at the progress made in obtaining the care Ms. Iglesias needs.

Under the Court's Memorandum and Order, what remains for the Court to examine now is whether the record supports a finding of contempt or the imposition of sanctions. For the reasons set forth below and in the attached declarations, we respectfully submit that it does not.

The Court's Memorandum and Order first directs BOP to show cause why it should not be held in contempt for violating the Court's December 27, 2021, preliminary injunction (Doc. 177), on the grounds that BOP's Transgender Executive Council ("TEC") did not evaluate Ms. Iglesias's request for gender-confirmation surgery ("GCS") as ordered, but instead delayed making a decision. As we explain below, the TEC evaluated Ms. Iglesias's request and issued a favorable decision consistent with its assigned role under BOP policy, the limits of its authority, and the limits of its expertise. That decision provided the authorization that permitted BOP to refer Ms. Iglesias to Surgeon One, and otherwise to begin arrangements for gender-confirming procedures. Defendants understand now that the Court intended BOP to proceed differently and that Defendants could have better described the process at issue. Defendants regret that they did not provide greater clarity and that the TEC's approach raised significant concerns for the Court. But we respectfully submit that BOP did not intend to violate the Court's preliminary injunction and, in our view, acted in compliance with its terms.

The Memorandum and Order next directs BOP to show cause why it should not be sanctioned under the Court's inherent power, or Federal Rule of Civil Procedure 11(c), for (i) reporting that its medical-services contractor had located what the contractor considered to be an "appropriate surgeon" for Ms. Iglesias (Surgeon One), without first conducting a formal analysis of Surgeon One's capabilities;

(ii) failing to clearly represent in Defendants' status reports that Surgeon One does not perform vaginoplasties, while continuing to state Ms. Iglesias was scheduled to consult with Surgeon One about gender-confirmation surgery; and (iii) keeping Ms. Iglesias's April 7 appointment with Surgeon One despite Defendants' awareness that Surgeon One refers patients seeking vaginoplasties to other providers. As we explain below, BOP informed the Court of its contractor's reported location of an appropriate surgeon in reasonable, good-faith reliance on the contractor's decades-long history of ably providing for the health-care needs of persons in BOP custody, and on additional information about Surgeon One's qualifications posted on the website of the highly reputable medical institution with which Surgeon One is affiliated. Additionally, BOP—even after receiving confirmation on March 3, 2022 (and immediately disclosing) that Surgeon One refers patients out for vaginoplasties—described the April 7 appointment with Surgeon One as a GCS consult, and kept the appointment, in the reasonable, good-faith belief that Surgeon One could consult with Ms. Iglesias about a range of GCS procedures, including vaginoplasty, and help arrange for another surgeon to perform a vaginoplasty for her. In addition, keeping the appointment would not (and did not) interfere with BOP's ongoing searches for other vaginoplastic surgeons to treat Ms. Iglesias.

Finally, the Memorandum and Order directs six Department of Justice attorneys who have worked on this case in different capacities and at different times to show cause why they should not be sanctioned under the Court's inherent power, or Rule 11, for representing in Defendants' status reports that Ms. Iglesias would meet with Surgeon One on April 7 for a GCS consult, when at least some of them also had known since March 3 that Surgeon One refers patients to other providers for vaginoplasties. As explained below, while we very much regret that the matter was not handled differently, none of the DOJ lawyers engaged in misconduct. We respectfully submit that, the DOJ trial attorneys responsible for the filings at issue relied reasonably and in good faith on an expectation (like BOP's) that Surgeon One would consult with Ms. Iglesias about vaginoplasty and help her secure the

services of another surgeon to perform the procedure for her, and an expectation that Surgeon One could perform other GCS procedures that Ms. Iglesias desires, including the facial feminization and breast augmentation procedures which are now moving forward.

For all of these reasons, discussed in greater detail below, Defendants respectfully submit that sanctions against BOP and its DOJ counsel are unwarranted, and the orders to show cause in the Court's Memorandum and Order should be discharged.

<u>BACKGROUND</u>[1]

## I.   BOP'S RESPONSE TO THE COURT'S PRELIMINARY INJUNCTION

The Court's December 27, 2021, preliminary injunction, ECF No. 177, ordered BOP to "have the TEC meet and evaluate [Ms.] Iglesias's request for GCS by **Monday, January 24, 2022**." *Id.* at 1.  The Court also ordered BOP to schedule a court reporter to attend the TEC meeting and provide a transcript.  *Id.*  If the TEC were to recommend Ms. Iglesias for GCS, the Court ordered BOP to "[f]ile a notice to the Court within two days of the recommendation," to "[r]efer [Ms.] Iglesias to the BOP medical director immediately," and, if the medical director found Ms. Iglesias suitable for GCS, to submit a treatment plan to the Court within two days, and file status reports every seven days thereafter.  *Id.* at 1-2.  If the TEC did not recommend Ms. Iglesias for GCS, the Court ordered BOP to "[f]ile a notice with the Court explaining all the reasons for the TEC's decision within seven days" and provide the Court with a transcript of the meeting.  *Id.* at 3.[2]

---

[1]  The discussion herein focuses solely on issues raised by the Court in its Memorandum and Order.  Defendants have previously provided background on the case generally, at ECF Nos. 99 (Resp. to Mot for Preliminary Injunction); 129 (Mot. to Dismiss); 191, 199, and 214 (Responses to Order to Show Cause).

[2]  On January 14, 2022, Defendants filed a partial motion for reconsideration seeking relief from one aspect of the injunction—the requirement that a court reporter be retained and be present to provide a transcript of the meeting.  ECF No. 178.  In their motion, Defendants argued that the requirement to transcribe and disclose internal agency deliberations and decisionmaking violated the deliberative-process privilege, the Prison Litigation Reform Act, and separation-of-powers

The TEC met as directed on January 24, 2022, and considered Ms. Iglesias's request for surgery.  ECF No. 206 at 21:12-21:17; 23:9-23:10; McLearen Jan. 31 Decl. ¶ 5 (ECF No. 183-1). The TEC had previously met and deliberated on Ms. Iglesias's request for GCS in October 2021, at which time Ms. Iglesias had resided in a BOP female facility (Federal Medical Center ("FMC") Carswell) for only six months.  For that and other reasons, the TEC decided that it would reconsider her request in approximately six months' time, after her transfer to the Residential Reentry Center ("RRC") in Miami.  McLearen June 30 Decl. ¶ 20.  However, in January 2022 the TEC's decision was to "recommend that [Ms.] Iglesias be referred to a surgeon for consultation for GCS approximately one month after she is placed in a Residential Reentry Center, . . . assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate for [Ms.] Iglesias."  McLearen Jan. 31 Decl. ¶ 6 (ECF No. 183-1).

The January 2022 decision differed from the decision reached in October 2021 because, whereas the TEC previously decided only to reconsider Ms. Iglesias's request in the future, the January 2022 decision was to approve Ms. Iglesias for referral after her transfer to the RRC, so long as she could remain in a female facility and no other contraindications arose.  McLearen July 1 Decl. ¶ 22.  The TEC's January 2022 decision was based on three factors: (1) complying with BOP's general policy requiring that a transgender individual have "about a year" of social adjustment living in a gender-conforming facility prior to gender confirmation surgery, ECF No. 206 at 25:7-25:11; (2) ensuring "continuity of care" by making it possible for Ms. Iglesias to complete the entire GCS process with a single team of providers near the Miami RRC, rather than beginning the process with one set of providers while still incarcerated at FMC Carswell, and then switching providers mid-

principles.  *Id.*  This Court granted Defendants' motion on January 19, 2022, and modified its preliminary injunction to remove the court reporter requirement.  ECF No. 181.

stream after transferring to the RRC, *id.* at 23:22-24:15; and (3) expediting Ms. Iglesias's receipt of care by avoiding the potentially time-consuming requirement of referring her first for an initial medical evaluation by the BOP medical director before she could consult with a specialist surgeon, a step not required for inmates residing in BOP RRCs.

The TEC believed the action it took in January 2022 complied with the Court's December 27 injunction to evaluate Ms. Iglesias's request for gender-confirmation surgery. *Id.* at 23:4-23:8, 26:4-26:6. The objective of the TEC's decision was to provide the "best care" that BOP could for Ms. Iglesias, and in no way by a desire to delay her receipt of care. *Id.* at 26:18-26:25; 103:22-104:8; 133:24-134:2. Defendants notified the Court of the TEC's January 2022 decision in a Notice of Compliance with Preliminary Injunction filed Court on January 31, 2022. ECF No. 183.

## II.   THIS COURT'S FEBRUARY 10, 2022, SHOW CAUSE ORDER AND DEFENDANTS' RESPONSE

On February 10, 2022, this Court issued a Show Cause Order directing Defendants by February 14, 2022, to explain in writing why sanctions should not be imposed for ignoring the Court's December 27, 2021, injunction, and delaying action on Ms. Iglesias's request for GCS, by not referring her immediately to the medical director. ECF No. 187 at 5.

Defendants filed their initial response to the Court's Show Cause Order on February 14, 2022, ECF No. 191. They explained that BOP complied with the Court's preliminary injunction when the TEC issued its January 2022 decision approving Ms. Iglesias's request, and set forth the reasons why it recommended that she be referred to a surgeon approximately one month following her arrival at the Miami RRC, barring contraindications. *Id.* at 11-12. Defendants also noted that BOP was continuing to work diligently to fulfill Ms. Iglesias's request for GCS, *id.* at 27-28, and advised the Court that

> BOP has notified its [medical-services] contractor of Plaintiff's pending transfer and has been informed that the contractor has located an appropriate surgeon. The surgeon has been contacted and given preliminary patient information, and Dr.

6

McLearen will provide a further update to the Court on any progress made at or before the February 22, hearing.

*Id.* at 28 (citations omitted). These statements were supported by a declaration provided by Dr. Alix McLearen, Acting Assistant Director of BOP with oversight of BOP's Reentry Services Division, in which she stated that "to avoid delay in this case, BOP[] has notified the contractor of Iglesias's pending transfer and has been informed they have located an appropriate surgeon," i.e., Surgeon One. McLearen Feb. 14 Decl. ¶ 20(ECF No. 191-2).

On February 18, 2022, Defendants provided the Court with a supplemental declaration from Dr. McLearen, in which she provided more information about Surgeon One, stating that "BOP has been informed by the contractor that it has located a surgeon to potentially perform [Ms.] Iglesias's . . . GCS (assuming the surgeon agrees to accept [Ms.] Iglesias as a patient)." McLearen Feb. 18 Supp. Decl. ¶ 2 (ECF No. 197-1). Dr. McLearen further noted that (a) the surgeon is a member of the World Professional Association for Transgender Health (WPATH), *id.* ¶ 4; (b) BOP had sent the surgeon the past two years of Ms. Iglesias's medical records and would work with its contractor to provide the surgeon with any further information the surgeon requested, *id.* ¶ 5; and (c) BOP had advised its contractor that the referral to the surgeon should include comprehensive services, including hair removal at the surgical site, *id.* ¶ 6.

When the contractor first identified Surgeon One, Dr. McLearen looked over Surgeon One's qualifications (solely for her own information, not as part of a formal review) on the website of the medical institution where Surgeon One practices, which stated that Surgeon One ███████████ ████████████████████████████████████████████████████████████ ███████ McLearen July 1 Decl. ¶ 57. (Defendants have no reason to believe that Surgeon One, on the webpage or otherwise, has misrepresented their qualifications to perform gender-

confirmation surgery. *Id.* ¶ 81.[3]) During the same time period BOP was also working with its contractor to obtain more information about Surgeon One, the surgeon's availability, and requirements for a consult. *Id.* ¶ 53. In connection with these efforts, BOP's contractor passed along what seemed to BOP to be conflicting information about the GCS procedures that Surgeon One performs. *Id.* ¶ 54. On February 11, in response to a BOP e-mail asking how many "bottom surgeries" Surgeon One had performed, the contractor answered "2-3 month." *Id.* 53 On February 14, the contractor forwarded BOP an e-mail from Surgeon One in which Surgeon One wrote "[w]e do not offer vaginoplasty yet." *Id.*[4]

At this early stage of the contractor's outreach to Surgeon One, Dr. McLearen had concerns about releasing too much information regarding Surgeon One, fearing that doing so could lead to accusations that BOP was sole-sourcing a contract in violation of federal procurement laws. *Id.* ¶ 83. Her concerns were based in her own limited understanding of complex federal procurement rules, and a recent episode in another transgender inmate's case. *Id.* Correspondence had been sent to that inmate's counsel discussing a surgeon with whom a BOP official had spoken directly (not through a contractor) about treating the plaintiff inmate. *Id.* The letter raised alarm within BOP about an appearance of illegally sole-sourcing a contract, with potentially severe legal consequences, and triggered stern admonitions from BOP procurement experts to avoid statements in litigation

---

[3]   On page 24 of its Memorandum and Order the Court lists six questions that it directs "Defendants and Dr. McLearen" to answer. ECF No. 238 at 24. The information above responds to the Court's third question—"[d]id [Surgeon One] misrepresent the ability to perform vaginoplasties before the show cause hearing in any additional way besides the website as discussed in Doc. 237?" *See* McLearen July 1 Decl. ¶ 81.

[4]   On page 24 of the Memorandum and Order the Court's fourth question asks "[w]as the first time Dr. McLearen or Defendants learned [that Surgeon One does not personally perform vaginoplasties] on March 3, 2022?" The February 14 e-mail forwarded by the contractor was the first piece of information specifically indicating that Surgeon One does not perform vaginoplasty. *See* McLearen July 1 Decl. ¶ 53.

that "got out ahead" of the contracting process. *Id.* Anxious, therefore, not to release information about Surgeon One that could result in a violation, or perceived violation, of procurement requirements—but not wishing, either, to conceal uncertainty about the procedures Surgeon One performs—Dr. McLearen informed DOJ counsel (during a discussion in preparation for the February 22, 2022, show-cause hearing) that BOP had received conflicting communications creating uncertainty about the bottom surgeries that Surgeon One performs and refers out. *Id.* ¶ 84.

