UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>Plaintiff,<br><br>v.<br><br>IAN CONNORS, ET AL.,<br><br>Defendants. | 19-CV-00415-NJR |

**SUPPLEMENTAL DECLARATION OF ALEXANDER K. HAAS**

I, Alexander K. Haas, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am a Director in the Federal Programs Branch, Civil Division, of the United States Department of Justice, a position in the Career Senior Executive Service of the United States Government. I have served in this position since August 2019. As outlined in my initial declaration, Dkt. No. 191-3, I have spent the majority of my career as a civil servant as an attorney for the United States in various capacities. I make this declaration based on personal knowledge, and am submitting it on behalf of the Federal Government in the above-captioned matter in response to the Court's April 18, 2022 Memorandum and Order, Dkt. 238.

2. The role of the Federal Programs Branch is principally to defend civil actions filed against the Government in federal district courts throughout the United States. The Branch is made up of approximately 110 attorneys, all of whom are career professionals. The Branch handles significant cases nationwide in which parties challenge the lawfulness of Federal Government

programs, policies, and decisions of virtually every agency of the Executive Branch as well as the constitutionality of Federal statutes; the cases handled by the Branch encompass a wide range of subject matters and address many different areas of the law. The Branch handles, and I supervise, significant defensive civil litigation concerning the Department of Justice and therefore the Federal Bureau of Prisons (BOP). As a result, I have been the Director supervising this litigation since the Branch began working on it.

3. I am familiar with the course of this litigation and am aware that the Court issued a preliminary injunction in late December 2021. I also am aware that on February 10, 2022, the Court issued an Order to Show Cause in the above-captioned case and expressed concerns about the Government's compliance with that preliminary injunction and the conduct of the Government's litigation. I attended the February 22, 2022 Show Cause Hearing. Like the other Department of Justice attorneys representing BOP in this case, I take this Court's concerns over the handling of this case very seriously and I regret that our handling of this case has led to these concerns and led to so much frustration for the Court, Plaintiff, and her counsel.

4. Since the February 22 hearing, I have continued to monitor this case closely and participated in numerous meetings and calls regarding this case to ensure BOP was making progress to provide Plaintiff with any and all necessary medical treatment, including surgery, to treat Plaintiff's gender dysphoria. I am aware that the Court issued a Memorandum and Order on April 18, 2022, Dkt. 238 requiring, among other things that: (1) Defendants show cause why BOP should not be held in contempt for violating the Court's December 27, 2021, preliminary injunction order (Doc. 177); and (2) BOP and six DOJ attorneys address representations made in

a series of status reports (Docs. 204, 212, 220, 221, 227, 229, and 231) about a surgeon with whom BOP, through its contractor, had scheduled a consultation on April 7, 2022 for Plaintiff.

5. On behalf of the Federal Programs Branch, I want to personally apologize to the Court, Plaintiff, and her counsel for any confusion or distress caused by Defendants' representations in this case. From the inception of this case up to the present day, I have observed a team of dedicated public servants who worked tirelessly to defend their client's interests while complying with their ethical obligations and this Court's Orders. Among other things, I have observed the care with which the team has sought to address the Court's concerns, including to provide the Court and Plaintiff with timely and accurate information available to them about the progress BOP made to provide Plaintiff with any and all necessary medical care. Notwithstanding these efforts, I recognize and understand why the Court and Plaintiff have expressed their concerns, for which I wish to express my profound regret.

6. Based on everything that I have seen, I do not believe that any of the DOJ attorneys identified in the Court's April 18, 2022, Memorandum and Order intentionally misled the Court, Plaintiff, or her counsel. Similarly, based on everything that I have seen, I do not believe that any of these DOJ attorneys sought to intentionally withhold or conceal information for the purpose of deceiving the Court, Plaintiff, or her counsel. I believe that each of these DOJ attorneys acted ethically, within the bounds of their professional duties, and reasonably at all times in this case.

7. Moreover, at no time as the events at issue here unfolded did any of the attorneys working on this case raise a concern with me that there was any intention to mislead the Court or Plaintiff, or to withhold information that the Defendants ought to disclose. Given my experience

3

as Director overseeing litigation handled by the Branch, and consistent with my expectations of the trial attorneys in the Branch, including those working on this case, it is inconceivable to me that there could have been an intention to mislead the Court or Plaintiff, or to withhold information that should be disclosed, without any of the career professionals working on this matter bringing it to my attention.

8. With the benefit of hindsight and more complete information, I now recognize, as do the DOJ attorneys, that Defendants' status reports identified in the Court's April 18, 2022, Memorandum and Order gave rise to expectations on the Court's part regarding Ms. Iglesias's April 7 consultation with Surgeon One that were not met. I believe that miscommunication arose in part from the failure—the highly regrettable failure—to give greater prominence in Defendants' March 4, 2022, filing to the fact that Surgeon One refers patients to other providers for vaginoplasty. I believe the miscommunication also stemmed from the different meaning that the term 'gender-confirmation surgery' held for the Court on the one hand, and for the DOJ attorneys (and BOP) on the other.

