UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>     Plaintiff,<br><br>     v.<br><br>IAN CONNORS, *et al.*,<br><br>     Defendants. | Case No. 19-cv-00415-RJN |

**THIRD DECLARATION OF JOSHUA M. KOLSKY**

I, Joshua M. Kolsky, make the following declaration, in accordance with the provisions of 28 U.S.C. § 1746:

1.      I am a Trial Attorney employed as a career civil servant by the Department of Justice, Civil Division, Federal Programs Branch.  I am one of the attorneys representing the Defendants in this litigation.  I make this declaration based on my personal knowledge of the facts stated herein.

2.      I am submitting this declaration to address various questions and concerns raised in the Court's Memorandum and Order issued on April 18, 2022.  In particular, this Court ordered certain DOJ attorneys, including myself, to address representations made in seven status reports filed by Defendants, Docs. 204, 212, 220, 221, 227, 229, and 231, that the Federal Bureau of Prisons ("BOP") had scheduled a consultation for Plaintiff Cristina Iglesias to discuss gender-confirmation surgery, when it knew by that time that the surgeon with whom she had the appointment ("Surgeon One") refers patients to other providers for vaginoplasty.  Doc. 238 at 29-30.

3.     I learned the identity of Surgeon One on or about February 15, 2022. At that time, I had limited information about Surgeon One. As a litigation counsel for Defendants, I generally deferred to the judgment of BOP and its contractor about the suitability of Surgeon One to treat Ms. Iglesias's gender dysphoria. Nevertheless, on February 15, 2022, I reviewed Surgeon One's website and a news article about Surgeon One, both of which indicated that Surgeon One had impressive academic and medical credentials and experience performing gender affirming procedures. At the time, I did not know, or even suspect, that Surgeon One would not be able to personally perform the surgery Ms. Iglesias was primarily seeking.

4.     I first learned that Surgeon One refers patients out to other providers for vaginoplasty on March 3, 2022 when I reviewed the declaration of Jenna Epplin. That declaration contained the following statement: "BOP was also advised that Surgeon 1 refers patients out to other providers for vaginoplasty and was advised the contractor would find out who those providers are." Doc. 212-1 ¶ 6. The following day, March 4, 2022, I filed the Epplin Declaration as an exhibit to Defendants' March 4 Status Report (Doc. 212).

5.     I do not recall receiving any information or communications prior to March 3, 2022, whether in writing or orally, suggesting that Surgeon One does not perform vaginoplasty. As noted, I reviewed Surgeon One's website in February 2022 but that website does not suggest that Surgeon One does not perform vaginoplasty (and instead describes Surgeon One's clinical interest in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). I recall generally that, in February 2022, one or more BOP officials discussed at a high-level their knowledge of Surgeon One's qualifications – which was limited at that time – but I do not recall any statement or suggestion in those discussions that Surgeon One does not perform vaginoplasty. I do not recall any statement from any BOP official expressing uncertainty about which procedures Surgeon One would perform, but I did not participate in every conversation with BOP officials.

6. After the Court issued the April 18 Memorandum and Order, I reviewed my files for any pre-March 3 references to the question of whether Surgeon One performs vaginoplasty. I located an email, dated February 18, 2022, on which I was copied. An attachment to that email included a comment from BOP suggesting there was some unspecified lack of clarity concerning Surgeon One and the vaginoplasty procedure. I had not reviewed that attachment until I searched my files in April 2022. I was on an airplane at the time the email was sent, and the email pertained to a document with which I had only minimal involvement. In any event, the attachment indicated only a lack of clarity—it did not state that Surgeon One did not perform vaginoplasty.

7. I am aware that the April 15, 2022 Declaration of Jenna Epplin stated in part, "BOP had previously received information from its contractor suggesting that Surgeon 1 may not currently offer vaginoplasty[.]" 4/15/2022 Epplin Decl. ¶ 13. While working to prepare that declaration and the associated status report, BOP indicated that, in February 2022, it received information through its contractor indicating that Surgeon One performed two to three bottom surgeries per month but did not offer vaginoplasty yet. I do not recall BOP sharing that information about Surgeon One with me at the time it was received in February 2022. Had I known of that information in February 2022, I am certain I and/or my DOJ colleagues would have promptly shared it with the Court and Plaintiff's counsel.

8. As noted above, I filed the March 4, 2022 Epplin Declaration as an exhibit to Defendants' March 4 Status Report (Doc. 212). The March 4 Status Report, which summarized the Epplin Declaration, did not itself state that Surgeon One refers patients to other providers for vaginoplasty. In deciding on the contents of the Status Report, neither I nor, to my knowledge, my colleagues, intended to mislead the Court or Ms. Iglesias regarding Surgeon One's capabilities. Otherwise, we would not have specifically disclosed in the March 4 Epplin declaration that Surgeon One refers patients to other providers for vaginoplasties.

9. Defendants' later status reports also did not state that Surgeon One refers patients to other providers for vaginoplasty. That is because the content of those status reports was based on the declarations submitted with them, which primarily described new information received or developments that had occurred during the preceding week.

