# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| CRISTINA NICOLE IGLESIAS (a.k.a., CRISTIAN NOEL IGLESIAS), ) <br> ) <br> ) | |
| Plaintiff, ) | |
| v. ) | No. 19-cv-00415-NJR |
| IAN CONNORS, *et al.*, ) | |
| Defendants. ) | |

## DECLARATION OF DR. ALIX M. McLEAREN

I, Dr. Alix M. McLearen, make the following declaration, in accordance with the provisions of 28 U.S.C. § 1746:

1. I am currently employed by the Federal Bureau of Prisons ("BOP") as Acting Assistant Director of BOP for the Reentry Services Division. I have held my current position since December of 2021, and have been the Senior Deputy Assistant Director since May of 2020. I have been employed by BOP since 2003.

2. I am familiar with the Court's April 18, 2022, Memorandum and Order (Doc. 238) ("Mem. & Order") requiring, in part, (i) that Defendants show cause why BOP should not be held in contempt for violating the Court's December 27, 2021, preliminary injunction order (Doc. 177) ("Dec. 27 Prelim. Inj."); and (ii) that BOP show cause why it should not be sanctioned for representing that Surgeon One[1] is an "appropriate surgeon" to perform gender-confirmation surgery ("GCS") for Plaintiff Cristina Iglesias. I submit this declaration in support of Defendants' response to the Court's Memorandum and Order. The statements made herein are based on my

---

[1] Surgeon One's name, and a link to information regarding Surgeon One's professional background, were submitted to the Court under seal on February 23, 2022 (Doc. 201).

personal knowledge and on information provided to me in connection with my duties and responsibilities as Acting Assistant Director for the Reentry Services Division.

3.   This declaration includes four principal sections.  In the first section I provide an update on the progress being made to arrange for Ms. Iglesias's gender-confirmation surgery, including vaginoplasty to be performed by the Chicago-based surgeon originally identified by Ms. Iglesias's attorneys, and facial-feminization and breast-augmentation surgery to be performed by Surgeon One, in accordance with the parties' settlement and the Court's Stipulated Order (Doc. 269).

4.   In the second section, I explain that in response to the Court's December 27 injunction, BOP's Transgender Executive Council ("TEC") evaluated Ms. Iglesias's request for GCS, and on January 24, 2022, issued a decision which allowed BOP to act on her request without the need for further decision-making by or authorization from the TEC.

5.   In the third section, I explain why BOP reported to the Court that its medical-services contractor had located a surgeon (Surgeon One) whom the contractor considered appropriate to treat Ms. Iglesias, even though BOP was not yet able to confirm that conclusion independently.  I also explain in section three why BOP's status reports referred to Ms. Iglesias's April 7, 2022, appointment with Surgeon One as a "GCS" consult, and why BOP kept that appointment—even though Surgeon One does not personally perform vaginoplasties.  In short, BOP believed it would be (and still believes it was) a GCS consult (i) because it expected that Surgeon One could help arrange for, that is, refer Ms. Iglesias to, another provider (or providers) to perform a vaginoplasty, (ii) because of other GCS procedures that Surgeon One potentially could perform (and currently plans to perform) for Ms. Iglesias, and (iii) because BOP could (and did) keep the appointment while still continuing its search for other providers who could potentially perform vaginoplasty for her.

6.   In the final section I respond to the list of questions posed by the Court on page 24 of its Memorandum and Order.

7.   Before turning to these subjects, however, I wish to say that I appreciate the Court's frustration with the time it has taken to arrange for Ms. Iglesias's surgery following the TEC's decision.  I share that frustration.  Acting under my supervision, the Reentry Services Division has been steadfastly working to make arrangements for Ms. Iglesias's surgery as quickly as could be done.  Unlike routine medical care provided to inmates for which a host of providers is available, this is a first-of-its-kind situation presenting a novel set of procedures for the Reentry Services Division specifically and agency as a whole to coordinate.  We have had to overcome numerous hurdles in doing so, such as legal constraints on BOP's ability to procure outside medical services (including the need to work through BOP's medical-services contractor), and BOP's lack of authority and control over outside medical providers, who decide for themselves whether to accept Ms. Iglesias as a patient, and, if so, when they will treat her and what procedures they believe it medically necessary and appropriate to perform.  As discussed in more detail *see infra* Paragraph 74, multiple medical providers contacted by BOP's contractor have declined to schedule consultations with Ms. Iglesias. In addition, we have had to remain mindful of correctional and rehabilitative considerations, such as Ms. Iglesias's preparation for reentry to society after spending most of her adult life in BOP custody.

8.   Because of these limitations and constraints on BOP's ability to act in a matter of this kind, and the absence an existing roadmap to obtain these services, I can understand that the process of arranging for Ms. Iglesias's care may have appeared at times to be stop-and-go.  But under my direction the Reentry Services Division has been working daily to overcome the obstacles we have encountered in order to provide Ms. Iglesias the care she requires.  I remain committed to doing what I can as Acting Assistant Director to see to it that she receives that care.  It has never

3

been my intention, nor BOP's, that she receive anything less, or that her care be delayed. BOP has put an extraordinary amount of time, effort, and resources into ensuring Ms. Iglesias receives proper treatment.

9.   I wish specifically to emphasize that BOP has never sought to mislead the Court, or Ms. Iglesias, into believing that BOP was arranging for her to receive a particular kind of gender-confirmation procedure, specifically vaginoplasty, when in fact it was not.  The agency recognizes the myriad treatment and surgical approaches for transgender individuals. As early as January, we were beginning to explore options for surgeons and have related internal discussions to ensure we consulted an expert while adhering to applicable rules. Once consultation for surgery was approved, it has been BOP's intention that Ms. Iglesias receive any and all medically necessary and appropriate GCS procedures, as determined by a surgeon, to treat her gender dysphoria.  BOP's actions have been consistently directed toward that goal.  I have spent my career working to ensure access to quality services for all inmates in BOP custody and regret any statements or actions by BOP that may have led the Court, or Ms. Iglesias, to feel that they have been misled, and regret the frustration caused as a result.

**I.  STATUS OF MS. IGLESIAS'S GENDER-CONFIRMATION SURGERY**

10.   In this section I report on recent progress made to arrange for Ms. Iglesias's gender-confirmation surgery in accordance with the parties' settlement and the Court's Stipulated Order, Doc. 269.

11.   At all times since Ms. Iglesias has been housed in an RRC, BOP has sought to provide Ms. Iglesias medical treatment in a manner that would also allow her reentry needs to be met.  Since the Court issued the Stipulated Order, BOP has been working to schedule facial-feminization and breast-augmentation surgeries with Surgeon One.  On May 24, 2022, Surgeon One's office initially advised that they are waiting for surgical information from Surgeon One before they will provide a

surgery date, and that the surgeries would be scheduled for July or later.[2]  On May 31, 2022, Ms. Iglesias underwent a computerized topography scan in preparation for her facial surgery.  On June 16, 2022, Ms. Iglesias had a telehealth appointment with Surgeon One.  Surgeon One has now scheduled the first procedure for August 23, 2022.[3]

12.    Second, BOP has been working to schedule vaginoplasty with the Chicago-based surgeon identified as Surgeon Two in the Stipulated Order.  As discussed previously, Ms. Iglesias underwent a telehealth consultation with Surgeon Two on May 5, 2022.  Doc. 256-1 at 1.  On May 26, 2022, a representative from Surgeon Two's medical office informed BOP's contractor that there is additional work that Surgeon Two's staff needs to complete before they can arrange an in-person consultation with Ms. Iglesias.  Specifically, the staff needs to work on contractual and other logistical issues.  The representative stated that she would be in touch with BOP's contractor once she has full approval to move forward.  The representative also stated that she had asked her finance leaders to work on pricing so that that could be forwarded to BOP's contractor.  BOP's contractor has continued to follow up weekly, and was advised on June 28, 2022, that there was no further update, the decision is still being worked on, and that the representative from Surgeon Two's office hoped to have an answer in the next few weeks.

13.    Third, BOP worked diligently to locate a provider and obtain medical orders in furtherance of permanent hair removal for Ms. Iglesias.  BOP is continuing to schedule permanent-

---

[2] As previously reported, Surgeon One indicated that she performs facial feminization in two stages.  Breast augmentation can occur during either one of those stages.  The two stages are spaced apart by one month.  (Doc. 256-1 at 3.)

[3] Last week BOP was advised that Surgeon One had a cancellation and could potentially see Ms. Iglesias sooner (the week of June 27).  However, Ms. Iglesias unfortunately had a recent emergency room visit related to gallstones or a gallbladder issue.  When Surgeon One's office was informed of this, they advised that the earlier appointment could not take place, but kept the August 23, 2022, appointment in place.

hair-removal appointments for Ms. Iglesias both for facial hair removal and surgical site hair removal in anticipation of vaginoplasty.  Ms. Iglesias had such an appointment on June 6, and her next appointment is currently scheduled for July 11, 2022.

