UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CRISTINA NICHOLE IGLESIAS (a.k.a. CRISTIAN NOEL IGLESIAS),<br><br>　　Plaintiff,<br><br>　　v.<br><br>IAN CONNORS, *et al.*,<br><br>　　Defendants. | Case No. 19-cv-00415-NJR |

## DECLARATION OF JOHN ROBINSON

I, John Robinson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I am a trial attorney in the Federal Programs Branch, an office within the Civil Division of the United States Department of Justice. I joined the Department of Justice in 2020. From 2016 to 2020, I was a Senior Associate at the Washington, D.C. office of Arnold & Porter. Earlier in my career, I clerked for the Hon. Joan B. Gottschall of the United States District Court for the Northern District of Illinois and the Hon. Rosemary S. Pooler of the United States Court of Appeals for the Second Circuit. I graduated from the University of Michigan Law School in 2012 and Yale University in 2009.

2.　　I previously provided declarations in this matter on February 14, 2022 (Doc. 191-6) and March 4, 2022 (Doc. 214-4). I am providing this declaration in response to the Court's April 18, 2022 Memorandum and Order (the "April 18 Order") (Doc. 238), and in support of Defendants' response to that order. Specifically, I address (i) Defendants' representations regarding efforts by the Federal Bureau of Prisons ("BOP") to secure a surgeon to provide gender-confirmation surgery for Plaintiff Cristina Iglesias, as set forth in seven of Defendants' Status Reports (Docs. 204, 212, 220, 221, 227, 229, and 231); (ii) my understanding as to why BOP continued to proceed with a consultation

with the surgeon referred to in those reports as "Surgeon 1" even after BOP learned that the surgeon refers patients to other providers for vaginoplasty; and (iii) other matters of concern to the Court raised in the April 18 Order.

3. Defendants first described BOP's efforts to secure a surgeon in their February 14, 2022, response to the Court's February 10, 2022, show-cause order (Doc. 187), where they stated that "BOP has notified its contractor of Iglesias's pending transfer, and has been informed that the contractor has located an appropriate surgeon." Doc. 191 at 3.[1] I believed that this statement was true for two main reasons.

4. First, the statement in Defendants' February 14 filing was supported by a declaration from Dr. Alix McLearen that BOP had been informed by its medical-services contractor that "they [*i.e.*, the contractor] have located an appropriate surgeon." McLearen Decl. ¶ 20 (Doc. 191-2). I did not participate in any communications between BOP and its contractor. However, I had no reason to believe that this statement was untrue. As a government attorney, I frequently must rely on declarations from agency witnesses when making factual representations to the Court. While I often discuss the contents of a declaration with agency counsel to ensure that I understand the factual assertions, I would generally presume that those assertions are true unless I had some reason to believe otherwise.

5. Second, I had no reason to doubt that BOP's contractor would be capable of finding an "appropriate" surgeon for the gender-confirmation surgery sought by Ms. Iglesias. I never directly interacted with the contractor, but based on my conversations with BOP, I understood that the contractor had considerable experience in locating providers for individuals in BOP custody, including out-of-network providers for specialized treatment. I also understood that BOP had provided the

---

[1] Although I was not a signatory to Defendants' February 14 response, I was substantially involved in preparing the response and stand behind the Government's representations in that document.

2

contractor with Ms. Iglesias's medical records, which indicated that she was seeking gender-confirmation surgery. I understood that BOP was relying on the contractor's expertise to use those records to find a surgeon who was appropriate for Ms. Iglesias. Accordingly, at the time of Defendants' February 14 filing, I had no reason to question the statement that BOP's contractor had located what the contractor considered to be "an appropriate surgeon." However, as noted, I did not have firsthand knowledge of BOP's communications with the contractor or even know the surgeon's identity at the time of Defendants' February 14 filing.

6. The day after Defendants' February 14 filing, I learned the identity of the surgeon for the first time in connection with preparing for the upcoming February 22 show-cause hearing. Upon learning the surgeon's identity, I looked up their background and areas of expertise on the website of the medical institution with which they are affiliated. The information there further suggested to me that the surgeon was appropriate for Ms. Iglesias. Among other things, the website noted that the surgeon specializes in "███████," listed as an area of their expertise "███████ ███████ stated that the surgeon is ███████████████████████████ ███████," and described the surgeon's "███████████████████████████ ███████████████████████████" in the region. However, I was still ultimately relying on BOP, which I understood at that early stage to be relying on an initial assessment made by its contractor, as to whether the surgeon was, in fact, appropriate.

