UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRISTINA NICHOLE IGLESIAS
(a.k.a. CRISTIAN NOEL IGLESIAS),

    Plaintiff,

v.

IAN CONNORS, *et al.*,

    Defendants.

Case No. 19-cv-00415-NJR

### Declaration of Daniel Schwei

I, Daniel Schwei, make the following declaration, in accordance with the provisions of 28 U.S.C. § 1746:

1.    I am employed by the U.S. Department of Justice (DOJ) in the Civil Division's Federal Programs Branch.  I currently serve as a Special Counsel, which is a Senior Level career civil-service position.

2.    Since graduating from law school, I have spent my entire legal career in public service.  I first clerked for a judge on the United States Court of Appeals for the Sixth Circuit, and then joined the Federal Programs Branch in October 2010 through the Attorney General's Honors Program.  I have remained at the Federal Programs Branch since October 2010, except for a temporary seven-month detail in 2020 to the Federal Bureau of Investigation's Office of General Counsel.

3.    As a career public servant who has served in the Federal Programs Branch across multiple Administrations, I consider it an honor and privilege to represent the United States.  I take seriously the Department of Justice's ethos that our responsibility is not to obtain courtroom victories, but rather to pursue justice on behalf of the United States as a whole.  For similar reasons,

-1-

I take seriously my duties as an attorney to act ethically, to comply with the rules of professional responsibility, to fulfill my duty of candor to opposing counsel and to the Court, and to comply with all court orders.

4.     Because of the importance I place on acting ethically and professionally, I deeply regret that this case has caused the Court to doubt the Department of Justice's actions and candor. I believe I have acted ethically, professionally, and reasonably at all times in this case – and I believe the same of my DOJ colleagues.  Based on my involvement in this case, I do not believe there is any basis to impose personal sanctions on any Department of Justice attorney.  However, I acknowledge that there have been mistakes and miscommunications during the case.  I do not believe that any of those mistakes or miscommunications were intentional or deliberate. Nonetheless, I wish to apologize for any negative impact that those mistakes and miscommunications have had on the Court and on Ms. Iglesias.

## I.     Summary of My Actions and Understanding Regarding Surgeon 1

5.     I have consistently endeavored in this case to provide the Court (and Plaintiff) with accurate, timely, and complete information to the best of my ability based on the information that has been provided to me.  I have been reliant on others to provide me with information concerning Ms. Iglesias's care and Surgeon 1, because I have not had any direct contact with any of Ms. Iglesias's potential medical providers (including Surgeon 1), nor have I had any direct contact with BOP's contractor responsible for arranging Ms. Iglesias's medical care.  Instead, I have been required to rely on communications relayed to me indirectly, frequently with multiple layers in between (*e.g.*, Surgeon 1 communicating with the contractor, which in turn communicates with BOP, which then communicates with DOJ).

6.     Prior to April 7, 2022, my understanding was that Surgeon 1 either personally performed vaginoplasties or at least evaluated and helped coordinate patients' requests for

vaginoplasties (and as of March 3-4, 2022, I believed the latter to be true).  In particular, I believed that even if Surgeon 1 did not personally perform vaginoplasties, the initial consultation with Surgeon 1 would still involve discussion of the vaginoplasty procedure and would meaningfully advance arrangements for that procedure, because I believed Surgeon 1 was part of a broader team of doctors that provided comprehensive care for individuals seeking gender-affirming surgical procedures, and that Surgeon 1 was an "entry point" for an individual interested in obtaining care from that broader team.  Thus, to the extent Surgeon 1 did not personally perform vaginoplasties, my understanding and expectation was that Surgeon 1 would provide a direct, seamless referral to a colleague who could perform the vaginoplasty for Ms. Iglesias.

7.     Based on that understanding, I was surprised and concerned to learn on April 7, 2022, that Ms. Iglesias's consultation with Surgeon 1 did not include any meaningful discussion of the vaginoplasty procedure.  That was inconsistent with my understanding of the purpose of that consultation—*i.e.*, as being primarily in pursuit of a vaginoplasty.

8.     In June 2022, in the course of the Government preparing its response to this Court's most recent Order to Show Cause, Doc. 238, I learned for the first time that, on February 14, 2022, BOP received information from Surgeon 1 indicating "[w]e do not offer vaginoplasty yet."  That information was not provided to me at any point in time prior to June 2022.  I also am not aware of any of my DOJ colleagues receiving that information until approximately the same timeframe.

9.     Had I been aware of this information, I would have taken steps to ensure that this information was timely disclosed to the Court (and to Plaintiff), and would have advised BOP differently regarding their overall plan for Ms. Iglesias's care.  Unfortunately, I was simply unaware of this information during the relevant points in time.  Instead, I believed the April 7 consultation would be a meaningful step towards obtaining a vaginoplasty and acted accordingly.

I believe my actions and understandings were reasonable, based on the information available to me at the time, although I very much regret that my understanding was mistaken and that the confusion surrounding the April 7 consultation was not avoided.

10.     In the sections that follow, I discuss my actions and understandings in more detail, including at different moments in time.

## II.     Background on My Involvement in the Case

11.     I first became aware of this case on February 10, 2022, after the Court issued its first Order to Show Cause regarding injunction compliance and certain representations made by attorneys in this case. *See* Doc. 187.  Given that the Court's Order specifically named attorneys who had been working on this case as potential subjects of sanctions, *id.* at 6, my colleague James Gilligan and I were assigned to represent the United States' interests in connection with responding to the Court's Order to Show Cause.  Mr. Gilligan had previously planned travel that made it difficult for him to attend the February 22, 2022 show cause hearing, so it was decided that I would be assigned to handle the February 22 hearing.