So far as memory serves, Dr. McLearen did not inform DOJ counsel that BOP had received information specifically indicating that Surgeon One does not perform vaginoplasties. Declaration of Joshua M. Kolsky (June 29, 2022) ¶ 7 (filed herewith); Declaration of John Robinson (June 29, 2022) ¶¶ 10, 13 (filed herewith); Declaration of Daniel Schwei (June 30, 2022) ¶¶ 22-24 (filed herewith). Dr. McLearen did not appreciate at the time the importance that information might hold for the Court, Ms. Iglesias, or DOJ counsel because she did not believe the conflicting information, at that early stage, was a reason not to find out what treatment Surgeon One could offer Ms. Iglesias, and believed the most important objective at the time was to arrange a consultation for Ms. Iglesias with a GCS surgeon who could discuss the range of GCS procedures available, and allow her to make informed decisions about the medically necessary and appropriate procedures she wished to undergo. McLearen July 1 Decl. ¶ 85. Dr. McLearen anticipated that even if Surgeon One did not personally perform vaginoplasties, Surgeon One would be able to refer Ms. Iglesias to another surgeon who could. *See id.* Dr. McLearen now recognizes that she could have more clearly made the information BOP had received available to DOJ counsel and the Court, and now fully understands why the failure to do so would be of concern to the Court. *Id.*

For their part, the DOJ trial attorneys named in the Court's Memorandum and Order who were working on this case at the time have vague recollections that during the week of February 14-18, 2022, "Dr. McLearen suggest[ed] . . . that BOP was working to confirm that the surgeon

9

performs bottom surgery," Robinson June 30 Decl. ¶ 10; that "one or more BOP officials discussed at a high-level their knowledge of Surgeon One's qualifications," Kolsky June 30 Decl. ¶ 5; that BOP conveyed "some uncertainty regarding the exact procedures Surgeon 1 would personally perform" due to the limited amount of information it had received about Surgeon One from its contractor, Schwei June 30 Decl. ¶ 24, and that they received a written comment from agency counsel along the same lines, Kolsky June 30 Decl. ¶ 6; J. Robinson June 30 Decl. ¶ 10; Schwei June 30 Decl. ¶ 24. At no point prior to March 3 do these attorneys recall receiving information specifically indicating that Surgeon One does not perform vaginoplasties. Kolsky June 30 Decl. ¶ 5; Robinson June 30 Decl. ¶¶ 12-13; Schwei June 30 Decl. ¶ 22.

Pursuant to the February 10 Show Cause Order, the Court held a hearing on February 22, 2022. During this hearing, Ms. Iglesias's counsel, referring to Dr. McLearen's February 14 declaration, asked Dr. McLearen "[w]hat constitutes an appropriate surgeon for gender-affirming surgery?" Dr. McLearen responded, "[i]n that context I was speaking to we have asked for somebody that does certain things and *the contractor has identified somebody appropriate to that*." ECF No. 206 at 74:20-75:1 (emphasis added). In response to the question whether she was asserting that Surgeon One was "appropriately qualified to be performing the surgery," Dr. McLearen responded "I am representing that *the contractor has identified somebody that they said is appropriate to perform the surgery*." *Id.* 75:2-75:5 (emphasis added). Dr. McLearen then added that "I have not done some kind of analysis. I looked at the basic facts out of my own desire to know, and this person appears to do [GCS] and have credentials." *Id.* 75:10-75:12. *See also* McLearen July 1 Decl. ¶¶ 79-80.[5] The Court

---

[5] The information in this paragraph is responsive to the first and second questions on page 24 of the Court's Memorandum and Order, which ask "[w]as Dr. McLearen relying on the first surgeon's website" and "on BOP's contractor" as the bases for stating in her February 14 declaration that BOP "has been informed that the contractor has located an appropriate surgeon." Dr. McLearen also addresses these questions in her declaration filed herewith. McLearen July 1 Decl. ¶¶ 79-80.

took the matter under advisement, and ordered Defendants to provide weekly status reports on their efforts to arrange for Ms. Iglesias's surgery. *Id.* 178:13-178:24.

BOP had confidence in the contractor's judgment that it had located an appropriate surgeon for Ms. Iglesias, and so informed the Court of this progress, for several reasons. The contractor has six years' experience and expertise in locating appropriate medical providers for individuals in BOP RRCs, and 22 years' experience acquiring contract medical services (when needed) at secure BOP facilities, and has built a reputation within BOP for reliability and competence. McLearen July 1 Decl. ¶ 55. Surgeon One also has impressive professional credentials and qualifications, as indicated on Surgeon One's webpage, and practices at a large, well resourced, and highly regarded medical institution that BOP believed could provide access to a network of affiliated surgeons and an array of medical services. *Id.* ¶¶ 56-57. Furthermore, notwithstanding the conflicting information BOP had received about the procedures that Surgeon One performs, BOP viewed a consultation with a knowledgeable GCS surgeon as an "essential first step" for Ms. Iglesias that would allow a surgeon to evaluate her needs, explain the various GCS options available to her, and allow her for the first time to make informed decisions about the procedures she wished to undergo. *Id.* ¶¶ 58-60. Surgeon One was at the very least an appropriate choice with whom to begin this process, because even if Surgeon One did not personally perform all the procedures Ms. Iglesias desired, given Surgeon One's affiliation BOP expected that Surgeon One could enlist the aid of other GCS specialists who do. *Id.* ¶ 60. BOP also believed that a direct exchange of information between Ms. Iglesias and Surgeon One would be the most effective way to resolve the conflicting information BOP had received about the procedures Surgeon One could and could not perform. *Id.* ¶ 61.

On February 25, 2022, Defendants filed the first of their weekly status reports, as ordered by the Court at the February 22, 2022 Show Cause Hearing. ECF No. 204. That status report was supported by a declaration from Dr. McLearen describing recent developments in BOP's and its

contractor's efforts to locate a surgeon for Ms. Iglesias.  ECF No. 204-1.  Dr. McLearen noted that

while BOP and its contractor were trying to arrange a consultation with Surgeon One as early as

possible, and that BOP had also request that its contractor to continue searching for other surgeons

who may be able to perform Ms. Iglesias's GCS.  McLearen Feb. 25 Decl. ¶ 7 (ECF No. 204-1).

## III. DEFENDANTS' MARCH 4 STATUS REPORT AND SUBSEQUENT REPORTS

Defendants' next status report was due to the Court on March 4, 2022.  Before filing that

report, BOP determined that Jenna Epplin, National Policy and Program Coordinator (Transgender

Inmates) for the Women and Special Populations Branch, would now provide declarations in

support of these status reports.  Declaration of Jenna Epplin (June 29, 2022) ¶¶ 1, 5 (filed herewith);

McLearen July 1 Decl. ¶ 89.[6]  In preparing her March 4 declaration, Ms. Epplin reviewed a number

of filings from this litigation, and contacted a number of BOP personnel to gather information on

the latest developments in Ms. Iglesias's case.  Epplin June 29 Decl. ¶¶ 6, 7.  Among other things

reported in her March 4, 2022 declaration, Ms. Epplin learned in the course of this information-

---

[6]  The fifth question on page 24 of the Court's Memorandum and Order asks "[w]hy has Dr. McLearen stopped providing declarations? (Notably, after Dr. McLearen made her declaration in Defendants' first status report, Jenna Epplin has been providing declarations to Defendants' status reports)" ECF No. 238 at 24.  Dr. McLearen had previously provided a number of declarations at decisive points in the litigation, but asked Ms. Epplin to take on responsibility for BOP's weekly status report declarations because: (a) Dr. McLearen was concerned that preparing the weekly declarations, which did not depend on her personal knowledge, would detract from her ability to meet her numerous time-consuming responsibilities as Acting Assistant BOP Director in charge of the Reentry Services Division, McLearen July 1 Decl. ¶¶ 91-92; and (b) Ms. Epplin was a logical choice, given that her duties as National Policy Coordinator for Transgender Inmates involves extensive gathering and coordination of information regarding transgender inmates, Epplin June 29 Decl. ¶¶ 1, 5; McLearen July 1 Decl. ¶ 92.  The decision that Ms. Epplin would submit declarations for the weekly status reports was in no way motivated by concern over the truth or accuracy of any declaration or testimony previously provided by Dr. McLearen.  McLearen July 1 Decl. ¶¶ 87-90.  Ms. Epplin previously was not involved in the day-to-day decisions regarding Ms. Iglesias's medical care, though she was generally familiar with Ms. Iglesias's case from her role on the TEC.  Epplin June 29 Decl. ¶ 3.  For reasons that Dr. McLearen explains, BOP's declarations in support of the parties' joint status reports, required under paragraph 9 of the Court's Stipulated Order (Doc. 267), will be submitted by Gregg Fearday.  McLearen July 1 Decl. ¶ 90.

gathering: (1) on March 1, that BOP's contractor had made an appointment for Ms. Iglesias to consult with Surgeon One on April 7, 2022, *id.*; and (2) on March 3, that BOP's contractor had confirmed that "Surgeon 1 refers patients out to other providers for vaginoplasty and that the contractor would find out who those providers are," *id.* This information was provided to DOJ counsel, and ultimately included in the final declaration Ms. Epplin filed with the Court on the following day. *See* Epplin Mar. 4 Decl. (Mar. 4, 2022) ¶¶ 5, 6 (ECF No. 212-1).

The preparation and filing of Ms. Epplin's March 4 declaration was also the first occasion on which any of the DOJ trial attorneys working on the case recalls receiving specific information from BOP indicating that Surgeon One does not personally perform vaginoplasty. *See* Kolsky June 29 Decl. ¶¶ 4-5; Robinson June 29 Decl. ¶¶ 12-13; Schwei June 30 Decl. ¶¶ 31-32. Thus within one day of receiving confirmation that Surgeon One does not perform vaginoplasties, and instead refers patients seeking that procedure to other providers, BOP had disclosed it to counsel, and Defendants had disclosed it to Plaintiff and the Court in the form of Ms. Epplin's declaration.

Plaintiff's counsel directly referred to the information that Surgeon One refers patients out for vaginoplasty in a response to Defendants' March 4 status report, filed on March 9. After quoting from Ms. Epplin's declaration, counsel advised that

> Ms. Iglesias seeks clarification whether Surgeon 1 – the surgeon with whom Ms. Iglesias has a consultation scheduled for April 7, 2022 – is capable of performing vaginoplasty and would perform the procedure for Ms. Iglesias if contracted as the surgeon, or whether this is a typographical error meant to refer to a different procedure.

ECF No. 219 at 4. During this early-March time period, counsel for the parties also exchanged a number of e-mail communications regarding the many logistical issues involved in arranging for Ms. Iglesias's medical care. Robinson June 29 Decl. ¶ 23. In one such communication, Ms. Iglesias's counsel requested much of the same information regarding Surgeon One referenced in her March 9 filing. *See* ECF No. 234-3, Ex. A, at 2. On March 14, Defendants' counsel recommended that Ms.

Iglesias obtain the information sought directly from Surgeon One during the initial consultation, *see id.* at 1, in response to which Ms. Iglesias's counsel asked either that Defendants' counsel provide the information requested, or that they "withdraw your prohibition" on their contacting Surgeon One directly, ECF No. 234-3, Ex. B, at 2. Defendants' counsel responded on March 16 that although they had previously requested that Ms. Iglesias's counsel voluntarily refrain from contacting Surgeon One, "we are not prohibiting you from doing so." *Id.* at 1; Robinson June 29 Decl. ¶ 23; Schwei June 30 Decl. ¶ 41-42. DOJ counsel believed this exchange, which clarified that Ms. Iglesias's counsel were free to contact Surgeon One, had essentially resolved the various requests for information Ms. Iglesias's counsel raised in the March 9 response, and contemporaneous e-mail requests to Defendants' counsel. *See* Schwei June 30 Decl. ¶ 43.

Following the March 4 status report, Defendants filed four more regular weekly status reports (and one sealed supplement) between March 11 and April 1. None of these reports restated the fact that Surgeon One referred patients to other providers for vaginoplasty, because Defendants had already disclosed that information, and the focus of the weekly status reports was on providing new information and updates on BOP's efforts to obtain GCS for Ms. Iglesias. Epplin June 29 Decl. ¶ 10; Kolsky June 29 Decl. ¶ 9; Robinson June 30 Decl. ¶ 22. Each of those status reports characterized Ms. Iglesias's forthcoming appointment with Surgeon One in identical terms, as "a consultation for gender-confirmation surgery on April 7, 2022." ECF No. 220 at 1; ECF No. 227 at 1; ECF No. 229 at 1; ECF No. 231 at 1.

Even knowing by then that Surgeon One does not personally perform vaginoplasties, both BOP and DOJ trial counsel believed it was fair to characterize the subject of the anticipated April 7 consultation as "gender-confirmation surgery." Both BOP and DOJ understood that the term "gender-confirmation surgery" as used and defined in the relevant literature such as the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People,

14

Version 7 at 57 (2012) ("WPATH Standards of Care"), includes a variety of different surgical procedures, including top, bottom, and facial surgeries.  McLearen July 1 Decl. ¶ 68-69; Kolsky June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶ 21.  Defendants, and counsel for Defendants, believed that because Surgeon One could perform at least some of these surgical procedures, including breast augmentation, and facial feminization, in which Ms. Iglesias had expressed interest, it was therefore appropriate to characterize the consultation as on regarding "gender-confirmation surgery." McLearen July 1 Decl. ¶ 71; Kolsky June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶¶ 16, 21.  (Indeed, Surgeon One's notes of the consultation ███████████████████████████████████████ ███████████████ ECF No. 249-1, and, validating Defendants' expectations, Surgeon One accepted Ms. Iglesias as a patient for breast augmentation and facial feminization, and the first of two facial-feminization surgeries is currently scheduled for August 23, 2022.  McLearen July 1 Decl. ¶ 11.)

In addition, both BOP and DOJ trial counsel also believed that even if Surgeon One would not personally perform Ms. Iglesias's requested vaginoplasty, Surgeon One could discuss the procedure with Ms. Iglesias and coordinate her care with another provider who could perform it. Epplin June 29 Decl. ¶ 13; McLearen July 1 Decl. ¶¶ 68, 71; Schwei June 30 Decl. ¶ 36.  Therefore, even understanding Ms. Iglesias's desire for a vaginoplasty, Defendants and their DOJ trial counsel still believed it was fair to describe the upcoming April 7 appointment as a consultation "for gender-confirmation surgery," given their belief that vaginoplasty would be discussed and that the consultation could lead to a direct referral to another provider who could personally perform the procedure.