9. Based on everything that I have seen, I also believe that the misunderstanding to which these filings inadvertently gave rise stemmed in large part from an attenuated chain of communications. My understanding is that medical care provided to individuals residing in BOP Residential Reentry Centers is provided not by agency personnel but through a federal contractor that identifies independent medical care providers and arranges for treatment. This arrangement adds extra links to the usual communication chain between DOJ and its client agencies—namely, the federal contractor and the independent medical provider. The DOJ attorneys lacked visibility

4

into the communications exchanged back and forth across these additional links, because they could not communicate directly with either the federal contractor or the independent medical provider with whom the contractor communicated.

10. I believe this lack of visibility contributed to the DOJ attorneys' (and BOP's) own set of expectations, which ultimately were also unmet, about the nature of the consultation that would occur on April 7, about whether Surgeon One would discuss the vaginoplasty procedure sought by Plaintiff, and whether Surgeon One would act as a point of access to other providers who could perform that procedure for her. I am convinced that these expectations are reflected in the manner in which Defendants' status reports described the anticipated April 7 consult. And I am equally confident that if the DOJ attorneys had possessed more complete and ready access to information, the status reports identified in the Court's April 18, 2022, Memorandum and Order would have been drafted differently, and that more complete information about what to expect from the April 7 consult would have been conveyed to the Court and Plaintiff. While it is regrettable and understandably frustrating to the Court, Plaintiff, and her counsel, that Defendants' status reports were unable to paint a more complete picture of what the April 7 consult would entail, I know that it is also deeply frustrating to the DOJ attorneys identified in the Court's April 18, 2022 Memorandum and Order, as well as to BOP.

11. As a Federal Programs Branch Director, it is my experience that DOJ and Branch attorneys, consistent with their responsibilities as career civil servants, seek to accurately present to the courts the position of the United States in litigation, the facts in a case as they know it at any given time, and the applicable law with respect to matters the Branch handles. Consistent with this

experience, from the moment the Branch first became involved in this case, I have witnessed a team of dedicated DOJ attorneys who worked days, nights, and weekends to comply with their professional and ethical obligations and to diligently provide the Court, Plaintiff, and Plaintiff's counsel with timely and accurate information. I also have witnessed a client agency, BOP, work persistently and diligently through a series of legal and practical problems to provide first-of-its-kind medical care with which they lacked expertise to a person in the care of the Residential Reentry Services Branch, Ms. Iglesias. And it is exasperating—to the DOJ attorneys identified in the Court's April 18, 2022, Order, to BOP, and to myself—that despite the entire team's genuine, good-faith efforts, more complete information regarding the April 7 consultation and/or the ability of Surgeon 1, or Surgeon 1's team, to provide the vaginoplasty procedure was not conveyed to the Court, Plaintiff, and her counsel.

12. Based on everything that I have seen, I see no basis to impose sanctions on any DOJ attorney personally or on BOP. I again wish to personally apologize, and profess my profound regret, to the Court, Plaintiff, and her counsel for any confusion or distress caused by Defendants' representations in this case. Further, I have asked the Branch's training committee to consider including this matter as a case study in future trainings for the entire Branch, so that current and future Branch attorneys can benefit and learn from this unfortunate experience.

13. It is my privilege as a Director in the Federal Programs Branch to represent the United States of America. And it is my privilege in this position to work with outstanding attorneys who execute their duties as counsel for the United States with skill and utmost professionalism. That is true with respect to the each of the attorneys assigned to this case, and whom I have known through

personal observation and interaction over time to have conducted themselves consistent with the highest standards of ethics and professionalism with respect to their litigation matters, including the above-captioned civil action.

    14. Finally, I would like to explain one matter of Branch practice as it pertains to attorneys who temporarily are on extended leave from the Branch. These extended leave situations typically occur in connection with either parental leave or a temporary detail to another part of the Federal Government and often last between three and twelve months. During the leave period, those on extended leave are Branch employees but the Branch does not expect them, absent special arrangements, to perform the Branch's work until the leave period ends. Because our cases continue to be litigated during these extended leave periods, the Branch assigns other attorneys to personally handle the case should a need arise. Starting in February 2020, I have handled case assignments for the Branch and have been responsible for identifying attorneys to litigate cases for the temporary period that another attorney is out on extended leave. When an extended leave situation terminates, my expectation is that the attorney who had been on leave will resume working on their cases unless I agree, after discussing the matter with the attorney and reviewer, otherwise. Because it is assumed that attorneys on extended leave will resume litigating the cases that are temporarily being litigated by a colleague, in my experience, attorneys beginning an extended leave arrangement do not usually formally withdraw from cases for the leave period. I explain this general practice because two attorneys identified in the Court's April 18, 2022 Memorandum and Order, Joshua Gardner and Gary Feldon, were on extended leave during the period when the status reports identified in that Order were filed. My understanding and

recollection is that neither Mr. Gardner nor Mr. Feldon were involved in preparing these status reports identified in that Order, which would be consistent with the Branch's general practice and my expectations of those in an extended leave situation.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on June 30, 2022, in the City of Kensington in the State of Maryland.

                                                                    _____
                                                                    Alexander K. Haas
                                                                    Director, Federal Programs Branch
                                                                    United States Department of Justice