10. The Court's Memorandum & Order also raises concerns with the fact that "DOJ attorneys have represented that the BOP has scheduled an appointment with a surgeon for a consultation for GCS—despite the fact that BOP was 'advised that Surgeon 1 refers patients out to other providers for vaginoplasty and was advised the contractor would find out who those providers are.'" Mem. & Or. at 29-30. My understanding of the term "gender confirmation surgery" is that it does not refer to one particular medical procedure, but rather is a broad term used to describe a variety of surgical procedures used to treat gender dysphoria. My understanding is based in part on the WPATH Standards of Care, which describe many different surgical procedures for the treatment of gender dysphoria in transgender women, including "breast/chest surgery: augmentation mammoplasty (implants/lipofilling)," "[g]enital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvopasty," and "nongenital, nonbreast surgical interventions," such as "facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid-cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures." My understanding is that Surgeon One personally performs some of these procedures, including breast augmentation and facial feminization surgery (both of which Ms. Iglesias has elected to pursue to treat her gender dysphoria). There are indications, including on Surgeon One's website, that Surgeon One may perform ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Therefore, I believe it was accurate to describe Ms. Iglesias's appointment with Surgeon One as a consultation for gender confirmation surgery. I recognize that the Court defined "gender confirmation surgery" for purposes of its December 27, 2022, preliminary injunction decision to

4

mean surgery or surgeries altering one's genital organs. (Doc. 176 at 1 n.1.) The term "gender confirmation surgery" in Defendants' status reports was used in the clinical sense, as in the WPATH Standards of Care. Any difference between the definition in the Court's December 27 opinion and the clinical definition did not occur to me at the time.

11. For multiple reasons, I believe it was appropriate for BOP to go forward with Ms. Iglesias's April 7 consultation notwithstanding the fact that Surgeon One refers patients to other providers for vaginoplasty. First, the consultation was an opportunity for Ms. Iglesias to discuss various surgical procedures that Surgeon One does personally perform (including facial feminization and breast augmentation), procedures that Ms. Iglesias desires and can help treat her gender dysphoria. I am aware that the medical record from Ms. Iglesias's April 7 consultation with Surgeon One notes that although Ms. Iglesias's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Second, BOP's contractor had reported that Surgeon One refers patients to other providers for vaginoplasty. In my personal experience, a referral from one doctor to another usually involves the doctor identifying a specific provider and coordinating with that provider so that there is a seamless transition of care. Prior to the April 7 consultation, I expected that Surgeon One would offer a similar process and would directly refer Ms. Iglesias to another surgeon for vaginoplasty, potentially another physician at Surgeon One's practice. I did not know that Surgeon One would not directly refer Ms. Iglesias to another surgeon and coordinate care with that other surgeon until April 7, when I learned that at the consultation Surgeon One instead provided a list of vaginoplastic surgeons for BOP or Ms. Iglesias to contact. However, I believe it was reasonable for BOP to expect that Surgeon One could help facilitate vaginoplasty by another surgeon. Third, at the time of the appointment with Surgeon One, BOP was actively continuing to search for other surgeons in the Miami area who would be acceptable to Ms. Iglesias and willing to schedule a

consultation with Ms. Iglesias for a vaginoplasty procedure. Thus, moving forward with the April 7 consultation even after it was discovered that Surgeon One does not personally perform vaginoplasties did not delay or prevent the identification or consultation with any other Miami-area surgeon for a vaginoplasty, had BOP been able to locate one who would accept Ms. Iglesias as a patient.

12. The Court's Memorandum and Order also notes that Defendants' Response to the Court's February 10, 2022 Order to Show Cause cites to the Declaration of Dr. Alix M. McLearen and states that "BOP has notified its contractor of Iglesias's pending transfer, and has been informed that the contractor has located an appropriate surgeon." Mem. & Order at 6. My understanding is that the term "appropriate surgeon" is a reference to BOP's contractor's initial assessment of Surgeon One. I am not personally aware of the information that BOP's contractor used to make that assessment. My understanding is that BOP generally relies on the knowledge and experience of its contractor to locate appropriate healthcare providers. I have not had any direct communication with BOP's contractor about this or any other matter.

13. Over the past several months, I have worked hard alongside my DOJ colleagues to assist BOP's efforts to identify and retain a surgeon or surgeons for Ms. Iglesias, and to accurately report BOP's progress to the Court, and Ms. Iglesias. Although we have faced challenges and setbacks in pursuit of a surgeon or surgeons for Ms. Iglesias, I believe that everyone at DOJ involved in this case has acted in good faith and endeavored to represent our client's legitimate interests within the bounds of our ethical and professional responsibility obligations. I regret that statements made and actions taken on BOP's behalf in this matter have caused the Court to question Defendants' candor, the candor of Defendants' counsel, or BOP's intentions to provide Ms. Iglesias with the medical care she requires. I am pleased that the parties were able to negotiate

a mutually-acceptable settlement of this action, which I expect will lead to Ms. Iglesias receiving multiple forms of gender confirmation surgery to treat her gender dysphoria.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 29th day of June 2022 in Chevy Chase, Maryland.

JOSHUA KOLSKY
Digitally signed by JOSHUA KOLSKY
Date: 2022.06.29 17:09:02 -04'00'

Joshua M. Kolsky