## II.  THE TEC'S RESPONSE TO THE COURT'S DECEMBER 27 INJUNCTION

14.    In this section I explain that in response to the Court's December 27 injunction, the TEC evaluated Ms. Iglesias's request for GCS and that its resulting January 2022 decision provided the necessary TEC approval for her to undergo such GCS procedures as physicians to whom she would be referred (subject to review by BOP staff), determined to be necessary and appropriate.

15.    The Court's injunction required the TEC, first, "to meet to evaluate [Ms.] Iglesias's request for GCS by Monday, January 24, 2022[ ]"; second, if the TEC recommended Ms. Iglesias for surgery, then to "[f]ile a notice to the Court within two days of the recommendation" and to "[r]efer [Ms.] Iglesias to the BOP's medical director immediately"; or third, if the TEC recommended against surgery for Ms. Iglesias, then in that event to "[f]ile a notice with the Court explaining all the reasons for the TEC's decision within seven days."  Dec. 27 Prelim. Inj. at 1-3.

16.    The Court's Memorandum and Order states three reasons why it appears to the Court that BOP may not have complied with its December 27 injunction:  first, that the TEC "failed to evaluate [Ms.] Iglesias's request for GCS on January 24, 2022[,]" Mem. & Order at 9; second, that on January 24 the TEC improperly delayed rather than make a decision regarding Ms. Iglesias's request for GCS, *id.* at 10-11; and third that the TEC did not make reasonable and diligent efforts to timely comply with the Court's injunction, *id.* at 12-13.

17.    As I testified in my February 14, 2022, declaration, and at the February 22, 2022, show-cause hearing, BOP and the members of the TEC (including myself) took with utmost seriousness their obligation to comply with the Court's December 27 injunction, and believed that the decision reached by the TEC at its January 2022 meeting, and the actions taken thereafter by BOP to notify

the Court of the TEC's decision satisfied the Court's requirements. After having made our best efforts to comply with the injunction, I respectfully continue to believe that to be true, and explain why that is so below.

**A. The TEC's Evaluation of Ms. Iglesias's Request for Gender-Confirming Surgery.**

18.    The Court's December 27 injunction first directed the TEC to meet on or before January 24, 2022, "to evaluate [Ms.] Iglesias's request for GCS[.]" Dec. 27 Prelim. Inj. at 1. The TEC did so, as I stated in my January 31 and February 14, 2022, declarations and testified at the February 22 show-cause hearing.

19.    As explained in prior testimony given by me and Dr. Alison Leukefeld, prior to January 2022 the TEC had not recommended Ms. Iglesias for gender-confirming surgery because she had not yet resided for twelve months in a female facility, and accordingly not shown adequate social adjustment, during the critical period of social adjustment meant to ensure that a transgender inmate can co-exist successfully and securely with peers of his or her own gender before undergoing gender-confirming surgery that cannot be reversed. As the Court is aware, it is BOP policy that persons in the agency's custody generally should be considered for GCS "only after one year of clear conduct and compliance with mental health, medical, and programming services at [a] gender-affirming [BOP] facility." Transgender Offender Manual, Program Statement 5200.18, § 9 at 9 (Jan. 13, 2022) (attachment 1 to McLearen Decl. (Doc. 183-1). Though the written policy was not formally finalized until this year, BOP has followed it in practice since 2016.

20.    That is the reason why the TEC did not recommend Ms. Iglesias for gender-confirmation surgery when it considered her request in October 2021. At that time she had resided in a BOP female facility (FMC Carswell) for less than six months (since May 2021). During that time her social adjustment was a work in progress. In addition, she was already scheduled for transfer to BOP's Residential Reentry Center ("RRC") in Miami, Florida (where she would also reside with

women) in March 2022, in anticipation of her December 2022 release from BOP custody. The TEC therefore decided that it would reconsider her request for surgery following placement and successful adjustment at the RRC of at least one month, approximately 11-12 months following her May 2021 transfer to the female facility at Carswell.

21.    When at the Court's instruction the TEC reconsidered Ms. Iglesias's request for surgery in January 2022, it took into account the facts and circumstances as they existed at that time, and reached a different decision than in October 2021, as I testified at the February 22 hearing. A number of factors that the TEC took into account in January 2022 were not present in October 2021. These included Ms. Iglesias's imminent transfer to the Miami RRC, the importance of maintaining continuity in her care throughout the GCS process, and the logistical expedience of referring Ms. Iglesias directly to a surgeon following her transfer to the RRC, rather than referring her, while still located at FMC Carswell, to the BOP medical director. After taking these additional factors into account, instead of holding over Ms. Iglesias's request for further consideration, as it had done in October 2021, the TEC decided in January 2022 that she would be referred for surgical consideration approximately one month after arrival at the Miami RRC, so long as her adjustment was adequate to show that she could maintain her placement there. *See* Feb. 22 Tr. at 23, 25-26; McLearen Decl. (Doc. 191-2) ¶¶ 4, 6, 9, 13.

22.    The difference between the TEC's October 2021 and January 2022 decisions is not just semantic. Under the October 2021 decision to re-evaluate Ms. Iglesias in April 2022, the TEC would have had to meet again to consider Ms. Iglesias's request for surgery, and a new decision (a favorable decision) would have been required, before she could be referred for a surgical consultation. *See* Transgender Offender Manual, § 9 at 9. In contrast, under the January 2022 decision, no further evaluation or decision by the TEC was required for her initial referral or (barring the unforeseen) for medically necessary and appropriate GCS surgeries to proceed. In fact,

if sufficiently serious contra-indications had arisen by April 2022 necessitating that surgery not go forward (such as an inability to maintain placement at the RRC), the TEC would have had to meet again to reconsider Ms. Iglesias's case, and rescind its prior decision authorizing her referral.

23.    The difference between the TEC's October 2021 and January 2022 decisions is also illustrated by events as they have unfolded.  Ms. Iglesias has now had two consultations with two surgeons for gender-confirming surgery.  She had an initial consultation with Surgeon One on April 7, 2022, to discuss a range of available gender-confirmation surgeries, including specifically a series of facial-feminization and breast-augmentation surgeries, and received a CT-scan on May 31, 2022, in preparation for the first of two facial-feminization procedures. Ms. Iglesias is scheduled to receive the first such procedure on August 23, 2022.  Ms. Iglesias also had an initial tele-health consult with Surgeon Two on May 5, 2022, to discuss vaginoplasty, and we anticipate that Surgeon Two's staff will schedule an in-person consult once they have completed work related to contractual and logistical issues.  Because of the consideration the TEC gave to Ms. Iglesias's request in January 2022, and the decision it reached, no further evaluation or decision-making by the TEC was necessary for BOP to authorize these consults, or (barring the unforeseen) any medically necessary and appropriate surgical procedures to follow.

24.    I understand that the Court nevertheless believes that the TEC did not evaluate Ms. Iglesias's request for GCS because in January 2022 it recommended only that she be referred for consultation with a surgeon, leaving it to the surgeon to decide what procedures are medically necessary and appropriate for her.  Mem. & Order at 9-10.  As I discuss below, however, in January 2022, after evaluating Ms. Iglesias's request for GCS, the TEC made the only type of decision it is authorized, and qualified, to make, and the only type of decision it has ever made when presented with a transgender inmate's request for GCS. The TEC's evaluation did not itself include a decision

9

or direction, as a medical matter, that Ms. Iglesias should receive gender-confirming surgery as that is not the TEC's function, nor is it a decision the TEC is equipped to make.

25.    The TEC is constituted under authority of the Transgender Offender Manual, § 3(a)(5), at 4, as BOP's "official decision-making body on all issues affecting [BOP's] transgender population," with authority "to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates[.]"  With regard, specifically, to requests by transgender inmates for GCS, the TEC is the body authorized to "determine that all milestones and individual goals for surgical consideration have been met."  *Id.* § 9, at 9.  If the TEC makes such a determination, then in the case of an inmate housed in a secure BOP facility, the request "is referred to the [BOP] Medical Director for medical consideration," and it is then the Medical Director who "determine[s] if the surgery is medically appropriate for referral to a gender affirming surgeon."  *Id.* (Section 3(a)(2) of the Transgender Offender Manual, at 4, correspondingly provides that the BOP Medical Director "receives referrals from the TEC and determines whether gender affirming surgery requests will be referred to a surgeon.")  This is precisely the type of decision the TEC made in October 2021, when for the first time it approved another inmate's request for GCS:  it made a referral to the Medical Director for surgical "consideration."  Transgender Offender Manual § 9 at 9. It did not purport to decide or direct, as a clinical matter, that it was medically necessary and appropriate to perform gender-confirming surgery on that inmate.  That determination was the responsibility of the BOP Medical Director and the provider(s) to whom the Director might refer that inmate.