7. On February 18, 2022, Defendants filed a supplemental declaration from Dr. Alix McLearen, which further apprised the Court of developments regarding BOP's efforts to arrange gender-confirmation surgery for Plaintiff. Doc. 197-1. The declaration again stated that BOP had "been informed by [its] contractor that [the contractor] has located a surgeon to potentially perform Iglesias's gender-confirming surgery . . . ." *Id.* ¶ 2. The declaration noted that BOP had "sent the surgeon (via its contractor) the past two years of Iglesias's medical records to review" and was

3

"continu[ing] to work with [the] contractor to ascertain what additional information, if any, the surgeon requires in order to decide whether to accept Iglesias as a patient." *Id.* ¶ 5. Again, I was relying on BOP (which I understood to be relying on its contractor) as to whether the surgeon was able to potentially perform gender-confirmation surgery for Ms. Iglesias in the event that the surgeon accepted Ms. Iglesias as a patient.

8. At the show-cause hearing on February 22, 2022, I conducted the direct examination of Dr. Alix McLearen. As part of the examination, I asked Dr. McLearen what steps BOP had taken to prepare for Ms. Iglesias's referral to a surgeon. She explained that BOP had "provided medical records, about two years['] worth of patient history" to BOP's contractor and "asked that a surgeon be secured." 2/22/22 Hr'g Tr. 28:7–9. She further explained that BOP "[doesn't] reach out to the surgeon directly," and instead relies on a contractor that is "like a medical referral service that . . . has almost a network of providers" and that the contractor was "attempting to secure [a] surgeon." *Id.* at 29:8–22. Dr. McLearen also confirmed that the surgeon had Ms. Iglesias's medical records and that BOP was waiting to hear whether the surgeon would accept Ms. Iglesias as a patient. *Id.*

9. On cross-examination, Dr. McLearen was asked whether she was personally representing that the surgeon was "appropriately qualified to be performing the surgery." *Id.* at 75:2–5. Dr. McLearen clarified that she was not herself representing that the surgeon was appropriately qualified but instead was "representing that the contractor has identified somebody that they said is appropriate to perform the surgery." *Id.* Counsel also asked whether BOP had "undertaken any analysis of whether th[e] surgeon is an appropriate surgeon." *Id.* at 75:6–12. Dr. McLearen responded that she had not done any formal analysis but had "looked at the basic facts out of [her] own desire to know" and thought that the surgeon "appears to do this work and have credentials." *Id.* She explained that she understood the surgeon "ha[s] a medical degree, . . . perform[s] these surgeries, and [is] WPATH-certified," but acknowledged that she did not know "how many past gender-

4

affirming bottom surgeries" the surgeon had performed. *Id.* at 75:23–25; 76:1–3. As explained in the first declaration of William Robinson, BOP expected that its subject-matter experts would formally vet the surgeon after the initial consultation, once BOP had a service proposal form its contractor. *See* Decl. of W. Robinson ¶ 21 (Doc. 210-1).

10.  I had no reason to believe that any statements in Dr. McLearen's declarations or any part of Dr. McLearen's testimony at the February 22 show-cause hearing was false or misleading. As noted above, I was relying on BOP and, in turn, BOP's contractor, to determine whether the surgeon was an appropriate provider for Ms. Iglesias. I do not recall learning any information in preparing for the show-cause hearing that caused me to question whether the surgeon was an appropriate provider. I believe that the surgeon's qualifications came up briefly during one meeting with BOP in advance of the show-cause hearing, and I believe Dr. McLearen stated during that meeting (as she stated at the show-cause hearing) that she had looked up the surgeon's credentials on their website and that the surgeon appeared to be qualified but that she had not done any formal analysis of the appropriateness of the surgeon. I vaguely recall Dr. McLearen suggesting at this time that BOP was working to confirm that the surgeon performs bottom surgery. But I do not recall receiving any information that the surgeon did not perform vaginoplasty and referred patients out to other providers for vaginoplasty. In reviewing my emails from this time period, I now see that agency counsel made a comment in one document regarding a lack of clarity as to whether the surgeon performs vaginoplasty, but I do not recall reading this comment at the time.