12.     I entered my appearance in this case on February 14, 2022.  Doc. 190.  Later that night, I filed Defendants' Response to the Court's Order to Show Cause, which was accompanied by eight declarations.  Doc. 191.  On February 18, I filed a Notice along with a supplemental declaration from an attorney, Doc. 196, as well as a Notice and supplemental declaration from Dr. McLearen, Doc. 197.  Following this Court's Notice and Order entered on February 21, 2022, Doc. 198, I also signed Defendants' Response to that Notice and Order, Doc. 199.

13.     I attended the show cause hearing on February 22, 2022, during which I noted that I was assigned to "handl[e] issues related to the Court's Order to Show Cause."  Tr. at 7.  Following the February 22 hearing, the Court provided Defendants an opportunity to supplement their Response to the February 21 Notice and Order.  *See* Doc. 200.  On February 28 I filed a consent

motion for a 48-hour extension of the deadline for that filing, *see* Doc. 207, and on March 4 I filed Defendants' Supplemental Response to the Court's February 21, 2022 Notice and Order, Doc. 214. That supplemental response was a legal brief approximately 25 pages long, and was accompanied by four additional declarations and excerpts from a deposition transcript. *See id.*

14.     Aside from the filings discussed above, I have not filed any other documents in this case. To my knowledge, my name has not appeared on the signature block for any other filings in this case. My communications with Plaintiff's counsel have also generally been limited to issues involving contempt and/or sanctions.[1]

## III.   My Connection to the Filings Cited in the Court's Order to Show Cause

15.     I have read the Court's Memorandum and Order dated April 18, 2022 (Doc. 238). In that Order, the Court directs that "DOJ attorneys are hereby ORDERED to SHOW CAUSE in writing on or before April 28, 2022, why sanctions should not be imposed." *Id.* at 30. I am one of the DOJ attorneys specifically ordered to appear and show cause why sanctions should not be imposed. *Id.* at 31.

16.     The Court's Memorandum and Order notes that "[t]he Court and DOJ attorneys have spent a significant amount of time addressing the following events," and then lists seven specific events. *Id.* at 29. As discussed above, I was not involved in any of those seven events. Instead, my role was to represent the United States' interests in connection with the Court's first Order to Show Cause and February 21 Notice and Order surrounding those seven events.

---

[1] I was the primary attorney who handled discussions with Plaintiff's counsel in connection with negotiating a briefing schedule on their motion for a modified preliminary injunction. *Cf.* Doc. 213 at 1 n.1 (noting an agreed-upon briefing schedule). That was principally because, when Plaintiff's counsel first sought to meet-and-confer regarding their forthcoming motion, they initially planned to style it as a motion for sanctions against Defendants. I have frequently been copied on e-mails between Defendants' counsel and Plaintiff's counsel, but my own communications with Plaintiff's counsel have generally been limited to the topics of contempt and/or sanctions issues.

17.     The Court's April 18 Memorandum and Order also directs:

DOJ attorneys are hereby ORDERED to SHOW CAUSE in writing on or before April 28, 2022, why sanctions should not be imposed.  Specifically, the DOJ attorneys shall address their continued representations in Docs. 204, 212, 220, 221, 227, 229, and 231.

Doc. 238 at 30.  I have reviewed each of the seven docket entries cited in the Court's Memorandum and Order, and confirmed that I did not submit any of those filings, nor does my name appear on the signature block for any of those filings.

18.     I understand that, in general, the Court is concerned with Defendants' representations regarding Surgeon 1, given that Surgeon 1 does not personally perform vaginoplasties.  I therefore address below my understanding at the relevant points in time with respect to Surgeon 1 and Plaintiff's request for a vaginoplasty.

IV.     **My Awareness of Surgeon 1 Not Personally Performing Vaginoplasties**

19.     As described above (in paragraphs 5-9), prior to Ms. Iglesias's initial consultation with Surgeon 1 on April 7, 2022, my understanding was that Surgeon 1 either performed vaginoplasties or at least helped coordinate patients' requests for vaginoplasties through direct, seamless referrals to other surgeons who could perform vaginoplasties (and my understanding was the latter as of March 3-4, 2022).  Based on what I know now, my understanding regarding Surgeon 1 was incorrect.  I genuinely regret that I had a misimpression of the facts.  As discussed further below, however, I believe my understanding was at least reasonable, and therefore does not provide a basis for sanctions.

A.     **Time Period Surrounding February 22 Order to Show Cause Hearing**

20.     It is difficult for me to recall exactly what I knew about Surgeon 1 and when.  As noted above, I first learned about this case and was assigned to it on February 10, 2022.  I immediately needed to familiarize myself with the history of this case, assist in preparing a written

response to the Order to Show Cause (due four days later on February 14, 2022), and begin preparing for the hearing on February 22, 2022, during which two BOP officials would be called as witnesses.  Thus, this time period was extremely intense and fast-moving, which makes it difficult to recall precise understandings at different moments in time.

21.     My recollection is that sometime shortly after I was assigned to the case, likely on Friday, February 11, 2022, I first learned BOP had identified, through its contractor, a potential surgeon located in Florida (Surgeon 1).  Dr. McLearen addressed the identification of this surgeon in her February 14 declaration, *see* Doc. 191-2 ¶ 20, and also in her supplemental declaration filed on February 18, 2022.  *See* Doc. 197-1 ¶¶ 2-9.  I believe I first learned the specific identity of Surgeon 1 on or about February 15, 2022.