## IV.  MS. IGLESIAS'S APRIL 7, 2022 CONSULTATION WITH SURGEON ONE

Ms. Iglesias attended her consultation with Surgeon One on April 7, 2022, as scheduled. ECF No. 233 at 1.  BOP believed that this consultation would be an important step in providing Ms. Iglesias with the medical care she had requested, for several reasons.  Even though Surgeon One

15

does not perform vaginoplasty, Surgeon One is a GCS expert, and BOP therefore believed Surgeon One could knowledgeably provide Ms. Iglesias with information regarding the full range of gender-confirming surgical procedures.  Epplin June 29 Decl. ¶ 13; McLearen July 1 Decl. ¶ 74. Furthermore, BOP believed that because that Surgeon One is associated with a large health-care institution, even though Surgeon One does not personally perform vaginoplasty, Surgeon One could help arrange for Ms. Iglesias to receive a vaginoplasty from another surgeon who performs that procedure.  Epplin June 29 Decl. ¶ 13; McLearen July 1 Decl. ¶ 71.  Notwithstanding these expectations, BOP instructed its contractor to continue to search for other surgeons near the Miami RRC who could provide Ms. Iglesias a vaginoplasty.  McLearen July 1 Decl. ¶ 73.  The April 7 consult did not interfere with BOP's continued search efforts.

Even knowing that Surgeon One does not perform vaginoplasties, DOJ counsel agreed that it made sense to keep Ms. Iglesias's April 7 appointment with Surgeon One, (i) because meeting with Surgeon One presented an opportunity for Ms. Iglesias to discuss gender-confirmation surgery with an expert who could advise her on the specific procedures available to her, and answer her questions about them, Kolsky June 29 Decl. ¶ 11, Robinson June 29 Decl. ¶ 15, Schwei June 30 Decl. ¶ 34.c, (ii) because they anticipated that Surgeon One could provide a direct referral for Ms. Iglesias to a surgeon who does perform vaginoplasties, Kolsky June 29 Decl. ¶ 11; Robinson June 29 Decl. ¶¶ 14-15; Schwei June 30 Decl. ¶¶ 34.a, 34.b, 34.f., and (iii) because DOJ counsel also understood that BOP's efforts to locate a local surgeon who performs vaginoplasties was continuing regardless of the appointment with Surgeon One.  Kolsky June 29 Decl. ¶ 11; Robinson June 29 Decl. ¶ 17.

The day following the consult, April 8, 2022, BOP received (via its contractor) a message from Surgeon One indicating that Surgeon One and Ms. Iglesias had discussed options for breast augmentation and facial feminization during the consultation.  *Id.*  According to Surgeon One's record of the visit, ███████████████████████████████████████████████████



ECF No. 249-1 at 1.

*Id.* at 3.

*Id.* at 4.

According to a declaration Ms. Iglesias filed on April 8, Iglesias Apr. 11 Decl. ¶ 4 (ECF No. 234-2), and , *id.* ¶ 5.  Following the consultation, Surgeon One provided BOP's contractor a list of four area surgeons who perform vaginoplasty, and BOP instructed its contractor to contact three of the four doctors (the fourth had already been contacted and declined to accept Ms. Iglesias as a patient).  ECF No. 233 at 1-2.

"BOP was surprised and disappointed . . . to hear that Surgeon One did not consult with [Ms. Iglesias] about vaginoplasty on April 7 . . .  [BOP was] also disappointed that Surgeon One did not offer to contact other surgeons to arrange vaginoplasty for Ms. Iglesias, but instead simply provided a list of other GCS surgeons" who perform the procedure.  McLearen July 1 Decl. ¶ 68. DOJ counsel shared this reaction of surprise and concern that the consultation did not include a substantive discussion of the vaginoplasty procedure.[7]  *See* Schwei June 30 Decl. ¶ 7

---

[7]  April 8, 2022 was the first time that Brian Boynton, Principal Deputy Assistant Attorney General for the Civil Division, one of the six DOJ attorneys named in the Court's April 18 Memorandum and Order, became aware that Surgeon One does not perform vaginoplasties. Boynton June 30 Decl. ¶ 9.

### V.  THIS COURT'S APRIL 18, 2022 SHOW CAUSE ORDER

On April 18, 2022, this Court issued its Memorandum and Order directing BOP and six named DOJ attorneys who worked at various times and in various capacities on this case to show cause why sanctions should not be imposed on them.  ECF No. 238.  First, BOP is directed to show cause why it should not be held in contempt for violating the Court's December 27, 2021, preliminary injunction, on the grounds: (1) that the TEC "failed to evaluate [Ms.] Iglesias's request for GCS on January 24, 2022[,]" *id.* at 9-10; (2) that the TEC improperly delayed rather than make a decision regarding Ms. Iglesias's request for GCS, *id.* at 10-11; and (3) that the TEC did not make reasonable and diligent efforts to comply with the Court's injunction, *id.* at 12-13.

Second, BOP is directed to show cause why it should be sanctioned under the Court's inherent power, and Federal Rule of Civil Procedure 11, for:  (1) representations that BOP's contractor had identified what it considered to be an "appropriate surgeon" to perform GCS for Ms. Iglesias, even though BOP did not itself conduct a "formal analysis" of Surgeon One's qualifications, *id.* at 23-24; (2) failing to "clearly represent[ ]" in its status reports that Surgeon One does not personally perform vaginoplasties, while continuing to state in those reports that Ms. Iglesias was scheduled to consult with Surgeon One about gender-confirmation surgery, *id.* at 25-28; and (3) keeping Ms. Iglesias's April 7 appointment with Surgeon One even after Defendants were aware that Surgeon One does not personally perform vaginoplasties, *id.* at 25-29.

Finally, the six named DOJ attorneys are directed to show cause why they should not be sanctioned under the Court's inherent power, and Rule 11, for the representations in Defendants' status reports that the purpose of Ms. Iglesias's April 7 consultation with Surgeon One would be to discuss gender-confirmation surgery, even though it was known that Surgeon One does not perform vaginoplasties, *id.* at 29-30.

## VI.  THE PARTIES' SETTLEMENT EFFORTS AND STIPULATED ORDER RESOLVING MS. IGLESIAS'S CLAIMS

On May 27, 2022, the Parties filed a joint motion reporting to the Court that the Parties had reached an agreement to resolve Ms. Iglesias's claims, and submitting a proposed Stipulated Order governing the steps the parties will take next to arrange for Ms. Iglesias's GCS.  ECF No. 267.  On May 31, 2022, the Court granted the Parties' joint motion, and entered the Stipulated Order.  ECF No. 269.   Stipulated Order provides, among other things, that:

1. Defendants will continue to schedule regular appointments for Ms. Iglesias for laser hair removal;

2. Defendants will schedule appointments for Ms. Iglesias with Surgeon One for facial feminization and breast augmentation;

3. Defendants will schedule an appointment for Ms. Iglesias for vaginoplasty with the Chicago-based surgeon identified by Ms. Iglesias's counsel;

4. Defendants will pay for the costs of the surgical procedures identified above, including pre-surgical care and post-surgical care and recovery, and any related necessary medical care, if such surgeries or care occur while Ms. Iglesias is still in BOP custody;

5. If any of the surgical procedures identified above, including pre-surgical care, post-surgical care and recovery, and any related necessary medical care, cannot be completed prior to Ms. Iglesias's release from BOP custody, then BOP will deposit funds into an escrow or trust account to cover costs of such care;

6. BOP will also deposit into an escrow account an amount to cover any unexpected medical or associated out-of-pocket costs;

7. BOP will pay Plaintiffs' counsel an agreed-upon amount in attorneys' fees and costs;

8. The Parties will file regular status reports with the Court on significant developments on the surgeries;

9. The case will be stayed until January 3, 2023;

10. Within fourteen days after BOP makes the required payment(s), Ms. Iglesias will file a stipulation of dismissal with prejudice.

ECF No. 267-1.

## VII.   BOP'S CONTINUING EFFORTS TO PROVIDE MS. IGLESIAS WITH THE HEALTH CARE SHE SEEKS

Since the Court entered the Stipulated Order, Defendants have continued to work diligently to provide Ms. Iglesias with the gender-confirmation procedures she is seeking, and have made significant progress in doing so. Ms. Iglesias continues to make progress toward obtaining facial feminization and breast augmentation surgery with Surgeon One. On May 31, 2022, Ms. Iglesias underwent a required CT scan in preparation for facial surgery. Fearday June 10 Decl. ¶ 5 (ECF No. 274-1). Ms. Iglesias had a telehealth appointment with Surgeon One on June 16, 2022, and Surgeon One has now scheduled the first surgical procedure for August 23, 2022. McLearen July 1 Decl. ¶ 11. BOP has also asked its contractor to move ahead with scheduling the second surgery with Surgeon One. Fearday June 10 Decl. ¶ 5 (ECF No. 274-1).

BOP has also continued to work to schedule a vaginoplasty procedure with the Chicago-based surgeon identified by Plaintiff's counsel ("Surgeon Two"). Ms. Iglesias had a telehealth consultation with Surgeon Two on May 5, 2022. ECF No. 256-1 at 1. On May 26, 2022, Surgeon Two's staff informed BOP that additional administrative tasks need to be completed before Surgeon Two could have an in-person consultation with Ms. Iglesias. McLearen July 1 Decl. ¶ 12. BOP has also continued to work to provide Ms. Iglesias with both facial hair removal and surgical-site hair removal in anticipation of vaginoplasty. *Id.* ¶ 13. Ms. Iglesias had a second dermatology appointment for laser hair removal at the surgical site and for facial hair removal on June 6, 2022, and her next appointment is currently scheduled for July 11, 2022. Fearday June 10 Decl. ¶ 7 (ECF No. 274-1).

Even though it is unusual for someone holding such a senior management position as Dr. McLearen now occupies to be integrally involved in managing the care of a single inmate, ECF No. 206 at 59:5-59:12; nevertheless, because Ms. Iglesias is "likely the first individual to receive gender-confirming surgery under BOP's care," she "is a special case," and Dr. McLearen will still maintain

personal oversight of Ms. Iglesias's case to ensure that she receives appropriate care under the terms of the Stipulated Order,[8] McLearen July 1 Decl. ¶ 91.

Throughout this time, Defendants have been operating in good faith with Ms. Iglesias, her counsel, and the Court, and no one involved with this case from either BOP or DOJ ever sought to mislead the Court, Ms. Iglesias, or her counsel about BOP's efforts to provide for her health-care needs. *See Id.* ¶ 77 ("The objective of of all of BOP's efforts was to obtain all medically necessary treatment for Ms. Iglesias, including vaginoplasty, and BOP did not seek at any time to mislead the Court about its intentions, or its efforts."); Robinson June 29 Decl. ¶ 26 ("I do not believe that I or any of my colleagues in this matter have engaged in misconduct, attempted to mislead the Court, or taken any action to inappropriately delay Ms. Iglesias' receipt of health care she requires."); Kolsky June 29 Decl. ¶ 13 ("I believe that everyone at DOJ involved in this case has acted in good faith and endeavored to represent our client's legitimate interests within the bounds of our ethical and professional responsibility obligations."); Schwei June 30 Decl. ¶ 4 ("I believe I have acted ethically, professionally, and reasonably at all times in this case – and I believe the same of my DOJ colleagues.") Haas June 30 Decl. ¶ 6 ("I do not believe that any of these DOJ attorneys sought to intentionally withhold or conceal information for the purpose of deceiving the Court, Plaintiff, or her counsel."); Boynton June 30 Decl. ¶ 8 ("I do not believe anyone on the team intended to mislead the Court or Ms. Iglesias…").

Nevertheless, BOP and DOJ personnel who have been involved with this case deeply regret the miscommunications that have led this Court to question their candor. *See* McLearen July 1 Decl. ¶ 9 ("I have spent my career working to ensure access to quality services for all inmates in BOP

---

[8]   The information above responds to the Court's sixth question in the Memorandum and Order—"[i]s Dr. McLearen still the one personally involved in seeing GCS through?" ECF No. 238 at 24. *See* McLearen July 1 Decl. ¶ 91.

custody and regret any statements or actions by BOP that may have led the Court, or Ms. Iglesias, to feel that they have been misled, and regret the frustration caused as a result."); Epplin June 29 Decl. ¶ 14 ("I am sorry that the Court has expressed concern with BOP's representations in this case but can assure the Court that I did not intend to withhold any information from the Court or Ms. Iglesias."); Kolsky June 29 Decl. ¶ 13 ("I regret that statements made and actions taken on BOP's behalf in this matter have caused the Court to question Defendants' candor, the candor of Defendants' counsel, or BOP's intentions to provide Ms. Iglesias with the medical care she requires."); Robinson June 29 Decl. ¶ 26 ("While I am glad that we have been able to reach a resolution with Ms. Iglesias that guarantees her the care she needs, I am very sorry that we continued to cause the Court concern notwithstanding our best efforts to represent the Government's interests ethically and professionally in this difficult and important matter."); Schwei June 30 Decl. ¶ 4 ("I acknowledge that there have been mistakes and miscommunications during the case. I do not believe that any of those mistakes or miscommunications were intentional or deliberate. Nonetheless, I wish to apologize for any negative impact that those mistakes and miscommunications have had on the Court and on Ms. Iglesias."); Haas June 30 Decl. ¶ 5 ("On behalf of the Federal Programs Branch, I want to personally apologize to the Court, Plaintiff, and her counsel for any confusion or distress caused by Defendants' representations in this case."); Boynton June 30 Decl. ¶ 8 ("On behalf of the Department of Justice, I apologize to the Court and to Ms. Iglesias and her counsel for any confusion caused by Defendants' failure to more clearly and prominently highlight and explain what Defendants learned regarding the procedures Surgeon 1 personally performed and those that Surgeon 1 referred to others as part of a patient's treatment plan.").

　　While Defendants acknowledge the difficulties, delays, and frustrations that have seemed, at times, to beset the parties' efforts to provide Ms. Iglesias the care she needs, for the reasons

discussed below we respectfully submit that the conduct of Defendants and their counsel, described herein, does not warrant the imposition of sanctions.

## ARGUMENT

### I.   CIVIL CONTEMPT SANCTIONS AGAINST BOP ARE UNWARRANTED.

The Court's Memorandum and Order cites three potential reasons for concluding that BOP did not comply with the December 27 injunction: (i) that the TEC "failed to evaluate [Ms.] Iglesias's request for GCS on January 24, 2022[,]" Mem. & Order at 9, ECF No. 238; (ii) that on January 24 the TEC improperly delayed rather than make a decision regarding Ms. Iglesias's request for GCS, *id.* at 10-11; and (iii) that the TEC did not make reasonable and diligent efforts to timely comply with the Court's injunction, *id.* at 12-13.

Defendants regret that the Court has these concerns and that there appears to have been some misunderstanding about what was intended.  As explained below, however, Defendants respectfully submit that BOP complied with the December 27, 2021 injunction, because the TEC (i) evaluated Ms. Iglesias's request for gender-confirming surgery in light of the circumstances presented in January 2022, and the limits of its authority and expertise; (ii) without further delay, issued a favorable decision that authorized the preparations now underway for Ms. Iglesias's surgery, without further action required of the TEC; and (iii)  issued its decision and notified the Court within the deadlines set by the Court's injunction, as soon as it was practical under the circumstances to do so.  And even if BOP did not comply with the December 27 injunction, principles of abatement of civil contempt, the lack of provable losses due to BOP's actions, and principles of sovereign immunity, preclude coercive or compensatory contempt sanctions.