26.    Similarly, "treatment decisions for inmates in community custody," that is, for inmates located in RRCs, "are made by the Residential Reentry Management Branch" of the Reentry Services Division, under my direction, "in consultation with the TEC."  Transgender Offender Manual § 16, at 13.  Consistent with this allocation of authority for inmates in a community setting, the TEC

recommended in January 2022 that the Residential Reentry Management Branch refer Ms. Iglesias to an outside surgeon to determine the medical necessity of treating her with GCS (absent contra-indications) in approximately mid-April 2022, instead of referring her to the Medical Director.

27.   In short, while it is true that a BOP inmate cannot obtain GCS without the TEC's approval, under the authority conferred on the TEC by the Transgender Offender Manual, the TEC can only recommend to the Medical Director, or, as done here for Ms. Iglesias, to the Residential Reentry Management Branch, that an inmate seeking GCS be referred to an appropriate medical professional for surgical consultation, based on the TEC's assessment that the inmate has achieved certain milestones in their transition, and met certain requirements, such as twelve months' residence in a gender-confirming facility.  The TEC does not now have, and has never had, authority to decide as a medical matter that an inmate should undergo any surgical procedure of any kind.

28.   In addition to a lack of authority to make medical decisions regarding transgender inmates' treatment, the TEC also does not include treating physicians (other than a psychiatrist) or surgeons.  The Transgender Offender Manual directs that the TEC consist of senior-level staff from (1) the Women and Special Populations Branch, and the Psychology Services Branch, of the Reentry Services Division; (2) the Designation and Sentence Computation Center (DSCC), within the Correctional Programs Division; and (3) the Health Services Division.  Transgender Offender Manual, § 3(a)(5) at 4.  As a result, the TEC is composed of staff with diverse specialty areas, commensurate with the wide variety of issues the TEC must be prepared to address concerning BOP's transgender population, but the TEC as currently constituted does not include treating physicians (other than the psychiatrist) or surgeons, and that was true in January 2022.  In January 2022, when the TEC last considered Ms. Iglesias's request for GCS, the TEC's members included two psychologists, one psychiatrist, a pharmacist, and BOP designations (facility placement) experts.

*See id.*; Nov. 22 Tr. at 130:6-22, 151:3-8, 158:21-159:19.  None of the individuals serving on the TEC at that time (other than the psychiatrist) was a physician or surgeon.

29.    Moreover, because BOP does not at this time employ surgeons on its medical staff who are capable of performing GCS, and must contract with outside surgeons to arrange GCS for its transgender inmates, neither the TEC nor anyone else at BOP can direct a surgeon to perform GCS on a particular patient, or decide for that surgeon which specific procedures to perform.  Any surgeon to whom BOP might refer an inmate would exercise independent discretion to accept that individual as a patient or not, and independent medical judgment in deciding what surgical procedures to perform.  BOP does not control such decisions.  Under no set of circumstances, therefore, could the TEC have purported to decide that it was medically appropriate for Ms. Iglesias to undergo GCS, or specific gender-confirming surgical procedures, or to direct any medical professional within or outside BOP to perform particular GCS procedures on her.  Given the limits of the TEC's authority and expertise, the most it can do when it considers an inmate's request for GCS is to recommend that the inmate be referred to a qualified surgeon for a consultation, if appropriate.  And that is what the TEC recommended in Ms. Iglesias's case in January 2022.

30.    Given the TEC's assigned role, when we received the Court's December 27 injunction directing the TEC to evaluate Ms. Iglesias's request for GCS by January 24, 2022, we understood the Court to require the TEC to consider and make a recommendation regarding her request in the same manner as it would any other such request.  Based on that understanding, the TEC evaluated Ms. Iglesias's request in light of the facts and circumstances presented at that time, and made a recommendation that has allowed her to consult with two surgeons and begin preparations for medically necessary gender-confirming procedures.  In so doing, we believed we had done what the Court required of us.  If I had understood the Court's December 27 injunction to require the TEC

to exercise authority it does not possess, or to reach medical judgments that it is not qualified to make, I would have sought clarification through counsel.

**B.  The TEC's Arrival at a Decision Regarding Ms. Iglesias's Request**

31.   The Court's Memorandum and Order next states that in January 2022 the TEC did not make, but delayed, a decision regarding Ms. Iglesias's request for GCS, because it recommended that she "be referred to a surgeon for consultation for GCS approximately one month after" her placement in an RRC, "assuming she does not engage in behavior that would prevent her from continued placement in a female facility and assuming further that no other reasons develop that would make gender confirmation surgery inappropriate for [her]."  Mem. & Order at 10-11; *see* McLearen Decl. (Doc. 183-1) ¶ 6.  For reasons already explained above, in January 2022 the TEC in fact made a decision in favor of Ms. Iglesias's request, a decision that has made it possible since then for her to consult with two GCS surgeons, and to schedule further appointments with them in anticipation of and preparation for gender-confirming procedures.

32.   As discussed above, in October 2021 the TEC decided only that it would reconsider Ms. Iglesias's request following her transfer to the RRC, thus necessitating a further meeting and decision by the TEC before her surgery could be authorized.  But in January 2022 the TEC, as noted, recommended that Ms. Iglesias be referred for surgery one month following her transfer to the RRC absent certain contra-indications.  That decision provided the necessary authorization to refer Ms. Iglesias to two separate surgeons to consult about and begin preparations for various GCS procedures, including vaginoplasty, without any further action needed by the TEC.  Accordingly, the TEC's action in January 2022 was a decision on Ms. Iglesias's request, under which her referral for surgery was authorized and preparations in anticipation of her surgery are now being made, and, as noted above, her first facial-feminization procedure is scheduled for August 23.

33.   The Court's Memorandum and Order emphasizes that the unambiguous purpose of the December 27 preliminary injunction was to avoid delay in the TEC's decision regarding Ms. Iglesias's request.  Mem. & Order at 11.  As both Dr. Leukefeld and I have previously testified, the TEC did not make its January 2022 decision with any purpose to delay Ms. Iglesias's surgery.

34.   In prior declarations and testimony I have previously explained the reasons for the TEC's decision to refer Ms. Iglesias for gender-confirming surgery one month following her placement at the Miami RRC.  First was the BOP policy that GCS is generally considered for persons in BOP custody "only after one year of clear conduct and compliance with mental health, medical, and programming services at [a] gender affirming facility."  Transgender Offender Manual, § 9 at 9; *see also* McLearen Decl. (Doc. 183-1) ¶¶ 6-7.  The twelve-month requirement serves crucial correctional objectives by allowing BOP to evaluate whether an inmate can be housed safely in a gender-confirming facility prior to conducting irreversible gender-confirming surgery.  *Id.* ¶ 8.  This requirement was particularly important in Ms. Iglesias's case, given her prior difficulties in adjusting to living with female peers in a correctional setting.  *See id.* ¶ 12.

35.   The second consideration was continuity of care—that it was more prudent for the welfare of the patient, Ms. Iglesias, to begin and complete the entire course of procedures involved in GCS, including pre-operative preparations, post-operative care, and psycho-social counseling, with a single team of physicians and mental-health care professionals, rather than begin the process with one set of providers (while she still remained in FMC Carswell, in Fort Worth) and complete it with another set of providers following her transfer to the Miami RRC.  Feb. 22 Tr. 23:18-24:15; McLearen Decl. (Doc. 191-2) ¶¶ 16, 18; McLearen Decl. (Doc. 183-1) ¶ 10.

36.   The final consideration that informed the TEC's January 2022 decision was that referring Ms. Iglesias for a surgical consult after her transfer from FMC Carswell to the Miami RRC meant that she could be referred directly to a surgeon (or surgeons) for consultation without having

to undergo the potentially time-consuming step of referring her first to the BOP Medical Director for a medical evaluation of her request.  *See* McLearen Decl. (Doc. 183-1) ¶ 11.  The members of the TEC anticipated, therefore, that making the referral after Ms. Iglesias's transfer to the RRC would allow for a more streamlined process that might expedite her surgery.  *Id.*; *see* Feb. 22 Tr. 24:16-25:6, 67:23-68:6; McLearen Decl. (Doc. 191-2) ¶ 17.

37.   None of the considerations that informed the TEC's January 2022 recommendation was in any way intended to  delay Ms. Iglesias's care.  To the contrary, the expectation was that referring her for surgery after her relocation to the Miami RRC might accelerate her treatment by eliminating the intermediate step of referral to the BOP Medical Director.  And further to that end, the TEC decided that only one month of adjustment at the RRC would be necessary before a surgical referral could be made, even though that meant Ms. Iglesias would spend only eleven months in a gender-confirming facility before the referral was made, not twelve, as is generally required by the Transgender Offender Manual.[4]

38.   Dr. Leukefeld and I have repeatedly sought in prior declarations and testimony to assure the Court that the TEC has never made a decision concerning Ms. Iglesias because it wanted to delay her receipt of appropriate physical or mental-health care.  We sought only to provide her with the most appropriate care that BOP, as an agency, is capable of offering, while still taking procurement laws and correctional considerations, including Ms. Iglesias's adjustment back into society, into account.  I regret any misunderstandings in this matter that have left the Court with doubts about the sincerity of BOP's intentions.  This is especially true as BOP has put an extraordinary amount of time, effort, and resources into ensuring Ms. Iglesias receives proper

---

[4] Ultimately, Ms. Iglesias spent just over 10 months in female facilities before being seen for GCS consultation. She arrived at FMC Carswell on May 25, 2021, and was seen by Surgeon One on April 7, 2022.

treatment.  But I wish to assure the Court again that the TEC acted with no intent to delay Ms.