11.  Shortly after the February 22 show-cause hearing, the Court directed Defendants to file weekly status updates on contacts with the surgeon, the surgeon's response, and any other developments relating to Ms. Iglesias's care. Defendants filed their first such status report and accompanying declaration on February 25, 2022. Docs. 204, 204-1. In that status report, Defendants stated:

5

> Through the attached Declaration of Dr. Alix McLearen, BOP reports that on February 24, 2022, BOP's contractor forwarded to BOP a message from the surgeon that the contractor had previously contacted about potentially providing gender confirmation surgery to Plaintiff. McLearen Decl. ¶ 5. A summary of that message is contained in the McLearen Declaration. *See id.* In short, the surgeon has not yet made a decision about whether she would accept Ms. Iglesias as a patient for surgery, but the surgeon appears to be open to potentially accepting Ms. Iglesias as a patient if certain requirements are satisfied. *See id.* The surgeon indicated that the surgery could feasibly be completed by December 2022. *Id.*

Doc. 204 at 1. Again, I believed that these statements were true and had ample factual support. Specifically, they were supported by a sworn declaration by Dr. McLearen, and I had no reason to believe that the representations in the declaration were untrue. The declaration noted, among other things, that "[t]he surgeon further indicated that if Ms. Iglesias only wants 'bottom surgery,' that could feasibly all be accomplished in the given time frame (i.e. by December 2022)." Doc. 204-1 ¶ 5. These communications from the surgeon seemed consistent to me with the contractor's judgment that the surgeon was an appropriate provider for Ms. Iglesias. On March 2, 2022, I learned that the surgeon had scheduled an appointment for a consultation with Ms. Iglesias, which also suggested to me that the surgeon believed they were an appropriate provider.

12. On March 3, 2022, I received a draft declaration from BOP stating that, in response to a question about hair removal, BOP had been advised by BOP's contractor that "the patient must be seen for evaluation before anything else is ordered." *See* Doc. 212-1 ¶ 6. The declaration also stated that in connection with this same inquiry, BOP was advised that the surgeon "refers patients out to other providers for vaginoplasty and was advised the contractor would find out who those providers were." *Id.*

13. To the best of my recollection, this was the first time that I learned that the surgeon does not perform vaginoplasty. As discussed above, I vaguely recall one prior conversation in which Dr. McLearen suggested that BOP was working to confirm that the surgeon performs vaginoplasty, but I do not recall having any prior knowledge that the surgeon in fact referred patients out to other

6

providers for vaginoplasty. While I am now aware that on February 14, 2022, Surgeon 1 sent an email to BOP's contractor that they do not perform vaginoplasty, I was not made aware of its contents at that time and had not seen it until recently, when it was sent to me in connection with preparing Defendants' response to the Court's April 18 Order. As noted above, in addition to the fact that the contractor apparently considered the surgeon to be appropriate, I was reassured at that time by the fact that the surgeon, who had Ms. Iglesias's medical records, had continued to engage with BOP and scheduled a consultation with Ms. Iglesias. This further suggested to me that the surgeon believed that it would be appropriate for Ms. Iglesias to meet with them for a consultation.

14. When I learned on March 3, 2022, that the surgeon refers patients out to other providers for vaginoplasty, I do not recall viewing this as a significant setback or reason for BOP to cancel the appointment with the surgeon. In my mind, the statement that the surgeon "refers patients out to other providers" suggested that the surgeon could refer Ms. Iglesias directly, either to another member of the team at the medical institution where the surgeon practices, or to an outside provider. I had in mind the situation where, for example, a primary care physician refers a patient to a specialist, such as a cardiologist. In my experience, such a referral is usually a seamless process that involves the primary care physician arranging for the patient to see a specific specialist. I did not understand the statement to suggest that the surgeon would provide Ms. Iglesias with a list of names, and that after the consultation BOP and its contractor would be responsible for directly contacting the surgeons on the list to find out if they would accept Ms. Iglesias as a patient.

15. I also thought that BOP's intention to proceed with the April 7 consultation with the surgeon made sense because I expected that the surgeon could discuss gender-confirmation surgery with Ms. Iglesias generally and answer any questions that she may have. I expected that the surgeon could coordinate Ms. Iglesias's care and, as noted, arrange for her to see another surgeon for vaginoplasty. I also thought that it was reasonable for BOP to proceed with the surgeon because the

7

surgeon had scheduled the consultation with Ms. Iglesias, which, as noted, suggested to me that the surgeon believed a consultation was an appropriate next step.