22.     During the week of February 14-18, 2022, my DOJ colleagues and I communicated frequently with BOP, both in writing and orally, regarding the filings mentioned in the prior paragraph as well as in preparation for the show cause hearing scheduled for February 22, 2022. At no point during this timeframe was I informed that BOP had received a communication from Surgeon 1 indicating that they do not offer vaginoplasty yet.

23.     To the contrary, my understanding during this timeframe was that Surgeon 1 likely personally performed vaginoplasties.  That procedure was the primary focus of the litigation at that time, and I believed, based on communications with BOP during the week of February 14-18, that BOP's efforts to locate a surgeon were specifically intended to address Ms. Iglesias's request for a vaginoplasty.

24.     During this same timeframe, I understood from BOP that there was some uncertainty regarding the exact procedures Surgeon 1 would personally perform.  (That is why, in the prior paragraph, I said that I believed Surgeon 1 "likely" personally performed vaginoplasties,

because I understood there to be some uncertainty on the question.)  I recall Dr. McLearen mentioning this uncertainty during at least one conversation during the week of February 14-18 (in advance of the February 22 hearing), and I also received a written communication from BOP on February 18 noting the uncertainty.  At the time, I understood this uncertainty to stem from the fact that BOP, through its contractor, had only received a limited amount of information about Surgeon 1 and Surgeon 1's qualifications, and BOP, through its contractor, was still in the process of trying to gain more such information.  I also understood it to be very early in the overall process of arranging for Ms. Iglesias to become a potential patient of Surgeon 1.  For all of these reasons, I understood BOP to be reluctant to state definitively that Surgeon 1 could personally perform *all* aspects of Ms. Iglesias's requested treatments.  I do not recall anyone from BOP communicating that Surgeon 1 does not perform vaginoplasty, or that BOP had received any specific information to that effect.

25.  Regardless, my understanding was that, even if Surgeon 1 did not personally perform certain aspects of Ms. Iglesias's requested treatment, Surgeon 1 operated as part of a broader team of professionals that provided comprehensive care for individuals seeking gender-affirming surgical procedures, and that BOP viewed Surgeon 1 as the "entry point" for an individual interested in obtaining care from that broader team of doctors.  Thus, I understood that, to the extent Surgeon 1 did not personally perform vaginoplasties (and assuming Surgeon 1 accepted Ms. Iglesias as a patient), then Surgeon 1 would directly, seamlessly refer Ms. Iglesias to another doctor on Surgeon 1's team to perform the vaginoplasty.  For that reason, I believed that pursuing treatment from Surgeon 1 would still be in pursuit of a vaginoplasty, notwithstanding the uncertainty as to whether Surgeon 1 would personally perform that procedure.

26.     As noted, this understanding was based on information provided to me by BOP in connection with the two filings submitted on February 14 and 18, as well as during the course of our preparations for the February 22 hearing.  Additionally, my understanding was based on and consistent with, among other things:

   a. Dr. McLearen's February 14 declaration, in which Dr. McLearen reported that BOP's medical-services contractor stated that "they have located an appropriate surgeon," Doc. 191-2 ¶ 20;

   b. Dr. McLearen's February 18 declaration, describing how "BOP has been informed by the contractor that it has located a surgeon to potentially perform Iglesias's gender-confirming surgery," Doc. 197-1 ¶ 2;

   c. Throughout this time, my understanding was that BOP's medical-services contractor was principally responsible for locating an appropriate medical provider (at least in the first instance, subject to BOP subject-matter experts later confirming the provider's qualifications).  *See, e.g.*, Robinson Decl. (Doc. 210-1) ¶¶ 17-18. My understanding was that the contractor knew what procedures Ms. Iglesias was seeking (including, as relevant here, a vaginoplasty), and was familiar with locating appropriate medical providers and arranging for appropriate medical care.  Thus, my understanding and expectation was that the contractor would identify surgeons capable of performing Ms. Iglesias's requested vaginoplasty, or at least surgeons who would be able to meaningfully coordinate Ms. Iglesias's request for a vaginoplasty.  In my mind, the contractor was in the best position to evaluate (at least in the first instance) whether it had located an "appropriate surgeon" for Ms. Iglesias's requested vaginoplasty, consistent with its responsibilities under the contract.  Once I learned that BOP was "informed [by the contractor] they have located an appropriate surgeon," Doc. 191-2 ¶ 20, I therefore believed it made sense for BOP to report that information to the Court, and I believed that information to be accurate based on my understanding of the contractor's role.

   d. My understanding was also consistent with informal research I performed regarding Surgeon 1.  Specifically, shortly after I learned Surgeon 1's identity (*i.e.*, on or around February 15, 2022), I recall reviewing two websites:

These materials were consistent with my understanding that Surgeon 1 practiced as part of a broader team, and that the initial consultation with Surgeon 1 would help provide access to the full suite of providers, regardless of what procedures Surgeon 1 could personally perform.

e.  I am not an expert in transgender health care or the surgical procedures necessary for a vaginoplasty, and during this timeframe, I did not know whether a vaginoplasty constituted only a single procedure. Specifically, I thought that, in order to obtain a vaginoplasty, it might first be necessary to undergo other procedures (beyond just permanent hair removal) – for example, I thought that the testicles and/or penis might need to be removed prior to receiving the vaginoplasty itself. I was aware that removal of the testicles (orchiectomy) and penis (penectomy) were potential surgical interventions based on my review of the WPATH Standards of Care, but it was not clear to me whether these procedures were performed as part of a vaginoplasty, or were independent procedures that needed to be performed prior to a vaginoplasty. Thus, BOP's reluctance to state definitively that Surgeon 1 would personally perform every aspect of Ms. Iglesias's requested treatment made sense to me, because it seemed possible to me that there could be multiple steps towards achieving the vaginoplasty, requiring a team of multiple surgeons, and Surgeon 1 might participate in some of those procedures even if Surgeon 1 did not perform the vaginoplasty itself.