### A.  Legal Standards for Civil Contempt

A finding of civil contempt may be sustained against a party only if the following elements are established by clear and convincing evidence: (1) the order in question "sets forth an

unambiguous command;" (2) the party violated that command; (3) the "violation was significant, meaning it did not substantially comply with the Order;" and (4) the party "failed to take steps to reasonabl[y] and diligently comply with the Order." *Prima Tek II, L.L.C. v. Klerk's Plastic Indus. B.V.*, 525 F.3d 533, 542 (7th Cir. 2008) (citing *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995)); *see also Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 751 (7th Cir. 2007), *cert. denied* 552 U.S. 1231 (2008) ("In order to prevail on a contempt petition, the complaining party must demonstrate by clear and convincing evidence that the respondent has violated the express and unequivocal command of a *court order*." (quoting *D. Patrick, Inc. v. Ford Motor Co.*, 8 F. 3d 455, 460 (7th Cir. 1993)).

Civil contempt sanctions "must relate to one of [] two purposes:" "compelling compliance with a court order" or "compensating the complainant for losses caused by contemptuous actions." *Autotech*, 499 F.3d at 752 (quoting *Tranzact Tech., Inc. v. 1Source Worldsite*, 406 F.3d 851, 856 (7th Cir. 2005)). Evidence in the record must support contempt sanctions directed to either purpose. *Id.*

As to the first purpose—coercing compliance—"the court must consider the 'character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Id.* (quoting *S. Suburban Housing Ctr. v. Berry*, 186 F.3d 851, 854 (7th Cir. 1999)). Moreover, coercive sanctions may stand only if the "'contemnor is afforded an opportunity to purge,'" that is, to "avoid the penalty, or some part of it, by complying with the order." *FTC v. Trudeau*, 579 F.3d 754, 770 (7th Cir. 2009) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994)).

Compensatory sanctions for civil contempt must be supported by evidence of the "provable losses sustained by the non-breaching party as a result of the violation of the order." *Prima Tek*, 525 F.3d at 543. Such evidence is "crucial to ensuring that the award is not greater than necessary[.]" *Trudeau*, 579 F.3d at 770 (vacating monetary sanction where district court did not "explain how it

24

arrived at the specific amount of the sanction imposed" and failed to "outlin[e] the methodology the court used to crunch those numbers and arrive at what it believed to be the appropriate amount").

As discussed below, contempt sanctions are neither warranted here nor available under the circumstances of this case.

**B. The TEC Evaluated Ms. Iglesias's Request for GCS and Issued a Recommendation that Authorized BOP to Refer Her for Surgery.**

The Court's December 27 injunction first directed the TEC to meet on or before January 24, 2022, "to evaluate [Ms.] Iglesias's request for GCS[.]" Dec. 27 Prelim. Inj. at 1, ECF No. 177. The TEC did so. *See* Feb. 22 Tr. at 23:4-17, ECF No. 206; McLearen Feb. 14 Decl. (ECF No. 191-2) ¶¶ 12-16; McLearen Jan. 31 Decl. ¶¶ 4-13 (ECF No. 183-1). Prior to January 2022 the TEC had not recommended Ms. Iglesias for gender-confirming surgery because, among other reasons, she had not yet resided for twelve months in a gender-confirming (i.e., female) facility, as BOP policy (adapted from WPATH standards of care) generally required. McLearen July 1 Decl. ¶ 19; *see also* Feb. 22 Tr. at 21-22; McLearen Jan. 31 Decl. ¶ 8 (ECF No. 183-1); Tr. of Motion Hr'g (Nov. 22, 2021) at 136:18-24 ("Nov. 22 Tr.") (ECF No. 175); Alison Leukefeld Apr. 20, 2021 Decl. ¶¶ 11-12 (ECF No. 99-2). That is why the TEC did not recommend Ms. Iglesias for gender-confirmation surgery when it considered her request in October 2021, and instead decided that it would reconsider her request for surgery following placement and at least one month's successful adjustment at the Miami RRC. McLearen July 1 Decl. ¶ 20; *see* Feb. 22 Tr. at 25.

When, as instructed by the Court, the TEC reconsidered Ms. Iglesias's request for surgery in January 2022, it took into account the facts and circumstances at that time—including Ms. Iglesias's impending transfer to the RRC, the importance of maintaining continuity in her care throughout the GCS process, and the logistical expedience of referring Ms. Iglesias directly to a surgeon following her transfer to the RRC, rather than referring her (while still located at FMC Carswell), to the BOP medical director. McLearen July 1 Decl. ¶¶ 34-36; *see also* Feb. 22 Tr. at 23-26; McLearen Feb. 14

Decl. ¶¶ 14-20 (ECF No. 191-2); McLearen Jan. 31 Decl. ¶¶ 10-12 (ECF No. 183-1).  Based on these factors, the TEC reached a different conclusion than before.  Instead of deferring her request for future consideration, as it had done in October 2021, the TEC decided in January 2022 to approve Ms. Iglesias's request and recommended that she be referred for surgical consideration approximately one month after arrival at the Miami RRC, so long as her adjustment was adequate to show that she could maintain her placement there.  McLearen July 1 Decl. ¶ 21; *see also* Feb. 22 Tr. at 23, 25-26; McLearen Jan. 31 Decl. ¶¶ 4, 6, 9, 13 (ECF No. 183-1).

The difference in outcome between the TEC's October 2021 and January 2022 meetings is a meaningful one.  In October 2021 the TEC decided to reconsider Ms. Iglesias's request in April 2022.  Accordingly, the TEC would have had to meet again in April 2022, re-evaluate her request, and issue a recommendation in favor of surgery, before she could be referred for a consultation.  McLearen July 1 Decl. ¶ 22; *see* Transgender Offender Manual, § 9 at 9 (Jan. 13, 2022),  https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf (last visited July 1, 2022).  In January 2022, the TEC approved Ms. Iglesias for referral to a surgeon as long as she experienced no significant adjustment problems.  Accordingly, no further evaluation or decision-making by the TEC was required for her referral to a surgeon and (if medically indicated) surgery to proceed.  McLearen July 1 Decl. ¶ 22.  And the tangible effects of that decision can now be seen in the record of recent events.  Ms. Iglesias has now had two consultations with two surgeons for various types of surgery, the first on April 7, 2022, with Surgeon One to discuss facial feminization and breast augmentation, and the second on May 5, 2022, a telehealth consult with Surgeon Two to discuss vaginoplasty.  *See id.* ¶ 23.  BOP was authorized to proceed with these consultations and related appointments in preparation for Ms. Iglesias's surgeries—all without any further involvement by the TEC—because the TEC considered and gave approval to Ms. Iglesias's request for surgery in January 2022.  *Id.*.

Thus the TEC complied with the Court's instruction to "evaluate" Ms. Iglesias's request for surgery at its January 2022 meeting.

The Court's Memorandum and Order suggests that the TEC did not in fact evaluate Ms. Iglesias's request for GCS in January 2022 because it recommended only that she be referred to a surgeon for consultation, and left it up to the surgeon to decide what procedures are medically necessary and appropriate for her, instead of deciding that on its own. Mem. & Order at 9-10. But as Dr. McLearen explains, the TEC is neither authorized nor qualified to make medical judgments of that kind, and the TEC would lack authority, in any event, to enforce them on outside surgeons retained to perform GCS on BOP inmates.

The TEC is constituted under authority of the Transgender Offender Manual, § 3(a)(5), at 4, as BOP's "official decision-making body on all issues affecting [BOP's] transgender population[,]" with authority "to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates[.]" *See also* Leukefeld Apr. 20, 2021 Decl. ¶ 4 (ECF No. 99-2). Regarding inmate requests for GCS, the TEC is authorized to "determine that all milestones and individual goals for surgical *consideration* have been met," Transgender Offender Manual § 9, at 9 (emphasis added), not to decide what surgical procedures are medically necessary and appropriate for individual inmates. Instead, if the TEC determines that an inmate has met the foregoing pre-requisites, then the Manual instructs that the inmate be referred to the BOP Medical Director for medical evaluation, or (in the case of RRC residents) to the Reentry Services Division for referral to a surgeon. *Id.* § 3(a)(2) at 4, § 9 at 9, § 16, at 12-13; *see also* McLearen July 1 Decl. ¶¶ 25-26.[9] In short, under the Transgender Offender Manual the TEC is authorized only to

---

[9]   This is precisely the type of decision the TEC made in October 2021, when for the first time it approved another inmate's request for GCS: it made a referral to the Medical Director for surgical consideration. McLearen July 1 Decl. ¶ 25; Feb. 22 Tr. at 64:3-6.

recommend that an inmate seeking GCS be referred to an appropriate medical professional for surgical consultation, based on the TEC's assessment that the inmate has achieved certain milestones and met certain requirements. The TEC does not have authority to decide as a medical matter that an inmate should undergo GCS. *Id.* ¶ 27.

In addition to a lack of authority, the TEC also lacks the necessary expertise to make such judgments. The TEC's membership is stipulated by the Transgender Offender Manual, the terms of which ensure that the TEC is composed of BOP staff with diverse specialties, but ordinarily it does not include treating physicians or surgeons, as was the case in January 2022. McLearen July 1 Decl. ¶ 28; Transgender Offender Manual, § 3(a)(5), at 4; Leukefeld Apr. 20, 2021 Decl. ¶ 4 (ECF No. 99-2); Nov. 22 Tr. at 130:6-22, 151:3-8, 158:21-159:19. None of the individuals serving on the TEC at that time was a physician or surgeon, and none had medical expertise in GCS. Moreover, neither the TEC nor any other BOP authority can dictate to outside surgeons on whom BOP must depend to perform GCS, which patients to accept, or what procedures to perform in individual cases. McLearen July 1 Decl. ¶ 29; *see* McLearen Feb. 18 Supp. Decl. ¶¶ 4, 10 (ECF No. 197-1); Feb. 22 Tr. 89:20-23, 112:13-20. The TEC therefore could not have decided that it was medically appropriate for Ms. Iglesias to undergo GCS, or specific gender-confirming surgical procedures, or to direct any medical professional within or outside BOP to perform GCS on her. McLearen July 1 Decl. ¶ 29.

Given the limits of the TEC's authority and expertise, the TEC reasonably concluded that the Court's direction to "evaluate [Ms.] Iglesias's request for GCS[,]" Dec. 27 Prelim. Inj. at 1, required it to make the type of decision for which it was created—to decide whether Ms. Iglesias should be recommended for referral to a qualified surgeon for a consultation. McLearen July 1 Decl. ¶ 24. That is what the TEC did, as a result of which Ms. Iglesias has had consultations with two GCS surgeons, preparations have begun in anticipation of her receiving medically necessary gender-affirming surgery, and one surgical procedure is now scheduled, without the need for further

decisionmaking by the TEC.  *Id.* ¶ 23.  We respectfully submit that nothing in the Court's instruction to the TEC to "evaluate [Ms.] Iglesias's request for GCS[,]" Dec. 27 Prelim. Inj. at 1, "sets forth an unambiguous command[,]" *Prima Tek*, 525 F.3d at 542, to make medical judgments about what manner of treatment she should receive, in lieu of trained and experienced GCS surgeons.  Even if that was the Court's intention, in light of the injunction's terms the TEC cannot be faulted for failing to grasp that meaning, thus precluding a finding of contempt.

## C.  The TEC Did Not Postpone Its Decision.

The Court's Memorandum and Order next suggests that BOP violated the December 27 injunction on the ground that in January 2022 the TEC did not make, but delayed, a decision on Ms. Iglesias's request for surgery, by recommending that she "be referred to a surgeon for consultation for GCS approximately one month after" her placement in an RRC, "assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate for [her]."  Mem. & Order at 4, 10-11 (quoting McLearen Jan. 31 Decl. ¶ 6 (ECF No. 183-1)).  As Dr. McLearen explains, the TEC in fact made a decision that approved Ms. Iglesias's request, a decision that has made it possible since then for her to consult with two surgeons, and to attend further appointments in preparation for gender-confirming procedures, and to schedule the first of her surgeries, all without further authorization by the TEC required.  McLearen July 1 Decl. ¶ 30.[10]

---

[10]  For reasons discussed in earlier filings, Defendants respectfully submit that the Court's December 27 injunction does not "set[ ] forth an unambiguous command[,]" *Prima Tek*, 525 F.3d at 542, either to make an immediate and unconditional recommendation in support of Ms. Iglesias's request for surgery, or to deny it outright, and that the caveated decision the TEC in fact made complied with the injunction's terms.  *See* Feb. 14 Resp. to Show Cause Order at 10-13 (ECF No. 191); Mar. 4 Supp. Resp. to Show Cause Order at 9-13 (ECF No. 214).  We incorporate those arguments by reference here, although we recognize that the Court has expressed views to the contrary.  Mem. & Order at 4-5, 8-13.  For present purposes, however, the salient point is that the TEC made a decision in January 2022, pursuant to which preparations for Ms. Iglesias's gender-confirmation surgery, including vaginoplasty, are now under way.

The Court's Memorandum and Order emphasizes that the unambiguous purpose of the December 27 preliminary injunction was to avoid delay in the TEC's decision regarding Ms. Iglesias's request.  Mem. & Order at 11.  As Drs. McLearen and Leukefeld testified, however, the TEC did not make its January 2022 decision for the purpose of delaying Ms. Iglesias's surgery. Rather, as set forth in prior declarations and testimony, the TEC's January 2022 decision was based on (i) BOP's policy that GCS is generally considered for persons in BOP custody "only after one year of clear conduct and compliance with mental health, medical, and programming services at [a] gender affirming facility[,]" Transgender Offender Manual, § 9 at 9; *see also* McLearen Jan. 31 Decl. ¶¶ 6-7 (ECF No. 183-1); (ii) continuity of care—that it was more prudent for the welfare of the patient, Ms. Iglesias, to begin and complete the entire course of procedures involved in GCS with a single team of physicians and mental-health care professionals in one location, rather than to begin the process with one set of providers (while Ms. Iglesias still remained in FMC Carswell) and complete it with another set of providers (following her transfer to the Miami RRC), Feb. 22 Tr. 23:18-24:15; McLearen Feb. 14 Decl. ¶¶ 16, 18 (ECF No. 191-2); McLearen Jan. 31 Decl. ¶ 10 (ECF No. 183-1); and (iii) that referring Ms. Iglesias for a surgical consult after her transfer from FMC Carswell to the Miami RRC meant that she could be referred directly to a surgeon (or surgeons) for consultation without having to undergo the potentially time-consuming step of referring her first to the BOP Medical Director for an initial medical evaluation before being referred to a GSC surgeon, *see* McLearen Jan. 31 Decl. ¶ 11 (ECF No. 183-1).  *See also* McLearen July 1 Decl. ¶¶ 34-36.