Iglesias's receipt of needed care when it made its January 2022 decision.

### C. BOP's Efforts to Comply With the Court's December 27 Injunction

39.    The Court's Memorandum and Order next states that BOP did not act reasonably and

diligently to comply with the Court's December 27 preliminary injunction, because the TEC did not

meet to evaluate Ms. Iglesias's request for gender-confirming surgery until the January 24, 2022,

deadline.  Mem. & Order at 12.  Although the TEC did not meet as directed until the last day

allowed under the Court's order, I believe that the TEC acted responsibly to evaluate Ms. Iglesias's

request as the Court had directed.

40.    We were surprised, however, at the order to have a court reporter attend and transcribe

the TEC's meeting.  As I explained in my January 14, 2022, declaration in support Defendants'

Expedited Motion for Partial Reconsideration of the Court's Preliminary Injunction Order (Doc.

178), when BOP staff seek the TEC's input on the needs of individual transgender inmates, such as

health care, psychological care, housing assignments, and others, the TEC depends on full and open

discussion and collaboration among its members in formulating the best possible recommendations.

An expectation that members' thoughts, opinions, and recommendations expressed during a TEC

meeting would be transcribed and publicly disclosed could deter TEC members from sharing their

frank observations, analyses, and recommendations, and compromise the TEC's ability to develop

thoroughly considered and soundly based recommendations.  *See* McLearen Decl. (Doc. 178-1) ¶¶ 6-

11.

41.    These concerns led to a period of time during which BOP conferred with its DOJ

counsel about the court-reporter requirement and what steps, if any, could be taken to have it lifted.

These deliberations culminated in the preparation and filing of Defendants' motion for

reconsideration on January 14, 2022.  As the Court is aware, the motion asked that BOP be relieved

of the requirement in the December 27 injunction to schedule a certified court reporter to be present at the TEC's meeting, and provide a transcript of the meeting to the Court. It was not feasible to schedule the TEC meeting before the Court ruled on the motion, because until the Court ruled we would have no way of knowing whether we had to conduct the meeting in the presence of a court reporter or not.

42.   In the end, the Court granted Defendants' motion for reconsideration, and lifted the injunction's court-reporter requirement, on Wednesday, January 19, 2022. As a result, only two business days passed thereafter before the TEC met, on Monday, January 24, 2022, and issued its decision concerning Ms. Iglesias's request. By the time the Court lifted the injunction's court-reporter requirement, it would have been impractical to reschedule the TEC meeting for an earlier date.

43.   The Memorandum and Order also expresses concern that BOP delayed the TEC's decision by not reporting it to the Court within two days (by January 26, 2022), as required under the December 27 injunction if the TEC recommended Ms. Iglesias for GCS, and instead reporting the decision to the Court in seven days (on January 31) as directed under by the injunction if the TEC did not recommend Ms. Iglesias for GCS.

44.   The decision to report the TEC's recommendation to the Court on January 31 rather than January 26 was not motivated by any purpose of delay. I was not personally involved in the decision, as it was largely made by DOJ and agency counsel. I have been advised that DOJ counsel concluded (as they have explained in their own prior declarations) that the TEC's recommendation did not constitute an unequivocal recommendation for immediate surgery, as contemplated by the injunction's first set of reporting requirements, and therefore that following the first set of requirements could have been misleading by suggesting that the TEC had made an unequivocal and/or immediate recommendation. I also have been advised that DOJ counsel decided that the

17

more forthcoming approach would be to follow the injunction's second set of instructions, which required BOP "to explain[ ] all the reasons for the TEC's decision," Doc. 177 at 3, even though the TEC had not recommended against GCS for Ms. Iglesias.

45.   Not only were the decisions to meet on January 24 and to report to the Court on January 31 not motivated by considerations of delay, they did not, in fact, lead to any delay in the arrangements for Ms. Iglesias's surgery.  As I explained in my February 14 declaration, BOP had already begun by then to develop a plan to provide Ms. Iglesias with GCS, and (through its medical-services contractor) had already contacted the surgeon (Surgeon One) who is now preparing to perform the facial-feminization and breast-augmentation surgeries desired by Ms. Iglesias. McLearen Decl. (Doc. 191-2) ¶ 20.  Indeed, BOP first asked its contractor if it could identify a surgeon for a potential GCS consultation in the Miami area on January 14, 2022, ten days before TEC's meeting.  *See* Decl. of William Robinson (Doc. 210-1) ¶ 19.  The decisions to schedule the TEC's meeting on January 24 and to report the TEC's recommendation to the Court on January 31, rather than January 26, had no impact on and did not delay the process of identifying surgeons through BOP's contractor, and the commencement of other efforts to provide Ms. Iglesias necessary medical care.

*   *   *

46.   To summarize, the TEC (i) evaluated Ms. Iglesias's request for gender-confirming surgery in light of the circumstances presented in January 2022, and the limits of its authority and expertise; (ii) without further delay, issued a favorable decision that authorized the preparations now underway for her GCS, without further action required of the TEC; and (iii) issued its decision and notified the Court within the deadlines set by the Court's injunction, as soon as it was practical under the circumstances to do so.

### III. BOP'S REPRESENTATIONS AND ACTIONS REGARDING SURGEON ONE

47.  The Court's Memorandum and Order next states that the Court is considering imposing sanctions against BOP based on:  (i) representations that BOP's contractor had identified what it considered to be an "appropriate surgeon" (Surgeon One) to perform gender-confirming surgery for Ms. Iglesias, notwithstanding that BOP had not conducted a "formal analysis" of Surgeon One's qualifications; (ii) statements in a number of Defendants' weekly status reports that Ms. Iglesias had been referred to Surgeon One for GCS, even though Defendants were aware that Surgeon One does not personally perform vaginoplasties; and (iii) Defendants' decision to keep Ms. Iglesias's April 7 appointment for a consult with Surgeon One even after learning that Surgeon One refers patients out for vaginoplasty.  Mem. & Order at 23-29.

48.  I address each of these concerns below, but first wish to reiterate that neither I nor BOP has sought to mislead the Court, or Ms. Iglesias, concerning BOP's efforts to provide her with needed medical care. BOP staff, including myself,  have had to arrange for a type of care that BOP has never provided before while navigating complicated contractual law and policy and meeting our obligations in fast-paced and complicated litigation.  I do regret any misunderstandings that have resulted.  It has always been my and BOP's intention to provide Ms. Iglesias with the treatment she requires for her gender dysphoria, including but not necessarily limited to vaginoplasty, as determined via consultations with those who have the expertise to decide on appropriate procedures, and notwithstanding the difficulties presented by procurement requirements, the limited number of available providers, and the novelty (at least to BOP) of the GCS process.  Neither I nor BOP has ever sought to deceive the Court about its intentions, or misrepresent its efforts, regarding Ms. Iglesias's care.

**A. Representations That Surgeon One Is an "Appropriate" Choice To Treat Ms. Iglesias**

49.   The Court first questions why "Defendants reported" on February 14, 2022, in Defendants' Response to the Court's February 10, 2022 Order to Show Cause (Doc. 191), and why I attested in my February 14 declaration (Doc. 191-2), "that an appropriate surgeon [for Ms. Iglesias] was located," even though at that time I had "neither performed a formal analysis of [Surgeon One's] qualifications nor knew how many past gender affirming bottom surgeries [Surgeon One] [had] performed[.]"  Mem. & Order at 23-24.

50.   Respectfully, I must observe that Defendants' February 14 response to the Court's February 10 show-cause order did not report for a fact that "an appropriate surgeon was located." Defendants stated that BOP "had[d] been informed," by its medical-services contractor "that the contractor ha[d] located an appropriate surgeon."  That statement was based on my February 14 declaration, in which I conveyed that BOP "ha[d] notified the contractor of [Ms.] Iglesias's [then] pending transfer [to the Miami RRC] and ha[d] been informed they ha[d] located an appropriate surgeon."