16. In addition, while I understood that Ms. Iglesias has been primarily focused on obtaining vaginoplasty, I did not understand this to be the only procedure she was requesting. I knew, for example, that gender-confirmation surgery often involved both "top" and "bottom" surgeries, and I am aware from separate litigation that BOP has agreed to provide both top and bottom surgeries to at least one other individual in BOP custody. I also understand that Ms. Iglesias herself requested that BOP provide top surgery in 2019. The consultation with the surgeon provided Ms. Iglesias an opportunity to discuss these other procedures so that she could decide whether she wished to request them in connection with her request for gender-confirmation surgery.

17. At the same time, I knew that BOP was continuing its efforts to identify other potential surgeons who might perform gender-confirmation surgery for Ms. Iglesias, including vaginoplasty. For example, I learned on March 4, 2022, that BOP had been informed by its contractor that the contractor had found and scheduled an appointment for a consultation on March 23 with a second surgeon. Around this same time, I was aware that BOP's contractor was continuing to look for appropriate surgeons in and around Miami. I also knew that BOP was evaluating whether it would be feasible to have the surgery performed in Chicago by the surgeon that Ms. Iglesias's counsel had identified. Under these circumstances, it seemed reasonable to me for BOP to proceed with the appointment with the original Miami-based surgeon, even if they referred patients to other providers for vaginoplasty, while it was continuing to pursue other options.

18. On March 4, 2022, Defendants filed their second status report and accompanying BOP declaration. *See* Docs. 212, 212-1. The status report referred to the attached declaration and noted that the surgeon had scheduled an appointment for a consultation with Plaintiff for April 7, 2022 and that BOP planned to move forward with the appointment. Doc. 212. The declaration stated

that BOP had been advised that the surgeon "refers patients out to other providers for vaginoplasty and was advised the contractor would find out who those providers are." Doc. 212-1 ¶ 6. I regret that we did not also include this statement in the status report itself, which summarized the contents of the declaration. But there was no attempt to hide this information from Plaintiff or the Court. To the contrary, we disclosed it in a public filing the day after learning the information.

19. As the April 18 Order observes, our weekly status reports continued to refer to the appointment with the surgeon as a consultation for "gender confirmation surgery." *See, e.g.*, Doc. 220. The Court's April 18 Order questions why Defendants continued to use that term after Defendants knew the surgeon refers patients to other providers for vaginoplasty. I believed the use of this term was appropriate because I understood that the consultation *was* for gender confirmation surgery—a term that I understood to refer not only to vaginoplasty but to any of the multiple procedures that a transgender individual might undergo to obtain the physical characteristics that match their gender identity. *See, e.g.*, Defs.' 4/15/2022 Status Report at 5, Doc. 237 (citing WPATH Standards of Care). Indeed, the surgeon's record of the consultation with Ms. Iglesias also states ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Doc. 249-1 at 1 ▬▬▬▬▬▬▬▬ The record notes that Ms. Iglesias was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and that while ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.* at 1, 3. Under these circumstances, I do not think that it was inappropriate to refer to the consultation with the surgeon as a consultation for "gender confirmation surgery." Indeed, I understand that after the April 7 consultation with the surgeon, Ms. Iglesias expressed an interest to BOP again in pursuing breast augmentation and facial feminization to help treat her gender dysphoria, as recommended by the surgeon. I understand that BOP is moving forward with coordinating with the surgeon to provide these procedures for Ms. Iglesias.

9

20.     The Court's April 18 Order also questions why Defendants did not report that the surgeon refers patients to other providers for vaginoplasty in these subsequent status reports. As noted, we reported this information in Ms. Epplin's March 4 declaration. We did not report it again in future status reports because the information had already been disclosed, and we did not learn any new information until shortly after the April 7 appointment, when the surgeon again indicated that they would refer out for vaginoplasty and provided a list of potential providers.

21.     In the April 18 Order, the Court notes that its preliminary-injunction opinion stated that "[f]or the purposes of this order, GCS refers to gender reassignment surgery or surgeries altering one's reproductive organs," Doc. 238 at 2 n.1, 25 (citing Doc. 176 at 1 n.1), and appears to suggest that it was inappropriate for BOP to proceed with a surgeon who referred patients to other providers for vaginoplasty. But I did not understand the term "gender-confirmation surgery" to mean vaginoplasty only. Rather, as noted, I understood that the term can refer both to surgeries that alter one's reproductive organs (such as vaginoplasty) and also to surgeries (such as facial feminization and breast augmentation) that do not alter one's reproductive organs.