27.  At the February 22 hearing, I believed and understood Dr. McLearen's testimony to be consistent with my understanding about Surgeon 1 and Surgeon 1's ability either to personally perform the vaginoplasty or seamlessly refer Ms. Iglesias to another doctor on Surgeon 1's team who could perform the vaginoplasty. For example, Dr. McLearen stated that "the contractor has identified somebody that they said is appropriate to perform the surgery," Feb. 22 Tr. at 75, and testified several times that BOP's goal was to obtain comprehensive care from the team of providers affiliated with Surgeon 1. *See, e.g.*, *id.* at 49 ("[W]e have explained we want this to be comprehensive. The first step would be actually meeting with this surgeon to understand what their team is willing to do, but that we would want everything to be included, and I have been informed that the contractor understands that."); *see also id.* at 33, 100-01, 102.

28.  That testimony (and other information received in this timeframe) informed and was consistent with my understanding – *i.e.*, that the appointment with Surgeon 1 was for the purpose of gaining access to the "team of surgeons" affiliated with Surgeon 1. I understood that

Surgeon 1 was simply "the identified surgeon" to "get in front of" in order to unlock access to the full "team of surgeons," Feb. 22 Tr. at 101, and that team would include a surgeon who could perform vaginoplasty (even if that person was not Surgeon 1).[2]

29.      Following the February 22 hearing, Defendants submitted their first weekly status report on February 25. *See* Doc. 204. In a declaration attached to that status report, Dr. McLearen reported that Surgeon 1 noted that two letters of support would be required "for any type of 'bottom surgery,'" and that "if Ms. Iglesias only wants 'bottom surgery', that could feasibly all be accomplished in the given time frame (i.e. by December 2022)." Doc. 204-1 ¶ 5. I interpreted those statements as essentially confirming my understanding—that Surgeon 1 would either personally perform Ms. Iglesias's vaginoplasty, or meaningfully coordinate Ms. Iglesias's vaginoplasty—because I did not think Surgeon 1 would offer those opinions regarding vaginoplasty if Surgeon 1 did not intend to have at least some role in performing or arranging that procedure.

30.      As noted above, at no point prior to April 7 was I informed that neither Surgeon 1 nor any member of Surgeon 1's team was able to perform Ms. Iglesias's vaginoplasty. Thus, I did not believe that there was any misrepresentation, inaccuracy, or other material omission made in any of the above-described testimony or filings submitted to the Court regarding Surgeon 1. Had

---

[2] Because I believed Surgeon 1 to be part of a broader team of providers, I understood that the consultation with Surgeon 1 might include discussion of other potential procedures in addition to vaginoplasty (*e.g.*, "top" procedures like breast augmentation and facial feminization). *Cf.* Feb. 22 Tr. at 62 ("The surgeon will be a recommender of what needs to come next. . . . So, while I am aware of what is likely to be needed, every case is different and I am giving that deference to the surgeon."); *id.* at 102 ("[W]e are going to send you to a surgeon who's an expert and they are going to decide what exactly is needed and how much and how long and work with their team."). Nonetheless, my understanding at this time—and at every point prior to April 7—was that the initial consultation with Surgeon 1 would primarily be in pursuit of a vaginoplasty, since that was the procedure that was the focus of the litigation at the time.

I been aware of any such misrepresentations, inaccuracies, or material omissions, I would have taken steps to ensure that any errors were corrected and that the Court (and Ms. Iglesias) were given accurate information regarding Surgeon 1.

**B.  March 4 Status Report and Declaration**

31.     I do not recall with certainty when exactly I first learned that Surgeon 1 in fact does not personally perform vaginoplasties, but I am confident that it was sometime on March 3 or 4, 2022, in connection with my review of the Epplin declaration (or a draft of the Epplin declaration) that was filed at Doc. 212-1 as an attachment to Defendants' March 4 status report.  Specifically, that declaration states:  "BOP was also advised that Surgeon 1 refers patients out to other providers for vaginoplasty and was advised the contractor would find out who those providers are." Doc. 212-1 ¶ 6.

32.     I cannot recall whether I read that sentence on March 3 or March 4 because, at that time, I was centrally focused on preparing Defendants' supplemental response to the Court's February 21 Notice and Order, which was also due on March 4, 2022.  As noted above, that filing was directly related to my role in this case (representing the United States' interests in connection with potential contempt and/or sanctions issues), and that was a significant, time-consuming filing for my colleagues and me to prepare:  the brief itself was 25 pages long, and the brief relied on four declarations (comprising over 30 pages), plus several pages of deposition testimony excerpts. *See* Docs. 214 through 214-6.  I worked multiple late nights to prepare that filing, and that filing was my overriding focus at that time.  Thus, my recollection of when I learned other facts during that timeframe is somewhat hazy.