None of these considerations was taken into account for purposes of delay.  To the contrary, the TEC expected that referring Ms. Iglesias for surgery after her relocation to the Miami RRC might accelerate her treatment by eliminating the intervening step of a medical evaluation by the BOP Medical Director.  And to expedite the process further, the TEC decided that only one month of adjustment at the RRC would be necessary before a surgical referral could be made, even though

that meant Ms. Iglesias would not spend the full twelve months in a gender-conforming facility that the Transgender Offender Manual generally requires before a referral is made.  McLearen July 1 Decl. ¶ 37.  Defendants regret that their statements and actions have raised doubts with the Court about BOP's sincere intent to provide Ms. Iglesias with needed medical care, and to do so without unnecessary delay.  *See id.* ¶ 38.  But Defendants respectfully submit that the TEC did not violate the Court's December 27 injunction by failing to issue a decision on Ms. Iglesias's request in January 2022.

### D.  The TEC Acted Diligently to Comply with the December 27 Injunction.

A citation for contempt requires an additional finding that the party "failed to take steps to reasonabl[y] and diligently comply with the Order."  *Prima Tek*, 525 F.3d at 542.  Defendants respectfully submit that no such finding can be made on this record.

The Court's Memorandum and Order first points to the fact that the TEC did not meet to consider and act on Ms. Iglesias's request for surgery until January 24, 2022, the deadline established by the Court's December 27, 2021 injunction.  Mem. & Order at 12.  But so long as BOP acted within the time allowed by the Court's order itself, no additional diligence was required.  And as Dr. McLearen explains, the pendency of Defendants' Expedited Motion for Partial Reconsideration of the Court's Preliminary Injunction Order (ECF No. 178), seeking relief from the injunction's requirement that the TEC's meeting be transcribed, made it impractical for the TEC to meet before January 24.  *See* McLearen July 1 Decl. ¶¶ 40-42.

The Memorandum and Order also points to the fact that, instead of reporting the TEC's decision in two days (by January 26, 2022), as required under the injunction if it approved Ms. Iglesias's request, Defendants reported the TEC's decision in seven days (on January 31) as required if the TEC did not recommend Ms. Iglesias for GCS.  Mem. & Order at 13.  But that decision does not reflect a lack of diligence.  As Defendants have previously explained, they followed the latter set

31

of reporting requirements out of concern that following the first set might mislead the Court, by suggesting that the TEC had made a recommendation that Ms. Iglesias be referred *immediately* for surgery, when, as explained above, it recommended that she be referred to a surgeon within one month after her March 2022 transfer to the Miami RRC. *See* Notice of Compliance at 2 (ECF No. 183); Feb. 14 Resp. to Show Cause Order at 5 (ECF No. 191)

Moreover, as Dr. McLearen explains, neither the TEC's decision to meet on January 24, nor the decision to report the TEC's recommendation on January 31, was intended to delay, or in fact delayed, BOP's arrangements for Ms. Iglesias's surgery. McLearen July 1 Decl. ¶¶ 42-45; *see also* McLearen Feb. 14 Decl. ¶ 20 (ECF No. 191-2). In fact, BOP asked its contractor to begin the process of identifying a surgeon for a potential GSC consultation for Ms. Iglesias on January 14, 2022, 10 days before the TEC's meeting and decision. McLearen July 1 Decl. ¶ 45; *see also* Declaration of William Robinson (Mar. 2, 2022) ¶ 19 (ECF No. 210-1). No lack of diligence on BOP's part can be found here.

### E. Civil Contempt Sanctions Would be Improper in the Current Posture of this Case.

As discussed above, a court may impose civil contempt sanctions on a litigant either to compel compliance with a court order, or to compensate an opposing party for injuries incurred because of the failure to comply with the court's order. *See supra* at Section I.A. But principles underlying the doctrine of abatement of civil contempt teach that coercive sanctions to compel compliance with an interlocutory order, such as a preliminary injunction, are improper once the parties' dispute been resolved, as here, by settlement. Awards of compensatory financial sanctions must be based on evidence of provable losses, evidence that is lacking here, and such awards are also foreclosed under the abatement doctrine by the comprehensive settlement of a case. In any event, sovereign immunity would preclude a monetary award of compensatory contempt sanctions against an agency of the Federal Government.

1. **Coercive contempt sanctions are inappropriate because the settlement and the Stipulated Order have eliminated any conceivable need to compel compliance with the December 27 injunction.**

Under the "general rule" of abatement of civil contempt, a civil contempt order that is coercive in nature "is mooted when the proceeding out of which it arises terminates." *Ohr ex rel. NLRB v. Latino Exp., Inc.*, 776 F.3d 469, 479-80 (7th Cir. 2015) (citing, *inter alia*, *United States v. Slaughter*, 900 F.2d 1119, 1125-26 (7th Cir. 1990)).   As the Court of Appeals explained in *Slaughter*, a coercive contempt sanction imposed for "purposes tied to the pendency of [a] proceeding" "would be invalid" if entered after the proceeding had come to a close.  900 F.2d at 1126.

This principle of abatement dates back at least to *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418 (1911), in which the Supreme Court held that a civil contempt proceeding for violation of an injunction "necessarily ended" once "the main cause of which [the civil contempt proceeding] [was] a part" was settled by the parties.  *Id.* at 452.  The settlement, the Court explained, made it "both unnecessary and improper to make any decree in '[the] contempt proceeding[,]" *Id.* at 451. This concept "of civil contempt abatement . . . has been described by court after court[,]" *Ohr*, 776 F.3d at 480, in a variety of contexts.[11]  The sole exception to the rule is that abatement "does not occur . . . when the need or purpose for [a] coercive contempt order survives the underlying proceeding."  *Slaughter*, 900 F.2d at 1125; *see Petroleos Mexicanos*, 826 F.2d at 400-01.

Although this case will not formally be terminated until, pursuant to the parties' Settlement Agreement, Ms. Iglesias files a Rule 41 stipulation of dismissal, *see* ECF No. 267-2, we submit that principles of abatement still apply here.  The parties' settlement agreement disposes of "all claims,

---

[11]  In addition to *Gompers, see, e.g., Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 400 (5th Cir. 1987); *Backo v. Local 281, United Bhd. of Carpenters & Joiners of Am.*, 438 F.2d 176, 182 (2d Cir. 1970), *cert. denied* 404 U.S. 858 (1971); *DeParcq v. U.S. Dist. Ct. of S.D. Iowa*, 235 F.2d 692, 700 (8th Cir. 1956); *Harris v. Texas & Pac. Ry. Co.*, 196 F.2d 88, 90 (7th Cir. 1952). *See also Yates v. United States*, 355 U.S. 66, 72 (1957); *cf. Shillitani v. United States*, 384 U.S. 364, 372 (1966).

issues, complaint, and actions that have been or could have been asserted by [Ms. Iglesias] against Defendants" in this action, Settlement Agreement (ECF No. 267-2) at 1; *id.* ¶ 3 at 4 (releasing all claims, causes of action, or requests for relief that have been or could have been asserted). The Stipulated Order (ECF No. 269), entered in accordance with the parties' agreement as consideration for Plaintiff's release of her claims, Settlement Agreement ¶ 1(a), now establishes a framework under which BOP will provide gender-confirmation surgery to Ms. Iglesias, including vaginoplasty, facial feminization, and breast augmentation, whether it occurs prior to or following her release from BOP custody. *See* Stipulated Order ¶¶ 3-5, 7, 8. The settlement and Stipulated Order thus make it unnecessary, and therefore, we submit improper to impose sanctions for the purpose of compelling compliance with the December 27 injunction. *Gompers*, 221 U.S. at 451-52.

The exception to the general rule, that "abatement does not occur when the need or purpose for [a] contempt order survives the underlying proceeding[,]" *Slaughter*, 900 F.2d at 1125, does not apply in this instance. This Court issued its December 27 preliminary injunction to provide "assurance that [Ms.] Iglesias w[ould] not fall victim to any further delays" in her receipt of GCS. Dec. 27 Prelim. Inj. at 1-2; Mem. & Order at 59 (ECF No. 176). By concurrence of the parties and the Court, the Stipulated Order now meets that need by guaranteeing that Ms. Iglesias will receive GCS, at no cost to her, regardless of whether the surgery occurs prior to her release from BOP custody, or afterward. Contempt sanctions intended to compel the TEC to meet again and "evaluate" Ms. Iglesias's request for GCS, or to compel the TEC to issue a new "decision" on her request, would serve no useful purpose under the framework of the Court's Stipulated Order. There is no need for the TEC to perform either of those acts to ensure that Ms. Iglesias receives GCS. Because there is no longer any such need to achieve the objectives of the December 27 injunction, issuing a contempt order to compel the performance of those acts is also no longer necessary, and would be improper. *See Gompers*, 221 U.S. at 451.

**2. A compensatory sanction is also unavailable because the parties have settled, there is no evidence of a need for further compensation, and such relief would be precluded by sovereign immunity.**

The Court's Memorandum and Order correctly observes that as a general matter a court may impose contempt sanctions on a party not only to coerce obedience to the court's orders, but also to "compensate the [opposing party] for losses." Mem. & Order at 8 (quoting *Teledyne Techs., Inc. v. Shekar*, 739 F. App'x 347, 351 (7th Cir. 2018)). Like coercive sanctions, however, compensatory contempt sanctions are unavailable under the circumstances of this case, for at least three reasons.

First, because the parties reached a settlement, Ms. Iglesias no longer has any claim for compensation, and compensatory sanctions are thus unavailable. Although termination of the underlying action generally does not moot a civil contempt proceeding that is compensatory in nature, *see Ohr*, 776 F.3d at 479-80; *Petroleos Mexicanos*, 826 F.2d at 400, in situations where the case is terminated by a comprehensive settlement between the parties of all claims raised in the case, a complainant relinquishes all claims to compensation for losses they may have suffered due to an opponent's alleged violation of a court order. *See Gompers*, 221 U.S. at 451-52; *see also Backo*, 438 F.2d at 182 & n.3. Thus, as held *Gompers*, once the parties reach a settlement of all claims, the plaintiff is not entitled to any further compensation, including monetary compensation for alleged contempts. 221 U.S. at 451-52; *see id.* at 444 (noting that the sanction sought in *Gompers* was "remedial relief" for the complainant, "measured . . . by the pecuniary injury caused by the act of disobedience"). Here, too, although the case has not yet been formally dismissed, the parties' comprehensive settlement of all claims brought or that could have been brought in this case eliminates any potential justification there otherwise might be to issue financial sanctions as compensation for hypothetical losses flowing from a failure to comply with the December 27 preliminary injunction.

Second, compensatory financial sanctions cannot be awarded here because they are not supported by evidence of any compensable injury suffered by Ms. Iglesias a result of the alleged

violation of the Court's preliminary injunction.  The Court's Memorandum and Order does not point to any evidence in the record of an injury to Ms. Iglesias that would form a basis for such sanctions (nor are Defendants aware of any).  Compensatory sanctions are permissible only if supported by that kind of evidence.  *See Prima Tek*, 525 F.3d at 543 (sanctions must be supported by evidence of the "provable losses sustained by the non-breaching party as a result of the violation of the order").

Third, sovereign immunity precludes an award of compensatory contempt sanctions against the Government.  Principles of sovereign immunity bar awards of monetary sanctions against the Government (including attorney's fees) except insofar as a waiver of that immunity has been unequivocally expressed in statutory text.  *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685-86 (1983).  And that is equally so where monetary sanctions for contempt are concerned.

The "power to punish [a party] for contempts" is a manifestation of a Federal court's inherent power.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  And it is firmly established as a general matter, of course, that a court's inherent authority includes the power to assess attorneys' fees or other monetary fines against either parties or their attorneys.  *Chambers*, 501 U.S. at 49–50.  *Accord Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-67 (1980).  But because "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed *in statutory text*," *Lane v. Pena*, 518 U.S. 187, 192 (1996) (emphasis added), a court's inherent power to sanction abuses of the judicial process does not authorize the imposition of monetary sanctions against the United States or its agencies.  *See United States v. Horn*, 29 F.3d 754, 764-67 (1st Cir. 1994) ("Congress, not the courts, is the government's authorized representative for purposes of waiving sovereign immunity"); *see also In re North*, 62 F.3d 1434, 1436 (D.C. Cir. 1994) ("The right to recover attorneys' fees from the United States depends on whether Congress has waived sovereign immunity."); *Resolution Trust Corp. v. Miramon*, 935 F. Supp. 838, 841 (E.D. La. 1996) ("[o]nly Congress has the power to waive a federal

36

agency's sovereign immunity"); *United States v. Waksberg*, 881 F. Supp. 36, 41 (D.D.C.1995)

("Sovereign immunity can only be curtailed pursuant to the exercise of legislative[,] not judicial[,]

power."), *vacated on other grounds,* 112 F.3d 1225 (D.C. Cir. 1997). *Cf. Ismie Mut. Ins. Co. v. HHS*, 2007

WL 9815957, at *6 (N.D. Ill. Mar. 22, 2007) (referring to "the bedrock principle that only Congress

can waive the federal government's sovereign immunity by means of an explicit pronouncement");

*Metro. Sanitary Dist. of Greater Chicago v. U.S. Dep't of Navy*, 722 F. Supp. 1565, 1568 (N.D. Ill. 1989)

("Only an Act of Congress can validly waive the sovereign immunity of the United States.").[12]

    In accord with these principles, courts have held that compensatory contempt sanctions may

not be awarded against the Government absent a congressional waiver of sovereign immunity.

*Yancheng Baolong Biochem. Prods. Co., Ltd. v. United States*, 406 F.3d 1377, 1382-83 (Fed. Cir. 2005);

*Coleman v. Espy*, 986 F.2d 1184, 1189-92 (8th Cir. 1993). In this case, too, sovereign immunity bars a

compensatory sanction against BOP as an exercise of the Court's inherent contempt power.[13]

    For all of the foregoing reasons, no finding of contempt against BOP for violation of the

December 27 preliminary injunction is warranted, and in the current posture of this case, no

sanction for contempt is available.