51.   I did not presume to say that I or anyone else at BOP had made an independent determination that Surgeon One is in fact an appropriate choice to provide any particular procedure or service to treat Ms. Iglesias's gender dysphoria.  I did not do so precisely because, as the Court's Memorandum and Order observes and as I testified, I had conducted no formal analysis of my own of Surgeon One's qualifications, nor, not being a physician, would I consider myself qualified to make such an assessment.  Instead, as I explained at the February 22 hearing, BOP has long provided health-care services for individuals residing in BOP RRCs, such as Ms. Iglesias, through a third-party contractor that provides or procures services for correctional systems.  Under the terms of the contract, when an RRC resident requests or requires treatment, a service request is submitted to the contractor, which then identifies a provider they believe is appropriate for the presenting

problem. In Ms. Iglesias's case, involving a request for specialized care requiring the contractor to seek an out-of-network provider, it was expected that the contractor, upon identifying a provider it considered appropriate and who agreed (after consultation) to treat the patient, would submit a detailed service proposal for evaluation by BOP subject-matter experts (likely BOP medical experts, and the TEC), who would analyze it for consistency with best practices and industry standards of care, and vet any service providers identified.

52.    However, when I submitted my declaration in support of Defendants' response to the February 10 show-cause order, none of these steps had yet occurred.  Ms. Iglesias had not yet consulted with Surgeon One; Surgeon One had not yet agreed to accept Ms. Iglesias as a patient; Surgeon One and Ms. Iglesias had not yet worked out an overall treatment plan; and the contractor had not yet submitted a formal service proposal for examination by BOP's subject-matter experts. That being the case, neither I nor BOP was in a position to say, and so did not say, that Defendants had concluded that Surgeon One was "appropriate" for Ms. Iglesias.  Rather, what I intended to convey was the contractor had located a surgeon in response to BOP's inquiry.  To apprise the Court of our progress to that point, we informed the Court of what we knew at the time—that BOP's contractor had identified a surgeon that BOP understood the contractor believed was appropriate to meet the request for medical services that that we had communicated to it.

53.    Moreover in mid-February the contractor, in response to various inquiries we had made about Surgeon One, the surgeon's availability, and requirements for a consult, sent us e-mails with conflicting information about the procedures that Surgeon One personally performs. To assess Surgeon One's qualifications to treat Ms. Iglesias we had asked the contractor to find out various pieces of information, including how many bottom surgeries Surgeon had performed, to which the contractor responded on February 11 "2-3 month."  Several days later, on February 14, the

contractor passed along to us a further response from Surgeon One stating "We do not offer vaginoplasty yet."

54.    Although in mid-February BOP had not independently verified Surgeon One's qualifications to treat Ms. Iglesias and had received conflicting information about the procedures Surgeon One personally performs, I believed then and continue to believe now that it was reasonable to inform the Court that BOP's contractor had identified a surgeon that it considered an appropriate choice to meet with Ms. Iglesias, evaluate her request for surgery, and then recommend a range of medically necessary and appropriate procedures that Surgeon One either could perform personally or refer out to other surgeons.  I believe this to be the case for a number of reasons.

55.    First, BOP's medical-services contractor has contracted with the agency for the acquisition of health-care services for inmates housed at BOP RRCs since 2016.  BOP has worked with the same contractor in regard to acquisition of contract medical services, when needed, at all BOP correctional facilities and penitentiaries, for approximately twenty-two years.  Over the course of this contractual relationship the contractor has developed a reputation within BOP of reliability and competence in meeting the diverse health-care requirements of BOP's inmate population nationwide.  To my knowledge, it has earned the respect and confidence of the BOP health-care specialists and management officials who are ultimately responsible for ensuring that the health-care needs of individuals in BOP custody are met.  I do not believe that the contractor would jeopardize its relationship with BOP, place its reputation in the marketplace at risk, or compromise its professionalism, by advising BOP that it had identified a surgeon who could meet a patient's health-care needs without a basis for saying so.

56.    Second, the contractor did not simply identify Surgeon One as a potential provider, it enthusiastically recommended Surgeon One as a choice for Ms. Iglesias.  The contractor pointed out that Surgeon One is affiliated with a large and highly regarded medical institution,  which

presumably could provide access to an entire network of providers and a comprehensive array of medical resources to aid in Ms. Iglesias's treatment.  Because of Surgeon One's institutional affiliation, it appeared that Surgeon One likely could act as a gateway for Ms. Iglesias to access a range of medical services that an individual practitioner might not be able to offer.  It was, and is, my understanding that this type of referral is a typical practice among medical providers whose patients require treatment by an inter-disciplinary team of physicians.  Even if there were certain GCS procedures that Surgeon One did not personally perform, those of us working at BOP to arrange for Ms. Iglesias's surgery were excited that the contractor had located what appeared to be such an encouraging option.

57.   Third, when the contractor identified Surgeon One to us, I reviewed (for my own knowledge, not as any sort of formal review) Surgeon One's professional and educational background as posted on the website of the medical institution with which Surgeon One is associated.  There it is stated that Surgeon One's



This description of Surgeon One's professional qualifications as a GCS surgeon, posted on the website of the reputable medical institution where Surgeon One practices, including references to Surgeon One's interest in gender-confirming surgery on the pelvic

and genital regions, gave me further confidence in what the contractor had reported about Surgeon One.

58. Perhaps uppermost in my mind, however, was the fact that arranging a consultation for Ms. Iglesias with a qualified GCS surgeon was the essential first step in obtaining the medical treatment she required. Although Ms. Iglesias had made requests over the years for various types of gender-confirming surgery, including breast augmentation, facial feminization, penectomy, orchiectomy, and vaginoplasty, as a lay patient she simply was not in a position, any more than we on the TEC were, to make medical judgments about which of the wide range of available GCS procedures would be necessary and appropriate for her. Treatment is individualized to the unique clinical needs of a patient and medical providers are procured based on their medical specialty and skill level. It is not uncommon to have a medical provider refer the patient to another medical provider with a different skill set when the patient's needs are evolving or change during the course of treatment. Several consultations with providers of differing specialties may, in some cases, be necessary until there is a final plan. And even then, plans are continuously adjusted or adapted as clinically indicated. Therefore, it was essential that she consult with a medical professional with expertise in various types of gender-confirming surgery, who could evaluate her individual needs and desires, explain the range of treatment options available to a patient such as herself, review the pros and cons of each, and allow her then to make an informed decision about the specific procedures she wished to undergo. Once the surgeon and Ms. Iglesias together decided on an appropriate course of treatment, BOP would then be prepared to arrange and pay for the medically necessary and appropriate procedures involved.

59. BOP's thinking on this issue was informed by its experience over many years with inmates seeking treatment for complex medical conditions, such as, to take one illustrative example, those inmates who, having contracted breast cancer, requested mastectomies. Although these

24

inmates, upon learning of their diagnoses, initially desired mastectomies to treat their illness, mastectomy is not medically necessary in all cases of breast cancer.  Depending on the individual, the size and nature of the tumor, and other factors such as metastasization, breast cancer can be treated by non-surgical means, such as radiation therapy, chemotherapy, hormonal therapy, and so on.  Even where surgical intervention is required, lumpectomy presents a less radical alternative to mastectomy.  In cases where BOP inmates have requested mastectomies, BOP has referred them to breast cancer specialists to consult about the range of treatment options available to them, help them make informed decisions about treatment plans appropriate to their clinical need, and arrange to secure the services of any additional specialists from various disciplines who might be needed to carry out the procedures included in that plan.  Accordingly, there have been times when inmates who believed at the outset that they want or needed mastectomies instead opted for less drastic means of treating their conditions once they were fully informed of the options available to them.  Those inmates who decided to get mastectomies still benefited from the opportunity to make informed decisions before undergoing such potentially life-changing surgery.

60.   Because GCS, like the treatment of diseases such as breast cancer, involves multiple treatment options involving inter-disciplinary teams of providers, we considered it just as essential for Ms. Iglesias that she consult with a GCS surgeon qualified to inform her about the procedures that are medically necessary and appropriate for someone in her circumstances, counsel her about the advantages and disadvantages of the options available to her, and arrange for the involvement of additional medical specialists needed to perform any appropriate procedures that Ms. Iglesias might decide to undergo, including vaginoplasty.  (Because BOP has never before provided an individual in its custody with GCS, we were learning information about these procedures through developments in Ms. Iglesias's case. So the need for expert medical opinion(s) was particularly acute here.)  Based on what we had been told about Surgeon One's qualifications by BOP's contractor,

25

and learned from Surgeon One's webpage, Surgeon One was at the very least an appropriate surgeon with whom to begin this consultation process, notwithstanding the conflicting information we had received about whether Surgeon One personally performed vaginoplasty.  Even if Surgeon One did not perform vaginoplasties yet, given the surgeon's affiliation with a large, extremely well-resourced medical institution, and our prior experience with inmates who required treatment by inter-disciplinary teams of doctors, we expected that Surgeon One could nevertheless enlist the aid—that is, refer Ms. Iglesias to—a GCS specialist who could perform that procedure for her.