22.     In addition, while I understood that Ms. Iglesias has been primarily focused on obtaining vaginoplasty, I did not understand this to be the only procedure she was requesting. I knew, for example, that gender-confirmation surgery often involved both "top" and "bottom" surgeries, and, as noted above, I am aware from separate litigation that BOP has agreed to provide both top and bottom surgeries to at least one other individual in BOP custody. I also understand that Ms. Iglesias herself requested that BOP provide top surgery in 2019 and that, after the April 7 consultation with the surgeon, she expressed an interest to BOP again in pursuing breast augmentation and facial feminization to help treat her gender dysphoria, as recommended by the surgeon. I understand that BOP is moving forward with these procedures. Thus, for all these reasons, I believe that it was

appropriate to refer to the appointment with the surgeon as a consultation for gender confirmation surgery.

23.  In addition to filing weekly status reports with the Court, my colleagues and I were also in regular contact with Ms. Iglesias's counsel about her care and BOP's search for a surgeon.  On March 8, 2022, Ms. Iglesias's counsel requested more information on the criteria that BOP and its contractor were using to identify and evaluate surgeons for Ms. Iglesias.  My colleagues and I conferred with BOP on counsel's request and responded with the information that was available to BOP at the time.  I explained that the contractor had identified two surgeons after researching area providers and reaching out to board-certified surgeons and transgender-care clinics.  I also provided the curriculum vitae of one of the surgeons and noted that information about the other surgeon's education, training, and patient satisfaction was available from their website.  I did not explain again that the first of the two surgeons had informed BOP's contractor that they refer patients out for vaginoplasty because we had recently disclosed this information in our March 4 filing.  In response to a follow-up email from Ms. Iglesias's counsel, I also made clear that we were not prohibiting Ms. Iglesias's counsel from contacting any of the surgeons that BOP had identified.  We explained that we had designated the surgeon's name as confidential under the protective order to prevent it from appearing on the public docket, but that the protective order did not prohibit Plaintiff's counsel from contacting the surgeon.

24.  On April 7, 2022, after the consultation with the surgeon, we had a call with Ms. Iglesias's counsel in which they expressed their concern and surprise that the surgeon advised Ms. Iglesias during the consultation that they do not perform vaginoplasties.  I asked if Ms. Iglesias's counsel knew whether a referral for vaginoplasty was discussed during the consultation, as it was my understanding that the surgeon referred patients to other providers for vaginoplasty, as BOP had previously reported.  They indicated that they did not believe such a referral was discussed.  I asked if Ms. Iglesias's counsel had made an effort to contact the surgeon in advance of the appointment, and

11

they indicated that they had attempted to contact the surgeon but had been unable to get answers to their questions. I explained that BOP would need to review the medical record from the appointment before determining appropriate next steps but that my hope and expectation was that the surgeon would work with another provider either on their team or outside of their practice to coordinate Ms. Iglesias's care, so as to ensure that she received vaginoplasty before her release date in December 2022, which the surgeon had previously suggested was feasible.

25. Since the April 7 consultation, my DOJ and BOP colleagues and I have worked to ensure that Ms. Iglesias receives the surgery that she seeks as expeditiously as possible. In recent weeks, the parties have worked together to resolve this matter through a settlement agreement and stipulated order that ensure Ms. Iglesias will either receive the medical care she requires while she is in BOP custody or, if after her release from BOP custody, will receive the care she needs at no cost to her. I am very pleased that the parties were able to reach this mutually beneficial resolution.

26. At the same time, I continue to regret that the Court remains concerned with the Government's actions and representations in this case. As noted in my prior declarations, I consider it a great honor to represent the United States, and believe that honor places a corresponding obligation on Government attorneys to hold themselves to the highest standards of ethics, professionalism, and candor to the courts. As stated in my prior declarations, I do not believe that I or any of my colleagues in this matter have engaged in misconduct, attempted to mislead the Court, or taken any action to inappropriately delay Ms. Iglesias's receipt of health care she requires. While I am glad that we have been able to reach a resolution with Ms. Iglesias that guarantees her the care she needs, I am very sorry that we continued to cause the Court concern notwithstanding our best efforts to represent the Government's interests ethically and professionally in this difficult and important matter.

_____
JOHN ROBINSON