33.     Following my review of the March 4 Epplin declaration, my understanding regarding Surgeon 1's role evolved somewhat because at that point I understood that Surgeon 1 did not, in fact, personally perform vaginoplasties.   Regardless, my overall understanding

continued to be that Surgeon 1 operated as part of a team of doctors, and Surgeon 1 was the "entry point" for that broader team of doctors who provided many different types of specialized medical care for transgender patients. Thus, even though Surgeon 1 did not personally perform vaginoplasties, my understanding was that an appointment with Surgeon 1 for an initial consultation was still a significant step towards obtaining a vaginoplasty for Ms. Iglesias – because the consultation with Surgeon 1 would essentially "unlock" access to other providers on Surgeon 1's team, including a provider on the team who would perform a vaginoplasty. I believed that, if Surgeon 1 accepted Ms. Iglesias as a patient, the "referral" for a vaginoplasty would be direct and seamless – because the referral would be to another provider already affiliated with Surgeon 1 and Surgeon 1's team.

34.    Based on what I know now, the understanding described in the prior paragraph was incorrect. Based on the information available to me at the time, however, I believed then (and continue to believe now) that this understanding of Surgeon 1's role made sense, for a variety of reasons:

a.  First, as noted above in paragraph 25, my initial understanding from the time period surrounding the February 22 show cause hearing was that Surgeon 1 operated as part of a broader team of doctors, and that BOP was seeking comprehensive care from that broader team, including with respect to a vaginoplasty for Ms. Iglesias. All of those same reasons (discussed above) continued to support my understanding regarding Surgeon 1 during this time period.

b.  Second, even when BOP's contractor reported on March 3rd that Surgeon 1 did not personally perform vaginoplasties, I understood the contractor to still state that Ms. Iglesias should be "seen for evaluation" by Surgeon 1, at which point Surgeon 1 could advise on hair removal procedures necessary for a vaginoplasty – and assuming Surgeon 1 accepted Ms. Iglesias as a patient, "then the rest [of the procedures necessary for a vaginoplasty] can be entered":

On March 3, 2022, in response to a question about hair removal, BOP was advised by BOP's contractor that 'the patient must be seen for evaluation before anything else is ordered.' Specifically, once Surgeon 1 has determined that Ms. Iglesias 'meets the clinical criteria and has accepted her then the rest can be entered.'

Mar. 4 Epplin Decl. (Doc. 212-1) ¶ 6.  In other words, even while the contractor was reporting that Surgeon 1 did not perform vaginoplasties, I understood the contractor to also be saying that the necessary procedures for Ms. Iglesias's vaginoplasty could be ordered after the consultation with Surgeon 1 if Surgeon 1 accepted Ms. Iglesias as a patient.  *See also id.* ¶ 10 ("[T]he contractor indicated they would reach out to see who Surgeon 1 uses for hair removal [at the surgical site], for the sake of finding such a service consistent with Surgeon 1's practice.").  I understood these statements to mean that the appointment with Surgeon 1 was still in pursuit of a vaginoplasty (potentially among other procedures), and that Ms. Iglesias's vaginoplasty could be performed by Surgeon 1's broader practice, even if Surgeon 1 would not personally perform the procedure.

Indeed, even after March 4, the consultation with Surgeon 1 continued to be linked with hair removal "at the surgical site." *See, e.g.,* Apr. 1 Epplin Decl. (Doc. 231-1) ¶ 8 ("As Surgeon 1 has not yet accepted Ms. Iglesias as a patient, I have been advised BOP needs to provide Surgeon 1 adequate time after the April 7, 2022, consultation in which to make that determination and to provide a physician's order that documents the medical necessity of hair removal at the surgical site[.]").  Because "hair removal at the surgical site" is relevant only in the context of the vaginoplasty procedure, I understood these statements to mean that BOP expected the consultation with Surgeon 1 to be in pursuit of a vaginoplasty (potentially among other procedures).

c. Third, my understanding was further supported by other events after March 4, when I understood BOP's position to be that the best way for Ms. Iglesias to obtain more information about vaginoplasty techniques, results, etc., would be for Ms. Iglesias to raise those questions with Surgeon 1 at the initial consultation.  In my mind, BOP's view that Ms. Iglesias should raise these issues at the consultation with Surgeon 1 re-affirmed to me, at least implicitly, that Surgeon 1 was expected to discuss vaginoplasties at the initial consultation with Ms. Iglesias in anticipation of potentially arranging a vaginoplasty for her, even if Surgeon 1 did not personally perform the procedure.

d. Fourth, on a number of occasions throughout this time period, my DOJ colleagues and I discussed with BOP the issue of whether BOP should pursue a vaginoplasty from the Chicago-based surgeon identified by Plaintiff's counsel.  *See, e.g.,* Mar. 18 Epplin Decl. (Doc. 227-2) ¶ 6; Mar. 25 Epplin Decl. (Doc. 229-1) ¶ 9; Apr. 1 Epplin Decl. (Doc. 231-1) ¶ 6.  Throughout these discussions, BOP's position was that Surgeon 1 was preferable to the Chicago-based surgeon, because Surgeon 1 had been identified by the medical-services contractor and was located in Miami near Ms. Iglesias's community placement.  *Cf.* Mar. 18 Epplin Decl. (Doc. 227-2) ¶ 6 (stating that BOP was willing to consider "whether it might be feasible to have the surgery performed in Chicago *should Surgeon 1 not agree to accept Ms. Iglesias as a patient*" (emphasis added)).  By preferring Surgeon 1 over the Chicago-based surgeon, I understood that to mean that BOP believed Surgeon 1 and the Chicago-based surgeon were both capable of providing vaginoplasties (or at least meaningfully arranging for that procedure through direct referrals).