---

[12] The contempt statute, 18 U.S.C. § 401, does not provide the necessary authorization. Notwithstanding the powers the statute confers on the courts, courts have held that the contempt statute does not qualify as a waiver of sovereign immunity, because it contains no explicit, unequivocal language allowing the government to be sued. *Horn,* 29 F.3d at 763; *Waksberg*, 881 F. Supp. at 40.

[13] The Court's Memorandum and Order cites *In re Kessler*, 100 F.3d 1015, 1017 (D.C. Cir. 1996) for the proposition that contempt orders against Executive Branch officials do not offend the separation of powers. Mem. & Order at 8. In *Kessler* the Commissioner of the Food and Drug Administration petitioned for a writ of mandamus vacating a district court order that authorized his deposition. 100 F.3d at 1015. The D.C. Circuit denied the petition, holding that ordinarily a litigant dissatisfied with a discovery order must disobey the order, stand in contempt, and appeal from the contempt order, *id.* at 1016, and that separation-of-powers principles did not require otherwise simply because the Commissioner was an official of the Executive Branch, *id.* at 1017. Nothing in *Kessler* suggests, however, that a court may impose a *monetary* sanction against an Executive Branch agency as a remedy for contempt.

## II. BOP'S GOOD-FAITH EFFORTS TO OBTAIN GENDER-CONFIRMATION SURGERY FOR MS. IGLESIAS, AND TO INFORM THE COURT OF ITS PROGRESS, DO NOT MERIT THE IMPOSITION OF SANCTIONS.

The Court's Memorandum and Order next directs BOP to show cause why it should not be sanctioned under the Court's inherent power, or Rule 11(c), based on (i) representations that BOP's contractor had identified what it considered to be an "appropriate surgeon" (Surgeon One) to perform gender-confirming surgery for Ms. Iglesias, notwithstanding that BOP had not conducted a "formal analysis" of Surgeon One's qualifications, Mem. & Order at 23-24; (ii) statements in a number of Defendants' weekly status reports that Ms. Iglesias had been referred to Surgeon One for GCS, even though Defendants were aware that Surgeon One does not personally perform vaginoplasties, *id.* at 24-28; and (iii) BOP's decision to keep Ms. Iglesias's April 7 appointment for a consult with Surgeon One even after learning that Surgeon One refers patients out for vaginoplasty, *id.* at 28-29.

Since the TEC's decision approving Ms. Iglesias's request for surgery and recommending that she be referred for a GCS consult, BOP has worked to secure the services of a surgeon who could either perform the medically necessary and appropriate procedures that Ms. Iglesias desires, or, as needed, refer her directly to other qualified surgeons capable of performing them. McLearen July 1 Decl. ¶¶ 13, 62. Defendants have endeavored in their weekly status reports to inform the Court of their progress, and at times, lack of progress, in achieving that goal. Epplin June 29 Decl. ¶¶ 10, 11. Defendants regret that their earlier efforts to arrange gender-affirming surgery for Ms. Iglesias, including a vaginoplasty, and to keep the Court apprised of their efforts, have given the Court reason to question the sincerity of BOP's efforts, and the candor of its representations to the Court. McLearen July 1 Decl. ¶¶ 9, 38, 48, 85.

As discussed below, however, at no time did BOP act in bad faith, or with a design to obstruct these proceedings, but in the good-faith, reasonable belief that its actions, including pursuit

of the referral to Surgeon One, were calculated to achieve the common objective of GCS surgery for Ms. Iglesias, including a vaginoplasty. BOP's representations that its medical-services contractor considered Surgeon One an appropriate choice to whom Ms. Iglesias could be referred, and that she was scheduled to meet with Surgeon One on April 7 for a "GCS consult," were also made in good faith and factually warranted based on the information available to BOP at the time. Defendants respectfully submit, therefore, that sanctions are not justified under either the Court's inherent power or Rule 11.

## A. Legal Standards Applicable to Inherent-Power and Rule 11 Sanctions

"A district court has inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith," *Secrease v. W.&S. Life Ins. Co.*. 800 F.3d 397, 401 (7th Cir. 2015) (citation omitted). "Because of their very potency," however, a court's inherent powers "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also United States v. Johnson*, 327 F.3d 554, 562 (7th Cir. 2003); *Black v. Brown*, 2019 WL 3325840, at *1 (S.D. Ill. Mar. 25, 2019). Chief among these restraints is the requirement that the subject of the sanction acted with "willful disobedience or bad faith." *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003) (holding that "[t]he district judge's finding of no willfulness . . . preclude[d] any sanction . . . under the inherent powers of the court"), *overruled on other grounds by Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016); *see also Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (to impose sanctions under its inherent authority a court "must first make a finding of bad faith, designed to obstruct the judicial process, or a violation of a court order") (citation omitted); *Schmude v. Sheahan*, 420 F.3d 645, 649–50 (7th Cir. 2005); *Johnson*, 327 F.3d at 562-63; *Morisch v. United States*, 2009 WL 6506656, at *1 (S.D. Ill. June 16, 2009) (inherent-power sanctions "should not be imposed unless there is willful disobedience, bad faith, or fraud"). A court has "no authority" under its inherent powers to issue sanctions for "mere negligence," *Maynard*, 332 F.3d at 471, or "clumsy lawyering[.]"

*Furery*, 900 F.3d at 464. *Cf. Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co.*, 8 F.3d 441, 449 (7th Cir. 1993) ("Although MCS' factual error was admittedly a serious one, and one with which the district court was understandably perturbed, the error was inadvertent and therefore not sanctionable.").

Rule 11(b) provides that by presenting a pleading, written motion, or other paper to the court, an attorney certifies to the best of their knowledge, information, and belief, based on reasonable inquiry, (i) that "it is not being presented for any improper purpose," including, *inter alia*, "unnecessary delay," and (ii) that "the claims, defenses, and other legal contentions" therein, as well as the "the factual contentions" and "denials of factual contentions" are warranted. Fed. R. Civ. P. 11(b)(1)-(4). "[A]fter notice and a reasonable opportunity to respond . . . the court may impose an appropriate sanction on any attorney . . . or party" for a violation of Rule 11(b). *Id.* § 11(c)(1); *see Bentz v. Maue*, 2020 WL 1938883, at *1 (S.D. Ill. Apr. 22, 2020) ("A court may impose [Rule 11] sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." (quoting *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998)); *Yonaka v. UPS, Inc.*, 2006 WL 8455949, at *1 (S.D. Ill. Dec. 20, 2006).

"Rule 11 sanctions 'are to be imposed sparingly,'" however. *Peoples Nat'l Bank, N.A. v. Am. Coal Co.*, 2012 WL 1606014, at *3 (S.D. Ill. May 8, 2012) (quoting *Hartmax Corp. v. Abbound*, 326 F.3d 862, 867 (7th Cir. 2003)). The "mere absence of legal precedent . . . or the failure to prevail on the merits of a particular legal contention . . . cannot justify a finding of frivolousness," which "connote[s] that the legal contention . . . is utterly implausible and lacks any arguable basis[.]" *Ogden v. Dyco*, 2010 WL 11685292, at *2 (S.D. Ill. Mar. 22, 2010) (citation omitted); *see also Nemsky v. Int'l Union of Operating Eng'rs, Loc. 399*, 2008 WL 4853626, at *10 (S.D. Ill. Nov. 4, 2008), *aff'd* 574 F.3d 859 (7th Cir. 2009). Likewise, "factual statements" that are "subject to interpretation that could render them accurate or [as] presenting a genuine issue of fact" do not warrant sanctions under Rule 11(c). *White v. Dep't of Justice*, 2018 WL 488719, at *7 (S.D. Ill. Jan. 19, 2018).

For the reasons discussed below, sanctions against BOP under the Court's inherent power, or Rule 11, are unwarranted.

## B. BOP Reasonably and Truthfully Informed the Court That Its Contractor Reported Locating an "Appropriate Surgeon."

The Court first directs BOP to show cause why it should not be sanctioned for "report[ing]" in its February 14 response to the Court's February 10 show-cause order (ECF No. 191), and in Dr. McLearen's supporting declaration (ECF No. 191-2) "that an appropriate surgeon [for Ms. Iglesias] was located[,]" even though at that time Dr. McLearen had "neither performed a formal analysis of [Surgeon One's] qualifications nor knew how many past gender-affirming bottom surgeries [Surgeon One] [had] performed[.]" Mem. & Order at 23-24. As discussed below, BOP respectfully submits that the representation made about Surgeon One in its February 14 response, and in Dr. McLearen's declaration, was warranted and made in good faith—to inform the Court, not to mislead it—and does not merit sanctions.

BOP's February 14 response and Dr. McLearen's declaration reported only that BOP "ha[d] been informed" by its medical-services contractor "that the contractor ha[d] located an appropriate surgeon." McLearen Feb. 14 Decl. ¶ 20 (ECF No. 191-2); ECF No. 191 at 3, 28. BOP did not state that Dr. McLearen or anyone else at the agency had made an independent determination that Surgeon One was in fact an appropriate choice to perform GCS, or any particular GCS procedure, for Ms. Iglesias. As of February 14, neither Dr. McLearen nor BOP had conducted a formal analysis of Surgeon One's qualifications to provide medically necessary and appropriate treatment that Ms. Iglesias required. McLearen July 1 Decl. ¶¶ 49, 51. No such formal analysis would or could occur until Ms. Iglesias consulted with Surgeon One; Surgeon One agreed to accept Ms. Iglesias as a patient; Surgeon One and Ms. Iglesias together worked out an overall treatment plan; and BOP's contractor submitted a formal service proposal for examination by BOP subject-matter experts. *Id.* ¶¶ 51-52. Because none of these steps had occurred by February 14, neither Dr. McLearen nor

41

BOP was in a position to say that they had concluded Surgeon One was an "appropriate" choice to treat Ms. Iglesias.  Instead, to apprise the Court of BOP's progress, they informed the Court of what they knew at the time—that the contractor had identified a surgeon that the contractor believed could meet the request for medical services that that BOP had communicated to it.  *Id.* ¶ 52.

In hindsight, BOP recognizes that in its eagerness to make the Court aware of its progress, *see id.* ¶¶ 62, 87, it may not have made it sufficiently clear that the contractor's identification of what it believed to be a suitable surgeon for Ms. Iglesias was just the beginning, not the culmination, of the process of identifying a surgeon (or surgeons) to provide Ms. Iglesias with the medical treatment she requires.  It was nevertheless reasonable, we respectfully submit, to inform the Court of what the contractor had reported.

First, BOP's medical-services contractor has been the agency's exclusive contractor for the acquisition of health-care services at all BOP halfway houses nationwide for the past six years, and for contract medical services (when needed) at BOP secure facilities for 22 years.  It has developed a reputation within BOP of reliability and competence in meeting the diverse health-care requirements of BOP's inmate population.  BOP had no reason to believe that the contractor would jeopardize its relationship with BOP and its reputation in the marketplace, or compromise its professional standards, by advising BOP that it had identified a surgeon who could meet a patient's health-care needs without a basis for saying so.  McLearen July 1 Decl. ¶ 55; *see also* Kolsky June 29 Decl. ¶ 12; Robinson June 29 Decl. ¶ 5; Schwei June 30 Decl. ¶ 26.c.

Second, the contractor pointed out that, in contrast to an individual practitioner, Surgeon One is affiliated with a large and highly regarded medical institution, suggesting that even if there were certain GCS procedures that Surgeon One did not personally perform, Surgeon One could still provide access to a whole network of providers and an array of medical resources to provide Ms.

42

Iglesias the full range of treatment she required.  McLearen July 1 Decl. ¶ 56; *see also* Robinson June 29 Decl. ¶¶ 5, 8; Schwei June 30 Decl. ¶¶ 6, 25.

Third, when the contractor identified Surgeon One to BOP, Dr. McLearen reviewed Surgeon One's professional and educational background as posted on the website of the medical institution with which Surgeon One is associated.  McLearen July 1 Decl. ¶ 57.  Among other things, the website states:  (i) that Surgeon One's ███████████████████████████; (ii) that ████████████████████████████████████; (iii) that █████████████████████████; (iv) that ███████████████████████; and (v) that ███████████████████████████.  *See id.* ¶¶ 57, 81.  This description of Surgeon One's qualifications ████████████████████████, posted on the website of the reputable medical institution where Surgeon One practices, gave further confidence in what the contractor had reported about Surgeon One.  *Id.* ¶ 80; *see also* Kolsky June 29 Decl. ¶¶ 3, 5; Robinson June 29 Decl. ¶ 6; Schwei June 30 Decl. ¶ 26.d.

Fourth, perhaps foremost in BOP's consideration was the imperative of arranging a consultation for Ms. Iglesias with a qualified GCS surgeon as the essential first step in deciding on any course of treatment for her.  Although Ms. Iglesias had clearly expressed her desire for certain GCS procedures, including vaginoplasty, it was necessary for her informed decisionmaking to consult with a GCS expert who could evaluate her individual needs and desires, explain the range of treatment options available to her, and review the pros and cons of each.  Once such a consultation occurred and the surgeon and Ms. Iglesias together decided on an appropriate course of treatment, BOP could then arrange and pay for the medically necessary and appropriate procedures involved.

McLearen July 1 Decl. ¶ 58.  Based on what BOP had been told about Surgeon One's qualifications by a trusted source—its contractor—and had learned from Surgeon One's webpage, Surgeon One appeared at the very least to be an appropriate choice with whom to begin this consultation process. Even if Surgeon One did not perform vaginoplasties, given the surgeon's affiliation with a large, extremely well-resourced medical institution, and BOP's prior experience with inmates who required treatment by inter-disciplinary teams of doctors, *see supra* at 16, BOP reasonably expected that Surgeon One could nevertheless enlist the aid—that is, refer Ms. Iglesias to— a GCS specialist who could perform that procedure for her.  McLearen July 1 Decl. ¶¶ 56, 60; *see also* Kolsky June 29 Decl. ¶ 11; Robinson June 29 Decl. ¶¶ 5, 8; Schwei June 30 Decl. ¶¶ 6, 25.

As explained above, it has come to light in Defendants' preparation of this response, that between February 11 and 14, 2022, BOP received conflicting messages from its contractor about the procedures Surgeon One does and does not perform.  On February 11 BOP received an e-mail from the contractor stating that Surgeon One performs two to three "bottom" surgeries each month, and on February 14 an e-mail forwarded by the contractor from Surgeon One stating, "We do not offer vaginoplasty yet."  McLearen July 1 Decl. ¶ 53.  BOP did not clearly communicate that information to DOJ counsel, however, out of concern on Dr. McLearen's part that releasing too much information about Surgeon One at that early stage of the contractor's outreach could result in accusations of sole-sourcing a contract in violation of federal procurement laws.  *Id.* ¶ 83.  The discovery of these facts raises two issues, which we address in turn.