61.   In point of fact, in mid-February we had concluded that a face-to-face consult between Ms. Iglesias and the surgeon was the only effective way to resolve the conflicting pieces of information we had received about Surgeon One via our contractor.  Procurement requirements dictated that all communications with Surgeon One be routed through our contractor, and all communications with our contractor had to be passed through BOP's Contracting Officer's Representative  As a result, attempting to obtain detailed information about Surgeon One turned into a frustrating game of telephone, in which communications with Surgeon One had to be passed from me or my staff (or DOJ counsel) to the contracting officer, to the contractor, to the surgeon, and then back, often leaving us with bits and snippets of information we could not readily verify or follow up on.  The only way, we concluded, to guarantee a complete exchange of the information necessary for Surgeon One to make judgments about what services Surgeon One could provide (or arrange) for Ms. Iglesias, for Ms. Iglesias to make informed decisions about which of the available procedures she wished to undergo, and for BOP, finally, to reach a conclusion about Surgeon One's suitability to treat Ms. Iglesias, was for the two of them to meet face-to-face and find out if they could arrive at a mutually agreed-upon and appropriate plan of treatment that Surgeon One alone, or in collaboration with other GCS specialists, could bring to fruition.

62. I can appreciate the Court's concern that Defendants conveyed the contractor's view about Surgeon One's suitability when, as is now known, Surgeon One does not perform vaginoplasties. I assure the Court, though, that it was not BOP's intention, or mine, to mislead the Court about the gender-confirming procedures Surgeon One performs, or to mislead the Court about BOP's intention to refer Ms. Iglesias to another surgeon, or surgeons, for any medically necessary and appropriate procedures that Surgeon One does not perform. We understood the Court's deep concern that Ms. Iglesias receive GCS as soon as possible, and wished to apprise the Court of progress BOP had made in obtaining treatment for her. Although we now know for a fact that Surgeon One does not perform but refers out for vaginoplasties, and was not, as hoped, able to directly refer[5] Ms. Iglesias to another surgeon to perform a vaginoplasty, in the end identifying Surgeon One represented genuine progress in obtaining needed care for Ms. Iglesias, as Surgeon One has agreed to perform certain GCS procedures that Ms. Iglesias desires, procedures that Surgeon One agrees will be helpful in treating Ms. Iglesias's gender dysphoria, and that are now being scheduled. And it should be noted that even after scheduling the consultation with Surgeon One, BOP continued to search for other surgeons, first in the Miami area, then more broadly in the surrounding Florida region, and finally reaching out to the Chicago-based surgeon identified by Ms. Iglesias's attorneys.

**B. BOP Understood That Ms. Iglesias's Consult With Surgeon One Would Include Vaginoplasty.**

63. The Court's Memorandum and Order next asks why Defendants continued to report that BOP had scheduled an appointment for Ms. Iglesias to consult with Surgeon One about

---

[5] It should be noted that two of the surgeons that Surgeon One referred to appeared to be candidates for providing Ms. Iglesias vaginoplasty, but when BOP inquired one told BOP to ask again in approximately 35 days; and one advised they were not taking new vaginoplasty patients until approximately August.

"gender-confirmation surgery," even after BOP reported on March 4, 2022, that Surgeon One does not personally perform vaginoplasty and instead refers patients to other providers for that procedure. Mem. & Order at 25-28. The Court also inquires why BOP did not state in its weekly reports until April 8, 2022, after Ms. Iglesias's initial consult with Surgeon One, that Surgeon One refers patients out for vaginoplasty rather than performing that procedure.

64.    Respectfully, BOP did not wait until April 8 to report that Surgeon One does not perform vaginoplasty. BOP first reported to the Court (and Ms. Iglesias) on March 4, 2022, "that Surgeon One refers patients to other providers for vaginoplasty and that the contractor would find out who those providers are." That information, which was confirmed in a communication from the contractor on March 3, 2022, was contained in paragraph 6 of the March 4, 2022, Declaration of Jenna Epplin (Doc. 212-1), which was filed as an exhibit to Defendants' Status Report (Doc. 212) also filed on that day. As noted above, although BOP had previously received conflicting information from its contractor about the procedures that Surgeon One personally performs, as soon as BOP received confirmation that Surgeon One personally would not provide vaginoplasty to Ms. Iglesias, but instead would refer her to other GCS specialists for that procedure, we informed the Court and Ms. Iglesias the following day.

65.    Upon confirming that Surgeon One refers out for vaginoplasty, BOP continued to report that Ms. Iglesias had an appointment with Surgeon One to consult about GCS. It did so because BOP believes it was correct, and is still correct, to characterize the consultation as being about GCS. First, as the American Society of Plastic Surgeons ("ASPS") has noted, GCS is typically "performed by a multispecialty team" of plastic surgeons. ASPS, Gender Affirmation Surgeries, https://www.plasticsurgery.org/reconstructive-procedures/gender-affirmation-surgeries. When the contractor informed BOP that it had identified a well-credentialed GCS surgeon associated with a large, well-resourced and highly respected medical institution, BOP believed that Surgeon One could

fill the role of assembling a team of providers, as needed, to ensure that Ms. Iglesias received the entire range of gender-confirming surgeries she needs, as would ordinarily occur with any complex, multi-part surgical procedures.

66.   Second, and consistent with the views of the ASPS, the WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7 at 57 (2012) ("WPATH Standards of Care"), observes that an entire range of surgical procedures is available for male-to-female patients with gender dysphoria, such as Ms. Iglesias, including "[g]enital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty," "breast/chest surgery: augmentation mammoplasty (implants/ lipofilling)," and "nongenital, nonbreast surgical interventions," such as "facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid-cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures."

67.   Based on these understandings, BOP believed that Ms. Iglesias's scheduled appointment with Surgeon One was properly described in its status reports as a consult for GCS, for several reasons.  First, as described above, even if Surgeon One could not personally perform all of the procedures Ms. Iglesias required, BOP believed Surgeon One could consult with Ms. Iglesias about the full range of surgical treatments available to her, including vaginoplasty; answer her questions about them, so that Ms. Iglesias could make informed decisions about which procedures to undergo; and develop a treatment plan including procedures that Surgeon One could perform (as Surgeon One now anticipates doing) as well as procedures, such as vaginoplasty, that other surgeons might perform.  Second, because of Surgeon One's institutional affiliation, BOP believed that Surgeon One could help refer Ms. Iglesias to, and help secure, another surgeon, or surgeons, to perform her vaginoplasty.

68.   BOP was surprised, and disappointed—as I know Ms. Iglesias must have been—to hear that Surgeon One did not consult with her about vaginoplasty on April 7, in addition to facial feminization and breast augmentation.  We were also disappointed that Surgeon One did not offer to contact other surgeons to arrange vaginoplasty for Ms. Iglesias, but instead simply provided a list of other GCS surgeons that she (or BOP's contractor) might contact to obtain a vaginoplasty. Nevertheless, prior to the April 7 consult, BOP believed, for the reasons I have explained above, that Ms. Iglesias's appointment with Surgeon One was appropriately considered a GCS consult. And because Ms. Iglesias in fact consulted with Surgeon One about procedures—facial feminization and breast augmentation—that Surgeon One is now preparing to perform for Ms. Iglesias as part of her gender transformation, BOP still believes it is accurate to refer to that appointment as a GCS consult.

69.   The Court's Memorandum and Order indicates its expectation that Ms. Iglesias would be referred for a vaginoplasty consult, pointing to the December 27 preliminary-injunction opinion where the Court explains that by "GCS" it meant "gender reassignment surgery or surgeries altering one's reproductive organs."  Mem. & Order at 25.  Although the clinical definition of GCS as understood by professional organizations including WPATH and ASPS is not limited to surgery involving the genital organs, WPATH Standards of Care at 57; https://www.plasticsurgery.org/ reconstructive-procedures/gender-affirmation-surgeries (listing categories of transfeminine and transmasculine top, bottom, and facial surgeries), I assure the Court that at no time did BOP contemplate that Ms. Iglesias would not be referred for vaginoplasty, or would not receive that treatment if determined to be medically indicated.  That is why, when Surgeon One provided BOP a list of other surgeons for Ms. Iglesias to consult with, BOP then continued to search for an available vaginoplastic surgeon for Ms. Iglesias, by (i) contacting (or re-contacting, in at least one case) Miami surgeons on the list Surgeon One gave to Ms. Iglesias, (ii) directing its contractor to expand its

search to the surrounding Florida area (within a 50-mile radius from the RRC where Ms. Iglesias resides), and (iii) arranging for Ms. Iglesias to consult with [and to be treated by] the Chicago-based surgeon identified by Ms. Iglesias's attorneys.

70.    As noted, the Court also asks why BOP continued to pursue the April 7 consultation with Surgeon One when the agency "knew [Surgeon One] would only provide [Ms.] Iglesias with breast augmentation and facial feminization[.]"  Mem. & Order at 28.  As I explain below, it made sense to keep the April 7 appointment with Surgeon One, for at least three reasons.