e.  Fifth, throughout this same time period (both before and after March 4), my DOJ colleagues and I discussed with BOP the issue of obtaining two letters from mental health practitioners in support of Ms. Iglesias's surgery. *See, e.g.*, Feb. 25 McLearen Decl. (Doc. 204-1) ¶¶ 5-6; Mar. 11 Epplin Decl. (Doc. 220-1) ¶ 9; Mar. 18 Epplin Decl. (Doc. 227-2) ¶ 10; Mar. 25 Epplin Decl. (Doc. 229-1) ¶ 7; Apr. 1 Epplin Decl. (Doc. 231-1) ¶ 10; Apr. 8 Epplin Decl. (Doc. 233-1) ¶ 8. I understood, based on my involvement in this case and my review of the WPATH Standards of Care, that two letters of support were required specifically for Ms. Iglesias's requested vaginoplasty (her "bottom surgery"), but not for any potential "top" procedures (which required only one letter of support). Thus, I understood BOP's preparation of two letters of support—specifically in advance of the April 7 initial consultation with Surgeon 1, *see* Doc. 220-1 ¶ 9—to be consistent with my understanding that the scheduled consultation with Surgeon 1 was in anticipation of a vaginoplasty (among other potential procedures).

f.  Sixth and finally, my understanding throughout this time – that an appointment with Surgeon 1 would help "unlock" access to other providers affiliated with Surgeon 1 – was informed by my own personal experiences obtaining specialized health care services. I have experienced situations where, once the patient is at an appointment with a specialist, the specialist is able to "refer" patients to their colleagues (providing other types of specialized care) and that referral is completely seamless and virtually automatic – sometimes as simple as walking down the hallway to the other specialist's office. My own personal experiences with these direct, seamless referrals have been in the same type of environment in which Surgeon 1 practices ███████████████. For all of the reasons discussed above, my understanding was that the "referral" discussed in the March 4 Epplin declaration would be a direct, seamless linking with a surgeon who performs vaginoplasty – such that the initial consultation on April 7 would still be a significant, meaningful step towards Ms. Iglesias receiving a vaginoplasty.

35.  In short, I knew based on the March 4 Epplin declaration that Surgeon 1 did not personally perform vaginoplasties, but I nonetheless still believed that the April 7 consultation with Surgeon 1 would be in pursuit of a vaginoplasty and would be a significant step towards obtaining that procedure. Based on the above, I believe my understanding was at least reasonable.

36.  The Court's April 18 Order to Show Cause questions why "DOJ attorneys have represented that the BOP has scheduled an appointment with a surgeon for a consultation for GCS—despite the fact that BOP was 'advised that Surgeon 1 refers patients out to other providers for vaginoplasty[.]'" Doc. 238 at 29-30. As discussed above, I did not think there was any inaccuracy in describing the April 7 appointment as a "consultation for GCS," given that my

-15-

understanding at the time was that the April 7 consultation would still involve meaningful discussion of the vaginoplasty procedure, and would be a significant step towards obtaining a vaginoplasty for Ms. Iglesias (albeit from one of Surgeon 1's colleagues).  For the same reason, I believed it made sense to continue with the April 7 appointment even after I was informed that Surgeon 1 did not personally perform vaginoplasties – because I believed the April 7 appointment would unlock, and was necessary to unlock, access to Surgeon 1's colleagues who *could* perform the vaginoplasty procedure.

**C.    The Period Between the March 4 Status Report and the April 7 Consultation**

37.    After the March 4 filing and prior to the initial consultation with Surgeon 1 on April 7, 2022, my understanding about Surgeon 1's role remained the same as described above, for the reasons laid out above.  Specifically, even though Surgeon 1 did not personally perform vaginoplasties, I still expected Surgeon 1 to discuss the topic at the initial consultation with Ms. Iglesias and then, if Surgeon 1 accepted Ms. Iglesias as a patient, Surgeon 1 would seamlessly refer Ms. Iglesias to a doctor affiliated with Surgeon 1 who did perform vaginoplasties.

38.    After March 4, 2022, my involvement in this case decreased substantially.  Partly that was because I had responsibilities arising in other cases, which I had not been able to focus on during the period of intense activity in this case (*i.e.*, between when I was assigned on February 10 and the supplemental sanctions filing that I submitted on March 4).  Additionally, after submitting the supplemental sanctions filing on March 4, Doc. 214, there were no longer any upcoming contempt and/or sanctions-related filings.  Thus, although I remained generally aware of what was occurring in the case, I did not draft or submit any filings after March 4.

39.    Nonetheless, I believe I reviewed all (or nearly all) of Defendants' filings submitted during this time period (*i.e.*, between March 4 and April 7).  Because of my understanding set forth above regarding Surgeon 1's role in arranging a vaginoplasty for Ms. Iglesias, I did not think that

any of the filings submitted during this time period were false or misleading.  If I had believed there were any inaccuracies or other ethical problems associated with any of Defendants' filings I reviewed, I would have immediately taken action to ensure that the inaccuracies and problems were corrected.

40.     I am aware that, on March 9, Plaintiff submitted a response to Defendants' March 4 status report and the March 4 Epplin declaration, in which Plaintiff's counsel raised questions about the statement in the Epplin declaration that Surgeon 1 does not perform vaginoplasties.  *See* Doc. 219 at 4 ("Ms. Iglesias seeks clarification whether Surgeon 1—the surgeon with whom Ms. Iglesias has a consultation scheduled for April 7, 2022—is capable of performing vaginoplasty and would perform the procedure for Ms. Iglesias if contracted as the surgeon, or whether this is a typographical error meant to refer to a different procedure.").