First, notwithstanding the conflicting information BOP had received about Surgeon One's capabilities, it was still reasonable of BOP to inform the Court that its contractor had reported finding an appropriate surgeon for Ms. Iglesias.  As already discussed, the contractor had an approximately 22-year track record of reliability when it came to locating appropriate providers to meet the health-care requirements of persons in BOP custody.  McLearen July 1 Decl. ¶ 55.

44

Surgeon One's webpage, indicating that Surgeon One's ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ supported a belief that Surgeon One could perform at least a number of GCS procedures that would be beneficial to Ms. Iglesias and of interest to her. *Id.* ¶ 57. Surgeon One's institutional affiliation, as reported by the contractor, and confirmed by the webpage, gave rise to a reasonable expectation that Surgeon One could assist Ms. Iglesias in arranging for other surgeons, perhaps colleagues at Surgeon One's place of work, to perform any medically necessary and appropriate GCS procedures for Ms. Iglesias that Surgeon One could not. *Id.* ¶ 56. And, importantly, BOP only meant to report to the Court the progress it had made to date in locating a suitable surgeon for Ms. Iglesias, not to suggest that the search had reached its end. *See id.* ¶ 62.

Even if, in hindsight, BOP could have more effectively communicated that latter point, BOP's representation that its contractor had reported locating an appropriate surgeon for Ms. Iglesias was factually warranted, and it was made without purpose to mislead the Court about the procedures Surgeon One performs, or the type of care that BOP intends Ms. Iglesias to receive. *Id.* And in the end, although it is now known that Surgeon One does not perform vaginoplasties, the contractor's identification of Surgeon One nevertheless represented genuine progress in obtaining care for Ms. Iglesias, as Surgeon One has agreed to perform (and scheduled) procedures—breast augmentation, and facial feminization—that Ms. Iglesias desires, that will be beneficial for her gender dysphoria, and that she is entitled to under the Court's Stipulated Order. Even if the Court were to conclude that BOP should have handled this matter differently, Defendants respectfully submit that BOP's representations about the appropriateness of Surgeon One provide no basis for imposing sanctions.

Second, although the failure in mid-February to clearly inform DOJ counsel about specific information indicating that Surgeon One does not perform vaginoplasty was ill-conceived and

regrettable, it is not sanctionable.  Dr. McLearen explains that her concern about releasing too many details regarding Surgeon One was based on her own limited understanding of federal procurement laws, *id.* ¶¶ 83-84 (about which she has previously testified, *see* Feb. 22 Tr. 29:10-12, 94:1-2, 94:11-12), and a recent episode in another inmate's case.  In that case, correspondence sent to the inmate's counsel about a potential GCS surgeon to treat the inmate raised alarm in BOP about an appearance of illegally sole-sourcing a contract, with potentially severe legal consequences.  McLearen July 1 Decl. ¶ 83.  That episode, combined with Dr. McLearen's limited grasp of federal procurement requirements, made her extremely anxious about statements or actions that could raise procurement-law issues in this case.  *Id.* ¶ 84.

Therefore, she attempted to convey the uncertainty about Surgeon One's capabilities in a way that she believed was less likely to result in a violation, or perceived violation, of procurement requirements.  *Id.*  To that end, during a discussion with DOJ counsel in preparation for the February 22 show-cause hearing, she recalls informing them that BOP had received conflicting communications from the contractor that had created uncertainty about the bottom surgeries that Surgeon One performs personally, and those that Surgeon One refers out.  *Id.*  For their part, the DOJ trial attorneys on the case at that time have some recollection of being told about a degree of uncertainty concerning Surgeon One's capabilities, Robinson June 29 Decl. ¶ 10; Schwei June 30 Decl. ¶ 24, but not of BOP receiving specific information at that time indicating that Surgeon One does not, in fact, perform vaginoplasties, Kolsky June 29 Decl. ¶ 5; Robinson June 29 Decl. ¶¶ 12-13; Schwei June 30 Decl. ¶ 22.

At the time, Dr. McLearen genuinely did not appreciate the importance this information might hold for the Court, Ms. Iglesias, or DOJ counsel, because at the time (for the reasons discussed above) she did not consider uncertainty about the procedures that Surgeon One would perform or refer out to be a reason, at least at that early stage, not to consider Surgeon One for Ms.

Iglesias.  *Id.*  In her mind, the critical first step in securing GCS for Ms. Iglesias remained arranging a one-on-one consultation with a GCS expert, during which Ms. Iglesias and the surgeon could make mutually informed decisions about a medically appropriate treatment plan.  *Id.*  From Dr. McLearen's perspective, the conflicting communications that BOP had received about Surgeon One only heightened the need for a consult.  Because communications with Surgeon One had to be routed back and forth through BOP's contractor, attempts to obtain detailed information about Surgeon One had turned into a frustrating game of telephone, in which BOP often received bits and pieces of information that it could not readily verify or follow up on.  *Id.* ¶ 61.  BOP concluded that the only way to ensure a complete exchange of information allowing Surgeon One to make judgments about what surgical services were appropriate for Ms. Iglesias, and Ms. Iglesias to make informed decisions about which of the available procedures she wished to undergo, was for the two of them to meet face-to-face and develop, if practicable, a mutually agreed-upon and appropriate plan of treatment that Surgeon One alone, or in collaboration with other GCS specialists, could execute.  *Id.*

Dr. McLearen now recognizes that she should have more clearly conveyed the information BOP had received in mid-February about Surgeon One's capabilities to DOJ counsel.  *Id.* ¶ 85.  She understands the Court's concerns, and wishes to assure the Court that she did not act with any intention to mislead the Court about Surgeon One's capabilities, or BOP's intentions to obtain all the medically necessary and appropriate care for Ms. Iglesias that she requires, including a vaginoplasty.  *Id.* (Indeed, just over two weeks later, when BOP received confirmation from its contractor on March 3 that Surgeon One refers patients out for vaginoplasties, BOP immediately disclosed that information.)  She regrets any actions that have led the Court to question otherwise.  *Id.* ¶ 86.  But because she acted without any intention to mislead the Court, to deprive it of information that she recognized as being material, or otherwise to obstruct the judicial process, the

elements of willfulness and bad faith are absent here, and her actions, though ill-considered, do not rise to the level of sanctionable misconduct. *Maynard*, 332 F.3d at 470 (absence of willfulness precludes inherent power sanctions); *Fuery*, 900 F.3d at 463 (inherent power sanctions require finding of bad faith).

### C. It Was Not Sanctionable of BOP to Describe the Intended Purpose of the April 7 Appointment With Surgeon One as a GCS Consult, or Keep the Appointment.

The Court next orders BOP to show cause why it should not be sanctioned on two additional grounds. First, the Court directs BOP to explain why it did not "clearly represent[ ]" in its status reports before April 8, 2022, that Surgeon One does not personally perform vaginoplasties, even though BOP's contractor confirmed on March 3, 2022, that Surgeon One refers patients out for vaginoplasty, and even though BOP continued to represent in its status reports filed from March 4 through April 1 that it had scheduled Ms. Iglesias to consult with Surgeon One about gender-confirmation surgery. Mem. & Order at 25-28. Second, the Court directs BOP to explain why it continued to pursue the April 7 consultation with Surgeon One when it knew by March 3 that Surgeon One does not perform vaginoplasties. *Id.* at 28-29. For the reasons set forth below BOP respectfully submits that it id not engage in sanctionable misconduct.

First, and again, respectfully, BOP did not wait until April 8 to report that Surgeon One refers patients out for vaginoplasty. BOP's contractor confirmed that fact for the first time on March 3, 2022, McLearen July 1 Decl. ¶ 64; Epplin June 29 Decl. ¶ 8, and BOP reported "that Surgeon 1 refers patients to other providers for vaginoplasty" the next day, in paragraph 6 of the March 4, 2022, Declaration of Jenna Epplin (ECF No. 212-1), filed as an exhibit to Defendants' March 4 status report (ECF No. 212). McLearen July 1 Decl. ¶ 64; Epplin June 29 Decl. ¶¶ 8, 9. No effort was made to conceal this information. *See also* Robinson June 29 Decl. ¶ 12; Kolsky June 29 Decl. ¶ 4; Schwei June 30 Decl. ¶¶ 31-32. Nor did the information escape the notice of Ms. Iglesias's counsel. Plaintiff's counsel specifically inquired about Ms. Epplin's representation that

48

"Surgeon 1 refers patients out to other providers for vaginoplasty" in their March 9 response to Defendants' March 4 status report, Pl.'s Resp. to Defs.' March 4, 2022, Status Report (ECF No. 219) at 4.

BOP did not again state in its declarations until April 8, 2022, that Surgeon One refers patients out for vaginoplasty, and so nothing further was said about it in Defendants' status reports, because there was no new information to report on that subject until after the April 7 consult. Epplin June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶ 22; Kolsky June 29 Decl. ¶ 11. We respectfully submit that the failure to repeat a fact of which Ms. Iglesias's counsel had already received actual notice does not constitute a material omission or misrepresentation of fact for which a party may be sanctioned, whether under a Court's inherent power, or Rule 11.

We also submit that it was not sanctionable of BOP to pursue the April 7 consult with Surgeon One, or to continue to describe the forthcoming appointment as a consultation about gender-confirmation surgery, even though it had been confirmed on March 3 that Surgeon One refers out for vaginoplasty. For several reasons BOP reasonably believed at the time that Ms. Iglesias had an appointment with Surgeon One on April 7 to consult about GCS. McLearen July 1 Decl. ¶ 68.

First, as discussed above, when the contractor informed BOP that it had identified a well-credentialed GCS surgeon affiliated with a large, well-resourced and highly respected medical institution, BOP believed that Surgeon One could provide Ms. Iglesias direct access to a team of providers who also practice there, ensuring that Ms. Iglesias received the entire range of gender-confirming surgeries she requires, including vaginoplasty, whether performed by Surgeon One, or other GCS specialists with whom she is affiliated. *Id.* ¶ 65. As discussed, prior to the appointment, BOP's contractor had confirmed that Surgeon One could refer out for vaginoplasty. It was thus reasonable to presume that a consultation with Surgeon One could encompass vaginoplasty.

49

Second, the term gender-confirmation surgery encompasses a wide variety of procedures in addition to vaginoplasty. The American Society of Plastic Surgeons ("ASPS") defines gender-confirmation surgery to include several categories of transfeminine and transmasculine top, bottom, and facial surgeries. ASPS, Gender Affirmation Surgeries, https://www.plasticsurgery.org/reconstructive-procedures/gender-affirmation-surgeries (last visited June 30, 2022). Consistent with the views of the ASPS, the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7 at 57 (2012) ("WPATH Standards of Care"), observes that an entire range of surgical procedures is available for male-to-female patients with gender dysphoria, including "[g]enital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty[,]" but also "[b]reast/chest surgery: augmentation mammoplasty (implants/lipofilling)," and "non-genital, non-breast surgical interventions[,]" such as "facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid-cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures." Based on that understanding, BOP believed, as discussed above, that the April 7 consult would provide Ms. Iglesias with an opportunity to meet with a GCS specialist to discuss the entire array of GCS procedures potentially available to her, including vaginoplasty; and then make informed decisions about the medically appropriate procedures she desires, regardless of whether Surgeon One would perform them personally, or refer them out to other providers. McLearen July 1 Decl. ¶ 67.

Third, BOP did not pursue the April 7 appointment with Surgeon One to the exclusion of other efforts to obtain a vaginoplasty for Ms. Iglesias. Notwithstanding the scheduled April 7 consult, BOP continued its already ongoing search for other surgeons in Miami, and the surrounding region, who might treat Ms. Iglesias. *Id.* ¶ 73. It also considered the option of reaching out to the Chicago-based surgeon, Surgeon Two, recommended by Ms. Iglesias's counsel. *Id.* ¶ 74. Keeping the April 7 appointment did not interfere with these efforts. *Id.* ¶ 76. And even if BOP

50

had not anticipated that the April 7 appointment would include consultation about vaginoplasty, so long as BOP continued to search for other surgeons who might perform a vaginoplasty for Ms. Iglesias, it still would have made sense in the meantime to work with Surgeon One to arrange for other GCS procedures, such as breast augmentation and facial feminization, that Ms. Iglesias desired and could benefit from. *Id.* On the other hand, canceling the April 7 consult could only have set back efforts to provide Ms. Iglesias with the full range of GCS procedures she requires. *Id.* Notably, although Ms. Iglesias's counsel had inquired specifically about the reference to Surgeon One referring out for vaginoplasty, her counsel did not request that the appointment with Surgeon One be canceled.

We recognize that the Court's December 27 preliminary-injunction opinion explains that by "GCS" the Court meant "gender reassignment surgery or surgeries altering one's reproductive organs." *See* Mem. & Order at 25 (quoting ECF No. 176 at 1 n.1). And while the clinical definition of GCS as understood by professional organizations such as WPATH and ASPS is not limited to surgery involving the genital organs, the Court naturally expected that Ms. Iglesias would be referred for a vaginoplasty consult, as she had requested. At no time, however, did BOP contemplate that Ms. Iglesias would not be referred for vaginoplasty, or would not receive vaginoplasty if it was medically indicated. McLearen July 1 Decl. ¶ 69. That is why, when Surgeon One did not directly arrange for Ms. Iglesias to consult with a vaginoplastic surgeon (contrary to BOP's expectations), BOP then continued to search for an available surgeon for Ms. Iglesias, by contacting (or re-contacting) surgeons on the list Surgeon One provided, expanding its contractor's search from Miami to the surrounding Florida area, and ultimately arranging for Ms. Iglesias to consult with the Chicago-based surgeon identified by her attorneys. *Id.*

BOP was surprised and disappointed to hear that Surgeon One did not consult with Ms. Iglesias about vaginoplasty on April 7, and did not offer to contact other surgeons to arrange a

vaginoplasty for her. *Id.* ¶ 68. We appreciate that Ms. Iglesias must have been disappointed as well. *Id.* Nevertheless, prior to the April 7 consult BOP believed, for the reasons explained above, that Ms. Iglesias's appointment with Surgeon One was appropriately considered a GCS consult. *Id.* And because Ms. Iglesias in fact consulted with Surgeon One about procedures—facial feminization and breast augmentation—that Ms. Iglesias desires as part of her gender transformation, that will be beneficial for treating her gender dysphoria, and that Surgeon One is now preparing to perform, BOP still believes it is accurate to refer to that appointment as a GCS consult. *Id.* Under these circumstances, we respectfully submit that it was neither intentionally misleading nor factually unwarranted of BOP to represent that Ms. Iglesias was scheduled to consult with Surgeon One about gender-confirmation surgery, nor was it an abuse of the judicial process to keep the April 7 appointment. Sanctions, therefore, are not justified.