71.    First, as discussed, BOP believed it appropriate to proceed with Surgeon One because even if Surgeon One referred patients out for vaginoplasty, BOP anticipated that the April 7 consult would provide Ms. Iglesias with an opportunity to meet with a GCS specialist; to discuss and learn more about the entire array of GCS procedures potentially available to her; and then make informed decisions about the procedures she desires, regardless of whether Surgeon One performs personally or refers them out to other providers.  As a result of the April 7 consult, Surgeon One has accepted Ms. Iglesias as a patient to perform certain procedures that Ms. Iglesias desires, and that apparently would be beneficial for her gender dysphoria, and we anticipate that Surgeon One will schedule further appointments with Ms. Iglesias in preparation for those procedures.

72.    Second, for the reasons discussed, BOP believed that its contractor had identified Surgeon One as a provider who could coordinate Ms. Iglesias's care with other GCS surgeons and refer her directly to them as needed to ensure she received the medically necessary and appropriate treatment to meet her needs.

73.    Third, BOP did not schedule and keep the April 7 appointment with Surgeon One to the exclusion of other efforts to locate a vaginoplastic surgeon for Ms. Iglesias.  Even after the April 7 consult was scheduled, BOP continued its already ongoing search for other surgeons who might treat Ms. Iglesias.  Through its contractor, BOP contacted three other Miami GCS surgeons

prior to the April consult, but the first two declined to accept Ms. Iglesias as a patient, and Ms. Iglesias declined to see the third, because (as I understand it) of a prior public controversy involving that provider.  BOP then expanded its search to include the surrounding Florida region, although without success.  Following the April 7 consult, BOP also reached out to three of the four surgeons on the list provided by Surgeon One.  (BOP had already contacted the fourth surgeon previously, who declined to accept her as a patient.)  BOP was advised that two of those three surgeons would not schedule an appointment for vaginoplasty at that time.  The third surgeon's office initially set an appointment for an April 11 tele-health consult, but soon thereafter canceled it, explaining that they would not be scheduling vaginoplasties before the fall 2022.

74.   Even before the April 7 consult, BOP also considered reaching out to the Chicago-based surgeon, Surgeon Two, recommended by Ms. Iglesias's counsel.  However, sending Ms. Iglesias to Chicago for her surgery raised (and still raises) serious concerns about her successful reentry into society after her release.  I was also informed by BOP contracting experts that referring Ms. Iglesias to a surgeon who had been identified by her counsel rather than BOP's medical-services contractor raised procurement issues, too, but I have been advised that those issues have been resolved through the parties' settlement and the Court's Stipulated Order.  The main purpose of BOP residential reentry centers, such as the Miami RRC where Ms. Iglesias now resides, is to help inmates nearing the ends of their sentences learn life skills necessary for independent living, develop vocational skills, find employment, secure housing, and (re)build ties with their communities, so they can successfully reintegrate into that community. To do so RRCs offer an array of services such as skills training, employment counseling, job placement, mental-health services, and opportunities to nurture relationships with family and friends, all within a safe, structured, and supportive environment.  This period of adjustment is especially critical for longtime inmates such as Ms. Iglesias, who has spent the bulk of her adult life in prison.  And critical to the success of the reentry

process is continuity, without which an inmate may not adequately develop the skills, maintain the steady employment, or successfully nurture the relationships needed, to thrive in the community once released from the prison system.

75.    BOP was therefore concerned (and remains concerned) that spending four-to-eight weeks in Chicago for surgery, pre-surgical procedures, and post-surgical recovery, would mean interrupting Ms. Iglesias's weekly mental-health counseling in Miami, could place her current employment at risk, impair her development of local social connections, and as a result reduce the chances of her successful return to society after her release.  Nevertheless, once it became clear to us that there were no immediately available options for Ms. Iglesias to receive vaginoplasty in Florida, BOP requested that its contractor arrange a tele-health consult with Surgeon Two, which occurred on May 5, 2022, and we are now awaiting word from Surgeon Two's office as to when an in-person consultation for vaginoplasty can be scheduled.

76.    Even if BOP had not expected the April 7 appointment with Surgeon One to include consultation about vaginoplasty, so long as BOP continued to make efforts to locate other potential surgeons who might perform vaginoplasty for Ms. Iglesias, it still would have made sense in the meantime to continue working with Surgeon One, to obtain other appropriate services that Surgeon One could offer.  Keeping the appointment for the April 7 consult did not interfere with BOP's other search efforts.  And canceling the April 7 consult could only have set back, not advanced, BOP's efforts to provide Ms. Iglesias with the full range of GCS procedures she needs.  The benefits of keeping the April 7 appointment are now apparent, as Surgeon One has accepted Ms. Iglesias for facial feminization and breast augmentation surgery—procedures that are medically indicated and that Ms. Iglesias desires—and is making preparations in anticipation of conducting those procedures for Ms. Iglesias beginning on August 23, 2022, assuming there are no contraindications (such as Ms. Iglesias's potential gallbladder issue) at that time.

33

*   *   *

77. To summarize, BOP reported that it had been informed by its medical-services contractor that the contractor had located an appropriate surgeon to whom to refer Ms. Iglesias (i) because we wanted to apprise the Court of progress the agency had made in arranging for her treatment; (ii) because we believed it was reasonable to rely on the word of BOP's contractor, given its long record of professionalism and competence as a third-party provider of health-care services; (iii) because of additional information available to us about Surgeon One's qualifications; and (iv) because Surgeon One appeared qualified for the essential first step of consulting with Ms. Iglesias to make mutually informed decisions about the procedures she would undergo, and either to perform those procedures personally or arrange for other GCS specialists to do so.  Similarly, we described Ms. Iglesias's April 7 appointment with Surgeon One as a consultation for gender-confirmation surgery, and decided to keep that appointment even after learning that Surgeon One does not perform vaginoplasties, because (i) we believed that Surgeon One could consult with Ms. Iglesias about a range of medically indicated GCS procedures available to her, including vaginoplasty; (ii) we expected that Surgeon One could offer to perform at least some of those procedures personally (as Surgeon One is now preparing to do), and make the necessary arrangements for other surgeons to perform any needed procedures, such as vaginoplasty, that Surgeon One does not perform; and (iii) keeping the April 7 appointment did not interfere with BOP's ongoing searches for other vaginoplastic surgeons to treat Ms. Iglesias, and nothing would be gained by canceling it.  The objective of all of BOP's efforts was to obtain all medically necessary treatment for Ms. Iglesias, including vaginoplasty, and BOP did not seek at any time to mislead the Court about its intentions, or its efforts.

## IV.  THE COURT'S QUESTIONS ON PAGE 24 OF ITS MEMORANDUM AND ORDER

78.    In this final section I address the list of questions posed by the Court on page 24 of its Memorandum and Order.

79.    The first two questions ask, respectively, whether I was "relying on BOP's contractor," and/or on Surgeon One's website, when I reported in my February 14 declaration (Doc. 183-1) that BOP's contractor had located what it considered an "appropriate surgeon" to treat Ms. Iglesias.  As discussed in paragraphs ___, above, the answer to both questions is yes.  Again, to be precise, I did not state in my February 14 declaration that BOP itself had determined at that time that Surgeon One was an "appropriate" choice to treat Ms. Iglesias.  In reliance on what we were told by the contractor, I stated only that the contractor had identified a surgeon whom it considered appropriate to meet the need for medical services that BOP had conveyed.  I was careful to state only the view of the contractor, because BOP had not yet had the opportunity at that early stage to confirm the contractor's conclusion independently.

80.    As also explained above, and as I noted when I testified at the February 22, 2022, hearing, I reviewed Surgeon One's qualifications as stated on the website of the medical institution where Surgeon One practices, which, together with the contractor's long history of reliable performance for BOP, gave me sufficient confidence in the contractor's conclusion regarding Surgeon One's suitability to report it to the Court.

81.    The third question on page 24 of the Memorandum and Order asks whether Surgeon One "misrepresented [their] ability to perform vaginoplasties . . . in any additional way beside the website[.]"  I do not have reason to believe that Surgeon One has misrepresented their ability to perform vaginoplasties in any way, and, respectfully, I have no reason to believe that Surgeon One's abilities are misrepresented on the website.  The website states that Surgeon One's █████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████   I do not

view any of those statements as misrepresentative of Surgeon One's abilities simply because Surgeon

One refers patients out for vaginoplasty.  As discussed, the term "gender-confirmation surgery" as

understood clinically by WPATH and ASPS refers to a wide variety of gender-confirming

procedures, including a number of genital surgeries other than vaginoplasty, such as penectomy,

orchiectomy, clitoroplasty, and vulvopasty.  The fact that Surgeon One does not perform one of

these procedures did not mean that Surgeon One is incapable of performing other so-called

"bottom" surgeries, or that it is inaccurate to refer to Surgeon One as a GCS surgeon.

82.   The Court's fourth question on page 24 of the Memorandum and Order appears to ask

whether March 3, 2022, was the first time that I or Defendants learned that Surgeon One does not

perform vaginoplasties.  As I discuss in paragraphs ___, above, March 3, 2022, was in fact the first

time that we received confirmation from BOP's contractor that Surgeon One refers out for

vaginoplasty.  But as I also discussed in paragraphs ___, above, between February 11 and 14, 2022,

BOP received conflicting information from its contractor about the procedures Surgeon One does

and does not perform—first, on February 11, an e-mail stating that Surgeon One performs 2-3

bottom surgeries a month, and second, on February 14, an e-mail stating "We do not offer

vaginoplasty yet."