41.     I understood that, through this statement, Plaintiff's counsel were seeking information about Surgeon 1's qualifications to perform vaginoplasty.  During this same timeframe, however, Plaintiff's counsel were engaged in ongoing e-mail correspondence with Defendants' counsel about that same subject.  *See generally* Doc. 234-3.  And many of the same topics that Plaintiff's counsel addressed in their March 9 filing were also addressed in the parties' e-mail correspondence.  *Compare, e.g.*, Doc. 219 at 3 ("Ms. Iglesias asks if these are also criteria for her prospective surgeons, and what other criteria Defendants are utilizing."), *with* Doc. 234-3, Exh. A, at 2 (Plaintiff's counsel inquiring on March 8 about "what criteria BOP and [the contractor] are using to identify and evaluate surgeons for Ms. Iglesias"); *and compare* Doc. 219 at 3-4 (listing nine bullet points of information Plaintiff's counsel seek), *with* Doc. 234-3, Exh. A, at 2 (requesting information on essentially the same nine topics).  Thus, I understood Plaintiff's

counsel's inquiry about Surgeon 1 in the March 9 filing to be encompassed within the general exchange of information that was ongoing via e-mail during this timeframe.

42.     Moreover, I understood Plaintiff's counsel's requests for information (including the requests made in their March 9 filing) to be resolved through mutual agreement of the parties approximately one week later.  Specifically, after Defendants' counsel recommended on March 14 that the requested information be sought during the initial consultations, *see* Doc. 234-3, Exh. A, at 1, Plaintiff's counsel responded on March 15:

> Regarding our requests for additional information, we are in a little bit of a bind. You are saying that much of the information will need to come from the surgeons themselves, but you have asked us not to contact [Surgeon 1] and [Surgeon 4]. . . . Accordingly, we reiterate our request for the information outlined in my previous email, or, in the alternative, ask that you withdraw your prohibition on Plaintiff's counsel contacting the surgeons so that we may seek the information directly.

Doc. 234-3, Exh. B, at 2.  Defendants' counsel then responded on March 16, stating that "[w]e previously requested that you not contact [Surgeon 1] because of our concerns," but "we are not prohibiting you from doing so."  Doc. 234-3, Exh. B, at 1.

43.     Although I received these exchanges, I did not view myself as being directly involved in them, given my role on this case (discussed above).  Regardless, I am not aware of anyone at DOJ who, through these exchanges, was attempting to conceal any information pertaining to Surgeon 1 or Surgeon 1's ability to perform a vaginoplasty.  Rather, I genuinely believed that we had resolved Plaintiff's counsel's requests for information pertaining to Surgeon 1 by confirming that Plaintiff's counsel were not prohibited from contacting Surgeon 1 directly, which was one of the options that Plaintiff's counsel suggested in their March 15 e-mail.  *See* Doc. 234-3, Exh. B, at 2.  Far from constituting any effort to conceal the facts regarding Surgeon 1, therefore, I recall being pleased that the parties were able to work cooperatively to resolve the information-sharing issue without needing to place the dispute in front of the Court, and I also

recall thinking that everything was still on track for Ms. Iglesias to have an initial consultation with Surgeon 1 on April 7 regarding her desire for a vaginoplasty.

44.     Had I known beforehand that the initial consultation with Surgeon 1 would not involve any discussion of the vaginoplasty procedure, I would unquestionably have taken steps to ensure that this fact was disclosed to the Court and to Plaintiff's counsel.  I believe the same is true of my DOJ colleagues assigned to this case.  At that time, however, my understanding was that the April 7 initial consultation would involve discussion of the vaginoplasty procedure, and would be a meaningful step towards Ms. Iglesias obtaining that procedure, as discussed above.

**D.     The April 7 Consultation with Surgeon 1**

45.     I do not have first-hand knowledge of what happened at Ms. Iglesias's April 7 consultation with Surgeon 1.  As noted above, throughout my participation in this case, I have not had any direct contact with any of Ms. Iglesias's potential medical providers, including Surgeon 1, nor have I had any direct contact with BOP's contractor.  Instead, I have relied on communications relayed to me indirectly, frequently with multiple layers in between.

46.     I have reviewed the medical record from Ms. Iglesias's April 7 consultation with Surgeon 1, which generally reflects that Ms. Iglesias was evaluated for breast augmentation and facial feminization.  *See* Doc. 249-1.  The record also states that Surgeon 1 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ *Id.* at 4.  My understanding is that, following the April 7 appointment, Surgeon 1 "provided a list of four doctors in Florida who provide vaginoplasty."   Apr. 8 Epplin Decl. (Doc. 233-1) ¶ 5.

47.     I have also reviewed Ms. Iglesias's declaration regarding the appointment, stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-19-

██████████████████████████████████████████████████████ Doc. 234-2, ¶¶ 4, 5, 8.

48.    Ms. Iglesias's description of the April 7 consultation ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████ is fundamentally inconsistent with my prior understanding and expectation of what was going to happen at the April 7 consultation.  When I first learned that the April 7 consultation did not involve any meaningful discussion of the vaginoplasty procedure, I was surprised and concerned, given my prior understanding described above.  ████████████████████████████████████████████████████████

████████████████████████ *See* Doc. 234-2 ¶ 10.

49.    Although I too was surprised by what happened on April 7, I would nonetheless like to apologize to the Court for this situation.  I recognize how much time and attention the Court has devoted to this matter, and how this type of confusion on critical aspects of Ms. Iglesias's medical care only compounds the Court's difficulties, and its frustration.  Moreover, as discussed at the February 22 hearing, my goal in this matter was to assure the Court of everyone's good faith, and to allow the parties and the Court to focus on the important merits issues in the case rather than on potential sanctions or contempt proceedings.  I was unable to achieve this goal, which I very much regret.