## III. THE REPRESENTATIONS OF DOJ COUNSEL WERE TRUTHFUL, MADE IN GOOD FAITH, AND ARE NOT SANCTIONABLE.

Lastly, the Court's Memorandum and Order instructs six Department of Justice attorneys representing BOP in this matter to show cause why they should not be sanctioned under the Court's inherent power, or Rule 11, for representations made in Defendants' status reports (and one sealed supplement) filed between February 25 and April 1, 2022 (ECF Nos. 204, 212, 220, 221, 227, 229, and 231). Mem. & Order at 29-31. Specifically, the Court directs the named DOJ Attorneys to explain why Defendants' status reports continued to state that Ms. Iglesias would consult with Surgeon One on April 7 about gender-confirmation surgery, when it was known by March 3 that Surgeon One refers out for vaginoplasty. *Id.* at 30.

The DOJ attorneys working on this matter since the Court issued its December 27 preliminary injunction have sought to do all they could in their role as counsel to ensure that prompt arrangements are made for Ms. Iglesias's surgery, including most recently engagement with her counsel to reach a mutually agreeable settlement that charts a new course for ensuring that she either

receives the care she requires while still in BOP custody, or receives it afterward at no cost to her. Boynton June 30 Decl. ¶¶ 6, 10; Kolsky June 29 Decl. ¶ 13; Robinson June 29 Decl. ¶ 25; Schwei June 30 Decl. ¶¶ 56, 57. They have not sought to hide information or to mislead the Court, or Ms. Iglesias, about BOP's efforts to locate a qualified surgeon, or surgeons, to perform the medically necessary gender-confirmation surgeries, including vaginoplasty, that Ms. Iglesias desires. They regret that their statements and actions on Defendants' behalf have raised doubt in the Court's mind about the Government's candor in this matter, and BOP's intentions to provide Ms. Iglesias with the care she requires—notwithstanding their best efforts to represent Defendants in accordance with the high standards of ethics and professionalism to which all Government attorneys are called. Boynton June 30 Decl. ¶ 8; Kolsky June 29 Decl. ¶ 13; Robinson June 29 Decl. ¶ 26; Schwei June 30 Decl. ¶¶ 4, 56.

For the reasons explained below, however, the DOJ attorneys involved to one degree or another with the preparation and submission of the status reports cited in the Court's Memorandum and Order all reasonably believed, like BOP, that Ms. Iglesias's April 7 appointment with Surgeon One was meant to be a consultation about gender-confirmation surgery, including vaginoplasty. Their representations to that effect in Defendants' status reports were factually warranted, and were made in good faith without purpose to obstruct these proceedings or delay Ms. Iglesias's receipt of care. Sanctions are therefore unwarranted.

As a threshold matter, we observe that not all six of the DOJ attorneys named in the Court's Memorandum and Order stand in the same shoes insofar as Defendants' status reports are concerned. Mr. Feldon and Mr. Gardner had no involvement in the preparation or submission of those reports, and little to no involvement in the efforts described therein to arrange for Ms. Iglesias's surgery. Declaration of Gary Feldon (June 29, 2022) ¶ 4 (filed herewith); Declaration of Joshua E. Gardner (June 30, 2022) ¶ 3 (filed herewith). During the relevant period, specifically,

from February 25 to May 23, 2022, Mr. Feldon was out of the office on parental leave and did not

participate in the handling of this case. Feldon June 29 Decl. ¶ 4. Similarly, since October 27, 2021,

Mr. Gardner has been on detail from the Federal Programs Branch (the office responsible for the

Government's defense of this case) to the Department of Justice Office of Legislative Affairs.

Gardner June 30 Decl. ¶ 3.[14] Thus, in addition to the fact that the statements made in Defendants'

status reports are not themselves sanctionable, neither Mr. Feldon nor Mr. Gardner is subject to

sanction under the Court's inherent power, Rule 11, or otherwise, because neither was responsible

for the contents or submission of those reports.

      Similarly, Mr. Schwei, who was assigned to this case to handle issues related to the Court's

February 10 Order to Show Cause, Schwei June 30 Decl. ¶ 13, did not sign or file any of the status

reports cited in the Court's Memorandum and Order, nor does his name appear in the signature

blocks, *id.* ¶¶ 14, 17, although he remained generally aware of what was occurring in the case during

the relevant period and reviewed all (or nearly all) of Defendants' filings during that period, *id.*

¶¶ 37-38. In addition to the fact that the representations made in Defendants' status reports were

factually warranted and not made for any improper purpose, Mr. Schwei is not subject to sanction

under Rule 11 because he did not "present[,] . . . whether by signing, filing, submitting, or later

advocating," any of the reports in question. Fed. R. Civ. P. 11(b).

      We also observe, as a threshold matter, that Mr. Boynton, the Principal Deputy Attorney

General for the Civil Division, did not personally become aware of the fact that Surgeon One does

not perform vaginoplasty until April 8, 2022. On the morning of April 8 he received an e-mail from

the DOJ litigation team passing along information about a conversation with Ms. Iglesias's counsel,

---

    [14] Although neither Mr. Feldon nor Mr. Gardner formally withdrew from representation of
Defendants when their absences began, that was in accord with Federal Programs Branch policy,
which anticipates that attorneys on extended leaves or details will resume working on the cases to
which they were previously assigned upon their return. Haas June 30 Decl. ¶ 14.

in which they expressed their disappointment that her April 7 consultation with Surgeon One did not include a discussion of that procedure. Boynton June 30 Decl. ¶ 9. Accordingly, in addition to all the other reasons why the statements made in Defendants' status reports about the April 7 consult are not sanctionable, Mr. Boynton cannot be sanctioned on the ground that he approved the submission of those reports with knowledge that Surgeon One refers out for vaginoplasty, for in fact he lacked such knowledge at the time.

Regardless, however, of the degree to which particular individuals among the six DOJ attorneys named in the Court's Memorandum and Order were involved in the preparation and submission of Defendants' status reports, the representation that Ms. Iglesias was scheduled to meet with Surgeon One for a GCS consult was made on the basis of a reasonable, good-faith belief that the consultation would include a discussion of vaginoplasty, among other procedures, notwithstanding the confirmation received on March 3 that Surgeon One refers patients to other providers for that procedure. Counsel's belief was based on a number of facts and reasonable expectations flowing therefrom.

Like BOP, the DOJ trial attorneys working on this matter first learned for a fact that Surgeon One does not perform vaginoplasties, but refers patients out for that procedure, on or about March 3, 2022, after BOP forwarded a draft of Ms. Epplin's March 3, 2022 declaration. Kolsky June 29 Decl. ¶ 4; Robinson June 29 Decl. ¶¶ 12-13; Schwei June 30 Decl. ¶¶ 31-32. During the week of February 14-18, 2022, BOP and the DOJ trial attorneys were in frequent communication to prepare for the February 22 show-cause hearing (the focus of which was the TEC's compliance with the Court's December 27 injunction, rather than BOP's search for a surgeon). *See* Schwei June 30 Decl. ¶ 22. The attorneys vaguely recall BOP at some point bringing up Surgeon One's qualifications, at a high level of generality, *see* Kolsky June 29 Decl. ¶ 5, and mentioning that BOP still needed to resolve some uncertainty concerning the procedures that

55

Surgeon One performs, *see* Robinson June 29 Decl. ¶ 10; Schwei June 30 Decl. ¶ 24, as well as a written comment from agency counsel along the same lines, Robinson June 29 Decl. ¶ 10; *see* Kolsky June 29 Decl. ¶ 6. Only recently were the attorneys made aware of the February 14 e-mail, forwarded from the contractor to BOP, in which Surgeon One states "We do not offer vaginoplasty yet." None of them recalls receiving information in mid-February, in any form, specifically indicating that Surgeon One does not perform vaginoplasty. Kolsky June 29 Decl. ¶ 7; Robinson June 29 Decl. ¶ 13; Schwei June 30 Decl. ¶¶ 8, 52.

Nevertheless, even upon learning on March 3 that Surgeon One refers patients out for vaginoplasty, the trial attorneys continued to represent that Ms. Iglesias was scheduled on April 7 to consult with Surgeon One about gender-confirmation surgery because, like BOP, *see supra* at 45, they reasonably believed that statement, in good faith, to be true. Their belief, like BOP's, was based on a variety of facts and information available to them. First, even knowing that Surgeon One referred patients out for vaginoplasties, the DOJ trial attorneys reasonably anticipated that to mean that Surgeon One would nevertheless discuss the procedure with Ms. Iglesias and let her ask questions about it, and thereafter refer her directly to another provider, perhaps a colleague at the institution where Surgeon One practices, who could perform the procedure for her. Robinson June 29 Decl. ¶ 14; Schwei June 30 Decl. ¶¶ 33, 34. Based in part on Surgeon One's institutional affiliation, their own personal experience, and other factors, they anticipated this to be a seamless process akin to arrangements made by a primary care physician to have a patient seen by a specialist. Kolsky June 29 Decl. ¶ 11; Robinson June 29 Decl. ¶ 14; Schwei June 30 Decl. ¶¶ 32-33.

Second, they did not understand the term gender-confirmation surgery in the same sense as the Court defined it for purposes of its December 27 preliminary injunction opinion, *see* Mem. & Order at 1 n.1, that is, to mean just a single surgical procedure, or to be limited to surgery involving the genital organs. Kolsky June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶ 21. Rather, they

understood it, with reference to the WPATH Standards of Care, as a menu of top, bottom, and facial surgeries available to treat gender dysphoria and/or to acquire physical characteristics matching an individual's gender identity.   Kolsky June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶ 19. They had reason to believe, based on the judgment of BOP's contractor, and Surgeon One's webpage, *see* Kolsky June 29 Decl. ¶ 3; Robinson June 29 Decl. ¶ 6, that Surgeon One performed a number of these procedures, including GCS procedures such as breast augmentation and facial feminization in which Ms. Iglesias had expressed interest, even if Surgeon one did not personally perform vaginoplasty, *see* Kolsky June 29 Decl. ¶ 10; Robinson June 29 Decl. ¶ 22.

Third, although Surgeon One did not in fact discuss vaginoplasty with Ms. Iglesias, the surgeon's record of the April 7 consult (ECF No. 249-1) supports the reasonableness of referring to their meeting as a GCS consult. ███████████████████████████████████████████ ███████████████████████████ ECF No. 249-1 at 1. ███████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ *Id.* at 3, 5.  The depth of Ms. Iglesias's interest in breast augmentation and facial feminization is expressed most compellingly, of course, by the Court's Stipulated Order, which entitles her to receive these treatments from Surgeon One, and affirms both the value of keeping the April 7 appointment with Surgeon One, *see* Kolsky June 29 Decl. ¶¶ 10, 11; Robinson June 29 Decl. ¶ 19, and the reasonableness of referring to that appointment as a GCS consult.

We acknowledge that Defendants' status reports could have more clearly and prominently highlighted the information that Surgeon One refers patients to other providers for vaginoplasty, and regret that they did not.  *See* Boynton June 30 Decl. ¶ 8; Robinson June 29 Decl. ¶ 18.  But there was no attempt to hide that information, *see id.*, and for the reasons explained above, the DOJ attorneys responsible for preparing and filing those reports acted reasonably, notwithstanding that

information, in referring to the April 7 appointment as a GCS consult. They did so, moreover, in good faith and without intent to mislead. Their actions do not call for punishment in the form of sanctions.[15]

## IV. DEFENDANTS WOULD APPRECIATE THE OPPORTUNITY TO ADDRESS ANY REMAINING CONCERNS THE COURT MAY HAVE.

Defendants are grateful for the opportunity to address the Court's concerns, and to explain why sanctions are not warranted or necessary here. In preparing this response, Defendants and the individual BOP personnel and DOJ attorneys who have provided declarations have endeavored to provide this Court with a comprehensive account of the events in question. Defendants respectfully submit that, based on the existing record, this Court should conclude its sanctions inquiry as to both BOP and the individual DOJ attorneys.

If the Court continues to have concerns about the conduct of this case, however, Defendants respectfully request an opportunity to further address those concerns. Defendants are not certain as to the precise form of potential sanctions under consideration. Additionally, although Defendants have attempted to comprehensively address the Court's concerns, given the breadth of conduct discussed in the Court's April 18 Memorandum and Order, Defendants would request a further opportunity to address any remaining concerns if the Court believes they have been inadequately addressed by this response. As the record here reflects, this case was litigated as a collective effort by numerous individuals at both DOJ and BOP. *See, e.g.*, Feldon June 29 Decl. ¶ 4; Kolsky June 29 Decl. ¶¶ 1, 6; Robinson June 29 Decl. ¶ 4; Schwei June 30 Decl. ¶¶ 5, 37.

---

[15] The Memorandum and Order notes that "Defendants were ordered to explain how *J.M. by & through Lewis v. Crittendon,* NO. 1:18-CV-568-AT, 2018 WL 7080041, at *1 (N.D. Ga. Apr. 10, 2018) and the additional cases relied upon were applicable. (ECF No. 198, p. 23). Counsel shall confirm where this explanation can be found." Mem. & Order at 29 n.11. *J.M.* and other cases were discussed by Defendants at page 19, footnote 6, in Defendant' Response to the Court's February 21, 2022, Notice and Order (ECF No. 199 at 19 n.6).

Accordingly, the United States would have serious concerns about the issuance of sanctions against any individual attorney, penalizing them for conduct that is more accurately attributable to the collective action of numerous individuals and/or entities. Before the Court enters any sanctions against individual DOJ attorneys, therefore, the United States would respectfully request the opportunity to address any remaining concerns the Court may have.

Again, Defendants appreciate the opportunity to submit this response, and hope that the detailed explanations provided herewith demonstrate that, although there were miscommunications in this case, those miscommunications were unintentional and not deserving of any sanctions. Defendants very much appreciate the Court's time and attention devoted to this important matter.

## CONCLUSION

For the reasons discussed above, Defendants respectfully submit that the Court's orders to show cause contained in its April 18 Memorandum and Order should be discharged, and that no sanctions, for contempt or otherwise, should issue against BOP or its counsel.

Dated:  July 1, 2022

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

STEVEN D. WEINHOEFT
United States Attorney

LAURA J. JONES
Assistant United States Attorney

 /s/ *James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C.  20530
Telephone: (202) 514-3358
E-mail:  james.gilligan@usdoj.gov

*Counsel for Defendants*