83.   These communications from the contractor in short snippets of information (rather

that complete detail) and appeared somewhat conflicting to me.  However, I had concerns that

releasing too much information about the surgeon at that early stage of the contractor's outreach to

Surgeon One could result in accusations of sole-sourcing a contract in violation of the competitive-

bidding requirements of the Competition in Contracting Act, and the Federal Acquisition

Regulation.  As I testified at the February 22 hearing, I am not a lawyer, and have at best only a basic

understanding of federal procurement requirements, which can be extraordinarily complex. But in late 2021, in another case involving a transgender inmate's request for GCS, Defendants, through counsel, sent correspondence to the inmate's counsel discussing a surgeon with whom a BOP official had spoken directly (without going through a contractor) about treating the plaintiff inmate. The letter caused alarm within BOP that it might create an appearance of illegally sole-sourcing a contract to perform surgery on that inmate, with potentially severe legal consequences for the officials involved. We were sternly advised by BOP procurement experts to avoid making statements in that case, and in this litigation, that "got out ahead" of the actual contracting process.

84.   The legal concerns that the release of information in a letter from Defendants' counsel in the other transgender inmate's case had given rise to, combined with my own limited understanding of federal procurement laws, made me extremely anxious about making any statement or taking any action in this case that could lead to accusations that we were not following proper procurement procedures. I was very concerned that releasing detailed information about Surgeon One at so early a stage in the procurement process—before Surgeon One had even agreed to see Ms. Iglesias for an initial consultation—might  violate, or appear to violate, federal procurement requirements. Not being a procurement expert, I did not know whether or not it would actually be unlawful to do so, but I was deeply worried that it might be. At the same time, I had no desire to conceal the uncertainty about the procedures Surgeon One performed; I only wanted to convey it in a way that was less likely (at least in my mind) to result in a violation, or perceived violation, of procurement requirements. With that objective in mind, several days after receiving the conflicting communications about Surgeon One, during a discussion with DOJ counsel in preparation for the February 22 show-cause hearing, I informed them that we had received conflicting communications from the contractor that had created uncertainty about the bottom surgeries that Surgeon One performs personally, and those that Surgeon One refers out.

85.   At the time I genuinely did not appreciate the importance this piecemeal and sometimes confusing and potentially conflicting information might hold for the Court, Ms. Iglesias, or our DOJ counsel, because, as I explained above, uncertainty about which procedures Surgeon One performed or referred out was not a reason in my mind to reject Surgeon One at that early stage of BOP's effort to locate a surgeon, or surgeons, to treat Ms. Iglesias.  In mid-February the most critical step in securing GCS of any type for Ms. Iglesias, was to arrange a one-on-one consultation with a GCS expert, during which Ms. Iglesias and the surgeon could make mutually informed decisions about a medically appropriate treatment plan, regardless of whether Surgeon One, or another provider, would perform her vaginoplasty.  I tried my best to balance what I perceived to be the pertinence of the conflicting and incomplete information about Surgeon One with my concerns about federal contracting requirements.  In hindsight, I realize that I could have more clearly made the information we had received about Surgeon One's capabilities available to our DOJ counsel and the Court, and I now fully understand the Court's concerns. I was also doing my best to maintain a surgical option for this patient. I am not a lawyer but was doing my abject best to manage this patient's care to the best of my abilities while trying to follow contractual law, policy requirements, and comply with requirements of the court.

86.   I again wish to assure the Court, however, that I did not act with any intention to deceive.  I had no intention of misleading the Court, or Ms. Iglesias, into believing that BOP was referring Ms. Iglesias for a vaginoplasty consultation when in fact it was not.  Neither I nor BOP was engaged in any such ruse.  In fact, just a short time after the February 22, 2022 hearing—seven business days—BOP asked its contractor to clarify whether Surgeon One refers out for vaginoplasty.  When the contractor confirmed this fact, BOP promptly included it in Ms. Epplin's March 4, 2022 declaration.  Our intention then, as now, was that Ms. Iglesias receive any medically

necessary and appropriate GCS procedure that she requires, and desires, including vaginoplasty, and I regret that our actions have led the Court to question otherwise.

87.    The Court's fifth question asks why I stopped submitting declarations in support of Defendants' weekly status reports following the first of those reports, filed on February 25, 2022 (Doc. 204).  As the Court is aware, beginning with the second of those reports, filed on March 4, 2022 (Doc. 212), BOP's supporting declarations have been submitted by Jenna Epplin, the National Policy and Program Coordinator (Transgender Inmates) for the Women and Special Populations Branch within the Reentry Services Division.   I asked Ms. Epplin to take on this responsibility for several reasons, but, as I explain below, not because of any concern about the truth or accuracy of any declarations I had previously submitted, or testimony that I had previously given.

88.    As noted above, I serve as Acting Assistant BOP Director in charge of the Reentry Services Division.  The Division's mission is to prepare inmates for reentry into society by providing them opportunities for skills development, employment, and re-establishment of social connections, thereby reducing recidivism and improving public safety.  As Acting Assistant Director, and a member of BOP's senior management team, I oversee approximately 85 programs, including numerous vocational programs and other activities designed to facilitate the successful transition of incarcerated men and women at 122 facilities into their communities upon release.  I am responsible for administering an approximately $1 billion annual budget, the supervision of over 200 BOP employees, and indirect oversight of thousands of contractor employees at more than 120 RRCs nationwide.  Notwithstanding the breadth of my duties and responsibilities as Acting Assistant Director, I decided personally to submit declarations on BOP's behalf as the need arose at decisive moments in the case, such as on January 31, and again February 14, when the Court's December 27 injunction, and later its February 11 show-cause order, required Defendants to explain the reasons for the TEC's decision on Ms. Iglesias's request for surgery.  I did so to demonstrate, by virtue of

the senior position that I hold, the level of BOP's commitment to providing Ms. Iglesias the medical treatment she needs.

89.   However, after submitting the February 25 declaration in support of Defendants' first weekly status report, I determined that I could not reconcile devoting the time and attention required to prepare weekly declarations with my obligation to attend to the many other duties and responsibilities of my position.  In addition, the declarations for Defendants' weekly status reports were not likely to be based on my personal knowledge, but information conveyed between the contractor and BOP personnel in the Residential Reentry Management Branch regarding efforts to arrange for Ms. Iglesias's GCS.  I concluded for these reasons that it would make more sense to assign this task to the individual at BOP with daily responsibilities for managing the transgender population, and fewer pressing demands on her time, to execute the declarations for Defendants' weekly status reports (although I have continued to review drafts of the declarations before their submission).  Ms. Epplin was the logical choice because, as National Policy Coordinator for the Women's and Special Populations Branch, she has overall responsibility for monitoring and providing guidance within the agency on all issues concerning BOP's transgender population, and ensuring that the needs of BOP's transgender inmates are met. She organizes and records TEC meetings, provides consultation on transgender matters to wardens and clinical staff, and engages regularly with stakeholders about transgender persons in BOP's custody.

90.   Under paragraph 9 of the Court's Stipulated Order, in lieu of Defendants' weekly status reports the parties are now required to file joint status reports, every four weeks, updating the Court on significant developments related to Ms. Iglesias's surgeries.  Mr. Gregg Fearday, Health Systems Specialist for the Residential Reentry Branch of the Reentry Services Division, submitted BOP's declaration in support of the parties' June 10, 2022, report (Docs. 274, 274-1), and will continue to do so for the additional reports to be filed.  Mr. Fearday was assigned this responsibility instead of

Ms. Epplin because under the Stipulated Order the parties' status reports going forward seem most likely to involve updates on Ms. Iglesias's medical appointments.  Tracking this information falls directly within the scope of Mr. Fearday's position.

91.   Finally, the Court asks whether I remain personally involved in BOP's efforts to secure gender-confirmation surgery for Ms. Iglesias.  The answer is yes.  I did testify at the February 22 hearing that as Acting Assistant Director for Reentry Services I am not personally responsible for managing the day-to-day care of individual BOP inmates.  That is the responsibility of the BOP clinical and contract staff assigned at individual BOP correctional facilities and RRCs.  But Ms. Iglesias is a special case—likely the first individual to receive gender-confirming surgery under BOP's care.  Therefore I have maintained, and will continue to maintain, oversight of the process by which BOP arranges for her care, to ensure that she receives the medical treatment she requires from qualified providers, and so that BOP continues to develop its understanding of the GCS process for the benefit of other BOP inmates who may require similar care in the future.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this ___1st____ day of July , 2022.


ALIX MCLEAREN   Digitally signed by ALIX MCLEAREN
                Date: 2022.07.01 13:02:12 -04'00'

_____

DR. ALIX M. McLEAREN