### E.    Time Period After April 7 Consultation

50.    Following the April 7 consultation, my colleagues and I immediately recognized the importance of arranging a consultation for Ms. Iglesias with a surgeon who could perform a vaginoplasty.  We worked with BOP in an effort to make that happen as quickly as possible.  *See, e.g.*, Doc. 233-1 ¶¶ 5-6; Doc. 237-1 ¶¶ 5-8.

51.     Additionally, following the April 7 consultation, Defendants submitted additional filings on April 8 and April 15.  *See* Docs. 233, 237.  As relevant here, the April 15 filing stated that "when BOP received a communication from its contractor on March 3 indicating that [Surgeon 1] refers patients for vaginoplasty, it disclosed this fact to the Court in a sworn declaration the next day."  Doc. 237 at 3 (citing Mar. 4 Epplin Decl, Doc. 212-1, ¶ 6).

52.     At the time of the April 8 and April 15 filings, I genuinely believed that the first time BOP learned that Surgeon 1 did not perform vaginoplasties was on March 3.  At the time of those filings, I was unaware of the February 14 communication (discussed above in paragraph 8) in which Surgeon 1 stated that "[w]e do not offer vaginoplasty yet."  Accordingly, at the time of those filings, I was not aware of any inaccuracy or omission in them—and had I been aware of any inaccuracy or omission at the time, I would have taken steps to ensure that it was corrected.

## V.     Although Unfortunate, The April 7 Consultation Does Not Provide a Basis for Attorney Sanctions

53.     Notwithstanding the unfortunate circumstances surrounding the April 7 consultation and its lack of meaningful discussion of the vaginoplasty procedure, I do not believe that sanctions against me personally (or any of my DOJ colleagues) are warranted or necessary.

54.     I am not aware of anyone at DOJ who expected the April 7 consultation to unfold the way it did, with no meaningful discussion or evaluation with respect to the vaginoplasty procedure.  Instead, I expected the April 7 consultation to involve substantive discussion of the vaginoplasty procedure and to be a meaningful step towards Ms. Iglesias receiving a vaginoplasty, and I believe the same is true of my DOJ colleagues who have worked on this case.

55.     Had I known what would happen at the April 7 consultation, I would have taken steps to ensure that Plaintiff's counsel and the Court were likewise aware of those facts.  Similarly, had I known about the February 14 communication to BOP indicating that Surgeon 1 and

Surgeon 1's colleagues "do not offer vaginoplasty yet," I would have taken steps to ensure that fact was disclosed to the Court and to Plaintiff's counsel, and would have advised BOP differently regarding their overall plan for Ms. Iglesias's care.

56.     I recognize now that my understanding of what would happen at the April 7 consultation was incorrect, as was my understanding regarding Surgeon 1's ability to provide a direct, seamless referral to a colleague who could perform a vaginoplasty.  Nonetheless, at all times, I believe that my DOJ colleagues and I acted reasonably based on the information available to us at the time.  We advised BOP about the importance of providing accurate, complete, timely information to the Court; we communicated with BOP about this case almost every day (and frequently multiple times each day); we asked follow-up questions when information provided to us was unclear; and we attempted to partner with BOP as much as possible to ensure that Ms. Iglesias's medical care remained on-track.  In short, I believe we did everything that attorneys are expected to do in terms of advising our client and making reasonable factual inquires supporting the accuracy of our representations to the Court.  Although I believe I acted at least reasonably based on the information available to me, I still very much regret that the April 7 consultation unfolded the way it did, and that the Court and Plaintiff were not provided complete information concerning Surgeon 1 in a timely fashion.

57.     Because I have personally been named in the Court's April 18 Order to Show Cause as being subject to potential sanctions, *see* Doc. 238 at 31, I am no longer in a position to represent the United States' interests in connection with contempt and/or sanctions issues in this case. Nonetheless, I still remain committed to fulfilling the goal I set at the outset of my involvement in this case—*i.e.*, allowing the parties and this Court to focus on Ms. Iglesias's medical care, rather than contempt or sanctions issues.  For that reason, my colleagues and I have worked extremely

hard to ensure that Defendants are addressing Ms. Iglesias's medical needs in a productive manner. I believe that the settlement agreement recently reached by all parties, Doc. 267, is the culmination of our efforts, and is itself strong evidence of our and Defendants' collective good faith in this matter. I am particularly pleased that, in addition to a vaginoplasty, the settlement agreement also contemplates Ms. Iglesias receiving facial feminization and breast augmentation from Surgeon 1 – which I hope will now allow the April 7 consultation to be viewed as a successful part of Ms. Iglesias's overall medical care, rather than an obstacle to such care.

58.     Through this declaration, I have attempted to provide the Court with a thorough, detailed explanation of my conduct at the relevant moments in time. I hope that this declaration demonstrates my good faith and reasonableness in this case. To the extent the Court has any remaining concerns regarding my conduct, however, I would appreciate the opportunity to further address those concerns. In particular, I have drafted this declaration under certain constraints, including my professional duties to protect client confidences and other privileged information, as well as the fact that I have not been a first-hand witness to many of the key communications or events surrounding the April 7 consultation.

59.     As noted at the outset of this declaration, I take very seriously my duties as an attorney to act ethically, to comply with the rules of professional responsibility, to fulfill my duty of candor to opposing counsel and to the Court, and to comply with all court orders. I am committed to fulfilling those duties in this case, and I believe I have acted reasonably and consistent with those duties throughout this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on June 30, 2022.

DANIEL SCHWEI   Digitally signed by DANIEL SCHWEI
                Date: 2022.06.30 20:54:14 -04'00'

Daniel Schwei